UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 09-10243-MLW |
| | ) | |
| RYAN HARRIS, | ) | |
| | ) | |

### GOVERNMENT'S OPPOSITION TO HARRIS'
### (RENEWED) MOTION TO DISMISS SUPERSEDING INDICTMENT

The United States asks the Court to deny defendant Ryan Harris's (renewed) Motion to
Dismiss the Superseding Indictment.   In this motion, Harris repeats some of the arguments that
he made in his previous motion to dismiss (filed 1/24/11) and now also purports to challenge the
validity of the government's conspiracy allegation as well as the constitutionality of the wire
fraud statute.[1]  None of these arguments has merit, and the Court should deny Harris's motion.

### *BACKGROUND – THE SUPERSEDING INDICTMENT*

The 11-count superseding indictment charges Harris with conspiracy to commit wire
fraud, substantive wire fraud, and aiding and abetting wire fraud, based on his involvement with
four Massachusetts residents who stole internet access from their local internet service providers
("ISPs").  The indictment alleges that Harris was the founder, owner, president of, and software
developer for TCNISO, Inc.  Through TCNISO, Harris developed and distributed cable modem
hacking products and services that were designed to, and indeed did, enable users to disguise

---

[1] Because Harris's initial Motion to Dismiss addressed the original indictment rather than
the current superseding indictment, because some of the arguments in that motion are moot in
light of changes from the original to the superseding indictment, and because Harris has
incorporated the remaining claims into his current motion, the Court need not rule on the original
Motion to Dismiss.

themselves as legitimate, paying subscribers in order to defraud their local ISPs into providing them with free, faster, and anonymous internet access.  (Sup. Ind. ¶¶16-18).

The indictment also alleges that Harris and the other TCNISO co-conspirators did far more than just develop and sell modem hacking tools; they expended considerable effort to ensure that TCNISO's users were successful in defrauding ISPs into providing them with free internet access.  Specifically, Harris and the other TCNISO co-conspirators (1) designed and provided  users with a software program called "CoaxThief" so that the users could steal the "MAC addresses"[2] of legitimate paying internet subscribers (Sup. Ind. ¶19); (2) set up a bartering platform on the TCNISO website for users to trade stolen MAC addresses so that they could use them in their own locales (Sup. Ind. ¶¶23, 33); (3) hosted on the website numerous discussions about techniques that ISPs employed to try to detect and block the use of Harris's cable modem hacking products on the ISPs' networks (Sup. Ind. ¶¶24, 34); (4) developed and distributed updates to these products that were designed to work around the ISPs' detection and blocking techniques (Id.); and (5) provided video tutorials, instruction manuals, and other ongoing customer support to ensure that TCNISO's customers could use its products successfully to steal internet access.  (Sup. Ind. ¶22).

The superseding indictment mentions six unindicted co-conspirators.  Two (identified as "I.L." and "C.P.") worked for Harris at TCNISO and will be referred to as the "TCNISO co-conspirators."  C.P. is Craig Phillips, TCNISO's vice president, who was prosecuted in this district for his role in this scheme (Sup. Ind. ¶3) (10-40014-FDS).  Phillips requested that his case be transferred, via Fed. R. Crim. P. 20, to the Southern District of California, where he

---

[2] These are the theoretically unique identifiers that ISPs rely on to identify their legitimate, paying subscribers before providing internet access to them.  (Sup. Ind. ¶¶ 9-11).

lives.  He pled guilty there and is awaiting sentencing.  I.L., a Kentucky resident, was a software developer for TCNISO.  (Sup. Ind. ¶2).  The remaining four unindicted co-conspirators are Massachusetts residents who acquired TCNISO's products and used those products and TCNISO's services successfully to steal internet access in Massachusetts.  (Sup. Ind. ¶¶4-7).

### ARGUMENT

### I.    Venue is Proper in Massachusetts

Harris's challenges to venue in Massachusetts are without merit because each of the counts in the indictment sufficiently alleges venue.  Count one, the conspiracy count, alleges that the co-conspirators committed a series of overt acts in and involving the District of Massachusetts.  Counts two through eleven, the wire fraud and aiding and abetting counts, allege that the underlying completed crimes of wire fraud took place in Massachusetts. As is set forth below, it is well settled that, for a conspiracy charge, venue is proper in any district in which a co-conspirator committed an overt act and, for an aiding and abetting charge, it is proper in any district where the principal completed the underlying crime.

In considering pre-trial motions to dismiss an indictment, courts accept as true the indictment's factual allegations.  See United States v. Ferris, 807 F.2d 269, 271 (1st Cir. 1986) (reviewing district court ruling on pretrial motion to dismiss); United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996) (same); United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985) (same).  Venue is not an element of the offense, and the government bears the burden of proving it, not by a reasonable doubt, but merely by a preponderance of the evidence.  United States v. Salinas, 373 F.3d 161, 163 (1st Cir. 2004); United States v. Lanou, 137 F.3d 656, 661 (1st Cir. 1998).  On appeal, the First Circuit reviews venue determinations "in the light most favorable to the government."  Id.

### A.      The Wire Fraud Charges Adequately Allege Venue

In aiding and abetting charges, venue is proper where the principal committed the underlying crime.  See, e.g., United States v. Mendoza, 108 F.3d 1155, 1156 (9th Cir. 1997); United States v. Winship, 724 F.2d 1116, 1125 (5th Cir. 1984); United States v. Kibler, 667 F.2d 452, 455 (4th Cir. 1982); United States v. Buckhanon, 505 F.2d 1079, 1083 (8th Cir. 1974).  As with conspiracy charges, for offenses that are committed in more than one district, venue lies properly in any district "in which such offense was begun, continued, or completed."  18 U.S.C. §3237(a).  See Lanoue, 137 F.3d at 661.

Here, counts two through eleven allege that Harris committed, and aided and abetted the Massachusetts users in the commission of wire fraud in Massachusetts.  The alleged underlying wire fraud consists of Massachusetts users – N.H., J.L., L.G., and W.M. – making wire transmissions in furtherance of a scheme to defraud Massachusetts ISPs into providing free, faster and anonymous internet access.  (Sup. Ind. ¶¶59-60).

Other courts have held upheld venue in aiding and abetting prosecutions in similar circumstances.  In Mendoza, for example, the Ninth Circuit held that venue in the Western District of Washington was proper where California-based defendants were charged with aiding and abetting Washington-based drug possession.  The Court reasoned that, "assuming those facts to be true, venue properly lies in the Western District of Washington because the crime of . . . aiding and abetting such [drug] possession occurs where the principal commits it."  Mendoza, 108 F.3d at 1156.  Likewise, the crime of aiding and abetting wire fraud charged here occurred where the principals committed wire fraud, namely, in Massachusetts.

The defendant's arguments to the contrary are without merit.  Harris seems to conflate his venue arguments with a challenge to the sufficiency of the evidence, when he asserts that

4

"the government cannot prove that Harris had knowledge of the individual purchasers' motives or that Harris intended to aid them in achieving the results they chose." (Harris Memo at 16). This challenge is premature. Indeed, the Court in <u>Mendoza</u> rejected the defendant's analogous attempts to convert a motion to dismiss for lack of venue into a challenge to the sufficiency of the evidence. The Ninth Circuit, in <u>Mendoza</u>, focused its analysis only on the four corners of the indictment, reasoning that, "Whether the charges are proved remains to be seen, but that's a question for another day." <u>Id.</u>

Here, the Court need not consider, at this point, whether the government will be able to prove that Harris committed and aided and abetted wire fraud in Massachusetts. Rather, the Court should deny Harris's motion to dismiss because the superseding indictment adequately alleges that he did so.

### B.    *The Conspiracy Charge Adequately Alleges Venue*

For conspiracy charges, venue exists where any co-conspirator committed any overt act in furtherance of the alleged conspiracy. <u>United States v. Joselyn</u>, 99 F.3d 1182, 1191 (1st Cir. 1996) (citing <u>United States v. Uribe</u>, 890 F.2d 554, 558 (1st Cir. 1989)). It follows that "the defendant need not have been physically present in the trial district during the conspiracy." <u>Joselyn</u>, 99 F.3d at 1191 (citing <u>United States v. Santiago</u>, 83 F.3d 20, 24-25 (1st Cir. 1996) and others). <u>Accord</u> <u>United States v. Caldwell</u>, 16 F.3d 623, 624 (5th Cir. 1994) ("Venue in a conspiracy case is proper in any district where any overt act occurred . . . even where it permits trial against a defendant in a district where he never set foot") (internal citations omitted); <u>United States v. Perez</u>, 280 F.3d 318, 329 (3rd Cir. 2002). Moreover, "the overt act necessary to support venue in a conspiracy case does not have to be substantial." <u>United States v. Mitchell</u>, 70 Fed.

Appx. 707, 711 (4th Cir. 2003) (noting that "insubstantial acts such as telephone calls to the district have served to establish venue in conspiracy cases").  Id.[3]

Here, the superseding indictment sets forth a series of overt acts allegedly committed by conspirators in Massachusetts.  It alleges that Harris and his co-conspirators advertised their products and services and displayed their user forums in Massachusetts via their website, tcniso.net.  The Massachusetts co-conspirators accessed these websites and forums, ordered products from these websites, and obtained stolen MAC addresses and configuration files and other information from these websites and forums.  (Sup. Ind. ¶¶ 43, 45, 48, 50, 52, 54).  Harris and the TCNISO co-conspirators shipped cable modem hacking products into Massachusetts. (Sup. Ind. ¶¶ 44, 49, 53).  The Massachusetts co-conspirators then used TCNISO's products in Massachusetts to obtain free or faster cable internet access without paying.  (Sup. Ind. ¶¶ 39, 46, 51, 55).  Furthermore, co-conspirator N.H. repeatedly communicated online, from Massachusetts, with Harris and other co-conspirators about using TCNISO's products to steal internet access.  (Sup. Ind. ¶¶ 4, 36).  The indictment also alleges that TCNISO shipped three modified cable modems and Harris's "Hacking the Cable Modem" book to an undercover FBI agent in Massachusetts.  (Sup. Ind. ¶58).

The defendant's arguments that the government has not alleged venue for the conspiracy count are unavailing.  Under the guise of a venue argument, Harris asserts that the government "cannot prove that Harris knew of a conspiracy, intended to join a conspiracy, or intended to

---

[3]See also United States v. Ramirez-Amaya, 812 F.2d 813, 816 (2nd Cir. 1987) (finding venue proper when cocaine flew over district); United States v. Shearer, 794 F.2d 1545, 1550-1551 (11th Cir. 1986) (finding venue proper based on automobile trip through and airplane flight over district); Untied Sates v. Lewis, 676 F.2d 508, 511 (11th Cir. 1982) (finding venue proper based on telephone calls to district); United States v. Prueitt, 540 F.2d 995, 1006 (9th Cir. 1976) (finding venue proper where marijuana was flown over district).

commit a particular crime." (Harris Memo at 20).  As with the wire fraud counts, the Court need

not yet consider what the government can or cannot prove at trial.  Rather, the question is

whether the indictment adequately alleges that Harris joined a conspiracy in which a conspirator

committed an overt act in Massachusetts.  The superseding indictment here does this.

## II.  The Court Should Not Transfer the Case to the Eastern District of California

Harris also asks, in the alternative, that the Court exercise its discretion to transfer venue

to the Eastern District of California.  This request makes no sense, however, as this prosecution

has no connection to the Eastern District of California.  None of the conduct that gave rise to the

superseding indictment occurred there.  Neither the defendant, nor the witnesses, nor the

evidence is located there.[4]  TCNiSO is now defunct, and in any case, was based in San Diego, in

the Southern District, not the Eastern District, of California.  Harris lives in Oregon.   The only

ancillary connection to the Eastern District of California is the fact that the tax fraud prosecution

against Harris, if it proceeds, will likely be venued in that district, because that is where his

allegedly fraudulent tax returns were filed.[5]

---

[4] The only probable West Coast witness is co-conspirator Craig Phillips, who lives in San Diego, not in the Eastern District of California, and who is willing to travel to Massachusetts to testify.  The items that the FBI seized during its search of the now-shuttered TCNISO store in San Diego are all now stored at the FBI office in Boston.

[5] During the course of the investigation that led to this indictment, the IRS agent working on the investigation determined that Harris had failed to report on his tax returns the approximately $500,000 in income he derived from TCNISO from 2005-2008.  But because there was no venue for tax charges in Massachusetts, the government did not include them in this indictment.  Shortly after indictment, however, the undersigned prosecutors met with defense counsel, explained that the financial records demonstrated that Harris had filed fraudulent tax returns, and offered him the option of waiving venue on those tax charges so that the government could seek a superseding indictment in this district that would include tax counts.  That way, Harris would have had to defend against only one prosecution in one district.  He has declined to waive venue, however, so any tax prosecution will likely be brought in the Eastern District of California, where Harris sent his allegedly fraudulent returns for filing.

For this case, however, Massachusetts is by far the more appropriate venue. The wire fraud and many of the overt acts underlying the conspiracy charge took place in Massachusetts. Most of the witnesses are located in Massachusetts, including the four customers/unindicted co-conspirators, representatives from the victimized ISPs, and the FBI case agents. The undersigned AUSA is in the District of Massachusetts, and the DOJ prosecutor is in Washington, D.C., which is a one-hour shuttle away.

Furthermore, transferring venue at this juncture would waste resources. Discovery is largely complete, and defense counsel has been steeped in the facts of this case from the inception. Transferring it to new defense counsel, and potentially new prosecutors, this late in the litigation process, makes no sense. Furthermore, transferring the case to California would significantly delay the trial and would be extremely burdensome to the government, as the case agents would have to travel across the country, as would both prosecutors (if they continued with the prosecution). The Court should therefore decline to transfer the case to the Eastern District of California. See United States v. Winter, 663 F.2d 1120, 1150 (1st Cir. 1981) (finding no abuse of discretion in denying transfer motion where two defendants lived in Las Vegas but others lived in Massachusetts, as did many of the Government's witnesses and some of the defense witnesses), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997); United States v. Stephenson, 895 F.2d 867, 875 (2nd Cir. 1990) ("Although [the defendant] points to several considerations favoring the District of Columbia as a more convenient forum, the residences of a number of Government witnesses and the location of the prosecutor and the documents and tape recordings . . . favored holding the trial in the Southern District [of New York]. The district court did not abuse its discretion in denying the Rule 21(b) motion").

**III.    The Court Should Reject Harris's Remaining Arguments for Dismissal**

Scattered throughout Harris's Memorandum are additional attacks on the superseding indictment and what he assumes to be the government's evidence, and he appears to be urging the Court to rely on these arguments in dismissing the indictment pre-trial.  Harris suggests that a seller of criminal tools in his position cannot, as a matter of law, be criminally liable for the crimes of his customers (Harris Memo 14-21); he argues that the charged conspiracy is actually multiple conspiracies (Id. 21-24); and he asserts that the wire fraud statute, as applied here, is void for vagueness (Id. 25-31).  None of these claims has merit.

**A.    *Legal Framework***

As is mentioned above, in evaluating a pretrial motion to dismiss, courts take all facts alleged by the government as true.  See Ferris, 807 F.2d at 271.  Thus, to prevail on a motion to dismiss, Harris must show that the conduct charged in the indictment is not prohibited by the language of the statute.  United States v. Pirro, 212 F.3d 86, 91 (2d Cir. 2000) (affirming dismissal of a tax count that failed to charge a violation of a known legal duty).

The elements of conspiracy are (1) an agreement between two or more people to commit a crime; (2) the defendant willfully joined the agreement; and (3) a conspirator committed an overt act in furtherance of the purpose of the conspiracy.  First Cir. Pattern Jury Instr. (Criminal) 4.03 (1998).  It is not necessary to prove that the defendant "agreed specifically to or knew about all of the details of the crime, or knew every other co-conspirator or that he/she participated in each act of the agreement or played a major role . . . ."  Id.  Furthermore, the defendant's intent to join the conspiracy "may be inferred from the surrounding circumstances."  Id.

The elements of wire fraud are: (1) a scheme to defraud or obtain money or property by means of false or fraudulent pretenses, involving a material misrepresentation; (2) the

defendant's knowing and willful participation in the scheme with the intent to defraud; and (3) the use of interstate wire communications in furtherance of the scheme.  First Cir. Pattern Jury Instr. (Criminal) 4.13 (1998); Neder v. United States 527 U.S. 1, 25 (1999).

In order to convict a defendant of aiding and abetting, the government must prove "that the defendant associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed."  United States v. Medina-Roman, 376 F.3d 1, 6 (1st Cir. 2004) (citations omitted).  The defendant "need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its execution to be guilty of aiding and abetting."  First Cir. Pattern Jury Instr. (Criminal) 4.03 (1998).

### B.     Sellers of Criminal Tools Can be Criminally Liable

A fairly robust body of case law supports the proposition that a supplier of goods or services to a known criminal undertaking can, under certain circumstances, be held criminally liable for the purchasers' crimes.  2 LaFave and Scott, Criminal Law (Second Edition), "Conspiracy:  Providing Goods or Services," 6.4(e)(3), pp. 537-39 & fn.150 (1986) (listing factors that courts have considered and citing cases).  In the conspiracy context, the pivotal question in imposing criminal liability is whether the "supplier shared the intent to achieve the criminal objective," id., or, stated otherwise by the Supreme Court in Direct Sales, whether he had taken "the step from knowledge to intent and agreement."  Direct Sales Co. v. United States, 319 U.S. 703, 713 (1943).

As with the defendant's venue-based claims, the Court should consider, at this point, whether the superseding indictment *alleges* that Harris shared the criminal intent of TCNISO's users.  See United States v. Senibaldi, 959 F.2d 1131, 1133 (1st Cir. 1992) (holding indictment "sufficient to withstand the motion to dismiss" where defendant's motion was based on "issue . .

10

. of evidence, not of pleading"). The superseding indictment does properly allege intent in a variety of ways.

### 1.    TCNISO's Products Were Inherently Susceptible to Illegal Use

The superseding indictment alleges that the tools Harris sold through TCNISO were designed to allow users to fraudulently obtain free or faster internet service, to steal MAC addresses belonging to paying subscribers, to evade detection by ISPs, and to disguise their true online identities.  (Sup. Ind. ¶¶ 16-20).  Furthermore, at trial, the government will introduce evidence that, contrary the assertions in Harris's Memorandum (pages 9-11), TCNISO's products had no practical legal purpose.

Courts have repeatedly held that where, as here, the very nature of the products or services supplied are inherently suspicious, a jury can infer that the supplier had the requisite criminal intent.   For example, in Direct Sales, the Supreme Court upheld the conspiracy conviction of a mail order wholesaler who mailed morphine sulphate to an out-of-state physician, who in turn dispensed morphine illegally.   The Court contrasted a supplier of toy pistols or hunting rifles to a supplier of machine guns, stating:

> all articles of commerce may be put to illegal ends.  But all do not have inherently the same susceptibility to harmful and illegal use.  Nor, by the same token, do all embody the same capacity, from their very nature for giving the seller notice the buyer will use them unlawfully.  Gangsters, not hunters or small boys, comprise the normal private market for machine guns.  So drug addicts furnished the normal outlet for morphine . . . .
>
> This difference is important for two purposes.  One is for making certain that the seller knows the buyer's intended illegal use. The other is to show that by the sale he intends to further promote and cooperate in it.  This intent, when given effect by overt act, is the gist of conspiracy.

Direct Sales, 319 U.S. at 710-711.

Similarly, in United States v. Brown, the First Circuit held that a defendant charged with participating in a conspiracy to utter forged checks "may not be permitted to escape liability by alleging that he merely conspired to transfer checks, and not to utter them, when it was apparent to him that the ultimate and necessary consequences of the scheme was to utter the checks, and when the defendant, by attempting to procure appropriate identification, made a substantial effort to further that end."  495 F.2d 593, 599 (1st Cir. 1974).

Likewise, in United States v. Grunsfeld, the Sixth Circuit upheld the conspiracy conviction of a chemist who sold lab equipment and chemicals to co-defendants who in turn illegally manufactured PCP.  558 F.2d 1231, 1237 (6th Cir. 1977).  The court reasoned, in part, that "the materials which [defendant] obtained for the conspiracy were hard-to-get items which are often used in the production of illegal drugs."  Id. at 1236.

Here, as in the cases cited above, the defendant's self-styled "cable modem hacking" tools were "inherently susceptible to illegal use" and were "hard-to-get items often used," and designed, to steal internet access.  Similarly, as alleged in the indictment, the software that the defendant named "CoaxThief" was a tool designed to allow users to steal "coaxial cable" information, namely, MAC addresses and configuration files.

The defendant's insistence that TCNISO's products are designed for "educational," "jailbreaking," or "diagnostic purposes" rings hollow and, in any event, is not relevant to the question at issue in his pre-trial motion to dismiss the indictment, which is simply whether the government has alleged that he shared the intent of TCNISO's users.

2.      *Harris Provided Continued Support to TCNISO's Users*

Courts have repeatedly held that where the supplier of criminal tools offers additional assistance to the users, a jury can infer that the supplier had the requisite criminal intent.  In United States v. Chamley, 376 F.2d 57, 59 (7th Cir. 1967), the court reasoned that "the defendant actively cooperated with those who fraudulently completed and transferred the checks and money orders by giving them the check protector, a device which assisted them in creating an indicia of genuineness of the fruits of their labor.  From this, and from the fact from his financial interest in the sales consummated, the defendant's membership and participation in the conspiracy charged was a permissible inference."  Id. at 59-60.

Likewise, in Grunsfeld, the defendant not only sold a tableting machine but also provided customers with demonstrations and instructions about its use.  In upholding his conspiracy conviction, the court noted that "he demonstrated its use to [co-conspirators] and instructed them in 'cutting' the PCP."  558 F.2d at 1237.  The court cited with approval United States v. Yahiz-Cremata, 503 F.2d 963 (5th Cir. 1974), noting that in that case, "three co-conspirators had smuggled cocaine into the country and went to the defendant's barber shop where he supplied them with milk, sugar, and bicarbonate, instructed them on how to cut cocaine and warned that Miami was too hot for operating."  Id. at 1237.

Here, as alleged in the indictment, Harris provided ongoing support to TCNISO's customers in an effort to ensure that they were successful in stealing free, faster, and anonymous internet service.  The ISPs and Harris played a continual game of "cat and mouse," in which ISPs tried to detect and block TCNISO's users from stealing service, and in response, Harris would tweak his products so that ISPs could not detect or block their use.  (Sup. Ind. ¶24). Harris also operated, moderated, and participated in, an online platform for his users to trade

stolen MAC addresses and configuration files with one another, for use in conjunction with his cable modem hacking products.  (Sup. Ind. ¶¶31-35).  The indictment, therefore, adequately alleges that Harris provided the kind of additional assistance to his customers that would support the inference that he shared their criminal intent.

### 3.    Harris's Financial Incentives Support an Inference of Intent

Courts have repeatedly held that where the supplier of criminal tools sells them or otherwise profits from their use, a jury can infer that the supplier had the requisite criminal intent.  In upholding the defendant's conviction in Direct Sales, the Court reasoned in part, "there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy.  Petitioner's stake here was in making the profits which it knew could only come from its encouragement of Tate's illicit operations." Direct Sales, 319 U.S. at 1682.  In United States v. Garcia-Rosa, the First Circuit followed Direct Sales and upheld a conspiracy conviction where the defendant loaned money to drug runners.  876 F.2d 209, 216 (1st Cir. 1989), vacated in part on other grounds Rivera-Feliciano v. United States, 498 U.S. 954 (1990).  The Court reasoned that an inference of the defendant's intent to join the conspiracy could be drawn from the fact that he was not in the business of lending money and that the fact that the loan was to be repaid in cocaine gave him a "vested interest in the outcome of the conspiracy." Garcia-Rosa 876 F.2d at 216.  See also Chamley, 376 F.2d at 60 (defendant's "financial interest in the sales consummated" helped support the inference that he had participated in the charged conspiracy).

Here, because the indictment alleges that Harris charged customers for his cable hacking tools, he had a personal financial interest in ensuring that these customers succeeded in stealing

free or faster internet access.  It is reasonable to infer that he wanted satisfied customers, to ensure repeat business and referrals, and that he therefore shared the customers' criminal intent.

       4.     *TCNISO Had a Huge Sales Volume*

Where a supplier provides criminal tools in volume, or at a high price, or repeatedly over time, courts have held that a jury can infer that the supplier had the requisite criminal intent. See, e.g., Direct Sales, 319 U.S. at 711 ("additional facts, such as quantity sales . . . may furnish conclusive evidence . . . that the seller knows the buyer has an illegal object and enterprise"); Chamley, 376 F.2d at 59 (defendant "made several sales at substantial sums.  His knowledge of the intended disposition of the items cannot be disputed"); Grunsfeld, 558 F.2d at 1236 (defendant was involved in "three or four large purchases of materials over a period of time . . . [and] promoted the very purposes of the conspiracy rather than merely supplying it").

Here, the indictment alleges that Harris ran TCNISO for at least four years and sold more than $1 million worth of cable modem hacking products.  (Sup. Ind. ¶27).  Furthermore, he provided not just one single product, but a cornucopia of cable modem hacking-related products, services, and training materials, and for many of those product lines, Harris released updates and newer versions.  (Sup. Ind. ¶¶21, 24, 28-30).  Additionally, in at least one instance noted in the superseding indictment, Harris sold approximately 20 modems to one of the Massachusetts customers.  (Sup. Ind. ¶47).  Thus, the breadth of Harris's product line along with his enormous sales volume, as alleged in the indictment, support the inference that he shared the TCNISO users' intent.

###### 5.   *Harris Attempted to Hide His Involvement With TCNISO*

Courts have held that where a supplier of criminal tools acts in a clandestine manner, that evidence can support an inference that he shared his customers' criminal intent.  For example, in United States v. Loew, 145 F.2d 332 (2d Cir. 1944), the defendant was a grocer who sold large quantities of sugar to co-defendants who operated illegal stills.  The court upheld his conviction for conspiracy to operate unregistered stills, noting "the sales were not made openly at the appellant's place of business; he arranged to take orders by telephone under code words, and he delivered the sugar furtively at night . . . ."  Loew, 145 F.2d at 332.  Likewise, in United States v. Rush, the defendant was a podiatrist who had loaned $25,000, under "usurious" terms, to his co-defendants, knowing that they would use this money to finance a drug deal.  666 F.2d 10, 11 (2d Cir. 1981).  The court upheld his conspiracy conviction, reasoning that the defendant "embarked upon a new line of business not only with full knowledge of its illicit nature but through a clandestine method devised to protect him from its consequences."  Id. at 11-12.

Here, Harris went to significant lengths to hide his identity and his involvement with TCNISO.  For example, as alleged in the indictment, he identified himself only by his online nickname, Derengel, which he used for his posts on TCNISO's forums.  (Sup. Ind. ¶¶1, 35).  And he published his book, "Hacking the Cable Modem," under that alias.  (Sup. Ind. ¶25).  Although he eventually operated a small storefront in San Diego, Harris did not permit customers to purchase his cable modem hacking products directly from the storefront.  Rather, they had to purchase them online.  Harris's efforts to hide his identity further support the inference that he shared the users' criminal intent.

6.      *Harris Traded MAC Addresses and Stole Internet Service*

When the criminal tool supplier personally engages in lawbreaking, that furnishes a "stake in the success of the venture" that will support the inference that the defendant had the intent to join the conspiracy with the purchasers.  United States v. Tramaglino, 197 F.2d 928, 931 (2d Cir. 1952).  Accord Fed. R. Evid. 404(b) (Evidence of other crimes may be admissible as proof of intent or knowledge).

Here, the superseding indictment alleges that Harris, himself, offered to pay for stolen MAC addresses.  (Sup. Ind. ¶35).  Furthermore, the government will offer evidence at trial that Harris used TCNISO's cable modem hacking products to steal internet service in the apartment he shared with Phillips.  While the superseding indictment does not charge Harris with wire fraud for this theft of service, because there would be no venue in Massachusetts for such a charge, Harris's conduct does support the inference that he shared the criminal intent of his Massachusetts customers.

7.      *Harris Knew Customers Were Using His Products to Steal Internet Access*

Notwithstanding the assertions in his memo that "[w]hat TCNISO did was to jailbreak modems; to open the internal workings and inherent possibilities of the modem to the user" (Harris Memo at 10), the superseding indictment alleges a series of facts from which a jury could reasonably infer that Harris knew that TCNISO's customers were using his products for fraud.  As set forth in the superseding indictment, the TCNISO website forums that Harris hosted and moderated were replete with user postings, made over a three-year period, discussing stealing internet access, obtaining faster internet access without paying, and trading stolen MAC addresses and configuration files.  (Sup. Ind. ¶¶31-33).  The superseding indictment also alleges

that there were frequent posts in which users complained when ISPs were detecting and blocking them and asked for help in circumventing these obstacles.  (Sup. Ind. ¶34).

Harris's knowledge that TCNISO's users were using its products to commit crimes is yet another factor supporting the inference that he shared their criminal intent.

### 8.    No Need For Harris to Have Personal Contact with Users

Harris argues that the government "cannot prove" that Harris intended to aid and abet the TCNISO users because the indictment does not allege that he had any personal contact with them.  (Harris Memo at 16).  This argument fails, first, because the indictment does allege that Harris, Craig Phillips, and I.L. "communicated repeatedly online with N.H. about cable modem hacking."  (Sup. Ind. ¶36).  Furthermore, as the Supreme Court held in Direct Sales, the fact that the defendant supplier "never met [the customer] face to face or held personal communion with him is immaterial.  Conspiracies, in short, can be committed by mail and by mail-order houses." Direct Sales, 319 U.S. at 714-15.  The First Circuit has also held that "a particular defendant need not have been familiar with all the details of the conspiracy or with the identities of all other conspirators."   Joselyn, 99 F.3d at 1190; United States v. Bello-Perez, 977 F.2d 664, 668 (1st Cir. 1992) (same).  Similarly, in the aiding and abetting context, the First Circuit has stated, "It is well settled that a culpable aider and abettor need not perform the substantive offense, be present when it is performed, or be aware of the details of its execution." Garcia-Rosa, 876 F.2d at 217 (citations omitted).

Here, the indictment alleges that Harris had personal communications with N.H. about cable modem hacking.  (Sup. Ind. ¶36).  As to the other three Massachusetts customers, the indictment alleges that Harris took their purchase orders and payment via the tcniso.net website

and that he shipped modified cable modems to them in Massachusetts.  (Sup. Ind. ¶¶43-44, 48-49, 52-53).   This contact with the TCNISO users supplements all of the other allegations supporting the inference that Harris shared these users' intent.

### C.    The Conspiracy Count Alleges One Conspiracy

Under the umbrella of his venue argument, Harris makes the unrelated claim that the government cannot prove that there was a single conspiracy here, as opposed to multiple conspiracies and that the Court should therefore dismiss the conspiracy count.  (Harris Memo 21-24).  This claim, however, is not a proper basis upon which to seek the pre-trial dismissal of the indictment.  "Whether evidence shows one or many conspiracies is a question of fact for the jury and is reviewed only for sufficiency of the evidence."  United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009); United States v. Brown, 495 F.2d 593, 599 n.5 (1st Cir. 1974) (the question of whether the facts indicate one or more distinct conspiracies is normally a matter of fact to be determined by the jury).  Here, because the government has not yet presented evidence to a jury, which in turn has not yet been able to consider the factual question of whether there was an overarching conspiracy or multiple smaller conspiracies, the defendant's motion to dismiss on this ground is premature.

Furthermore, even if the Court were to consider the defendant's argument on the merits, that argument fails because the indictment properly alleges a "hub and spokes" conspiracy.  In evaluating whether there is a single conspiracy, the First Circuit has focused on three factors: "(1) the existence of a common goal, (2) interdependence among participants, and (3) overlap among the participants."  Unites States v. Dellosantos, ___ F.3d ___, 2011 WL 3569334 *7 (1st (Cir., August 16, 2011) (internal quotations omitted).  The court, in Dellosantos, went on to

explain that "[t]he first factor, common goal, is given wide breadth.  For example, a goal of selling cocaine for profit or furthering the distribution of cocaine may be sufficient evidence of a common goal."  Id. (internal quotations omitted).  Here, the common goal, as set out in the superseding indictment, was for all conspirators to benefit from the theft of internet service – Harris and the TCNISO co-conspirators benefitted because they profited from the sale of the hacking tools, and the users benefitted by receiving free, faster, and anonymous internet access without paying.  (Sup. Ind. ¶¶16-27)

The second factor, interdependence, concerns whether "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme."  Id.  The superseding indictment alleges that Harris, the TCNISO co-conspirators, and the users all participated in forums on the TCNISO website in which they exchanged information and provided advice about cable modem hacking, exchanged stolen MAC addresses, and discussed techniques ISPs were using to block the use of TCNISO's modem hacking products.  (Sup. Ind. ¶¶22-24).  The superseding indictment therefore alleges that the conspirators worked together and were, therefore, interdependent.

"Finally, the third factor, overlap among the participants, is satisfied by the pervasive involvement of a single core conspirator, or hub character."  Dellosantos, 2011 WL 3569334 *7.  Here, Harris is that single core conspirator, or hub character, and therefore satisfies this third factor.  The superseding indictment, therefore, properly alleges a hub and spokes conspiracy, rather than multiple conspiracies, and the Court should deny Harris's motion to dismiss on that basis.

**D.      *The Wire Fraud Statute Is Not Void For Vagueness***

Harris also urges the Court to dismiss the wire fraud counts on the grounds that the wire

fraud statute is void for vagueness.  (Harris Memo 25-31).  He fails, however, to cite for support

any case in which a court has found this statute to be void for vagueness, let alone dismissed an

indictment pre-trial on this ground.  Because there is no basis for such a finding here, the Court

should deny motion.

The Supreme Court has set out the standard for determining whether a statute is void for

vagueness:

> A criminal statute must be sufficiently definite to give notice of the required
> conduct to one who would avoid its penalties, and to guide the judge in its
> application and the lawyer in defending one charged with its violation. But few
> words possess the precision of mathematical symbols, most statutes must deal
> with untold and unforeseen variations in factual situations, and the practical
> necessities of discharging the business of government inevitably limit the
> specificity with which legislators can spell out prohibitions. Consequently, no
> more than a reasonable degree of certainty can be demanded. Nor is it unfair to
> require that one who deliberately goes perilously close to an area of proscribed
> conduct shall take the risk that he may cross the line.

Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340 (1952) (footnotes omitted).

Courts have consistently held that wire fraud, because of its specific intent requirement,

is not unconstitutionally void for vagueness.  See, e.g., United States v. Conner, 752 F.2d 566

(11th Cir. 1985).  There, the Court reasoned:

> Wire fraud is a "specific intent" crime . . . .  A statute meets the standard of
> certainty required by the Constitution if its language conveys sufficiently definite
> warning as to the proscribed conduct when measured by common understanding
> and practices.  The case of Colautti v. Franklin, 439 U.S. 379, 395 (1979), states
> that "This Court has long recognized that the constitutionality of a vague statutory
> standard is closely related to whether that standard incorporates a requirement of
> *mens rea.*" "The requirement that the act must be willful or purposeful may not
> render certain, for all purposes, a statutory definition of the crime which is in

21

some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware." <u>Screws v. United States</u>, 325 U.S. 91, 102 (1945). There is no merit in the claim of unconstitutionality."

<u>Id.</u> at 574.  <u>See also</u> <u>United States v. Louderman</u>, 576 F.2d 1383, 1388 (9th Cir. 1978) (same).

Here, contrary to Harris' assertion, there is nothing novel about the wire fraud charges in the superseding indictment.  It alleges that the defendant participated with the users of his cable modem hacking products and services in a scheme to defraud the ISPs into providing them with free internet access.  In essence, by using modified modems with stolen MAC addresses that belonged to paying subscribers, TCNISO's customers were making material misrepresentations to the ISPs about their identity and, correspondingly, their right to access the ISPs' networks. Harris helped them do this.

Other defendants have been convicted of wire fraud for participating in similar theft of service schemes.  <u>See</u> <u>United States v. Abboud</u>, 273 F.3d 763, 765 (8th Cir. 2001) (defendants convicted of conspiracy to commit wire and mail fraud for their role in selling modified cable boxes that received unauthorized cable television signals); <u>Brandon v. United States</u>, 382 F.2d 607, 608 (10th Cir. 1967) (defendant convicted of wire fraud for stealing long distance service from phone companies).

The wire fraud statute makes it clear that it is illegal to make material misrepresentations (here, about the users' identity, status as a paid subscriber, and rights to access the network) to others (here, ISPs) to deprive them of their property (here, their network access and/or subscriber fees that would otherwise be owed by the illegal users).  Accordingly, Harris was on notice that his conduct was illegal, and the Court should reject his argument to the contrary.

**CONCLUSION**

For the above reasons, the Court should deny the defendant's motion.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:      */s/ Adam Bookbinder*
Adam J. Bookbinder
Assistant U.S. Attorney
Mona Sedky
Department of Justice Trial Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Adam Bookbinder*

Dated: August 26, 2011