1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3                                No. 1:09-cr-10243-MLW

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    RYAN HARRIS

10

11                         * * * * * * * *

12

13                      For Hearing Before:
                       Chief Judge Mark L. Wolf

14

15                       Pretrial Conference

16

17                   United States District Court
                     District of Massachusetts (Boston.)
                     One Courthouse Way

18                   Boston, Massachusetts 02210
                     Thursday, October 20, 2011

19

20                         * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter

23               United States District Court
            One Courthouse Way, Room 5200, Boston, MA 02210

24                   bulldog@richromanow.com

25

```
1                    A P P E A R A N C E S

2

3    ADAM J. BOOKBINDER, ESQ.
         United States Attorney's Office
4        One Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
5        (617) 748-3960
         E-mail: Adam.bookbinder@usdoj.gov
6   and
     MONA SEDKY, ESQ.
7        U.S. Department of Justice
         601 D. Street, N.W.
8        Washington, DC 20530
         (202) 353-4304
9        E-mail: Mona.sedky@usdoj.gov
         For the United States of America
10

11   CHARLES P. McGINTY, ESQ.
     CHRISTINE DEMASO, ESQ.
12       Federal Public Defender Office
         District of Massachusetts
13       51 Sleeper Street, 5th Floor
         Boston, Massachusetts 02210
14       (617) 223-8061
         E-mail:  Charles_mcginty@fd.org
15       For the defendant

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2           (Begins, 11:30 a.m.)
 3           THE CLERK:  Today is October 20th, the case of
 4   United States v. Harris, Criminal Action 09-10243, will
 5   now appear before this court.  Would counsel please
 6   identify themselves for the record.
 7           MR. BOOKBINDER:  Good morning, your Honor,
 8   Adam Bookbinder, and with me, from Criminal Justice, is
 9   Mona Sedky, for the United States.
10           MR. McGINTY:  And, your Honor, my name is
11   Charles McGinty from the Federal Defender Office and
12   with me is Christine Demaso from my office.  My client
13   is on the line from Oregon, as I understand it.
14           THE COURT:  Mr. Harris, are you able to hear
15   us?
16           THE DEFENDANT:  (Via telephone.)  Yes, I am,
17   your Honor.
18           THE COURT:  Okay.
19      I think in the interest of full disclosure I
20   should ask a question and possibly explain something.  I
21   should ask Ms. Sedky if her parents are Sharif and Julie
22   Sedky?
23           MS. SEDKY:  Yes, they are, your Honor.
24           THE COURT:  I practiced law with Ms. Sedky's
25   father from 1971 to 1974.  I hadn't had any contact with
```

1    either of her parents for several decades, but I saw her

2    mother at a funeral in which I was speaking in

3    Washington a week ago Sunday.  I'm confident that

4    Ms. Sedky's participation in the case would not affect

5    my ability to be impartial and I, at the moment, don't

6    think a reasonable person would question my impartiality

7    because of that.

8         However, I'm going to give each side a week, so

9    Mr. McGinty can talk to Mr. Harris, and let me know, um,

10   one, whether anybody's requesting my disqualification

11   under Section 455(b) for being actually biased or

12   prejudiced; two, whether you believe a reasonable person

13   would question my impartiality in the circumstances;

14   and, three, if the only possible basis for

15   disqualification is under 28 United States Code, Section

16   455(a), whether, as is permissible, you waive that as

17   the basis for my disqualification in this case.

18             MR. McGINTY:  If I might, your Honor?  There

19   has been, in our view, and I have spoken to Mr. Harris

20   about this, but there has been full disclosure about

21   this matter.

22             THE COURT:  Oh?

23             MR. McGINTY:  I raised it with Mr. Harris.

24   Mr. Harris, um, believes that it is not an issue.  So,

25   um -- and we can submit something within a week, but I

1  would --

2            THE COURT:  Oh, if you already knew about it.

3            MR. McGINTY:  We knew about it, we discussed

4  it, we've had, as far as I'm concerned and my client is

5  concerned, sufficient information about it.  We do not

6  view it as any grounds for disqualification of the Court

7  and we make an express waiver of that issue.

8            THE COURT:  All right.  And are there any

9  further questions you'd like to ask me, Mr. McGinty?

10           MR. McGINTY:  None.

11           THE COURT:  All right.

12      And what about the government?

13           MR. BOOKBINDER:  Your Honor, again we raised

14  this issue with Mr. McGinty once we knew that you would

15  be hearing the case and we thought it appropriate to do

16  that.  We had intended, if you hadn't beaten us to it,

17  to raise it today so that it would be on the record and

18  clear, but I don't think there's anything more --

19           THE COURT:  All right.  Well, I'm going to

20  proceed with the understanding that everybody, including

21  Mr. Harris, agrees that I'm not actually biased or

22  prejudiced, that a reasonable person wouldn't question

23  my impartiality under the circumstances, and that any

24  ground for objecting under Section 455(a) based on the

25  fact that I knew Ms. Sedky -- because I haven't had

1    her -- when she was very young, um, and the last time

2    being probably about 1974, um, so that's been waived.

3        All right.  So why doesn't the government give me

4    an overview of this case.  I know there's a motion to

5    dismiss and I'm not in a position to decide it today,

6    although I do want to get a fuller flavor for it.  But

7    it would also help me to get a better feel for the case

8    generally.

9        MR. BOOKBINDER:  Happy to do that, your

10   Honor.

11       Essentially, as you know, the indictment charges

12   conspiracy and, um, conspiracy to commit wire fraud and

13   substantive wire fraud and aiding and abetting wire

14   fraud, and the basis for those charges is a company that

15   Mr. Harris founded and ran called TCNISO -- but that

16   that company was a defendant in the case as well.

17   Initially the indictment was against both Mr. Harris and

18   his company, but it became clear fairly early on that

19   there really wasn't any company left, that the company

20   was defunct, at least practically speaking, it had

21   closed its office, it didn't have any employees, it

22   didn't have assets, it wasn't defending the case, and so

23   there didn't seem to be any purpose in proceeding

24   against the company.

25       So the government has moved in -- and I guess

1    maybe that motion is still pending, I'm not sure, but to

2    dismiss all the counts against the company.  I guess

3    that would be a motion that this court would have to

4    rule on and I don't believe that that ever happened, so.

5            THE COURT:  All right.  We'll -- all right.  I

6    don't seem to have that printed out, but we'll get it

7    and I will act on it.

8            (Pause.)

9            THE COURT:  Apparently it's not on the docket.

10            MR. BOOKBINDER:  Well, it's possible that it

11    was filed as a notice of dismissal and therefore didn't

12    trigger the motion procedure.  We can take a look.

13            THE COURT:  All right.  Why don't you just get

14    me another copy.

15            MR. BOOKBINDER:  We will do that, absolutely,

16    your Honor.  There shouldn't be any issue, I don't

17    think, about that in this case.  And so as the case

18    stands now, this is a case against only Mr. Harris.

19        And, um, what he did and what this company did was

20    they, um, developed and then sold and supported and

21    charged work with users of products that were designed

22    to allow people to modify their Internet cable modems so

23    that they could get Internet cable service without

24    paying for it, or if they were paying for service, they

25    could get faster high-speed service without paying the

1   premium for that.  That's what the products did.  But

2   what we've alleged, your Honor, is that Mr. Harris and

3   the company did more than just put these products out

4   there and allow people to buy them and use them, rather

5   they developed a product, first of all, that had no

6   other use, no legitimate use other than this, and that

7   they then created a website that allowed and that let

8   them work with their users to make sure that people

9   were, in fact, able to use these products to steal cable

10  service.  So they put forums up there that allowed

11  people to share information about situations where

12  they'd been thwarted by cable companies, how to work

13  around that, how to actually trade information needed to

14  make all of this work, and we can get into this in more

15  depth and I'm assuming that we'll have an opportunity to

16  do that.

17           THE COURT:  And just to clarify, is it certain

18  that that's a crime?  I mean, a conspiracy has to be an

19  agreement to commit a crime.

20           MR. BOOKBINDER:  Sure.  Your Honor, the theory

21  in which it's a crime is that what the customers were

22  obtaining is something of value, meaning Internet

23  service that otherwise people would have to pay for, and

24  that they were doing it by misrepresenting to the cable

25  companies who they were.  Essentially they're taking on

1    the electronic identities of the legitimate subscribers

2    and getting the service for which those other people

3    pay.  So we, um, certainly charge that in doing that

4    that's a violation of our fraud statutes.

5              THE COURT:  So it's charged as a wire fraud,

6    it's a scheme essentially to get money or property, and

7    to do that by making false representations essentially

8    representing, you would say, that the person was a

9    subscriber when they weren't a paid subscriber?

10             MR. BOOKBINDER:  Correct.  That's right.  So

11   that's essentially the theory of the prosecution here.

12   Obviously Mr. McGinty has challenged it in his motion to

13   dismiss and we'll, I'm sure, be -- I assume the Court

14   will want to hear argument on that and we'll get into it

15   in more depth in the future.

16             THE COURT:  I will.  And assuming you survive

17   the motion to dismiss and the case isn't transferred to

18   California, um, how long do you think the case will take

19   to try, trying from 9:00 until 1:00?

20             MR. BOOKBINDER:  Your Honor, we've discussed

21   this with Mr. McGinty and we expect that we would be

22   able to put in our case in somewhat less than two weeks,

23   but given that there may be a defense case and there's

24   obviously argument and instructions, the case could go

25   into a third week.  So that's kind of where we stand.

1           THE COURT:  Okay.  I'll assume I have to carve

2    out three weeks at some point if the case is not

3    dismissed.

4        And have you calculated the sentencing guidelines

5    to determine what the government at least thinks the

6    sentence would be if the defendant went to trial and was

7    convicted?

8           MR. BOOKBINDER:  The answer is we have, your

9    Honor, but I can't remember exactly where they are,

10   frankly, right now.  But we've had some discussions with

11   Mr. McGinty about that and, um, they are, at least after

12   trial, you know, in the multiple years of jail level,

13   and that's part of the reason why this case is likely to

14   proceed to trial.  We can certainly apprise the Court

15   more fully, but I just don't know exactly right now.

16          THE COURT:  I'll ask you again when I see you

17   the next time.

18        Is there more I should know from the government at

19   this point?

20          MR. BOOKBINDER:  I think that's the essence of

21   the charge and again, you know, we'll, um -- we'll get

22   into the issues Mr. McGinty's raised at that time.

23          MR. McGINTY:  Um, your Honor, I don't know

24   that the government fully apprehends what theory it's

25   invoking here.  It is presuming that the sale of cable

```
 1    modems are the sale of a bad thing.  Now it's not clear
 2    how it's a bad thing because it's not illegal to design
 3    it, it's not illegal to sell it, um, but they presume
 4    it's a bad thing and therefore they presume that the
 5    seller of that item is --
 6                (Interruption by dial tone.)
 7                THE COURT:  We'll call Mr. Harris back.
 8                (Places call again.)
 9                THE COURT:  Mr. Harris?
10                THE DEFENDANT:  Yes.
11                THE COURT:  Okay, we got cut off and now we're
12    reconnected.
13                THE DEFENDANT:  Okay.
14                MR. McGINTY:  So to resume, the government
15    presumes this is a bad thing, which is a proposition
16    that they've provided no case support or statutory
17    support for it, but they presume that the sale of that
18    item to a third party makes the seller an aider and
19    abetter of unknown conduct by that purchaser of the item
20    in whatever that purchaser's use of the product may be.
21    It also presumes that a conspiracy would link the seller
22    to the purchaser, to all others who similarly purchased
23    it, in effect a conspiracy of the fashion of a hub and
24    rim except there's no rim that links all of this
25    together.
```

1          Now to back up, Mr. Harris was part of a company

2     that had, um --

3               THE COURT:  Well, let me just pause for a

4     moment because while I haven't been able to focus on

5     this much, I anticipate we're going to be having a

6     continuing conversation about this if the motion to

7     dismiss isn't allowed.  And while in many respects, for

8     mail or wire fraud, a scheme to defraud is similar to a

9     conspiracy, it's possible to have a scheme to defraud, I

10    think, that might not satisfy the requirements for a

11    conspiracy.  In other words, it goes to the issue of the

12    intent to defraud.

13         Owning a cable box, of course, is not

14    intrinsically illegal, um, but if somebody is -- and

15    this just comes to me, and I've spent a lot of time with

16    mail fraud in the *DiMasi* case recently, but if -- you

17    know, if somebody with intent to defraud is selling what

18    is, in isolation, a legitimate item and does so with a

19    demonstrated intent that the people he's selling it to

20    use it to defraud somebody, um, that, at the moment,

21    seems to me that it could be a scheme to defraud or, I

22    think, even though it's inherent in every criminal case,

23    they state that they're seeking aider and abettor

24    liability under Section 2 and then certain things would

25    have to be known -- and I don't know whether you can aid

1    and abet a crime by somebody you don't know exists.  But

2    I'm just talking off the top of my head.  But I think

3    these are some of the things we're going to have to

4    contend with.

5              MR. McGINTY:  Right.  Well, certainly we

6    dispute that the cable modem was designed for -- solely

7    for the purpose of that service.  It had a diagnostic

8    capability.  It had a way of ensuring and evaluating the

9    connectivity, um, which companies who purchased it did

10   it for purposes of diagnosing their cable modem

11   connection.  There were legitimate purposes that this

12   was for.  Among them, most generally, is that it would

13   ensure your connection to the Internet as would any

14   cable modem.  So first there's a dispute about whether

15   this is solely for the purpose of doing something

16   involving the theft of services.

17        Even if the product is sold with knowledge that it

18   might be used for the purpose of a crime or harm to

19   others, in the civil law the analysis has been -- and

20   this goes back to Oliver Wendell Holmes.  It has been

21   that the conduct of the third party is an intervening

22   event that breaks a line of causality back to the

23   seller.  That rule has been followed in the civil law

24   ensuring that makers of potentially significantly

25   dangerous but legal items are not going to be held

1    civilly culpable for the use of the item even if they

2    know, or have reason to suspect, or have high cause to

3    assume, that it's going to be used improperly.

4         There's a conspicuous case some years ago, um, it

5    was a fellow who used black talon bullets to kill a

6    significant number of people.  A suit was brought

7    against the manufacturer of the black talon bullet and

8    the suit rested on the proposition that he surely knew

9    that selling this to general customers, that persons who

10   were buying it would buy it with the intent to do harm

11   because the only thing that bullet did is tear flesh and

12   assure that whoever was hit with that bullet would be

13   killed and would be killed brutally and bloodily.  And

14   despite that the Second Circuit asked the question

15   whether that's a foundation for civil liability and said

16   "No."  That a manufacturer of a product that is not

17   defective has no responsibility to guard against the use

18   by third parties of this product even if you know how it

19   might be used.

20        So in Harris's case there are four persons who are

21   the trigger, so to speak, and these are the predicates

22   for the secondary liability.  And so this case is this

23   mixed interaction between a venue contest and a motion

24   to dismiss because to take this case which is a -- what

25   is the consequence of a sale of a product from a

1   California place of doing business and bringing it to

2   Massachusetts where you say this rests on the conduct of

3   third-party users of the product, the government says,

4   "Well, we rest our charge on the primary conduct of the

5   persons who use the product and Harris is secondarily

6   liable because he provided the product that would be

7   used for that purpose."

8           THE COURT:  I can think of another criminal

9   statute and a First Circuit case that we may have

10  differing views on, whether it's analogous, but for the

11  purpose of tax fraud, the First Circuit held, in

12  *Goldberg*, that if somebody provides rebates or money to

13  another person, it's not sufficient to prove that the

14  defendant who provided the money or the rebate knew that

15  the person who received the money, the cash, could use

16  it to avoid taxes.  It's required that the government

17  prove beyond a reasonable doubt, to get a conviction for

18  tax conspiracy, that the defendant knew the person

19  would, um, use the money rebated, or the cash, um, to

20  defraud the IRS.

21       So it sounds like you're talking about something

22  similar and it may turn on the terms of the statute.

23           MR. McGINTY:  And *Goldberg* is analogous.

24           THE COURT:  I'm sorry?

25           MR. McGINTY:  And *Goldberg* is analogous and

1    ***Goldberg*** said you have to know it's tax-specific

2    conduct, and here you have to know what they're going to

3    do with the device.

4          Now, um, presumably at some point complicity with

5    a person changes the analysis, but in this case there

6    are four persons who are the -- sort of the pivots with

7    the primary liability that's the predicate for the

8    secondary liability, and of these four three of them

9    are, as far as I understand, and the government has

10   effectively conceded, the entirety of their interaction

11   was through the purchase of firmware, either a modem or

12   software, from this company.  The only other thing the

13   government --

14                THE COURT:  Through the website?

15                MR. McGINTY:  Through the website from

16   California.  The only thing the government alludes to is

17   that these persons had access to the forum.  And the

18   interesting thing about the forum is that, um, Congress,

19   seven or eight years ago, concerned about forums and

20   whether it was better to encourage forums --

21                THE COURT:  What's a "forum" in this context?

22                MR. McGINTY:  A "forum," in this case, would

23   be a website that goes to a forum where people could

24   send in their messages and sort of exchange information

25   and so forth.  "Forums" are part of, as I understand it,

1    and I'm probably the last person to be responsive to

2    this --

3              THE COURT:  That's why you need the younger

4    colleague.

5              (Laughter.)

6         MR. McGINTY:  Who understands this thing.  Um,

7    it provides sort of a chat capability where people can

8    go back and forth.

9         Congress in the -- in 47 U.S.C. 230, Subsection

10   (e)1, specifically provided that no provider of

11   interactive computer services -- and we're talking now

12   about a forum moderator, should be treated as the

13   publisher of information on a forum.  In other words,

14   you can have a forum, you can host a forum --

15             THE COURT:  But that's for libel law, I

16   presume.

17             MR. McGINTY:  Well, no, that's for civil

18   liability --

19             THE COURT:  Right.

20             MR. McGINTY:  -- um, plenary civil liability,

21   um, part of it is libel, but part of it is legal, but

22   plenary civil liability.  And what it does is it avoids

23   the problem where the forum moderator is viewed as the

24   responsible party for everything that ends up on the

25   forum.

1    Now, the government is saying that because people

2    access the forum and they exchange information, that

3    that somehow is part of the interaction with Harris for

4    purposes of Harris's criminal culpability about what

5    those persons may have done with the product.

6         THE COURT:  Well, I doubt that the

7    government's arguing that that alone is sufficient.

8    They have to show that he did something with intent to

9    defraud and there are things that would be innocent if

10   you don't have intent to defraud that are criminal if

11   you do.

12        MR. McGINTY:  But if there's a forum, if the

13   moderator is not responsible for what's on the forum, a

14   customer who gets a product, on their own time and using

15   their own Internet connection, hooks into the forum and

16   is viewing, um, chats on the forum, um, that doesn't

17   import knowledge to Harris about what that person

18   intends to do with the product.

19        So the entirety -- that three of the four pivot

20   persons, who are the persons who are supposed to be

21   primarily responsible here, the predicate for

22   culpability is the purchase of the product and that

23   these people may have accessed a forum, and that's it.

24   So the issue for those is, under what circumstances is

25   the seller of a product, lawful when sold, responsible

1    for the conduct of the third party who gets it?

2         And the cases that establish the parameters, and

3    this goes back to, um, *Falcon* and *Direct Sales*, two

4    Supreme Court cases in the '40s, and they provide the

5    divide in the analysis between what's potentially the

6    basis for criminal liability or potentially isn't.

7    *Direct Sales* related to multiple separate sales of large

8    quantities of morphine to a small-town doctor in the

9    Southwest -- in the Southeast of the United States.

10   Which doctor was advised by the DEA at the time -- well,

11   it wasn't the "DEA" at the time, but the narcotics

12   enforcement federal agency --

13             THE COURT:  The -- well, anyway.  Go ahead.

14             MR. McGINTY:  -- that the feds were monitoring

15   his purchases, but they also notified the seller that

16   "If you continue to do this," which is selling large

17   block quantities of morphine, a controlled, restricted

18   -- a legally-restricted item, that "there may be

19   consequences," and the seller continued to sell it over

20   time.  So the combination of the legal restriction on

21   the item, the morphine, um, repeated sales and warnings

22   and so forth, all of it combined for the Court to carve

23   out an exception to the general rule, articulated in

24   *Falcon,* that if an item is not legally restricted, um, a

25   seller of an item otherwise lawful to sell is not liable

1    even if that person knows of the use that that is going

2    to be put to.  And in that case it involved the sale of

3    items that were used for manufacturing alcohol back in

4    the bad old revenue days.

5         So the boundaries here are was it legally

6    restricted?  Was it not legally restricted?  Under the

7    Supreme Court standards that tie together *Falcon* and

8    *Direct Sales* where an item is legal when sold, there is

9    no criminal culpability that arises even if one knows

10   the likely use of that product.  That's consistent with

11   the civil cases that deal with the lesser standard

12   presumably for culpability in civil cases where the

13   issue is only monetary damages.

14        The government has not cited a single case, not

15   one, that supports the premise that underlies this,

16   which is that the seller of an item, in that act alone,

17   can be responsible for how that legally-sold product was

18   used.  Not one case.  And that's the --

19             THE COURT:  Yeah, but there's -- we'll sort

20   this out.  This is a valuable preview of coming

21   attractions.  But let's say in the conspiracy context,

22   um, it's not illegal to sell a handgun, um, but let's

23   say somebody goes into a hardware store and says to the

24   owner who he knows, "I want to kill my wife by hitting

25   her on the head with a hammer, please give me a hammer

1     that will be suitable for that purpose," and the owner

2     says, "I agree that your wife's a pain in the neck, it

3     would be good to get rid of her, and we'll be able to

4     have a lot more fun together, so here's a hammer."  So,

5     you know, in those circumstances it could be a

6     conspiracy revolving around the hammer and the sale of

7     the hammer and the provision of the hammer would be an

8     overt act in furtherance of the conspiracy even though,

9     in other contexts, it's an utterly innocent act to sell

10     somebody a hammer.

11         MR. McGINTY:  Because it's complicity to know

12     that and that's what doesn't happen here.

13         THE COURT:  Well, we'll get into this on the

14     hearing on the motion to dismiss.

15        You know, the general Rule 12 standard is that if

16     you have to try the case, you know, to find the facts,

17     um, that determine whether the case should be dismissed,

18     then you don't do that pre trial, that's ***Barletta,***

19     ***Jalbert,*** um, well, I'll give you the cites in a minute.

20         MR. McGINTY:  But the delicate issue, though,

21     is that in order for there to be an assurance to

22     Mr. Harris that he gets the benefit of his

23     constitutional right to proper venue, um, it is

24     necessary to look to see whether facts supporting the

25     complicity of which the Court discusses can be had in

1   this case.  And the threshold barriers that exist

2   against that theory being more than, um, a mere fiction

3   here are that there is a Supreme Court-announced rule

4   that the sale of a legal item is okay even if you know

5   the likely use of the product.  A seller of an item is

6   not in conspiracy by that fact with a purchaser.

7           THE COURT:  By that fact alone.

8           MR. McGINTY:  By that fact alone.  And with

9   respect to three out of four of the named persons, that

10  is the fact.

11          THE COURT:  How do I know that's the fact?

12          MR. McGINTY:  Well, we know that because of

13  two things.  One, no more than that is charged in the

14  overt acts of the indictment, and, I think, the

15  government has fairly disclosed --

16          THE COURT:  But if it's charged as an overt

17  act, it has to be an act committed by a co-conspirator.

18  So the charge is that, you know, those three people

19  entered into an agreement with Mr. Harris to defraud the

20  ISPs.

21          MR. McGINTY:  Well, the government has told

22  us, and I don't want to be making any statement here

23  that the government doesn't agree with, but my

24  understanding of what the government has represented to

25  us is that that's the sum total of the facts that would

1    be presented.

2          Now, there are cases under Rule 12 that talk

3    about, um, if no facts are going to get developed at

4    trial which change our review or in any way modify what

5    we have before us now, um, then it doesn't make any

6    sense to go through a trial to get to where we are

7    already.  That would seem to be doubly so if the issue

8    is why is Harris, um, who is selling the product in

9    California, called in here for legal propositions that

10   are singular, unique, unsupported in the law, and under

11   *Falcon* flat out wrong?

12          THE COURT:  All right, but let me, at this

13   point, just mention a couple of cases and you'll think

14   about whether you need to do more briefing.  But one is

15   *Barletta*, 644 F.2d 50 at 58.  Another one *Jalbert*, 242

16   F. Supp. 2nd 44, 45 to 46.  And *Barletta* is a First

17   Circuit case explaining that:  "The Court must defer

18   deciding a motion to dismiss if it requires a review of

19   a substantially complete portion of the evidence to be

20   introduced at trial and even if that's not the case,

21   where a decision requires more than a de minimis review

22   of evidence relevant to the general issue but less than

23   a substantially complete edification of such evidence.

24   The provision vests the timing of the decision in the

25   sound discretion of the district court."

1      I addressed this, to some extent, in one of my

2    many *Salemme* decisions, and you'll find it at 1997

3    Westlaw 810057, whether something's amenable to being

4    resolved on a Rule 12 motion.

5           MR. McGINTY:  And I call this court, um, to a

6    case, *Andrade*, where the issue was the statute of

7    limitations.  The accusation against *Andrade* is that by

8    virtue of participating in a drive-by shooting, a single

9    act -- a consequential act for sure, but a single act,

10   whether that act outside the statute of limitations

11   would carry an agreement or was the foundation for an

12   agreement which would carry into the limitations period,

13   and while the Court did not make the finding that

14   precipitated the dismissal, um, the government, in the

15   face of the analysis the Court had made, yielded to it.

16      The other example of that is Judge Keeton in

17   *O'Neil,* who basically said that if there's an issue

18   about the statute of limitations and we can resolve it

19   --

20           THE COURT:  I'm sorry to cut you off.  My

21   understanding is that the statute of limitations, um, is

22   in the heartland of those cases that should be decided

23   before trial, if they can.

24           MR. McGINTY:  But the a fortiori aspect of

25   this is that the reason for doing it here is not the

```
 1    convenience of resolving expeditiously a statute of
 2    limitations issue, which is consequentially sure, but it
 3    doesn't have the constitutional assurance of proper
 4    venue right, which Harris is invoking here.  If the
 5    Court delays a resolution of this, um, it's fair to say,
 6    predictably from what we have here, halfway through
 7    trial in a forum that is neither convenient nor
 8    appropriate, then we're going to be confronting the
 9    issue of whether he is held for trial on facts which, as
10    the trial is developing, show that he shouldn't have
11    been brought here in the first place.  And it's a little
12    late then to vindicate his right to a proper venue.
13                MR. BOOKBINDER:  Your Honor, I will not
14    address all of what Mr. McGinty said and while I
15    certainly respect and appreciate his enthusiasm and
16    passion, I disagree with his factual assertions and the
17    legal assertions.  But on the -- just two very quick
18    points.
19                The point that the Court raised about that hammer
20    analogy, I think it's appropriate and I think here what
21    we have is more than the example that you gave, your
22    Honor.  You've got someone saying, um, "I've got a
23    business and I'm selling hammers.  They're not good for
24    anything else, but they're good for killing people, and,
25    by the way, those people have come up with some ways to
```

1   defend against my hammers, so let's talk about ways we

2   can get around that so that you can accomplish what you

3   wanted to."  So I suggest that it's very much what the

4   Court suggested maybe plus a couple of levels.

5         The second point you raised also, your Honor, is

6   that, as you know, venue is something that needs to be

7   properly alleged in the indictment, but ultimately it

8   comes down to what is proven at trial and we are not in

9   the business typically of pretrying cases to determine

10   whether the government will be able to prove what

11   they've alleged in the indictment, and that's what I

12   think Mr. McGinty is asking for.

13             THE COURT:  Well, that's --

14             MR. McGINTY:  Can I just make one response?

15             THE COURT:  Yes.

16             MR. McGINTY:  And the response is, that on

17   Mr. Bookbinder's hypothetical, 12(b)(6) on a civil case,

18   his complaint gets booted, it gets kicked out, and it

19   does on the strength of every single case except for

20   one, which is the hitman case that I've cited in our

21   papers, which is the only one that says that if you

22   write a manual about how to kill somebody, um, if that

23   manual is sufficiently specific and basically directs a

24   criminal act of the gravity of homicide, we will treat

25   you as legally culpable.  That case stands alone for

1    civil liability.

2         So if I make a hammer and I say, "It's really good

3    for killing people," and I put that on the Internet and

4    I get sued, the only case that threatens me is that case

5    and all the rest of them say, "Not a problem."  And I've

6    cited those cases in there.  And I would feel, on a

7    12(b)(6), on the strength of the prevailing law, that he

8    loses.  And that's not even a criminal case.

9              THE COURT:  Well, we'll see.

10        Um, is this the first prosecution on this theory

11   in the country?

12             MR. BOOKBINDER:  For this type of cable modem-

13   hacking tool, there was actually a prosecution out in

14   New York and Mr. McGinty cites it in his pleadings.

15   Ultimately it ended up with a plea to a different

16   charge, so there wasn't a testing of the theory.  There

17   are, um, and I've cited some of them, but there are

18   aiding and abetting cases that involve people making

19   tools and selling tools to people committing crimes.

20   But on these exact facts, there is no prosecution on --

21             THE COURT:  It's interesting.  In the civil

22   context, there's an evolving body of law, and I haven't

23   dealt with it recently, but on what kind of activity on

24   the web creates sufficient contacts to permit

25   jurisdiction in civil cases.  And I don't know whether

1    you've considered that body of law, at least by analogy,

2    because it all derives, you know, from a due process

3    analysis.  So there are enough contacts with

4    Massachusetts, you know, to make it fundamentally fair

5    for somebody to be brought into court.

6            MR. BOOKBINDER:  Your Honor, in this case that

7    would absolutely be a close analogy if you're talking

8    about sort of putting something on the web and seeing

9    who looks at it.  Here you're talking about the

10   defendant shipping products to people buying them in

11   Massachusetts.  So there's --

12           THE COURT:  That's usually the case in the

13   civil context, too.

14           MR. BOOKBINDER:  I suppose it depends, yes.

15   But, your Honor, so, you know, here you've got a known

16   sale to Massachusetts customers who then use the product

17   as they're designed to be used, and that's what we've

18   got.  But we'll certainly take a look at that area.

19           THE COURT:  All right.  Well, the motion's

20   pending, so the speedy trial clock has stopped.  It's

21   certainly engaged my attention.

22       You know, I mentioned to you -- I think I'm going

23   to give you a chance, based on this very -- from my

24   perspective, my preliminary off-the-top-of-my-head

25   discussion to supplement the memos that you've filed and

1    particularly to look at them in the context of **Barletta**

2    and **Jalbert** and what I said in **Salemme,** and I may have

3    only decided it orally, but I doubt -- well, it was

4    relatively recently in **Djokich.**  It was a prosecution

5    and the argument was jurisdictional, the defense was

6    jurisdictional entrapment, or one of them was.  That

7    somebody was lured from Canada to Massachusetts.  And I

8    found that that was not permissible, or at least it

9    wasn't appropriate to do that pre trial, and so we tried

10   the case.  If I -- if there's a record of my reasoning

11   in deciding that, I'll bring it to your attention.

12        But what if I give you, you know, say, two weeks

13   or maybe a little longer to supplement your

14   submissions.  In view of my schedule, I would give you a

15   hearing in early December, something like --

16             MR. McGINTY:  Since we replied to the

17   government's early submission, if the government could

18   have two weeks from that and we could have one week

19   after that to at least see what their response is, so

20   that we can -- so we could end up talking to each

21   other's papers, so to speak.

22             THE COURT:  Well, I was thinking that I'd give

23   you each a period of time and then each a chance to

24   respond further today.  But -- and you know what the --

25   I mean, I've just told you what's on my mind, how does

1  **Barletta** and the other case apply here?

2  I mean, another question I have -- is the

3  government going to provide any evidence of any -- you

4  know, that Mr. Harris knew of the existence of these

5  four people?

6  MR. BOOKBINDER:  Your Honor, well, there's two

7  answers to that.  First of all, one of the four he

8  communicated with directly, so there is that as to one.

9  As to the other three, we don't have evidence of direct

10 communications, but because they were customers to whom

11 he'd send modems in a business that he ran with maybe

12 one or two employees, we'd argue from that that he at

13 least knew he was shipping modems to these people in

14 Massachusetts.

15 THE COURT:  All right.  Because, of course,

16 the general instructions regarding conspiracy are that

17 the defendant doesn't have to know every other

18 co-conspirator.  But I would think you would have to

19 know at least one of them to convict somebody on a

20 conspiracy theory --

21 MR. BOOKBINDER:  Your Honor --

22 THE COURT:  -- to know who you're agreeing

23 with.

24 MR. BOOKBINDER:  There are other -- the

25 customers are charged for sure as co-conspirators, but

1    there are also other co-conspirators within his company

2    who will testify in this case and will testify about

3    what Mr. Harris knew about what they were doing and what

4    they were sent.

5              THE COURT:  And that takes me back to where I

6    started, you know, sort of the off-the-top-of-my-head

7    response to this.  You could engage in a scheme to

8    defraud, even one that involved sort of unwitting

9    intermediaries -- 18 United States Code, Section 2(b),

10   causation, um, but it doesn't have to be aiding and

11   abetting.  But --

12              (Interruption, dial tone.)

13              (Places call again.)

14              THE COURT:  We're going to go ahead without

15   Mr. Harris.  He's been disconnected.  My time is

16   limited.

17        If all the requirements of a scheme to defraud --

18   um, it's the scheme that's the crime.  So if you look at

19   a case like **Potter**, which we discussed a lot in **DiMasi,**

20   a First Circuit case, um, there were people who wanted

21   to get money to a public official in Rhode Island

22   through his law firm, the public official didn't know

23   anything about it, and the money never got there.  But

24   the people who devised the scheme were held liable.  And

25   it appears in **Potter** that even the lawyer who was being

1    retained didn't share the criminal intent.  He wasn't

2    charged.

3              MR. McGINTY:  And presumably the scheme

4    contemplates a benefit shared by the parties involved in

5    the scheme and here it's the sale of an item where the

6    seller is indifferent to whether the user uses it at

7    all.

8              THE COURT:  All right.  All right.  Here's

9    what I'm going to do.  You're going to -- I'm ordering

10   that you simultaneously supplement your briefs by

11   November 4th and replies can be filed by November 14th,

12   or further submissions, and I'll give you a hearing on

13   December 8th at 3:00.  And because of the pendency of

14   the motion, the speedy trial clock remains stopped, that

15   further briefing and a hearing is certainly required.

16   All right?

17         And I'm going to ask, or if necessary order you to

18   order the transcript of this hearing.  I'm going to need

19   to refresh myself and I'm not sure who will assist me on

20   this, so it will be available.

21             MR. McGINTY:  The government will order it.

22             (Laughter.)

23             MR. BOOKBINDER:  We will, your Honor.  We

24   would also ask whether the Court would consider, at this

25   point, setting a trial date.  I don't know if we're

1    jumping the gun.  But obviously there will be no trial

2    if the Court dismisses the case.

3                THE COURT:  All right, I'll give you a trial

4    date, a tentative trial date.  But you need about three

5    weeks, right?

6          How about Monday, February the 6th?

7                MR. BOOKBINDER:  That's actually, your Honor,

8    a perfect date from our perspective and I think the

9    defense's as well.

10               MR. McGINTY:  Yes.

11               THE COURT:  If the case isn't dismissed -- as

12   usual I'll aim to decide this orally in December and if

13   I'm able to do that, you know, I'll issue the trial

14   order and the date will be February 6th, unless

15   something comes on my radar screen that disrupts that.

16   Okay?

17               MR. McGINTY:  Thank you.

18               MR. BOOKBINDER:  Thank you, your Honor.

19               THE COURT:  All right.  The Court is in

20   recess.

21               (Ends, 12:30 p.m.)

22

23

24

25

C E R T I F I C A T E

    I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
hereby certify that the forgoing transcript of the
record is a true and accurate transcription of my
stenographic notes, before Chief Judge Mark L. Wolf, on
Thursday, October 20, 2011, to the best of my skill and
ability.


/s/ Richard H. Romanow 10-28-11
_____
RICHARD H. ROMANOW   Date