UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 09-10243-MLW |
| RYAN HARRIS, | ) ) ) | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM
IN OPPOSITION TO HARRIS'S (RENEWED) MOTION
TO DISMISS SUPERSEDING INDICTMENT**

The United States files this supplemental memorandum in which it addresses three authorities referenced by the Court and renews its opposition to defendant Ryan Harris's (renewed) Motion to Dismiss the Superseding Indictment.[1] The Court should deny Harris's motion because (1) it contorts the allegations in the superseding indictment, misconstrues the government's theory of liability, and misstates the law, ignoring a well-settled body of case law that has affirmed convictions of suppliers of criminal tools; (2) it is essentially a sufficiency-of-the-evidence challenge that is premature and procedurally improper in this pre-trial context; and (3) the authorities cited by this Court support denial of his motion.

**OVERVIEW OF HARRIS'S ALLEGED SCHEME TO DEFRAUD ISPs**

The 11-count superseding indictment charges Harris with committing substantive wire fraud, as well as with conspiracy to commit, and aiding and abetting others in the commission of, wire fraud. In a nutshell, the indictment alleges that Harris and his TCNISO co-conspirators, through his $1 million business enterprise TCNISO, purposefully designed and sold a series of

---

[1] This memorandum supplements but does not restate the arguments in the government's August 26, 2011, Opposition to Defendant's Motion to Dismiss. [Dkt. 57]. The government continues to rely on those arguments and will address them at the hearing.

self-styled "cable modem hacking" products and services that were intended to enable, and in fact did enable, customers to steal free and faster internet access from their ISPs. (Sup. Ind. ¶¶16-18).

But the indictment alleges that Harris and his TCNISO co-conspirators did far more than just develop and sell cable modem hacking tools. Rather, they made considerable ongoing efforts to ensure that TCNISO's customers were successful in stealing free and faster internet access. In that vein, the indictment alleges that Harris and his TCNISO co-conspirators continually tweaked their product line, introducing new products and features to enhance their effectiveness (e.g., they introduced their self-styled "CoaxThief" MAC address stealer/sniffer program and added an anti-probing function to evade ISPs' detection and blocking efforts (Sup. Ind. ¶20, 24)). Using his "DerEngel" alias, Harris operated an online user-feedback forum to elicit input about his products' effectiveness and, specifically, to gather intelligence about various ISPs' latest detection and blocking techniques so that he could then devise work-arounds. (Sup. Ind. ¶¶23, 33). Again using his "DerEngel" alias, Harris operated an online bartering platform for users to trade stolen MAC addresses and configuration files, and indeed himself used this platform to obtain a stolen MAC address. (Sup. Ind. ¶¶23, 33). Further, Harris provided users with robust and ongoing customer support, including video tutorials, instruction manuals, and his book, again written under the "DerEngel" pseudonym, which he tellingly titled "Hacking the Cable Modem." (Sup. Ind. ¶22).

## ARGUMENT

I. **HARRIS MISCHARACTERIZES THE ALLEGATIONS IN THE SUPERSEDING INDICTMENT, MISCONSTRUES THE GOVERNMENT'S LEGAL THEORY, AND MISSTATES THE CASE LAW REGARDING SUPPLIERS' CRIMINAL LIABILITY**

Harris mischaracterizes the allegations in the indictment and misconstrues the government's theory of the case, claiming that the charges rest "solely" on the "capability" of Harris's products and the "intervening" actions of other users.[2] Harris would have the Court believe that he is charged with ignorantly and innocently putting a benign product into the stream of commerce that fortuitously had certain "capabilities" used by other "intervening actors" used to steal internet access, without Harris's knowledge or intent. This fundamentally contorts the allegations set forth in the indictment. The indictment charges Harris with purposefully designing and distributing a series of products and services, bolstered by ongoing and robust customer support, with not only the knowledge but the intent that others would use them to steal free and faster internet access.

The charges do not, as Harris contends, rest "solely" on any one alleged factor. Rather, the 12-page, 62-paragraph indictment contains a litany of allegations that flesh out Harris's scheme to defraud, and to conspire with and aid and abet others in defrauding, ISPs, all of which support the inference that he acted with the requisite criminal purpose. Nor do the allegations, as

---

[2] Harris claims that the indictment's allegations "reduce to the notion that a product's *capability alone* [support criminal liability] . . . that *capability suffices* for culpability. . . that the government's case rests *fundamentally and entirely* on the alleged *capability* of the firmware and on actions of product purchasers and end users." (Reply, p. 1, 14) (emphasis supplied).

3

Harris insists, hinge on fortuitous product "capability" or "functionality." Rather, the indictment alleges purposeful product "design" and effective use.[3]

Harris not only contorts the alleged facts and legal theory, he also misstates the law. Harris conveniently ignores a robust body of case law (discussed, with citations, in more detail in the government's August 26, 2011, opposition brief) that holds that a supplier of goods or services can, under certain circumstances, be held criminally liable for the users' crimes. See e.g., 2 LaFave and Scott, Criminal Law (Second Edition), "Conspiracy: Providing Goods or Services," 6.4(e)(3), pp. 537-39 & fn.150 (1986) (listing factors that courts have considered and citing cases). In the conspiracy context, the pivotal question in imposing criminal liability is whether the "supplier shared the intent to achieve the criminal objective." Direct Sales Co. v. United States, 319 U.S. 703, 713 (1943). The Court should consider, at this point, whether the superseding indictment *alleges* that Harris shared the criminal intent of TCNISO's customers. See United States v. Senibaldi, 959 F.2d 1131, 1133 (1st Cir. 1992). Likewise, in the wire fraud's "scheme to defraud" context, the Court should consider, at this point, whether the indictment *alleges* that Harris knowingly and willfully participated in a scheme to defraud ISPs into providing internet service free of charge.

As set forth in the government's August 26 opposition brief, courts, in upholding convictions of suppliers of criminal tools, have held that an inference of the seller's criminal intent can be drawn from a variety of factors, many of which are alleged in the indictment. These include the nature of the products sold, ongoing assistance that the seller provides, the

---

[3] For example, it alleges that Harris' products "were *designed to*" enable, not, as Harris asserts, merely "*capable of*" enabling, users to steal free, faster, and anonymous internet access (Sup. Ind. ¶ 1).

seller's financial incentives, the market conditions surrounding the product, the seller's personal illegal use of the product, the seller's attempts to hide his identity and the like.  Here, the superseding indictment alleges intent in a variety of ways, including that (1) TCNISO's products were inherently susceptible to illegal use and had no legitimate, commercially meaningful use; (2) Harris continually tweaked his products in a game of "cat and mouse" with the IPSs to defeat their attempts to detect and block customers from using his products on their network, (3) Harris provided continued ongoing customer support to his users; (4) Harris had financial incentives to sell more products and enhancements; (5) the market conditions surrounding TCNISO's business included a large sales volume (grossing $1 million in revenues) and repeated sales to a single customer; (6) Harris tried to hide his identity and involvement in the business; (6) Harris himself traded MAC addresses; (7) Harris knew of his customers' theft of internet access.

At trial, the government intends to introduce other evidence of Harris's intent.  For example, the government plans to show that Harris passionately believed that all internet access should be uncapped, that ISPs were "greedy corporations,"and that, by designing his cable modem hacking products, he had begun a "war" against them.[4]  Accordingly, he had not only a financial motive to sell more products, but he also had a personal vendetta against cable companies.  Consistent with these views, the government intends to show that Harris himself personally used his own products to steal free or faster internet access without paying for it.

---

[4]The government intends to introduce statements that Harris made in his book titled Hacking the Cable Modem, which he dedicates to "the righteous hackers that have been silenced by greedy corporations," and states that he "wanted to uncap as many cable modems as possible! The war [against cable companies] had begun."

## II. HARRIS'S MOTION IS PREMATURE AND PROCEDURALLY IMPROPER IN THIS PRE-TRIAL SETTING

Although Harris has filed his motion under the rubric of Fed. R. Crim. P. 12, a closer look at his motion reveals that Harris is not actually challenging the sufficiency of the *pleadings*; rather, he is challenging the sufficiency of the *evidence*. Harris is in essence asking this Court to make the determination, before the jury has heard any evidence, that there is insufficient evidence to convict him. Ironically, although Harris attempts to cast the government's prosecution as novel and far-reaching, in fact it is Harris's pre-trial motion that is novel and far-reaching. In short, he asks this Court to announce a bright-line rule, which would be contrary to established precedent, that a supplier of a criminal tool can never be held criminally liable for crimes committed by his customers.

Harris's motion is procedurally improper at this pre-trial juncture. As set forth below, deferral of this motion until after trial is particularly appropriate here, because it involves questions of fact that are "inevitably bound up with evidence about the alleged offense itself." United States v. Jalbert, 242 F.Supp. 2d 44, 45 (D. Me. 2003) (citations omitted).

## III. THE AUTHORITIES CITED BY THE COURT SUPPORT THE DENIAL OF THE DEFENDANT'S MOTION

In its Order, the Court directed the parties to file supplemental briefs addressing three authorities, each of which supports denying Harris's motion to dismiss. In Jalbert, the Court refused to consider, pre-trial, the defendant's motion to dismiss the indictment for outrageous government conduct. Id. The Court reasoned that "a motion requiring the presentation of a significant quantity of evidence relevant to the question of guilt or innocence constitutes good cause to defer." Id. at 46. (citing, *inter alia*, Fed. R. Crim. P. 12(b)(2)). See also United States

v. Wilson, 26 F.3d 142, 159 (D.C. Cir. 1994) (encouraging deferral where the motion involves questions of fact "inevitably bound up with evidence about the alleged offense itself").

Here, as in Jalbert, Harris's motion to dismiss "involves questions of fact 'inevitably bound up with evidence about the alleged offense itself.'" Id. at 46 (citations omitted). Harris challenges the sufficiency of the evidence relating to his knowledge and intent, which goes to the core criminal liability determination at trial.

In Barletta, the government moved in limine, in the district court, for a pretrial ruling on the admissibility of a recording. United States v. Barletta, 644 F.2d 50, 52 (1st Cir. 1981). The government requested the pretrial ruling to preserve its ability to appeal an unfavorable decision, but the district court denied the government's motion without specifying whether it was doing so on the merits or was merely denying the request for a pretrial ruling on the issue. Id. The First Circuit, in considering the government's appeal of that order, described the standard for determining when a trial court should rule on a motion in advance of trial:

> First, it excludes from pretrial determination any issues that require review of a substantially complete portion of the evidence to be introduced at trial. At the other extreme, it requires pretrial determination of any evidentiary questions raised by the government that require no such review. Finally, where a decision requires more than a de minimus review of evidence relevant to the general issue but less than a substantially complete duplication of such evidence, the provision vests the timing of the decision in the sound discretion of the district court.

Id. at 58.

Here, Harris's motion to dismiss implicates the "general issues" to be tried and would require review of a "substantially complete portion of the evidence." Specifically, the Court would need to determine whether the government can prove that Harris had the knowledge and

intent necessary to have committed the charged crimes of conspiracy and wire fraud – the primary issue at trial.  To resolve the question Harris has raised in his motion to dismiss, therefore, the Court would need to conduct what would in essence be a bench trial on the primary issue in the subsequent jury trial.  "Accordingly, it is appropriate, if not necessary, that the Court defer until trial any decision regarding the Motion to Dismiss."  Unites States v. Djokich, 2010 WL 276336 *1 (deferring decision on a motion to dismiss alleging that the government improperly manufactured jurisdiction).

Furthermore, unlike in Barletta, there is no need for the Court to rule on Harris's motion before trial to preserve his right to appeal.  If Harris is convicted at trial, he can move under Fed. R. Crim. P. 29 for a judgment of acquittal.  If the Court rules in the defendant's favor, the government can appeal that decision.  Conversely, if the Court rules in the government's favor and uphold's the jury's verdict, the defendant can appeal that decision.

This Court, in Salemme, held that the defendant was entitled to a pre-trial evidentiary hearing on his motion to dismiss to the extent that the motion asserted that the government had granted him immunity.  United States v. Salemme, 1997 WL 810057 (D. Mass. 1997).  The Court reasoned that a claim of immunity "presents an issue to be decided by the court rather than the jury."  Id. (Citations omitted).  It further reasoned that a pre-trial ruling "may be required to preserve the government's right to appeal," citing Barletta.

Here, unlike in Salemme, Harris's motion to dismiss is based on his challenge to the government's ability to prove his mental state.  Unlike an immunity claim. which falls within the court's provenance to decide, a determination about a defendant's mental state falls in the heartland of issues that a jury determines.

## CONCLUSION

For the above reasons, the Court should deny the defendant's motion.

                                        Respectfully submitted,

                                        CARMEN M. ORTIZ
                                        United States Attorney

By:    */s/ Adam Bookbinder*
           Adam J. Bookbinder
           Assistant U.S. Attorney
           Mona Sedky
           Department of Justice Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                        */s/ Adam Bookbinder*

Dated: November 3, 2011