```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3                            No. 1:09-cr-10243-MLW

 4

 5    UNITED STATES OF AMERICA

 6

 7    vs.

 8

 9    RYAN HARRIS

10

11                      * * * * * * * * *

12

13                     For Hearing Before:
                      Chief Judge Mark L. Wolf

14

15                      Motion to Dismiss

16

17                   United States District Court
                     District of Massachusetts (Boston.)
                     One Courthouse Way

18                   Boston, Massachusetts 02210
                     Tuesday, December 13, 2011

19

20                       * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter

23              United States District Court
          One Courthouse Way, Room 5200, Boston, MA 02210

24                  bulldog@richromanow.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3    ADAM J. BOOKBINDER, ESQ.
          United States Attorney's Office
 4        John Joseph Moakley Federal Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          (617) 748-3112
 6        E-mail: Adam.bookbinder@usdoj.gov
      and
 7    MONA SEDKY, ESQ.
          U.S. Department of Justice
 8        601 D. Street, N.W.
          Washington, D.C. 20530
 9        (202) 353-4304
          Email: Mona.sedky@usdoj.gov
10        For the United States of America

11

12    CHARLES P. McGINTY, ESQ.
          Federal Public Defender Office
13        District of Massachusetts
          51 Sleeper Street, 5th Floor
14        Boston, Massachusetts 02210
          (617) 223-8080
15        E-mail: Charles_mcginty@fd.org
          For the defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2             (Begins, 1:15 p.m.)

 3             THE CLERK:  Criminal Matter 09-10243, the

 4   United States of America versus Ryan Harris.  The Court

 5   is in session.  You may be seated.

 6             THE COURT:  All right.  Would those present in

 7   the courtroom please identify themselves for the record.

 8             MR. BOOKBINDER:  Good afternoon, your Honor,

 9   Adam Bookbinder.  And with me is Mona Sedky,

10   representing the United States.

11             MR. McGINTY:  For Ryan Harris, Charles McGinty

12   from the Federal Defender's Office.  With me is

13   Christine DeMasso, with your Honor's permission.  Thank

14   you.

15             THE COURT:  And Mr. Harris, I understand, is

16   on the phone, correct?

17             THE DEFENDANT:  (By phone.)  Yes.

18             THE COURT:  All right.  The rules don't

19   require that the defendant be present for proceedings at

20   which evidence is not being taken.  However, I do want

21   you to understand this, Mr. Harris, to the maximum

22   extent, so I'm glad we can do it this way.

23             Let's see.  Since I saw you on October 20th, the

24   government has filed a dismissal of all counts as to the

25   corporate -- the defunct corporate defendant,
```

 1   TCNISO, Inc., that's in order, so it is hereby allowed.

 2   Mr. Harris is the only remaining defendant.

 3         Although we'll discuss it later, as I had

 4   Mr. Hohler tell you, as a result of the evolution of my

 5   schedule the trial date will have to be rescheduled and

 6   it is my intention to start the trial on February 21st.

 7   So I'll listen to you, of course, but I think you're

 8   probably going to have to adjust for that.

 9         When we left last time, Mr. Bookbinder, you told

10   me you'd look into what you think the guideline range is

11   so I could have a sense of what's at stake in this

12   intriguing -- legally-intriguing case.

13         MR. BOOKBINDER:  Your Honor, I did do that

14   and, I apologize, I actually forgot to bring it, but we

15   both believe that the guideline range is, I believe,

16   it's 57 to 71 months, um, is where we believe that it

17   cannot -- as I said, I printed it out and I think I left

18   it on my desk.

19         THE COURT:  That's based on a certain amount

20   of loss, I assume?

21         MR. BOOKBINDER:  Your Honor, yes, we're using

22   -- right.  The base offense level is 7 because of wire

23   fraud charges, um, then there is a loss, um, that for

24   purposes of this calculation anyway we're assuming it's

25   between $400,000 -- or actually we're using gain instead

1    of loss because we concluded that loss -- while there is

2    a loss, that it's impossible to accurately calculate.

3    So the gain would be between $400,000 and a million

4    dollars.

5                THE COURT:  This is the gain to?

6                MR. BOOKBINDER:  The gain to the defendant.

7                THE COURT:  From his alleged conspiracy with

8    the fellows of Massachusetts?

9                MR. BOOKBINDER:  No, the -- well, the

10   conspiracy with all the users in the fraud scheme in

11   general.  So it's the charge and relevant conduct, your

12   Honor.

13               THE COURT:  All right.  And this is premature,

14   although I expect it will come up later, um, I asked

15   Mr. Hohler to ask you to read my Rule 29 *Pappathanase*

16   decision which builds on the *Goldberg* case that I

17   mentioned on October 20th, that goes to the sufficiency

18   of the evidence.  But, you know, we'll do this in a

19   logical order.  I want to hear you and decide the motion

20   to dismiss for a lack of venue or a request for a

21   transfer of venue or to dismiss because the mail fraud

22   statute's allegedly void for vagueness.  Um, my present

23   tentative view is that I'll deny that motion.  But I'm

24   getting educated about this case and, as you can see

25   from my reference to *Pappathanase*, which is possible

1    that Mr. McGinty referenced -- he referenced the concept

2    back in October about the idea of a hub and spoke

3    without a rim-type conspiracy.

4           MR. McGINTY:  I apologize.  I remembered the

5    case, but I simply didn't cite it.  You know, it was in

6    the *Goldberg* line of cases and, frankly, I did not cite

7    it and I apologize.

8           THE COURT:  Well, no, that's okay.  But if

9    that's a -- here, I'm interested in hearing your

10   argument, but I'm also interested, as usual, in being as

11   transparent as possible.  With regard to the motion to

12   dismiss for lack of venue, it appears to me that it's

13   not meritorious.  I think you recognize that it needs to

14   be decided on the face of the indictment.  Okay?  The

15   face of the indictment alleges a conspiracy between

16   Mr. Harris and, among others, four people in

17   Massachusetts who allegedly committed overt acts in

18   furtherance of that conspiracy in Massachusetts.  Venue

19   at trial has to be proven by a preponderance of the

20   evidence, but my understanding is that if a conspiracy

21   is proven and it's proven that there was an overt act in

22   furtherance of it in Massachusetts, venue would exist

23   here.

24          With regard to the mail fraud counts, I have to --

25   and it's not perfectly -- and the government may be

proceeding on both, but it's not perfectly clear to me
what the government's theory is, that is, whether the
individuals of Massachusetts who made the wire
transmissions were engaged in a scheme that was aided
and abetted by Mr. Harris.  You also might have a -- and
you allege that he caused as part of his own scheme, um,
transmissions to be, um, made that arguably could have
caused the people of Massachusetts to make the
transmissions.  But, um, you know, if essential offense
conduct occurred in Massachusetts, then it's my
understanding that he could be held liable based on
aiding and abetting even if he didn't act himself in
Massachusetts.  I have in mind, *Griffin*, 814 F.2nd 806
at 810.

So, you know, my present sense is, you know, doing
this on the face of the indictment, the charges survive
a motion to dismiss for lack of venue.  My present sense
also is that while it's helpful for me to be educated on
*Falcone* and *Direct Sales*, um, *Direct Sales* made clear
that *Falcone* didn't stand for the proposition that, you
know, a seller could never be held criminally liable for
an alleged conspiracy with a buyer, it's just that the
mere fact of selling and buying is not enough.  And it
seems to teach me again that it's a very fact-specific
inquiry that I would have to instruct the jury on if the

1 case gets to a jury.

2     MR. McGINTY:  Can I --

3     THE COURT:  But anyway, that's my present

4 thinking.  You should start where you want to start and

5 argue what you want to argue.  It's an interesting

6 matter and *Pappathanase* is the only case in my almost 27

7 years as a judge that I've ever granted a Rule 29 motion

8 on with regard to all counts and it all started with a

9 motion to dismiss, where the government originally

10 charged the rebates -- it was known that the rebates

11 could facilitate tax evasion and *Goldberg* taught that

12 the defendants had to know they would be used to evade

13 taxes.  The government superseded the indictment, made

14 the required edit, but the proof didn't rise to that

15 level.

16     MR. McGINTY:  The Court made a point that a --

17 that an act in furtherance of the conduct of the

18 purchasers of the item could cause venue to lie here

19 against Mr. Harris.  What I would like to do is just to

20 go to the indictment and just to walk through the

21 indictment and see exactly what it is that's charged

22 here.  If the issue is going to be whether there is

23 sufficiently charged the wire fraud crime, that's seems

24 to be an appropriate place to start.

25    Now, what the government alleges is that

1    Mr. Harris had sold firmware, um, the firmware was both,

2    as I understood it, the software --

3              THE COURT:  And sold --

4              MR. McGINTY:  Firmware, which is, as I

5    understand it, both software and hardware, the hardware

6    being in the form of a cable modem, the software being

7    software that could be used, um, either in connection

8    with the modem or separate from the modem for the

9    purpose of achieving certain things.

10             Now, let me just back up just for a moment and say

11   that, um, what Mr. Harris was doing was in the nature of

12   what's called, in the computer jargon, "reverse

13   engineering," and another word for it is "jail

14   breaking."  And what that is is identifying the piece of

15   technology, what the underlying code is, what the

16   underlying technology is that gives birth to this

17   device.  A recent example of that is the IPhone.

18             A young man of maybe 17 years of age was charged

19   with having jail-broken or reverse engineered the IPhone

20   and what Apple tried to do is to make sure that the

21   IPhone would only use applications created by Apple and

22   persons who purchased that product say, "Well, we'd like

23   to have applications in addition to what it is that

24   Apple provides because there are better applications

25   out."  But Apple could prevent him from doing it by

1    having technological barriers that prevent the accessing

2    of the internal code to permit those applications to be

3    used.  And what this young man did -- apparently a

4    brilliant young man, was that he was able to identify

5    the code that supported the applications that were used

6    in the IPhone.  Having done that, he found himself in a

7    world of trouble with Apple, which sought to do

8    something about this because they said that reverse

9    engineering is fundamentally illegal and they sued him

10   civilly.

11       The reverse engineering instinct among people who

12   are on the Internet is to identify -- for each piece of

13   technological capability, is to identify what that is,

14   what the underpinnings are, open it out and see what the

15   applications would be, identify what the platform can

16   do, and from that open up a potential of things that can

17   be done.

18       Now, here Mr. Harris wrote a book that was engaged

19   in the reverse engineering of a cable modem, a device

20   that connects to the ISP that permits internet access

21   via a cable.  In doing this reverse engineering, he both

22   opened it up in terms of a book which described what he

23   did, but he also provided some software and hardware

24   which permitted the application, by persons who intend

25   to do things with that, open up the potential of a

1      number of different applications.  So this is in the

2      genre, um, which is now net-wide, of persons who engage

3      in reverse engineering for purposes of finding out

4      capability.  That's not the same as doing the thing with

5      the capability.

6           Now, if we go back to the indictment.  In the

7      indictment the government alleges a number of things

8      that the software can do.  Um, one of them is that it

9      would permit, quote, "Users could obtain internet

10     service from ISPs without paying for the service."  This

11     is in Paragraph 1 of the indictment.  So one of the

12     things it would permit being done is to get free

13     service.  That's Paragraph 1 of the indictment.

14          The second thing it would permit being done is to

15     get faster service.  Referring now to Paragraph 12.

16     Quote:  "Harris's products and services also enabled

17     users to obtain faster, upgraded or uncapped internet

18     service without paying the premiums."  Now, what this

19     does is it suggests that what Harris is doing is

20     permitting a person to exceed a limitation that's

21     created by the cable company, by the ISP.  In fact,

22     there is a world of information to the effect that the

23     uncapped, the effort to obtain greater speed on the

24     Internet can be consistent with the, um, with the

25     service that a person is paying for for the ISP.

1          There are articles that appear in, among other

2      places, PC Magazine and so forth, which talk about the

3      --

4                  THE COURT:  Yeah, but this is --

5                  MR. McGINTY:  If I could just sort of -- if I

6      could just put this into context.

7                  THE COURT:  All right.  Go ahead.  Go ahead.

8                  MR. McGINTY:  Part of this is implied in the

9      indictment, some of it is expressly stated in the

10     indictment.  It's important to, I think, root this out.

11                 THE COURT:  Well, I mean, it may be at trial.

12     But let me ask you the following.  I understood from

13     your supplemental memo that you accept that, in the

14     context of this case, the motion to dismiss should be

15     decided based on the face of the indictment, not --

16     because I basically have to try the whole case, um, to

17     determine the venue issue.

18                 MR. McGINTY:  Well, the -- ordinarily the

19     answer to that is "Yes."  Um, there are some things that

20     are not on the face of the indictment.  For example, the

21     government is contemplating charging Mr. Harris in the

22     Northern District of California on tax charges.  I think

23     that's a fact that --

24                 THE COURT:  I think in the Central District,

25     they said.

```
 1              MR. McGINTY:  Um, either Central or Northern.
 2              MR. BOOKBINDER:  Actually it's neither, it's
 3    Eastern.
 4              MR. McGINTY:  Eastern?  I think of California
 5    in terms of going south, not east or west.  Um, but
 6    that's a fact, it's a part of what's in the indictment.
 7              THE COURT:  Okay, that -- that may relate to
 8    the motion to transfer venue if venue's properly here.
 9              MR. McGINTY:  But to sort of develop this
10    point just a tiny bit further --
11              THE COURT:  No, you can because, while I doubt
12    it's really cognizable now, this is, when we get to
13    trial, can be very important.
14              MR. McGINTY:  So, um, what is -- what ISPs do
15    is they frequently choke off the cable speed that they
16    otherwise contract with the customer for so a customer
17    applying or paying the premium for a certain speed, um,
18    finds that that speed is not what's provided.  Imagine
19    going into a produce store and finding the scales are
20    not working or finding that when one pumps gas into
21    one's car --
22              THE COURT:  What chokes it off?
23              MR. McGINTY:  What chokes it off is they have
24    the capability of narrowing the -- of both narrowing the
25    broadband that's provided to the customer and narrowing
```

1    what it is they can do with that broad band.

2              THE COURT:  Who has that capacity, the ISPs?

3              MR. McGINTY:  The ISPs.  Um, one of them, for

4    example, Comcast, um, was sued by the FCC because what

5    Comcast was doing was narrowing and throttling, um,

6    traffic that involved the person-to-person websites.  So

7    the FCC, in 2008, um, issued a cease-and-desist order

8    against the cable company, Comcast, which is one of the

9    ISPs here, against Comcast, um, for what they were

10   doing, which was to choke, um, individual customers'

11   access to the net services that they were getting or

12   thought they were getting when they contracted for

13   service fees.

14             THE COURT:  What's the relevance of that to

15   this case and this motion?

16             MR. McGINTY:  The point of this is that one of

17   the things that in the indictment, um, the government

18   alleges is that this -- this firmware had the capability

19   of permitting a user to increase the speed of their

20   access notwithstanding the limits that were put on by

21   Comcast.  In some circumstances what they would be able

22   to do is to achieve the speed that they were promised

23   for the fee that they're paying and --

24             THE COURT:  I think the allegation in the

25   indictment is that they were able, with these devices,

1    to either get services they didn't pay for or a higher

2    level of services, more speed than they were paying for,

3    and therefore it was a scheme to deprive, say, Comcast

4    of money.

5              MR. McGINTY:  Well, I think one of the points

6    I think that the Court -- um, one of the lessons that

7    may be drawn from the Court's *Pappathanase* decision is

8    four weeks into the case a proposition that might have

9    been apparent had there been acknowledgements by the

10   government of the limits of their proof went four weeks

11   into trial before it was -- before the Court confronted

12   the issue of whether this was a scheme for purposes of

13   defeating the collection of taxes.  Um, here there's one

14   more ingredient to this, which is that Mr. Harris is

15   called into Massachusetts, um, and is asked to stand

16   trial on a case which, at the end of the day may prove

17   to be in the same category as *Pappathanase,* with one

18   additional reading, which is that he will effectively be

19   denied his right to a constitutionally-suitable venue.

20        So one of the things that's important, I think, to

21   do here is to take a look at what really is underlying

22   the charge, what underlies the predicate, but I don't

23   want to rest entirely on that because, um, the way it's

24   charged in the indictment, it's as if Comcast provided,

25   um, the appropriate Internet access speed that it

1    contracted for and, in reality, that's not what happens,

2    and that's part of what motivates a person to get a

3    modem because one of the things they can do is the self-

4    help of responding to the choke or throttling by the

5    cable company.

6         Now, the third part of this is that, um, according

7    to the government now, in Paragraph 13, this can be

8    used, quote, "to mask the user's on-line identity."  So

9    one of the things that can be done here is the person

10   can use that capability that this modem has to mask who

11   they are.  Now, if one were an Iranian national or

12   perhaps a Libyan national or perhaps a dissident

13   communicating with their home country, there are a world

14   of reasons why a person, in terms of their political

15   communication on the internet, might not want the origin

16   of their speech to be made available on the Internet.

17   And persons who purchase this, among the things -- among

18   the potentials they get is the possibility of

19   concealing, um, their identity, and that can be, in many

20   cases, an entirely laudable objective.

21        THE COURT:  Well, I don't think it's the

22   government's contention that it's intrinsically unlawful

23   to mask your identity.  The way I read this is they were

24   providing an explanation for why somebody might want to

25   mask their identity and they might want to mask their

1  identity because they're stealing services they haven't

2  paid for.

3           MR. McGINTY:  Right, but what the government

4  is doing here is to say that this is a bad thing, this

5  firmware is a bad thing, it is in itself a bad thing.

6  Now, they don't point to a statute that makes this thing

7  prohibited.  And, you know, in the positive law we look

8  to the thing that makes the thing illegal.  When they

9  say it's a bad thing, um, they talk about getting faster

10  -- they talk about getting the free service.  Where they

11  don't point to is that among the capabilities that this

12  thing does, which they acknowledge in their indictment,

13  is it permits the masking of identity, the hiding of

14  identity, and a purchaser of a cable modem can be doing

15  it for the purpose of concealing who they are for

16  purpose of political speech.

17       Now the final ingredient on this, as I understand

18  the government's allegation, is that this program can

19  also permit, um, the obtaining of MAC addresses.  Now, a

20  MAC address, which the government -- you know, we have

21  many times said to the government, "Why is getting a MAC

22  address a crime?"

23           THE COURT:  It's not charged as a crime.  The

24  crimes charged here, as I understand it, are conspiracy

25  to commit wire fraud and wire fraud, so.  You know, the

1    fact that -- you know, for wire fraud they have to prove

2    a scheme to get money or property based, you know,

3    unlawfully and the use of the wires in furtherance of

4    the scheme.  The constituent elements don't have to be

5    unlawful just as -- you know, we went through this the

6    last time.  An overt act doesn't have to be

7    intrinsically unlawful, but if it's in furtherance of a

8    conspiracy, um, it's evidence of a crime and an

9    essential element of the crime in this case.

10              MR. McGINTY:  I'm getting ahead of myself a

11   tiny bit to say that the ingredient the government has

12   now alleged and ultimately would be unable to prove is

13   that the sale of these items was with the knowledge,

14   leave out the intent, to assist in a specific crime --

15   without the knowledge of the application of the device.

16   So what I'm talking now is about the government's

17   allegation of not what the capability of the device is,

18   before getting into the question, um, that's fairly

19   begged by the government's indictment, which is where's

20   the allegation, um, in the indictment, um, that he knew

21   what it was -- that the capabilities of the modem would

22   be used for purposes of engaging in wire fraud?

23              THE COURT:  Well, I think it is alleged in

24   Paragraph 15 of the conspiracy in the sense that it's

25   alleged that Mr. Harris, um, knowingly conspired to

1   commit wire fraud.  Because, I mean, that's what the

2   standard instruction is.  You know, they're going to

3   have to prove the agreement charged in Count 1, and not

4   some other agreement, that is, an agreement that has

5   essentially or substantially all of those people in

6   Massachusetts in it and not individual conspiracies with

7   individuals.  But I think that's the import of that.

8   Because a conspiracy, you know, requires that somebody

9   knowingly and willfully intend to agree and intend that

10  the crime be committed.

11       So there the government's going to have to prove

12  that Mr. Harris and at least some of the people named in

13  the indictment entered into an agreement, express or by

14  conduct, and that he intended that wire fraud be

15  committed.

16          MR. McGINTY:  That is the formal charge,

17  that's an iteration of what the statutory elements are.

18  Um, that can be sufficient in a case that did not

19  implicate a larger constitutional guaranty relating to

20  the proper venue.  But here when we look to what the

21  overt acts are and we look to what is charged with

22  respect to the conduct and the knowledge, the nitty-

23  gritty ingredients of what the government is purporting

24  to be able to prove, there we come up short.

25          Now, it may be that the Court and the government

1    can say, "Well, that's what a trial is for," but it's a

2    trial in a place that is a constitutionally-assured

3    place and here what we have is not only the **Pappathanase**

4    problem of getting to the end of the road and finding

5    out we could have addressed this at the start of the

6    road, but why is Harris answerable for an allegation of

7    participation in wire fraud in Massachusetts where the

8    critical ingredients are, with respect to three of the

9    persons named here, that he -- and let's take -- let's

10   assume it's the case that they can prove that it was he

11   that sold the item -- which I think the proof will come

12   up short of, he did not sell the item, it was sold by

13   other people who worked for the company.  But apart from

14   that, if he had sold the item without having the benefit

15   of knowing how that item might be used, then you can say

16   with respect to the sale of the item, yes, he had a

17   connection to that delivery in Massachusetts.  But if

18   the crime in Massachusetts isn't the delivery of the

19   item, it's what did he do with respect to a rip-off of

20   Comcast?  Did he know how it was going to be done?  Did

21   he know if the target was Comcast?  Did he know what the

22   person was going to do?  Did he get on the phone with

23   him and say, "Look, I know you're having some technical

24   problems here."  If you attach this point to this point

25   to this point, um, Comcast can't defeat that.  Did he

1    say anything to indicate that he knew the application

2    here was going to be theft, not masking identity, not

3    MAC address, um, grasping, not getting greater service

4    from the ISP, but was going to be theft of service?

5         Now, with respect to these three persons, the

6    theft of service that's charged, with respect to these

7    three substantive accounts, is going to be that for a

8    period of that calendar year each of these people had

9    free internet service, which would roughly approximate

10   the maximum likely cost of this would be 50 bucks a

11   month times 12, which would be $600.  Not satisfying any

12   jurisdictional standard here.  Um, not certainly

13   satisfying the --

14        THE COURT:  Why doesn't that satisfy a

15   jurisdictional standard?

16        MR. McGINTY:  Um, because while wire fraud

17   does not have a money amount, um, to the extent the

18   government doesn't --

19        THE COURT:  He doesn't have to get any money.

20   If you engage in a scheme to defraud and it doesn't

21   succeed, um, you're still guilty.  When I was reading --

22   when I was preparing today, I thought of the First

23   Circuit decision in **Potter**, that I may have mentioned to

24   you back in October, um, it's an honest services fraud

25   case, but that that's where there was this scheme to

1     give money to the law firm of a public official with the
2     expectation that some of that would get to the public
3     official and he would vote to get the racing dates in
4     Rhode Island, I think.  And the scheme was aborted, you
5     know, before the public official got any money and, in
6     fact, it wasn't proven, I think, that the law firm knew
7     about the scheme.  But the people who devised the
8     scheme, um, were found to have been properly convicted.
9              MR. McGINTY:  There's no jurisdictional amount
10    that is the -- sort of the condition precedent to a wire
11    fraud charge.  I would suggest that on the substantive
12    charges here, um, that for the -- for the -- to be a
13    realized amount of money, not what a person actually
14    gained, but what the amount of money at issue was, there
15    has never been a wire fraud case in this district of
16    $600.  Um, the vindication of the right that's sought
17    here is the use of the wire fraud statute to reach
18    conduct that has not been charged in the United States
19    except for one court where the prosecution was
20    abandoned.  In two other courts, computer fraud charges
21    were brought and then reduced to a misdemeanor in order
22    to elicit a plea.  But nowhere has wire fraud been
23    brought, as I understand it, involving conduct of the
24    sort, for the amount of money at issue here or where a
25    person has created a -- sold an item which has

1    capability of doing things -- among the capabilities it

2    has is the capability to be misused, where that becomes

3    the predicate for the person being charged for

4    participation with a user in what the user was doing,

5    um, quite apart from the fact that here, in the

6    indictment -- and I look through -- if you look through

7    the paragraphs that relate to the specific individuals,

8    without any allegation that there was shared

9    communication between Harris and them with respect to

10   what they were going to do.

11        So the issue here is, Harris makes a capability.

12   The capability charged in the indictment is the

13   capability of free service, enhanced service, MAC

14   addresses, and masking one's identity.  Masking one's

15   identity is not fraud.

16             THE COURT:  It could be part of a scheme to

17   defraud.

18             MR. McGINTY:  But leaving a scheme to defraud

19   out, because if you don't have the knowledge, you don't

20   have participation in the scheme.

21             THE COURT:  I know, but --

22             MR. McGINTY:  So hypothetically speaking

23   you're correct in this case, but there's no allegation

24   to that effect.

25        So with respect to the MAC addresses, making the

1    capability that permits you to have -- to retrieve MAC

2    addresses implicates the conduct of Google every day in

3    its operation.  Um, a MAC address is no different from a

4    VIN number on a car.  It's out there.  It's not

5    confidential.  Um, Comcast can't claim that this is

6    something assigned to a person that in some way, um,

7    deprives them of their property interest in that.

8         So the capability to do these things, um --

9    there's multifaceted capabilities here.  The government

10   in its indictment, quite apart from the reality, which

11   is that the capability is broader than the government

12   acknowledges -- among other things is simply the

13   capability of making a connection to an ISP, there's the

14   self-diagnostic capability, there are other capabilities

15   not acknowledged in the indictment.  But taking what's

16   charged in the indictment, which of those four, three of

17   which under most circumstances are illegal in terms of

18   making that capability and the fourth one only if you

19   allege knowing participation, benefitting participation

20   in the conduct of a third party with what the third

21   party is doing.

22                  THE COURT:  Well, you actually just used a

23   word that I was going to direct you all to brief, which

24   is "benefit."  In other words, it's -- here's an alleged

25   mail fraud.  Um, I mean, mail fraud's alleged here.  And

1   I did want to try to get some clarification today on

2   what the government's theory is and their theory may be

3   that Mr. Harris aided and abetted -- I'm sorry, wire

4   fraud by the individuals who made the transmissions.

5        One of the questions that I expect will rise, and

6   you just alluded to it, is whether the government is

7   required to prove that the scheme was intended to

8   benefit Mr. Harris in some way?  In **DiMasi**, I instructed

9   the jury that it had to find that payments made to third

10  parties were for his benefit, but that was because that

11  was alleged in the indictment and I noted that I might

12  be requiring -- and the government undertook that burden

13  until just before the case went to the jury.  And I

14  noted that I might be instructing that the jury had to

15  find more than the law required for the purposes of a

16  Hobbs Act extortion under 951, um, there's Supreme Court

17  cases that say, you know, if a public official extorts

18  money, the money -- you know, causes money to be paid

19  under color of official right, that it doesn't have to

20  come to him or be for his benefit, it could be for a

21  third party.  So, I mean, this is something we're going

22  to have to zero in on if the case goes on beyond today.

23        MR. McGINTY:  But in this case, um, taking

24  what the critical ingredient is, um, whether Harris had

25  the knowledge of the unlawful application, um, that

seems to be a conspicuous, um, omission here, and let's

add one more ingredient to that.  With respect to, um,

the first of the named persons, um, the government

there, um, alleges with respect to him not that he had

purchased from Harris, but on two occasions had

downloaded, and under the circumstances then it's fairly

obvious that what the government is not going to be

trying to prove is that the items that were obtained in

those instances even came from Harris.

To the extent they were downloaded, what we know

in looking at the discovery is that one of the downloads

was from the -- um, the software having been made

available on the internet without cost.  The second was

that it was made available by a different person, um,

another employee of the company, um, under circumstances

that were known only to her, um, if she made available

that.  So with respect to the first of the individuals,

there's not even any, um, sale by Harris, so there's no

money, presumably there's no financial benefit there.

So what you have with respect to these four persons, or

for three of them, you don't have any knowledge, and for

the fourth, you don't even have a transaction.

Now, again, you know, to harp on the venue issue,

because it's so important, um, is that the government

didn't elect to bring this in California, they didn't

1    elect to bring this where the scope of the conduct by

2    Harris, um, would be addressed, there'd be no venue

3    issue there, but it's brought here, um, it's brought

4    here because presumably the government's view is that by

5    alleging secondary conduct --

6         THE COURT:  Actually there's at least one

7    Ninth Circuit case, which struck me as not quite right,

8    um, that holds that the proper place for venue in wire

9    fraud is where the transmissions were made.  I wouldn't

10   think, and I believe the First Circuit's statement of

11   what's required for venue would be, you know, where some

12   essential offense conduct occurred and it could be where

13   the scheme was devised.  But I do -- but to me, if the

14   case were brought in California, you'd probably still

15   have a venue claim based on their theory of the case.

16        MR. McGINTY:  Um, you know, it's interesting

17   that the Court had raised the issue of were this a civil

18   case, what about the jurisdictional aspect of this?  Um,

19   I would note that in the last year the Supreme Court in

20   two different cases has really tightened up the

21   opportunity to sue under a long-arm statute where you'd

22   pull someone in by virtue of conduct occurring, um, in a

23   distant locale both in, um, *Goodyear Dunlop* and also in

24   *McIntyre Machinery*.

25        What's interesting in *McIntyre Machinery* is it

1    involved a -- um, some metal shearing from a machine

2    that was made in London, four of those machines had

3    ended up in New Jersey, the accident occurs in New

4    Jersey, and under the stream of commerce, um,

5    jurisprudence, as I understood it -- and maybe I didn't

6    understand it too well, but it was *Gray vs. Standard*

7    *Radio* back in law school and the issue of if you have a

8    radiator which ends up in Illinois and then the pressure

9    valve on it fails and the thing explodes and hot water

10   goes all over and the person's very badly harmed, the

11   stream of commerce permitted you, in *Gray*, to say "When

12   it blew up in my house, I can go down to the court and

13   file suit," and, you know, *Gray* became one of the

14   principal cases that sort of dictated the course of

15   jurisdiction.

16       If I understand what the Supreme Court's doing, in

17   a pretty badly-splintered decision, but in *McIntyre*

18   *Machinery*, um, they seem to be chucking the stream of

19   commerce argument that if you set something out, where

20   it ends up, there can be jurisdiction if a harm flows

21   from that.  Um, there -- here, um, if Harris sold

22   something and if the harm is independent of the sale of

23   the item because there's a plus factor -- in other

24   words, there's nothing wrong with ordering a modem,

25   there's nothing wrong with ordering software, it's

1    entirely lawful for Harris to sell it, it's entirely

2    lawful for someone to purchase it, the only thing that

3    makes this illegal is the application, provided Harris

4    knew about it.

5         So in order for this to be civilly sued here for

6    something that originated in California, the agents sort

7    of cooking up a couple of, you know, sales here wouldn't

8    -- certainly wouldn't cut it, because that would be

9    viewed as manipulating it, um, the fact that it ended up

10   here doesn't answer the question in *McIntyre* and the

11   question is whether in *McIntyre* there were four of these

12   items that ended up in New Jersey.  The Court just

13   pushed that aside and said that the issue is whether or

14   not, um, the person, quote, "intended to submit to the

15   power of that sovereign," um, and it said, um, "and

16   whether the person can be said to have targeted the

17   forum."

18        Let's go back to the first individual charged here

19   who downloaded -- who went to the site for the company,

20   who downloaded from the site a free application.  So the

21   site presumably -- and, you know, computer -- you know,

22   net locations are, um, almost a theory.  But if you go

23   to a site which is generated by a business in California

24   and you go in to get from them something and you then

25   apply it in Massachusetts, um, on any civil application

```
 1    of whether civil jurisdiction would lie with respect to

 2    that first individual the answer would be resoundingly

 3    "no."  And second would be, with respect to the other

 4    three, what is the conduct that he's answering for

 5    here?  The conduct that he's answering for would be that

 6    he was complicit in what they did with the item, not in

 7    sending it, but what he was complicit with --

 8              THE COURT:  I think that's right.  The

 9    jurisprudence basically says that -- I mean, if there's

10    a conspiracy and it occurs in, you know, some acts or --

11    um, that acts are committed as part of the conspiracy

12    and in furtherance of the conspiracy in different

13    jurisdictions, um, the case -- there's venue in any

14    jurisdiction in which an overt act was committed.  And

15    they allege that there are overt acts committed here.

16              MR. McGINTY:  But the overt acts they're

17    alleging, um, do not include the ingredient that makes

18    it a crime for Harris.  So if the overt acts --

19              THE COURT:  But we went through this last time

20    with the hammer, an overt act doesn't have to be

21    intrinsically unlawful if it's --

22              MR. McGINTY:  No, it doesn't have to be, but

23    it has to be the thing that's the overt act in

24    connection with the crime.  Now, if Harris provides

25    something which someone else uses in a fashion that is a
```

```
 1   crime -- now, the Court can say, "Well, we're not going
 2   to" -- "that's what trial is for," I mean, if this were
 3   a civil case we would have supplemental filings to
 4   address that.  But here, um, if you look at the
 5   indictment and say, "How are they charged?"  Given the
 6   fact that there's a constitutional guaranty of a venue,
 7   um, not once but twice in the Constitution, to assure a
 8   person would only be charged in a place, um, that is --
 9   where the venue is appropriate, honoring that in a
10   situation where you're looking at the indictment and you
11   say, "Where do you allege with respect to Person Number
12   1, (A) that he knew what the application was going to
13   be, and (B) that he sold anything, as opposed to it
14   being downloaded from a site?"  And with respect to the
15   other three, "Where's the thing that says that he
16   knew" --
17                (Interruption dial tone.)
18                THE COURT:  We'll try to get Mr. Harris back.
19                (Clerk redials.)
20                THE COURT:  And I think you've made these
21   points.  Just to move ahead a little, and you can
22   address them now or we can do --
23                THE DEFENDANT:  (Over phone.)  Yes, I'm here.
24                THE COURT:  -- or we can do them separately,
25   but that transferring venue would be a discretionary
```

 1    matter.  I'm not even sure there would be venue

 2    concerning Mr. Harris in the part of California you'd

 3    like me to send this, to the Eastern District of

 4    California.

 5         But, you know, again looking at the indictment and

 6    the government's representations concerning the relevant

 7    facts, the defendant lives in Oregon, California is

 8    closer, but he doesn't live in the Eastern District of

 9    California.  The corporate defendant now dismissed was

10    in the Southern District of California.  Many of the

11    alleged co-conspirators, presumably witnesses, are here

12    in Massachusetts.  They're unindicted.  None of them are

13    in the Eastern District of California.  So I'm not

14    inclined to transfer the case there.

15         And I believe it's premature, in effect, for me to

16    decide if the wire fraud statute is void for vagueness.

17    Void for vagueness is decided facially when the claims

18    are First Amendment claims.

19         And while you have talked somewhat about speech, I

20    mean, the essence, I think, of the government's

21    purported proof is not that it was unlawful for

22    Mr. Harris to advocate rebellion on the internet, but,

23    you know, to say, "Here's a device you can use to steal

24    internet service without paying for it," you know, they

25    say are doing certain things that would constitute

1   aiding and abetting.  They may have to prove at trial

2   that he actually knew these people.  I don't know that

3   you can aid and abet a crime that you're not aware is

4   being committed.

5           MR. McGINTY:  Frankly this is the problem.

6   Are we going to be in a better position four weeks or

7   three weeks or two weeks into this case to resolve the

8   issue when -- were there to be, let's say, candor about

9   what the lay of the land is?  And candor would be that

10  there's going to be no proof offered for that.

11          THE COURT:  Well, it's just very difficult.

12  There's a Tenth Circuit case, **Reed**, where the parties --

13  and I don't know if you cited **Reed** or not?  (Pause.)

14  No, you didn't.  But it's very much on point.  114 F.3d

15  1067 at 1070.  And, you know, the government made a

16  detailed proffer, the defendant didn't object to it, nor

17  did he stipulate to the facts, um, and the First Circuit

18  said, "You know, I understand why -- we understand why

19  the judge was lured into doing this, but it's not

20  proper.  Until you have all the facts developed at

21  trial, that you can't properly decide a void for

22  vagueness challenge."  So you may get, you know, a

23  chance to try a case that you think you got a good shot

24  of winning.

25          All right.  What does the government want to say?

1            MS. SEDKY:  Thank you, your Honor.

2        The government believes that Mr. McGinty, although

3   he's a very passionate advocate for his client, is

4   fundamentally mischaracterizing the 60-plus paragraph

5   indictment that we've -- um, the superseding indictment.

6        This case is not about jail breaking, we haven't

7   alleged jail breaking, this is not about capability and

8   functionality and misuse, this is about purposeful

9   design and intended use of a product to steal free and

10  faster Internet access.  And I'd like to take a moment

11  just to focus the Court on the indictment itself, the

12  four corners of the indictment.

13       And with the Court's indulgence, I would like to

14  take a slight detour.  There is some technical

15  underpinnings of the indictment, we did flush it out of

16  the indictment, but it is relevant to go to what this

17  product functionality and design was and it elucidates

18  Mr. Harris's intent and knowledge and purposeful

19  conduct.

20            THE COURT:  Okay.

21            MS. SEDKY:  So Mr. Harris built a $1 million

22  commercial enterprise over the course of about 5 to 6

23  years and the products -- there were a series of

24  products that he released over time, um, starting with,

25  I believe the first one was Sigma, then came Blackcat,

 1    then came Sigma X, and there was a product called Coax

 2    Thief, that initially was a standalone add-on, and he

 3    later incorporated that into the functionality of Sigma

 4    X, and that was sort of his last product.

 5        What the products did was they allowed a --

 6    through a buyer of the product or a user of the product,

 7    to, um, have a packet sniffer and a packet sniffer is

 8    essentially a software device that allows you to

 9    intercept packets that are going across a network.  And

10    this packet sniffer was designed to allow the user to

11    pick up two things, a MAC address and a configuration

12    file.  And a MAC address, as Mr. McGinty has explained,

13    is essentially a hardcoded serial number that a modem

14    has on it.  It's put in at the factory.  The modem

15    manufacturers take a lot of care to make sure that it

16    cannot be changed.  It is the primary identifier that

17    ISPs use to determine that one of their users is a

18    paying subscriber.

19        So the user turns on their computer, the MAC

20    address beacons itself to the ISP, the ISP says, "Alas,

21    I recognize this MAC address," the ISP then sends what's

22    called a configuration file to what it thinks is a

23    paying subscriber, and the configuration file

24    essentially determines the band width speed of what that

25    person is paying for.

1          And Mr. McGinty alluded to earlier "throttling

2    service."  The cable companies do offer tiered service

3    and the reason they do that is because if I'm an ISP and

4    I am sending cable access to your neighborhood, for

5    example, there's a pipe essentially, it's like a

6    physical pipe, and it has limited band width capacity,

7    only so much band width can go through it at the same

8    time, only so many electronic packets.  So if there's a

9    superuser in your neighborhood, your internet access is

10   going to slow down, and the only way I can give

11   everybody the internet access they're paying for, if

12   I've got a superuser, is I have to build more pipes,

13   which costs me money, and so I charge more money for

14   people who are using faster service to try to titrate

15   demand and make sure everybody's happy.

16        So there's limited band width through the pipe and

17   I -- then the ISP delivers the kilobits per second for

18   upstream and downstream, that's what's in the

19   configuration file.  And it's multitudes more expensive

20   to get faster service.  It's like tenfold more expensive

21   to get superfast service.  These are orders of

22   magnitude, differences in price.

23        So what Mr. Harris designed, with help of a few

24   others, is a product that allows the user to first sniff

25   MAC addresses of his neighbors in hope that he gets a

paying subscriber's MAC address, then he uses that MAC

address, and he can also sniff for config files, for

configuration files, um, that the package sniffer was

designed to pick up both.

There's a little bit of a technical twist here

which is that you cannot use the same MAC address in the

same neighborhood because you will kick off your

neighbor from using internet access.  So if I'm here and

Mr. Bookbinder is in my neighborhood and I'm using --

I've got my MAC going, I'm on-line, he sniffs my MAC

address, tries to use it, I will get kicked off and the

cable company will now know there's probably a cloned

modem on his system.

So there needs to be a wide group of successful

users to make these products work because they need to

barter and exchange MAC addresses from different

neighborhoods.  I can use a MAC address from across the

country or another part of town and the cable companies

will not kick us off at the same time.

So what Mr. Harris did was, in addition to

providing this sniffer program, he --

THE COURT:  If you use somebody else's

address, is there the risk or reality that that person

will end up being charged more?

MS. SEDKY:  Um, indirectly, yes.  If I am a

freerider or somebody's network and I become a superuser

because I've stolen a config file, my neighborhood is

not set up to have 20 megabits per second of downstream

activity -- let's say I'm downloading all these pirated

movies, let's say, and they take a lot of bandwidth, and

nobody knows about me because I'm not -- the cable

company hasn't allocated for me, well, people will start

complaining and say "My service is slow," "My service is

slow," and if I'm using a MAC address of my neighbor,

they'll say "I'm off the network," "I'm off the

network."  So the cable company has to come out and

build more and have to -- they have to pass the costs

off to the users.

So indirectly, yes, if I am using bandwidth, it's

finite, the pipe is finite and the bandwidth is finite.

And so there's this hermetically-sealed world of

bandwidth essentially to a given neighborhood and now I

need to disguise myself as another user, but I have to

do it from a user across town or across country.

So we're all kind of -- we all need each other, we

all need each other to be successful, we all need to be

sniffing, we all need to be posting our MAC addresses on

the website that Mr. Harris runs that he himself has

used to solicit MAC addresses, and there has to be this

give and take of config files and MAC addresses in order

1    for me to disguise myself as either a paying subscriber,

2    which is the theft of service, or maybe I paid for the

3    bottom, baseline cheap-o service, but I want superuser

4    service, so I just steal the config file, I use my own

5    MAC but I steal the config file.

6        So his products do two things, there's the packet

7    sniffer component and then there's the MAC address

8    config file changer component, which -- neither of which

9    is an easy task.  You'll here at trial, um, from people

10   who make the modems, Motorola, and from people who are

11   the ISPs, how unbelievably complicated these devices are

12   to make -- to allow people to change their MAC addresses

13   and change their config file.  So that's in a nutshell

14   what the products do.

15       And Mr. Harris's behavior vis-vis the products is

16   not as Mr. McGinty would have characterized, "a guy who

17   puts the products in the stream of commerce and walks

18   away or sticks his head in the sand."  He stayed very

19   involved in this process.  He stayed -- he was

20   constantly eliciting user feedback from the user

21   community to find out if his products were working

22   because, as I said, he grossed a million dollars, he was

23   making money selling these products, and he had -- this

24   goes to the benefit question.  His benefit was straight

25   to his bottom line.  He wanted to sell more products

 1   and, um, so he had a financial incentive, among other

 2   incentives, to make sure that his products were being

 3   used successfully.  So he not only had the MAC address

 4   sniffer --

 5             THE COURT:  That gives him a motive, but I

 6   don't understand it to be the government's theory that

 7   he was defrauding the purchasers of his product?

 8             MS. SEDKY:  No, that is not our theory, your

 9   Honor.

10             THE COURT:  All right.  So --

11             MS. SEDKY:  Our theory is that he engaged in

12   -- our conspiracy theory is that he engaged in a

13   conspiracy with the -- with his TCNISO insiders and with

14   his purchasers to defraud ISPs into providing free and

15   faster service.

16             THE COURT:  But one of the -- I thought the

17   conspiracy with the people he knew, the people in his

18   company who you call "insiders," was a fairly

19   conventional allegation, um, but as far as I know none

20   of them were in Massachusetts?

21             MS. SEDKY:  That's correct.

22             THE COURT:  So you're going to have to prove

23   -- for venue, prove by a preponderance of the evidence,

24   not beyond a reasonable doubt, but to prove at trial to

25   the jury, I think, by a preponderance of the evidence,

1   um, that he was engaged in a conspiracy with somebody in

2   Massachusetts, that is, that he had an agreement,

3   express or inferred from conduct, um, to commit wire

4   fraud with a person in Massachusetts and he intended

5   that that person commit the wire fraud himself.

6           MS. SEDKY:  That's exactly what we've alleged

7   and we intend to prove at trial, your Honor.  And in

8   addition to our conspiracy count, we've alleged that he

9   has engaged in a scheme with them, he's participated in

10  a scheme to defraud, and he has aided and abetted them

11  in a scheme to defraud.  And at this point our theory of

12  the case is really, "Look, we believe that the aiding

13  and abetting charge is sort of subsumed within the

14  substantive wire fraud charge and we intend to proceed

15  on both theories."

16          THE COURT:  Well, yeah, I think there's

17  overlap.  If you look at 18 United States Code, Section

18  2, 2A is aiding and abetting and 2B is causation.  Now,

19  causation involves an innocent intermediary, so this is

20  not quite the same.  But you've charged that as part of

21  the scheme he caused others to make wire transmissions.

22  That, if it could be proven, if it is proven, would be

23  sufficient.

24          But are you prepared to prove that he knew of the

25  existence of these four alleged co-conspirators?

1          MS. SEDKY:  Yes, your Honor.  And we are also

2     prepared to argue that he need not know the specifics of

3     each user.  That he need not --

4          THE COURT:  Know who they are?

5          MS. SEDKY:  Correct.  We believe that --

6          THE COURT:  But that -- that -- okay, you're

7     going to be ordered to present a trial brief with jury

8     instructions, and memos on jury instructions, these are

9     just the type of things that I'm going to try to decide

10    to the maximum extent possibly before trial.  But at the

11    moment, that doesn't sound right to me.  Because you are

12    going to have to prove that -- I mean, not -- a

13    co-conspirator doesn't have to know every other member

14    of the conspiracy or all the details of it.  However,

15    you know, to prove that a person conspired with another

16    person, you have to prove a meeting of the minds between

17    them and if Mr. Harris -- well, you'd have to prove that

18    he had a meeting of the mind with somebody, you'd have

19    to know at least one of them, and then you'd have to

20    prove the others are in the same conspiracy.

21         MS. SEDKY:  Well, I believe that we can prove

22    -- I'm not ready to concede that we have to prove, but I

23    believe that we will be able to prove that he was in

24    charge of shipping the product -- this was essentially a

25    one-man show.  He was working out of his living room for

1    the most part.  I think his wife helped him with the

2    shipping and his roommate is a cooperator and from what

3    we understand he is -- he was the guy who was in charge

4    of the shipping and he also kept all of the records, the

5    invoices.  And so the invoices clearly show -- that's

6    how we found these people, from looking at the

7    defendant's own records.  Who do we have in

8    Massachusetts?  We got the defendant's business records

9    out and we started looking for Massachusetts and we

10   found more users.

11             THE COURT:  You've got to be able to prove

12   that he communicated with these people, that he spoke to

13   them or --

14             MS. SEDKY:  Vis-vis Mr. Hanshaw, we will have,

15   um, fairly robust communications with Mr. Hanshaw,

16   directly with Mr. Harris, and also with his other

17   co-conspirators, um, Ms. Linquist -- he had two other --

18   the insider co-conspirators, um, Frank Philips and

19   Isabela Linquist.  And vis-vis the other three users, we

20   will establish that their communications consisted of

21   product ordering and shipment and the cable -- the

22   satellite TV and the cable TV scrambler cases, um, I

23   would submit to the Court, essentially stand for the

24   proposition that you don't need more communications --

25   that ordering and shipping is enough participation in

```
 1    the scheme to make --
 2                THE COURT:  Are those conspiracy cases?
 3                MS. SEDKY:  Those are wire fraud cases.
 4                THE COURT:  Right.  I mean, you could have a
 5    real problem with this conspiracy.
 6                MS. SEDKY:  Well, we believe that he certainly
 7    had business records that say the names of the
 8    Massachusetts --
 9                THE COURT:  He might have had, theoretically,
10    four individual conspiracies, he might have conspired
11    with four people in Massachusetts, but it doesn't mean
12    that it was a single conspiracy.  The standard
13    instruction in Massachusetts, because it's a correct
14    statement of law, is you have to prove the conspiracy
15    charged in the indictment.  And there are -- you know
16    all about computers, but you all want to make sure you
17    know all about conspiracy law, too.
18                MS. SEDKY:  Well, the MAC address bartering
19    that we were speaking about earlier, um, this particular
20    business operation made all of the users interdependent
21    on one another.  This product could not stand alone.  It
22    couldn't work alone.  You couldn't have one person
23    sitting in his living room in Massachusetts and
24    successfully use the packet sniffer and change the MAC
25    address.  They had to get a MAC address from somewhere
```

```
 1   and it had to be from somewhere else.
 2              THE COURT:  Yeah, I haven't looked at it
 3   lately, but I'll probably go back and look at, say,
 4   Grunwald, which is a tax case.  Sometimes people develop
 5   tax products and lots of people might use the same
 6   device, but it doesn't necessarily mean that they're
 7   conspiring with each other.
 8         Well -- anyway.  Go ahead.  We're not there yet,
 9   but this is helpful.
10              MS. SEDKY:  What I really wanted to do was to
11   sort of help root the Court in the -- in some of the
12   technical underpinnings of this type of product work
13   because the key point that the product functionality
14   really drives home is that it supports what we have
15   alleged as Mr. Harris's intent and purposeful --
16              THE COURT:  Okay, so why don't you go to the
17   allegations in the indictment because that's the focus
18   of the --
19              MS. SEDKY:  That's fine.  So our allegations
20   have multiple references to Mr. Harris's purposeful
21   conduct and it starts in Paragraph 1, for example.  It
22   says that his products -- this is, I believe, the second
23   -- the third full sentence, "were designed to modify."
24   Not merely capable of allowing misusers to modify, but
25   designed to modify cable modems so that users could
```

1    obtain free internet access essentially.

2        Then we go to paragraph -- I essentially went

3    through the indictment and Paragraph 11.  So I guess --

4    let me step back and say this.

5        The thrust of these allegations are he was

6    designing and selling what he termed, he self-styled

7    them as "cable modem-hacking products."

8                THE COURT:  Cable modem what?

9                MS. SEDKY:  "Cable modem-hacking products" is

10   what he called them, and he is the one who named "Coax

11   Thief."  Coaxial cable is where the "coax" comes from

12   and the "thief," I think, is pretty self evident.

13       So the cable modem hacking we've alleged in

14   Paragraph 11 is altering software for the purposes of --

15   not for the capability of, but for the purposes of

16   obtaining Internet access without paying for it in order

17   to steal service.

18       We go on, as the Court had pointed out, on

19   Paragraph 15, the charging paragraph, the guts of the

20   charging paragraph where the conspiracy talks about how

21   he acted "knowingly, conspiring for the purposes of

22   executing the scheme," "devising a scheme to defraud."

23   Paragraph -- well, let's see.  I think some of our other

24   sort of really hit at home why are you doing --

25                THE COURT:  Well, one of the things that

1    struck me, as I read it, you know, it starts at 16 and
2    goes on, and these are just questions at this point, you
3    talked about these products and services "enabling
4    computer users to do various things."
5              MS. SEDKY:  Right.
6              THE COURT:  Are they -- Paragraph 19,
7    "additional software tools that users could use to
8    steal."  That's relevant, um, but may not be enough, you
9    have to prove something more specific, I think, with
10   regard to Mr. Harris eventually.
11             MS. SEDKY:  Well, I think that, taken as a
12   whole, that Paragraph 26, for example, talks about his
13   personal knowledge.  He knew that his users successfully
14   used his products to steal free and faster internet
15   access.  We go through all of the --
16             THE COURT:  Yeah, we'll see.  You're going to
17   brief all of this.  That may not --
18             MS. SEDKY:  We believe.
19             THE COURT:  Yeah, I know, but what I'm telling
20   you is it may not be enough.  If you get -- I don't know
21   to what extent -- in the tax context, that I was
22   addressing in **Pappathanase**, knowing that cash rebates
23   could be used to illegally evade taxes didn't make
24   somebody a co-conspirator.  It was insufficient to know
25   that it could be done, you'd have to -- the government

1   had to prove they knew it would be done, that it was

2   being done.

3            MS. SEDKY:  We understand that, your Honor,

4   and we believe that we have alleged his purposeful

5   knowing, willful conduct, we've used words like

6   "design," "purposeful," and we believe that at trial, as

7   I'm sure the Court recalls, the Court denied two motions

8   to dismiss in that case and held off on the ruling for a

9   Rule 29 motion.  I think the bottom line is that

10  everybody in this room agrees that this is the stuff of

11  Rule 29 and we'll probably be hearing these same things

12  in a few months.

13           THE COURT:  But I want to make sure that I'm

14  well-educated on what the law requires.  Go ahead.

15           MS. SEDKY:  That this case is about a product

16  that has -- we will show at trial that this product had

17  zero commercially-viable functionality that was

18  legitimate.  We will have users -- we will have his

19  insiders come in and testify that this is what the

20  product was designed to do.  "I designed it," "that's

21  how I designed it."  The posts on his internet website

22  talk about not only just his knowledge, but that there

23  is no other use for this thing.  We will have our

24  witness from Motorola who makes diagnostic tools.  We

25  will have our witness from Charter who -- they were a

```
 1    consumer of diagnostic tools.  They will tell you that

 2    they have looked at this product and it is useless as a

 3    diagnostic tool.  They would never buy it, it does not

 4    have any of the core functionalities of diagnostic

 5    tools.

 6              THE COURT:  All right.  So they're going to

 7    give expert testimony, so I'm going to have to build

 8    into the schedule a time for the disclosure of expert

 9    reports.

10              MS. SEDKY:  We just made our expert

11    disclosures, your Honor.  We're not necessarily

12    conceding that they're experts, but in an abundance of

13    caution we are complying with the expert discovery

14    requirements.

15              THE COURT:  That they're experts, that is not

16    knowledge that a lay person knows and --

17              MS. SEDKY:  Fair enough.  Well, we just sent

18    Mr. McGinty on Monday our expert discovery.  And we plan

19    on supplementing it.  We have a few 302s.

20              THE COURT:  Well, when I give you your trial

21    schedule before you go home, remind me to build in time

22    for the defendants to give you their expert reports and

23    for any supplementation.

24              MS. SEDKY:  We will, your Honor.

25         So we have the core functionality of the product,
```

1   we have Mr. Harris's ongoing and very active
2   participation all along the five years of the scheme.
3   As I alluded to earlier, the ISPs -- this device was the
4   scourge of the ISPs.  He was market leader in this
5   space.  They were very well aware of this product and
6   they were spending significant resources trying to
7   detect Sigma on its system and knock it off.  And he had
8   these platforms for users to say, "Hey, I can't get into
9   Roadrunner," "I can't get into Comcast," "They're doing
10  this, they're doing that," and he was all over those
11  boards making -- finding out what troubleshooting was
12  happening, who was getting detected and blocked, and
13  then he, himself, or he would direct his coder, Isabela
14  Linquist, to go figure out a work-around.  He had this
15  game of cat and mouse with the ISPs where they were --
16  he needed to stay one step ahead of the ISPs, otherwise
17  his products had no commercial viability.  So he had to
18  stay involved.
19       He also had to keep a fresh supply of MAC
20  addresses going because a lot of times the ISPs would
21  figure out that a MAC address had been cloned and they
22  would blacklist it.  So there was a very continual and
23  active involvement that Mr. Harris played that we submit
24  is another way to infer his intent.  He was not a guy
25  who put in a benign product that was misused by

1    wrongdoing third-party interveners.  He designed a

2    product that had no other commercial use.

3         We will also show at trial that he himself used it

4    to steal internet access and that goes to his own

5    intent, not just knowledge, and that he knew and he took

6    lots of steps to hide himself and hide his involvement.

7    People will describe him as paranoid and taking all

8    kinds of steps to make sure that no one knew where he

9    went or what his name was.  And these are all factors

10   that the courts have looked at in determining what's the

11   plus factor that gets you out of the buyer-seller

12   conspiracy and into a real intent criminal conspiracy.

13            THE COURT:  Well, that's what I want to be

14   educated on.

15            MR. McGINTY:  Could I just say something?

16            THE COURT:  Well, I don't know if Ms. Sedky is

17   finished.

18            MS. SEDKY:  Well, I wanted to just close, um,

19   after I consult with my co-counsel to make sure I

20   haven't missed anything, I wanted to close by now that

21   we've looked at the indictment itself, I would like to

22   turn for a moment to what an incredibly heavy burden the

23   defendant has at this stage of a Rule 12 motion and we

24   submit that the defendant can't meet this burden.

25         What the defendant has to do is look at the

1    indictment and say, "Here are the elements of conspiracy

2    and here are the elements of the wire fraud," whether by

3    case law or jury instructions or statute, whatever, and

4    "Here's the indictment and it's not there."  And the

5    defendant hasn't done that today, your Honor, and the

6    defendant hasn't done it because he can't do it, because

7    we have more than amply alleged conspiracy and wire

8    fraud.  There's nothing missing from our indictment.

9             THE COURT:  Well, you don't have to just

10   allege conspiracy and wire fraud, you have to allege

11   facts that would establish venue in Massachusetts, which

12   I think you've done.

13            MS. SEDKY:  We have a 60 paragraph speaking

14   indictment here that has more than enough to satisfy a

15   Rule 12 motion.  And really I started counting in the

16   defendant's brief --

17            THE COURT:  There are only a handful of those

18   60 that are really important for this analysis.  But go

19   ahead.

20            MS. SEDKY:  Well, many of the overt acts are

21   actually Massachusetts based and the wires --

22            THE COURT:  Well, I don't -- maybe they're

23   meant to say that.  It wasn't --

24            MS. SEDKY:  Well, I mean, all of the

25   Massachusetts users, when they were accessing the

1    internet, those were -- I believe we alleged those as

2    overt acts and they were sitting in Massachusetts --

3              THE COURT:  Look, they're overt acts, but it

4    doesn't -- it's not perfectly clear.  If you go to, say,

5    43, 43 to 47 are JL?

6              MS. SEDKY:  Yes.

7              THE COURT:  Well, the first one says he was in

8    Massachusetts, but the others don't tell me --

9              MS. SEDKY:  I apologize, your Honor.

10              THE COURT:  Well, actually, 44 does,

11    "Massachusetts."  All right.  That's fine.

12              MS. SEDKY:  The ISPs were all in Massachusetts

13    and the ordering and equipment was all in

14    Massachusetts.  And I believe that in the wire fraud

15    substantive counts where we talk about wires 2 through

16    11, we talk specifically about being from Massachusetts,

17    vis-vis the venue for wire fraud.

18              THE COURT:  That's right.  Okay.

19              MS. SEDKY:  So he has a very heavy burden

20    here.  We would submit that he hasn't met it.  And

21    really the gist of his argument is a sufficiency of the

22    evidence argument and that this is a procedurally

23    improper motion for that type of an argument.

24              THE COURT:  Okay.  Mr. McGinty, do you want to

25    reply briefly?

 1            (Pause.)

 2            THE COURT:  You don't have to.

 3            MR. McGINTY:  Well, the --

 4            THE COURT:  You could surprise us.

 5            MR. McGINTY:  Could I say this out loud,

 6    because I've said it in briefings on numerous occasions,

 7    and that is, what is the case -- just one case.  What is

 8    the case that supports, um, criminal liability -- not

 9    civil liability, but criminal liability of a product

10    seller for the conduct of third parties?  And I have

11    searched -- I mean, this has been sort of painstaking,

12    trying to find where it is that's the foundation for the

13    predicate for that kind of criminal liability exists?  I

14    got hints of it in terms of contributory liability, I

15    have nothing in the issues that address square-on for

16    the purposes of a criminal case.

17        So this case is, in a lot of ways, seminal in that

18    --

19            THE COURT:  Well, is that really right?

20    Wasn't the defendant convicted in *Direct Sales*?

21            MR. McGINTY:  Well, that's interesting

22    because, um, perhaps the view of *Direct Sales* and of

23    *Falcone* was different.  That the difference between

24    those two, and the Supreme Court was quite careful

25    there, in *Falcone,* to say that if you sell things that

1    are legal, um, the amount of proof that -- not that you

2    knew how it was going to be used, but you were a

3    participant in what they were doing, has to be so high.

4         And along comes, to sort of pare it out comes

5    *Direct Sales* and in *Direct Sales* the Court said, um,

6    that the difference here is that narcotics are

7    restricted items and with the restriction comes, and in

8    *Direct Sales* it was, he was -- the company was warned

9    not to make sales in the volume they were doing, um,

10   they were warned that they were involved with items that

11   were restricted and controlled by the predecessor, DEA,

12   um, they were selling in lots that exceeded any

13   reasonable amount of the -- in other words, the conduct

14   was such that even though the sale of the item had

15   otherwise been lawful, the conduct reached into a

16   category of egregious conduct.  And the difference

17   between *Falcone* and *Direct Sales* was the difference

18   between an item that is unrestricted and in *Direct Sales*

19   was restricted.

20        Here you have an unrestricted item.  There is

21   nothing that makes the sale of this unlawful.  Let's

22   assume that everything the government says about the

23   capability of the item is true.  What is the thing that

24   makes it unlawful to sell, the thing that can be misused

25   by a third party?  And frankly, your Honor, the list of

1    things is pretty staggering.

2         For example, on the internet, one can find for

3    sale keystroke counters.  Keystroke counters are the

4    things that defeat, um, codes, that permit you access to

5    confidential -- that permit access to confidential

6    documents, that permit you to get credit card numbers

7    sold on the internet.  There are -- there are other

8    items like this that are sold on the internet that

9    companies belief that they can sell lawfully.  They are

10   not answerable to the consequence of the matter of the

11   use.  And we've cited in there the Metasploit program.

12   They're talking about whether Harris got affirmative,

13   um, information about the manner in which his products

14   were being used.  In the Metasploit program, which is

15   released by the Rapid7 company in Massachusetts, um, the

16   information that they get back is they're the Number 1

17   hacking tool internationally, um, breaching security

18   in --

19        THE COURT:  Well, we're going to have to

20   stop.  I've got another matter shortly and we've got

21   more after that.  What I have in mind from *Direct Sales*,

22   and they did make a distinction between regulated

23   morphine and nonregulated ingredients that can go into

24   moonshine, but they said:  "Petitioner obviously

25   misconstrues the effect of the *Falcone* decision in one

respect.  This is in regarding it as deciding that one

who sells to another with knowledge that the buyer would

use the article for an illegal purpose cannot, under any

circumstances, be found guilty of conspiracy with the

buyer to further his illegal act.  The *Falcone* case

creates no such sweeping insulation to sellers to known

illicit users.  The decision comes down merely to this.

That one does not become a party to a conspiracy by

aiding and abetting it, through sales or supplies or

otherwise, unless he knows of the conspiracy and the

inference of such knowledge cannot be drawn merely from

knowledge the buyer will use the goods illegally."

So to the extent you're arguing that the

government's going to have to prove more than that

Mr. Harris sold particular people devices he knew could

or this suggests would be used illegally, um, it looks,

at the moment -- and all of this is subject to

evolution, that *Direct Sales* says "You're right."  On

the other hand, the government says they recognize

they've got a burden and they'll provide proof to

satisfy it.  But the mere fact that this is a buyer --

what you characterize as a buyer-seller relationship and

they characterize as a conspiracy or people engaging in

a common scheme.  But the mere fact that if it were a

buyer-seller relationship is not the end of the inquiry,

1      you have to know what else, and there has to be a trial.

2           Okay.  I'm going to give you --

3                MR. McGINTY:  Your Honor, can we address the

4      trial date?

5                THE COURT:  No, no, I'm going to explain my

6      reasoning.  Yeah, then we will discuss the trial date.

7      But you've got to listen to this for a minute -- a few

8      minutes.

9           I'm denying the motion to dismiss for lack of

10     venue.  I'm denying the request for a change of venue.

11     I'm denying the request to find the applicable statutes

12     void for vagueness.

13          The motion to dismiss for lack of venue is made

14     under Rule 12(b)(2), which applies to motions that the

15     Court can decide without a trial of the general issue.

16     Rule 12(d) permits deferring a decision for good cause.

17          As I pointed out to you in October, the First

18     Circuit addressed the standards very helpfully and

19     importantly in *Barletta*, 644 F.2d 50 at 58.  It teaches

20     that the Court must defer deciding the motion to dismiss

21     if it requires a review of substantially all of the

22     evidence to be introduced at trial.  The Court may defer

23     a decision if it requires more than a de minimis review

24     of the evidence.

25          Generally the government has the burden of proving

venue at trial by a preponderance of the evidence.  The

First Circuit has said that in *Salinas*, 373 F.3d 161 at

163 to 164, and *Scott*, 270 F.3d 30 at 34 to 35, and in

*Lanoue*, 137 F.3d 656 at 661.  However, generally if

venue is challenged before trial, the decision is based

on the allegations in the indictment.  This was held by

the Ninth Circuit in *Jensen*, 93 F.3d 667, and there are

a number of District Court decisions reaching the same

conclusion, *Ohle*, 678 F.Supp. 2d 215 at 231 to 232,

*Dorceant*, 2010 Westlaw 3122814 at 3, a New Hampshire

case, and *Motz*, 652 F.Supp.2d 284 at 290.

The First Circuit has suggested that if facts

essential to a venue determination are not in dispute,

the issue may be decided before trial.  That's *Arteaga*,

102 Federal Appendix 731.

The defendant agrees that the issue should be

decided now on the face of the indictment.  18 United

States Code, Section 3237, provides that venue exists

where a continuing crime has begun, continued or was

completed.  Generally venue exists where any essential

conduct element of the crime charged occurred, as the

Supreme Court said in *Rodriguez-Moreno*, 526 U.S. 275 at

280.  The First Circuit has stated that if the crime

consists of distinct parts taking place in different

localities, then venue is proper wherever any part can

1    be proved to have taken place.  That's *Scott*, 270 F.3d

2    30 at 35.

3        In a conspiracy case, venue is proper in any

4    district in which an act in furtherance of a conspiracy

5    has taken place even if a particular co-conspirator was

6    not himself present in the district.  That's the holding

7    of *Santiago*, 83 F.3d 20 at 25.

8        In a wire fraud case, venue exists where the wire

9    transmission originated, passed through or was received,

10   as the Ninth Circuit held in *Pace*, 314 F.3d 344 at 349

11   to 350.  This includes districts in which the defendant

12   caused wire transmissions to be made, as the Second

13   Circuit explained in *Kim*, 246 F.3d 186 at 191 to 193.  A

14   defendant charged with aiding and abetting under 18

15   United States Code, Section 2A, may be prosecuted not

16   only where he committed accessorial acts, but also where

17   the principal committed the substantive crime, as the

18   First Circuit said in *Griffin*, 814 F.2d 806 at 810.

19       The indictment in this case alleges the essential

20   elements of conspiracy and wire fraud and also includes

21   allegations that, for present purposes, indicate that

22   venue is proper in Massachusetts.  The charging count of

23   Count 1, the conspiracy count, is in Paragraph 15.  It

24   charges that from approximately 2003 to approximately

25   August of 2009, in the District of Massachusetts, Ryan

1    Harris and others known and unknown to the grand jury

2    did knowingly conspire to commit mail fraud -- I'm

3    sorry, wire fraud, and it explains how.  It's well

4    established in the First Circuit that to prove that

5    charge, the government will have to prove that the

6    defendant, Ryan Harris, intended to agree with another

7    person, who I expect will have to be identified, to

8    commit wire fraud and intended that the wire fraud be

9    committed.  Count 1 also alleges that in furtherance of

10   that conspiracy several overt acts occurred in

11   Massachusetts.  Some of the paragraphs making such

12   allegations are 37, 43, 52 and 56.

13        Counts 2 through 11 charge that Mr. Harris

14   committed wire fraud or aided and abetted wire fraud.

15   The essential elements of wire fraud are stated, alleged

16   in Paragraph 60.  It's alleged that in the District of

17   Massachusetts and elsewhere, Ryan Harris, having

18   knowingly devised a scheme to defraud or to obtain money

19   or property by means of material false and fraudulent

20   pretenses, representations and promises transmitted and

21   caused to be transmitted in interstate commerce certain

22   wire communications.  Counts 2 through 11 each allege

23   wire transmissions as part of that scheme originating in

24   Massachusetts.

25        As I said, it's charged that the defendant caused

1   each transmission as part of his scheme to defraud or

2   aided and abetted the principal committing the crime.

3   Therefore, for present purposes venue is adequately

4   established.  It will, however, have to be proven by a

5   preponderance of the evidence at trial.

6        The defendant relies on *Falcone vs. United States*,

7   311 U.S. 205, and *Direct Sales vs. United States,* in an

8   effort to argue that the indictment fails to state a

9   claim on which he can be convicted.

10       In *Falcone*, the Supreme Court held that "one who

11  without more furnishes supplies to an illicit distiller

12  is not guilty of conspiracy even though his sale may

13  have furthered the object of a conspiracy to which the

14  distiller was a party but of which the supplier had no

15  knowledge."  That's 311 U.S. at 210 to 211.

16       In *Direct Sales*, a drug wholesaler that had

17  supplied large quantities of morphine sulfate to a

18  small-town doctor challenged a conviction for a

19  conspiracy to violate the narcotics laws.  The Supreme

20  Court found that the defendant, as I said earlier,

21  "obviously misconstrued the effect of the *Falcone*

22  decision in regarding it as deciding that one who sells

23  to another with knowledge that the buyer will use the

24  article for an illegal purpose cannot, under any

25  circumstances, be found guilty of conspiracy with the

buyer to further his illegal end.   The *Falcone* case

creates no such sweeping insulation for sellers to known

illicit users," the Supreme Court said in 319 U.S. at

709.

Instead, the Court found sufficient evidence

existed in the case before it to support a conclusion

that the defendant had the requisite intent, conspired

with a physician, based on a large -- based to a large

degree on continuous high-volume sales of a restricted

drug and the wholesaler's actions to stimulate

additional high-volume sales to the physician.   The

Court observed that it had not been asked in *Falcone* to

decide whether the evidence was sufficient to sustain a

conviction for conspiracy between the buyer and the

seller in that case.   Rather, the *Falcone* court found

that "one does not become a party to a conspiracy by

aiding and abetting it through sales or supplies or

otherwise, unless he knows of the conspiracy."

The cases cited by the defendant indicate to me at

this point that a buyer-seller relationship is not

enough, by itself, to establish a conspiracy.   As the

Supreme Court said in *Direct Sales* at 712, "not every

instance of sale of restricted goods, harmful as are

opiates, in which the seller knows the buyer intends to

use them unlawfully will support a charge of

1    conspiracy."

2         This is a concept that will have to be developed

3    as we get toward trial, but essentially **Falcone** and

4    **Direct Sales** demonstrate that determining whether, in

5    this case, a crime has been committed in Massachusetts

6    is a very fact-intensive inquiry and the question of

7    venue cannot be properly or conclusively decided without

8    trying the case.

9         I've also considered the motion to exercise my

10   discretion to transfer the case to the Eastern District

11   of California, which, as I said, I'm also denying.

12        There are a series of factors to be considered and

13   some of them are summarized well in **Motz**, 652 F.Supp. 2d

14   at 290.  I've considered them, but in this case I find

15   it's not proper to, or appropriate, to transfer the case

16   to the Eastern District of California under Rule 21(b).

17   I actually have a question as to whether venue would lie

18   there.  But as a matter of discretion, I'm relying on

19   the facts that the defendant does not live in the

20   Eastern District of California.  His company was not

21   based there, it was based in the Southern District of

22   California.  Many of the alleged co-conspirators and

23   presumably the witnesses are in Massachusetts and none

24   are in the Eastern District of California.

25        I also find that it's premature to decide whether

the wire fraud statute on which Counts 2 through 11 rest
is void for vagueness.  "To satisfy due process a penal
statute must define a criminal offense, one, with
sufficient definiteness that ordinary people can
understand what conduct is prohibited and, two, in a
manner that does not encourage arbitrary and
discriminatory enforcement," as the Supreme Court
recently said in *Skilling*, 130 S.Ct 2896 at 2928.  As
the Supreme Court -- well, the First Circuit, at least,
has recognized, "many statutes will have some inherent
vagueness, but a statute is unconstitutionally vague
only if it prohibits an act in terms so uncertain that
persons of average intelligence would have no choice but
to guess at its meaning and modes of application."
That's *Councilman*, 418 F.3d 67 at 84.

     "Outside the First Amendment context, a party has
standing to raise a vagueness challenge only insofar as
the statute is vague as applied to his or her specific
conduct."  That's *Pungitore*, 910 F.2d 1084.  A vagueness
challenge not implicating the First Amendment is thus
"limited by the framework of the specific facts in the
record of the case," *Maquardo*, 149 F.3d at 42, and *Reed*,
114 F.3d at 1067 and 1070.

     Essentially the claim of void for vagueness has to
be addressed in the context of the evidence presented at

1   trial.  This was discussed in a way very relevant to the

2   instant case in **Reed**, by the Tenth Circuit, 114 F.3d at

3   1070.  So this, like the venue question, is one that

4   will need to be revisited.

5         All right.  Let me have your book.  Now, when I

6   saw you in October, I did give you a trial date of

7   February 6th.  My schedule has evolved in a way that

8   doesn't permit me to start on February 6th.  Unless

9   we're going to start much earlier than that, um, we're

10  going to need to start by February 21st, because that's

11  when I can put aside the three weeks necessary to try

12  the case.

13        So, Mr. McGinty, I asked Mr. Hohler to tell you

14  that, I think, yesterday.  I understand you had a

15  concern relating to a witness in another case.  I'll

16  hear you, but --

17              MR. McGINTY:  Well, it's a little more

18  complicated than that.  I have a case starting in mid

19  April with Judge Stearns that involves witnesses coming

20  in from Rwanda.  Um, there will be a parallel case

21  relating to a family member that's up in New Hampshire

22  that's starting on February 22nd, I understand.  Um,

23  that trial will involve persons coming over from Rwanda

24  whom I hope to meet with, to interview, and ultimately

25  to see testify during a trial that's probably going to

1        run three weeks up there.

2             The concurrence of this case with that one would

3        mean that I would be unable to do that and that would

4        diminish my ability to represent my client.

5                  THE COURT:  Well, you know, we're going to be

6        sitting from 9:00 till 1:00.  I know it's hard to go on

7        two tracks.  But I can't accommodate your concern.

8        You've got weekends, you've got evenings, you've got

9        colleagues, so, you know, we're going to start on the

10       21st.

11            Can you give him the trial order, please.

12                  (Pause.)

13                  THE COURT:  All right.  The trial is going to

14       commence on February 21st.

15                  (Pause.)

16                  THE COURT:  Does the government understand

17       that it has a duty to disclose all material exculpatory

18       information, whether it's written or unwritten, and

19       whether it negates guilt or just challenges the

20       credibility of evidence that the government wishes to

21       present?

22                  MR. BOOKBINDER:  We do, your Honor.

23                  THE COURT:  And do you understand that I

24       define "materiality" the way Judge Paul Freedman defined

25       it in his *Safavian* decision in the District of Columbia

1    and not the way the government sometimes argues it

2    should be?  So you want to take a look at *Safavian*.

3         Do you understand you have an obligation to go to

4    all the agencies that participate in the investigation

5    to find any material exculpatory information whether

6    it's written down or not?

7              MR. BOOKBINDER:  We do, your Honor.

8              THE COURT:  All right.  And finally do you

9    understand that that's a continuing obligation, so if

10   you interview a witness, for example, and he or she says

11   something inconsistent with what he or she said before,

12   um, that needs to be turned over?

13             MR. BOOKBINDER:  We do, your Honor.

14             THE COURT:  All right.  Well, I'll give you

15   until January 20th.  This is Paragraph 3.

16        Does the government have any Rule 404(b) evidence

17   that it expects to present?

18             MR. BOOKBINDER:  Your Honor, we may.  Um, to

19   the extent that Mr. Harris's own use of a modified

20   modem, basically one of the products he was selling, his

21   use of it to essentially steal internet access, um, that

22   may constitute evidence under Rule 404(b).

23             THE COURT:  Okay.

24             MR. BOOKBINDER:  And there's one other.

25             THE COURT:  Go ahead.

1          MR. BOOKBINDER:  One other piece of

2     information, which is that, um, as you know there is a

3     -- there's a tax investigation not yet charged, um,

4     centered around Mr. Harris's failure to report any of

5     the income that he earned as a result of this

6     enterprise.  That is -- um, we haven't sort of finalized

7     what our plan is, but if we're intending to use that --

8     that certainly, if we're going to use it affirmatively

9     in our case in chief, it might well be 404(b) evidence

10    as well, your Honor.

11          THE COURT:  All right.  Well, in fact, for

12    these, you've got until January 20th to make that

13    decision and explain it to the defendant.

14       Are the parties agreeable to exchanging **Jencks**

15    statements a week before the trial?

16          MR. BOOKBINDER:  We certainly are, your Honor.

17          MR. McGINTY:  Your Honor, I would ask for a

18    week earlier for the government and I have to review

19    their **Jencks** before I can respond to them.  One of the

20    complications here is that --

21          THE COURT:  Well, wait.

22          MR. McGINTY:  Well, I would ask that it would

23    be staggered, that they would be a week before us,

24    before we would have to evaluate those.

25          THE COURT:  Why?  I mean, if the question is

1    whether you have the statements, if you have --

2         MR. McGINTY:  Right, but whether they're

3    *Jencks* depends on whether I call the witness and whether

4    I call the witness depends on what they're offering and

5    there's uncertainty, among other things.  I don't mean

6    to be coy, but I --

7         THE COURT:  Well, does the government have any

8    objection to that?

9         MR. BOOKBINDER:  Your Honor, as a practical

10   matter, to the extent we have *Jencks* material, at this

11   point, we've already turned it over, we will continue to

12   do so.  We don't have any objection if you want us to

13   order it two weeks before.

14        THE COURT:  Okay.  So the government will need

15   to turn it over by February, let's say, 3rd, and the

16   defendant by February 10.  And I want you to put

17   together, please, a set of the *Jencks* for me, um, as

18   well as sets of the exhibits, one for the Court -- I

19   mean, one for the file and one that I can write on.

20        All right.  Now, Mr. McGinty.

21        MR. McGINTY:  The complication here, your

22   Honor, is that -- such as the breathe of Count 1, that

23   in response to a discovery letter that we submitted to

24   the government, they indicated that users had discussed

25   or attempted to access many ISPs, including the

1   following, and there was a list of probably 20 of them,

2   and then it said that the list may expand as the agents

3   speak to additional customers.

4        The difficulty with Count 1 is its expanse, it not

5   only contemplates ISPs, um, it not only anticipates

6   customers who use these ISPs, it also anticipates users

7   who use the software for purpose of accessing ISPs.  Um,

8   we haven't gotten discovery that would flesh out what

9   the scope of that conspiracy is and frankly one of the

10  reasons that we challenge this in a motion to dismiss is

11  in the hopes of trimming -- shall we say trimming this

12  to some kind of manageable dimension.  Right now --

13        THE COURT:  Well, what you didn't give me,

14  that I thought you might, and I don't know how I would

15  have acted on it, is a motion for a bill of particulars,

16  but you didn't file that motion.

17        MR. McGINTY:  Well, what we had done is we had

18  asked for a bill of particulars early on in the case,

19  but we hadn't, um, pressed it because the answer was,

20  "Here's the ISPs, but more information needs to be

21  developed."  So now that the case is sort of marching on

22  to its trial, what's the boundary of the, um, the

23  allegedly injured ISPs and what's the proof going to be

24  that it was accessed at a discernible time by a

25  discernible person?

1          THE COURT:  I'm soon going to order them to

2     file a trial brief and I'm hoping that this will help.

3     But you've got the dates to put in Paragraph 4.

4          MR. BOOKBINDER:  Your Honor, on the *Jencks*

5     issue, we're happy to provide the Court with a copy, I

6     just want to warn your Honor that because we have

7     defined *Jencks* very broadly, um, we're talking about

8     probably at least a thousand pages of stuff.  I'm happy

9     to give it to the court as long as --

10          THE COURT:  You don't have to give it to me

11    far in advance, but by the time the trial approaches,

12    basically I'm going to want to have the *Jencks* for each

13    witness as the witness testifies.  If they were in the

14    grand jury, you know, I want to be able to look up a

15    transcript.  Sometimes I look at it before the witness

16    testifies, sometimes I just have it on the bench so I

17    can rule on a better-informed basis.

18          MR. BOOKBINDER:  And, your Honor, that's a

19    narrow -- really the bulk of what we produced is

20    probably not *Jencks,* but it's essentially all of the

21    e-mail written by the agents who may testify, that's

22    what is --

23          THE COURT:  Well, that would be *Jencks* if it's

24    relevant to the case.

25          MR. BOOKBINDER:  Again we're sort of broader

1   than what's really relevant to their testimony.  But we

2   can give it to the Court now, if you would like it, or

3   just more traditional witness statements.

4               THE COURT:  I encourage you to be expansive.

5               MR. BOOKBINDER:  Then we'll do that then, your

6   Honor.

7               THE COURT:  Thank you.  We have a spacious

8   courtroom.  We'll find a space for it.  But this is

9   important.

10        There are issues that -- I want to give you a date

11  for these filings, voir dire questions, jury

12  instructions, motions in limine, and supported memos and

13  trial briefs that's early enough, because now the trial

14  has been moved back.

15              (Pause.)

16              THE COURT:  I want those filings to be made on

17  January 13th and the responses to be filed say by

18  January 25th to the motions in limine.  And I also am

19  ordering that you file, with the proposed jury

20  instructions, memoranda, um, the hard issues, explaining

21  your positions.  It could be in the trial brief.  But, I

22  mean, this is -- this isn't the conventional conspiracy

23  or mail fraud case.  We have to take the general

24  familiar principles and figure out how they apply here.

25              You know, I did -- I do -- you've answered this

somewhat today, but I think there are two overlapping

theories of mail fraud that the government has.  One is

that Mr. Harris, with others similar to the conspiracy,

participated in devising the scheme and caused wire

transmissions to be made.  The other is not that he did

everything necessary to commit wire fraud himself, but

he knew that particular people were committing wire

fraud and aided and abetted, deliberately did something

to help it succeed with the state of mind necessary to

convict a person of wire fraud.  So you want to -- and

*Potter* may be a case that has some significance in the

scheme to defraud.

I'm directing that you address the issue of

whether the government has to prove that the -- that an

alleged wire fraud was a scheme to get money for

Mr. Harris himself.  I don't -- beyond, you know,

selling people his products.  Or whether it would be

sufficient if he aided an abetted a scheme by another

person intended solely to enrich that other person.

As I told you, if you take a look at my

instructions in *DiMasi*, and we'll make them available

for you, um, but I did instruct, for the honest services

mail and wire fraud, that the government had to prove

that DiMasi personally would benefit from the payments.

However, it was alleged in the indictment that DiMasi

1    caused these payments to be made for his benefit, not

2    just that he caused them to be made.  And the government

3    originally accepted that burden and only at the end of

4    the 7-week trial tried to change its mind.  But I'm not

5    sure that the law requires that.  For extortion it

6    doesn't, um, Hobbs Act extortion.

7         Then I gave you the **Pappathanase** decision in

8    which, you know, raises issues about the nature of any

9    conspiracy.  The conspiracy charged here, as I

10   understand it, is not just between Mr. Harris and people

11   in California and not just Mr. Harris and one person in

12   Massachusetts, but it's alleged that all those -- that

13   all four of them in Massachusetts were part of the same

14   conspiracy.  And if the government doesn't intend to

15   prove that, I need to find out soon.  If the government

16   does intend to prove that, you know, at some point

17   proving a different conspiracy arguably will be a fatal

18   variance.

19        And then this I'd like some immediate guidance on,

20   but it's got to be addressed further.  Will the

21   government be seeking **Petrozziello** co-conspirator

22   hearsay rulings?

23             MR. BOOKBINDER:  We will, your Honor.

24             THE COURT:  Well, they don't have to be

25   statements by the same person or statements made in

1    furtherance of the same conspiracy, but, you know,

2    frequently I'll conditionally admit something.  But I'm

3    going to need a very detailed proffer.  You need to

4    identify every person for whom you hope to get in

5    co-conspirator hearsay statements against Mr. Harris and

6    tell me -- the defendant, in detail what the evidence is

7    that will ultimately prove by a preponderance of the

8    evidence that that person was in a conspiracy with

9    Mr. Harris when he made the statement and the statement

10   was in furtherance of the conspiracy.  Because -- and I

11   have the discretion to conduct a pretrial hearing on

12   this.

13        But what I absolutely don't want or intend to do

14   is conditionally admit a lot of testimony and then find

15   that the government hasn't proven by a preponderance of

16   the evidence what it has to prove because then you're

17   going to have a foreseeable motion for a mistrial and

18   problems with that.  I'm going to try this case for

19   three weeks.  I don't want the jury to hear anything

20   that I don't have good reason to believe is ultimately

21   going to prove to be admissible.  So this relates to my

22   concerns about what the conspiracy is.

23        Well, that's it.  Then I think I'm going to plan

24   to start seeing you on those dates that we have, the 7th

25   or 8th probably.

 1          But in any event, um, the government's turning

 2    over its -- essentially you're telling who the witnesses

 3    are, right, because the other -- I'll give you a date

 4    for this, 6.  But what I want the parties to do, both

 5    parties, is to organize their exhibits in some way, and

 6    it doesn't have to be the way you number them, but you

 7    know what witness you're going to try to get them in

 8    through.  And you're going to exchange the exhibits and

 9    then you're going to tell me which exhibits are objected

10    to and I'll know what witnesses they're associated with

11    so we can take them up in some logical order and the

12    trial can progress.

13          So, you know, if the government gets more

14    exhibits, it can supplement them, but --

15          Does the government think it would have --

16             (Pause.)

17             THE COURT:  Does the government think it would

18    have a problem providing those exhibits say by January

19    13th, also?

20             MR. BOOKBINDER:  Your Honor, with the briefing

21    that the Court expects and the holidays --

22             THE COURT:  It's too much?  Okay.

23             MR. BOOKBINDER:  If we could step back a bit?

24             THE COURT:  Yes, we can.  We can.  How about a

25    week later, would that work?

1          MR. BOOKBINDER:  Let's try that.

2          THE COURT:  Yes.  And, in fact, I think

3     Mr. McGinty's going to tell me that he can't do it until

4     he sees yours, right?

5          MR. McGINTY:  It seems prudent.

6          THE COURT:  All right.  The defendants are to

7     do the same by the 27th.  And those are the dates that

8     the government should provide its witness list, it could

9     be supplemented, and the exhibits.  And to the extent

10    you can, tell them what witness the exhibits are

11    associated with.

12         MR. BOOKBINDER:  Your Honor, I think that

13    makes sense.  We can try to number them by witness.  If

14    we can't, just a technical question on that.  I found in

15    the past it's often helpful to kind of leaves gaps in

16    numbering so that we can supplement and exhibits can

17    still sort of be in groups, but if the Court would

18    prefer them to be sequential from the outset, we'll add

19    things at the end and --

20         THE COURT:  Just add them at the end.

21         MR. BOOKBINDER:  That's fine.

22         THE COURT:  And then the defendants -- I mean,

23    it may end up -- here, the defendants should number

24    theirs at the end of the government's, I think.  And

25    then if the government gets more, you can put them after

1    that.  So the 20th and the 27th.  And then I would say

2    --

3              MR. BOOKBINDER:  Your Honor, one more question

4    on that?  It sounds like you don't want these exhibits

5    marked "Government's Exhibit," but just plain numbers?

6              THE COURT:  Yeah, just numbers.

7              MR. BOOKBINDER:  All right.

8              THE COURT:  I mean, you can do it, but I think

9    now with all the electronics it's just better -- well,

10   we'll put our own stickers on them eventually.  But when

11   we let them into evidence, it will just be 1 to whatever

12   it is.

13             MR. BOOKBINDER:  Your Honor, will you be using

14   the jurist system so that we'll be submitting them on a

15   disk as well in advance?

16             THE COURT:  Actually that's a good question

17   because we just got that capacity.  I've never used it

18   before.  But yes.  Or we'll make that disk after the

19   exhibits are entered.

20             MR. BOOKBINDER:  But what we were instructed

21   by the Clerk is that we would only actually be

22   submitting them at a pretrial conference or at some

23   point in advance with the understanding that they could

24   be supplemented, but --

25             THE COURT:  I know, but they may not all go

1    into evidence.

2              MR. BOOKBINDER:  Right.  And my understanding

3    is, and certainly Mr. Hohler can tell me if I'm wrong,

4    but what we submit on disk isn't necessarily what the

5    jury will get.

6              THE COURT:  Right.  No, that's fine.  That's

7    fine.

8              All right.  So the 20th.  I gave you 20th and the

9    27th and I want to know by then, say, February 2nd, you

10   know, let me know which exhibits are objected to, and

11   you can say just "hearsay" or this or whatever it is,

12   that it's not co-conspirator -- it's not a

13   co-conspirator statement, and let me know of any

14   stipulations.

15             And then I will plan to see you to begin working

16   on all of this on February 7th at 10:00 and I won't be

17   available that afternoon.

18             (Pause.)

19             THE COURT:  Give me the 7th and the 8th, the

20   morning of the 7th and all day the 8th.  And then I'm

21   going to be away for a couple of days, but I may want to

22   see you that following week, one or two mornings, to

23   polish this up.  All right?

24             And is the defendant agreeable to excluding the

25   time until these voluminous filings are made for Speedy

1    Trial Act purposes?

2              MR. McGINTY:  We are, your Honor.

3              THE COURT:  Okay.  All right.  You have a very

4    interesting and challenging case.  You're doing a very

5    good job so far.  So keep it up.

6              MR. BOOKBINDER:  Your Honor, you had asked

7    earlier about the guidelines.  If you want to give me 30

8    seconds, I've refreshed myself.

9              THE COURT:  All right.

10             MR. BOOKBINDER:  It is correct that the end

11   guideline range is 57 to 71 months and the calculation

12   comes from a base offense level of 7, under 2(b)(1.1), a

13   14-level enhancement or gain between $400,000 and a

14   million dollars, two levels for --

15             THE COURT:  I don't need to know the

16   particulars, I just want to get the range.  But actually

17   that reminds me.  It's my standard -- you want to listen

18   to this.

19             MR. BOOKBINDER:  I apologize, your Honor.

20             THE COURT:  It's entirely up to -- I'm not

21   trying to prompt a plea or a dismissal, um, but you've

22   got a lot to discuss in this case.  You'll think about

23   this further.  And there's a tremendous amount of work

24   that needs to be done and we're all carving out a big

25   block of time to try the case.

1          So I'm going to order that you confer and let me

2     know, by January 10, whether you've reached some

3     agreement to resolve the case.  Mr. McGinty says it

4     shouldn't be a criminal case --

5               MR. McGINTY:  And they may agree.

6               THE COURT:  Not that I noticed.  But whatever

7     it is, you're going to be doing a lot more research.

8     Conspiracy.  Mail fraud.  So --

9               MR. BOOKBINDER:  Your Honor, Ms. Sedky just

10    pointed out to me that we may have actually

11    underestimated the legal organizer enhancement, that

12    guideline calculation, so we'll finalize that and let

13    Mr. McGinty know where we stand on that.

14              THE COURT:  Well, if you're going to have

15    these discussions, you should know what your respective

16    positions are, (A), but (B), I mainly just wanted to

17    know for myself.  I mean, you've got many state-of-the-

18    art legal issues and I'm just curious about what the

19    potential consequences are.

20         All right?  Anything further for today?

21              MR. McGINTY:  No, your Honor.  Thank you.

22              MR. BOOKBINDER:  No, your Honor.

23              THE COURT:  Okay.  The Court is in recess.

24              (Ends, 3:25 p.m.)

25

1           C E R T I F I C A T E

2

3

4

5       I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

6   hereby certify that the forgoing transcript of the

7   record is a true and accurate transcription of my

8   stenographic notes, of the aforementioned Motion to

9   Dismiss hearing, before Chief Judge Mark L. Wolf, on

10  Tuesday, December 13, 2011, to the best of my skill and

11  ability.

12

13

14

15  /s/ Richard H. Romanow 12-22-11

    _____
16  RICHARD H. ROMANOW  Date

17

18

19

20

21

22

23

24

25