UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 09-10243-MLW |
| | ) | |
| | ) | |
| RYAN HARRIS | ) | |

**DEFENDANT'S MEMORANDUM IN RESPONSE TO COURT'S ORDER OF FEBRUARY 9, 2012**

Defendant Ryan Harris respectfully submits this Response to this Court's Order of February 9, 2012, in which this Court ordered him to file updated proposed jury instructions and to submit a memorandum supporting his jury instructions and addressing the nature of the extrinsic evidence necessary to admit evidence under Rule 801(d)(2)(E) and the role of 47 U.S.C. § 230 in analyzing the admissibility of forum posts under Rule 801(d)(2)(E).

**A. Jury Instructions**

On February 3, 2012, Harris submitted a detailed set of jury instructions for this Court's consideration. Harris urges this Court to use these requests as a basis for its instructions both before and after trial. Harris also continues to request that this Court instruct the jury pretrial regarding the legal boundaries of the charges. Without this context, counsel cannot properly prepare his opening or trial strategy, nor can the jury properly process the testimony as it is offered. This case is atypical, and boundaries are necessary to orient the jury as well as counsel. For this reason, Harris requests this Court to give the jury preliminary instructions, which are separately submitted, to provide it with context regarding the legal background of this case.

1. Falcone and Direct Sales

Much of the briefing in this case, as well as the foundation for Harris's proposed jury instructions, has drawn on two, decades-old Supreme Court cases: United States v. Falcone, 311 U.S. 205 (1940) and Direct Sales Co. v. United States, 319 U.S. 703 (1943). Because of the centrality of these cases to his proposed jury instructions, Harris reviews his reading of these cases here.

Two types of defendants were charged in Falcone: distillers and individuals who sold goods (sugar, cans, and yeast) to those distillers. 311 U.S. at 206-07. The vendors were convicted of conspiring, with the distillers, to illegally distill alcohol. Id. Their appeals formed the basis for the Supreme Court opinion. The Court held that it was insufficient to prove that the vendors knew that their products would be used illegally; the government had to prove that the vendors knew that there was a conspiracy. After reviewing the facts in this case and assuming that the vendors knew that their products would be used illegally, the Court held that there was insufficient evidence to sustain their convictions because the vendors did not join the charged conspiracy. Id. at 208-11. The ruling rested in part on a careful consideration of the nature of the charged conspiracy and its object. Id. at 210-11 ("[O]ne who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a part but of which the supplier had no knowledge.").

In Direct Sales, a mail-order drug manufacturer/vendor was charged with conspiring with a doctor and his network of drug dealers to violate the Narcotics Act by selling morphine sulphate for non-medical purposes. 319 U.S. at 704-05. Despite repeated warnings from the predecessor to the DEA, the vendor continued to sell to the doctor in question who had

frequently ordered vast quantities of the drug over a period of years. Id. at 706-07. Additionally, the vendor had sales practices in place to encourage bulk sales, providing discounts for large quantity purchases and listing sales lots of large quantities. Id. at 706-08. The Court analyzed this case in terms of Falcone, first noting that one element of a conspiracy is knowledge of the conspiracy. Id. at 709-10. The Court held that "one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally." Id. at 709. The Court then discussed what types of proof might suffice to show that a seller knew of a given conspiracy.

In connection with this discussion, the Court first raised the distinction between "goods of free commerce" and restricted goods. Id. at 710. The Court held that "[t]he difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, arising from the latters' inherent capacity for harm and from the very fact they are restricted, makes a difference in the quantity of proof required to show knowledge that the buyer will utilize the article unlawfully." Id. at 711 (emphasis added). The Court also noted that facts "such as quantity sales, high pressure sales methods, abnormal increases in the size of the buyer's purchases, etc., which would be wholly innocuous or not more than ground for suspicion in relation to unrestricted goods, may furnish conclusive evidence, in respect to restricted articles, that the seller knows the buyer has an illegal object and enterprise." Id. (emphasis added). This distinction turns on the legal restrictions attached to the goods, not on

the capacity of the product to cause harm.[1] Throughout the rest of its opinion, the Court returns to the distinction, highlighting the fact that restricted goods are different. Id. at 710-15. This division makes sense when one considers the facts of Direct Sales. Because the drugs involved in Direct Sales were legally restricted, the predecessor to the DEA oversaw the sale and purchase of these drugs, and because it did so, it was in a position to warn the vendor that it was being used as a "source of supply" by doctors who were selling the drug illegally. Id. at 707. Therefore, because the drugs were restricted, the vendor was on notice not only that its products were being used illegally, but that they were being used illegally in a specific conspiracy. Unrestricted goods do not put a seller on notice in this manner, and the fact that the seller of an unrestricted good knew that customers were using those goods illicitly does not imply that the seller also knows that those customers are engaged in a conspiracy.

After stating that the restricted nature of a good can reduce the quantum of proof necessary to prove that a seller had knowledge of a conspiracy involving the buyer, the Court stated that "[t]here may be circumstances in which the evidence of knowledge is clear, yet the further step of finding the required intent cannot be taken." Id. at 711-12. In fact, the Court held that even when the seller of restricted goods knows that the buyer will use them illegally, there may not be a conspiracy:

> This may be true, for instance, of single or casual transactions, not amounting to a course of business, regular, sustained and prolonged, and involving nothing more on the seller's part than indifference to the buyer's illegal purpose and passive

---

[1] As an example of this distinction, the Court discusses the difference between toy pistols and rifles on one hand and machine guns on the other. Direct Sales, 319 U.S. at 710. The Court noted that these items each carry a different risk of misuse, but ultimately returned to the fact that in addition to having a greater potential for harm, machine guns are different because they are legally restricted. Id. at 710-11 (discussing "machine guns and such restricted commodities").

> acquiescence in his desire to purchase, for whatever end. A considerable degree of carelessness coupled with casual transactions is tolerable outside the boundary of conspiracy. There may be also a fairly broad latitude of immunity for a more continuous course of sales, made either with a strong suspicion of the buyer's wrongful use or with knowledge, but without stimulation or active incitement to purchase.

Id. at 712, n.8. In determining that intent to conspire had been shown, the Court noted that the facts revealed a "seller of harmful restricted goods" who sold "in unlimited quantities," stimulated high volume sales "by all the high-pressure methods" and used "[m]ass advertising and bargain counter discounts." Id. at 712. The Court noted that there was "more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern," there was "informed and interested cooperation, stimulation, instigation." Id. at 713.

Although Falcone and Direct Sales provide guidance on resolving the issues raised by Harris's case, there is one important difference that should be noted. In both Falcone and Direct Sales, the Supreme Court was faced with a proven conspiracy and had to decide whether the seller appealing his conviction was guilty of joining that conspiracy. In Falcone, an unchallenged conspiracy of distillers existed, and in Direct Sales, a conspiracy between the doctor who purchased from the manufacturer and the individuals who sold the drugs for the doctor was established. In both instances, the Court faced the relatively straightforward task of evaluating if and how one seller fit into a known, defined, and discrete conspiracy. This case presents a different challenge. The government asserts that Harris participated in a vast and multi-faceted conspiracy stretching over years and encompassing anyone who ever used Harris's products. Harris contends that it cannot establish any conspiracy at all. Accordingly, this Court must give the jury the tools not only to understand when someone is considered a participant in a

conspiracy, but also how to determine whether a conspiracy exists in the first place. It is not just Harris's role in a conspiracy that raises an issue; it is the existence of any type of conspiracy.

Direct Sales makes clear that regardless of the legal status of a product, knowledge of the illegal use of a product alone cannot be sufficient to prove that the seller knew of a conspiracy. Id. at 711-712. The government points to product capability to prove that Harris knew that his products could be used illegally. However, Direct Sales dictates that because product capability shows only that the product could be used illegally, it does not suffice to prove that Harris knew of a conspiracy.

Direct Sales also establishes that the legal status of a product is a critical question. If a product is unrestricted, the jury cannot infer that the seller knew of a conspiracy involving buyers from the fact that the seller knew that the buyers were using the product for illicit ends. If, however, a product is restricted, such that the seller is on notice[2] of the government's

---

[2] Reserving the lower quantum of proof for cases involving restricted products ensures that sellers have fair notice regarding the possible legal consequences of their actions. As Harris has argued in prior briefing, this cases raises serious notice issues and uses the wire fraud statute in a way that is void for vagueness. Because the products Harris sold were not legally restricted, he had no notice that selling these products could potentially expose him to criminal liability based on the conduct of third parties. Unlike the pharmacy in Direct Sales, Harris did not have the benefit of two warnings from law enforcement that his conduct was potentially criminal before he was hauled across the country to face federal charges. Instead, case law would have indicated to Harris that sellers of products (including restricted products like guns and bullets) are not even civilly liable for the actions of product users. See McCarthy v. Olin Corp., 119 F.3d 148, 157 (2nd Cir. 1997) (dismissing civil suit filed by crime victims against maker of hollow point bullets and noting that manufacturer "was under no legal duty to prevent criminal misuse of its product"); Perkins v. F.I.E. Corp., 762 F.2d 1250, 1265 n.43 (5th Cir. 1985) ("The marketing of a handgun is not dangerous in and of itself, and when injury occurs, it is not the direct result of the sale itself, but rather the result of actions taken by a third party."). Cf. United States v. Czubinski, 106 F.3d 1069, 1079 (1st Cir. 1997) ("The broad language of the mail and wire fraud statutes are both their blessing and their curse. They can address new forms of serious crime that fail to fall within more specific legislation. On the other hand, they might be used to prosecute kinds of behavior that, albeit offensive to the morals or aesthetics of federal prosecutors, cannot

determination that it is susceptible to bad uses and must therefore be controlled, the jury can infer, in part from the restricted nature of the product, that the seller knew of a conspiracy involving buyers. The government has not pointed to any statutes outlawing or restricting any of the products that Harris sold. Accordingly, the rule of Direct Sales does not apply, and regardless of the nature or capabilities of the product Harris sold, the quantum of proof required to show that Harris knew of a conspiracy involving users is not diminished. The government cannot rely on product capability alone, even a known and intended product capability, to establish that Harris is criminally liable for the conduct of product users.

2. Scope of Offenses

Throughout his proposed jury instructions, Harris has attempted to identify precisely the scope of the charged crimes. It appears that the government's strategy in this case has been to do the opposite; to blur the lines dividing crimes, to expand the boundaries of the offenses, and to avoid providing specifics as to the conduct, individuals, and crimes at issue. The government's allegations have been inchoate on a number of levels: they implicate Harris in the conduct of individuals with whom he had never communicated; they impute the speech of anonymous individuals to Harris; and they use the wire fraud statute in a novel and untested manner. That this breadth is not compatible with the actual charges further indicates the government's unwillingness to specifically define the allegations it has made.

The jury should be given pretrial instructions that provide it with a framework that makes the charges concrete and prevent it from returning a conviction based on implication,

---

reasonably be expected by the instigators to form the basis of a federal felony. . . .").

assumptions, and innuendo. See Direct Sales, 319 U.S. at 711 ("[C]harges of conspiracy are not to be made out by piling inference upon inference, thus fashioning what, in [Falcone], was called a dragnet to draw in all substantive crimes."). This risk is compounded, and circularity assured, with the promise of a Pinkerton instruction.

One way in which the scope of the offenses should be clarified pertains to the wire fraud counts. The law is clear that to prove that Harris aided and abetted wire fraud, it must prove that he knew of and intended to help a particular person commit a particular crime; "general suspicion" of wrongdoing is insufficient. United States v. Loder, 23 F.3d 586, 591 (1st Cir. 1994). The government cannot fall back on general assertions that everyone involved in this case was trying to "steal internet/broadband." In each wire fraud charge alleging the use of a TCNISO device, the government has charged that one individual (Hanshaw, Genao, LaRosa, or Madeira), came up with a plan to obtain internet service without paying from a single ISP (Charter or Comcast). The jury must consider whether that individual attempted to obtain this unpaid access solely for his own benefit and did not care whether other TCNISO customers did or did not desire or get free service from any particular ISP. Cf. Kotteakos v. United States, 328 U.S. 750, 754-55 (1946) (holding that pattern including "separate spokes meeting at a common center" but "without the rim of the wheel to enclose the spokes" indicated many similar conspiracies, each with its own discrete goal, rather than one overarching conspiracy). The particular crime that each of these product users set out to commit is defined by that man's own intent, own cable company, and own actions. None of the wire fraud counts charge these men with participation in some limitless scheme with thousands of others to steal the unstealable.

Accordingly, with regard to each specific offense, the jury must be instructed that for each wire fraud count, the government must prove that the charged product user devised a scheme to obtain internet access from a specific ISP without paying. The government must establish that this access is money or a thing of value. The government must prove beyond a reasonable doubt that Harris knew of this specific user's plan to get internet access from the specific ISP without paying, and that Harris intended to help this specific individual to obtain his desired end.

The scope of the offenses is also relevant to the conspiracy charge. In determining whether a single conspiracy exists, courts have considered three factors: "(1) the existence of a common goal, (2) interdependence among participants, and (3) overlap among the participants." United States v. Dellosantos, 649 F.3d 109, 117 (1st Cir. 2011) (quotations omitted). Each of these factors is independent. The scope of the offense charged is particularly important to determining whether the charged conspiracy had a common goal. A common goal, is an "overall objective to be achieved by multiple actions." United States v. Chandler, 388 F.3d 796, 811 (11th Cir. 2004). Typically, the common goal requirement can be met by proof that all of the alleged conspirators had one end in sight, such as selling or distributing cocaine. See, e.g., United States v. Dellosantos, 649 F.3d 109, 117 (1st Cir. 2011).

When the government's charges are broken down, it is clear that there is no such common goal here, but rather a series of similar goals. Unlike a typical drug conspiracy in which all members are attempting to sell a single pool of drugs coming from the top of the pyramid, there is no such unity of purpose in this case. Each TCNISO user was attempting to get or to modify internet access for himself from a specific ISP in his region. No user cared whether any other user ultimately got or tried to get free internet access, and the users were not marching in concert

to reach one unitary end together. Instead, each was walking his own direction towards an end that was similar in character to, but independent of, the goals of other users. Courts have repeatedly held that multiple individuals pursuing similar but distinct goals do not have a common goal and are not part of a single conspiracy. In Kotteakos, for example, the Supreme Court held that multiple individuals seeking to defraud the Federal Housing Administration were not in a single conspiracy despite their links to a central figure, because "the other individuals in each loan transaction had no interest in the success of any loan application other than their own." United States v. Smith, 82 F.3d 1261, 1269-70 (3d Cir. 1996) (explaining Kotteakos). Similarly, in Chandler, a single conspiracy did not arise where multiple individuals sought to embezzle McDonald's game stamps because no individual "was aware that it was participating in anything larger than its own redemptions." 388 F.3d at 811. This Court's instructions should clarify the common goal requirement and precisely delineate the bounds of the conspiracy that the government must prove. Similarly, the Court should demand specificity from the government regarding the scope and nature of all conspiracies involved before admitting statements under Rule 801(d)(2)(E).

3. Pinkerton Instruction

The government has requested, and this Court has indicated that it is considering giving a Pinkerton instruction. Such an instruction would be inappropriate in this case.

"A Pinkerton instruction tells the jury that they may hold a defendant liable for a criminal offense in which the defendant did not personally participate if it was committed during the course and in furtherance of the conspiracy of which he was a member." United States v. Newell, 658 F.3d 1, 19 (1st Cir. 2011). The First Circuit has stated that there are some cases in

which a Pinkerton instruction is inappropriate where the jury is being asked "to infer, on the basis of a series of disparate criminal acts, that a conspiracy existed." United States v. Sanchez, 917 F.2d 607, 612 n.4 (1st Cir. 1990); see also Newell, 658 F.3d at 19. The Second Circuit articulated this caution well:

> We would like to note, however, that the charge based on Pinkerton v. United States, 328 U.S. 640, 645 (1946), . . . should not be given as a matter of course. While no appellants in this case were prejudiced by the charge, it was used here in circumstances quite different from those that gave it birth. In the Pinkerton case, there was no evidence that Daniel Pinkerton had committed the substantive offense for which he had been convicted, but it was clear that the offense had been committed and that it had been committed in furtherance of an unlawful conspiracy of which he was a member. Daniel's conviction on the substantive count was sustained because 'in the law of conspiracy . . . the overt act of one partner in crime is attributable to all.' Id. at 647. In this case, however, the inverse is at work. The evidence of various substantive offenses, . . . was great; it was the conspiracy that in some instances must be inferred largely from the series of criminal offenses committed.

United States v. Sperling, 506 F.2d 1323, 1341-42 (2nd Cir. 1974).

Following this logic, a Pinkerton instruction is inappropriate in this case. The conspiracy charge in this case is far from well-established, and its viability rests heavily on the ability of the government to prove a number of substantive acts. The government's charging decision is new and untested, and as has been discussed in this memorandum, the charges are far from clearly delineated, and the conspiracy and substantive charges overlap and intertwine. Additionally, a Pinkerton instruction is unnecessary because the government has alleged that Harris was directly involved in the charged substantive acts; it has not argued that Harris stands apart from these acts but is linked to them through a conspiracy. A Pinkerton instruction is appropriate where there is solid proof of a conspiracy; it permits the jury to infer liability for an act that is clearly part of a conspiracy based on proof that an individual was part of a conspiracy. See Pinkerton v. United

States, 328 U.S. 640, 642, 646 (1946) (noting that a single conspiracy was proved and that the act in question was done in furtherance of that conspiracy). Here there is no clear proof that any given act was part of a given conspiracy, or even a clear statement of what actions are alleged to be part of any one conspiracy. Giving a Pinkerton instruction would cause the jury to make an impermissible inference–that because there were a number of substantive acts, there was a conspiracy. Such an inference would violate Harris's constitutional rights by impermissibly lowering the level of proof that the government must offer to obtain a conviction. This Court should refrain from giving a Pinkerton instruction to ensure that the jury considers all of the elements of each of the charges and does not let the fact that some charges exist influence its decision on other counts.

**B. Forum Content**

Harris has asked this Court to exclude all testimony about and all excerpts from the forum connected with the TCNISO website. If this Court admits such evidence, Harris has requested a jury instruction explaining that Congress has passed a statute insulating Harris from responsibility for knowing or policing the content of this forum. These rulings are driven by the language of 47 U.S.C. § 230.

After presenting Congress's findings about the importance of free speech on the Internet, § 230(c)(1) states that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." What this simple, declarative sentence means, is that a forum host is not to be considered responsible for or to have endorsed a message posted on that forum by another individual. Similarly, individual A who posts on a forum is not responsible for content posted by individual

B. This sentence does not limit the circumstances in which it applies; across the board, a forum host or moderator is not considered to be the speaker of any information posted on that forum by another person. This sentence is meant to protect forum hosts who might otherwise worry that they could be held responsible for the statements of others made on their forums. It ensures, for example, that CNN is not held responsible for a defamatory comment about the President that someone leaves on an article CNN posts on its website. This protection serves to encourage individuals to host the forums that permit freedom of speech on the internet.

Section 230 is not the only situation in which Congress has determined that certain speech is important enough to merit special protection. As a general matter, the FCC can fine a radio station or television channel for broadcasting speech that includes obscenities. 47 U.S.C. § 503(b)(1)(D). Another statute provides that if a station permits any candidate for public office to use the station, that station must give equal access to all candidates for that office. 47 U.S.C. § 315(a). The station is not permitted to censor any of the material broadcast under this section or reject it based on content. Id. One could imagine Howard Stern running for president and urging, among other things, that crass speech is appropriate and should be used more freely. If Stern produced an ad containing some of the content of one of his typical shows, broadcasters would be required to run the ad and would not be sanctioned for its content even though they would be fined for broadcasting this conduct outside of the context of a political ad. See Seth T. Goldsamt, "Crucified by the FCC"? Howard Stern, the FCC, and Selective Prosecution, 28 Colum. J.L.&S.P. 203 (1995) (discussing fines imposed on Infinity Broadcasting Corporation for remarks made by Howard Stern). Just as Congress determined that political ads are important enough to insulate broadcasters from responsibility for and consideration of their content,

Congress determined that encouraging and protecting free speech on the internet required insulating forum hosts from responsibility for the content of posters' speech.

The co-conspirator hearsay exception "derives from agency law," and to the extent that there is an rationale for the continued existence of the exception, it is based on the idea that by intentionally joining a conspiracy with someone, you authorize them to speak for you during the conspiracy and ratify their speech in furtherance of the end to which you both aspire. Section 230 does not "trump" the co-conspirator hearsay rule, but it speaks to whether such a relationship can form between a forum host and individuals who post on his forum with whom the host has no other personal contact. Section 230 states Congress's intent to establish that no agency-like relationship forms between a forum host and an individual who posts on that forum by virtue of the post. The forum host is not seen as endorsing, adopting, or promoting the content posted to the forum by others. Section 230 states that the words of forum posters may not be attributed to the forum host, and that is precisely what the government seeks to do in this case.

A serious notice problem arises if responsibility for and knowledge of the posts on the forum is imputed to Harris and the posts are admitted against him. The plain language of this statute would have indicated to Harris that he did not need to police, or even read, the content posted by forum users. It would have led him to believe that the words of those users could not be attributed to him under any circumstances. Imposing responsibility on Harris for those posts despite § 230 is unfair and violates his constitutional right to due process.

**C. Extrinsic Evidence of a Conspiracy**

Federal Rule of Evidence 801(d)(2)(E) states that the government cannot introduce a statement as co-conspirator hearsay unless it provides evidence extrinsic to the proffered

statement showing the existence of the conspiracy as well as the declarant and defendant's participation in it. The First Circuit has explained: "[A] coconspirator's statement, standing alone, is insufficient to meet the preponderance standard of Rule 801(d)(2)(E). In other words, to satisfy the weight-of-the-evidence criteria for that hearsay exception, there must be some proof *aliunde*. Though the district court may consider a statement's contents and the circumstances attending its utterance when gauging the statement's reliability, admitting the statement into evidence requires some extrinsic proof of the declarant's involvement in the conspiracy." United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993). In Sepulveda, the Court held that where there was no evidence as to the identify of the declarants of proffered hearsay, those statements should not have been admitted under Rule 801(d)(2)(E).

Here, the government seeks to admit chat conversations and forum posts by individuals it has not and cannot identify. Simply providing a name does not identify that person or give this Court any additional information to help it determine that person's reliability or their potential role in a conspiracy. Perhaps the easiest way to determine whether the government has sufficient extrinsic evidence to conditionally admit a statement is to remove the statement from consideration and see what remains. In the case of the chat conversations with unidentified individuals, the only remaining material is Harris's side of the conversation, which in no instance indicates that Harris and the declarant were participating in a conspiracy together. In the case of the forum posts, the sole evidence of a conspiracy is the fact that the declarant purchased an item from TCNISO. This basic, unadorned buyer-seller relationship cannot alone suffice to show that there was a conspiracy involving Harris and the declarant.

RYAN HARRIS
By his attorney,

/s/ Charles P. McGinty

Charles P. McGinty
B.B.O. #333480
Federal Defender Office
51 Sleeper Street
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 14, 2012.

/s/ Charles P. McGinty

Charles P. McGinty