UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 09-10243-MLW |
| | ) | |
| RYAN HARRIS | ) | |
| | ) | |

**GOVERNMENT'S MEMORANDUM
IN SUPPORT OF ITS PROPOSED JURY INSTRUCTIONS**

The government submits this memorandum in support of its proposed jury instructions.

The government believes that the jury instructions in this case should generally track the First Circuit Pattern Jury Instructions, where available, and it has submitted proposed instructions that reflect that view. The pattern instructions have been tested by the courts and offer clear guidance to the jurors about the elements of wire fraud, conspiracy, aiding and abetting, and other matters. The government is mindful of the Court's comments about the need for customized jury instructions that are tailored to the particular issues presented in this case. In that vein, it has offered a customized proposed instruction (Instruction Number 2) that addresses conspiracy liability in the supplier context. Because the defendant appears to focus his defense in part on the existence of multiple rather than single conspiracies, the government has offered a customized instruction addressing single or multiple conspiracies that largely tracks those used in other circuits' pattern instructions, since the First Circuit does not offer one. (Instruction Number 3). The government also offered three instructions that were based on the DiMasi jury instructions provided to the parties by the Court. (Instruction Number 7,

relating to Pinkerton liability; Instruction Number 8, the use of cooperating witnesses; and Instruction Number 9, evidence of consciousness of guilt). It has also offered an instruction on venue in the conspiracy context (Instruction 10) that is based largely on the Third Circuit and Sixth Circuit Pattern Jury Instructions.

**I.      Instruction No. 1 (Conspiracy)**

This instruction mirrors the pattern instruction, with one addition. It makes clear that a co-conspirator need not communicate with, trust, or like his co-conspirators. These principles are set forth in United States v. Mena-Robles, 4 F.3d 1026, 1033 (1st Cir. 1993); United States v. Heinemann, 801 F.2d 86, 91 (2d Cir. 1986) (holding that disputes, distrust and anger between co-conspirators does not vitiate a finding of a conspiracy); and United States v. Nersesian, 824 F.2d 1294 (2nd Cir. 1987). In Nersesian, even where the evidence revealed "instances of distrust, anger, and argument among appellants," the court held that "it is not at all uncommon for disagreements to occur in a common enterprise. That conspirators may have problems or difficulties in dealing with one another which result in angry accusations or heated discussions does not necessarily negate the existence of a single conspiracy." Nersesian, 824 F.2d at 1303 (citing Heinemann, 801 F.2d at 92). The court concluded that "the jury could have believed that any acrimony . . . simply related to the common business of the single conspiracy charged." Id.

**II.     Instruction No. 2 (Conspiracy Involving Suppliers)**

The government proposes a customized jury instruction that addresses conspiracy involving a supplier of products and services to illegal users. The government's proposed instruction sets forth the overarching legal principal in the first paragraph (that a supplier

of products or services can be held liable for conspiring with those he supplied if he intended to further and promote their illegal use).  Then in the second paragraph it lists factors that the jury can consider in order to draw an inference that the supplier had the requisite intent.  We believe this approach provides an accurate statement of the law and a workable way to instruct the jury.

The first paragraph sets forth the overarching legal principle:

> In certain circumstances, a supplier of products or services to illegal users can become a party to a conspiracy.  In order to find the supplier guilty of conspiring with those he supplied, you must find that the supplier shared the intent to achieve the criminal objective.  In other words, you must find that, by supplying the products or services, the supplier intended to further and promote the illegal use.

This language is adopted from <u>Direct Sales Co. v. United States</u>, 319 U.S. 703, 713 (1943).

The government also proposes that the instruction add that:

> It is not enough for you to find that he supplied a product or service that was then used by others in an illegal manner, without the supplier's knowledge and intent.  It is not enough to find that the illegal use was merely a foreseeable consequence or collateral effect of the conspiracy.  You must find that the illegal use was a purpose of the conspiracy.

This language is adopted from <u>United States v. Pappathanasi</u>, 383 F.Supp.2d 289, 291-92 (D. Mass. 2005) (citing <u>United States v. Goldberg</u>, 105 F.3d 770, 773-74 (1st Cir. 1997)). It seems that the parties agree on this overarching legal principle.

The second paragraph lists factors that the jury can consider in deciding whether there is sufficient evidence to infer that the supplier intended to further his customers' illegal use.  It seems that the parties also agree that these factors are relevant to the jury's determination.  Where the parties disagree is as to whether any one of those factors (specifically, the nature of the products supplied) is either a legally sufficient or legally

insufficient basis from which a jury can infer intent.  However, as set forth below, we believe that the Court need not, and should not, instruct as to the sufficiency (or insufficiency) of any one factor.  Courts do a fact-based inquiry without employing bright-line rules.  Accordingly, we suggest providing a list of factors that the jury can consider, with no instruction about how much weight the jury should give to any single factor.

In the government's view, <u>Direct Sales</u> stands for the proposition that, when the product is "inherently susceptible to illegal use," the fact that the defendant supplied it is sufficient evidence from which the jury can infer the requisite intent.  The defendant apparently disagrees.  Relying on <u>Falcone</u>, the defendant is seeking an instruction that sales alone, no matter what the nature of the product involved and the supplier's actual knowledge of its ultimate illegal use, cannot support an inference of intent.  The defendant asserts that, unless the product is deemed formally "restricted," <u>Direct Sales</u> does not apply.

The government believes that this misconstrues <u>Direct Sales</u>, and that the defendant's reliance on <u>Falcone</u> is misplaced.  <u>Falcone</u>, as the Court noted in <u>Direct Sales</u>, involved a unique set of facts and litigation posture, as no conspiracy was even charged between the seller and the buyer, and the government inexplicably conceded that the facts did not support a conspiracy charge.   Thus, courts, including the Supreme Court in <u>Direct Sales</u>, have limited <u>Falcone</u> to its facts.  <u>See</u>, <u>e.g.</u>, <u>United States v. Rush</u>, 666 F.2d 10, 11 (2d Cir. 1981).

Accordingly, we suggest that, rather than announce bright-line rules about what evidence is sufficient or insufficient by itself, the Court use an instruction that sets forth a

list of factors courts have held to be relevant, including the nature of the product.  The government's proposed instruction sets forth the following factors that are relevant to a seller's intent, based on factors that courts have considered in <u>Direct Sales</u> and its progeny.

### 1.   Nature of the product or service supplied

Courts have repeatedly held that, where the nature of the products or services supplied is inherently suspicious, a jury can infer that the supplier had the requisite criminal intent.  For example, in <u>Direct Sales</u>, the Supreme Court upheld the conspiracy conviction of a mail order wholesaler who mailed morphine sulphate to an out-of-state physician, who in turn dispensed morphine illegally.  The Court contrasted a supplier of toy pistols or hunting rifles to a supplier of machine guns, stating:

> all articles of commerce may be put to illegal ends.  But all do not have inherently the same susceptibility to harmful and illegal use.  Nor, by the same token, do all embody the same capacity, from their very nature for giving the seller notice the buyer will use them unlawfully.  Gangsters, not hunters or small boys, comprise the normal private market for machine guns.  So drug addicts furnished the normal outlet for morphine . . . .
>
> This difference is important for two purposes.  One is for making certain that the seller knows the buyer's intended illegal use. The other is to show that by the sale he intends to further promote and cooperate in it.  This intent, when given effect by overt act, is the gist of conspiracy.

<u>Direct Sales</u>, 319 U.S. at 710-711.

Likewise, in <u>United States v. Grunsfeld</u>, the Sixth Circuit upheld the conspiracy conviction of a chemist who sold lab equipment and chemicals to co-defendants who in turn illegally manufactured PCP.  <u>United States v. Grunsfeld,</u> 558 F.2d 1231, 1237 (6th Cir. 1977).  The court reasoned, in part, that "the materials which [defendant] obtained

for the conspiracy were hard-to-get items which are often used in the production of illegal drugs." Id. at 1236.

## 2.   Supplier's providing additional assistance or support

Courts have repeatedly held that where the supplier of criminal tools offers additional assistance to the users, a jury can infer that the supplier had the requisite criminal intent.  In United States v. Chamley, 376 F.2d 57, 59 (7th Cir. 1967), the court reasoned that "the defendant actively cooperated with those who fraudulently completed and transferred the checks and money orders by giving them the check protector, a device which assisted them in creating an indicia of genuineness of the fruits of their labor. From this fact, and from his financial interest in the sales consummated, the defendant's membership and participation in the conspiracy charged was a permissible inference." Id. at 59-60.

Likewise, in Grunsfeld, the defendant not only sold a tableting machine but also provided customers with demonstrations and instructions about its use.  In upholding his conspiracy conviction, the court noted that "he demonstrated its use to [co-conspirators] and instructed them in 'cutting' the PCP." Grunsfeld, 558 F.2d at 1237.  The court cited with approval United States v. Yahiz- Cremata, 503 F.2d 963 (5th Cir. 1974), noting that in that case, "three co-conspirators had smuggled cocaine into the country and went to the defendant's barber shop where he supplied them with milk, sugar, and bicarbonate, instructed them on how to cut cocaine and warned that Miami was too hot for operating." Id. at 1237.

### 3. Supplier's financial interest

Courts have repeatedly held that where the supplier of criminal tools sells them or otherwise profits from their use, a jury can infer that the supplier had the requisite criminal intent.  In upholding the defendant's conviction in <u>Direct Sales</u>, the Court reasoned in part, "there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy.  Petitioner's stake here was in making the profits which it knew could only come from its encouragement of Tate's illicit operations." <u>Direct Sales</u>, 319 U.S. at 1682.  In <u>United States v. Garcia-Rosa</u>, the First Circuit followed <u>Direct Sales</u> and upheld a conspiracy conviction where the defendant loaned money to drug runners.  <u>United States v. Garcia-Rosa,</u> 876 F.2d 209, 216 (1st Cir. 1989), <u>vacated in part on other grounds</u> <u>Rivera-Feliciano v. United States</u>, 498 U.S. 954 (1990).  The Court reasoned that an inference of the defendant's intent to join the conspiracy could be drawn from the fact that he was not in the business of lending money and that the fact that the loan was to be repaid in cocaine gave him a "vested interest in the outcome of the conspiracy." <u>Garcia-Rosa</u> 876 F.2d at 216.  <u>See also</u> <u>Chamley</u>, 376 F.2d at 60 (holding that defendant's "financial interest in the sales consummated" helped support the inference that he had participated in the charged conspiracy).

### 4. Market conditions such as sales volume, price

Where a supplier provides criminal tools in volume, or at a high price, or repeatedly over time, courts have held that a jury can infer that the supplier had the requisite criminal intent.  <u>See</u>, <u>e.g.</u>, <u>Direct Sales</u>, 319 U.S. at 711 (holding that "additional facts, such as quantity sales . . . may furnish conclusive evidence . . . that the seller knows

the buyer has an illegal object and enterprise"); <u>Chamley</u>, 376 F.2d at 59 (holding that defendant "made several sales at substantial sums.  His knowledge of the intended disposition of the items cannot be disputed"); <u>Grunsfeld</u>, 558 F.2d at 1236 (holding that defendant was involved in "three or four large purchases of materials over a period of time . . . [and] promoted the very purposes of the conspiracy rather than merely supplying it").

### 5.   Supplier's attempts to hide his involvement

Courts have held that where a supplier of criminal tools acts in a clandestine manner, that evidence can support an inference that he shared his customers' criminal intent.   For example, in <u>United States v. Loew</u>, 145 F.2d 332 (2d Cir. 1944), the defendant was a grocer who sold large quantities of sugar to co-defendants who operated illegal stills.  The court upheld his conviction for conspiracy to operate unregistered stills, noting "the sales were not made openly at the appellant's place of business; he arranged to take orders by telephone under code words, and he delivered the sugar furtively at night . . . ."  <u>Loew</u>, 145 F.2d at 332.  Likewise, in <u>United States v. Rush</u>, the defendant was a podiatrist who had loaned $25,000, under "usurious" terms, to his co-defendants, knowing that they would use this money to finance a drug deal.  <u>United States v. Rush</u>, 666 F.2d 10, 11 (2d Cir. 1981).  The court upheld his conspiracy conviction, reasoning that the defendant "embarked upon a new line of business not only with full knowledge of its illicit nature but through a clandestine method devised to protect him from its consequences."  <u>Id.</u> at 11-12.

### 6.   Supplier's personal lawbreaking

When the criminal tool supplier personally engages in lawbreaking, that furnishes a "stake in the success of the venture" that will support the inference that the defendant had the intent to join the conspiracy with the purchasers.  United States v. Tramaglino, 197 F.2d 928, 931 (2d Cir. 1952).  Accord Fed. R. Evid. 404(b) (Evidence of other crimes may be admissible as proof of intent or knowledge).

## III.      Instruction No. 3 (Single or Multiple Conspiracies)

The government proposes an instruction that addresses single or multiple conspiracies, as it seems that the defendant intends to rely on this issue as a defense.  The first paragraph of the proposed instruction is taken virtually verbatim from Ninth and Fifth Circuit pattern instructions:

> Count One charges that there was a single conspiracy.  You must decide whether the conspiracy charged in the indictment existed, and, if it did, who at least some of its members were.  If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed.  Similarly, if you find that the defendant was not a member of the charged conspiracy, then you must find the defendant not guilty, even though the defendant may have been a member of some other conspiracy.

The second paragraph borrows language from the Third Circuit and Sixth Circuit pattern instructions that spell out the various ways single conspiracies can exist:

> But a single conspiracy may exist even if all the members did not know each other, or never sat down together, or did not know what roles all the other members played. And a single conspiracy may exist even if different members joined at different times, or the membership of the group changed. These are all things that you may consider in deciding whether there was more than one conspiracy, but they are not necessarily controlling.  Similarly, just because there were different sub-groups operating in different places, or many different criminal acts committed over a long period of time, does not necessarily mean that there was more than one conspiracy. Again, you may consider these things, but they are not necessarily controlling.

The third paragraph uses the First Circuit's three-factor "totality of the circumstances" language from <u>United States v. Portela</u>, 167 F.3d 687, 695 (1st Cir. 1999) and <u>United States v. Dellosantos</u>, 649 F.3d 109, 118 (1st Cir. 2011):

> In determining whether there was a single conspiracy or separate and unrelated conspiracies, you should consider the totality of the circumstances, including whether there was a common goal, whether there was interdependence among the participants, and whether there was overlap among the participants. Overlap among the participants may be established by the pervasive involvement of a single core conspirator, or hub character. The government has charged that the defendant is this "hub."

## IV.    Jury Instruction No. 5 (Aiding and Abetting)

The government proposes that the Court use the First Circuit pattern instruction for Aiding and Abetting, with one addition -- language clarifying that the defendant need not know, or communicate with, the person engaging in the underlying criminal act. This is consistent with the current pattern instruction and the aiding and abetting case law.

The First Circuit's pattern instruction states that "a defendant need not perform the underlying criminal act, be present when it is performed or be aware of the details of its execution to be guilty of aiding and abetting." First Circuit Pattern Jury Instructions (Criminal), No. 4.02 (1998). Consistent with this, courts have held that it is not necessary for the defendant to know the identity of, have met, or have communicated with the other principals in order to be convicted of aiding and abetting. <u>See</u> <u>United States v. Lawson</u>, 872 F.2d 179, 181 (6th Cir. 1989) (holding that defendant could be convicted of aiding and abetting without knowing the identity of, or having any direct discussion, with principal who possessed illegal weapons); <u>United States v. White</u>, 366 F.2d 474 (10th

Cir. 1966) (holding that defendant could be convicted of aiding and abetting without knowing identity of, or actually communicating with, principal who stole automobile).

Rather, a defendant's intent to associate and participate in the illegal conduct may be inferred by his or her actions, even without knowledge and direct communication. In Lawson, the court found the defendant's intent to aid and abet could be inferred because he was aware that his possession of unregistered firearms was illegal and that any person procuring weapons for him would be committing a crime. 872 F.2d at 181.

Likewise, in Untied States v. Blitz, 533 F.2d 1329 (2nd Cir. 1976), the court affirmed the defendant stock broker's conviction for aiding and abetting a large-scale market manipulation scheme, rejecting his argument that he could not be found guilty because he did not know the other participants. The court reasoned that the defendant knew of his role in the market manipulation and that he knew it would be impossible for him to conduct the manipulation alone. As the scheme "depended upon an intensive, large-scale effort, involving as many brokers and salesmen as could be enlisted… [the defendant] necessarily knew there were [other principals] in this large scale market manipulation unless he deliberately closed his eyes to that fact." 533 F.2d at 1343.

### III.     Instruction No. 8 (Consciousness of Guilt)

The government offers a proposed instruction regarding consciousness of guilt, as the government intends to introduce evidence that the defendant engaged in a variety of evasive tactics, which tends to show consciousness of guilt. The government has used the DiMasi instruction, with one modification – we have deleted references to false statements, since, at this point, we do not intend to argue that this prong applies here.

IV.     **Instruction No. 10 (Venue For Conspiracy)**

The government offers a proposed instruction regarding venue for conspiracy charges, as the defendant appears to base his defense in part on a venue challenge.  The proposed instruction is largely adapted from Third Circuit Pattern Jury Instruction 3.09 and Sixth Circuit Pattern Jury Instruction 3.07.  It adds language relating to sending e-mails and packages into a district.  It states, in part:

> The government does not need to prove that the defendant or any co-conspirator was physically present in Massachusetts.  It would be sufficient if the defendant or a co-conspirator sent an e-mail message or mailed a package into Massachusetts.

Courts have analyzed venue in the telephone call context, and held that venue can exist even where no co-conspirator is physically present, where, for example, an undercover agent or other non-conspirator is located in the district and places a call to the defendant outside the district.   United States v. Rommy, 506 F.3d 108, 119-120 (2d Cir. 2007); United States v. Cordero, 668 F.2d 32 (1st Cir. 1981); accord United States v. Santiago, 83F.3d 20, 24-25 (1st Cir. 1996) (holding venue in drug conspiracy can be established when co-conspirator sends drugs, via a drug courier, into district).

As the court in Rommy reasoned, as long as the call furthers the conspiracy, the direction of the call makes no difference (inbound v. outbound), nor does the fact that the call is between co-conspirators or between conspirators and non-conspirators (e.g., a government actor).   Rommy, 506 F.3d at 122.   Indeed, as set forth below, the Second Circuit in Rommy affirmed the district court's use of a jury instruction (and following colloquy) that contained language very similar to the language that the government offers here.

The First Circuit in <u>Cordero</u> affirmed the convictions of two foreign defendants for conspiracy to import drugs into Puerto Rico.  Venue was based on the fact that an undercover government agent located in the district (Puerto Rico) placed calls to the two defendants who were outside of the district.  The defendants provided the agent with key information that he then communicated to others.  The First Circuit held that venue was proper in Puerto Rico, reasoning that venue lies if the offense was "begun, continued, or completed" in Puerto Rico.  The court ultimately concluded that the offense "continued" in Puerto Rico by virtue of the telephone calls.  The court held that "the statutory venue standard may be satisfied as long as 'any act in furtherance of the conspiracy' is committed in Puerto Rico, even if the coconspirators are not 'physically present' there." <u>Cordero</u>, 668 F.2d at 44 (citations omitted).  The court noted that the fact that the agent placed the calls to the defendants who were outside the district "does not change the fact that [the defendants] transmitted this information through [the agent] who was inside Puerto Rico."  <u>Id.</u> The court also noted that the defendants knew the agent was in Puerto Rico and that the offense was "bound for completion" in Puerto Rico.  <u>Id.</u>

The Second Circuit, citing <u>Cordero</u> with approval, expounded on this concept in <u>Rommy</u>, 506 F.3d at 119.  In that case, the court affirmed the conviction of a Dutch defendant for conspiracy to import drugs into the Southern District of New York.  The defendant challenged the jury instruction that venue in S.D.N.Y. could be established by phone calls between undercover agents in that district and the defendant in the Netherlands discussing drug importation.   The jury instruction relating to venue contained the following language:  "For example, if you find by a preponderance of the evidence that, after the alleged conspiracy was formed, a telephone call in furtherance of

the conspiracy was made to a location in the [district], that would be sufficient to fulfill the venue requirement, even if the call was made to an undercover agent or some other nonconspirator." Id. at 116-117.  When prompted by a jury question, the court further instructed that venue could also be established by an out-bound call made by a non-conspirator as well (provided that there was a conspiracy and the call was induced by or in some way furthered the conspiracy). Id. at 117.

On appeal, the Second Circuit rejected the defendant's challenge to the district court's instructions as to venue.  That court held that telephone calls can be "overt acts" whether they are made between conspirators in different districts or between conspirators and non-conspirators (such as government actors). Id. at 120. The court further held that "telephone calls in furtherance of a conspiracy can establish venue either where placed or received."  The court held that "what is determinative of venue . . . is whether the conspirator used the telephone call to further the objectives of the conspiracy." Id. at 122.  The court reasoned that the conspirator effectively propels not only his voice but the scheme itself beyond his own physical location into the district where the person with whom he is speaking is located.  He "avails himself of modern technology to commit at long distance the identical overt act he would commit by being in the same room with the person and whispering a conspiracy—furthering the message directly into his listener's ear."  The Court concluded, "what matters is that the conspirator speaks not to hear the sound of his own voice but to communicate to his listener because he thinks that, by doing so, he furthers a conspiratorial goal." Id.  The court then went on to discuss whether it was reasonably foreseeable that the calls would involve the district, citing to

cases where advertising on the internet was deemed to be reasonably foreseeable to involve virtually any district.

The holdings in <u>Rommy</u> and <u>Cordero</u> apply with equal force to the e-mail purchase confirmations and the shipment of modems at issue in this case.  Accordingly, the government requests a jury instruction that contains language similar to the language upheld in <u>Rommy</u>.

### V.    CONCLUSION

For the above reasons, the Court should include the government's proposed jury instructions in its instructions to the jury.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    */s/ Adam Bookbinder*
Adam J. Bookbinder
Assistant U.S. Attorney
Mona Sedky
DOJ Trial Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Adam Bookbinder*

Dated: February 14, 2012