UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
        v.                        )          CRIMINAL NO. 09-10243-MLW
                                  )
                                  )
RYAN HARRIS                       )

DEFENDANT'S RESPONSE TO GOVERNMENT'S
REVISED PROPOSED JURY INSTRUCTIONS

Defendant Ryan Harris, submits the following responses to the government's revised

proposed jury instructions and the accompanying memorandum filed on February 14, 2012.  As a

general matter, Harris asks this Court to reject the government's proposed instructions and to use

the instructions that he has requested as the basis for its charge.

**I.      Instruction No. 1 (Conspiracy)**

The government proposes adding the following sentence to its general conspiracy

instruction: "Nor do you need to find that the defendant had direct contact with, trusted, or liked

each co-conspirator."  There is nothing in the general conspiracy instructions that would lead the

jury to believe that the government is required to make a showing at all members of the

conspiracy liked one another.

More pointedly, conspirators must, to some degree, trust each other to pursue the

common conspiratorial purpose.  The absence of trust may indicate the absence of conspiratorial

agreement, and sufficient animus among alleged joint venturers may indicate no joint venture.

The government's proposed amendment dilutes the proof requirement.

Further, the instruction also dilutes consideration of a witness' credibility.  One factor in

determining credibility is the witness's "motive, bias or prejudice."  First Circuit Pattern

Criminal Jury Instructions 1.06.  A defendant has a Sixth Amendment right to confront and

impeach witnesses, including by showing the their bias or interest.  See United States v. Bagley,

473 U.S. 667, 676 (1985); United States v. St. Pierre, 599 F.3d 19, 23 (1st Cir. 2010).  The

government's requested instruction tends to cloud this issue, minimizing the significance of

personal animus, witness bias or personal interest in connection with the conspiracy charge.

The cases cited by the government do not support this type of instruction.  United States

v. Mena-Robles, 4 F.3d 1026, 1033 (1st Cir. 1993) does not address the issue of the quality of the

relationship between co-conspirators.  In both United States v. Heinemann, 801 F.2d 86 (2nd Cir.

1986) and United States v. Nersesian, 824 F.2d 1294 (2nd Cir. 1987), the defendants were

convicted despite evidence that there had been dissension in the charged conspiracies.  In both

Second Circuit cases, the defendants argued that there was insufficient evidence to prove a single

conspiracy because of this dissension.  Heinemann, 801 F.2d at 92; Nersesian, 824 F.2d at 1303.

Neither of these cases involved a jury instruction like the one proposed by the government, and

neither supports the proposition that such an instruction is necessary.  In fact, the results of these

cases suggests that juries are perfectly capable of determining when differences among persons

are and are not relevant to the proof of a conspiracy.  The sole result of the instruction requested

by the government would be to confuse the jury in a manner likely to violate Harris's

constitutional right to due process and to confront the witnesses against him.

## II.      Instruction No. 2 (Conspiracy Involving Suppliers)

The government has abandoned its earlier instruction that "you cannot find that the

defendant intended to join a conspiracy based solely on his knowledge of the illegal use of his

products."  It has embraced the converse: that absence of knowledge may indeed be sufficient so long as the produce is inherently susceptible of misuse.

The government's proposed instruction begins with the sentence "In certain circumstances, a supplier of products or services to illegal users can become a party to a conspiracy," guidance akin to "in certain circumstances, one might (win the lottery) (crash their car) (fall into a well)."  This is not terribly helpful.

Perhaps it would be useful to restate the government's instruction using a common, unrestricted product that has recognized illegal use(s) plainly known to the manufacturer.  A Canon photocopier, for example, can be used to quickly violated copyright laws, and an Apple iPod can be used to hold and distribute illegally downloaded music.  In an imaginary prosecution of Canon or Apple, we can see the government's proposed instruction taking the jury to an unhappy place:

> In certain circumstances, a supplier of products or services to illegal users can become a party to a conspiracy.  Here, in order to find [Canon/Apple] guilty of conspiring with those [it] supplied, you must find that [it] shared their intent to achieve the criminal objective.  In other words, you must find that, by supplying the products or services, [Canon/Apple] intended to further and promote the illegal [duplication of copyrighted books/music without paying].  It is not enough for you to find merely that he supplied a product or service that was then used by others in an illegal manner [for the duplication of copyrighted books/music without paying,] without the supplier's knowledge and intent.  It is not enough to find that the illegal use, [duplication of copyrighted books/music without paying,] was merely a foreseeable consequence or collateral effect of [Canon/Apple] supplying the products or services.  You must find that the illegal use, [the duplication of copyrighted books/music without paying,] was a purpose of the conspiracy.

> Different types of evidence can support an inference that [Canon/Apple] shared his customers' criminal intent.  This includes the nature of the products or services supplied, for example, whether they are inherently susceptible to illegal use or are hard-to-get items that are often used in an illegal manner.  It also

3

includes whether [Canon/Apple] provided continued assistance or support to his
customers.  It includes whether [Canon/Apple] had a financial interest in the
customers' success.  It includes whether [Canon/Apple] provided the products or
services in a high volume or at a high price or repeatedly over time.  It also
includes whether [Canon/Apple] acted in a secretive manner.  It includes whether
[Canon/Apple]  personally engaged in lawbreaking [itself].  You may consider
these things in deciding whether [Canon/Apple] intended to conspire with his
customers.

Nearly every one of the factors suggested by the government would be true of Canon/Apple: the

products are inherently susceptible to being used to violate copyrights; the illegal use is

foreseeable; each provides ongoing customer support; they have a financial interest in the success

of customers because they would like to sell more products; iPods in particular have been sold in

a high volume, at a high price, for over a decade; and companies, particular Apple, are extremely

secretive about their work and new product developments.  The sole proposed factor that might

not apply to Canon and Apple is that they engaged in lawbreaking (although Steve Jobs admitted

he had sold "blue boxes" in his past, a factor bearing on his knowledge of illegal use among

users, or so the government might argue), although query whether an anti-trust or tax violation by

either of these companies would be relevant to this calculus.

The government's instruction insists that the supplier's own alleged lawbreaking is a

factor that the jury can consider in this context.  Rule 404(b) provides that evidence of other

crimes or bad acts cannot be admitted to prove propensity.  Yet the government's proposed

instructions urge such a use.  As Harris has argued, the only possible use of evidence of Harris's

own uncharged acts is the impermissible one, to make the jury infer that because he did a certain

thing, he intended all other people to do the same thing.  If the sole difference between Harris and

Canon/Apple is that Harris used his own products in a certain way, clearly the jury is being told

that it can infer that the manufacturer who used his products in a certain way intended other people to do the same.  Because this is the impermissible inference barred by Rule 404(b), the jury must not be instructed that it can consider the defendant's own "lawbreaking."  The instruction also fails the test of Rule 403, as Harris will not be disputing that the firmware had the capability of providing faster or free service, and thus there is no probative benefit from the government's offer of evidence of bad acts, only the prejudicial inference that he is a lawbreaker, hammered home in this proposed instruction.

In its memorandum, the government states that if a product is "inherently susceptible to illegal use," the jury can infer that the supplier had the intent to join a conspiracy with a buyer based solely on the fact of the sale.  This assertion seriously misconstrues Direct Sales v. United States, 319 U.S. 703 (1943).  First, Direct Sales did not present the case where the sole evidence of a conspiracy between the buyer and seller was the nature of the product and the fact of the sale.  Instead, there was evidence that the defendant sold "vast quantities" of a restricted product to a single doctor over a period of more than five years, encouraged and discounted bulk purchases of this restricted product, and continued both practices despite repeated warnings from the predecessor to the DEA to stop these sales because the purchasing doctor was selling the product illegally.  Id. at 705-07.  Because of the restricted nature of the products involved, the defendant had direct knowledge of the occurrence and illegality of the charged conspiracy.

Direct Sales does not, therefore, stand for the proposition that the sale alone of a product, even one inherently susceptible to illegal use, suffices to establish a conspiracy between buyer and seller.  The First Circuit has clearly held, in cases involving illegal drugs, that: "[A] buyer-seller relationship, simpliciter, is an insufficient predicate for finding that the buyer and

5

seller are guilty <u>as coconspirators</u>."  <u>United States v. Santiago</u>, 83 F.3d 20, 23-24 (1st Cir. 1996);

<u>see also</u> <u>United States v. Moran</u>, 984 F.2d 1299, 1302-03 (1st Cir. 1993).  The government's

memorandum does not discuss these cases.

What <u>Direct Sales</u> does establish is that there is a meaningful difference between

restricted and unrestricted products.  As discussed in Harris's memorandum in support of his

proposed jury instructions, <u>Direct Sales</u> repeatedly distinguishes between unrestricted, legal

products, and restricted products, and states that it is only in the case of restricted products that

factors like those listed by the government can suffice to prove that the seller knew of and

intended to join a conspiracy.  <u>Id.</u> at 710-15.  Even the portion of <u>Direct Sales</u> quoted in the

government's memorandum highlights this distinction:

> The commodities sold there were articles of free commerce, sugar, cans,
> etc.  They were not restricted as to sale by order form, registration, or other
> requirements.  When they left the seller's stock and passed to the purchaser's
> hands, they were not in themselves restricted commodities, incapable of further
> legal use except by compliance with rigid regulations, such as apply to morphine
> sulphate."  The <u>difference</u> is like that between toy pistols or hunting rifles and
> machine guns.  All articles of commerce may be put to illegal ends.  But all do not
> have inherently the same susceptibility to harmful and illegal use.  Nor, by the
> same token, do all embody the same capacity, from their very nature, for giving
> the seller notice the buyer will use them unlawfully.  Gangsters, not hunters or
> small boys, comprise the normal private market for machine guns.  So drug
> addicts furnish the normal outlet for morphine which gets outside the restricted
> channels of legitimate trade.
> This <u>difference</u> is important for two purposes.

<u>Id.</u> at 710-11 (emphasis added).  This section refers to a "difference" twice, as underlined in the

above quotation.  When the passage is read in its entirety, it is clear that the "difference" to which

the Court refers is the distinction between "articles of free commerce" and "restricted

commodities" that is set up in the first two sentences.  <u>Id.</u>  It is the "difference" between

restricted and unrestricted goods that carries through the opinion, and because Harris sold solely

unrestricted products, it is this "difference" upon which the jury instructions should be based.

### III.     Instruction No. 3 (Single or Multiple Conspiracies)

In the last paragraph of its proposed instruction regarding the number of conspiracies, the

government attempts to summarize the test from United States v. Portela, 167 F.2d 687 (1st Cir.

1999):

> In determining whether there was a single conspiracy or separate and unrelated
> conspiracies, you should consider the totality of the circumstances, including
> whether there was a common goal, whether there was interdependence among the
> participants, and whether there was overlap among the participants.  Overlap
> among the participants may be established by the pervasive involvement of a
> single core conspirator, or hub character.  The government has charged that the
> defendant was this "hub."

Gov't Modified and Revised Proposed Jury Instructions at 10.  This instruction usurps the jury's

role as fact-finder.  After listing the three factors described by Portela, the government's

instruction goes on to discuss just one of these factors: overlap.  The instruction states that

overlap may be established by the involvement of a single hub, yet it gives the jury no context for

determining when the involvement of such an individual is sufficient to show overlap and when

it is not.  Instead, the instruction goes on to state that the government has charged that Harris is a

hub figure.  This juxtaposition clearly implies that Harris is a hub, and that because he is, the

element of overlap is present, and there is likely a single conspiracy.  This instruction usurps the

jury's role of determining, for itself, whether there is a hub figure, whether the existence of that

figure indicates the presence of overlap, and whether, based on the totality of the circumstances,

the government has proved a single conspiracy.  Critically, the government's proposed

instruction fails to inform the jury that a number of similar acts done by different individuals is

not a conspiracy unless the government can prove that those individuals intended to join with one

another to attain a single, shared end.  See Kotteakos v. United States, 328 U.S. 750, 755 (1946);

United States v. Chandler, 388 F.3d 796, 811 (11th Cir. 2004); United States v. Smith, 82 F.3d

1261, 1269-70 (3d Cir. 1996).

The government's proposed instruction also smacks of burden shifting.  The instruction

talks about evidence which does not necessarily negate the existence of a single conspiracy.  This

phrasing tends to lessen the government's burden by indicating to the jury that there are things

the government need not prove, rather than focusing on the elements that the government must

prove and the meaning of those elements.

### IV.    Jury Instruction No. 5 (Wire Fraud Definitions)[1]

As with the single conspiracy instruction, much of this instruction is phrased in terms of

what the government need not prove.  Statements along these lines are burden shifting and

should not be included in the jury instructions.

In this instruction, the government states that it does not need "to prove all of the details

concerning the precise nature and purposes of the scheme."  Gov't Modified and Revised

Proposed Jury Instructions at 13.  This statement is incorrect: the government must prove the

scheme as charged in the Superseding Indictment.  To prove that Harris aided and abetted wire

fraud, the government must prove that he knew of and intended to help a particular person

commit a particular crime; "general suspicion" of wrongdoing is insufficient.  United States v.

Loder, 23 F.3d 586, 591 (1st Cir. 1994).  Additionally, to avoid unanimity and notice issues and

---

[1] The government's memorandum does not specifically discuss its fourth proposed instruction–a general instruction regarding the elements of wire fraud.  Harris prefers his slightly differently worded version of this instruction.

to aid this Court in making informed rulings, at this late date, the government must be able to articulate the theory upon which it proceeds.  Throughout these proceedings, the government has represented that it alleges that Harris participated, with product users, in a scheme to obtain free or enhanced internet access from each user's ISP.  Therefore, the government must prove that Harris participated in a scheme involving each charged user to defraud each individual ISP.

## V.    Jury Instruction No. 6 (Aiding and Abetting)

The government asks this Court to instruct the jury that a defendant can be convicted of aiding and abetting wire fraud absent proof that the defendant was "aware of the identity of" or communicated with the principal.  None of the cases cited by the government support this proposition.  In United States v. Lawson, 872 F.2d 179, 180 (6th Cir. 1989), the defendant asked individual A to get him "five Uzis, fully automatic, with no paperwork on them."  A, in turn, asked individual B to get these weapons for the defendant.  Id.  B agreed and asked individual C to help him fulfill this request.  Id.  C agreed, the defendant paid A, and the guns were delivered to A.  Id.  The Court held that the defendant could be convicted of aiding and abetting the possession of illegal weapons by C, because the defendant "knew that his possession of the unregistered guns would be illegal, and thus anyone trying to procure the weapons for him would also be committing such an offense."  Id. at 181.

Similarly, in White v. United States, 366 F.2d 474, 476 (10th Cir. 1966), the defendant asked Individual A to find someone to get him a certain car, and Individual A agreed to do so.  Individual A then hired individuals B and C to steal a car for the defendant, and they did so.  Id.  The Court held that the defendant could be convicted of aiding and abetting the theft of the car by B and C because communication between a principal and an aider and abetter "may be through a

third person." Id.

In United States v. Blitz, 533 F.2d 1329, 1342-43 (2nd Cir. 1976), the defendant was convicted of a series of security fraud counts, some involving stock sales he made, some involving stock sales made by others he did not know.  The Court held that the defendant could be convicted of aiding and abetting the sales made by others because he was engaged in a "market manipulation" scheme and "knew that the success of this market manipulation, like any scheme to drive up the price of a publicly traded stock, depended upon an intensive, large-scale effort, involving as many brokers and salesmen as could be enlisted." Id. at 1343.

Each of these cases, then, held that a defendant could be liable for aiding and abetting the conduct of someone he did not know, so long as the defendant knew, based on the nature of the scheme, that there was a role that needed to be filled (i.e. procuring the guns, stealing the car, or helping to inflate stock prices), and that someone was filling that role (i.e. the gun purchase plan moved forward, he received a stolen car, the stock price increased).  No such facts are present in this case.  When Harris offered products for sale, not only did he not know what purchasers were going to do with those products, he did not know whether anyone would ever buy his products. Once some individuals purchased modems, Harris did not know what those individuals were doing, and their use of his products was irrelevant to him.  Nor was there any stream of communication flowing between Harris and the product users as there was in the cited cases.

To prove that Harris aided and abetted users, the government must prove that he knew of and intended to help a particular person commit a particular crime; "general suspicion" of wrongdoing is insufficient.  United States v. Loder, 23 F.3d 586, 591 (1st Cir. 1994). Accordingly, to establish aiding and abetting liability, the government must first prove that the

user named in the count committed wire fraud, that is, that each one devised a scheme to defraud

(per the government, getting internet access without paying), that each user intended to obtain

something of value or to deprive someone else of something of value (alleged to be unpaid

access to the internet), and that each user made an interstate wire transmission as charged in the

superseding indictment.  Then the government must prove that Mr. Harris knew about each

user's scheme and intention and that he purposely joined in the venture of each user with the

intent to help that user realize his own wire fraud scheme.  Such shared knowledge and intent

cannot arise without some communication, or at least some knowledge on the part of Mr. Harris

regarding each user and his or her personal objectives.

### VI.   Jury Instruction No. 7 (*Pinkerton*–Wire Fraud)

As he explained in Harris's memorandum accompanying his jury instructions, a

Pinkerton instruction is inappropriate in this case.

"A Pinkerton instruction tells the jury that they may hold a defendant liable for a criminal

offense in which the defendant did not personally participate if it was committed during the

course and in furtherance of the conspiracy of which he was a member."  United States v.

Newell, 658 F.3d 1, 19 (1st Cir. 2011).  The First Circuit has stated that there are some cases in

which a Pinkerton instruction is inappropriate where the jury is being asked "to infer, on the basis

of a series of disparate criminal acts, that a conspiracy existed."  United States v. Sanchez, 917

F.2d 607, 612 n.4 (1st Cir. 1990); see also Newell, 658 F.3d at 19.  The Second Circuit

articulated this caution well:

> We would like to note, however, that the charge based on Pinkerton v. United
> States, 328 U.S. 640, 645 (1946), . . . should not be given as a matter of course.
> While no appellants in this case were prejudiced by the charge, it was used here in

circumstances quite different from those that gave it birth.  In the Pinkerton case, there was no evidence that Daniel Pinkerton had committed the substantive offense for which he had been convicted, but it was clear that the offense had been committed and that it had been committed in furtherance of an unlawful conspiracy of which he was a member.  Daniel's conviction on the substantive count was sustained because 'in the law of conspiracy . . . the overt act of one partner in crime is attributable to all.'  Id. at 647.  In this case, however, the inverse is at work.  The evidence of various substantive offenses, . . . was great; it was the conspiracy that in some instances must be inferred largely from the series of criminal offenses committed.

United States v. Sperling, 506 F.2d 1323, 1341-42 (2nd Cir. 1974).

Following this logic, a Pinkerton instruction is inappropriate in this case.  The conspiracy charge in this case is far from well-established, and its viability rests heavily on the ability of the government to prove a number of substantive acts.  The government's charging decision is new and untested, and the charges are far from clearly delineated, and the conspiracy and substantive charges overlap and intertwine.  Additionally, a Pinkerton instruction is unnecessary because the government has alleged that Harris was directly involved in the charged substantive acts; it has not argued that Harris stands apart from these acts but is linked to them through a conspiracy.  A Pinkerton instruction is appropriate where there is solid proof of a conspiracy; it permits the jury to infer liability for an act that is clearly part of a conspiracy based on proof that an individual was part of a conspiracy.  See Pinkerton v. United States, 328 U.S. 640, 642, 646 (1946) (noting that a single conspiracy was proved and that the act in question was done in furtherance of that conspiracy).  Here there is no clear proof that any given act was part of a given conspiracy, or even a clear statement of what actions are alleged to be part of any one conspiracy.  Giving a Pinkerton instruction would cause the jury to make an impermissible inference–that because there were a number of substantive acts, there was a conspiracy.  Such an inference would violate

Harris's constitutional rights by impermissibly lowering the level of proof that the government must offer to obtain a conviction.  This Court should refrain from giving a <u>Pinkerton</u> instruction to ensure that the jury considers all of the elements of each of the charges and does not let the fact that some charges exist influence its decision on other counts.

### VII.    Jury Instruction No. 8 (Cooperating Witnesses)

In this proposed instruction, the government asks this Court to instruct the jury that it will hear from two witnesses who have entered into plea agreements with the government, but that these two witnesses are different.  It asks for an instruction that "Hanshaw's situation is different from that of Phillips, because Hanshaw has already been sentenced for his crimes, and he has served that sentence.  Therefore, the government cannot recommend any reduced sentence for Hanshaw, because he has already served his sentence."  Gov't Modified and Revised Proposed Jury Instructions, at 17.  The instruction goes on to tell the jury to consider Phillips's (but not Hanshaw's) testimony with special care because of his plea agreement.  This instruction errs in dividing Phillips from Hanshaw: they are in the same position and the jury must be instructed to listen to testimony from both men with great care.

In his plea agreement, Hanshaw promised "to cooperate fully" with law enforcement and the government and to "testify truthfully and completely before any grand jury, and at any hearing and trial."  Gov't Ex. 27, at 5.  The agreement further provides that if Hanshaw fails to comply, the U.S. Attorney's office is released from the entire agreement and can pursue any and all charges against Hanshaw.  Gov't Ex. 27, at 7; <u>see</u> <u>Ricketts v. Adamson</u>, 483 U.S. 1 (1987).  Additionally, Hanshaw is still on supervised release, and due to repeated violations is currently serving a second period of incarceration.  Hanshaw could well conclude that he has every reason

to cooperate with the government in the hopes of easing his future incarceration and supervision, as well as assuring that his entire plea deal does not unravel.  Adamson, 483 U.S. at 3 (permitting government to prosecute Adamson for first-degree murder when he refused to testify in accordance with his plea agreement even though he had pled guilty to a lesser offense, been sentenced, and begun serving that sentence).

### VIII.   Jury Instruction No. 9 (Consciousness of Guilt)

This instruction is inappropriate in this case and defendant has already objected in open court.  The First Circuit has explained that "evidence of a defendant's flight and attempts to conceal or falsify identity may be presented at trial as probative of a guilty mind if there is an adequate factual predicate creating an inference of guilt of the crime charged."  United States v. Tracy, 989 F.2d 1279, 1285 (1st Cir. 1993).  Such a factual predicate does not exist here; the factual predicate is heavily contested.  Any concerns about product lawfulness pertained to issues of possible copyright infringement (e.g., possibly aiding downloads or uploads of movie or music content, or using copyrighted pictures from the Motorola website on the TCNISO website), not possible wire fraud.  The government has brought novel charges here, diminishing any likelihood that any of Harris' actions or comments bore on the crime charged here, and not some other.

Additionally, all of the evidence proffered by the government indicating that Harris attempted to conceal his identity is more prejudicial than probative and must be excluded under Rule 403.  For example, the government alleges that Harris used a screen name (DerEngel) on the internet.  This is a common practice on the internet–from email addresses to chat handles to names used to login to an online bank account–people use screen names instead of their full names.  That Harris used a screen name is not probative of anything more than that he was using

the internet and participating in its culture.  The government also alleges that Harris wrote his

book under his screen name–but the book also contains his full name, and his photograph and

biography are printed in the back.  The government states that Harris's website was hosted in

Russia–but after it was hosted there, he moved it to a host in the United States.  The government

asserts that Harris used Phillips's parents' address to incorporate his company, but his name and

personal address (in Oregon, so presumably this address could not be used to incorporate in

California) also appear on the incorporation document.  Harris told people that he was paranoid,

but there is no direct evidence regarding him engaging in paranoid behaviors.  Because these acts

are not probative of guilt, a consciousness of guilt instruction is inappropriate.

### IX.     Jury Instruction No. 10 (Venue)

The government's proposed instruction on venue combined with its theory of the case

would permit the government to try Harris in any district in the country, assuming someone used

a TCNISO product in that district at some time.  This instruction would also permit the

government to manufacture venue in any district at any time, by ordering a product.

Additionally, the government's venue charge assumes the correctness and truth of the

government's charging decisions.  The instruction assumes that a seller enters into a conspiracy

with a buyer merely by mailing the purchased product, that every email sent by a conspirator was

in furtherance of the conspiracy, and that every package mailed by TCNISO was sent in

furtherance of the conspiracy.  This sweeping venue is broader even than in the civil context and

simply cannot define the scope of the constitutionally guaranteed venue in a criminal case.  This

instruction usurps the jury's role in determining venue by asserting that uncontested actions

(TCNISO did mail products to Massachusetts) suffice to establish venue, a proposition that is

simply incorrect.

**X.      Conclusion**

For the foregoing reasons, Harris asks this Court to reject the government's proposed

instructions and to instruct the jury pursuant to his proposed instructions.

RYAN HARRIS
By his attorney,

/s/ Charles P. McGinty

Charles P. McGinty
 B.B.O. #333480
Federal Defender Office
51 Sleeper Street
Boston, MA  02210
Tel: 617-223-8061

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants on February 16,
2012.

/s/ Charles P. McGinty

Charles P. McGinty