UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 09-10243-MLW |
| | ) | |
| RYAN HARRIS | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
PROPOSED JURY INSTRUCTIONS**

The government submits this response to defendant Ryan Harris's proposed jury instructions.

**I.   Overall Objections to Defendant's Proposed Instructions**

The defendant has offered several proposed standard jury instructions that deviate from the First Circuit Pattern Jury Instructions, for no apparent benefit (See, Instructions Nos. 2, 4, 7, 16, 18, 20).   He also offers a number of customized jury instructions that attempt to set forth the various legal arguments that appeared in his motion to dismiss (and will likely appear in his closing argument) (e.g, Instructions 10, 11, 13, 22, 23).   As set forth below, the customized instructions mischaracterize the charges, the evidence, and the law, and they would confuse and mislead the jury.   Some of these quotes that form the basis of these instructions are dicta, some are inconsistent with other decisions, some are taken out of context, and many do not apply here. The customized instructions are incoherent and incomplete statements of the law.   Accordingly, we object to those instructions.

It is undisputed that the government will have to prove at trial that Harris knew that his customers were stealing (or at least attempting to steal) free and faster internet service and that

1

Harris intended to help them do so.   The parties are well aware that the challenge for the government will be to prove that Harris acted with the requisite intent.   But these factual challenges do not open the floodgates for a series of complicated customized jury instructions. There have been other cable modem hacking prosecutions, and there have been other analogous wire fraud prosecutions involving sellers of predecessor satellite t.v. and cable t.v. descramblers. No new legal principles are being tested here.

### II.   Specific Objections

#### A. "Defendant's Proposed Instruction No. 10:   What is *Not* a Crime"

We object to this customized instruction in its entirety.   As a threshold matter, there is no need to instruct a jury about what is *not* charged in the superseding indictment.   The purpose of a jury instruction is to instruct the jury about what *is* charged and what the government is required to prove.   More important, this instruction fundamentally mischaracterizes the indictment, misstates the law, and would confuse the jury.

##### 1.   Sales, Product Capability, and Knowledge Instructions

The defendant proposes to instruct the jury that "Harris is not charged with selling . . . or altering modems."   This mischaracterizes the indictment.   Harris *is* being charged with selling or altering modems, with the coda that he is charged with doing so *with the intent to help* his customers steal free or faster internet service.   Likewise, instructing that "it is not a crime to modify or alter . . . or sell a modem . . . that an individual could use to get free or enhanced service" misstates the law, as does his instructing about quantum of proof, namely, "proof that Harris sold modified modems is not enough to establish Harris's guilt" and "product capability alone cannot support a conviction".   It can be a crime to make, alter, or sell such a modem *if* the supplier knew

and intended for his customers to steal free or faster service with it.

Furthermore, as is set forth in detail in the government's memorandum in support of its proposed instructions, proof of sales can be enough for a jury to infer intent, depending on the nature of the product.   That is exactly the proposition that Direct Sales supports.   For example, if the modems themselves were "inherently susceptible to illegal use," then proof that he sold them could suffice to establish that he conspired with or aided and abetted others in committing wire fraud.   Direct Sales Co. v. United States, 319 U.S. 703, 713 (1943).   Although, in this case, the government does not intend to rely solely on the nature of the products or services Harris was providing to prove intent, given the nature of the products involved here (specifically, their inherent susceptibility to stealing free or faster service), it is not required to do so, and it is not accurate to instruct the jury in that regard.[1]   Likewise, "proof that Harris knew that individuals used or could use" his products illegally can, in some instances, establish Harris's guilt.   The Court in Direct Sales described the link between establishing knowledge and intent in establishing

---

[1] In his supporting footnote, the defendant seems to concede that the nature of the goods or services can support an inference of intent.  He states that "the jury must be made aware that the nature of the goods is relevant to its determination of whether Harris had the knowledge and intent necessary to join a conspiracy with TCNISO customers."   The government agrees with this assessment, and in its proposed customized instruction specifically references the nature of the product as a factor the jury can consider in inferring Harris's intent. But then Harris goes on to say that "inferences regarding knowledge and intent cannot be drawn from the nature of an unrestricted product."   This misstates the law.   Even if a product is not itself "restricted," a jury can consider the nature of the product and draw an intent about knowledge and intent.   Neither Direct Sales nor Falcone (nor any other case) stands for the proposition that the only time a jury can consider the nature of the product at issue is when that product by itself is "restricted." In Direct Sales, the Court itself discussed the difference between a supplier of "machine guns" as contrasted to "toy pistols," noting that the seller would have a higher level of notice about how his products were being used, when those products themselves were suspicious.   Likewise, in Grunwald, the court held that the nature of the products were relevant to inferring intent, where the chemist supplied laboratory equipment.   Clearly, laboratory equipment was not "restricted" or "illegal" good itself.   But the court noted that it is a "hard to get" item that is "frequently used in the manufacture of meth."

guilt:

> all articles of commerce may be put to illegal ends.   But all do not have inherently the same susceptibility to harmful and illegal use.   Nor, by the same token, do all embody the same capacity, from their very nature for giving the seller notice the buyer will use them unlawfully . . . .   This difference is important for two purposes. One is for making certain that the *seller knows* the buyer's intended illegal use. The other is to show that *by the sale he intends* to further promote and cooperate in it. This intent, when given effect by overt act, is the gist of conspiracy. *While it is not identical with mere knowledge that another purposes unlawful action, it is not unrelated to such knowledge.   Without knowledge, the intent cannot exist.*

Direct Sales, 391 U.S. at 711.

As the Court stated, as the knowledge "becomes clear, not equivocal," and "so far as knowledge is the foundation of intent, the latter also becomes the more secure."   Id. at 711-12.

The government's proposed instruction regarding conspiracy in the supplier context (Instruction 2) is a more accurate statement of the law and makes it clear that the government has to prove that Harris intended to help his users steal free and faster service.   Furthermore, the government's proposed instruction also makes clear that product functionality is a factor that the jury can consider to infer intent.

## 2.  Sniffer program/anti-probing instructions

Harris's instruction regarding sniffer programs is a red-herring and is, in any case unsupported by the law.   Harris is not charged with using or selling a sniffer program.   Nor is he charged with making an anti-probing device.   Rather, the sniffer program and anti-probing feature are relevant here to help establish Harris's knowledge and intent for how his cable modem hacking products would be used.   The defendant is essentially attempting to carve up individual overt acts/manner and means set forth in the indictment and then argue that each one in isolation is not a crime.   The law is clear that the government need not prove that an overt act itself is illegal.   So

pointing that out to the jury, in the guise of an instruction about the asserted legality each specific overt act, is unnecessary and confusing.

Furthermore, using or selling a sniffer program might well amount to a computer intrusion under 18 U.S.C. 1030(a)(2).[2]  Likewise, a MAC address and configuration file are certainly intended by the paying subscriber to be "confidential," and they have in no way authorized Harris's clients to use them and disguise themselves as the subscriber.

In any case, whether a sniffer program is illegal is irrelevant.

### 3.   Uncapping instructions

Harris also asks for an instruction that "uncapping a modem to obtain faster service than you have paid for is not illegal; at most, it may be a violation of the ISP's terms of service."   He cites no authority for this proposition, and it is contrary to the law.   Stealing service that you have not paid for by masquerading as a premium subscriber is wire fraud.

### B.  Objection to Defendant's Proposed Instruction 11 — Operation of web forum

Echoing the arguments he made (and this Court at least preliminarily rejected) in his Motion in Limine to Exclude Forum Posts, Harris requests an instruction that an operator of a forum is immune from suit.   As set forth in the Government's Opposition to Defendant's Motion in Limine to Exclude Forum Posts, Harris first tried to contort provisions in the Communications Decency Act ("CDA"), 47 U.S.C. § 230, into some type of novel evidentiary exclusionary rule. He now also tries to contort it into some type of blanket immunity/legal defense.   But to the extent that the CDA provides a "safe harbor" for publishers, § 230(e)(1) specifically provides that the "safe harbor" has no applicability to "any other Federal criminal statute." ("Nothing in this section

---

[2] There is a law enforcement exception that would apply to the FBI's obtaining Hanshaw's MAC. See 18 U.S.C. 1030(f).

shall be construed to impair the enforcement of . . . .   any other Federal criminal statute.")

Whether the CDA might protect Harris from some type of civil tort is not germane to this inquiry.   Nor does the case he cites, Universal Communications System, Inc. v. Lycos, Inc., 478 F.3d 413 (1st Cir. 2007), help him.   As the Court in Universal noted, the CDA addresses statutory limits on imposing intermediary civil tort liability on a provider of an interactive service as a "publisher."   Whether the posters or Harris enjoy some type of First Amendment protection or whether Harris would be immune from a state law tort claim against him as a publisher is irrelevant to this case.

Further, to the extent that the CDA is in part designed to abrogate any legal presumptions about a publisher's knowledge of the contents of his website, here, the government does not intend to rely on a presumption.   Rather, the government intends to prove through Lindquist, Phillips, and others, that Harris was aware of the posts. Harris is free to argue to the jury that he did not see these particular posts.   An instruction on this statute would mislead and confuse the jury.

## C.  Objection to Defendant's Instruction 13 -- Wire Fraud -- First Element Definitions

### 1.  Two fraud scheme instruction

The defendant has proposed a jury instruction that misconstrues the wire fraud charges against him.   It describes two independent wire fraud schemes, when the indictment alleges only one.   The indictment charges that Harris participated in a scheme to defraud cable companies by helping his users disguise themselves as paying and premium subscribers. The wires that were sent in furtherance of this single scheme are of two different types: wires that facilitated the initial acquisition of Harris's modems/software and wires where the customer successfully uses Harris's modems/software to steal service.

6

### 2.   Enabling instruction

Harris then proposes an instruction where he picks out several manner and means and overt acts in the indictment that use the word "enabled" and then states: "enabling a user to do something means creating a potential in a product for a particular use. I instruct you that 'enabling' a user by selling a product with the potential for an illegal use is not a crime."

But Harris misconstrues the use of the term "enabled" as it is used in the indictment.   The word "enabled" means "facilitated" or "helped."   The indictment is clear that Harris is being charged with purposefully designing and distributing products and services that he intended to help users steal free and faster internet service.   The proposed instruction is therefore misleading.

### 3.   Communication instructions

Without citing to any authority, Harris proposes an instruction that: "a product seller or supplier who does not communicate with users beyond the mere sale of the item is not liable for the conduct of those purchasers."   This misstates the law.   Indeed, in <u>Direct Sales</u>, it is not at all clear that the supplier communicated with the buyer, other than in the context of product ordering and fulfillment.   Indeed, the case law is clear that a co-conspirator can be held liable for conspiring with someone he has never communicated directly with.   <u>United States v. Mena-Robles</u>, 4 F.3d 1026, 1033 (1st Cir. 1993).   Likewise, a defendant can be held liable for aiding and abetting a principal that he does not know, has never met, and with whom he has never communicated. <u>United States v. Lawson</u>, 872 .2d 179, 181 (1989); <u>United States v. White</u>, 366 F.2d 474 (10th Cir. 1966); <u>United States v. Blitz</u>, 533 F.2d 1329 (2nd Cir. 1976).

Furthermore, there are many published decisions affirming wire fraud convictions against sellers of satellite t.v. descramblers, cable t.v. descramblers, and telephone blue boxes that

facilitated enabled theft of service, with no discussions of communications between the supplier and the customer, other than product ordering.   See, e.g., <u>United States v. Manzer</u>, 69 F.3d 222 (8th Cir. 1995) (affirming wire fraud conviction of defendant who manufactured and distributed modified satellite t.v. descramblers, sold cloned chips containing unit addresses from authorized units, and sold "cloning packages," with the information and unit addresses needed to clone additional counterfeit chips); <u>United States v. Coyle</u>, 943 F.2d 424 (4th Cir. 1991) (affirming wire fraud conviction of defendant who distributed cable t.v. descrambler); <u>United States v. Patterson</u>, 528 F.2d 1037 (5th Cir. 1979).   <u>See</u> <u>also</u> Lawlor, James, "Federal Criminal Prosecutions under Wire Fraud Statute for Use of 'Blue Box' or Similar Device Permitting User to Make Long-Distance Telephone Calls Not Reflected on Company's Billing Records," 34 A.L.R. Fed. 278 (West 2009) (citing a list of circuit court published decisions involving § 1343 charges). There is no indication in these decisions that the seller had any direct communication with the users beyond the "mere sale."

Finally, Harris misstates the evidence that the government intends to offer. At trial, the government intends to prove that Harris did more than just product fulfillment.   He sent confirmatory and other e-mails to his customers, kept electronic tabs on them, and was aware of their identities.

### 4.  Anonymzer instructions

Harris then proposes an instruction that "enabling a person to disguise their identity to an internet service provider does not constitute fraud."   Helping someone disguise his identity to *masquerade as a paying subscriber* and in turn *steal* free or premium service does indeed constitute a fraud on the ISP.   Likewise, the proposed instruction that "an internet customer who

otherwise pays his bill does not commit a fraud on the cable company by disguising his or her identity" is again a red herring.   Here, Harris is charged with helping his customers, even those who pay for barebones service, masquerade as a premium, higher-level subscriber in order to obtain much faster service without paying the required premiums.   This is fraud on the ISP.   The material misrepresentation (that the customer is a paying or premium subscriber) operates to allow the user to deprive the ISP of money or property (internet service or subscriber fees).

    We are not charging Harris with providing an anonymizer device.   So we do not have to prove that using an anonymizer device amounts to wire fraud.   The fact that his customers might have used his product not only to steal service, but that it also had the ancillary benefit of allowing them to obtain anonymous service, does not change the charges against Harris.   It is worth noting that the government will elicit testimony from FBI Special Agent Russell that there are many free ways to make one's internet activities anonymous.   So it is not logical that customers would have bought Harris's products for this reason, nor will there be any evidence that they did so.

    Again, Harris is picking apart each overt act or manner and means, setting it up as a straw man, and proposing an instruction that it is not illegal.   Harris is charged with purposefully helping his clients steal free and faster service.   That Harris's modems might have had other ancillary benign uses (as a $100 paperweight, theoretically), does not mean that the Court should instruct that each of these theoretically possible uses is not a crime.   If Harris wants to argue in closing that he actually intended only to provide an anonymizer device, he is free to do so.

### 5.   Product Seller Is Not Liable Instruction

    Again without authority, Harris proposes an instruction that states that "a product seller is not responsible for the end use by a product customer."   This misstates the law and is directly

contrary to <u>Direct Sales</u> and its progeny, as discussed above.

**D. Defendant's Instruction No.15 -- Wire Fraud Third Element**

Without any support, Harris proposes an instruction that dramatically overstates the government's burden of proof.   Harris's instruction states that the government must prove that he specifically intended that a *specific identified ISP* be defrauded.   There is no support for requiring the government to prove this level of specificity, namely the name of the ISP involved.   The government need only prove that Harris participated in a scheme to defraud whichever ISP his customer utilized.   The case law and pattern instructions makes it clear that one can aid and abet wire fraud without participating or being aware of any of the details of the underlying crime. Indeed, in the descrambler and blue box wire fraud prosecutions, cited above, there was no discussion that the seller knew which specific satellite or cable provider or telephone provider a given user was using.

Harris next asks the Court to instruct the jury that the government must prove that (1) Harris himself deprived the named ISP of something of value, and (2) Harris himself "obtained something of value" as a result of a scheme to defraud.   This is directly contrary to the law. The government need only prove that Harris participated in a scheme *with another person* (i.e., his customer) who deprived the ISP of something of value.   There is no requirement that the government prove that it was Harris himself who used his own tools and personally stole service. Nor is the government required to prove that Harris personally benefited from the scheme to defraud.   The First Circuit has held that, in the context of a wire fraud charge, the government need not allege, let alone prove, that the defendant personally benefited from the fraud scheme. "It is immaterial whether [the defendant] personally profited from the scheme."   <u>United States v.</u>

<u>Silvano</u>, 812 F.2d 754, 758-62 (1st Cir. 1987) (rejecting defendant's argument that the government did not prove that the defendant in an honest services mail fraud prosecution "in any way personally profited from his activities"). <u>See</u> <u>United States v. Vila</u>, 2009 U.S. Dist. LEXIS 2729 (D. PR. 2009).

Consistent with this principle, it is similarly well settled that a defendant can be convicted of wire fraud even when the scheme was never completed, no benefit accrued to anyone, and no loss ultimately occurred.   <u>See</u> <u>United States v. Potter</u>, 463 F.3d 9, 17 (1st Cir. 2006) (affirming convictions for honest services wire fraud where defendants' contemplated monetary payments to state official's law partner were never actually made).   <u>Accord</u> <u>United States v. Louderman</u>, 576 F.2d 1383, 1387 (9th Cir. 1978) (holding that that "in a prosecution under 1343  . . . the prosecution need not prove that the scheme was successful or that the intended victim suffered a loss or that the defendant secured a gain.   The gist of the offense is a scheme to defraud and the use of interstate wires to further that scheme") (internal citation omitted).

**E.   Defendant's Instruction No.17 -- Aiding and Abetting**

The defendant proposes an instruction that states that the government must prove "that Mr. Harris had the same specific intent to defraud each ISP.   Such shared knowledge and intent cannot arise without some communication, or at least some knowledge . . . "   This is an incorrect statement of the law.   As set forth above, the government need not prove that Harris intended to defraud a specific ISP.   Likewise, a defendant can be convicted for aiding and abetting a principal that he has does not know, has never met, and with whom he has never communicated.   <u>United States v. Lawson</u>, 872 .2d 179, 181 (1989), <u>United States v. White</u>, 366 F.2d 474 (10th Cir. 1966), <u>United States v. Blitz</u>, 533 F.2d 1329 (2nd Cir. 1976).

11

**F.  Defendant's Instruction No.20 – Conspiracy -- Membership**

Once again, this instruction contains misstatements of law.   It is well settled that, in order to be convicted of conspiracy, the government need not prove that the defendant "knew every other co-conspirator."   First Cir. Pattern Jury Instr. (Criminal) 4.03 (1998).   In that vein, the First Circuit has held that a defendant need not directly communicate with his co-conspirators.   See United States v. Mena-Robles, 4 F.3d 1026, 1033 (1st Cir. 1993) (affirming conspiracy conviction, holding that "the jury need not be presented with evidence showing that each coconspirator knew . . . every other coconspirator").

**G.  Defendant's Instruction No.22 – Conspiracy -- Buyer-Seller Relationship**

The defendant asks this Court to announce, by way of a jury instruction, a bright-line rule that "a buyer-seller relationship" can never by itself be a sufficient predicate for finding a conspiracy in any context.   This is not an accurate statement of the law, and the defendant's sole reliance on drug distribution cases for this proposition is misplaced.   See, e.g., United States v. Santiago, 83 F.3d 20, 23-24 (1st Cir. 1996) (drug distribution conspiracy) and United States v. Moran, 984 F.2d 1299 (1st Cir. 1993) (same).   The conspiracy issue in this case differs markedly from the "buyer-seller" drug conspiracy issue that is common place in drug distribution cases. Significantly, in those cases, the supplier/defendant was charged with conspiring with another person to *distribute* drugs even further down the food chain.   He was  not with conspiring with another person to *possess* drugs for his personal consumption.   And in analyzing whether a buyer-seller conspiracy existed, the courts specifically discussed the distinction between distribution and possession for personal consumption.   The Court reasoned that, on its face, evidence of a one-time sale of a small amount of drugs was not, by itself, enough to establish that

the defendant intended further distribution, as opposed to personal use. The sale alone did not establish that supplier knew that the buyer would then further distribute the drugs to others, rather than consume them himself.

These drug distribution buyer-seller cases have no application here, and in any case, if anything, they undermine the defendant's argument.  That is because, using the drug analogy, Harris is in essence being charged for supplying drugs to someone for that person's personal use (or consumption), not for re-sale or re-distribution to others.   Accordingly, applying Harris's facts to the drug context, a single drug sale *would* be more than enough from which a jury could infer that the supplier conspired with the buyer to further the buyer's *personal use* of the drugs.

The defendant's partial quotation of, and reliance on, Direct Sales is also misplaced.   He quotes from the portion of the Court's opinion distinguishing and limiting Falcone, not adopting its reasoning.  In Direct Sales, the Court specifically noted that, in Falcone, the "*supplier was not charged with conspiring with the user, and . . . the government had conceded that no such conspiracy existed*."   Direct Sales, 319 U.S. at 709 (emphasis supplied).  Rather, as the Direct Sales Court noted, in Falcone, significantly, the supplier was charged with aiding and abetting an existing conspiracy between a group of users/distillers, and the Court ultimately held that there was insufficient evidence that the supplier knew of the distillers' conspiracy.   Id.

The defendant then takes two partial quotes out of context and contorts them into two bright line rules that do not exist.   The defendant's instruction states, "inference of such knowledge [of a conspiracy] cannot be drawn merely from knowledge the buyer will use the goods illegally" and then states "nor does 'the act of supplying itself' demonstrate an agreement . . . between the buyer and the seller."   Significantly, the full quote makes clear that the Court, in

those sentences, was addressing distinguishable concessions that the government made in <u>Falcone</u> that did not exist in <u>Direct Sales</u>.  The full quote from <u>Direct Sales</u>, including the two pivotal portions that the defendant has omitted, reads:

> "The [Falcone] decision comes down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally. The *government did not contend* in those circumstances, as the opinion points out, that there was a conspiracy between the buyer and the seller alone.   It *conceded* that on the evidence neither the act of supplying itself nor the other proof was of such a character as imported an agreement."   Id. at 709.

Notably the Court in <u>Direct Sales</u> seems to question the Government's concessions in <u>Falcone</u>.   "Nor need it be determined whether the Government conceded too much.   We do not now undertake to say . . . that the evidence presented in that case was sufficient to sustain a finding of conspiracy between the seller and buyer inter sese."   Id. at 710.

As set forth above in the discussion about "what is not a crime," the government's proposed instruction relating to Conspiracy Involving Suppliers (Instruction 2), contains an accurate statement of the law and includes the <u>Pappathanasi</u> and <u>Goldberg</u> language set forth in the defendant's proposed instruction.   Accordingly, the government urges the Court to use the government's proposed Instruction 2 in lieu of the defendant's proposed Instruction 22.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:      */s/ Adam Bookbinder*
Adam J. Bookbinder
Assistant U.S. Attorney
Mona Sedky
US Dept. of Justice Trial Attorney

<u>CERTIFICATE OF SERVICE</u>

     I certify that this document filed through the ECF system will be sent electronically to counsel as identified on the Notice of Electronic Filing.

<u>/s/ <i>Adam Bookbinder</i>     </u>

Dated: February 16, 2012