UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 09-10243-MLW |
| ) | |
| RYAN HARRIS ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant Ryan Harris respectfully submits this Memorandum in aid of sentencing.

On March 1, 2012, after a jury trial, Mr. Harris was found guilty of seven counts of an eight count revised Superseding Indictment charging wire fraud, in violation of 18 U.S.C. § 1342.

I.   The Applicable Legal Standard

Following United States v. Booker, 543 U.S. 220, 259 (2005), a sentencing court must begin by considering the Guidelines. But the Guidelines are not "presumptively" controlling, nor is a particular Guideline sentence "per se reasonable." United States v. Jiménez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc). The sentencing court should consider any non-frivolous arguments for a departure or variance raised by the parties. Rita v. United States, 551 U.S. 338, 356-57 (2007). Under 18 U.S.C. § 3553(a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in § 3553(a)(2). The sentence must be tailored to statutory concerns, including reflecting the

seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively providing the defendant with needed educational or vocational training and medical care. 18 U.S.C.A. § 3553(a).

    a.  <u>The Applicable Guidelines</u>

The parties agree that the applicable Guideline offense level is 27 under §2B1.1 (base level 7), increased by 14 (loss between $400,000 and $1 million)), increased by 2 (sophisticated means), and increased by 4 (role in offense). Mr. Harris has no prior criminal record and is in Criminal History I. The resulting guideline range is 70-87 months.

    b.  <u>The Guideline Overstates the Seriousness of the Offense Due to Undue Reliance on Loss</u>

When the Commission created the Guidelines, it aligned the prescribed penalties for most offenses with pre-Guidelines practice. It chose not do so in the case of economic crimes, instead increasing penalties for those crimes over the pre-Guidelines practice of the judiciary. U.S.S.G. ch. 1 pt. A § 4(d) (2011) ("Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes .... The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation previously

was frequently given and provide for at least a short period of imprisonment in such cases.")

The provision for a "short period of imprisonment" increased over time.  Thus, in 1989, the Commission raised the penalties for economic crimes by creating a new loss table.  U.S.S.G. app. C, amends. 99, 154 (1989).  Between 1998 and 2001, the Commission added numerous aggravating specific offense characteristics related to economic crimes.  U.S.S.G. app. C, amend. 317 (1990); amend. 551 (1997); amend. 576 (1997); amend. 596 (2000).  In 2001, it again adopted a new loss table that introduced further wholesale sentence increases.  U.S.S.G. app. C, amend. 617 (2001).  The increases continued in 2003.  U.S.S.G. app. C, amends. 647, 653 (2003).

In each instance, the Commission increased sentencing ranges without empirical support.  See, e.g., Alan Ellis, John R. Steer, & Mark H. Allenbaugh, At a "Loss" for Justice: Federal Sentencing for Economic Offenses, 25:4 Crim. Just. 34 (2011), available at http://www.alanellis.com/CM/Publications/lossforjustice.pdf; James E. Felman, The Need to Reform the Federal Sentencing Guidelines for High-Loss Economic Crimes, 23:2 Fed. Sent. Rptr. 138 (2010).

Viewed over the life of the Guidelines, the changes are dramatic.  Assuming more than minimal planning and a loss of under $1 million, the 1987 version of the Guidelines would have

scored the present offense at level 20 (14 for loss between $500,000-$1 million, +2 for more than minimum planning, +4 for role in offense), with a corresponding sentencing range of 33-41 months.  The proposed offense level under the current Guidelines (27) yields a range of 70-87.  No empirical evidence supported more than doubling the sentencing range.

Loss has a place in measuring the gravity of an offense. But numerous courts have recognized that loss in a fraud case, like quantity in a drug case, is not always an appropriate proxy for culpability.  Loss, alone and in combination with various specific offense characteristics, can yield Guidelines ranges that significantly overstate a defendant's culpability.  See, e.g., United States v. Watt, 707 F.Supp.2d 149, 155-56 (D. Mass. 2010).

> The Guidelines place undue weight on the amount of loss involved in the fraud.  This is certainly a relevant sentencing factor:  All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting – no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes – to assign precise weights to the theft of different dollar amounts.  In many cases ... the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.

United States v. Emmenegger, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004).

Watt is particularly relevant here.  Watt was a twenty-five year old man convicted of conspiracy for his role in a massive conspiracy to steal credit card numbers from the computer networks of major companies and to sell those numbers.  707 F.Supp.2d at 150-52.  Driven by a loss amount of more than $20 billion, Watt's Guidelines called for a sentence of life imprisonment.  Id. at 151-54.  The court noted the stark contrast between the offender and the crime, ultimately sentencing Watt to 24 months of incarceration.  Id. at 151-52, 158 ("Two years in a federal prison is a long time for someone who has never been to prison before.  Moreover, whatever punishment is inflicted by this sentence will be exacerbated by the substantial restitution and the impact of this high profile felony conviction.").

Increased sentences for fraud have led to the anomalous result that first-time, nonviolent offenders like Mr. Harris are subject to sentences that exceed those imposed on violent offenders (e.g. sentences for kidnapping, arson, high volume drug trafficking, and voluntary manslaughter). Compare USSG §2B1.1 (offense level of 27) with USSG §2A4.1 (offense level of 24 for kidnapping), USSG §2K1.4 (offense level of 24 for arson creating substantial risk of death or serious bodily injury), USSG §2D1.1 (offense level of 24 for trafficking over 100 kg of marijuana), and §2A1.3 (offense level of 25 for voluntary manslaughter).

The Commission's own research undermines its ever-higher Guidelines ranges. In 1999, Commission staff reported that the average time actually served had doubled since the Guidelines were created, but noted that lengthy prison terms with no deterrent value were being served by offenders with little risk of recidivism, and recommended an evaluation of whether prison resources were being used effectively. Paul J. Hofer & Courtney Semisch, <u>Examining Changes in Federal Sentence Severity: 1980-1998</u>, 12:1 Fed. Sent. Rptr. 12, 1999 WL 1458615 (July/August 1999). That same year, Justice Breyer gave a speech criticizing the false precision created by the Guidelines, and called upon the Commission to "know when to stop," to "act[] forcefully to diminish significantly the number of offense characteristics," to broaden "the scope of certain offense characteristics, such as 'role in the offense,'" and to move in the direction of "greater judicial discretion" in order to provide "fairness and equity in the individual case." Justice Stephen Breyer, <u>Federal Sentencing Guidelines Revisited</u>, 11 Fed. Sent. R. 180, 1999 WL 730985 *10-11 (Jan./Feb. 1999). Instead, the Commission has continued to raise Guidelines ranges in the absence of empirical support and analysis.

Whether a judge may draw any useful advice from a Guideline depends on whether the Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional

role." Kimbrough v. United States, 552 U.S. 85, 109 (2007).  As described in Rita v. United States, 551 U.S. 338, 349-50 (2007), this role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field.  Where a Guideline was not developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." Kimbrough, 552 U.S. at 109-10; see also Spears v. United States, 555 U.S. 261, 265-66 (2009) ("[W]e now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines.").

Because the Sentencing Commission did not rely on empirical data when it increased the ranges associated with § 2B1.1 - and thus failed to fulfill its institutional role – sentencing courts have discretion to disagree on policy grounds.  "[T]he Sentencing Guidelines ... in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to

such factors." United States v. Adelson, 441 F. Supp.2d 506, 509 (S.D.N.Y. 2006), aff'd, 301 Fed. Appx. 93 (2d Cir. 2008).

    II.   Gravity of the Offense and Retribution

The sentencing purposes set forth in § 3553(a)(2)(A) (reflecting the seriousness of the offense, promoting respect for the law, providing just punishment) are generally referred to, collectively, as "retribution." These factors encompass a consideration of the nature and seriousness of the harm.

Here, the seriousness of the offense may be lessened by reviewing contemporaneous email of cable providers. For example, in a September 29, 2008 email, the government asked whether Motorola "had reports or other documentation about TCNISO, a company that appears to offer software (and some hardware) designed to hack Motorola cable modems," to which Senior Corporate Counsel for Motorola replied that "the search for responsive documents, while not yet complete, does not appear to be fruitful ...." Indeed, the germination of this prosecution was the cooperation of a teenage hacker who explained how he used TCNISO's products to create anonymity on the web, not any cable company's complaint to DOJ about modified modems.

It is a fair conclusion that the cable companies hardly noticed that TCNISO existed. Charter's Benjamin Brodfuehrer said that he examined Harris's firmware in 2006 or 2007, but could find no reports to substantiate the effort. Motorola made modems

with a single means of user authentication, the MAC address.  The number was hardly confidential; MAC addresses appear on shipping boxes and on the base of each modem.  Combined with the absence of a documented concern about wide service abuses, a fair inference could be that theft of service was of modest concern to the cable companies.

Thus, neither Motorola nor ISPs sought by civil action to invoke proprietary rights to modems or to enjoin TCNISO.  If TCNISO posed a credible risk to a profit center of Motorola (or any cable company), one would have expected Motorola to respond as Apple did against individuals who reverse engineered the iPhone and iPad.  Shutting down TCNISO would been child's play.  Even apart from the merits, TCNISO could not afford the lawyers' time to defend itself.

Further, an offense may be more or less serious depending on "the community view of the gravity of the offense" or the "public concern generated by the offense."  28 U.S.C. § 994(c)(4), (5).  For example, several prospective jurors voiced concerns whether this was a crime, and many had actually participated in related offense conduct.

More generally, it is perhaps appropriate to comment on the disparity of treatment of Harris in the context of DOJ's disinclination to use criminal process against more significant targets.  In recent years, the Department of Justice has resolved

investigations of dozens of Fortune 500 companies via deferred prosecution agreements and non-prosecution agreements, where, instead of facing criminal charges, companies find an amicable way of avoiding this consequence.  Examples abound.  The DOJ entered into a non-prosecution agreement with a mine owner regarding the Upper Big Branch mine disaster in West Virginia where the owner had a history of mine safety violations and where the company kept a double set of books – an internal one documenting the violations, and one for mine safety officials that covered up those violations.  See Uhlmann, 29 Dead Miners, No Justice," NY Times, Dec. 9, 2011.

"A facade of enforcement," Judge Jed Rakoff complained when he disapproved a Consent Judgment proposing a $33 million SEC settlement with Bank of America for false statements in connection with its acquisition of Merrill Lynch.  <u>United States v. SEC</u>, SDNY, 1:09-cv-6829-JSR, dkt. #22, Memorandum and Order at 8.  A second federal judge, Judge Emmet Sullivan, criticized DOJ lawyers for giving "a free ride" to Barclays, which was accused of evading US sanctions on Iran and Cuba.  "Barclay's Bank Sanction-Busting Fine Approved," at www.bbc.co.uk/news/business-11019140 (Aug. 18, 2010).  Evidence made clear that its officers knew they were breaking the law, but none of them were indicted.  "You know what?" Judge Sullivan told the government lawyers.  "If other banks saw that the government

was being rough and tough with banks and requiring banking officials to stand before federal judges and enter pleas of guilty, that might be a powerful deterrent to this type of conduct." Binyamin Applebaum, "U.S. Judges Sound Off on Bank Settlements," at

http://www.nytimes.com/2010/08/24/business/24judges.html (Aug. 23, 2010).

In May 2011, the government filed a civil suit against Deutsche Bank alleging that for over a decade, "Deutsche Bank and MortgageIT repeatedly lied" to secure mortgage loan insurance to the tune of hundreds of millions of dollars. United States v. Deutsche Bank AG and MortgageIT, Inc., 1:11-cv-02976-LAK, dkt. #1, Complaint at ¶ 1 (S.D.N.Y 2011). "Many of these losses were caused by the false statements defendants made to HUD to obtain FHA insurance on thousands of individual loans." Id. at ¶12. But, when asked why such a far-reaching fraud was being prosecuted as a civil action, the United States Attorney in S.D.N.Y. replied: "That's a litigation decision made by us ... to get the maximum recovery possible." Adam Klasfeld, "Deutsche Bank Accused of Giant Mortgage Fraud," available at http://www.courthousenews.com/2011/05/04/36313.htm (May 4, 2011). Except for corporate titans who become notorious (Kenneth Lay) or behave like Nero (Dennis Koslowski at Tyco), only minor corporate actors get prosecuted. Large corporate actors pay fines despite

-11-

the gravity of the offenses in matters involving healthcare fraud, military contract fraud, bribery of foreign governments, money laundering, tax evasion and violating trade sanctions. See generally Jeff Madrick and Frank Partnoy, "Should Some Bankers Be Prosecuted?," N.Y. Review of Books, Nov. 10, 2011, available at http://www.nybooks.com/articles/archives/2011/nov/10/should-some-bankers-be-prosecuted/?pagination=false ("[T]hus far, federal agencies have launched few serious lawsuits against the major financial firms that participated in the collapse, and not a single criminal charge has been filed against anyone at a major bank.  The federal government has been far more active in rescuing bankers than prosecuting them.").

One might fairly ask how the government justifies a multi-year recommendation against Harris when, by prosecutorial fiat and with rare exception, it reserves criminal sanctions and prison sentences only for those unable to satisfy a civil judgment.

   III. Mr. Harris's Personal History

Mr. Harris is 28, raised in California and Washington.  He left school at about age 15, instead obtaining a GED.  He attended Central Oregon College from 2003 to 2004, studying computer science.  He has skills as a software engineer, which are largely self-taught.

He is currently employed, working remotely from his home doing customer service and addressing server support issues.

He is married, with no children.  His wife is a citizen of the Hong Kong Special Administrative Region of China.  When they married, they attempted to enter the United States, but his wife was denied entry.  For that reason, Mr. Harris moved to Hong Kong for almost a year, eventually returning when his wife was allowed to enter the U.S. on a visa.  She is largely dependent on him, cannot drive, and fears life without him.

The nature of the offense is unlikely to be duplicated. Harris is currently employed.  He has been on release during the pendency of this case.  He was also released pending sentencing, and has been in compliance with release conditions and has honored his commitment to this Court.  There is little risk of recidivism.

    a.   There is No Correlation Between Recidivism and <u>Guideline Offense Level</u>

Harris's Guidelines range is high.  This increased range is not based on a greater risk of further crime, with the corresponding need for the enhanced sentence.

The Sentencing Commission has conducted research that examined the power of various sentencing metrics to predict the risk of recidivism.  In its first study, the Commission concluded that "There is no correlation between recidivism and guidelines' offense level.  Whether an offender has a low or high guideline

offense level, recidivism rates are similar." United States Sentencing Commission, <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u>, 15 (May 2004). It would seem that if the recidivism rates are the same no matter how long the sentence, there is little benefit to longer warehousing of offenders.

Harris is a first time offender. According to the Commission, Mr. Harris qualifies as a true first-time offender - not only has he never been convicted of a crime, he has never previously been arrested or had any prior contact with the police or the criminal justice system. United States Sentencing Commission, <u>Recidivism And The "First Time Offender"</u> (May 2004). This factor differentiates him from other individuals with zero criminal history points whose prior conduct was not counted for some reason. The report shows recidivism rates for offenders with zero criminal history points to be 11.7%, but for the subgroup of offenders into which Mr. Harris falls - those with no prior offenses or arrests - the recidivism rates were the lowest at 6.8%. <u>Id</u>. at 13-14.

There is no evidence that increased sentences reduce crime through deterrence. Current empirical research on general deterrence shows that the certainty of punishment has a deterrent effect, but "increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three

-14-

National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."  Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 1, 28-29 (2006) (citations omitted).  Interestingly, "offenders are most likely to recidivate (25.6%) when their sentence is a straight prison sentence."  Measuring Recidivism, supra, at 13.  In other words, a sentence of prison may have the paradoxical effect of increasing recidivism.

  b. The Need to Avoid Sentencing Disparity

  Section 3553(a)(6) requires this Court to consider the need to avoid unwarranted "sentence disparities among defendant with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  See, e.g., United States v. Martin, 520 F.3d 87 (1st Cir. 2008)[Codefendant disparity may be considered where disparities are conspicuous and threaten to undermine confidence in criminal justice system].

  Here, Craig Phillips pleaded guilty to the same offense conduct (although to a different charge, 18 U.S.C. § 1030).  His Guidelines, by agreement with the government, were base offense level 6 with no attribution of loss (Loss Amount $5,000 or less), plus 2 for sophisticated means under §2B1.1(b), less acceptance of responsibility, resulting in a total offense level of 6.  He was sentenced to one year of probation.  United States v. Craig

Phillips, 10-cr-03839-JLS (S.D.Cal. 2012). In turn, Isabel Lundquist was not charged, and Nathan Hanshaw was sentenced to 13 months custody.

### IV. Harsher Guidelines Have Contributed to Significant Increases in Prison Populations

The increase in guideline ranges for economic crimes, along with increases throughout the Guidelines, reflect a trend toward harsher sentences, not efforts to better capture gradations in culpability. This trend contributes to increases in the prison population unlinked to public safety concerns.

At the inception of Guidelines, the Sentencing Commission predicted that the Guidelines would "lead to an increase in prison population that computer models, produced by the Commission and the Bureau of Prisons, estimate at approximately 10 percent over a period of ten years." U.S.S.G. Ch. 1 Pt. A, ¶ 4(g) (2011). Instead, the prison population has increased dramatically. The 1986 prison population, federal and state, was 544,972. According to the Department of Justice statistics, "as of December 31, 2010, state and federal correctional authorities had jurisdiction over 1,612,395 prisoners, a decrease of 5,575 prisoners from yearend 2009. The combined U.S. prison population decreased 0.3% in 2010, the first decline since 1972. The 2010 imprisonment rate for the nation was 500 sentenced prisoners per 100,000 U.S. residents, which is 1 in 200 residents." Paul Guerino, et al., "Prisoners in 2010," at 1 (rev'd Feb. 2 2012),

available at http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf. According to a report from the Center for Economic and Policy Research, "The United States currently incarcerates a higher share of its population than any other country in the world. The U.S. incarceration rate - 753 per 100,000 people in 2008 - is now about 240 percent higher than it was in 1980." John Schmitt, et al., The High Budgetary Cost of Incarceration, at 1 (June 2010) available at http://www.cepr.net/documents/publications/incarceration-2010-06.pdf

Supreme Court Justice Anthony M. Kennedy offered a critical view of criminal justice in the United States: "Our resources are misspent, our punishments too severe, our sentences too long." Speech by Justice Anthony Kennedy at ABA Annual Meeting (Aug. 9, 2003), text available at http://www.abanow.org/2003/08/speech-by-justice-anthony-kennedy-at-aba-annual-meeting/. In his widely reported speech to the American Bar Association on August 9, 2003, Justice Kennedy also noted that, at the time: "Were we to enter the hidden world of punishment, we should be startled by what we see. Consider its remarkable scale. The nationwide inmate population today is about 2.1 million people. In California, even as we meet, this State alone keeps over 160,000 persons behind bars. In countries such as England, Italy, France and Germany, the incarceration

rate is about 1 in 1,000 persons. In the United States it is about 1 in 143." Id.  A current chart of the incarceration rates among advanced countries is set out at Exhibit A.

The cost, both social and economic, of our nation's reliance on prisons as the principal vehicle for deterrence and punishment is well documented.  A report by the Boston Foundation notes that in Massachusetts alone, the number of people held in state prisons surged by 300 percent, and the number in county jails by about 320 percent, from 1980 to the mid-1990s.  The Boston Foundation, Priorities and Public Safety: Reentry and the Rising Costs of our Corrections System, (Dec. 3, 2009) available at http://cjinstitute.org/files/CorrectionsCosts.pdf.  Spending on prisons and jails in Massachusetts has surpassed spending on higher education, as of 2003, with investments in corrections crowding out spending on other important priorities.  The report of the Center for Economic and Policy Research states:

> We calculate that a reduction by one-half in the incarceration rate of non-violent offenders would lower correctional expenditures by $16.9 billion per year and return the U.S. to about the same incarceration rate we had in 1993 (which was already high by historical standards).  The large majority of these savings would accrue to financially squeezed state and local governments, amounting to about one-fourth of their annual corrections budgets.  As a group, state governments could save $7.6 billion, while local governments could save $7.2 billion.
> A review of the extensive research on incarceration and crime suggests that these savings could be achieved without any appreciable deterioration in public safety.

-18-

<u>The High Budgetary Cost of Incarceration</u>, <u>supra</u>, at 1.

It is perhaps appropriate to consider in this light the efficacy of a lengthy prison sentence on Mr. Harris, a first-time, non-violent offender.

<u>CONCLUSION</u>

For these reasons, this Court should impose a sentence of one year and a day, followed by three years of supervised release, with the first 24 months under house arrest.

```
                              RYAN HARRIS
                              By his attorney,

                              /s/ Charles P. McGinty

                              Charles P. McGinty
                                B.B.O. #333480
                              Federal Defender Office
                              51 Sleeper Street, 5th Floor
                              Boston, MA  02210
                              Tel: 617-223-8061
```

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 13, 2012.

```
                              /s/ Charles P. McGinty

                              Charles P. McGinty
```