1                 UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3                           No. 1:09-cr-10243-MLW

4

5     UNITED STATES OF AMERICA

6

7     vs.

8

9     RYAN HARRIS

10

11                      * * * * * * * *

12

13                    For Hearing Before:
                    Chief Judge Mark L. Wolf

14

15                   Status Conference

16

17                 United States District Court
                   District of Massachusetts (Boston.)
                   One Courthouse Way

18                 Boston, Massachusetts 02210
                   Tuesday, February 7, 2012

19

20                      * * * * * * * *

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter

23              United States District Court
           One Courthouse Way, Room 5200, Boston, MA 02210

24                  bulldog@richromanow.com

25

```
1                    A P P E A R A N C E S

2

3    ADAM J. BOOKBINDER, ESQ.
         United States Attorney's Office
4        John Joseph Moakley Federal Courthouse
         One Courthouse Way, Suite 9200
5        Boston, Massachusetts 02210
         (617) 748-3112
6        E-mail: Adam.bookbinder@usdoj.gov
   and
7    MONA SEDKY, ESQ.
         U.S. Department of Justice
8        601 D. Street, N.W.
         Washington, D.C. 20530
9        (202) 353-4304
         Email: Mona.sedky@usdoj.gov
10       For the United States of America

11

12   CHARLES P. McGINTY, ESQ.
         Federal Public Defender Office
13       District of Massachusetts
         51 Sleeper Street, 5th Floor
14       Boston, Massachusetts 02210
         (617) 223-8080
15       E-mail: Charles_mcginty@fd.org
         For the defendant
16

17

18

19

20

21

22

23

24

25
```

```
1              P R O C E E D I N G S
2          (Begins, 11:00 a.m.)
3          THE CLERK:  Criminal Matter 09-10243, the
4  United States of America versus Ryan Harris.  The Court
5  is in session.  You may be seated.
6          THE COURT:  Good afternoon.  Would counsel
7  please identify themselves for the Court and for the
8  record.
9          MR. BOOKBINDER:  Good afternoon, your Honor.
10 Adam Bookbinder and Mona Sedky for the United States.
11 Your Honor, I would just like to point out that our two
12 case agents are here as well, which may be something
13 that we want to take up as a preliminary matter, whether
14 it's proper for them to be here.
15         THE COURT:  Okay.  What are their names?
16         MR. BOOKBINDER:  I'm sorry.  Their names are
17 Special Agent Timothy Russell, from the FBI, and Special
18 Agent Jason Ryan from the IRS.
19         THE COURT:  Okay.
20         MR. McGINTY:  And, your Honor, for Mr. Harris,
21 who is here by phone connection, Charles McGinty for the
22 Federal Defender's Office, and with me is Christine
23 Demaso, who is a legal writing attorney with my office.
24         THE COURT:  All right.  Actually I realized
25 that I hadn't issued a sequestration order which I will
```

1    do today.  I think it's the government's request, if I

2    understand it, that it be allowed to have two

3    representatives in the courtroom, even if --

4         Are both of them potential witnesses?

5              MR. BOOKBINDER:  They are, your Honor, yes.

6              THE COURT:  Is there any objection to that?

7              MR. McGINTY:  There is, your Honor, and there

8    is at this time.  This is a hearing on evidentiary

9    considerations.  Um, it will presumably address

10   admissibility, potentially also the basis for a contest

11   of certain factual matters.  I don't want that to inform

12   their possible testimony.

13             THE COURT:  Well, the government has an

14   absolute right to pick one of them.  And I'm delayed in

15   coming in because of the failure to brief the motions in

16   limine in a timely way has had just the effect I was

17   concerned about.  It set me back.  I'm not going to

18   spend much time on this right now.  I'll get it resolved

19   before trial.

20        But which one would you like to pick?  One could

21   stay and one can go.

22             MR. BOOKBINDER:  Your Honor, I suppose then

23   Special Agent Russell has been the case agent somewhat

24   longer and I figure that he stay and Special Agent Ryan

25   can have the morning off.

1          THE COURT:  All right.  Then his colleague is

2     excused.

3               (Agent Ryan leaves courtroom.)

4          THE COURT:  Here's the sequestration order

5     that operates from this time forward, although it may

6     need some discussion because I'm not sure it's my

7     intention to exclude Mr. Russell from talking to

8     Mr. Ryan about the case.

9               (Pause.)

10          MR. BOOKBINDER:  Your Honor, that actually

11     would be a helpful clarification to the extent that we

12     prepare --

13          THE COURT:  At this point I'm not excluding

14     Mr. Russell from discussing the case with Mr. Ryan.

15          MR. BOOKBINDER:  Thank you, your Honor.

16          THE COURT:  And we'll come back to this.

17          MR. BOOKBINDER:  Thank you, your Honor.

18          THE COURT:  My suggestion is that we talk

19     further about this.

20        The filings that I ordered on February 1st have

21     been made, although perhaps not all the filings I

22     ordered on December 14th.  We'll get this.  I've begun

23     to work on those submissions.  We'll spend about an hour

24     and a half this morning, that's all I have, and resume

25     tomorrow.

1        One motion that's come in since I saw you last

2   week is the defendant's motion for travel and lodging.

3   That's allowed.  Mr. Harris will be lodged at the YMCA

4   on Huntington Avenue and the marshals will arrange his

5   travel.  The chief pretrial services officer, Mr. Riley,

6   is present.  Basically what I just described is standard

7   operating procedure.

8        But are there any questions about this that should

9   be discussed with me now or would you like a chance,

10  Mr. McGinty, to talk to Mr. Riley and let me know

11  tomorrow if you have any questions?

12          MR. McGINTY:  Yes, your Honor.  I would also

13  like to talk to my client about it.  So if we could

14  discuss this tomorrow.

15          THE COURT:  Talk to your client about it.  But

16  he'll enjoy the YMCA.

17       All right.  So, Mr. Riley, um, Mr. Hohler will

18  tell you when we're going to resume tomorrow and if you

19  come back we'll take up any logistical issues at the

20  outset.

21          MR. RILEY:  Thank you, your Honor.

22          THE COURT:  Then with regard to the

23  implementation of the trial order, have the parties --

24  have the parties discussed possible stipulations?

25          MR. BOOKBINDER:  We have, your Honor, and

```
 1   we've gone back and forth with drafts of stipulations,
 2   um, the most recent being, I think, over the weekend,
 3   and we're hopeful we'll have some stipulations.  But,
 4   you know, it's been a process to try to work them out.
 5   And we're mindful of the Court's order that they were to
 6   be filed last week.  We tried.  We couldn't reach any
 7   agreement by then.  But we're hopeful to get an
 8   agreement shortly.
 9              THE COURT:  Because I think one of the issues
10   related to one of your FBI agents in Seattle who was
11   going to authenticate something?
12              MR. BOOKBINDER:  Yes.
13              THE COURT:  All right.  So, Mr. McGinty, are
14   you discussing stipulations?
15              MR. McGINTY:  We are discussing it and
16   frankly, your Honor, this is a case where there's good
17   communication between and among the parties.  So I think
18   that a lot of these things can get either ironed out or
19   respectfully disagreed about.  But we are in the
20   process, we've had a back and forth, we've had daily
21   communications about the core issues.  So there has
22   been, I think, effective communication and both parties
23   are trying to iron out the --
24              THE COURT:  That's good, as we'll begin
25   discussing soon, there are some challenging, you know,
```

```
 1    issues that are well worth vigorously contesting.  And
 2    it would be fortunate if our focus didn't get distracted
 3    from that by things that are not genuinely in dispute.
 4    But that's up to the parties.  I'll keep asking.
 5         And when there are stipulations, um, they'll need
 6    to be signed by Mr. Harris when he gets here as well as
 7    by counsel, that's the form that I require, and they'll
 8    be a question -- it comes out in different ways in
 9    different cases, as to whether the stipulations will
10    just be read to the jury or entered into evidence.  But
11    when they are detailed matters -- and this is a matter
12    in which I have discretion, I think, if there's a
13    dispute, if it's detailed matters, um, I would simply
14    enter them into evidence.  Okay?
15         The government mentioned in its trial brief that
16    it proposed to elicit expert testimony from two
17    witnesses, I think Kohler and Brodfuehrer, is that
18    right?
19              MR. BOOKBINDER:  It is, your Honor.  Yes.
20              THE COURT:  Have you made the expert
21    disclosures required by Rule 16?  I'm not sure I gave
22    you a deadline.
23              MR. BOOKBINDER:  I don't know that there was a
24    court deadline, but we did, your Honor.
25              THE COURT:  Okay.  And does the defendant
```

1  anticipate any expert testimony?

2          MR. McGINTY:  Um, not at this time, your

3  Honor.

4          THE COURT:  Since the government's disclosed

5  its expert evidence, Rule 16, as I recall, imposes a

6  reciprocal obligation on the defendant.  So I'll give

7  you until a week from today, the 14th of February, to

8  make the -- to identify any expert or experts and give

9  the government a written summary of the expert's

10 testimony required by Rule 16(b)(1)(C).

11     Has the government produced all material

12 exculpatory information?

13         MR. BOOKBINDER:  I believe we have, your

14 Honor.

15         THE COURT:  That was due January 20th and it's

16 a continuing obligation.  I hope -- have you gone to all

17 of the agencies that were involved in this investigation

18 and sought such information, written or oral?

19         MR. BOOKBINDER:  We have done that, your

20 Honor, and we expect to continue producing discovery

21 through trial.

22         THE COURT:  And has the government described

23 all of its proposed Rule 404(b) evidence?

24         MR. BOOKBINDER:  We have, your Honor, and

25 there are some situations, as I think we'll talk about

1  today, where it's not clear that things fall within the

2  rule, but we've flagged them as a possibility.

3      THE COURT:  Yeah, I think there will be issues

4  -- are issues as to whether something is intrinsic or

5  would have to be admitted under Rule 404(b) and I just

6  want to try to make sure that the defendant knows about

7  all of the evidence that you might reasonably argue

8  should be analyzed under Rule 404(b) and 403 rather than

9  as evidence intrinsic to the conspiracy.

10      I thought I had ordered this, but perhaps I

11  didn't.  I didn't see a single list of all of the

12  people, like a pseudonym like "Mr. T," um, that the

13  government is going to be asking me to make *Petrozziello*

14  rulings on.  Are you able to -- do you have such a list?

15      MR. BOOKBINDER:  Your Honor, we apologize if

16  you misunderstood there.  We did not produce a list like

17  that.  They were all discussed in our memorandum in

18  support of our motions in limine by excerpts that were

19  seized.

20      THE COURT:  So there's nobody other than the

21  people mentioned in the motion in limine?

22      MR. BOOKBINDER:  That's correct, your Honor,

23  yes.  We've gone through each of the excerpts in that

24  motion and there aren't other witnesses -- well, not

25  witnesses, I guess they would be declarants, outside of

1     that.

2              THE COURT:  All right.  So just so I can make

3     note of it.  Who are the people?  You've got Harris,

4     Phillips -- I'm sorry.  You've got -- here, are you able

5     to give me the names?

6              MR. BOOKBINDER:  I'm sorry.  Yes.  So the

7     names of the individuals.  So obviously Mr. Harris,

8     Mr. Phillips, and Ms. Lindquist as the, um, insiders.

9     Then Mr. Hanshaw -- I don't think I have any statements

10    of his that were seized and introduced for that

11    purpose.  Your Honor, if I could just refer to our

12    filing to answer.

13              (Pause.)

14              MR. BOOKBINDER:  So then, um, there's the

15    person going by the name of "Mr. T."  A person using the

16    name of "Moore," M-O-O-R-E, Capital R.  And the -- well,

17    we discuss a person going by the name "X-factor," but

18    we're not offering that statement as a co-conspirator

19    statement.

20              THE COURT:  Well, you'd better make a list of

21    this anyway because --

22              MR. BOOKBINDER:  Well, that's fine.  We can

23    include him.  So the first one there would be

24    "X-factor."  And then, um, there are posts by a series

25    of other individuals and those people, their user names,

```
 1   are the following.  There is someone who uses the name
 2   "LV Neptune."  There's someone using the name "Joe
 3   Tecno."  The next one is "Live it up 278."  And there is
 4   one that we refer to in our brief that turns out not to
 5   be a customer, and so therefore we're not going to
 6   suggest that he's a co-conspirator.  It's the next one.
 7   Don't add him to the list.  And the final one is someone
 8   using the name of "Bored," B-O-R-E-D, Number "7," and
 9   word "One," O-N-E, and the number "4."  So it's "Bored
10   7One4."  And I believe -- oh, I'm sorry.  There's one
11   that I missed.  Ms. Sedky points to me.  Someone using
12   the name "DJ," letter D, letter J, "212."
13              THE COURT:  All right.  And there's somebody
14   mentioned in the trial memo who you do not contend is a
15   co-conspirator.  Who is that?
16              MR. BOOKBINDER:  Oh, I'm sorry, the one that
17   we do not contend is a co-conspirator is one that is --
18   uses the name "P. McGrath," M-c-G-R-A-T-H.
19         And, your Honor, if I could consult with counsel
20   to see if I'm missing any.
21              (Pause.)
22              MR. BOOKBINDER:  Let me just make sure, your
23   Honor, I didn't skip one.
24              (Pause.)
25              MR. BOOKBINDER:  I think that's it, your
```

 1   Honor.

 2              THE COURT:  Well, if there are any others,

 3   you'll let us know tomorrow.

 4              MR. BOOKBINDER:  I apologize.  There are two

 5   more that we got through the course of our discussion of

 6   the posts and I didn't include them.  Let me give those

 7   to you.  They are both customers.  The user names are

 8   "Sean," S-E-A-N, "19661."  And the next one is someone

 9   who goes by the name "Aspeer," A-S-P-E-E-R.

10              THE COURT:  Okay.  I'm ordering that, ideally

11   by tomorrow, but if you need more time, I can give it to

12   you, but just give me a submission that says "These are

13   the people as to whom the government will be requesting

14   **Petrozziello** rulings," because my clerks and I will have

15   to keep track of the evidence with regard to each of

16   them, so I can decide, at the conclusion of all of the

17   evidence, whether it's proven by a preponderance that

18   the individual by that name or with that identifier is a

19   member of the conspiracy and that the statement that

20   would be admissible under Rule 801(d)(2)(E) were made in

21   furtherance of a conspiracy.

22          All right.  Procedurally, with regard to the

23   trial, um, I'm going to order the parties to let their

24   adversaries and the Court know, several days in advance,

25   the order of the expected witnesses and what exhibits

1    that you each hope to introduce in your cases in chief

2    through those witnesses, and then I'm going to want to

3    know if there are objections to those exhibits.  So

4    basically we're going to begin discussing these issues,

5    and other issues, this morning, but, um, even if I rule

6    in limine, I have to rule again at trial and I'm going

7    to want to be able to prepare for each day and minimize

8    the risk that we'll need sidebars or lengthy sidebars

9    while the jury is sitting there.  Okay?

10        So why don't we say, by the 14th, that the

11   government provide to the defendant and the Court, you

12   know, the witnesses it expects to present during the

13   first three days of testimony and the exhibits

14   associated with each.  And by the 16th, I want to -- the

15   defendant to inform me, and the government, of which of

16   those exhibits are objected to and on what basis -- and

17   it can be a shorthand, "hearsay," "not a co-conspirator

18   statement," "contrary to the government's contention, it

19   is being offered for the truth," comparable to what's in

20   the opposition to the motions in limine.  Just

21   sufficient enough so it will remind me.

22            MR. BOOKBINDER:  Your Honor, if I could ask a

23   question that relates to that a little.  Um, what it

24   would be helpful for us to know is whether the Court

25   would like us to have a witness here for the first day

```
 1    of trial?

 2              THE COURT:  I'm going to go through that, but

 3    no.  I'm going to explain the jury selection process to

 4    you at some point.  I expect the first morning, at

 5    least, will be subsumed with selecting the jury and then

 6    the next day you'll make your openings and then call

 7    your first witness.

 8              MR. BOOKBINDER:  Okay, that's helpful, your

 9    Honor.  Thank you.

10              THE COURT:  All right.

11         Did the defendant produce his exhibits?  They were

12    due February 2d.

13              MR. McGINTY:  Your Honor, at the moment, um,

14    we have not produced any -- we're not presenting any at

15    the moment.

16              THE COURT:  You have no exhibits that you plan

17    to introduce in your case in chief?

18              MR. McGINTY:  That may be subject to change,

19    your Honor, but as of now, no.

20              THE COURT:  As of now you have none?

21              MR. McGINTY:  Correct.

22              THE COURT:  Well, as soon as you get one, you

23    have to produce it forthwith.

24              (Pause.)

25              THE COURT:  I will explain the jury selection
```

1    process to you tomorrow.

2         Do you have a sense of how long you might want for

3    your openings?

4              MR. BOOKBINDER:  Your Honor, not more than

5    about 40 minutes, I would think.

6              THE COURT:  Does the defendant expect to make

7    an opening?

8              MR. McGINTY:  Yes, and I think the same, your

9    Honor.

10             THE COURT:  All right.  You can each have up

11   to 40 minutes.

12        And does the government intend to use any chalks

13   or summaries or exhibits in its opening?

14             MS. SEDKY:  At this point we do, your Honor.

15   We intend to, um -- we haven't put them together, but we

16   intend to take some select quotations from Mr. Harris

17   and put them on a board and possibly also have a visual

18   aid that our expert will also --

19             THE COURT:  Fine.  You have to show those --

20   basically I don't permit anything to be shown to the

21   jury, except on cross-examination, that hasn't been

22   shown to your adversaries so I can see if there's an

23   objection.

24        So would there be a problem with developing those

25   within the next week, showing them to Mr. McGinty, and

1    then you can let me know on February -- so you'll do

2    that on February 14 and on February 16 I'll see if the

3    defendant has any objection.  Okay?

4              MS. SEDKY:  Thank you, your Honor.

5              THE COURT:  In the last couple cases I've

6    tried, um, there have been disputes about the

7    admissibility of summaries, basically that the summaries

8    need to be, under Rule 1006, summaries of voluminous

9    writings, essentially things that are documented,

10   without any evidence, any testimony that -- you know,

11   it's got to summarize what's in the documents and if

12   it's going to be admitted as a summary that will go to

13   the jury as an exhibit under Rule 1006, it can't include

14   any of the evidence.  Um, if it's going to have

15   something more than that, it's potentially usable as a

16   chalk that's not admitted, a device that's permitted

17   under Rule 611.

18        So you should keep that distinction in mind and

19   you might want to look at something like **United States**

20   **vs. Milkowicz**, 470 F.3d 390 at 398.  **MacElroy**, 587 F.3d

21   73.  These are First Circuit cases.  But basically I

22   think **Milkowicz** is probably the best discussion.

23        All right.  I've read the trial briefs and they

24   are, as I expected, helpful.

25              (Pause.)

1          THE COURT:  I think -- and after the jury is

2     sworn, probably on the second day of trial, which would

3     be a Wednesday -- and I'll give them some preliminary

4     instructions on the black letter law as it applies to

5     this case and I'll review that with you, but in reading

6     the trial briefs there were a couple of issues in cases

7     that struck me as particularly important to this case

8     that it might be useful to talk about a little now.

9          One of the issues that both the defendant and I

10     have focused on is whether the government, in this case,

11     has alleged and is going to be able to prove a single

12     conspiracy, rather, with Mr. Harris at the hub, with a

13     number of spokes, but also a rim, to use the customary

14     analogy, or whether this case involves at most multiple

15     conspiracies?  And of course the government would be

16     required -- I'll instruct the jury that the government's

17     required to prove the conspiracy charged in the

18     indictment and not some other conspiracy existed.

19          I thought that among the cases on this issue cited

20     in the trial briefs that were particularly valuable were

21     **Blumenthal**, a Supreme Court decision, **Surreff**, which I

22     think is a Second Circuit case, and particularly

23     **Portella**, 167 F.3d 687 at 695 to 696, a 1999 First

24     Circuit case.  Also **Fenton**, 367 F.3d 14, a First Circuit

25     case that talked about nefarious in the conspiracy

context.  But I found **Portella** particularly important or

valuable because the First Circuit wrote:  "That to

determine if the evidence supports a single conspiracy,

that is to say, a single general agreement, courts have

looked for, one, common goal, two, interdependence among

the participants, and, three, overlap among the

participants."

In this case my sense is that that interdependent

prong is especially important for our focus and the

First Circuit said on that:  "To establish an

interdependence among participants requires determining

whether the activities of one aspect of the scheme are

necessary or advantageous for the success of another

aspect of the scheme.  Each individual must think the

aspect of the venture interdependent on each defendant's

state of mind and not as mere participation in some

branch of the venture as key.  No interdependence makes

it reasonable to speak of a tacit understanding between

the" -- it's a drug case, I guess, "distributor and

others upon whose unlawful acts the distributor knows

his own success likely depends."  Put another way:

"Evidence of an individual participant's understanding

of the interdependence of the co-conspirator's

activities is evidence, often the best evidence of a

tacit agreement between the individual and his

1    co-conspirators."

2         But I think that interdependence, in my present

3    conception, is important to proving the rim of the

4    alleged conspiracy, or that of the purchasers of

5    Mr. Harris's devices for conspiring with each other as

6    well as with him.  And then I think I understand better

7    than I did previously that the government contends that

8    the people who purchase Mr. Harris's products didn't

9    have everything they needed, they needed to get MAC

10   addresses typically from other purchasers.

11        But anyway I think it would be helpful, before we

12   get to the particulars of the evidentiary disputes, for

13   me to go over some of these fundamental principles and

14   to see whether you think I focused on the right cases

15   and have stated the standards correctly.

16        But what does the government have to say about

17   this?

18             MS. SEDKY:  Thank you, your Honor.

19        It's correct that the government's position is we

20   charged this as a single hub-and-spokes conspiracy with

21   Mr. Harris at the hub and the spokes are the users all

22   over the country including the four that we've named in

23   our indictment.  And the way that -- this is a -- well,

24   Mr. Harris's operation cannot function alone.  A single

25   user really can't sit alone in Boston, with no other

1    user, and successfully steal internet service using

2    Mr. Harris's help because functionally the way many ISPs

3    -- and we'll have our expert testify about this at

4    trial, but the way many ISPs work is, um, to the extent

5    that Harris helped his customers steal or sniff MAC

6    addresses, that was to a specific node -- and that's a

7    technical cable term.  You can sniff on your node or at

8    most you can sniff on what's called your Cable Modem

9    Termination System, your CMTS.  And cable companies are

10   set up so that if I have a MAC address on one node or

11   one CMTS and I'm a legitimate paying subscriber, then

12   Mr. Bookbinder can't clone my MAC address and try to use

13   that if he is also on my own CMTS or my own node.  We've

14   been using the "neighborhood" loosely to describe the

15   CMTS or a node and different ISPs operate in different

16   ways.

17        But it's very -- it's a common problem that you

18   can't sniff your neighbor's MAC address and use it to

19   steal because what will happen is somebody's going to

20   get bumped off or both people will get bumped off

21   because technologically the packets don't know where to

22   go when they have two MAC addresses popping up at the

23   same time.  And so it's --

24            THE COURT:  At the same time or at the same

25   time in the same neighborhood?

1           MS. SEDKY:  At the same time in the same

2     neighborhood on the same node, it will not --

3           THE COURT:  So is a node geographic?

4           MS. SEDKY:  Yes, a node is geographic and it's

5     also load focused.  So if you have a very dense

6     population, you'll have fewer nodes on a CMTS, for

7     example.  So basically nodes -- houses feed to nodes,

8     nodes feed to a CMTS.  And just depending on whether

9     we're talking about apartment buildings or single-family

10    dwellings, the geographic area could be smaller or

11    larger, depending on how dense the population is.

12          THE COURT:  But is it true that if there were

13    a MAC address in Boston, say, or a neighborhood in

14    Boston, nobody in that neighborhood in Boston could use

15    the same MAC address, but somebody in Los Angeles

16    could?

17          MS. SEDKY:  That's correct, for many, many

18    ISPs at the time that Mr. Harris's products were in

19    operation.  And so most of these people knew that.  Most

20    people knew that if they used the CoaxThief, the packet

21    sniffer, they would get something that was probably not

22    going to be helpful to them, but would be helpful to

23    somebody else who was doing the same thing.

24          THE COURT:  It wouldn't be helpful to them

25    because they're getting other MAC addresses in their own

1    neighborhood and they would have to, if they were in

2    Boston, find somebody in Los Angeles --

3             MS. SEDKY:  Exactly.  Exactly.  And so

4    Mr. Harris knew this.  This was essentially a technical

5    issue that he had to face and that his users had to face

6    and so that he knew that he had to facilitate their

7    exchange of stolen MAC addresses cross-country, cross-

8    neighborhood, basically cross-CMTS.

9             So, um, I mean, I guess ostensibly you could take

10   his product and you could drive across town and plug it

11   in there and sniff over there and then drive back to

12   your home and use the stolen MAC address.  And, you

13   know, there would be one-off instances where if that's

14   what you wanted to do you could.  But what happened was,

15   um, there was a very robust black market essentially for

16   stolen MAC addresses to be traded very freely and openly

17   on his website.

18             THE COURT:  And so it's your theory, your

19   contention that this interdependence prong of a single

20   conspiracy would be satisfied by the fact that the

21   purchasers of Mr. Harris's products knew that there were

22   many other purchasers and only if they cooperated, or

23   cooperated, I suppose, with people who got similar

24   products from somebody else, um, would it be of any

25   value to them?  Is that the theory?  Or how are you

1    going to prove the interdependence?

2         MS. SEDKY:  Well, we have four or five

3    different factors that we think show the

4    interconnectedness.  One is just the sheer functionality

5    of the need to obtain MAC addresses either by swapping

6    to get MAC addresses from another node or there are

7    people who just -- they don't know how to use the MAC

8    sniffer, they don't want to deal with MAC sniffing, so

9    they just -- they need to go get a MAC address, and so

10   they go to his website to get MAC addresses and it just

11   so happens that the MAC addresses are, by and large,

12   being posted by other users.

13        So one is the trading of the MAC addresses, that

14   was one interconnectivity function.  The other was they

15   relied on each other for reconnaissance because some of

16   the ISPs, as we've mentioned in our briefs before, this

17   was a very, very fluid, um, marketplace where the ISPs

18   were constantly trying to add security measures to knock

19   Harris's users off their networks and so there was a lot

20   of exchange of information and data about "Roadrunner is

21   blocking Nicknacks," and we'll have some people testify

22   about what a "Nicknack" is, and how, "someone has

23   instituted some kind of other security measure."

24        And so there's a lot of information flow that --

25   it was almost like they had a help desk for one another,

1    that they were exchanging information about their

2    successes and failures about their particular ISPs in

3    their geographic areas.  So in addition to exchanging

4    MAC addresses, they also exchanged information about

5    product success and failure which Harris himself then

6    used to tweak his products.

7          And so in addition to, I think we called it the

8    "bartering platform for the MAC addresses," they also

9    had what was essentially a user feedback forum, which

10   was very important for the success of the product

11   because it was a product that kept evolving.  They

12   issued updates constantly to try to continue this game

13   of cat and mouse with the ISPs.  And that was his only

14   source of -- and that was a primary source of

15   information was finding out what the heck was going out

16   on the field.  So, Number 2, was sort of, um, a user

17   feedback form.

18         And Number 3 was just help desk functionality

19   where a lot of them you'll see are troubleshooting for

20   one another.  And so that was a very interconnected --

21   way to the interconnected.  Someone will say, "I can't

22   get on this," "Well, try this.  Try that."  And so those

23   things fed into the product evolution and the product

24   tweaking.

25         And so there was this whole sort of agrarian

1   system or microcosm or mini world of people all needing

2   information and MAC addresses and also configuration

3   files.  We haven't been talking about configuration

4   files, but they were trading configuration files just

5   the way they were trading MAC addressing

6           THE COURT:  What's a configuration file?

7           MS. SEDKY:  A configuration file comes into

8   play for the uncapping piece.  There were two types of

9   theft of service here.  Mr. Harris was helping two

10  different kinds of computer users steal service.  He was

11  helping people who were not subscribers at all do

12  outright theft of service.  So they needed a MAC address

13  because they weren't legitimately on anybody's network,

14  so they weren't subscribers.  He also helped people who

15  were bare bones subscribers of the cheapest, slowest

16  service uncap.  And these are not mutually exclusive.

17  But the way that you uncap is you essentially get much

18  faster and much more expensive speeds and you don't pay

19  the premiums.

20      And so for the uncappers, some of those uncappers

21  were subscribers and some of them were not subscribers,

22  but either way they needed a configuration file and the

23  configuration file is the file that the ISP sends out to

24  the modem that has the key settings for that modem in

25  it.  So the modem is told, "This is the speed of what

1    you paid for."  So if I'm a subscriber and I turn on my

2    modem, I shoot out my MAC address to my ISP, my ISP says

3    "Oh, I recognize Mona Sedky, she pays for high, medium

4    or low service, here is her configuration file," and

5    they send it back to me, the configuration file, and

6    then my modem will see how many megabits per second or

7    kilobits per second is in that configuration file, which

8    tells me how fast my service is going to be.

9                THE COURT:  Okay.  I think that gives me what

10   I was looking for.

11         So the government -- am I correct from the

12   government's perspective that, you know, *Portella* is one

13   case that succinctly states the requirements for

14   establishing a single conspiracy rather than multiple

15   conspiracies?

16                MS. SEDKY:  Yes.

17                THE COURT:  And what's the defendant's view on

18   this?

19                MR. McGINTY:  Well, I agree with the Court in

20   terms of the characterization of the cases, but I think

21   the Court neglected to mention one case that's sort of

22   singularly important --

23                THE COURT:  This is what I would like you to

24   do.

25                MR. McGINTY:  -- because it really is the

1   template for, um, what has happened in the case and what

2   is going to happen in the case and that's **Pappathanase**.

3   So let me back up and try to provide the context for

4   that to show how the Court's -- the Court's outline for

5   how things came to pass in **Pappathanase** or exactly the

6   track record --

7           THE COURT:  And actually -- here, I'll say

8   this so you can address it, and you can probably

9   continue to think about it, but since I saw you the last

10  time, I've read **Pappathanase** and I've read **Goldberg** and

11  both of those cases were schemes to defraud, you know,

12  to interfere with the functions of the Internal Revenue

13  Service and -- and I thought that Judge Boudine in

14  **Goldberg** was suggesting that you needed a particular

15  specificity with regard to intent in such a case because

16  virtually any crime done for financial gain has, as an

17  incidental effect, hiding revenue from the Internal

18  Revenue Service.  And I think he talked about bank

19  robbers.  If you rob a bank, you're not going to record

20  the proceeds on your tax form.  But it doesn't mean that

21  it was a scheme to defraud -- a conspiracy to defraud

22  the IRS.

23      So it caused me to -- and then I'm going to talk

24  to you, after we discuss this, about **Direct Sales**, which

25  I think you both properly bring to my attention, but you

1      may not have a common sense of the implications of it

2      because I think that also -- that **Direct Sales** is

3      important for the sort of **Pappathanase, Goldberg** point I

4      was raising.  But go ahead.

5            MR. McGINTY:  The very important, um, degree

6      in **Pappathanase** that sort of sets the table here is in

7      that case, you know, the obvious concern was the

8      **Goldberg** concern, which was whether, um, the tax

9      consequence was integral or was just a consequence of,

10     you know, a scheme that was intended for a different

11     purpose.  And the Court pointed out that what the

12     government had done in that case is charge that it could

13     have the tax effect pointing out that structural flaw

14     the government thought it could cure it by using the

15     word "would," and as the Court pointed out, that then

16     gave -- that then explains of how the -- about how the

17     case then proceeded after that into turmoil because the

18     expectation that could would suffice emboldened the

19     government to charge the rim of the conspiracy, the

20     larger conspiracy, which failed, and once it failed,

21     then the individual counts for which all the evidence

22     had been brought in, in turn failed, and the whole thing

23     unravels.

24           What's interesting about this indictment is what

25     the government alleges.  This is not what the

1    government's conception of the wrong here is, but what

2    they charged as the wrong.  In the indictment they use

3    the word "enabled."  "Enabled" sounds an awful lot like

4    the "could," and the "enabled" is found in the

5    indictment --

6              THE COURT:  Under the manner and means.

7              MR. McGINTY:  -- under the manner and means

8    and what it describes as the, um -- the -- how these

9    things which the government says had the inherent

10   capability of doing something, describes how these

11   things "enabled" conduct by third parties.  So it could

12   have the effect -- and among the things it describes in

13   manner and means in Paragraphs 16, 17, 18, um, and also

14   in 22, it's describing how the capability of these

15   products could have a number of effects among them, they

16   enable the computer users to obtain internet service

17   without making the required payment, they enable users

18   to obtain faster upgraded or uncapped internet service

19   without paying the premiums charged by the ISP, they

20   enable users to use without authorization configuration

21   files that the ISP would otherwise only provide to the

22   legitimate subscriber paying for premium access.

23              THE COURT:  And, I mean, I can move this and

24   this may take us right into *Direct Sales*, but as a

25   general statement with regard to black letter law, do

1    you agree that *Portella* sets out the standards?

2            MR. McGINTY:  I do.

3            THE COURT:  That's one.  And then this does go

4    into *Direct Sales* and this is jumping ahead probably

5    more to my final instructions than my preliminary

6    instructions.  But as in *DiMasi*, which I gave you, um,

7    it's my present intention, when I finally instruct, to

8    say "The government has to prove A, B, C and D, and it

9    would not be sufficient to prove only something else,

10   including, at this point, enabling."  But I think *Direct*

11   *Sales* teaches me, particularly beginning on Page 209 --

12   and let's see, that mere knowledge that a product will

13   be used illegally is not sufficient to prove the

14   defendant's a member of the conspiracy.  So it follows

15   that it wouldn't be sufficient to just show it could

16   be.  But this is why I think *Direct Sales* is an

17   important case for the government as well as for the

18   defendant.

19           I understand *Direct Sales* to mean that if a

20   product is inherently susceptible to an illegal use, um,

21   knowledge that it will be used illegally is relevant to

22   proving that the defendant knew the buyer intended to

23   use it illegally and intended to cooperate in that

24   crime, which the Supreme Court says, plus an overt act,

25   is the essence of a conspiracy.  And I think that, you

1    know, in **Direct Sales**, if I remember it right, it was

2    morphine, **Falcone** was sugar.  And, you know, to say

3    that -- that it indicates to me, you know, that it's the

4    government that has essentially undertaken to prove,

5    that it says it's going to show that Mr. Harris's

6    products didn't have legitimate uses, and certainly --

7    well, let me just finish this.

8              MR. McGINTY:  Sorry.

9              THE COURT:  -- and therefore, you know, it's

10   been designed for illegal use, and you know from certain

11   evidence that they propose to introduce that some people

12   are using it illegally, and therefore this is some

13   evidence that Mr. Harris intended to agree with the

14   purchasers and intended that wire fraud be committed.

15   That's sort of the framework in my mind at the moment.

16             MR. McGINTY:  Right.  And the challenge for

17   the government, I think, in proposing the instructions

18   is that it sort of tees up what the standards would be

19   for the plus factor that **Direct Sales** plays out because

20   in **Direct Sales** it isn't just that the items were

21   restricted items, and they were, it was morphine, it

22   wasn't just that it was sold in lot quantities that were

23   staggering to an individual doctor who couldn't

24   conceivably have used it, it wasn't just that the

25   predecessor to the DEA contacted the doctor and said,

1    "What are you doing?" basically saying, "Look, if you

2    keep doing this, bad things are going to happen," but it

3    was that the doctor continued to do it after that

4    point.  So there's a constellation of plus factors that

5    makes *Direct Sales* of a kind and explains why after

6    *Direct Sales* there has been, um, virtually no cases that

7    have addressed the consequence of the sale of an item in

8    terms of how it's used by an end user.

9         So in *Direct Sales* the Supreme Court said that

10   when it reaches the point where it's in the face of the

11   person that their continued conduct here is culpable

12   conduct, um, we will permit the conviction, otherwise

13   *Falcone* governs, and what *Falcone* says is that that

14   knowledge, unless it's activated by a causal

15   relationship where you're a part of the transaction, a

16   part of what they're doing, that mere knowledge they're

17   doing it is not sufficient for proof.

18        And if I could just back off a second, because the

19   government talked about what these modems are, and I

20   think just for background, the government in Exhibit 3,

21   um, puts in the face pages, as I understand it, of the,

22   um, website Mr. Harris had, and on that face page it

23   demonstrates that among the things that Mr. Harris sold

24   were a number of modems which were conventional modems,

25   um, they were -- I'm referring now to Exhibit --

```
 1                 THE COURT:  Is this 3?
 2                 MR. McGINTY:  Um, at 209, the government has
 3      paged these, which is rather helpful.
 4                 THE COURT:  Are you sure it's 3, because if
 5      you look at the pages I have, it's numbered 3 at the
 6      bottom.
 7                 MR. McGINTY:  I'm sorry.  It's Exhibit 2.
 8                 THE COURT:  Oh, it's 2.
 9                 MR. McGINTY:  So it's at Page 0208 at the top
10      right.
11           The first item there, a Motorola SB-5101 cable
12      modem.  It's a stock modem.  It's not a modified modem.
13                 THE COURT:  08?  Okay.
14                 MR. McGINTY:  Okay?  There are other modems
15      that are sold on the second page, on 0209, the SB-5100
16      is a regular modem, it is unmodified.  In other words,
17      among the things that were sold by Harris included
18      modems that were stock modems available for connection
19      to the internet.
20           Each of the modems that Mr. Harris sold that were
21      modified, each permitted access to the modem, and
22      there's no significant price differential between the
23      ones that were modified and the ones that weren't
24      modified and what it would cost me if I went to Radio
25      Shack and bought a modem to connect to the internet.
```

1              Now, the government, in its charge, talks about

2       what the modified modems enable and what they say the

3       modified modems enable is they enable theft of service,

4       they enable --

5                     THE COURT:  They enable what?

6                     MR. McGINTY:  They enable theft of service,

7       they enable increased service, and the increased service

8       that can be obtained would include a person who is given

9       by the ISP a crimping of their speed.  They can download

10      a config file, a configuration file that governs their

11      speed, with no misrepresentation of the ISP, and obtain

12      the thing that the ISP promised to give in terms of the

13      service that they were promising to the customer, and

14      that would be within the boundary of the payment that

15      one makes as a customer for the service.  Imagine a

16      person going to the fruit shop and buying a pound of

17      bananas and seeing that the scale registers a pound and

18      a half when the person's, in fact, getting less than

19      that.  And what happens here is that Harris makes

20      possible the, um, the deconstruction of a modem that

21      creates the potential that a customer can do a number of

22      different things, but among them change their config

23      file to get the speed that they otherwise expect from

24      the ISP in which the ISP is not providing.

25                    THE COURT:  You mean that they paid for?

1           MR. McGINTY:  Which they paid for.  A

2    legitimate customer can use a modified modem to get the

3    service promised.  What he can also do with the modem is

4    he can get, um, basically rechannel ways to receive, um,

5    Internet content that has been, um -- that has been

6    constrained or eliminated by the ISP.

7           So ISPs have remarkable control over my cable

8    modem in my house and they disfavor, um, certain kinds

9    of uploads.  Um, they disfavor uploads from companies

10   which they suspect might be involved in copyright

11   infringement and they prevent me from getting access, or

12   they limit my access, or they delay my access, or they

13   restrain my access to person-to-person content, where I

14   upload content, because they don't think that --

15           (Notification that conference call is

16   disconnected.)

17           MR. McGINTY:  He will call back in.  That's

18   his instruction.

19           But they -- where the ISP is of the view that

20   because that content may involve copyright violations,

21   they will prevent it.

22           So the potential you get, by getting a modem, is

23   that you get a reverse-engineered modem that permits you

24   control in a way that the relationship with the ISP

25   deprives you of.

1              THE COURT:  So let me just --

2              MR. McGINTY:  Just one more thing to that,

3     your Honor?

4              THE COURT:  All right.

5              MR. McGINTY:  And in their charge, when they

6     talk about what's enabled, they say that it's theft of

7     service, they say there's increased speed.  In their

8     indictment they also say it permits anonymity, that it

9     permits someone to have anonymity on the net.  I can be

10    a paying customer and I can achieve anonymity on the net

11    by using a modem that deceives the ISP, yes, but is that

12    fraud on the ISP for purposes of the wire fraud

13    statute?  I think the answer to that is "No."  And the

14    reason I may do that is I may be interested in anonymity

15    because of my political communications and so forth --

16             THE COURT:  But that's taken care of by, I

17    think, by the intent to defraud requirement.  In other

18    words, anonymity -- there are lots of things that in

19    some context might be lawful and in another context --

20             (Notification that conference call is

21    reconnected.)

22             MR. McGINTY:  So if I might just finish up?  I

23    think this is important.

24             THE COURT:  Okay.

25             MR. McGINTY:  So they're alleging multiple

uses that are part of a conspiracy and they are alleging
among those multiple possible uses ones that are not
illegal or ones that are not sufficient to implicate the
wire fraud statute.

Jump to **Pappathanase**.  In **Pappathanase** the
question was, that the Court asked, was whether certain
-- whether the conduct of the parties in having this
payback system from the creamery, whether there were
other reasons for it.  Well, the other reasons are in
the indictment here and in that case the Court said it
was sufficient that one of the reasons might be float
for -- and I mean no -- it's a modest benefit of a
kickback program that a person may be able to get a
couple hundred bucks and hold that without -- you know,
for the benefit of future purposes.  But if float is
sufficient to float **Pappathanase**, um, the ability to get
anonymity, um, the ability to contest the constraints
that the ISP puts on my modem, on the things that
otherwise I have access to and ought to be free content,
certainly satisfies the standard that's in **Pappathanase**.

So under the circumstances here, um, the
government charges a conspiracy and the conspiracy they
say is all the things that Harris does.  In their
indictment is the core problem which is among the things
it is alleged to do are things that are entirely outside

1  of the wire fraud statute.  It then says to prove the

2  hub what we're going to do is we're going to put in

3  comments by other parties on a, um -- on a, um -- a

4  forum that is part of the website, all of whom involve

5  participants and outsiders who are posting their own

6  thoughts, who are sharing their own views and their own

7  information, where Harris has a statutory, um,

8  protection against being responsible for the content.

9          THE COURT:  Yeah, and I was going to get to

10  that later, the Section 230, I think?

11          MR. McGINTY:  Yes.

12          THE COURT:  In that universal decision that

13  Judge Keeton wrote.  That's statutory protection against

14  state law tort liability, it's not statutory protection

15  against -- in federal criminal prosecutions.

16          MR. McGINTY:  No, but it is notice that if

17  you're the moderator of a website, you don't have a

18  responsibility for cleaning out a forum.  And it

19  basically says that posters to a forum have the First

20  Amendment right to communicate and that is respected by

21  limiting the moderator's obligation for what is on

22  there.  And frankly, your Honor --

23          THE COURT:  This is good.  This is one of the

24  points I was going to get to with you.

25          But let me hear from them about *Direct Sales*.

1   What's the government's --

2          MS. SEDKY:  Your Honor, we agree with the

3   Court's assessment of what *Direct Sales* says, which is

4   that, um, if you have a product, which we plan to prove

5   in this case we do, that is inherently susceptible to an

6   illegal or harmful use, the fact that they slapped the

7   label "restricted item" in that case is not some

8   talismanic omen that every object has to fit within.  We

9   fit within the notion that this is a product that is

10  inherently susceptible to stealing free and faster

11  internet and that that is a direct piece of evidence to

12  show Mr. Harris knew how his products were going to be

13  used and from his knowledge you can then infer in part

14  his intent that people used his products the way that he

15  knew that they would.

16         THE COURT:  Well -- and there are two types of

17  intent the government always has to prove to prove a

18  conspiracy, intent to agree and intent that the object

19  of the agreement of that crime be committed.

20      So what if anything, in addition to proving that

21  Mr. Harris knew that his products could and would be

22  used illegally, needs to be shown?

23         MS. SEDKY:  Well -- and when we talk about

24  "could" versus "would," before I forget, I do want to

25  just make one minor point.  In our indictment we use the

1  word "enable" as equivalent to help.  When you're an

2  enabler in the psychotherapy context, you're helping

3  someone, you're not just passively sitting back and

4  letting them do what they're going to do as independent

5  actors.  So when we use the word "enable," we stand by

6  that definition as help.  And in case there's any doubt

7  that we're talking about purposeful availment,

8  purposeful conduct and intent, in Paragraph 1 we use

9  words "designed to," in Paragraph 11 we use words "for

10  the purpose of," "so that," and in Paragraph 15, which

11  is the core charging paragraph of the conspiracy

12  count --

13           THE COURT:  Hold on just a second.  I had

14  underlined "designed to."

15           MS. SEDKY:  That's Paragraph 1.  Paragraph 11

16  is the definition of "cable modem hacking."

17           THE COURT:  I've got it.

18           MS. SEDKY:  "For the purposes of," modified

19  "so that."  Paragraph 15, which is our core charging

20  paragraph, "knowingly conspired, devised a scheme for

21  the purpose of."  Very intentional language that tracks

22  the statute.  Paragraph 25, more definitions, "designed

23  to."  Paragraph 26, "knew that."

24           Our indictment very plainly alleges that he -- and

25  we plan on proving that Mr. Harris intended to agree

1    with his inner-sanctum insiders and with others known

2    and unknown to the grand jury and that he intended to

3    help them steal free and faster internet service.

4         And I think I got sidetracked because you were

5    asking me a question about *Direct Sales*.

6         Oh, so do we believe that we are obligated to

7    prove a plus factor here?  Not necessarily, because we

8    actually believe -- although we plan on offering plus

9    factors, but we will object to instructions that require

10   us to prove plus factors.  We have plenty of plus

11   factors.

12               THE COURT:  You say you will?

13               MS. SEDKY:  We will object.  We actually

14   believe --

15               THE COURT:  You say you will object?

16               MS. SEDKY:  We will object.  We believe that

17   if you have a product that is inherently susceptible to

18   illegal use, that in certain circumstances providing

19   that product is enough for a jury to draw the inference

20   that the supplier knew and intended for its illegal use.

21        Now, we can prove, and our proposed instruction

22   says that there are many factors that a jury can use to

23   -- from which to infer the requisite intent, and we list

24   about five factors, all of which we intend to prove at

25   trial, the first one being the inherent susceptibility

1    of use, but we're not limiting ourselves in saying that

2    that would not be enough alone.  We have his own

3    personal use, which the courts have held is relevant to

4    inferring intent if the supplier himself engages in the

5    same criminal conduct that's at issue with the product

6    that he's supplying, that is a factor.  The market

7    conditions of the --

8              THE COURT:  What case is that?

9              MS. SEDKY:  It's in the trial brief.

10              THE COURT:  All right.  I'll find it.

11              MS. SEDKY:  We briefed it mostly in our

12    opposition to the motion to dismiss and I'm happy to --

13    I don't have that one in front of me, actually.

14              THE COURT:  Well, that's okay.  That's okay.

15    But this is what I intended, and what didn't occur

16    because my order wasn't complied with, I intended that

17    you would really specify these things.

18              MS. SEDKY:  We did in the jury instructions.

19              THE COURT:  I know, but also in your memo.

20    This is what I had in mind in December.

21              MS. SEDKY:  I apologize.

22              THE COURT:  The U.S. Attorney's Office is

23    capable of doing it.  They did it for me in *DiMasi,* the

24    defendants did it, but you haven't done it here.  But

25    we'll --

```
 1            MS. SEDKY:  Every footnote in the jury
 2    instruction for our -- our Instruction Number 2 is our
 3    customized conspiracy instruction and I pulled out every
 4    case cite for every factor that we have listed among the
 5    factors that we would like the Court to instruct the
 6    jury to consider without instructing them that any
 7    single factor is not enough.  And so it goes to things
 8    like the market conditions, the financial incentive that
 9    the supplier has.  Um, his personal use.  His attempts
10    to hide.  And courts, post *Direct Sales* and *Falcone,*
11    have come up with a list of factors that they -- these
12    are all sufficiency-of-the-evidence challenges usually,
13    and so it's a miss-mash.  They look at the facts and
14    they say, "Well, here they have this, this, and this,
15    and that was enough," or "Here they have that and it
16    wasn't enough," and so we've culled those together.
17            THE COURT:  All right.  This is getting me in
18    the right direction.
19        All right.  Then as I noted, I think, in this
20    case, um, it's going to be necessary and appropriate for
21    me to give an instruction that distinguishes between a
22    mere buyer/seller relationship and a conspiracy.  And I
23    noted one case that discussed that.
24        Does the government have a -- you know, what's the
25    government's view on whether I should give such an
```

```
1    instruction?
2              MS. SEDKY:  We believe that our proposed
3    instruction contains the appropriate language that
4    essentially says that, um, at the bottom --
5              THE COURT:  Which instruction?
6              MS. SEDKY:  I'm sorry.  It's proposed
7    Instruction Number 2.  And what we tried to do was
8    essentially take *Direct Sales* as a starting point, um,
9    look at the different factors --
10             THE COURT:  And, actually, hold on a second.
11             (Pause.)
12             THE COURT:  I'm looking at your Number 2.
13             MS. SEDKY:  The government's proposed
14   Instruction Number 2, it says "Conspiracy involving a
15   supplier of products or services."
16             THE COURT:  Right.  Actually the last sentence
17   says:  "But you cannot find that the defendant intended
18   to join a conspiracy based solely on his knowledge of
19   the illegal use of his products."  That's what I thought
20   you were telling me when we were discussing *Direct Sales*
21   you were going to object to.
22             (Pause.)
23             MS. SEDKY:  I think that gets drawn on what
24   inferences you draw about the product itself.  So if it
25   were a benign product, I think you could -- my
```

1    understanding of **Direct Sales** is there's a continuing --

2         THE COURT:  No, no, no, but -- here.  To some

3    extent I'm relying on what you've given me.  If you tell

4    me --

5         MS. SEDKY:  I think that in the benign

6    screwdriver context, and we've talked about hammers

7    before --

8         THE COURT:  But this isn't a benign

9    screwdriver case, this is your case-specific --

10        MS. SEDKY:  No, I understand.  We were trying

11   to accommodate a concern that we thought the defendant

12   would have, that's why we threw that in there.

13   Personally I didn't want to put it in and Mr. Bookbinder

14   agreed that it's fair to the defendant.

15        THE COURT:  Here, fine.  We can do it legally

16   correct.  But this isn't Mr. Bookbinder or Ms. Sedky

17   versus Mr. Harris, this is United States of America and

18   you submitted this and you need to be -- the

19   government -- it's not that your positions can't evolve,

20   although at some point if I relied on them, if the

21   defendants relied on them in the theory of the case, I'm

22   not going to change it at the end.  That's something

23   that happened in **DiMasi**, but --

24        MS. SEDKY:  Okay.  At this point we would

25   probably delete the last sentence because we don't think

1   it's applicable to the facts here where you have a

2   product that we believe that we will prove is inherently

3   suspicious.

4          THE COURT:  This is identifying things I need

5   to work on.

6       All right.  So how have you addressed here the

7   fact that a mere buyer/seller relationship is not

8   sufficient?

9          MS. SEDKY:  Well, we say in certain

10  circumstances, so it's not in all circumstance, in

11  certain circumstances a supplier of products to known

12  illegal users can become a party to a conspiracy.

13      So the first sentence we intended to tee up the

14  notion that -- you know, to debunk the idea that any

15  time a supplier sells something to users who then use it

16  illegally become party to the conspiracy.  And then we

17  list what you have to do to fit within those

18  circumstances, namely in order to find them guilty you

19  have to show that they shared the intent essentially to

20  effectuate the criminal purpose.

21      So the first paragraph, we believe, articulates

22  the legal standard -- I'm not sure the defendant

23  actually disagrees with that proposition.  And then what

24  we did was we gave the types of evidence that jurors

25  could use to infer that we have met that legal

1   standard.  That's the purpose of the second paragraph.

2            THE COURT:  Well, I'll look at it.  But *Gee* is

3   a Seventh Circuit decision in what seems to be an

4   analogous case, some box used to steal cable service.

5            MS. SEDKY:  Well, *Gee* -- yeah, I'd actually

6   like to address it if the Court wouldn't mind.

7            THE COURT:  Go ahead.

8            MS. SEDKY:  There were a series of descrambler

9   cases that were out back when descramblers and cable and

10  satellite TV were big and the technology's actually

11  different functionally quite significantly.  In some of

12  the cases, some of the descramblers, they essentially

13  allow the user to just hide and be invisible.  So

14  there's no misrepresentation involved.

15       So in the wake of, um, *Neder*, that imposed a

16  materiality standard on the wire fraud statute, some

17  courts have backed away from some of the descrambler

18  cases depending on which of the two technologies was

19  involved, whether it was cable or satellite.

20       So I think it's *Coyle*, C-O-Y-L-E, which we cited

21  in our opposition to the motion, that was the technology

22  --

23            THE COURT:  Your opposition motion to what?

24            MS. SEDKY:  To the motion to dismiss.  We were

25  on a bunch of these descrambler cases and -- and, I'm

1    sorry, I've read a lot of cases and, um, I believe it's

2    *Coyle*, it's a Fourth Circuit case, and that is the one

3    -- it teases out the technology and says in that case,

4    very analogous to Mr. Harris's products, that

5    descrambler essentially allows the user to take a file

6    from another user and masquerade as the legitimate

7    subscriber.  And that case is still standing.  No one

8    has been challenging that technology.

9         Now, some of it -- and I can't remember whether

10   it's cable or satellite, but the silent-mode cases --

11        THE COURT:  Ms. Sedky, you're beginning to

12   sound like the boy who knew how to spell banana, but

13   didn't know when to stop.

14        MS. SEDKY:  Okay.  Thank you, your Honor.

15        THE COURT:  You're very technical and I'm

16   confident that the Seventh Circuit case was after *Neder,*

17   which required materiality.  I'm not quite sure what one

18   has got to do with the other one.

19        MS. SEDKY:  We believe that the technology is

20   different and materially different.

21        THE COURT:  But I think -- well, that's

22   what -- so you think -- well, let's see.

23        (Pause.)

24        THE COURT:  Let me put it this way.  Just

25   glancing at your Proposed Instruction 2, I doubt that it

1   is adequate to distinguish buyer/seller in the context

2   of this case where the interdependence of the buyers is

3   going to be important and I'll give you --

4              MS. SEDKY:  We could certainly outline --

5              THE COURT:  Fine.  I'm going to give you until

6   the 14th to supplement your jury instructions on this at

7   least and in any other way that emerges from the

8   discussion we're having.  Both of you.

9        But does the defendant agree that there should be

10  a buyer/seller instruction?

11             MR. McGINTY:  Oh, absolutely.

12             THE COURT:  And did you give me one?

13             MR. McGINTY:  I did and it's in the

14  instructions that we've submitted.

15             THE COURT:  And I think that's --

16             MR. McGINTY:  And we wouldn't object to

17  exactly what the Court is suggesting that we add here.

18             THE COURT:  Well, I didn't suggest anything

19  specific.

20        But, I mean, you know, these are getting at, I

21  think, important nuances.  You know, even you and

22  Mr. Bookbinder apparently -- aren't in complete

23  agreement.  The United States is going to have to state

24  its position and then I'm going to decide.  I think you

25  have two goals, one is to get a conviction and the other

1      is to have it affirmed on appeal.

2           Okay.  All right.  I thought that *Loder*, 23 F.3d

3      586, 590 at 591, was a helpful decision on aiding and

4      abetting.  This goes to the mail fraud theory.  Um, it

5      provides that, among other things, to aid and abet the

6      defendant here, Mr. Harris, um, would have to share the

7      specific intent to defraud of the principal.  The

8      government will have to prove the defendant knew he was

9      furthering wire fraud and would not have to be shown to

10     have known all the details, but a general suspicion

11     would not be enough.  That's sort of the black letter

12     law.

13          And it leaves me with a question of whether --

14     that I've raised before, whether you can aid and abet a

15     crime either by a person that you don't know by name or

16     pseudonym, um, and I don't know what -- I didn't get a

17     sense from the government's trial brief that, except

18     perhaps with regard to Mr. Hanshaw, there's going to be

19     any evidence from which a jury could infer that

20     Mr. Harris knew that the other three named

21     co-conspirators from Massachusetts were committing wire

22     fraud.

23          MS. SEDKY:  Thank you, your Honor.

24          We believe that he had very extensive

25     communications with Mr. Hanshaw directly and also one of

the three users was a reseller.  And we will prove at

trial that he bought thousands of dollars worth of

products, many, many, many different iterations over the

span of an entire year, from Mr. Harris.

THE COURT:  Which one is that?

MS. SEDKY:  I can't remember.

(Pause.)

MS. SEDKY:  It's Mr. Larosa.

So we have sort of two super users and then we

have two who are admittedly, you know, maybe has one or

two transactions.

THE COURT:  Well, a super reseller is not

necessarily a super user.  It goes back to the --

MS. SEDKY:  Well, he used it for a year

himself.  I don't know how many of those products he

bought and used himself, but he bought hundreds of

products and resold them to others.

And so he had a -- but let me just step back and

say that we don't believe that we have to prove direct

communication to establish aiding and abetting and we're

happy to supplement.  But I have some case citations

that we've researched and I'd be happy to submit it to

the Court.

THE COURT:  I don't know what you've been

saving it for.

1          MS. SEDKY:  I just got them this weekend in

2      case it came up and I apologize if --

3          THE COURT:  Well, it's come up, it's come up

4      before.  I have a substantial question as to whether

5      somebody can be convicted based on a theory of aiding

6      and abetting unless he knows a particular person is

7      committing a particular crime.

8          MS. SEDKY:  Well, and to step back to the

9      evidentiary piece, the factual piece, Mr. Harris, um, we

10     will prove at trial was in charge of the customer

11     records and the customer records show the name and the

12     physical address and what they brought and when, and he

13     also, um, was at certain times personally in charge of

14     shipping.  And each time someone bought a device from

15     him -- and we will prove this through our own undercover

16     purchase, that Mr. Harris would send out an e-mail to

17     that person, "Dear," name of purchaser, and it would

18     have the person's name in there, "Here's your -- here

19     are some details about your purchase," and then he also

20     kept track of who his users were.  He instituted a

21     licensing requirement where they would have to get a

22     license from him.  He had a decryption key that they had

23     to use to unlock.  He started decrypting his -- he

24     thought people were stealing his intellectual property

25     and copying and stealing from him and so he started

```
 1     locking down his software program.  And what he did was
 2     he also had Isabella Lindquist, and we will have her
 3     testify, that she coded, at his instruction, a feature
 4     into each modem that would have it phone home, phone to
 5     the TCNISO website, to ping the TCNISO website so he
 6     would know the IP address of all of his users at a
 7     time.
 8            So there were -- you know, there were electronic
 9     communications back and forth in the ways of e-mails and
10     product ordering and we will also brief the legal issue
11     of whether and how much proof an aider and abetter needs
12     to have.
13            THE COURT:  Well, if you've got some cases,
14     I'm ordering that you provide them to us by 3:00 this
15     afternoon.
16            MS. SEDKY:  We will do so.
17            THE COURT:  Give them to me and to Mr. McGinty
18     and then we'll see what's going to be briefed.  But this
19     --
20            And, Mr. McGinty, what would you like to say about
21     the aiding and abetting, particularly whether you have
22     to, as a general matter, prove the evidence, you know,
23     to know the particular person is committing a particular
24     crime?
25            MR. McGINTY:  Well, the government's argument
```

1    is largely that product capability dictates culpability

2    and what their argument is is that in the sale of the

3    item to the customer, the aiding and abetting is

4    established by virtue of that product capability.  Um,

5    so they want an instruction that says "capability equals

6    culpability," they want that both for principal

7    liability, they want it for conspiracy, but they also

8    want it for aiding and abetting, and that's a

9    proposition that the cases don't support.

10          And just to back up a second.  Their proposed

11   instruction is that in certain circumstances -- and the

12   point of a jury instruction is to identify the

13   significance of those circumstances, but in certain

14   circumstances a seller can be culpable for the conduct

15   of a product purchaser, and what they haven't done is

16   identified what modicum of sufficiency is necessary for

17   a jury to find that.

18          Now, one of the things we've tried to do is to say

19   that the Court has to make preliminary rulings sort of

20   baseline on what is and is not unlawful and in

21   connection with the sale of modems.  The government says

22   that trading MACs is unlawful and that it's part of

23   culpable conduct for the purposes of the jury's

24   consideration of guilt.  They haven't supplied any

25   support for the claim that MACs are confidential and the

1    trading of them is --

2              THE COURT:  My present reaction to that is

3    that this is hardly a final answer, this is, you know,

4    what I want to test and I expect will evolve, that the

5    answer to that is, um, whether it was done with intent

6    to defraud.  In other words, you know, if somebody

7    collected MAC addresses the way kids used to collect

8    baseball cards, you got a MAC address and you just put

9    them up on your wall and looked at them rapturously,

10   that, you know, wouldn't be illegal.  If you're trading

11   MAC addresses to get something of value by virtue of a

12   misrepresentation and you use a wire in furtherance of

13   that scheme, you know, then getting the MAC addresses is

14   part of a scheme to defraud.

15             MR. McGINTY:  Well, can I sort of peel that

16   apart because I think the charges here do this.  The

17   government has presented the scheme in two different

18   ways in substantive counts, they charge the scheme in

19   the sale of the product and they allege that the

20   communication or the delivery of the items to the person

21   or the communication about the sale of the items to that

22   person, um, is integral to the scheme.

23             THE COURT:  Well, in furtherance of the

24   scheme.

25             MR. McGINTY:  In furtherance of that scheme.

1     They allege separately that each customer, in his use of

2     the item, is, um, violating the wire fraud statute, the

3     wire fraud, um, the wire component being the access to

4     the internet occasioned by the use of the product.

5          So they've alleged in their substantive counts

6     two different schemes.

7               THE COURT:  No.  Let me put it this way.  Let

8     me tell you how I understand it and then they can

9     address it.

10               MS. SEDKY:  We agree with you, your Honor.

11    No, I'm just kidding.

12               THE COURT:  They've alleged a scheme and then

13    they've alleged certain wire communications in

14    furtherance of the scheme.  I so far interpret it as an

15    overarching scheme and that, in *DiMasi*, when I

16    instructed on furtherance, and this is in the

17    instructions I gave you previously.  Just a second.

18               (Pause.)

19               THE COURT:  I instructed that:  "The mailing,"

20    in that case, "does not have to be essential to the

21    scheme or be itself fraudulent, however it must be made

22    as part of an attempt to execute or accomplish the

23    scheme."  So if there were an overriding scheme to, you

24    know, deprive ISPs of money or property by

25    misrepresenting their MAC addresses, that, in my current

1    conception, would be the scheme.  Let's see if the

2    government agrees.  And then some of the wires, as I

3    understand it, um, were wires ordering devices from

4    Mr. Harris and that could be part of the scheme because

5    you need the device to execute the scheme, and the goal

6    of the scheme was to get internet service without paying

7    for it, either for free or not paying the premium price,

8    so those wires would be in furtherance of the effort to

9    accomplish the scheme.  That's how I think about it at

10   the moment.

11        Is that -- hold on just a second.  Is that the

12   government's theory?

13             MS. SEDKY:  Yes, it is, your Honor.

14             THE COURT:  Okay.  Go ahead.

15             MR. McGINTY:  You know, what's important here

16   is the government is saying that they are of the view

17   that the capability, the inherent, um, capability of

18   this to steal service is a sufficient predicate for

19   culpability.  So the fraud, the wire fraud here is in

20   the sale of the item.  But that's --

21             THE COURT:  And --

22             MR. McGINTY:  If they an instruction, and I

23   think they can support an instruction, that capability

24   supports a conviction, aiding and abetting or principal

25   liability or conspiracy, that product capability

1    supports that, then their conspiracy is complete upon

2    the delivery.  Whether there's a secondary use of the

3    product or not is not --

4              THE COURT:  Well, it could be.  No, it could

5    be.  I told you about *Potter*.  Remember you can have a

6    scheme that -- in a mailing or a wiring, that in

7    furtherance of the scheme, that doesn't actually get any

8    money or property.  It could be aborted before it got to

9    that point.

10             I -- you know, I'm trying to do what I do in every

11   case, one, listen to you, but, two, I don't want -- I

12   would prefer we not get to the final jury instructions

13   and you say, "Judge, why are you going to instruct that

14   way?  We've pegged our whole defense to the assumption

15   you're going to instruct some other way."

16             And I'll consider *Direct Sales*.  First of all, the

17   government will have to decide which of the prosecutors

18   speaks for the government on this, but -- you know, I'll

19   give what I consider to be an accurate, balanced-type

20   description of the law.

21             But I think -- I had understood both the law

22   generally and the government's theory particularly

23   differently than you described it today, which is how

24   you described it to me before, but as I've studied this

25   over the last couple of days, I got to the point that I

```
 1     just explained to you.  So you want to think about it.
 2     And it's not the last time we're going to discuss it,
 3     but you may want to consider what I just said to you.
 4          As I told you -- and I am, you know, limiting the
 5     time that I can devote to this today.  I think the
 6     defendant's reliance on 47 United States Code, Section
 7     230, is misplaced.  There may be no liability for
 8     defamation, um, to Mr. Harris for hosting a website, if
 9     somebody does something that was defamatory.  It's state
10     law.  But it doesn't -- you know, the First Amendment
11     precludes, you know, statements on the website -- well,
12     you know, conspiracies often, although not always,
13     involve some statements and the First Amendment doesn't
14     protect them.  But if it's a statement that expresses an
15     intention to agree on an intention to commit a crime,
16     it's not protected by the First Amendment or this
17     statute, is my current conception.
18               MR. McGINTY:  Well, your Honor, if I might
19     just recite the words of the statute.
20               THE COURT:  Hold on a second.  Let me get it.
21               MR. McGINTY:  This is 47 U.S.C., Section 230.
22               THE COURT:  Just one second.  Go ahead.
23               MR. McGINTY:  "No provider" --
24               THE COURT:  I'm sorry.  Which section?
25               MR. McGINTY:  This is C(1), Section 230.  So
```

1    it's "Treatment of Publisher or Speaker.  No provider or

2    user of an interactive computer service shall be treated

3    as the publisher or speaker of any information provided

4    by another information-content provider."  And what this

5    provides is that a provider of interactive computer

6    service, which would be here for him, is not treated as

7    the publisher or speaker, um, of content that is posted

8    by another person.  And here what we have are -- and we

9    haven't really gotten to the co-conspirator part of this

10   and the claim that --

11          THE COURT:  That's where this is going.

12          MR. McGINTY:  -- that these forums are somehow

13   admissible.  You've got the potential for someone to

14   post on the forum their own ideas about what they can do

15   with the modem, and if they say on there, "Is there

16   someone who could get me a MAC address," is Harris on

17   notice that he's responsible for that content?

18          THE COURT:  Well, let me put the question to

19   you.  Is it your contention that this section trumps

20   Rule of Evidence 801(d)(2)(E)?

21          MR. McGINTY:  The trump is -- in order for it

22   to be a statement of a co-conspirator, there are a

23   number of requirements for it.  The person has to be

24   identified.  Here they're not.

25          THE COURT:  No, I understand all of that, but

1      please answer my question.

2             MR. McGINTY:  I will.  The answer is "yes,"

3      and why?  801(d)(2)(E) is a -- is based on a theory of

4      adoptive admission, the theory of the rule is that it is

5      consequential --

6             THE COURT:  No, it's based on a theory of

7      agency.

8             MR. McGINTY:  I'm sorry.  Of agency.  I

9      misspoke.  But it's the idea that a person who is part

10     of your conspiracy that you, in effect, permitted them

11     as speaker on your behalf, um, what this statute does is

12     it reflects an enactment by the Congress saying that

13     there is no such agency, the party that runs the forum

14     is not responsible for the content.  And there are

15     considerations that cause Congress to express this.

16     Among them is the First Amendment right of the speaker.

17     Among them are liability issues.  But there's a flat

18     statement here that makes that third-party statement of

19     some other person not your statement in terms of, um --

20            THE COURT:  Well, that's the first time I've

21     understood you to be making that argument, or perhaps I

22     misunderstood you, but I didn't have all that much time

23     to understand you, and then that's one we should brief

24     further, too.

25            What's the government's position on it?

1              MR. BOOKBINDER:  Your Honor, essentially we --

2      first of all, our core position is that this statute

3      talks about civil liability --

4              THE COURT:  Well, actually where does it talk

5      about civil liability?  I read about that in the

6      *Universal* case, but I didn't.

7              MR. BOOKBINDER:  Well, your Honor, it may not

8      be so much that it -- well, I don't have the section in

9      front of me, I'm afraid.  That's -- it had something to

10     do with the rules of evidence and, um, I don't think

11     there's anything in there that addresses certainly the

12     use of statements in criminal cases.  But Mr. McGinty

13     might be right in one sense which is the sense that if

14     the only evidence you had linking someone -- linking

15     people together, linking let's say a speaker with the

16     person who publishes the website, was that this person

17     had made a post on someone else's website, um, what the

18     statute seems to say is that the publisher -- the person

19     who sets up the website is not considered responsible

20     for that post, for example, and therefore might not be

21     responsible for the content.

22          In this case we've got people, at least the ones

23     we're seeking to offer as co-conspirator statements,

24     there are other links between them, they are customers

25     of Mr. Harris's, meaning they've either bought a product

1    or they've paid a membership fee to be a member of his

2    forums.  And so we're not relying on the fact that they

3    may have post as the link between them that establishes

4    this kind of a connection.  And so therefore I think

5    that kind of addresses the concern of the statute.

6              THE COURT:  Well, these are interesting

7    issues.

8         All right.  I'm going to have to stop momentarily

9    and we haven't actually gotten to the motions in

10   limine.

11        I'll tell you what some of my main questions are.

12   And I think when we resume tomorrow morning, which we'll

13   do at 10:00, um, the defendant's -- well, let me ask you

14   this question, because I haven't finished going through

15   the motions in limine the way I want to.

16        Do the defendants raise any points -- does the

17   defendant raise any points in his motions in limine that

18   are not raised and addressed by the defendant as well as

19   the government with regard to the government's motions

20   in limine?  Are they essentially mirror images?

21             MR. McGINTY:  I'm sorry.  Is there anything in

22   my view --

23             THE COURT:  Yeah, so far I've read the

24   government's recently-filed memo in support of its

25   motions in limine and your response.  I haven't yet read

```
 1     the -- your memo.  Does it raise some issues that are
 2     not raised in the government's submission?
 3               MR. McGINTY:  Um, the particular thing it
 4     raises and it's, um -- I think the government elects not
 5     to answer the question.  As I understand the
 6     *Petrozziello* issue, it is, is there a conspiracy?  Was
 7     the statement of the -- was the speaker's statement part
 8     of and in furtherance of that conspiracy?  The
 9     government --
10               THE COURT:  Well, that's not it necessarily,
11     but you raise a point that requires some focus in this
12     case.  I think, as a general proposition, the
13     government's right, the statement can come in under Rule
14     801(d)(2)(E) even if it was not in furtherance of the
15     conspiracy charged, or any charged, you know, even in a
16     case that doesn't charge a conspiracy, but it has to be
17     a conspiracy with Mr. Harris.  And if it's not the
18     conspiracy charged in the indictment, at a minimum,
19     you're right, I want to know what conspiracy it is and
20     whether there are Rule 403 considerations that might
21     operate to exclude it if it's not this charged
22     conspiracy.
23               MR. McGINTY:  So the difficulty is the
24     government has said either way we get it in and what I
25     don't know is either way what, which is the conspiracy
```

1    that you say that supports your theory?

2          THE COURT:  Yeah, I know, you've educated me

3    to that point.  Let me -- well, because of my time

4    constraints.  I have to preside at a meeting with my

5    colleagues.

6          Here, you've told me who are the alleged

7    co-conspirators for the purpose of making *Petrozziello*

8    rulings.  *Sepulveda* was the initial First Circuit case

9    that established what I think is now widely recognized

10   as the rule that, in fact, Rule 801(d)(2)(E) codifies,

11   that you need something more than the statements

12   themselves.

13         The government, in some of these instances, is

14   relying on Mr. Harris's statements and I think,

15   depending on what those statements are, that it might

16   be, in some instances, enough.  But I think with regard

17   to each alleged co-conspirator for these purposes and

18   each -- and each statement, I want the government to be

19   able to show me what, or tell me now, what the extrinsic

20   evidence is going to be.  Not today.  Tomorrow.  What

21   the plus is going to be.  And again, you should look in

22   my *DiMasi* instructions.  And *Richardson*, which is cited

23   there, 225 F.3d 46 at 53, um, I said:  "A defendant's

24   membership and conspiracy must be proved by evidence of

25   his own words and actions.  In deciding whether a

1    defendant was a member of the conspiracy alleged in this

2    case, you should consider the direct and circumstantial

3    evidence of his own acts and statements."  That's what

4    the First Circuit says.  "Such evidence may include acts

5    or statements of other defendants and another

6    co-conspirator, Lally, only to the extent they are

7    evidence of the words and actions of the defendants you

8    are considering."

9         So I had some difficulty -- that's how I

10   reconciled *Richardson* and *Petrozziello*.  In other words,

11   I don't think you just look at -- I don't think I just

12   look at what, say, Mr. T said, I look at other evidence

13   of whether Mr. T was a member of the conspiracy.  If

14   Mr. Harris had said to Mr. Phillips, "I've recruited

15   Mr. T to be part of our conspiracy, here's what he's

16   going to do, here's what we're going to pay him," that

17   would be evidence, in my current conception, that Mr. T

18   was part of the conspiracy.  The defendant can argue

19   about that, as a general proposition, and he could also

20   argue about whether the statements of Mr. Harris here,

21   that the government is relying on say with regard to

22   Mr. T, are sufficient.  I have that question.  That

23   we'll talk about tomorrow.

24        My tentative view is that the defendant does not

25   have to know a co-conspirator's real name, but the

person has to be identifiable in some way by me to make

a **Petrozziello** ruling.  So you've identified Mr. T, but

you have what I think are unidentified people on chats

and posts -- and you'll to have to tell me what a chat

is and what a post is tomorrow, but I, at the moment,

you know, have a question -- you know, I have a doubt

that I could admit those statements as co-conspirator

hearsay and I would -- and I also have some skepticism

about whether there's another basis for admitting any of

it, and if there is, whether they should nevertheless be

excluded under Rule 403.

        I have a question and I'll look at -- I didn't

look at the cases, but I think I'm familiar with the

concept, of how an adoptive admission standard should

operate with regard to chats?  In other words, I think

an adoptive admission, as I understand it, is a

statement that a reasonable person would ordinarily, um,

refute if it wasn't true.  If somebody said to me, "That

was, you know, great last night when we robbed the bank

and got away with it."  If I didn't rob the bank, um, a

reasonable person, I think, would say, "What are you

talking about?"

        I don't do chats, but, you know, these things are

going back and forth and they go very quickly and they

don't seem to be entirely linear or coherent, you know,

1    they're jumping around and are very cryptic.  So would a

2    reasonable person disagree with something in one of

3    these chats?  I've got a question.

4        And I think I will -- and we'll start tomorrow

5    with the defendant's opposition to the government's

6    motion in limine, because it's starts with some -- well,

7    the opposition is mainly a discussion of the applicable

8    law, like a verbal act.  I do think the government may

9    have too broad a view of what's a verbal act.  You know,

10   the defendant -- the government says, "Well, we're not

11   offering this for the truth, we're offering it for

12   context," but it may not -- I think there's at least one

13   case that said, you know, it doesn't provide any

14   meaningful context unless it's true.

15       So I think a lot of this is -- I'm going to end up

16   -- I'm inclined to analyze it, but closely, under the

17   co-conspirator hearsay provisions.  And it's true, in

18   many cases, that I can conditionally admit something,

19   but as I told you previously, I also have the

20   discretion, if I thought it was appropriate, you know,

21   to either do voir dires on whether this is going to link

22   up, but that would be trying the case twice.  But it

23   would require the government to put the linking evidence

24   first.  I'm not inclined to do that at the moment, but I

25   do want more specificity on how the government's going

1   to prove --

2        I think I directed you to give me today something

3   in writing on the names of the alleged co-conspirators

4   for *Petrozziello* purposes?  I think I did.

5            MR. BOOKBINDER:  Yes, your Honor.

6            THE COURT:  You gave me the names.  But do

7   that this afternoon.

8            MR. BOOKBINDER:  Yes, your Honor.

9            THE COURT:  And you don't have to put this in

10  writing for today, you can make it a little later, do it

11  at 3:30 or something, if you want to supplement it.

12  But, you know, what's going to be the plus, what's going

13  to meet the requirements of *Borgelay*, Rule 801(d)(2)(E),

14  *Sepulveda*?  Because what I don't want to do is get to

15  the end of the government's case, you know, find that

16  I've conditionally admitted evidence as co-conspirator

17  hearsay that the government has not proven is admissible

18  and then have to contend with the foreseeable motion for

19  a mistrial.  Mr. Harris will say there's prejudice, that

20  the jury's not going to forget or disregard what they've

21  heard.

22        And I would encourage the government to think

23  about -- think further about the evidence it wants to

24  offer.  In other words, what do some of those chats and

25  posts really add?  You know, what are they relevant to?

1    Because these are also 403 considerations.  Do they show

2    that Mr. Harris knew something?  Don't you have a lot of

3    other evidence that shows he knows it?  You may want to

4    say, you know, "We won't put that in our case in chief,

5    we'll wait to ask you to put it in rebuttal."  And you

6    want to think about how you're going to respond to a

7    question about Rule 403.  All right?

8         Let me see my calendar.

9              (Pause.)

10             THE COURT:  Here, why don't you come in at

11   10:30 tomorrow and it will give me a little more time to

12   catch up with you.

13        All right.  The Court is in recess.

14             (Adjourned, 12:45 p.m.)

15

16             C E R T I F I C A T E

17

18        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

19   hereby certify that the forgoing transcript of the

20   record is a true and accurate transcription of my

21   stenographic notes, before Chief Judge Mark L. Wolf, on

22   Tuesday, February 7, 2012, to the best of my skill and

23   ability.

24   /s/ Richard H. Romanow 11-06-12
     _____
25   RICHARD H. ROMANOW   Date