1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3                              No. 1:09-cr-10243-MLW

4

5     UNITED STATES OF AMERICA

6

7     vs.

8

9     RYAN HARRIS

10

11                        * * * * * * * * *

12

13                        For Hearing Before:
                      Chief Judge Mark L. Wolf
14

15                        Motions in Limine

16

17                     United States District Court
                   District of Massachusetts (Boston.)
                   One Courthouse Way
18                 Boston, Massachusetts 02210
                   Wednesday, February 8, 2012
19

20                        * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
23               United States District Court
         One Courthouse Way, Room 5200, Boston, MA 02210
24                 bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    ADAM J. BOOKBINDER, ESQ.
          United States Attorney's Office
 4        John Joseph Moakley Federal Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          (617) 748-3112
 6        E-mail: Adam.bookbinder@usdoj.gov
     and
 7    MONA SEDKY, ESQ.
          U.S. Department of Justice
 8        601 D. Street, N.W.
          Washington, D.C. 20530
 9        (202) 353-4304
          Email: Mona.sedky@usdoj.gov
10        For the United States of America

11

12    CHARLES P. McGINTY, ESQ.
          Federal Public Defender Office
13        District of Massachusetts
          51 Sleeper Street, 5th Floor
14        Boston, Massachusetts 02210
          (617) 223-8080
15        E-mail: Charles_mcginty@fd.org
          For the defendant

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2               (Begins, 10:30 a.m.)
 3               THE CLERK:  The United States of America
 4     versus Ryan Harris.  The Court is in session.  You may
 5     be seated.
 6               THE COURT:  Good morning.  Would counsel
 7     please identify themselves for the record.
 8               MR. BOOKBINDER:  Good morning, your Honor.
 9     Adam Bookbinder and Mona Sedky for the United States.
10               MR. McGINTY:  Your Honor, for Ryan Harris,
11     Charles McGinty from the Federal Defender's Office and
12     with me is Christine Demaso, who's a legal writing
13     attorney from my office.  Good morning.
14               THE COURT:  Good morning.  And is Mr. Harris
15     on the telephone?
16               MR. McGINTY:  He is, your Honor.
17               THE DEFENDANT:  I'm here.
18               THE COURT:  Okay.  Thank you.
19          All right.  Since I saw you yesterday, the
20     government made two filings.  One is a list of people as
21     to who -- the request I make *Petrozziello* rulings.  It
22     doesn't include some of the people who are mentioned
23     yesterday, such as "X-factor," "Joe Tecno," and
24     Hanshaw.  Were all of those omissions deliberate?
25               MR. BOOKBINDER:  Yes, your Honor.  Um, we have
```

1  taken heed of the Court's suggestion and we've sort of

2  rethought what we're going to offer and we've cut down

3  both on the number of people and also the number of

4  posts and chats and things like that.

5          THE COURT:  Excellent.  So we're going to

6  focus today on going through the evidence you continue

7  to wish to admit.

8      And then there were three cases on aiding and

9  abetting, which I read.  I actually -- it brought one

10 issue into somewhat sharper focus.  One of those cases,

11 perhaps *Lawson*, um, but in any event, the case about

12 altering -- the conspiracy to alter weapons, um, noted

13 that there's insufficient evidence to convict on an

14 aiding and abetting theory, but it was sufficient on a

15 *Pinkerton* theory, and I expect that I would, as I did in

16 *DiMasi* in the instructions I gave you, um, if the

17 government survives the Rule 29 motion, which is

18 foreseeable, um, instruct on all three of those theories

19 of liability, conviction for having committed personally

20 every element of mail fraud, aiding and abetting, and

21 *Pinkerton*.  That may be of some practical significance.

22 So that's one.

23     Has the defendant or have the parties talked any

24 further about whether the -- whether both of the agents

25 should be subject to the sequestration order or whether

1      only one agent should be in the courtroom?

2           MR. McGINTY:  Um, we have not.  And I am, um,

3      since this is an issue not only for today, but also for

4      the trial, um, I wanted to reflect further on -- in

5      terms of, you know, further trial preparation, um,

6      whether I would or would not agree or would not object

7      to the presence of the second agent.  So I would ask the

8      Court for --

9           THE COURT:  Here's -- I had some very quick

10     research done and I think you'll find there's a split in

11     the circuits on whether I have the discretion to permit

12     both of them to be here.  I'm inclined to think I do.

13     At various times, and usually probably it's been

14     briefed, experts for both sides have been in the

15     courtroom and regular witnesses have been excluded.  But

16     that may have been my -- it may be, you know, that

17     rather than deciding this fascinating issue, um, which

18     you'll have to brief, if there's going to be an enduring

19     dispute and the government continues to want to have

20     both of them here, that I'll ask you is there particular

21     testimony that you would like a particular agent

22     excluded for?  Because if I assume I have the

23     discretion, it would be reasonable if I could say to the

24     government, "You could have one for the whole case,"

25     because I think when you look at the First Circuit cases

1      you'll see that it's totally up to the government.

2           But what I can do though is control the order of

3      the witnesses.  For example, I could require the

4      government witness to testify first before I heard

5      anybody else testify, if it was sufficiently

6      significant, and I could also, if I permitted both of

7      them to be in the courtroom, at your request, either

8      with the agreement of the government or if you're

9      persuasive, say they could both be in the courtroom

10     generally but each of them had to be excluded for some

11     particular testimony.

12          So there are various ways to do it, but if the

13     government still wants to, and it turns out that the

14     defendant objects, um, then you should each file memos

15     on this next Tuesday, and that's the 14th.

16               MR. McGINTY:  And, again, I think this is in

17     the category of things that we can work out amongst

18     ourselves.

19               THE COURT:  I hope so.  But I just gave you,

20     you know, a couple of practical alternatives.

21               MR. McGINTY:  All right.  May I, your Honor --

22     I noticed that Mr. Riley's here.

23               THE COURT:  That's the next matter on my list.

24               MR. McGINTY:  I'm sorry?

25               THE COURT:  On the issue of travel.

1          Well, actually, maybe I should ask the

2    government.  Who's the government's representative in

3    the courtroom today?

4               MR. BOOKBINDER:  Um, today, as yesterday, your

5    Honor, is FBI agent, Special Agent Russell.

6               THE COURT:  All right.  I wanted to next ask

7    where -- whether there are any open issues that I need

8    to know about and address regarding Mr. Harris's travel

9    and lodging?

10              MR. McGINTY:  I think the answer to that is

11   "no."  As I understand it, once the Court signs the

12   order, the marshals will make the arrangements for the

13   flight.  Mr. Riley tells me that, um, he will provide a

14   T pass, he will provide arrangements at the Y for both

15   transportation also for overnights, um, while Mr. Harris

16   is here.  But that the marshals will take care of

17   booking the flight and making sure he's here on time.

18              THE COURT:  Well, if somebody gives me the

19   motion right now, I'll allow it.

20              MR. McGINTY:  Well, your Honor --

21              THE COURT:  Oh.  Mr. Hohler will print it out.

22              (Pause.)

23              THE COURT:  All right.  I've endorsed the

24   motion "allowed" and it goes on to say:  "The marshal

25   service shall arrange for the defendant to arrive in

1     Boston no later than February 20, 2012.  Pretrial

2     Services shall arrange for his lodging."  Okay?  And is

3     the 20th still the date you request?

4               MR. McGINTY:  It is, your Honor.

5               THE COURT:  Okay.

6               MR. RILEY:  Thank you, your Honor.

7               THE COURT:  Thank you very much, Mr. Riley.

8               (Mr. Riley leaves.)

9               THE COURT:  All right.  I think it would be

10    valuable to focus now on the motions in limine.  We'll

11    start with the government's.  I think a useful way to do

12    this will be to start with the government's memorandum

13    in support of its motion in limine, Docket Number 94.

14    I've now read the defendant's motions, too, and the

15    supporting memos and many of the key cases.

16        I think if we go through this form we'll identify

17    essentially what the government's eliminated.  In fact,

18    maybe I'll have them tell us that right up front.  And

19    then a number of the legal issues are, you know,

20    embedded in the particular proposed submissions.

21        But is the government able to identify, at least

22    generally and quickly, what it's no longer proposing to

23    introduce?

24               MR. BOOKBINDER:  Yes, your Honor.  We'll do

25    that and maybe the easiest way to do it is to go through

1    -- um, I can tell you where in this memo the discussions

2    are.

3                THE COURT:  Okay.

4                MR. BOOKBINDER:  And the things we are

5    eliminating are starting, I believe, on Page 10 of the

6    memo.  Its heading is H, Exhibit 5, Page 16.  And there

7    are two excerpts there.  There's the first one, it's

8    just a couple of lines long, that one we're not going to

9    offer.  It's from March 28th, 2009.

10                THE COURT:  So these are matters relating to

11   Mr. Phillips?

12                MR. BOOKBINDER:  Yes, Mr. Phillips.

13                THE COURT:  Okay.

14                MR. BOOKBINDER:  So that first excerpt is

15   out.  There are more for Ms. Lindquist.

16          On the next page, Page 11, the bottom of that

17   page, um, B, that Exhibit 6, Page 1, that excerpt, that

18   one is out.

19                THE COURT:  Okay.

20                MR. BOOKBINDER:  Page 12, that whole excerpt

21   is out.

22                (Pause.)

23                THE COURT:  Okay.

24                MR. BOOKBINDER:  Um, your Honor, on Page, um,

25   15 and 16, there are a series of excerpts that we put

1    there to highlight information showing that Mr. T was a

2    co-conspirator.  Um, the one -- one on the bottom of

3    Page 15, we are going to seek to offer as well, as well

4    as the first one on the top of Page 16.

5              THE COURT:  Okay.  So we'll come back to this.

6              MR. BOOKBINDER:  We'll come back to it.

7              THE COURT:  But that's still in.

8              MR. BOOKBINDER:  Right.  So the excerpt at the

9    top of Page 16 on April 6th, that one we are -- that is

10   still in, we're still seeking to offer that.

11             THE COURT:  Okay.

12             MR. BOOKBINDER:  But the rest of that page.

13             THE COURT:  So April 20 and December 10?

14             MR. BOOKBINDER:  Um, April 20 and July 10.

15             THE COURT:  July 10th.

16             MR. BOOKBINDER:  Yes, there's three different

17   excerpts, there's two on the 20th and one on July 10th,

18   and those are all out.

19        Right.  Obviously, your Honor, we will ask the

20   Court to consider them before making a *Petrozziello*

21   finding or at least for the purpose of this discussion

22   as to evidence of Mr. T's participation, but we don't

23   intend to offer them substantively.

24             THE COURT:  All right.  So you're asking that

25   I make a *Petrozziello* ruling on some evidence that's not

1    been submitted to the jury.

2              MR. BOOKBINDER:  Right.  But to the extent

3    that the Court is going to make that kind of finding

4    based on a pretrial discussion, um, we'd ask the Court

5    to --

6              THE COURT:  Well, no, I'm not doing that.  I

7    mean, I'm deciding whether to conditionally admit it.

8              MR. BOOKBINDER:  Fair enough, your Honor.

9              THE COURT:  To be a little more precise.  But

10   are you going to be asking me to consider more than the

11   evidence at trial in making any of the *Petrozziello*

12   rulings?

13             MR. BOOKBINDER:  If I could have a minute,

14   your Honor, to discuss that with co-counsel?

15             (Pause.)

16             MR. BOOKBINDER:  Um, your Honor, I guess what

17   was -- if it's possible, can we reserve on that question

18   for right now?

19             THE COURT:  All right.  It's just something to

20   get clarified.

21             MR. BOOKBINDER:  Right.  It may be possible,

22   based on the other excerpts, for the Court to make a

23   ruling, and we wouldn't need to use these at trial, but

24   if it's necessary for this evidence to be in as well,

25   then it makes sense for us not to rule them out at this

 1   point.

 2              (Pause.)

 3              THE COURT:  Okay.  I'd have to look at this

 4   more closely, but I think under Rule 104(a), I can

 5   consider evidence that's not, um, given to the jury and

 6   indeed might be inadmissible.  But I'll take a look at

 7   it.

 8              MR. BOOKBINDER:  And we'll look at this

 9   further, your Honor.  It may not be necessary.

10        On Page 17, the excerpt at the top of Page 17, um,

11   that one we'll not be using.

12              THE COURT:  So this is 17?

13              MR. BOOKBINDER:  Page 17, yes.

14              MR. McGINTY:  And, your Honor, if I might ask,

15   in view of the last discussion, does that mean for any

16   purpose?  Does that mean it's being withdrawn and can't

17   be offered by the government for any purpose?

18              MR. BOOKBINDER:  Right.  Yes.

19              THE COURT:  Well, let me ask you this.  I'm

20   not -- and, Mr. Bookbinder, you might want to pause, I

21   think.

22        Are you withdrawing your request to use these

23   statements in the government's case in chief, but

24   reserving your right to use them, for example, to cross-

25   examine Mr. Harris?

1          MR. BOOKBINDER:  Thank you, your Honor, yes,

2     obviously that would be true.

3          MR. McGINTY:  Um, can I --

4          THE COURT:  Go ahead.

5          MR. McGINTY:  Um, that was valuable counsel

6     for the government and --

7          THE COURT:  It wasn't counsel, it was

8     clarification.

9          MR. McGINTY:  And I understand the subtlety.

10    Does that make us -- does that require us to go back and

11    revisit the ones that have already been withdrawn so I

12    can understand exactly what the nature of the

13    stipulation is?

14         THE COURT:  No, I think that -- I think the

15    way to deal with this, if I understand the government

16    correctly, the government's withdrawing its request to

17    offer this in its case in chief.  If the government

18    wishes to offer it for any other purpose, including

19    cross-examination, um, you'll have to let me know and

20    we'll talk about it.  But it's -- I just have to see

21    what the context is and what the particular request is.

22    So we'll proceed in that fashion?

23         MR. BOOKBINDER:  Yes, your Honor.

24         THE COURT:  All right.

25         MR. BOOKBINDER:  Um, your Honor, on Page 18,

1    the excerpts on the bottom of that page, from April

2    20th, um -- well, they're both from April 20th, but

3    under Category D, um, that one we will not be seeking to

4    offer it in our case in chief.

5              THE COURT:  All right.

6              MR. BOOKBINDER:  Um, on Page 19 and 20, the

7    portion of that excerpt that crosses those two pages,

8    the portion that's on Page 19, we are continuing to seek

9    to offer, but the portion on Page 20, we will not.

10              THE COURT:  So starting with the second line

11   there?

12              MR. BOOKBINDER:  Right.  Exactly.

13              MR. McGINTY:  I'm sorry.  I'm not

14   understanding.

15              THE COURT:  So you want to admit through the

16   words "four things I've designed in the past," is that

17   correct?

18              MR. BOOKBINDER:  Yes, correct, that's a

19   continuation of the line, so, yes.

20              THE COURT:  And you want to withdraw the rest?

21              MR. BOOKBINDER:  The rest, yes.

22              (Pause.)

23              MR. BOOKBINDER:  All right.  And for the

24   excerpt below it -- and we can talk about this in more

25   detail later, but the one on the bottom of Page 20, we

```
1    would seek to offer only the statements by Harris in
2    that excerpt.  So we could redact it out, um -- or leave
3    them in if counsel would prefer.
4              THE COURT:  Okay.
5              MR. BOOKBINDER:  On Page 21, the excerpts, um,
6    on that page, we will not seek to offer.
7              MR. McGINTY:  I'm sorry?
8              THE COURT:  Okay.
9              MR. McGINTY:  I'm sorry.  What was that?
10             MR. BOOKBINDER:  Page 21.
11             MR. McGINTY:  Which one?
12             MR. BOOKBINDER:  In the center of that page.
13             MR. McGINTY:  Okay.
14             MR. BOOKBINDER:  As well as the one on the top
15   of Page 22.
16             THE COURT:  Okay.
17             MR. BOOKBINDER:  And then the only other
18   remaining one is the -- on Page 25, as we pointed out
19   yesterday, we realized that the post at the bottom of
20   that page by "P. McGrath," that he is not a customer or
21   a member, so we are not seeking to offer that either.
22             THE COURT:  All right.
23             (Pause.)
24             MR. BOOKBINDER:  I believe that's it, your
25   Honor.
```

1            THE COURT:  So that reduces the number of

2     proposed statements I need to rule on.

3            MR. BOOKBINDER:  Your Honor, since we may be

4     starting with this one, may I also point out, on Page 6,

5     the first excerpt.

6            THE COURT:  Right.

7            MR. BOOKBINDER:  There we would only be

8     offering the bottom portion of that starting with "I'm

9     using a stolen MAC," and that to the end, and not at the

10    top.

11            THE COURT:  All right.

12        Now, we'll go through this, but many of the

13    statements are offered for the truth as co-conspirator

14    hearsay and I'm going to want your representation,

15    explanation of what evidence is going to establish, in

16    addition to the speaker's statement or statements

17    themselves, that he was or she was a member of a

18    conspiracy?  I told you this yesterday.  What's the

19    extrinsic evidence going to be?  Because I want to see

20    if I'm comfortable with conditionally admitting the

21    statements that are being offered as co-conspirator

22    hearsay or, in my view, would only be admissible if they

23    were co-conspirator hearsay.

24            And I also need to know why -- and some of this is

25    more fully explained in the government's response to the

 1    defendant's motion in limine that substantially

 2    overlapped with the government, you know, why the

 3    statements were made during the course of the conspiracy

 4    and in furtherance of it.  My understanding is that

 5    those don't require any extrinsic proof, they require a

 6    finding ultimately by me.

 7        I think that the defendant cited helpful cases on

 8    the limitations on matters that can be properly admitted

 9    or should be admitted.  I think it's discretionary under

10    Rule 403, I would say, for context.  And that's not an

11    expansive concept, um, if it's something that has value

12    primarily for the truth of what's said, to put a

13    particular statement -- you know, to make a particular

14    statement intelligible, I'd be concerned about the

15    admitting of it didn't meet some exception for hearsay

16    -- if it wasn't hearsay because it was a co-conspirator

17    statement or it didn't fit in some exception under Rule

18    803, which I think is not mentioned by the government,

19    but I thought some of these statements might come in

20    under Rule 8033.  We'll see.

21        It won't come up until toward the end of the

22    government's memo, but to the extent there are

23    unidentified speakers, I have particular concerns

24    because I can't make *Petrozziello* rulings about those

25    people who aren't identified even by some pseudonym, but

 1    we'll get to that.  I told you yesterday about -- that I

 2    have a question about how the general adoptive admission

 3    standard ought to apply to *Katz*.

 4             MR. BOOKBINDER:  Your Honor, I believe that,

 5    as we've now structured it, I don't think we have

 6    anything left that we would be seeking as an adoptive

 7    admission.

 8             THE COURT:  Good.  And the defendant has some

 9    authentication issues that we can discuss at the

10    appropriate point.

11        All right.  So let's start on Page 5 and I think

12    I'm going to do the following.  I'm going to ask

13    Mr. Hohler to print out a copy of Document Number 94 and

14    mark it as Exhibit A for the purpose of this case, so

15    then there will be something in the record easily

16    accessible to show what we're talking about.

17        So the government wants to admit -- okay, this is

18    by Phillips, who the government alleges, as I understand

19    it, will testify that he was a co-conspirator up to a

20    certain point.  The conspiracy allegedly went from on or

21    about 2003 to on or about 2009, is that right?

22             MR. BOOKBINDER:  That's right, your Honor.

23             THE COURT:  And he says here:  "I'm using a

24    stolen name and serial for this FTP," and "DerEngel,"

25    you're going to demonstrate or stipulate is Mr. Harris,

that he responds "110k, it seems, right now."  And then

Phillips, known as "YourMoma," um, says something else.

Why does the government say that's admissible and

why does the defendant say it's inadmissible?  And we'll

do some of these earlier ones with particular care,

which once I've made rulings, I think you can predict

how comparable they are to --

MR. BOOKBINDER:  So, your Honor, here what's

happening, what Mr. Phillips is saying, is he's

reporting --

THE COURT:  Why don't you remind me, for the

record, who's Mr. Phillips in this context?

MR. BOOKBINDER:  So Craig Phillips was the, um

-- I believe we said in the indictment he testified he's

the vice-president, that that was the title they agreed

on, of TCNISO.  He was a friend, and it was before the

company started, a friend of Ryan Harris's and they

lived together as roommates at some point during the

conspiracy.

He, um, ran -- well, he was involved in, at least

on sort of the business side of the company, he was the

one who actually filed the incorporation papers, he's

the one who set up the bank account, although Mr. Harris

ended up being the signatory on the account.  And so he

had some role on sort of the business side.  And then he

1    will testify that Mr. Harris gave him some jobs to do,

2    that he responded to some customer service-type calls

3    and, um, had some roles in dealing with customers in

4    that sense.  He was the closest thing that Mr. Harris

5    had to a partner.  But they'll be no evidence they were

6    equal partners, but he was close.  And they also spoke

7    daily, many times a day, through these chats as well as

8    on the telephone.  And that's essentially who Craig

9    Phillips is.

10        And you're right, your Honor, he's pled guilty in

11   San Diego to a misdemeanor computer fraud charge for his

12   participation in this and will testify pursuant to a

13   cooperation agreement.  (Pause.)  Oh, I'm sorry.

14   Ms. Sedky points out to me it's not a misdemeanor, it's

15   a felony that he pled to, but it was not wire fraud, it

16   was computer fraud.

17                 THE COURT:  Okay.

18                 MR. BOOKBINDER:  So that's who he is.

19        And what he's saying here is that he's using a

20   stolen MAC for this FTP, FTP is a file transfer, he's

21   transferring a file over, um, and then he says -- and

22   Harris says, "110k, it seems right now," which 110k is

23   the measure of the speed for the transfer.  And then

24   Phillips says, "And I have my regular house modem,"

25   spelled incorrectly -- and there's a lot of typos

1   obviously in these things, but what I think he says is

2   "I have my regular house modem running completely for my

3   mom and my other computer."

4       And so he's talking about the fact that he has one

5   modem which is using a stolen MAC and getting internet

6   access and then a second one, which is his regular, um,

7   and in which he'll testify was a paid internet service.

8       And the way in which this is in furtherance of the

9   conspiracy is he's telling Harris that, "Hey, this is

10  working.  I'm able to get internet access using a stolen

11  MAC address," um, and -- so he's explaining that, um,

12  you know, that "our products are working and we're being

13  successful, I'm using them myself."  So that would be a

14  way in which it's a statement in furtherance of the

15  conspiracy.

16      Also, as we noted in the memo, your Honor, even if

17  not admitted for the truth, um, it is relevant to show

18  that Harris is at least being told by his partner -- his

19  partner is at least saying that he's using a stolen MAC

20  address to get access.  Whether that's actually true or

21  not, it's certainly some evidence from which one can

22  infer that Harris understood what he was doing.

23          THE COURT:  How is this in furtherance of the

24  conspiracy?

25          MR. BOOKBINDER:  In reporting success,

1    reporting that the product that they are selling and

2    that they are developing is working and, um, that, you

3    know, he's been able to use it.  That's a statement that

4    gives Harris information that's useful to him for the

5    purpose of figuring out "What we need to change?" "How

6    is this working?" or "Are our products working or are

7    they not?"

8              THE COURT:  And, um, does the defendant object

9    to the admission of this statement?

10             MR. McGINTY:  We do.  I mean, this statement

11   may reflect on Craig Phillips' knowledge, um, it may

12   reflect on his conduct.  It's 403 as to Harris.  Looking

13   at the statement --

14             THE COURT:  I'm sorry.  You say 403?

15             MR. McGINTY:  403 in that, um, what the jury

16   could do is infer that because Phillips is engaged in

17   theft of service, that Harris would be as well, and

18   arguably, you know, under 403, that would be an

19   impermissible inference.

20        Now, the statement that is being -- that is being

21   offered here isn't Harris's statement, it's really a

22   statement that Mr. Phillips is making.  So looking at

23   what's said here, the predicate that the government is

24   offering is, "I'm using a stolen MAC and serial

25   number."  That is offered for the truth of the matter.

1    The source of that statement is Mr. Phillips.

2        Implicit, the government argues, inferentially,

3    the government argues, this is an affirmation by Harris,

4    not "I know what you're doing," but that "I approve of

5    what you're doing and it's our products that are doing

6    it."

7            THE COURT:  Okay.

8            MR. McGINTY:  That -- I'm sorry?

9            THE COURT:  Go ahead.  Go ahead.

10           MR. McGINTY:  So that's hinged to the truth of

11   what Phillips says.

12           THE COURT:  The government's seeking to have

13   this admitted primarily under Rule 801(d)(2)(E), the

14   co-conspirator exception, so it would be admissible for

15   the truth.  That's what I'm focusing on.

16       I'm going to permit this statement to be

17   admitted.  As the evidence has been explained to me, I

18   feel comfortable conditionally admitting this subject to

19   final *Petrozziello* rulings at the end of all the

20   evidence under Rule 801(d)(2)(E).  It appears that the

21   government would be able to prove by a preponderance of

22   the evidence -- and not just Phillips' statements that

23   we're focusing on, but his testimony as well, that he

24   and Mr. Harris were engaged in a conspiracy to provide

25   internet service providers -- to deprive internet

1   service providers of payment for service or for a

2   premium service and that the wires were used in

3   furtherance of it.  So that would be a wire fraud.

4       This set of statements by Phillips was in the

5   period of the conspiracy.  It would further the

6   conspiracy because, as Mr. Bookbinder argued, um, it can

7   be regarded as co-conspirators discussing whether the

8   product works and if not how it should be improved.

9       Rule 403 doesn't operate to exclude it, it's

10  relevant to show Mr. Harris's knowledge that the product

11  could and would be used as part of a wire fraud scheme

12  and that probative value -- the probative value of that

13  is not substantially outweighed by any of the 403

14  factors.

15      So that's my ruling at this point with regard to

16  that statement and we'll have to see if the others fit

17  the same analysis or are distinguishable.  But that's

18  admitted or the motion to exclude it is denied.

19      And should we go over to Page 7?

20          MR. BOOKBINDER:  We should, your Honor, and

21  the first excerpts on the top of that page, I suggest --

22  well, I'll give the Court a chance to read it.

23          (Reads.)

24          THE COURT:  Okay.

25          MR. BOOKBINDER:  I'd suggest that it's a --

```
 1    what he's saying is slightly different, which is now
 2    he's talking about the fact that he wasn't on an
 3    uncapped modem initially, then he switches to the one
 4    that is uncapped and he's --
 5              THE COURT:  This is a different date, isn't
 6    it?
 7              MR. BOOKBINDER:  Right, yes, your Honor.  It's
 8    a similar context to --
 9              THE COURT:  All right.  Go ahead.  Go ahead.
10              MR. BOOKBINDER:  What I mean to say is that in
11    some ways these are very similar and in some ways they
12    are slightly different.  It is now he's saying he's
13    switching to an uncapped modem and he's getting much
14    faster speeds.  So --
15              THE COURT:  "Uncapped" means what, now you're
16    getting premium service?
17              MR. BOOKBINDER:  Yes.  What "uncapped" means
18    is you've reduced -- you've eliminated the caps that the
19    cable companies put on your speed, based on how much you
20    pay, and you're getting the fastest possible service,
21    and he says, "I'm getting much nicer speeds."
22         So once again, I think, as far as fitting into a
23    co-conspirator exception, it's the same analysis, he's
24    reporting that the products are working this time to
25    give him a much faster uncapped service.
```

1         THE COURT:  Mr. McGinty.

2         MR. McGINTY:  The, um -- I think that the

3    excerpt itself only indicates that, um, Mr. Harris

4    replied twice saying, "Okay" to each one.  This is the

5    individual conduct of Mr. Phillips, um, for which he

6    might individually be answerable for.  I don't see an

7    inference that supports its place as probative in the

8    conspiracy that -- as I understand the government is

9    arguing here, which is a larger conspiracy of all users.

10        THE COURT:  Well, one of the things that --

11   and this relates to *Direct Sales*, among other things,

12   but the government's going to have to prove that

13   Mr. Harris intended to agree with a certain set of

14   people, including Mr. Phillips, he's an unindicted

15   co-conspirator, and that he intended that the alleged

16   wire fraud scheme to deprive the internet service

17   providers of money they would have received for service,

18   or should have received for service, um, be committed.

19   And so if this is a statement of somebody, who the

20   purpose is of conditionally admitting, then I find the

21   government has sufficiently shown was a co-conspirator,

22   and that's Mr. Phillips, um, telling Mr. Harris of

23   Mr. Phillips' own illegal conduct using this device and

24   that's evidence, not alone sufficient proof arguably,

25   that Mr. Phillips -- I'm sorry, that Mr. Harris intended

1  to agree with Phillips and intended that the wire fraud

2  be committed.  That would come in under 801(d)(2)(E).

3  It's a statement, um -- so that's that one.

4        MR. McGINTY:  Your Honor, if I might?  I'm

5  concerned about the inferences that could be drawn were

6  the Court simply to instruct that the wire fraud -- that

7  the conspiracy to engage in wire fraud would be

8  sufficiently shown if the person intended the end users

9  to use the product in a way consistent with the way the

10 product was designed.

11     I mean, the problem in this case is the jury

12 could --

13       THE COURT:  Well, that's going to be -- that's

14 going to be refined in my preliminary and particularly

15 my final instructions, but this is --

16       MR. McGINTY:  But I think that that problem

17 infects the consideration of co-conspirator statements

18 as well.  I mean, if this is a statement about product

19 capability, it's not a statement about the conspiracy,

20 um, to ensure and to cause others to engage in that

21 behavior.

22       THE COURT:  They're not mutually exclusive.

23       MR. McGINTY:  Unless the Court is prepared

24 to -- and one of the things we do in the instructions --

25 not to belabor this point, but, you know, in the

1    instructions we've asked the Court to make affirmative

2    directions to the jury so that as they're listening to

3    the evidence they can, um, have a conceptual framework

4    to understand this.

5           THE COURT:  Yeah, I don't know how specific

6    I'll be in my preliminary instructions, but ultimately

7    my present plan is to do something similar to what I did

8    in *DiMasi*, or say "The government has to prove this,

9    this, this, and this, and it would not be sufficient to

10   prove only this or that."  But what's a "this" and

11   what's a "that"?

12          MR. McGINTY:  We have a list of what's --

13          THE COURT:  I know.  I know.  And even to the

14   extent that those statements are accurate as to what the

15   law is, and I'm not sure all of them are, um, they're

16   not complete, because something might alone not be

17   sufficient, but it can be a building block and -- well,

18   it can be admissible as evidence, and an accumulation of

19   admissible evidence, each piece of which alone might be

20   insufficient, could be ample to prove beyond a

21   reasonable doubt the charges in the case.

22          MR. McGINTY:  Right.  But the jury shouldn't

23   labor through the case without clearly understanding

24   that under *Direct Sales* the mere sale is not

25   sufficient.  Now, it may be a contributing factor in how

1   -- you know, what the algorithm is that the jury is

2   going to be instructed on to help them sort out when

3   there's enough plus and when there isn't.  I don't

4   know.  I certainly don't think the government has come

5   close to helping the Court identify what that is.  But

6   at the beginning, um, they can be told that the use of

7   MACs may contribute to some other aspect of the mail

8   fraud, but they need to be told that the pure fact of

9   harvesting MACs itself is not illegal, the pure fact of

10  increasing your modem speed, not illegal, obtaining

11  anonymity, not illegal.  So as they're sitting there,

12  the government doesn't say, "Ah ha, did they provide a

13  capability of harvesting MACs?"  The agent says, "Yes,

14  they did."  The government goes, "Hum, meaningful."

15  Well, it may be meaningful after a fashion, but the jury

16  doesn't have the context, they're sitting there thinking

17  --

18          THE COURT:  Well, maybe "meaningful" is

19  evidence of a scheme.  I think I understand your point.

20  I'm going to work on the final and the preliminary

21  instructions before the 21st and I'll discuss them

22  further with you.  I understand them.

23          But for present purposes I'm satisfied that these

24  statements by Phillips were in the heartland of

25  statements that can properly be conditionally admitted,

1    um, putting aside, as some of the nuances, of what the

2    final jury instructions may be.

3          Okay.  What's the next one?

4          MR. BOOKBINDER:  The next one is at the bottom

5    of that page.  And, your Honor, again, I'll just give

6    you a minute to read it.

7          (Reads.)

8          MR. BOOKBINDER:  Your Honor, it may be worth

9    pointing out right now that we would be willing, in this

10   case, to offer only the Harris portions of this

11   excerpt.  So it depends what the Court would like, and I

12   can redact everything else out.  And I think the Harris

13   ones, they're all bolded except there's one on Page 8

14   that isn't.  But it would be just what he says.  I'm not

15   sure that's helpful, but if it is, you know, we would do

16   that.

17         THE COURT:  Mr. Harris' statements, and unless

18   there's some other consideration, come in under Rule

19   801(d)(2)(A).

20         MR. BOOKBINDER:  Right.  And just to explain

21   what this is about, what he's saying here, um, is he's

22   asking Phillips what the name of the configuration file

23   is that Phillips is using on his uncapped modem to, um,

24   you know, presumably to getting himself --

25         THE COURT:  You say CFG means

1    "configuration"?

2              MR. BOOKBINDER:  "Configuration file," yes.

3              THE COURT:  And somebody's going to testify to

4    that?

5              MR. BOOKBINDER:  And either Mr. Phillips or

6    Mr. Russell, yes, your Honor.  And then he also has

7    "What's the name of the file and what's its speed?"  And

8    then Mr. Phillips is answering him.

9         And then at the end, um -- I guess there is one --

10   I'm sorry, there's one portion of Phillips' statement

11   that we would want and it's the last two lines of where

12   Phillips says, and they're also in bold, "I will d-load

13   it," which means download it, "from TFTP," which is a

14   kind of computer server.  So "I'll download it if you

15   want me to."  Um, it's an offer, um, and Harris says

16   "Please."  So that -- um, those would be the portions we

17   would be primarily focused on and the rest is sort of

18   the back and forth.

19             THE COURT:  All right.  Mr. McGinty, do you

20   want to be heard on this?

21             MR. McGINTY:  Well, we object to this on

22   grounds already stated and also set out in the

23   memoranda.  I would, depending on the Court's ruling,

24   um, the parties, I think, can sort out -- depending on

25   the Court's ruling, um, whether the preference is to

1    have the entire section in there or not.  But we can

2    iron that out, I think, depending on the Court's

3    ruling.  Were the Court to rule in our favor, that would

4    obviate that, if not, I may talk to Mr. Bookbinder and

5    we can resolve this.

6             THE COURT:  Well, I don't, at the moment, see

7    a material difference between this and the several prior

8    sets of statements that I admitted under 801(d)(2)(E).

9             MR. McGINTY:  Both of which we objected to,

10   so.

11            THE COURT:  And you know you'll need to do

12   that, to some extent, again at trial.  I may --

13        All right.  Um, so you've got that ruling.  I'm

14   going to proceed on the assumption that except for the

15   end of the thread --

16        Is that what you would call it?  What do you call

17   it?

18            MR. BOOKBINDER:  Um, the end of this portion

19   of the chat, I guess, is what --

20            THE COURT:  All right, this portion of the

21   chat, um, it's only the bolded statements by Phillips

22   that the government is going to move for.

23            MR. BOOKBINDER:  That's right, your Honor.

24   Let me just make a note of that, your Honor.

25            THE COURT:  All right.

 1              (Pause.)

 2              MR. BOOKBINDER:  Your Honor, the next excerpt

 3     is the one in the middle of Page 8.

 4              (Reads.)

 5              THE COURT:  And this relates to what, the

 6     price of the product?

 7              MR. BOOKBINDER:  That's right.  So essentially

 8     what this discussion is about is we're going to be

 9     selling SB-5100s, those are the kind of modems that

10     they're selling, um, with BlackCat.  BlackCat is one of

11     the software products that the company made for 99 --

12     $100 essentially.  And then Phillips says, "Nice.  Good

13     profit."  Harris says, "You got them at what price?"

14     Phillips says "$18 each," for one kind, the 3100, which

15     is a different kind of modem, and this 5100 for $30

16     each.  And DerEngel says "Tight," which I take to be an

17     expression of approval.

18         Meaning essentially what's going on here is Harris

19     is saying, "We're selling them for $100.  How much did

20     you buy them for?"  "I bought them for $30."  It's a

21     discussion of the profit margin for their business.

22              THE COURT:  Okay.  And this, too, for the

23     reasons I said is admissible under 801(d)(2)(E), unless

24     there's some material distinction the defendant wants to

25     point out.

1          Then the next one, F?

2                MR. BOOKBINDER:  Yes, your Honor.

3          Here we would be seeking to offer the whole

4     excerpt.  Um, I'll give the Court a minute.

5                (Reads.)

6                THE COURT:  Go ahead.

7                MR. BOOKBINDER:  So this discussion is

8     Phillips relaying an offer essentially to Harris.  Um,

9     he wants to know, "How much do you want to sell a Sigma

10    license for?"  Sigma is another one of their products,

11    software products.  "I can mass-volume 10,000 of them on

12    the SB-300," which is a kind of one of these modems.

13    And then he goes on to say, "They want to use them to

14    steal service.  We have to show them how to steal

15    service, too."  That's the offer someone is proposing to

16    him.  He's relaying it on.  And then Harris says, "$2

17    apiece, 20,000 U.S., sounds good to me," all Harris.

18    And then Phillips says "Okay" and then Harris says, um,

19    expletive, "for $20,000, man, I'll give them unlimited

20    licenses."

21          So this is the proposal.  This is what someone

22    wants to pay.  This is what we're going to have to do.

23    "How much do you want to charge?"  Harris tells them how

24    much he would charge.

25                THE COURT:  All right.  And these are all

```
 1    statements in 2005 during the period of the conspiracy?

 2              MR. BOOKBINDER:  Yes.

 3              THE COURT:  Okay.  Based on the framework I've

 4    articulated, I will conditionally admit these

 5    statements, also.

 6              MR. McGINTY:  Your Honor, if I might just say

 7    one thing here?

 8              THE COURT:  Okay.  I didn't see you getting

 9    up, otherwise I would have let you say it before I

10    ruled.  Go ahead.

11              MR. McGINTY:  I mean, the First Circuit has

12    recognized the troublesome character of co-conspirator

13    statements, they recognize that the foundation for them

14    may be suspect, that the reason that, um, co-conspirator

15    statements have been permitted in appears to be largely

16    driven by the ease with which it helps the government to

17    obtain a conviction, not because it's especially well-

18    founded on agency grounds.  And here, you know --

19              THE COURT:  You're talking about the passing

20    statement in *Goldberg*?

21              MR. McGINTY:  Well, it's more than a passing

22    statement in *Goldberg*, it's been repeated several times,

23    I believe it was stated several times here as well.

24    These things are the recognition that this is

25    troublesome stuff and it's troublesome because when a
```

1    jury hears it, it treats it as if it's an adoptive

2    admission even though were this to be evaluated either

3    on agency grounds or on adoptive admission grounds, it

4    wouldn't be admitted.

5        So the troublesome part of co-conspirator

6    statements is it opens a back door that permits in

7    things that, were there to be rigor applied to the

8    ordinary rules of evidence, um, they would not --

9            THE COURT:  This is one of the ordinary rules

10   of evidence.

11           MR. McGINTY:  It is.  It's one of the ordinary

12   rules that survives although commentators on evidence

13   realize that it's largely unprincipled and that it

14   functions more as an aid to ease the government's burden

15   of making a case than it does for any other reason.

16           THE COURT:  You know, the -- to the extent

17   there's a -- I don't want to get academic about this,

18   but to the extent -- it seems to me, and I haven't

19   studied the cases, but there's a reason for a concern,

20   it's a concern about saying a statement that

21   Mr. Phillips makes, when Mr. Harris is not there, to

22   some third party in furtherance of the conspiracy.  Is

23   it fair, you know, to use that as evidence against

24   Mr. Harris who may have had no idea the statement was

25   made?

1          This is a statement from Mr. Phillips to

2    Mr. Harris, um, saying, "I've got some customers, they

3    want to use our devices to steal services and not pay

4    for them," and it's quite direct evidence, and the

5    defendant here says, "Sounds good to me."  So I don't

6    think this is -- whatever the misgivings some may have

7    about co-conspirator hearsay, um, I don't think this is

8    an example of what has caused them concern.

9          MR. McGINTY:  But this is going to be offered

10   in a case where the jury, in one or other form, is going

11   to be told that the mere sale of the product, even if

12   you know how it may be used, is not sufficient to

13   convict.  In other words --

14          THE COURT:  Well, even Ms. Sedky and

15   Mr. Bookbinder hadn't agreed on this yesterday.

16          MR. BOOKBINDER:  We've agreed now, your Honor,

17   and we'll be amending our instruction.  Um, after

18   looking at the cases and talking about it further, we

19   don't think that Mr. McGinty is correct about that.  We

20   don't think our instruction is correct about that.

21          THE COURT:  Well, you're going to file any new

22   instructions by the 14th -- proposed instructions by the

23   14th.

24          MR. BOOKBINDER:  Yes, your Honor.

25          MR. McGINTY:  Your Honor, if I might, though,

1    I'd like to treat what they had earlier said as an

2    admission by a party opponent.

3              (Laughter.)

4              THE COURT:  I'm going to give what I

5    understand to be a correct statement of the law to the

6    jury.  It's not an admission for those purposes because

7    this is -- I'm not bound by the rules of evidence and

8    even if the two of you agree that I should tell the jury

9    something, if I don't believe it's correct, I'm not

10   going to do it.

11             MR. McGINTY:  Right, but I'm trying to find

12   some parallelism between the statement where Harris

13   doesn't respond and one where the government makes a

14   deliberate choice and communicates to the Court what its

15   position is.  But my point is that --

16             THE COURT:  No, on that point I said yesterday

17   -- and there's a footnote in the order I gave you on

18   December 14th in *DiMasi* because the government didn't

19   change its position until a matter of law -- you know,

20   whether the indictment obligated them to prove something

21   that perhaps the statute didn't, um, that I wasn't going

22   to relieve them of that obligation even if I thought

23   their belated position might be legally correct, because

24   the defendant argued, I thought reasonably, you know,

25   "We've been relying on this in defending the case for

the last many months."  Now we're before trial and I've

ordered you and I'm spending now two days, you know,

trying to really focus on the law because, as I told you

before, I have to understand the law to make rulings,

and my understanding, I expect, is going to continue to

evolve right up until the time I instruct the jury.

MR. McGINTY:  But here if Phillips says

something in shorthand which captures one of the

purposes that modems can be put to, and let's say both

speakers know that that's one of the purposes that it

can be put to, but he's not under an obligation to or

isn't seeking to lay out what other purposes modems may

be used for and Harris doesn't take this as an

opportunity to educate him about this, the jury in

effect is told that what Phillips says about what the

product does Harris is answerable for, which were this

an adoptive admission, would not be the case because it

wouldn't be that standard, and a jury that hears it,

they go, "Ah ha, Harris guilty."

THE COURT:  Well, it does contribute to that,

but that's not unfair.  Every -- it's not unfairly

prejudicial if -- the argument is there's a scheme to

steal internet service.  So if Phillips says to Harris,

"I have customers who want to use our devices to steal

internet services," and Harris says, "Sounds good to

1    me," that's direct evidence that Harris is participating

2    in a scheme to steal internet services at least with

3    Phillips and, you know, whether this conspiracy has

4    other nuances.  But anyway.  It's probative.

5         What's the next one?

6              MR. BOOKBINDER:  At the bottom of that page,

7    your Honor.

8              THE COURT:  And actually let me say one more

9    thing in connection with this -- and I don't think you

10   need much encouragement from me, Mr. McGinty, you'll be

11   relentless.  But, you know, I'm ruling in limine and I'm

12   listening to all of this and I'm going to go back and

13   read more cases and read them more closely and my clerk

14   will work on it with me and, you know, you'll raise

15   these objections again, you'll have to, to some extent,

16   at trial to preserve them, and maybe, you know, my

17   thinking will evolve in some way that's helpful to you.

18   But what I'm trying to do now is both get educated

19   myself and, you know, give you these rulings in limine

20   so you can prepare your case.  And this is meant to be,

21   among other things, fair to both parties, so the

22   defendant doesn't peg his defense to some theory that

23   I'm not going to instruct on.  Go ahead.

24             MR. BOOKBINDER:  The bottom of that page, your

25   Honor.

```
 1              (Pause.)

 2              THE COURT:  Okay.

 3              MR. BOOKBINDER:  Your Honor, they're talking

 4      here, Mr. Phillips is the one who did the application

 5      for the corporation status.  He's telling Mr. Harris

 6      "the papers have come."  Um, and then Mr. Harris says,

 7      "and then we'll start on our count to becoming

 8      millionaires."  It goes to his, um, profit motive, his

 9      motive to sell a lot of these products, um, which is

10      relevant in any number of ways to what kind of a product

11      and what kind of business he's trying to run.  And

12      they're talking about both the corporate status and the

13      profitability.

14              THE COURT:  All right.  And these, again, you

15      say the co-conspirator hearsay -- how does incorporating

16      further the conspiracy?

17              MR. BOOKBINDER:  Well, in several ways.  First

18      of all, it's the -- the conspiracy essentially was to

19      run this business and, um, to sell products and help

20      people, so the structure of business is relevant to

21      establish what it is that they set up together.

22              Also, um, there are comments later on, it's not in

23      this one, where Mr. Harris talks about both with -- I

24      think with Phillips, but certainly with Ms. Lindquist,

25      the fact that he used incorporating as a way of
```

1    protecting himself from at least civil liability, um,

2    for the kinds of products they're selling.  So there's a

3    couple of different ways in which it's in furtherance,

4    your Honor.

5              THE COURT:  Do you want to be heard on this

6    one?

7              MR. McGINTY:  Well, apparently the

8    government's contending that the conspiracy is running

9    the business.  Um, secondly, there's, um -- in the

10    Government's Exhibit 2, it's set out that among the

11    things that Harris is selling are unmodified modems,

12    modems that are, um -- I don't think the government can

13    contest were anything other than original models of

14    firmware that was provided by Motorola.

15         So the business itself is not the conspiracy, the

16    attempt to give it a structure and a form is not part of

17    the conspiracy, and I don't know how that creates an

18    inference about how the business is going to be

19    conducted the way the government argues.  So it's not in

20    furtherance of the conspiracy.  It does suggest that

21    everything that, um -- that the company does, including,

22    um, becoming born, is a contribution to the conspiracy

23    and would create the impression that the company was

24    itself a conspiratorial entity, and I think that

25    implicates 403 concerns about prejudicial --

```
 1              THE COURT:  Well, they unfortunately don't
 2     have a RICO charge here, but -- you know, I suppose it's
 3     -- well, it's not the way they usually work, but if
 4     somebody said, you know, "We're going to sell cocaine.
 5     Let's rent a store and, you know, put our names out
 6     front," and, you know, so renting the store would be in
 7     furtherance of the conspiracy.  Here forming the
 8     corporation and developing the website, in their view,
 9     the government's view, you know, I think it's in
10     furtherance.  They're creating vehicles for people to
11     buy the products that are part of the scheme.  It's not
12     itself illegal to have a corporation, but -- and I've
13     said this over and over for conspiracy and it's true
14     with schemes, too, that something that in isolation or
15     in other contexts is legal can be a component of a
16     scheme.
17          Is this a corporation that, according to the
18     government's trial brief, was -- used the address of
19     Phillips' mother's home, or something like that, or is
20     that something else?
21              MR. BOOKBINDER:  Yes, your Honor.
22              THE COURT:  Well, you're going to -- at some
23     point I'm probably going to have to instruct on
24     consciousness of guilt and the general concept is that
25     the activity has to be linked to the charge here.  You
```

1    have to show some conscious -- that it's probative of

2    whether somebody feels guilty about what they're doing

3    here, you know, with regard to the charges in this case,

4    and not for some other reason.

5              MR. McGINTY:  Your Honor, can I -- the

6    government has not asked for a consciousness of guilt

7    instruction and I -- it's for the government to --

8    respectfully, to indicate what it thinks its best

9    arguments are for instructions and what its best theory

10   is that go into the jury.  A consciousness of guilt

11   instruction is a very serious additional component to a

12   case and frankly, your Honor, I'm dismayed that that

13   would be a contribution from the bench and not from the

14   government.

15             THE COURT:  I'd guess I'd say a couple of

16   things and I know it's respectful.  One, I'm frequently

17   given proposed instructions later.  Two, depending on

18   what they've argued in their opening and closing, I

19   thought you might ask for it because in some respects

20   it's a limiting instruction.  But in any event --

21             MR. McGINTY:  But on another point, which is

22   the cocaine reference, and this I think is part of the

23   orientation issue that makes this case so difficult, um,

24   the wall -- and we submit that it is a wall, the wall

25   between the ***Direct Sales*** analysis and the ***Falcone***

1    analysis that explains how it is that you can know what

2    the customer is doing, but you're answerable in one case

3    and you're not answerable in another is the difference

4    between a product being legally restricted, cocaine, or,

5    in that case, morphine, and one where it's not, which is

6    sugar and other unregulated commodities.  And the only

7    thing that explains how it is that in *Falcone,* where you

8    know what they're doing with your product, I mean, you

9    know what it is they're doing, but you're not answerable

10   to that, and *Direct Sales,* where you know what they're

11   doing because volume and warnings from DEA's

12   predecessor, et cetera, tell you what they're doing,

13   that you're answerable for it.  The only thing that

14   makes the difference in those two cases is the

15   difference between whether it's regulated and not

16   regulated.  And that's the difference between the

17   cocaine and the non cocaine.  This case is about the

18   non cocaine, it's not a regulated entity, and that's

19   what creates the difficulty in evaluating the

20   conspiracy.

21            THE COURT:  And this again I'll probably

22   continue -- I'm certainly going to continue to work on

23   it.  I don't see it as that bright line a test at the

24   moment.  And December 14th, I ordered you, and by

25   January 12th, to file memos that raised these issues and

1    if I haven't been adequately educated by your arguments

2    yet, it's in part perhaps because I've been deprived of

3    the two weeks to study it that I ordered you to give

4    me.  But I guess I don't have to tell you any of this

5    right now.  I don't have to tell you that I don't think

6    there's a bright line between regulated and

7    unregulated.  As I recall in **Direct Sales,** there's some

8    discussion about machine guns and they don't say machine

9    guns are regulated and we know now they're not.  But,

10   you know, gangsters are more likely to use machine guns,

11   but lots of people use sugar.

12        So I don't have to tell you any of this,

13   respectfully, but I really, you know, want to -- want us

14   to get this right.

15             MR. McGINTY:  And I have every --

16             THE COURT:  So that's -- and I don't mean to

17   be arguing, but I'm just -- I hear your argument.  I'm

18   going to think about it all further.  But if you get up

19   in your opening and you say, "The judge is going to tell

20   you, you know, there's an important legal distinction

21   between regulated and unregulated," I think you, at the

22   moment, you're going to be disappointed at the end of

23   the case.

24             MR. McGINTY:  And that's why I've made the

25   list of things which we're asking the Court to rule on

1    preliminarily because I don't, at the moment, know what

2    I can say to the jury and the last thing I want to be

3    doing is standing up there and having my wings cut out.

4             THE COURT:  I think either a week from Friday

5    or on that Tuesday afternoon before you have to open,

6    we're going to have some further discussion on all of

7    this.  Whether -- all I know is I read the trial memos

8    and I pulled out my consciousness of guilt instruction

9    and the cases.

10        So Exhibit 5, Pages 14 to 15, is admitted under

11   801(d)(2)(E) conditionally.

12        Let me just see something.

13             (Pause.)

14             THE COURT:  All right.  Let's see.  The

15   excerpt on Page 10 has been withdrawn, correct?

16             MR. BOOKBINDER:  The Line at the top, yes,

17   your Honor.

18             THE COURT:  Okay.

19             MR. BOOKBINDER:  Your Honor, I don't -- I

20   don't think this is the time for me to respond to

21   Mr. McGinty on the instructions.  I think the Court

22   knows that we don't agree with his view of the case law

23   at all and --

24             THE COURT:  I'm perfectly clear what it is.  I

25   just told you.  You're going to give me a revised

1      instruction and a memo in support of them by the 14th.

2                MR. BOOKBINDER:  Yes.  We will.

3                THE COURT:  And, you know, the defendant

4      should do the same.  And I'm ordering that you respond

5      to your adversary's submission by the 16th, because I'm

6      going to study these.  The 16th at noon.

7                Go ahead.  We're at the bottom of Page 10.

8                MR. BOOKBINDER:  Yes, your Honor.

9           In this excerpt, what's going on is Craig Phillips

10     is saying the user goes by the name "Bronx" on the forum

11     and how it needs to be activated on the forum.  He can't

12     log in.  It says, "You need to be activated from

13     administrator," and then below that there's -- I'm not

14     sure that the next two lines make much difference, but

15     below that DerEngel says, "Okay.  Okay.  Activated," and

16     Phillips says "Thanks."  So that's what's going on

17     there.

18          And, um, this is, um -- this is then sort of

19     talking about the operation of the forums.  Phillips is

20     saying "There's someone who needs to get activated," the

21     administrator has to activate them, and then Harris

22     says, "Okay," and he does it.  So it's then talking

23     about -- well, part of the business is not just selling

24     the products but running these forums that people are

25     allowed to access either because they paid to be a

1   member or because it's a benefit of buying a product,

2   and someone is saying, "I'm not getting that benefit,"

3   and so they correct it.

4        So it's the operation of the business and, as we

5   allege, the scheme or the conspiracy that people are

6   using these forums to exchange information and it shows

7   Harris's role as the administrator and the one who can

8   activate someone on the forums.

9            THE COURT:  Do you want to be heard on this,

10  Mr. McGinty, because we've got quite a bit to go

11  through?

12           MR. McGINTY:  Um, I do.  What is his activity

13  as moderator probative of in the conspiracy?  If he is

14  not responsible for content, the fact that he can allow

15  someone on the forum or not on the forum is immaterial.

16  So the issue is what is the, um -- what is the probative

17  worth of knowing he's a moderator if the issue is

18  whether he's answerable for the content of the forum and

19  there's a statute saying that he's not.  So how is this

20  in furtherance of --

21           THE COURT:  Well, that's one of the points, as

22  I mentioned yesterday, that you need to address

23  further.  At the moment I don't see that Section 230 --

24  well, I mean, maybe -- I don't see --

25           MR. McGINTY:  What's interesting is it's a

1    simple declarative sentence.  I mean, it says that

2    you're not responsible.  It may be that a court may want

3    to put a gloss on that for purposes of whatever civil

4    liability suits there's going to be, but in terms of

5    notice to Harris about whether he's on the hook for what

6    chatter occurs on a forum, that simple declarative

7    sentence is pretty powerful.

8              THE COURT:  All right.  Brief it in -- you

9    know, to the extent it's your argument that Section 230

10   trumps the rules of evidence, see if you can find a case

11   and --

12             MR. McGINTY:  Well, it's not a matter of

13   trumping it, it's a matter whether it puts a gloss on

14   it.  I mean, there are common rules of privilege that

15   are integrated, by operation of the rules, into the

16   rules and --

17             THE COURT:  No, I'm going to think about all

18   of this further.  It just hasn't -- I don't feel it's

19   been fully presented to me nor have I had an adequate

20   opportunity, you know, to think about these arguments.

21   There are a lot of submissions.  There are a lot of

22   issues.  And I was deprived of the two weeks I expected

23   to have to deal with them.

24        All right.  Well, this is conditionally admitted

25   because -- I think if there was an absence of evidence

1     of Mr. Harris' personal involvement, that it would tend

2     to negate the contention that he knew what was going on

3     and agreed to the scheme that's alleged.  So something

4     that shows his active involvement can bear on his

5     knowledge that -- this one, it seems to me, has less

6     probative value than the others that we've been -- you

7     know, that I've ruled on, but I also don't see any

8     unfair prejudice here.

9          All right.  So then we go to Lindquist, right?

10               MR. BOOKBINDER:  Yes, your Honor.

11               THE COURT:  Go ahead.

12               MR. BOOKBINDER:  So, um, Ms. Lindquist will

13    also testify, um, and she will testify as to what her

14    role was in the company, that she wrote much of this

15    company's software, that, um, she had been given stock

16    in the company, um, that she discussed the products

17    daily with Harris, and, um -- that Mr. Phillips will

18    also testify to some extent about basically his role

19    with the company, and what Ms. Lindquist's role was.  So

20    I think there will be several sources of evidence that

21    she's a co-conspirator.

22               THE COURT:  And this has been implicit, but

23    the Lindquist statements are going to be admitted while

24    she's testifying?

25               MR. BOOKBINDER:  Um, yes, your Honor.

1          THE COURT:  So she'll provide some context

2     presumably.

3          MR. BOOKBINDER:  Correct.

4          THE COURT:  All right.  You've withdrawn the

5     first one.

6          MR. BOOKBINDER:  We've withdrawn the first

7     two, I believe.

8          THE COURT:  The first two.  All right.

9        So we go to Page 13.

10          MR. BOOKBINDER:  Correct.

11          (Pause.)

12          THE COURT:  Go ahead.

13          MR. BOOKBINDER:  So in this excerpt Harris is

14     giving her a shipping address for a product and then she

15     says, "I wonder what's at that address, probably his

16     police precinct cable investigator board."  Um, so to

17     some extent, you know, she's making light of the

18     situation.  But what we would suggest is this is -- this

19     is -- it's not an explicit warning, it's a statement

20     that she's concerned about law enforcement and about

21     cable companies, um, and she wants to make sure they're

22     not -- it's a concern that they don't want to be sending

23     things to people who are going to be investigating them.

24          THE COURT:  So how is this in furtherance?

25          MR. BOOKBINDER:  Um, your Honor, to the extent

1    that it's a discussion about risks that the conspiracy

2    faces, the fact that people might be investigating them,

3    um, it would be in furtherance, but also primarily this

4    is certainly not offered for the truth.  I mean, I'm

5    sure that we've never suggested that address as in fact

6    either a police precinct or a cable investigative

7    board.  It's not.

8              THE COURT:  But you say it's probative of

9    whether Mr. Harris knew what he was doing was illegal

10   and you have to prove that he was acting knowingly and

11   willfully?

12             MR. BOOKBINDER:  That at least his

13   co-conspirator is kind of joking a little bit about the

14   fact that, you know, this could be the police, this

15   could be the cable board in the conversation with him.

16   But certainly not for the truth.

17             THE COURT:  All right.  Mr. McGinty.

18             MR. McGINTY:  Um, the government calls this a

19   discussion about risk.  Um, this isn't a discussion.

20   This is a joke.  And the government says the joke has at

21   its core a concern on Lindquist's part that she has to

22   be concerned about whether this is a police address or

23   not.  Um, talk about a stretch.

24        Um, if a person, um -- if a person makes a joke or

25   a concern about whether their phone is tapped by the

1    police, is that a meaningful contribution to their

2    thought process about whether they might be engaged in

3    tax fraud or might otherwise just be a paranoid person?

4    I mean, I'm stunned by the government trying to put this

5    in.  I can't imagine how this is meaningful.

6         And here you have it not being offered for the

7    truth.  She's saying, "I wonder what's at that

8    address?"  What's the truth of the statement?  If she

9    said that, um, "I wonder if this is the stationery

10   store?"  It wouldn't be admitted.  It's that she's

11   saying, "I'm concerned about whether this is a police

12   precinct."  This is back-dooring the --you know, the

13   claim is not for the truth of the matter, but we're

14   back-dooring it and her concern becomes somehow --

15              THE COURT:  Well, it seems -- well, you say

16   it's --

17              MR. McGINTY:  Well, I mean --

18              THE COURT:  Well, it seems to me that its

19   probative value is -- it falls into essentially two

20   categories.  One, a co-conspirator who has to be shown

21   to have acted knowingly and willfully, um, indicating a

22   concern that they'll get caught for what they're doing,

23   you know, thinking about whether this is a police

24   precinct or investigative work.  Second, and this does,

25   it seems to me, implicate the idea of an adoptive

1    admission -- and I don't know what comes after this, I

2    only have the excerpt, or maybe I have the whole thing

3    in Exhibit 6?  It's Page 3.

4              MR. BOOKBINDER:  Um, I don't think there's any

5    meaningful response.  But it is in Exhibit 6, your

6    Honor.

7              (Pause.)

8              MR. BOOKBINDER:  What Harris says -- it's Page

9    3, your Honor.

10             THE COURT:  Is this 3 on the bottom?

11             MR. BOOKBINDER:  Yes.  And it's towards the

12   bottom of the page.

13             (Pause.)

14             THE COURT:  Well, the next one says "What kind

15   of meth lab is this?"

16             MR. BOOKBINDER:  That's Harris's response.  I

17   don't know exactly what that means.

18             THE COURT:  Are you planning to put in only

19   the excerpts?

20             MR. BOOKBINDER:  Correct.  And that's --

21   Mr. McGinty has asked and it seems reasonable, if the

22   Court would like, that for all of these excerpts, we

23   will redact out everything else on the page, and if

24   that's the preference of the defense and the Court, then

25   we're happy to do that.  This would certainly be a

1    situation where I think it would be appropriate to do

2    that.

3              THE COURT:  Well, let me just ask them step by

4    step.

5         One, are you proposing that just the excerpts go

6    in, not the whole --

7              MR. McGINTY:  I frankly want to evaluate

8    that.  I mean --

9              THE COURT:  Well, here, let me tell you what I

10   -- well, here, let me give you more specific -- well,

11   I'm excluding this at the moment essentially under Rule

12   403 because where the excerpt ends, as I just told you,

13   I wondered what his response was.  Um, "a cable

14   investigative board?" and then his answer is "What kind

15   of meth lab is it?"  You know, maybe you would say he

16   was joking.  But I think to get the context, then it

17   raises a question about whether Mr. Harris was involved

18   in some kind of drug business, too.  So for the moment

19   I'm excluding this one under Rule 403.  I think, um --

20   well, all right.

21        And with regard to the excerpts which I thought

22   had been agreed to, um, this has to be resolved next

23   week, either you agree to it or, you know, I was going

24   to decide it now if there's a dispute.  Um, but what I'm

25   not going to do is have a jury and spend time dealing

1      with things that I intend to get resolved before trial.

2             And there's a doctrine of completeness.  So, you

3      know, certainly anything, as a matter of fairness, that

4      ought to come in will come in.  And maybe if the

5      defendant says "Just put it all in," I will, and the

6      government, you know, can focus on certain parts and

7      everything will go back to the jury room.  That's an

8      alternative.  But let me know by Tuesday how you can

9      resolve this.

10            MR. McGINTY:  The difficulty with this is that

11     these chats are sort of in the nature of, you know,

12     unrelenting non sequiturs and, you know, the government

13     has combed through it to try to find something that's,

14     in their view, meaningful, um, but because they're

15     non sequiturs, to give or to elevate this to a

16     meaningful comment about the scope of the conspiracy may

17     be placing this in a better context than what the --

18            THE COURT:  Well, that may go to the weight of

19     the evidence, but not all of this are non sequiturs.  If

20     they say, you know, "We're going to get $20,000 from

21     somebody who wants to steal Internet service," and

22     Mr. Harris says, "Sounds good to me," that's not a

23     non sequitur.

24            MR. McGINTY:  Well, it's a 403 problem if we

25     look at *Falcone* and say, "And the difference would be,

1    um, if Falcone knows that and still shipped the sugar?"

2    and the answer is "Falcone could be indifferent to

3    that."

4         So the 403 problem there is that the jury will

5    think something meaningful that in *Falcone* isn't

6    meaningful.

7                   THE COURT:  All right.  What's next?

8                   MR. BOOKBINDER:  Your Honor, next is the --

9                   (Pause.)

10                  THE COURT:  Go ahead.

11                  MR. BOOKBINDER:  Um, the area that's in

12   discussion between Lindquist and Harris is where he

13   tells her that their website's being blocked.  She asks

14   him, you know, "Would you tell me more?"  And he says,

15   "Agada moved it.  Agada is there."  Agada is the company

16   that's hosting their website and they were in Russia at

17   that time.  And so she asked, "Did they move it?"  He

18   says, "They blocked it.  They deleted my access.

19   Something has to be" --

20                  THE COURT:  What's "FTP"?

21                  MR. BOOKBINDER:  "FTP" is, again, it's "File

22   Transfer Protocol," it's a way to transfer information

23   to and from a computer.

24        "It's something that has to be -- it's nowhere at

25   the end in the month of the payment, we didn't receive

1   an e-mail about this?"  She asks, "A court order?"  And

2   on the next page, he says, "Agada is in Russia.  A court

3   order won't do shit."

4        So it's a discussion about where their website is

5   hosted, a problem with the hosting, um, and the fact

6   that, um, you know, they are being protected essentially

7   from things like court orders.

8             THE COURT:  It's protected from court orders

9   because it's in Russia?

10            MR. BOOKBINDER:  Yes, it's in Russia and

11  therefore an order of the court here would have no

12  effect and so, you know, that's not the explanation for

13  this problem.  But it's also relevant to, um -- you

14  know, the fact is it's relevant to them trying to

15  protect themselves.

16       But here, though, your Honor, as far as a

17  co-conspirator issue, it's worth pointing out that her

18  statements here are only questions, not statements or

19  declarations, I guess.  She doesn't actually say

20  anything affirmatively.  It's his -- he was doing all

21  the stating here.

22            MR. McGINTY:  Your Honor, obviously the

23  inference from the Russia part, that it's going to be

24  that somehow this is an attempt to find a safe haven in

25  a place that wouldn't be regulated, that's obviously a

1    403 issue.

2          THE COURT:  Why is that unfairly prejudicial?

3          MR. McGINTY:  Because there's going to be no

4    evidence that Russia -- um, that a hosted site in Russia

5    is outside the bounds of regulation.  You know, it's not

6    going to be, um, anything other than something that the

7    jury would seize upon as an indication of guilt.  So I

8    think the 403 problem is pretty obvious.

9          THE COURT:  Well, the question goes to

10   whether -- I mean, it could be prejudicial in the sense

11   that why would you have somebody host it in Russia and

12   not in the United States?  Um, but it's Mr. Harris

13   saying, "Agada is in Russia.  A court order won't do

14   shit."  I mean, I think that it might be taken to

15   whether this was set up in a way that would be difficult

16   for authorities of the United States to disrupt,

17   including the courts, but I don't know that that's

18   unfairly prejudicial or that any risk of unfair

19   prejudice substantially outweighs the probative value.

20        I haven't seen, actually, the government's expert

21   disclosure.

22          Has the defendant?

23          (Silence.)

24          THE COURT:  I'm ordering that you file a copy

25   of that with me today.

1          MR. BOOKBINDER:  Your Honor, actually it's

2     included in the witness statement binder that we

3     provided under the names of --

4          THE COURT:  Oh, it is?  All right.

5          But is there going to be any expert testimony on

6     Russia?

7          MR. BOOKBINDER:  No.  No.  I would suggest,

8     your Honor, that -- certainly we haven't disclosed any

9     or we hadn't planned on it, however, um, here Mr. Harris

10    himself is saying what the significance of it is, your

11    Honor.

12         THE COURT:  Yeah, that I think is the point.

13    And to the extent Russia has some probative value, it's

14    not unfairly prejudicial.  So I'm going to be admitting

15    it.

16         MR. McGINTY:  Your Honor, I would note that,

17    as a matter of fact, while it was hosted in Russia for a

18    time, it was moved to the U.S.  So the inference that

19    the hosting was for the purpose of evading, um, any kind

20    of regulations is an impermissible inference.

21         THE COURT:  Well, you can put into evidence

22    that it was moved.

23         MR. McGINTY:  Well, at that point --

24         MR. BOOKBINDER:  We will, your Honor.  That's

25    -- in the government's exhibits are the Go Daddy

```
 1   records, it was moved to Go Daddy.  So Mr. McGinty will
 2   be free to argue on that.
 3              MR. McGINTY:  Well, is the government going to
 4   be permitted to argue that there was an inference to be
 5   drawn from the earlier place where the website was
 6   hosted even though Harris didn't seek -- I mean,
 7   presumably you would expect that if he was trying to
 8   conceal what the business was doing, um, he would have,
 9   um, continued to wish that his site was hosted outside
10   the jurisdictional limits of the United States.
11              The other thing, your Honor, is that --
12              THE COURT:  Well, since you asked the
13   question, I guess I'd say the following.  One, there are
14   many First Circuit cases, I think *Zulu* is one of them,
15   that stand for the proposition that Rule 403 rarely
16   operates to exclude otherwise admissible evidence.  And
17   it seems to me the argument you just made goes to the
18   weight to be given to this evidence, which may be not
19   much, um, rather than to whether the jury ought to be
20   allowed to hear it, whether it's admissible and its
21   probative value is not substantially outweighed by any
22   of the Rule 403 factors.
23              MR. McGINTY:  And further, your honor, the
24   concern about the website blocking, um, the government's
25   witness, Isabella Lindquist, is going to testify about
```

1   this incident involving the website blocking.  Um, she

2   is not going to say that it was a concern that this

3   involved theft of a service.  So the inference that this

4   supports, um, an inference that the blocking was for the

5   purpose of stopping what the government contends here is

6   criminal conduct, it's not going to be supported by the

7   testimony.

8           THE COURT:  Well, what's the government say

9   about that?

10          MR. BOOKBINDER:  If we could have a minute,

11  your Honor?

12          (Pause.)

13          MR. BOOKBINDER:  Your Honor, I think that what

14  the testimony is going to be from Ms. Lindquist is that

15  Mr. Harris, at some point, told her that -- that the

16  reason the website -- at least in one sense it was

17  blocked and was sort of shut down several times, but at

18  least at one point the reason it was blocked, he tells

19  us, is because of copyright infringement issues.  That's

20  what he says.  Now, she doesn't have any position to

21  know, she's not in a position to know whether that's

22  true or not true, and the government would suggest that

23  other than his assurance to her that that's all that

24  this is about, there isn't any evidence that that's what

25  it was about.

1          THE COURT:  What's the copyright infringement?

2          MR. BOOKBINDER:  I don't know.  It's not clear

3     why there would be copyright -- well, there is actually

4     a way you could spin this to be copyright infringement,

5     which is to the extent you are using but then

6     manipulating the software of, for example, the cable

7     modem manufacturers like Motorola, one can claim and

8     might civilly that that is copyright infringement when

9     it's the same kind of conduct we're talking about.  So

10    it's possible that something could have been styled that

11    way, but there's no -- it doesn't really make a lot of

12    sense.

13         THE COURT:  I know.  Then it sounds to me as

14    if perhaps I ought to exclude this because there is a

15    risk of confusion.  Now, you're going to have

16    testimony --

17         Ms. Sedky, he's got to listen to me.  Not you.  If

18    you need a break, you can ask me for one.

19         Um, you know, if she's going to get up there and

20    start talking about or testifying about copyright

21    infringement, you know, it makes it sound like -- that

22    sounds like a propensity to break the law.  You're not

23    arguing that any copyright -- it wasn't copyright

24    infringement as part of the scheme?

25         MR. BOOKBINDER:  No.

1          THE COURT:  So for present purposes, this is

2     excluded, too, under Rule 403.  It's confusing.

3          And as far as I can tell, the probative value of

4     this -- I mean, it's not being blocked because of --

5          Do you contend that it was blocked because of, you

6     know, somebody wanted it to -- you know, was concerned

7     that the site was being used to steal internet service?

8          MR. BOOKBINDER:  (Pause.)  Your Honor, we

9     expect that, um, Craig Phillips will testify that

10    what they -- that they did run into problems with

11    website hosts who were getting complaints from cable

12    companies and ISPs and so -- and therefore based on

13    those complaints, um, that -- well, at least he's told

14    us that.  But we haven't sort of fleshed out what the

15    testimony is going to be on that.

16         THE COURT:  All right.  If you think you need

17    this, then come back and ask me, but at the moment I'm

18    concerned that it's just more confusing and unfairly

19    prejudicial to think that the Russians aren't as good as

20    Go Daddy and can't run all the websites as effectively

21    as we can.

22         All right.  Page 14.  What about this?

23         MR. BOOKBINDER:  Your Honor, again they're

24    talking about the -- sort of the intersection of the

25    fact of incorporation and the protection that that

```
 1    provides from -- here Mr. Harris, um, was talking about
 2    "We're immune to lawsuits, to cable modem hacking."  Um,
 3    and she says to him, Ms. Lindquist, towards the end of
 4    this excerpt, "And I can just say I was doing what I was
 5    told," and he says, "Exactly.  Anything related to cable
 6    modems, you are protected."
 7            So, again, your Honor, um, this is talking about
 8    their ability or their interest in incorporating to
 9    protect themselves from the legal consequences of their
10    actions.
11                 THE COURT:  Okay.
12                 MR. BOOKBINDER:  And it's primarily his
13    statements, so I suggest there isn't much of a
14    co-conspirator issue here.  Mr. McGinty may have a Rule
15    403 argument, but I suggest that indeed the probative
16    value outweighs any prejudice.
17                 MR. McGINTY:  And I think the key words the
18    government used are "from the legal implications of
19    their conduct."  Um, the legal implications, to be
20    probative, have to be concerned about the criminal
21    consequences, not the civil consequences.  Um, a
22    corporation insures limited liability of participants in
23    the company that's different from criminal consequences
24    and if this can be made intelligible it is about the
25    civil benefits of incorporation known to everyone and
```

sought by many who are in business for the sensible

benefits that it provides.  Um, those kinds of

conversations about the benefits of incorporation are

not admissions of concern about the culpability for

criminal conduct and they --

THE COURT:  That's something that, if I gave a

consciousness of guilt instruction, it would address.

It has to be the charges of this case, not something

else.

I'm excluding this under Rule 403 for present

purposes.

MR. BOOKBINDER:  Your Honor, could I just

respond?  If the Court wants to move on, I'm happy to,

but I would also like to respond to Mr. McGinty on

this.

If people are using these products, too -- and

Mr. Harris knows the reasons to steal service from cable

companies, um, the cable companies, to the extent they

are the victim, their remedy -- their direct remedy is a

civil suit and it's in an effort to -- it's an attempt

to try to shut down the website through webposting

services and maybe to file a civil action.  That is not

in any way different from the concern we're talking

about here, it's just a different way that those victims

could --

1        THE COURT:  Well, I'm thinking about what I

2  have to tell the jury.  I have to -- you know, people

3  can -- legitimate businesses -- you know, legitimate

4  businesses incorporate to limit the liability of

5  principals all the time and so I would have to tell the

6  jury -- it goes right to the idea of consciousness of

7  guilt, you'd have to find -- for this to be probative

8  they'd have to be finding that they wanted to operate

9  through the corporate form in order to protect

10  themselves against criminal prosecution, not just civil

11  lawsuits, I think.

12        Now, it could be part of the same scheme, they

13  could have a mixture of motives, but --

14        MR. BOOKBINDER:  I guess that would be the

15  suggestion, your Honor, is that they're worried about

16  two --

17        THE COURT:  How does having a corporation, if

18  your name's on the corporation, um, it protects you from

19  criminal investigation and prosecution?

20        MR. BOOKBINDER:  It doesn't, your Honor.  But

21  what they're worried about -- I guess what I'm

22  suggesting is they're worried about a different

23  consequence of the same theft.  They are helping people

24  steal service.

25        THE COURT:  But it could be many facts.  You

1    know, if you have a business and you buy goods and you

2    don't pay for them, the business can be sued, but the

3    owners of the stock of the business can't be sued and, I

4    mean, there's a whole bunch of ways that operate in the

5    corporate forum that protects you from a range of civil

6    liability.

7              MR. BOOKBINDER:  And Mr. McGinty would be --

8    the Court could instruct that Mr. McGinty could argue

9    that, but we would want to argue the --

10             THE COURT:  For present purposes I don't -- I

11   find that the probative value is substantially

12   outweighed by the risk of confusion.

13        What's the next one?

14             MR. BOOKBINDER:  Is that the one at the

15   bottom?

16             (Pause.)

17             THE COURT:  Go ahead.

18             MR. BOOKBINDER:  Yes, your Honor.

19        Um, so the next excerpt is the one on the bottom

20   of that page, a very short comment by Ms. Lindquist

21   saying she had a disclaimer, saying essentially the

22   "device should not be used for malicious purposes," and

23   the "hee hee hee hee hee hee."  Obviously I think it's

24   the "hee hee hee hee hee" --

25             THE COURT:  This is Exhibit 6, Page 8?

1           MR. BOOKBINDER:  Yes.

2           THE COURT:  I guess I'm interested in what

3    comes after that.

4           (Pause.)

5           MR. BOOKBINDER:  It's right at the top, your

6    Honor.

7           THE COURT:  What?

8           MR. BOOKBINDER:  It's right at the top, it's

9    the second line.

10           THE COURT:  Oh, I see.

11           MR. BOOKBINDER:  And there's nothing that

12    comes after it.  There's a gap in time.  And what we

13    would suggest here, your Honor, is just a couple of

14    things.

15       Obviously the relevance of it is that the "hee hee

16    hee" is, um, her expressing something that, um, we think

17    is relevant and we expect there will be other testimony

18    about, too, which is that the disclaimers were there,

19    they're on the back of his book, um, they're in a couple

20    of places, but they're essentially a joke and that's

21    what they considered them.  And they knew that, you

22    know, people weren't following them or they didn't truly

23    intend people to follow them.

24       And this is one that might fall under the -- what

25    the Court noted as 8033, the sort of present sense

1    impression exception to -- to the hearsay rule.

2              THE COURT:  This is not one that I had in

3    mind, um, but maybe.  (Pause.)  This is her mental

4    feeling that she thinks is a joke.

5              MR. BOOKBINDER:  She's the one putting it in

6    there and she's the one who wrote it, the disclaimer,

7    and she's expressing what her view is of it.

8              (Pause.)

9              THE COURT:  Mr. McGinty, what do you say about

10   this one?

11             MR. McGINTY:  Um, this is the adoptive

12   admission, um, that the Court had requested support from

13   the government for the proposition that, um, in the

14   context of a chat, um, that a silence would be

15   meaningful.

16             THE COURT:  Excuse me for just one second.

17   What -- can the government remind me of one of its

18   adoptive admission cases?  I'm dealing with the First

19   Circuit cases.  I'm assume you had it briefed.

20             MR. BOOKBINDER:  Your Honor, I think under the

21   circumstances we're not pursuing the adoptive admission

22   here.

23             THE COURT:  All right.  So you're pursuing it

24   under 8033 --

25             MR. BOOKBINDER:  Or a co-conspirator

1    statement, that she's describing something she's done,

2    the first part of it seems very clear, and her

3    assessment of it, um, in that sense.

4              THE COURT:  I see.  So it's in furtherance of

5    the conspiracy, "I added a disclaimer and so this will

6    make it harder for them to convict us."

7              MR. BOOKBINDER:  Right.

8              THE COURT:  Okay.  Mr. McGinty, go ahead.

9    They've abandoned the adoptive admission.

10             MR. McGINTY:  Again this gets us into the

11   world of what 801(d)(2)(E) permits, that no other rule

12   of evidence will tolerate.  Um, here a statement by, um,

13   Ms. Lindquist, unlinked to any product, out of the

14   period that, um, the book was written, which was seven

15   years later, out of the period where any of the

16   purchasers of the product bought it, is adding a "hee

17   hee hee hee hee hee," um, after a statement and getting

18   no response from Harris.  Now, if Harris said, um,

19   "You've got to be kidding me," then this wouldn't be

20   admitted, but he doesn't respond.  And the government is

21   saying that that absence of response doesn't warrant an

22   adoptive admission, um, but nonetheless that lack of

23   response would be used for co-conspirator admission

24   purposes.

25             THE COURT:  Well, you know, even if he

```
 1    responded, um, depending on what the response was,
 2    perhaps, but even if this was what he responded, I think
 3    this would come in both under 801(d)(2)(E), they added a
 4    disclaimer, and it's a way of protecting us from
 5    investigation and prosecution in a civil suit, and under
 6    8033.  You know, I interpret the "hee hee hee" to mean
 7    -- arguably to mean, "I added a disclaimer and I believe
 8    that's a joke."  Um, so she's expressing her state of
 9    mind.  That one's a -- and I don't find Rule 403
10    operates to exclude it.
11         So that one's admissible, but not as an adoptive
12    admission.  The government's abandoned it on that
13    basis.
14         All right.  My time is limited, but let's go to
15    Mr. T.
16         Mr. T, you say you're not contending is a
17    co-conspirator now?
18              MR. BOOKBINDER:  No, we're not, your Honor,
19    because there's only one -- actually there are two
20    excerpts that we're, um -- that we're offering here.
21    And in the first one --
22              THE COURT:  This is on Page 15?
23              MR. BOOKBINDER:  This is on Page 15.
24         There, um, what Mr. T is saying -- they're just
25    questions or it's an initial question that he provides a
```

1    user.  He's asking to be added to the member section of

2    the forums and DerEngel asks, "What's your pass?" your

3    password.  He gives them a number.  And DerEngel says,

4    "Done.  Here's your login."  And again, it's relevant to

5    show that Harris is the one who controls access to the

6    forums.  But what Mr. T says there are, um, not

7    assertions for -- or offered for the truth.

8         And on the second one, if you want to do both at

9    the same time, um, he's asking, um, again another

10   question, um, "I'm wondering if you can give a

11   commissioner or something like that if I can get some

12   people to uncap using the software?"  And the response

13   is, "I'm sure we can work something out."

14        And so again he's making an offer -- I mean, your

15   Honor, and I apologize, um, Mr. T is on our list of

16   co-conspirators and it's for use --

17             THE COURT:  Oh, no, I'm talking about

18   X-factor.  I misspoke.

19             MR. BOOKBINDER:  Yeah, and I forgot, too.  But

20   -- and it's this second one that we would suggest would

21   fall under the co-conspirator exception.  Um, we are --

22   you know, he is asking, um, if he can get a commission

23   for bringing some people in to buy the products uncapped

24   and Harris says, "I'm sure we can work something out."

25   They're coming up with an arrangement.

```
 1              THE COURT:  Okay.  Mr. McGinty?
 2              MR. McGINTY:  This person's anonymous.  The
 3    government doesn't know who he is.  And the government
 4    hasn't provided any support for the proposition that a
 5    statement from an anonymous person can be admitted.  The
 6    Court asked for the government to do that.  We have put
 7    in *Sephulveda* which tends to suggest two things, one,
 8    there has to be reliability in the identification, and
 9    secondly, that it's the Court's evaluation of the
10    reliability of a person that dictates the necessity of
11    the --
12              THE COURT:  And, in fact, I'll do more work on
13    this, too, um, and maybe you can brief it further, but
14    my present sense is, and this will come up toward the
15    end, that there's nobody even by a pseudonym associated
16    with, I think, a post.  And somebody else might see a
17    difference between a post and a chat, but --
18              (Laughter.)
19              MR. McGINTY:  Not my generation.  It won't be
20    me.
21              THE COURT:  I was just going to say, maybe
22    somebody's children.
23         But the -- well, here.  What's the evidence in
24    addition to the statement that's going to show me that
25    -- you know, persuade me to find, by a preponderance of
```

1      the evidence, that Mr. T was a co-conspirator?

2              MR. BOOKBINDER:  Um, your Honor, it's the

3      series of statements made by Mr. Harris and they

4      continue below on that page.  These are ones we weren't

5      necessarily seeking to offer once, we're seeking to

6      offer them in our case in chief, but as we've told the

7      Court, where there's a back and forth dialogue between

8      DerEngel and Mr. T on this topic.  "Can I refer people

9      to you?  Will I get a commission?"  "Yes, you will.  You

10     need to give me the order numbers and the e-mail and

11     I'll give you a commission."  And DerEngel says -- um,

12     Mr. T asked him, "How much am I going to get?"  Um, a

13     little bit further down that page and --

14             THE COURT:  I'm going to reserve judgment on

15     this one and I do want to touch on a number of others,

16     but I have to stop.  I've been at this about two hours

17     now and I have a sentencing this afternoon, so I don't

18     know if we're going to get back to this today.

19         It's Mr. T and maybe some others.  The government

20     says that the "plus," that in addition to his own

21     statements, you need evidence of his own actions.  And

22     you're saying Mr. Harris's statement -- Mr. T is saying,

23     "I'm wondering if you could give me a commission or

24     something like that if I get people to uncap using your

25     software and hardware?"  And Harris responds, "I'm sure

1     we can work something out."

2          I mean, it seems to me, actually -- I'm going to

3     admit this one -- this one at least for context, I

4     think, it comes in.  Mr. T is saying, you know, "Will

5     you pay me if I get somebody to uncap?" to do something

6     illegal, and the answer, "I'm sure we can work something

7     out," is relevant to knowledge and intent as to how the

8     product would be used.  So at a minimum it would come in

9     for context --

10              MR. BOOKBINDER:  And, your Honor, the excerpt

11     before that may be something the Court can resolve very

12     quick.  I don't think there's much prejudice to it.

13     It's the one on Page 15.

14              THE COURT:  No, it's Mr. Harris' statements

15     here.  That's context also.  I'm admitting that for

16     context.

17              MR. McGINTY:  Your Honor, if I might?  The,

18     um, comment made at 41603, "LOL," um, that apparently

19     means "Lots Of Laughs" -- or is it "Laugh Out Loud"?

20              THE COURT:  What?  What does it mean?

21              MR. BOOKBINDER:  "Laugh Out Loud."

22              THE COURT:  Oh, "Laugh Out Loud."

23          So wait a minute.  The defendant is saying "Laugh

24     Out Loud," he's not saying "Lots Of Love"?  No?

25              (Laughter.)

1              MS. SEDKY:  I think you could ask those guys.

2              (Points to law clerks and interns.)

3              MR. BOOKBINDER:  Yeah, but --

4              THE COURT:  What do you think they're there

5     for.

6         Go ahead.

7              MR. McGINTY:  So Harris's statements, as to

8     Mr. T's contributions, are "LOL, I'm sure we can work

9     something out."  "Something" meaning what?  "Something"

10    meaning "We'll do what you propose" or meaning "I'll

11    work out something that's not consistent with what you

12    propose, but it would be something."  The "LOL" is the

13    immediate response to the suggestion that something be

14    done to aid --

15             THE COURT:  Is somebody going to interpret

16    "LOL"?  I mean, this is like the drug talk.  Who's going

17    to say what "LOL" is?

18             MR. BOOKBINDER:  Yes, your Honor, this would

19    come in under -- let me explain how these are going to

20    come in.  These were all, um, copied by Mr. Phillips,

21    he's the one who copied them, um, we could offer them

22    through him.  But it may make sense to sort of offer

23    them and not go through them and it would be Special

24    Agent Russell who will explain to the extent there is --

25    generally it's technical, some technical terms in there

1    that might -- "FTP" and things like that.

2              THE COURT:  Yeah.  And this is in the expert

3    disclosure, how he knows this stuff?

4              MR. BOOKBINDER:  Your Honor, we did.  We've

5    explained to Mr. McGinty that he will talk about

6    explaining some technical terms in the cyber age and can

7    --

8              THE COURT:  Like "LOL"?

9              MR. BOOKBINDER:  Well --

10             THE COURT:  No, I'm serious.  It wasn't

11   obvious to me what it meant.

12             MR. BOOKBINDER:  Okay, your Honor, yes.  I

13   think that -- I expect that Mr. Russell will testify

14   that for someone who's familiar with reading these kinds

15   of chats and on-line communications, that you see that

16   frequently and learn what it means in that context.

17   It's a common chat-type expression.  Maybe Mr. McGinty

18   will stipulate.  I don't think we disagree about that.

19             THE COURT:  Well, actually I think it helps

20   Mr. Harris that I didn't understand it.

21             MR. McGINTY:  Yeah, no, I would embarrass

22   myself if I repeated what I thought it meant.  So I'll

23   concur with what I'm told it meant.

24        When the Court says "context," um, we have, in the

25   papers here, challenged the government's assertion of

```
 1    context saying that it has to be -- that context has to
 2    be something which is not being put in, um, as evidence
 3    by the statement itself, it has to be something that
 4    simply is an orientation here.  Um, this would have to
 5    be, if at all, an 801(d)(2)(E), where the contents of
 6    the statement shall be considered, under the rule, but
 7    are not alone sufficient to establish --
 8              THE COURT:  Here, I'm going to reserve
 9    judgment on this.  I'll tell you when we get back or at
10    the end of the day.  Okay?
11              (Pause.)
12              THE COURT:  Basically for Mr. T you're relying
13    on Mr. Harris' statements to Mr. T as the required
14    additional evidence beyond Mr. T's statements of
15    conspiracy?
16              MR. BOOKBINDER:  Yes.
17              MR. McGINTY:  I'm sorry.  I missed that?
18    The --
19              THE COURT:  (Pause.)  You'll see in the *DiMasi*
20    instructions, and I quoted them yesterday, that I
21    believe I said, quoting *Richardson*, that, "A person's
22    membership in a conspiracy has to be proven by
23    evidence" -- well, that may not actually be true for
24    these purposes.  But a person's guilt for a conspiracy
25    membership, for the purposes of determining guilt, has
```

1    to be established by his own -- you know, evidence of

2    his own acts and statements and evidence of his own acts

3    could come from other people, Like Mr. Harris saying,

4    "Mr. T's one of my co-conspirators," you know, "He's a

5    great salesman."  If Mr. T were an indicted

6    co-conspirator, it may be that, for the purpose of

7    *Petrozziello* rulings under Rule 104, I can make the

8    determination even based on inadmissible information.

9    My clerk's going to have to do some more work on that.

10   Maybe you can tell me next Tuesday, too.  But I'm

11   reserving judgment on that one.

12        Okay.  17?

13        MR. BOOKBINDER:  Yes, your Honor.

14        Um, I'm sorry.  So the excerpts on Page 17, we're

15   not seeking.

16        THE COURT:  And Page 18?

17        MR. BOOKBINDER:  So it's Page 18 and this is

18   one of a -- I'll give everyone a chance to read it.

19        (Pause.)

20        MR. BOOKBINDER:  Here again, your Honor, we'd

21   seek to offer, starting with Mr. T's statement, "Well, I

22   mean, is Sigma working 100 percent with all ISPs?"  The

23   first four lines don't add much.

24        THE COURT:  So you withdraw your first couple

25   of lines?

1          MR. BOOKBINDER:  We are, the first four lines.

2          (Pause.)

3          MR. BOOKBINDER:  What this is, just in case

4    it's not clear, is, um, Mr. T says, "Is Sigma" -- which

5    is again the product, TCNISO'S software, "-- is it

6    working 100 percent with all ISPs?"  You know, "Are

7    people able to get internet access with all ISPs using

8    your products?"  And the response is, "Everyone except

9    Adelphia."  Adelphia is an internet service provider.

10   "Everyone except Adelphia?"  "Yes, and maybe one in

11   Australia."  Those are Harris.  And Mr. T says, "Okay,

12   cool.  What are those ISPs doing?"  And Harris responds,

13   "Something with the modem certainly.  We will have it

14   cracked soon."

15          THE COURT:  Okay.  Mr. McGinty, what do you

16   say about these?

17          MR. McGINTY:  Well, we're back again to the,

18   um, 801(d)(2)(E) problem, there has to be corroboration

19   of the conspiracy and the person's role in the

20   conspiracy.

21          MR. BOOKBINDER:  Actually, your Honor --

22          THE COURT:  But here he's -- excuse me.  But

23   here he's just -- well, let's see.

24          (Reads.)

25          THE COURT:  Actually we're going to have to

1  resume here next week, because I have to stop for today

2  and I have to explain one more thing to you.

3              (Pause.)

4              THE COURT:  Um, I will see you at 2:00 p.m. on

5  the -- well, I gave you some responses to file on the

6  16th.

7        But I'll see you at 2:15 on the 16th.  Are you

8  available?

9              MR. BOOKBINDER:  The government is, your

10 Honor.

11             MR. McGINTY:  I'm sorry, 2:00 p.m. on the

12 16th?  Yes.

13             THE COURT:  All right.  Plan on that for now

14 and leave me Friday morning the 17th, too, if

15 necessary.  All right?  We'll go through these motions

16 in limine and I may have a more refined view of **Direct**

17 **Sales** and things like that.

18             MR. McGINTY:  I'm sorry.  Friday at?

19             THE COURT:  Say 9:00, too.  All right?

20             (Pause.)

21             THE COURT:  All right.  And when I see you

22 next week I'll explain to you the jury selection

23 process.

24        I had ordered that certain filings be made on the

25 16th.  Um, I'm going to order that those be made by

1    11:30 on the 16th, so I can at least glance at them.

2    But these are, you know, objections to each other's

3    further jury instructions, I think, things you've

4    already thought about.

5          All right.  Is there anything further for today?

6              MR. McGINTY:  No, your Honor.

7              THE COURT:  Okay.  The Court is in recess.

8              (Ends, 12:45 p.m.)

9

10                 C E R T I F I C A T E

11

12          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

13    hereby certify that the forgoing transcript of the

14    record is a true and accurate transcription of my

15    stenographic notes, before Chief Judge Mark L. Wolf, on

16    Wednesday, February 8, 2012, to the best of my skill and

17    ability.

18

19

20    /s/ Richard H. Romanow 11-06-12

21    _____
      RICHARD H. ROMANOW  Date

22

23

24

25