1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3                                No. 1:09-cr-10243-MLW

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    RYAN HARRIS

10

11                          * * * * * * * *

12

13                        For Hearing Before:
                        Chief Judge Mark L. Wolf

14

15                        Motions in Limine

16

17                     United States District Court
                       District of Massachusetts (Boston.)
                       One Courthouse Way
18                     Boston, Massachusetts 02210
                       Friday, February 17, 2012

19

20                          * * * * * * * *

21

22              REPORTER: RICHARD H. ROMANOW, RPR
                        Official Court Reporter
23                   United States District Court
            One Courthouse Way, Room 5200, Boston, MA 02210
24                     bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3   ADAM J. BOOKBINDER, ESQ.
         United States Attorney's Office
 4       John Joseph Moakley Federal Courthouse
         One Courthouse Way, Suite 9200
 5       Boston, Massachusetts 02210
         (617) 748-3112
 6       E-mail: Adam.bookbinder@usdoj.gov
    and
 7   MONA SEDKY, ESQ.
         U.S. Department of Justice
 8       601 D. Street, N.W.
         Washington, D.C. 20530
 9       (202) 353-4304
         Email: Mona.sedky@usdoj.gov
10       For the United States of America

11

12   CHARLES P. McGINTY, ESQ.
         Federal Public Defender Office
13       District of Massachusetts
         51 Sleeper Street, 5th Floor
14       Boston, Massachusetts 02210
         (617) 223-8080
15       E-mail: Charles_mcginty@fd.org
         For the defendant

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (Begins, 10:15 a.m.)
3              THE CLERK:  Criminal Matter 09cr10243, the
4    United States of America versus Ryan Harris.  The Court
5    is in session.  You may be seated.
6              THE COURT:  Good morning.  Would counsel
7    please identify themselves for the Court and for the
8    record.
9              MR. BOOKBINDER:  Good morning, your Honor.
10   Adam Bookbinder and Mona Sedky for the United States and
11   in the courtroom as well is FBI Special Agent Timothy
12   Russell.  The IRS Special Agent, Special Agent Ryan, is
13   not here because he had a conflict today, but I
14   understand from Mr. McGinty that he has no objection to
15   Special Agent Ryan being in the courtroom as well.
16             THE COURT:  Well, I inferred that from the
17   absence of briefing of the dispute, but we'll confirm
18   that momentarily.
19         Mr. McGinty.
20             MR. McGINTY:  And Charles McGinty and
21   Christine Demaso for Mr. Harris, who is on the line,
22   and, your Honor, there is no objection to the presence
23   of both agents during the course of trial.
24         I would note one other matter that the Court may
25   want to address, since Mr. Riley is here, um, there's
```

```
 1    the issue of travel and lodging expenses for
 2    Mr. Harris.  The Court had entered an order, which was
 3    filed on February 8th, to accommodate Mr. Harris with
 4    both the travel and the lodging expenses.  Mr. Harris,
 5    um, has made those arrangements himself.  Consequently
 6    we're asking that the Court now vacate the order and
 7    relieve Pretrial Services as well as the Marshal's
 8    Office of any --
 9              THE COURT:  He's going to pay for his own
10    travel?
11              MR. McGINTY:  He's going to pay for his own
12    and assure his own presence.
13              (Pause.)
14              THE COURT:  Will he be able to pay for
15    counsel?  I'll deal with that, um, if and when we get to
16    sentencing.
17         All right.  But let me -- Mr. Harris, are you on
18    the phone?
19              THE DEFENDANT:  Yes, I am.
20              THE COURT:  Do you understand that you have to
21    be here in court in Boston at 9:00 a.m. next Tuesday,
22    February 21?
23              THE DEFENDANT:  Yes, I do.
24              THE COURT:  And are you going to be here?
25              THE DEFENDANT:  Yes, sir.
```

```
1              THE COURT:  And have you indeed, you know,

2    made the arrangements for your travel and lodging while

3    you're here in Boston for this trial which may take

4    several weeks?

5              THE DEFENDANT:  Yes.

6              THE COURT:  All right.  Then I'll -- well, let

7    me ask Pretrial Services.  Is there any --

8         Well, I want you to provide your itinerary today

9    to Pretrial Services and to Mr. McGinty.  In other

10   words, I want to know what your flights are, where

11   you're staying.

12        Do you have a cell phone?

13             THE DEFENDANT:  Yes.

14             THE COURT:  What's the number?

15             THE DEFENDANT:  Area code 858, 335-2456.

16             THE COURT:  Where are you going to be staying

17   in the Boston area?

18             THE DEFENDANT:  Um, the Red Roof Inn, Logan

19   Airport.

20             THE COURT:  What's it called?

21             THE DEFENDANT:  The Red Roof Inn at Logan

22   Airport.

23             THE COURT:  Actually do you have your flight

24   information right there?

25             THE DEFENDANT:  I believe so.
```

1            THE COURT:  Um, why don't you provide it now

2       and then it will reduce the number of moving parts.

3            THE DEFENDANT:  Um, Delta, flying out of

4       Portland to Boston and arriving at 3:41 p.m. on Monday

5       February 20th, 2012.

6            THE COURT:  And what's the flight number?

7            THE DEFENDANT:  Um, the confirmation code?

8            THE COURT:  The flight number.

9            THE DEFENDANT:  Okay.  Let me see here.

10      (Pause.)  The flight number is 8987.

11           THE COURT:  All right.  I will look forward to

12      seeing you at 9:00 on Tuesday morning.  You're ordered

13      to be here then.  And if for some reason you're not

14      here, I'm going to understand that you waived your

15      presence for jury selection.  We'll start without you.

16      And if there's any change in your travel plans or where

17      you're going to be staying, um, it's essential that you

18      let Mr. McGinty and Pretrial Services know immediately.

19      Okay?

20           THE DEFENDANT:  Okay.

21           THE COURT:  All right.  Thank you very much.

22          All right.  Now, I apologize for coming in late,

23      but, among other things, I was trying to catch up with

24      the filings that were made yesterday.

25          The government has moved to dismiss Counts 8 and

1    9, which I believe are the wire fraud substantive counts

2    involving Lasky Genoh, um, and I need to understand this

3    a little better.  I have limited discretion in this

4    area, but I have to make sure that the defendant is not

5    going to be prejudiced by the dismissal, among other

6    things.  Could you speak briefly to the reasons for the

7    dismissal and particularly whether in effect it's a

8    dismissal with prejudice, so the defendant doesn't face

9    the risk of another independent prosecution for engaging

10   in a scheme or conspiring with Lasky Genoh.

11           MR. BOOKBINDER:  Yes, your Honor, it is

12   dismissal of prejudice and here's what happened.  Um,

13   essentially when we sat down with Mr. -- I think it's

14   pronounced "Genoh," um, to review with him his testimony

15   before trial, we learned that the facts were, that he

16   had described earlier, were true, but that there was an

17   added complexity which undermined the possibility of

18   basing charges against Mr. Harris on Mr. Genoh's actions

19   and that is this.

20           Mr. Genoh did, as the records indicate, as he

21   said, buy some equipment by TCNISO's website, from

22   Mr. Harris, and then shortly thereafter he did get free

23   unpaid internet service for more than a year, but there

24   was an intervening event that we didn't know about until

25   last week and that is that he gave the equipment that he

```
1   bought to a friend of his who then gave him back a modem
2   that was able to get him free internet service.  That
3   modem that he was given back appears, based on his
4   memory, to be made not by and modified not with the
5   software made by Mr. Harris, but actually by another
6   company or competitor essentially of Mr. Harris's and
7   called Hacksaware.  And so, um, once we learned that,
8   um, we concluded that we needed to dismiss those counts
9   and they are being dismissed with prejudice.
10              THE COURT:  And does the defendant have any
11  questions or concerns?
12              MR. McGINTY:  No, your Honor.
13              THE COURT:  Well, let me ask this question.
14  Are there any implications for the conspiracy count?
15  Previously, although there's no bill of particulars and
16  there's no named unindicted co-conspirators, I was told
17  that the government was, you know, intending to prove a
18  conspiracy with the four people in Massachusetts named
19  in the manner and means.  Now I guess we're down to
20  three.  Right?
21              MR. BOOKBINDER:  That's correct.
22              THE COURT:  All right.  So it changes the
23  nature of the conspiracy count, and having just thought
24  about this quickly, it doesn't appear to me that it
25  changes -- that it would create some kind of variance --
```

1  um, the concerns that underline variance.  In other

2  words, if you were trying to add a co-conspirator, there

3  would be a question of fair notice to the defendant,

4  that he had notice of four, that he prepared for four,

5  but now he only has to deal with the three alleged

6  co-conspirators.

7       Second, there's not a double jeopardy problem

8  because you've told me that the government will not

9  prosecute Mr. Harris based on some alleged scheme or

10 conspiracy with Genoh, right?

11            MR. BOOKBINDER:  Correct.

12            THE COURT:  Are you planning to offer any

13 evidence of the transactions with Genoh?

14            MR. BOOKBINDER:  Um, no, your Honor, we will

15 not use him as a witness.  He's not going to testify.

16            THE COURT:  So there's no risk of prejudicial

17 spill-over.  I haven't researched this and you haven't

18 addressed it.

19       But do you anticipate any variance issues,

20 Mr. McGinty, based on dismissing these two counts?

21            MR. McGINTY:  Well, my understanding is that

22 the government will not be trying to prove any conduct

23 that's attributable to Mr. Genoh, so I don't see a

24 concern there.  Um, and with respect to variance, we

25 wouldn't be resting a variance claim on the single

1    participation of Mr. Genoh.

2              THE COURT:  You would not?

3              MR. McGINTY:  Would not.

4              THE COURT:  Would you be resting it in part on

5    him?

6              MR. McGINTY:  No, we're not.  He would not be

7    part of that calculus.

8              THE COURT:  Okay.  Then I'm allowing the

9    motion to dismiss.

10             (Writes.)

11             THE COURT:  So I've endorsed this as follows:

12   "As stated in court, the government intends this

13   dismissal to be with prejudice, therefore Counts 8 and 9

14   are hereby dismissed with prejudice."

15             MR. BOOKBINDER:  Thank you, your Honor.

16        In light of that I guess it raises questions as to

17   what the Court, and I suppose defense counsel, would

18   like the government to do with the indictment.  I

19   understand that you typically allow the indictment to go

20   back to the jury, is that correct?

21             THE COURT:  Correct.  I think in the

22   circumstances -- well, let's see, it should be

23   redacted.

24             MR. BOOKBINDER:  Mr. Genoh appears, um, in two

25   places in the indictment, your Honor, one is in the

1   overt act section.

2           (Pause.)

3           THE COURT:  What paragraph?

4           MR. BOOKBINDER:  At 48 through 51.  And then

5   again, and I apologize, your Honor, there's one other

6   place.  He's mentioned as an unindicted co-conspirator

7   in Paragraph 6, and that's at the beginning of the

8   indictment as well.

9           THE COURT:  Well, let's see.

10          (Pause.)

11          THE COURT:  All right.  And he is mentioned in

12  the subsequent counts?

13          MR. BOOKBINDER:  And in the subsequent counts,

14  yes.

15          THE COURT:  Is there an objection to having

16  the indictment redacted?

17          MR. McGINTY:  Um, for purposes of eliminating

18  the specific references to him, no.

19          THE COURT:  So those paragraphs should be --

20          MR. McGINTY:  Those paragraphs and then the

21  paragraphs which would be in the substantive counts

22  would be Counts 8 and 9 on Page 12.

23          THE COURT:  Okay.

24          MR. BOOKBINDER:  And when we do the redaction,

25  your Honor, I assume we'll just renumber the counts?

1          THE COURT:  Um, I think that's satisfactory.

2     Just do it, show it to Mr. McGinty, get me a copy,

3     because it will need to be read to the jury.

4          So you don't redact Paragraph 6.  And what are the

5     other paragraphs?

6          MR. BOOKBINDER:  48 to 51.  And then there's

7     just Counts 8 and 9 of Paragraph 60.

8          THE COURT:  Okay.  That's fine.  Very good.

9          All right.  Then with regard to -- I may revise

10    the sequestration order, but in any event, I'm ordering

11    and revising it that both agents can be in the courtroom

12    at all times in the future.

13         In my February 9 order, memorializing what I said

14    earlier on February 8th, I ordered the government to

15    show the defendant any chalks he proposes to use and the

16    defendant to register any objections.

17         Did you disclose the chalks because I received no

18    objection?

19         MR. BOOKBINDER:  We have, your Honor, and we

20    just discussed that earlier with Mr. McGinty, who has

21    raised a concern about one word in one of our chalks.

22    We will discuss it.  We may be able to reach an

23    agreement on that.  If not, we'll obviously bring it to

24    the Court's attention.

25         THE COURT:  Okay.  I'll deal with that Tuesday

1    morning, if necessary.  So you've reached agreement with

2    regard to the agents.

3         What about the status of the possible

4    stipulation?

5              MR. McGINTY:  Your Honor, if I might?  We're

6    in the process of arguing those out now.  I expect that

7    to be seemless.

8              THE COURT:  Okay.  And I believe I told you

9    last week that I'd like Mr. Harris to sign those

10   stipulations, too.  So they can be signed by Tuesday and

11   submitted then.

12        Okay.  Let me tell you about the jury selection

13   process.

14        We're going to get, I think, at least 68 potential

15   jurors.  I will devise a set of questions that I'll go

16   over with you on Tuesday morning before they come in and

17   I'll talk to you a little bit about what you've

18   submitted now and they'll be seated 1 to 68 in the

19   courtroom.  And assuming, say, there are 18 questions,

20   I'll ask all 18 questions and I'll ask them to stand if

21   the answer to them is "yes."

22        Then we're going to go back into the jury room.

23   It's public, the Court Security Officers will be

24   instructed to tell any members of the public they can

25   come back there and watch it, if they want, and I'm

1    going to question all of them, starting with Juror

2    Number 1, individually regardless of whether they

3    answered something "yes" or "no."  I sometimes find that

4    people who didn't answer anything "yes" don't understand

5    English or can't hear and I also, even more often, find

6    that people say there's something they should have

7    answered "yes" to when they don't have to stand up and

8    disclose that to everybody else.  So we'll do that.  And

9    my goal will be to seat 12 jurors and at least 2 and

10   maybe more than 2 alternates.  But at least 2

11   alternates.

12        So if there are 2 alternates, it will be necessary

13   to qualify 32 potential jurors.  The defendant will have

14   10 objections, the government will have 6.  Um -- let's

15   see.  That's 16 objections to get 12 jurors, and that's

16   28, and then I would have 4 potential alternates with

17   each side getting one objection.

18        But basically I would aim to qualify 32 people and

19   when that's done, um, I'll give you a chance to think

20   about them and then at the sidebar I'll have you

21   exercise your challenges, the defendant two, the

22   government one, until you have an equal number left and

23   then the government will go first.

24        I'll repeat this on Tuesday for you.  But do you

25   have any questions about that so far?

1        MR. McGINTY:  Um, just a few.

2    When the jurors come in, there's 68 of them, they

3    will be in the order of the juror lists that have been

4    provided, so they won't be again randomized in that

5    order?

6        THE COURT:  No, they won't.  Number 1 will be

7    to my far left, they'll go right across and we'll have

8    them right in order, and they'll come in in that order.

9        MR. McGINTY:  When the Court asks the

10   questions, if the jurors raise their hand, they won't

11   respond then, they will all -- only at the end they'll

12   be brought in singularly to address that?

13       THE COURT:  Exactly.  When they come back,

14   I'll say, "Why did you answer 'yes' to this question?

15   Is there any other question that on reflection you feel

16   you should have answered 'yes' to?"

17       MR. McGINTY:  And the specific inquiries the

18   Court, whether you -- the general range of questions the

19   Court's going to put to the jurors when they're

20   questioned in the back, um, we're going to get notice of

21   that today or on Tuesday?

22       THE COURT:  You'll get it on Tuesday, but

23   they'll basically be amplifications of the questions

24   that I ask in open court.  In other words, you know,

25   unless something comes up that wasn't elicited, which

1    shouldn't happen, but might, um, I'll be covering the

2    same subject matter.  And you'll get a chance to signal

3    me if you think of other questions or if you have an

4    objection, and I'll excuse the juror so you don't have

5    to express yourself in front of the juror.

6         It's a careful process.  It takes some time.  But

7    it's the very rare trial where somebody doesn't tell me,

8    back in the jury room, "Oh, yes, I have a conviction or

9    my son has a conviction, you know, for drugs, but I was

10   too embarrassed to stand up in front of everybody else."

11        And I just glanced at your questions, so I'll look

12   at them more closely.

13        I see that the defendant has some objections to

14   what are usually pretty standard questions about, you

15   know, whether a potential juror or somebody close to him

16   or her has ever been a victim of a crime, for example,

17   or involved in a criminal case, I would usually ask as a

18   victim as a witness or as a defendant?  But I think

19   that's relevant to possible prejudice against the

20   government, among other things, so I expect I'll cover

21   that.

22        And I expect I will ask whether anybody has

23   obtained television or internet service without paying

24   for it.  If somebody is engaged in the kind of conduct

25   that's at issue in the case, um, that may certainly be

1    relevant and they may be disqualified.

2          MR. McGINTY:  Um, my difficulty with that,

3    your Honor, is that it's sort of a broad range of

4    persons who get internet service who may question

5    whether it's appropriate to do that.  If someone, on one

6    occasion, pulls into a parking lot behind a pizza store

7    and gets the benefit of their WIFI, is that person going

8    to be up there confessing to misconduct?  So there's

9    sort of this broad range of possible misunderstanding in

10   which we will end up spending a good deal of time and

11   frankly may embarrass people needlessly.  So I think

12   that if it's narrowly framed, it's one thing, but where

13   it can be capturing --

14         THE COURT:  Well, I'll work on the questions,

15   but the fact that somebody answers "yes" doesn't

16   necessarily mean that he or she will be disqualified,

17   it's just something to discuss.  If they say, you know,

18   "Occasionally I can get on my neighbor's wireless

19   because it doesn't need a code and I've done that once

20   or twice," you know, that's one thing.  If somebody

21   says, "I bought similar products and have done this or

22   my son has done it," then that may be disqualifying.

23         MR. McGINTY:  Well, I certainly understand

24   that, but I'd rather not, in the first instance, have a

25   person who did as you describe thinking that, "Well, is

1    there something amiss about that, because I don't know

2    what the nature of the charge here is about, the misuse

3    of the internet?" and then coming up to embarrass

4    themselves needlessly.  So if it's a focused inquiry

5    about the nature of the conduct as you'll hear and it's

6    captured --

7              THE COURT:  No, actually it's probably going

8    to be pretty broad to begin with and it will get focused

9    in the individual questioning where the potential

10   embarrassment will been minimized because only the

11   lawyers and the parties will be privy to it, but it's

12   very important.  Okay?  But I'll think about it further.

13        Then yesterday the defendant filed two additional

14   motions in limine and to the extent they relied on some

15   recently-disclosed evidence, they're not untimely, but I

16   want to get a sense of them and whether they're going to

17   be disputed before I get to the matters that the parties

18   have both addressed.

19        One of them is the defendant's motion in limine

20   regarding the Russian web host.  I looked at this

21   quickly and the defendant reminds me that -- I think --

22   well, let me ask you this.

23        Has the government read this motion?

24              MR. BOOKBINDER:  Yes, your Honor.

25              THE COURT:  And is this evidence you want to

1    present?

2              MR. BOOKBINDER:  Your Honor, what we had

3    intended to elicit was simply testimony that, for a

4    period of time, the website was listed at a hosting

5    facility in Russia and that it was then moved back --

6    that Mr. Harris then moved it back to Go Daddy in the

7    United States, which occurred in 2005 and 2006, um, and

8    that much we did intend to elicit.  That's the story of

9    the business that's the subject of the case.

10             THE COURT:  And did I exclude some evidence on

11   one of the chats about Russia last week?

12             MR. BOOKBINDER:  You did.  You did exclude a

13   chat where there's a discussion about the fact that in

14   Russia, that something like a court order wouldn't be --

15   that a court order isn't enforceable in Russia or

16   something like that.  You did exclude that, that's

17   correct, your Honor.

18             THE COURT:  All right.  I'm glancing at this

19   motion in limine.  I see that the defendant has

20   recognized why I mentioned consciousness of guilt

21   previously.  I actually thought it was the defendant who

22   might want me to be using that framework to strike the

23   balance because the case you cite, *Tracey*, is

24   essentially the proper principle, as I understand it,

25   and that if there's something that is arguably evidence

1    of guilt, that the government, in this case, has to make

2    a sufficient showing there is guilt concerning the crime

3    charged and not something else.

4         Do you want to speak briefly to this, Mr. McGinty,

5    so I could think about it?

6              MR. McGINTY:  Well, frankly the suggestion of

7    a consciousness of guilt instruction elevates the

8    significance of this.  The government wants this to be

9    out there knowing full well that the suggestion, um,

10   that a server was located in Russia, um, will have an

11   effect on how the jurors perceive Mr. Harris, that he

12   couldn't use a domestic one, so he had to use one

13   abroad.  They want that to be a meaningful reflection of

14   what his intent was.  Well, it's hardly probative if it

15   turns out that Mr. Harris, had he had that consciousness

16   of guilt and had he had that guilty knowledge, would not

17   have gone to the Go Daddy web server which he used in

18   2008 and 2007.

19             THE COURT:  What was the period of time that

20   the Russian server was used?

21             MR. McGINTY:  Well, the government's claim, as

22   I understand it, is at some period prior to the use of

23   the Go Daddy server there had been a Russian server and

24   they want that to reflect, um, as they had with respect

25   to the chat, to reflect on his intent and his knowledge

1    that what he was doing was somehow unlawful.  You know,

2    it sort of begs the question, unlawful in what respect,

3    are we talking about copyright concerns or are we

4    talking about criminal concerns?  We have the ambiguity

5    about what the nature of the concern was that implicates

6    the *Tracey* question, which is, guilty about what?  But

7    then you have what seems to be the fact that makes this

8    all prejudicial and not probative which is that, um,

9    within the time that the government is alleging that

10   these persons got products from Mr. Harris, um, his web

11   server was located, I believe, in Arizona.

12        So it's not a probative fact and it surely will

13   have the kind of prejudicial effect that I think drove

14   the Court to say that the chat, um, would not be

15   admissible.

16             THE COURT:  What's the probative value from

17   the government's perspective?

18             MR. BOOKBINDER:  Your Honor, there's no

19   question that, um, Mr. Harris moved back to the United

20   States, but the fact that he hosted his website in

21   Russia is probative, I'd suggest, to consciousness of

22   guilt.  There's no other reason why you would host a

23   website abroad, particularly in a place like Russia,

24   unless you were trying to avoid the legal process,

25   detection, um, things of that nature.  In fact, the

```
 1    reason why he brought his service back here, I think the
 2    evidence suggests, is it just wasn't working in Russia.
 3    There were too many problems.  There are chats where
 4    this company, the Russian company, you know, the service
 5    has gone down for some period of time.  He can't
 6    understand why.  He comes back because frankly the
 7    service is better and more efficient and more reliable
 8    in the United States.  But the fact that it was there in
 9    the first place I think is relevant.
10              THE COURT:  What years do you say it was
11    there?
12              MR. BOOKBINDER:  It was there until at least
13    2005 and we're not sure, your Honor, I don't know that
14    we have the specificity on when it was brought back.
15    But there's no question it was there in 2005 at the time
16    of the chats.  So it was either 2006 or 2007 when it
17    came back to Go Daddy.
18              THE COURT:  Well, I'll have to give this some
19    further -- or some more thought, but -- well, there are
20    other cases that I'm going to take a look at on
21    consciousness of guilt.  And the government should file
22    a brief response to this.  You can look at **Boyle**, 675
23    F.2d 430 at 432 to 433 and **Myers**, 550 F.2d 1036 at 1049
24    to 1050.  (Pause.)  Because I would have to instruct the
25    jury something like the following.  I mean, you want
```

1    this essentially as consciousness of guilt evidence.

2         So I would instruct something along the lines of:

3    "The jury would have to decide whether the evidence is

4    consciousness of guilt concerning any or all of the

5    crimes charged in this case," if they find that Russia

6    was used.  I'd have to tell them that:  "Feelings of

7    guilt may exist in innocent people and certain acts do

8    not necessarily reflect actual guilt of particular

9    crimes.  In your consideration of the evidence of

10   alleged consciousness of guilt, you should consider that

11   there may be reasons for a person's actions including

12   consistent with innocence of the crimes charged in this

13   case.  It is up to you to decide if there's proof that

14   something was done and whether if so that shows

15   consciousness of guilt concerning the crime charged

16   here.  If these facts are proven, you must decide what

17   weight or significance to give them.

18        That's essentially the instruction on

19   consciousness of guilt that I gave in *DiMasi*.  You know,

20   it may be that -- it's very valuable to raise these

21   before trial, but it may be that I'll exclude some of

22   this initially, but after listening to the questioning

23   and hearing some of the other evidence, I'll see if the

24   door's opened, but to be able to do the 403 balancing.

25             MR. McGINTY:  Well, your Honor, the concern

1    here is that if the government proposes to introduce

2    this, then I need to respond, and we get into the

3    question of whether a Russian server is less expensive

4    than a U.S. server?  Um, we get into a whole list of

5    questions that divert the case from where it ought to be

6    going.  And if this is in pursuit of a balance, the

7    government suggests that Mr. Harris is looking at this,

8    um, as an issue of efficiency, in other words, that the

9    Russian server proved to be inefficient.  Were he

10   concerned about whether he would be prosecutable for

11   what he's running through that server, um, my guess is

12   that that would outweigh any concern about efficiency.

13   My guess is that internationally there's a lot of other

14   places you can host a server and not be concerned about

15   whether you're going to get prosecuted.  The fact that

16   he comes here and does it in Arizona I think speaks

17   mightily to whether there's an inference here or not.

18            THE COURT:  Are you going to make any argument

19   based on the fact that the server was in Arizona?

20            MR. McGINTY:  No.  None.  None.

21            THE COURT:  Okay.  Well, does the government

22   want to respond?

23        Well, let me put this way.  The government

24   shouldn't offer this evidence until you respond and I

25   rule on it.  So --

1        MR. BOOKBINDER:  Your Honor, we'll give it

2   some thought as to whether -- we'll either respond and

3   explain our bases and provide some legal support or if

4   we decide if on balance it's not necessary, then

5   we'll -- then we understand the Court to be saying that

6   we can't offer it unless we persuade you that we can.

7        THE COURT:  Yes, let's leave that on there for

8   now, um, and something might open the door to it and, of

9   course, it would be during trial.  But I would say, you

10  know, if you decide you want it, you should need to file

11  something by 1:00 on Monday, if you want it for your

12  opening.  Okay?  Otherwise, at the moment, it's

13  excluded.

14      Then the other one, which is the defendant wants,

15  in his renewed motion in limine, Docket 125, to exclude

16  evidence of his own allegedly unlawful conduct, the

17  testimony the government intends to elicit alleging that

18  Harris used TCNISO products to get further enhanced

19  internet service himself.  It's not clear to me -- I

20  need to be reminded of the years of that evidence and

21  whether it's within the period of the conspiracy.

22           (Pause.)

23        MR. BOOKBINDER:  Your Honor, there is a, um --

24  and some of this we discussed, as you may remember, in

25  the context of the chats.  But we believe it to be sort

 1    of at least during the period of 2005 to 2007.  That's

 2    when, um -- the chats are in 2005 that we're talking

 3    about.

 4                THE COURT:  And the alleged period of the

 5    conspiracy is --

 6                MR. BOOKBINDER:  2003 to 2009, I believe.

 7                THE COURT:  So basically the government would,

 8    I assume, argue that this is not 404(b) evidence, this

 9    is intrinsic, this is evidence of Mr. Harris's, um --

10    well, it's evidence of the existence of the conspiracy,

11    his membership in it, overt acts in furtherance of the

12    conspiracy?

13                MR. BOOKBINDER:  Your Honor, as we set out in

14    -- we haven't obviously filed something in response to

15    his latest motion, but we've addressed this earlier in

16    our briefing and what we said is that -- is absolutely

17    that, the fact that it is true, Mr. McGinty is right,

18    that there is no count charging Mr. Harris with using

19    the products because there wouldn't be venue here for

20    that.  However, um, what we've charged is that he was

21    part of a conspiracy to help the named co-conspirators

22    and others use these products to steal services.

23                THE COURT:  And remind me what you expect the

24    evidence of Mr. Harris's own misuse to be?

25                MR. BOOKBINDER:  Um, that Craig Philips is the

```
 1    vice-president of his company with him, his friend and
 2    also roommate, will testify they both before they
 3    discussed this before they were living together, the
 4    fact that they were both using the products and, um --
 5    and then Mr. Philips will say that, um, they -- that
 6    when they were living together they had one of these
 7    modems set up and they both used it.  There are also
 8    Harris's own statements in the chats that we talked
 9    about that support this as well.
10        So there doesn't seem to be any ambiguity about
11    the evidence and the fact frankly that he was not just
12    the designer and the seller of these products, but also
13    one of the users himself is extrinsic to the conspiracy.
14              THE COURT:  Intrinsic.
15              MR. BOOKBINDER:  I'm sorry.  It's intrinsic to
16    the conspiracy.  And it's also the best possible
17    evidence of his own knowledge.  There's no better.
18              MR. McGINTY:  And they did suggest that it was
19    offered in terms of his knowledge.  Um, what they have
20    in their instructions, though, which says that among the
21    factors -- this is the new proposed Instruction Number
22    2.
23              THE COURT:  Hold on a second.  Let me see if I
24    can get it.
25              (Pause.)
```

1            THE COURT:  All right.  This is in the

2    government's revised proposed jury instructions, Number

3    115?

4            MR. McGINTY:  Correct.

5            THE COURT:  What page?

6            MR. McGINTY:  At Page 8.

7            THE COURT:  All right.  Go ahead.

8            MR. McGINTY:  This is part of the instruction

9    for conspiracy involving a supplier of products or

10   services.  Among the factors the government claims bears

11   on whether there was a conspiracy -- not knowledge of a

12   conspiracy, but a conspiratorial agreement, is a number

13   of considerations pointedly including the following,

14   quote, "It includes whether he personally engaged in

15   law-breaking himself," unquote.  And so the government

16   is here using this not solely for purposes of showing

17   knowledge, they're offering it also to show intent to

18   participate in a conspiracy with others, um, elevating

19   what the initial offer was of this information and now

20   elevating it to a further use.

21        They also want to use it, now that the cat is out

22   of the bag, so to speak, on consciousness of guilt to

23   suggest that -- or not to suggest, but to make available

24   to the jury something that they will pointedly and

25   clearly and predictably use as evidence of consciousness

1    of guilt.

2         So this is not probative, in any significant way,

3    of knowledge.  There's no question that --

4              THE COURT:  Why isn't it probative of

5    knowledge that the devices can be used to steal internet

6    service if he's using it to steal internet service

7    himself?

8              MR. McGINTY:  Because it's redundant of other

9    proof.

10             THE COURT:  But it's not that it isn't

11   probative.

12             MR. McGINTY:  Right, but it's redundant of

13   other proof.

14             THE COURT:  By the book, right?

15             MR. McGINTY:  Proof from the book, proof from

16   other places, there's other testimony that --

17             THE COURT:  Well, the book says "Don't use

18   this to steal services."  It's bears on the credibility

19   of that contention.

20             MR. McGINTY:  Well, your Honor, there are a

21   number of instances where the government has

22   acknowledged that they have abundant different ways to

23   prove Harris's knowledge.  So the issue here is, um, is

24   this redundant of other proof?  Yes.  On a 403 balance,

25   um, is this prejudicial?  Um, highly, in that his law

1    breaking becomes a contributor to consciousness of

2    guilt, to the factfinding the government lays out for

3    the Court as part of a determination of whether a

4    conspiracy existed, and quite apart from what it was

5    originally proffered as, which is going to the question

6    of his knowledge.

7         So this is plainly, um, the kind of proof that's

8    going to impact on a jury in a way that will have a

9    disproportionate effect balanced off of a minimum

10   probative effect.

11        THE COURT:  Yeah, but I don't see why --

12   everything the government introduces is intended to be

13   prejudicial to the defendant to prove that he's guilty,

14   the question is whether it's unfairly prejudicial, and

15   at the moment it doesn't appear to be to me, but I'll

16   look at it more.  And I'll also look at the jury

17   instructions more.  I'm actually not going to have

18   further discussion today about the jury instructions,

19   except as it comes up in this context, because I have to

20   do more work on it.

21        So this is helpful.  But at the moment, um,

22   references to Russia are out, but I'm not excluding

23   this.

24        MR. McGINTY:  Well, I would only ask the Court

25   to look at that language that they put in their brief

```
 1    and not only is that -- or in their instruction.  I
 2    mean, not only is that, um, a suggested instruction from
 3    the Court, but it dictates the flavor of how the
 4    government is going to try the case and if it is on the
 5    back of Harris as a law breaker, which is how this is
 6    framed, then this case is going in a direction that the
 7    Court ought to steer it away from.
 8              THE COURT:  How is this different than the
 9    argument that would be made in a drug conspiracy that
10    somebody's charged with conspiring to possess with
11    intent to distribute and distribute drugs and evidence
12    that the defendant himself was one of the people who
13    distributed drugs as part of the alleged conspiracy
14    would come in I think both to prove the existence of the
15    conspiracy and the defendant's membership in it and
16    overt acts in furtherance of the conspiracy.  Why isn't
17    this analogous?
18              MR. McGINTY:  Frankly, in a lot of cases the
19    defense wants to introduce that to show that his
20    presence there is explained by something different from
21    his participation in the conspiracy, namely he is there
22    to get drugs.
23              THE COURT:  No, I'm talking about his
24    distribution of drugs.
25              MR. McGINTY:  I understand that.  But he can
```

1    -- that can be introduced and the government can try to

2    keep that out actually in cases because they're

3    concerned that that's going to be the defense.

4          THE COURT:  Keep out that he distributed

5    drugs?

6          MR. McGINTY:  No, keep out that he was himself

7    a possessor and user of drugs.  So that can have a very

8    different use and a positive use that a defense would,

9    frankly in drug cases, and I've done this in cases, to

10    introduce that in to vitiate the claim that he was part

11    of the conspiracy.

12      Here what the government wants is to use this as a

13    reflection of his character, his character as a law

14    breaker and his character in a way that paints him in a

15    way that makes the jury much more inclined to --

16          THE COURT:  But again this is -- assuming that

17    it's within the period of the conspiracy that's alleged,

18    which I understand it to be, it would be intrinsic, it's

19    not evidence of other bad acts as part of the alleged

20    conspiracy.  But I'll think about this further.

21          (Pause.)

22          THE COURT:  All right.  But, you know, what I

23    instruct the jury initially, which may not be much, and

24    eventually, which I'll develop carefully on these **Direct**

25    **Sales**-related points, is important, but I need to do a

1    lot more work before I talk to you about it.

2         That reminds me of something else that I intended

3    to ask you about.

4              (Pause.)

5              THE COURT:  All right.  Pursuant to my order,

6    the government gave its witness and exhibit order list,

7    and I asked you to identify -- and then I asked the

8    defendant to tell me what he was objecting to with

9    regard to the initial witnesses.

10        So, just to be clear, and I have to prepare on

11   this, on Document 118, the government's witness and

12   exhibit order, these are the witnesses.

13        About how many days do you think these witnesses

14   will take?

15             MR. BOOKBINDER:  Your Honor, we'll definitely

16   finish before the end of the second week.

17             THE COURT:  Are these all of your witnesses?

18             MR. BOOKBINDER:  That's it.

19             THE COURT:  Okay.  That's what I was trying to

20   sort out.  That's a better question.  Because you -- and

21   I don't object to this.  I commend it.  You've done more

22   than I ordered you to do.  I said to give me the

23   witnesses for the first couple of days.

24             MR. BOOKBINDER:  Right.

25             THE COURT:  But just in terms of my own time,

```
 1    you know, we'll be trying the case in the mornings and I
 2    think I've got other matters, I think, every afternoon
 3    next week, but what --
 4         The first witness is Phillips?
 5              MR. BOOKBINDER:  The first witness will be
 6    Craig Phillips, who is probably also the longest
 7    witness, um, and I would say his direct would be between
 8    an hour and a half and two hours probably.
 9              THE COURT:  All right.  And these are the
10    exhibits you want to offer in your case in chief.  And
11    then the defendant has certain objections.  And before
12    Phillips testifies, I will discuss with you the
13    foreseeable objections to the Phillips exhibits.  They
14    seem to go from about 1 to 29, um, but not all 29
15    exhibits.  Um, and I'll either rule on them or give you
16    some guidance.  So if we don't get to that Tuesday, then
17    we'll spend some time on it Wednesday morning.
18         All right.  Is it fair to assume that Phillips
19    will probably take at least the first day -- the first
20    day of testimony?
21              MR. McGINTY:  I think -- I have to just back
22    up and ask something.
23         Tuesday is jury selection and openings are
24    Wednesday?
25              THE COURT:  Correct.
```

```
 1              MR. McGINTY:  So I would guess that, um --
 2              THE COURT:  So we won't get past Phillips on
 3    Wednesday.
 4              MR. McGINTY:  We may, conceivably.
 5              THE COURT:  We may?  Okay.
 6         So then the next witness is Kohler and there are
 7    no exhibits, so there are no objections.
 8              (Pause.)
 9              THE COURT:  Who is Kohler?
10              MR. BOOKBINDER:  Chris Kohler is an employee
11    of Motorola who will be offering some -- well, some of
12    his testimony is expert testimony talking about what a
13    cable modem is and how it works and how cable internet
14    access works, essentially educating the jury, and then
15    talking a little bit about the TCNISO.
16              THE COURT:  Okay.  And the defendant hasn't
17    designated an expert or filed the expert reports that I
18    ordered.
19         So is it correct to assume that the defendant does
20    not intend to present an expert in his case in chief?
21              MR. McGINTY:  That's correct.
22              THE COURT:  All right.
23         And then Lindquist, she's the alleged designer,
24    right?
25              MR. BOOKBINDER:  Yes.
```

```
 1              THE COURT:  And I'll have to look at the

 2    objections to the -- to Exhibit 6.

 3              (Pause.)

 4              THE COURT:  And Brodfuehrer is?

 5              MR. BOOKBINDER:  He works for Charter

 6    Communications, one of the cable company ISPs, and he

 7    again will provide some sort of educational testimony to

 8    the jury about how internet access works and again some

 9    specific -- he's the one who tested, and we have short

10    video clip demos, of the defendant's products.

11              THE COURT:  Okay.  And Larosa?

12              MR. BOOKBINDER:  Um, Larosa is one of the

13    Massachusetts customers.

14              THE COURT:  Okay.

15        Madeira?

16              MR. BOOKBINDER:  Is another Massachusetts

17    customer.

18              THE COURT:  Hanshaw?

19              MR. BOOKBINDER:  Hanshaw is, as you know, a

20    Massachusetts user and cooperator.

21              THE COURT:  I'm sorry.  A cooperator?

22              MR. BOOKBINDER:  And a cooperator.  He was

23    charged in a separate case.

24              THE COURT:  Oh, so he's a co-conspirator.

25              MR. BOOKBINDER:  Yes, he's a co-conspirator.
```

```
 1    They're all -- the Massachusetts customers, all three of
 2    them, I guess, are co-conspirators.
 3                THE COURT:  Is he cooperating with the
 4    government?
 5                MR. BOOKBINDER:  Mr. Hanshaw?  Yes.
 6                THE COURT:  Oh, he is.
 7                MR. BOOKBINDER:  So he has pled guilty.  He
 8    had a plea agreement.  He's already served his juvenile
 9    prosecution, he's served his sentence, so it's not the
10    typical cooperation posture, but he is testifying
11    pursuant to a plea agreement.
12                THE COURT:  And does the plea agreement, by
13    letter, provide immunity?
14                MR. BOOKBINDER:  It does.
15                THE COURT:  All right.  So you're not going to
16    have a need of a 6001 order for him?
17                MR. BOOKBINDER:  Correct, your Honor.
18          Yes, as to -- and actually while we're talking
19    about immunity actually, if I could for a minute, um, I
20    do want to address this because it applies to three of
21    our witnesses.  We have provided and given the defendant
22    notice of the fact that the other -- um, Mr. Madeira and
23    Mr. Larosa, for both of them, um, our office has given
24    them letter immunity, um, and they're not represented by
25    counsel, they didn't request it, but to make things
```

1    proceed smoother and to try to make sure their testimony

2    is as accurate as possible, we've given them letter

3    immunity and they will be testifying pursuant to that.

4              THE COURT:  All right.

5              (Pause.)

6              MR. BOOKBINDER:  One other matter.

7         Ms. Lindquist, um, has requested -- she is

8    represented by counsel who has requested on her behalf

9    that we apply for, and we have filed this with the

10   Court, um, an application for court-ordered immunity.

11             THE COURT:  When did you ask for that?

12             MR. BOOKBINDER:  Um, several weeks ago, I

13   believe, we filed that, your Honor.

14             THE COURT:  I haven't seen it, but we'll get

15   it, and I have no discretion, so.

16             MR. BOOKBINDER:  Typically we --

17             THE COURT:  If the order is in proper form.

18             MR. BOOKBINDER:  Right.

19        Typically we file that ex parte.  We've actually

20   given a copy to Mr. McGinty.  We actually filed it

21   probably through ECF because there's nothing to be

22   sealed about it.

23             THE COURT:  There's a lot of paper here and

24   somehow it hasn't come to my attention.

25             MR. BOOKBINDER:  Yes.  So I have the original

1   in front of me.  I don't have the docket number.  I

2   apologize for that.  But what I wanted to raise is I

3   don't know whether the Court would want to inquire of

4   her in advance of her testimony and --

5           THE COURT:  Yeah, I, sometimes -- well, often.

6           MR. BOOKBINDER:  I apologize, your Honor.  I

7   think it was filed February 5th.

8           THE COURT:  -- conduct a voir dire, um, and

9   that would just be very brief.  And it appears to me

10  that she would have the proper basis to assert a Fifth

11  Amendment privilege, so.

12          MR. BOOKBINDER:  And, your Honor, Mr. Hohler

13  is indicating that he doesn't see it.  I will check and

14  confirm that we filed it.  And if not, I have the

15  original frankly right here.  So I don't know if it

16  would be easiest for me just to hand it right up?

17          THE COURT:  Okay.  But there should be more

18  than one copy.  But why don't you just -- well, actually

19  let me see it because sometimes your office doesn't

20  draft the orders in a way that I'll sign them.

21          (Passes up to judge.)

22          THE COURT:  Okay.  This is -- we'll give it

23  back to you.  It should be filed again if it doesn't

24  show up on the docket.

25          MR. BOOKBINDER:  That's fine, your Honor.

1          THE COURT:  And I may just question her and
2    her lawyer very briefly before entering the order, like
3    before she testifies.
4          MR. BOOKBINDER:  That's fine.
5          THE COURT:  All right.  We're going to have
6    the Go Daddy recordkeeper who will testify to what?
7          MR. BOOKBINDER:  Um, your Honor, merely just
8    to authenticate the Go Daddy business record.  The
9    records obtained from Go Daddy are related to TCNISO.
10          THE COURT:  All right.  And you're not going
11    to have a stipulation that will obviate the need for the
12    recordkeeper?
13          MR. McGINTY:  Your Honor, we've entered
14    stipulations on a number of things, but I don't
15    anticipate we're going to be able to reach a stipulation
16    here.
17          THE COURT:  Well, is there going to be an
18    objection -- well, let me see.  It says there's no --
19    Oh, I see.  Exhibit 4 -- what's Exhibit 4?
20          MR. BOOKBINDER:  Your Honor, Exhibit 4 are
21    records from -- it's an excerpt essentially of the
22    TCNISO records kept at Go Daddy for the customers who
23    are going to be testifying in this trial.
24          THE COURT:  And on what basis do you say
25    they're admissible, as business records?

```
 1              MR. BOOKBINDER:  As business records, your
 2    Honor.
 3              THE COURT:  All right.  I mean, we'll take
 4    this up as it comes.  Is there something particular in
 5    the records that you think makes them excludable as
 6    business records?
 7              MR. McGINTY:  Well, actually, your Honor, I
 8    prefer at this time not to voice that concern.
 9              THE COURT:  Well, you're going to have to
10    voice it before the recordkeeper testifies.
11              MR. McGINTY:  I appreciate that, your Honor.
12              THE COURT:  All right.
13         And Timothy Russell is who?
14              MR. BOOKBINDER:  An FBI Special Agent, your
15    Honor.
16              THE COURT:  Yeah.  All right.
17         And Jason Ryan?
18              MR. BOOKBINDER:  The IRS Special Agent.
19              THE COURT:  Okay.  That's useful.
20              (Pause.)
21              THE COURT:  All right.
22         I want to now go back to where we left off in my
23    ruling on the entries in the chats in the posts, the
24    government's memorandum in support of its motions in
25    limine, Docket Number 94.
```

1        Here's where I am right now.  And essentially for

2    reasons I'll give you an overview of, I'll hear you

3    further, we'll look at the particular statements, but,

4    um, my present intention is to admit the portions of the

5    chat logs relating to Mr. T and MooreR -- and you

6    should -- I'm going to direct, by Tuesday, you give the

7    stenographer a dictionary of all these unusual terms,

8    like how do you spell "MooreR" or the technical terms

9    that are involved, so the transcript, including the

10   draft transcript can be as accurate as possible.  But I

11   intend to admit those conditionally as co-conspirator

12   hearsay based on the evidence that's been proffered to

13   me, which I'll note I think is -- if the government's

14   proof is as it predicts, um, there's a good chance I'll

15   be persuaded by a preponderance of the evidence that

16   Mr. T and MooreR were each members of the conspiracy at

17   the time they made the statements in question and that

18   those statements were in furtherance of the conspiracy.

19            MR. McGINTY:  Can I?

20            THE COURT:  I'm going to explain this.  This

21   is just a little something -- we're not finished.  I'm

22   just telling you where I am and I'm going to tell you

23   why I'm there and then you're going to get a chance to

24   address it further.

25        The posts I find more problematic.  The posts, to

the extent that the government is trying to get them

admitted under 801(d)(2)(E), seem to fall into two

categories, as I'll explain, that there's some evidence

that some of the people making the posts were customers,

bought something, but there's no evidence that anybody

else -- for some of the others there's no evidence, as I

understand it, that they were customers.  So I have

questions as to whether the government's going to be

able to prove by a preponderance of the evidence to me,

admissible and inadmissible evidence, that they were

co-conspirators at the time they made the posts.  I

doubt that they're verbal acts.  I question their

relevance for other purposes.  I have to give a limiting

instruction and do a 403 balancing.

So at the moment I'm not inclined to let the

government refer to the posts in the opening and wait to

hear until I, you know, have a fuller feel for the

evidence that somehow, you know, it would demonstrate,

for example, that Mr. Harris read the posts.  But

basically let me tell you what leads me, for the moment

at least, to these conclusions.

To admit a statement under Rule 801(d)(2)(E), the

government recognizes it needs extrinsic evidence in

addition to the statement to ultimately prove by a

preponderance of the evidence that a conspiracy existed

and that the defendant was a member of the conspiracy when the statement was made, and the Court is not bound by the rules of evidence in making that determination except with regard to privilege.  That's Rule 104(a) and (b).  The First Circuit discussed this concept in *Paradis-Rodriguez*, 160 F.3d 49, 56 to 57, citing *Borgelay,* in which the Supreme Court held:  "Trial courts may consider any nonprivileged evidence regardless of its admissibility in making Rule 801(d)(2)(E) determinations, including hearsay evidence."  Although there are various First Circuit cases, among others, where the Court notes that there was admissible evidence in addition to the statement itself.

A statement by somebody who uses a pseudonym or even somebody who's utterly anonymous may be admitted under Rule 801(d)(2)(E) if the requirements are met. And although the parties may not have cited it, I don't know if the defendant found it, one of those cases is a First Circuit case, *Alosa*, A-L-O-S-A, 14 F.3d 693 at 697.  And there are cases in other circuits that have concluded that anonymous co-conspirator statements are admissible provided that the requirements of Rule 801(d)(2)(E) are satisfied.  They include *Martinez*, 430 F.3d 317 at 325 to 328, a Sixth Circuit case.  *Gill*, 58

F.3d 1414 at 1420, a Ninth Circuit case.  **Dynalectric**

**Company**, 859 F.2d 1559 at 1581 to 1582.  And **Almesnian**,

664 F.3d 467 at 405.  I'm sorry, at 505 to 507.

More specifically, statements by individuals using

pseudonyms are admissible if the requirements of Rule

801(d)(2)(E) are met.  Another relevant case on this

issue is **Gill**, 58 F.3d, the jump-cite is 1420.

The extrinsic evidence required to support the

admission of alleged co-conspirator hearsay can be

circumstantial evidence including the context and

content of the anonymous statement itself.  That is the

ruling of **Martinez**, 430 F.3d at 324 to 328, a Sixth

Circuit case, upholding the admission of an anonymous

letter warning of a government investigation of the

conspiracy.  And **Dynalectric**, 859 F.2d at 1581 to 1582,

which involved an anonymous phone call.

Statements can also be admitted for nonhearsay

purposes.  A statement could be "the reciprocal portion

of an integrated utterance that puts the defendant's

statements into perspective and makes them intelligible

to the jury."  That's **Colon-Diaz**, 521 F.3d at 38.

**Delacruz-Paulino**, 61 F.3d 986 at 996, Note 8, is to a

similar effect.  In addition, questions are not hearsay

or they're not offered for the truth, as the First

Circuit said in **Vastig**, 42 F.2d 1319 at 1330.

1      As I said, it's my present intention to

2   conditionally admit some of the statements in the chat

3   logs of Mr. T and MooreR.  The government's proffer

4   makes it reasonable to expect that the government will

5   prove a conspiracy existed and each of those individuals

6   remembers at the time that the statement is at issue and

7   it also appears the statements were in furtherance of

8   the conspiracy.

9      For example, some of the evidence relevant -- some

10  of the evidence that the government relies on with

11  regard to Mr. T, it doesn't intend to submit to the

12  jury, as I understand it.  But I can consider that.  And

13  some of it will be admitted to the jury foreseeably.

14  The evidence, the extrinsic evidence concerning Mr. T,

15  at this point, appears to include a March 31, 2005 chat

16  log already admitted for context that shows the

17  defendant gave Mr. T access to the member forum on the

18  defendant's website, which indicates that Mr. T was a

19  customer.

20     Second, there's a chat log from April 20th, 2005,

21  which the government does not seek to admit, showing

22  that Mr. T solicited commissions from the defendant for

23  finding people to buy modems and a Sigma license on

24  TCNISO.net products -- on that site.  There's also

25  evidence that I expect will be admitted, um, when Mr. T

asked for the commission.

Third, there's a chat log from July 10th, 2005, which the government does not seek to admit, where the defendant told Mr. T that he was sending $50 through Pay Pal.

Fourth, there's a chat log, dated March 31, 2005, and another from April 18th, 2005, which the government does not seek to admit showing that Mr. T was being prosecuted for theft of service.

Five, there are additional portions of a chat log from April 20th, 2005, which the government does not seek to admit, where Mr. T asked the defendant if he got feedback and whether Sigma was working for users in Quebec, so he could be sure if it worked for them.

And six, um, there's a chat log from April 20th, 2005, which the government does not seek to admit, where Mr. T asked the defendant whether people with Sigma can get on-line with the MAC cloning or with a legitimate MAC address and use the highest configuration file?  And the defendant replies, "We don't condone theft of service."  And Mr. T responds, "But that would be their option, if they had a diabolical mind."

So I give those some weight.

There's independent nonhearsay corroborating evidence supporting the admission, at least the

1     conditional admission, of certain of Mr. T's

2     statements.  That evidence appears to include the

3     defendant's statements in the chat log, which suggests

4     that Mr. T was acting as a broker for TCNISO products.

5     Evidence that TCNISO hardware and software products like

6     modems and Sigma, which Mr. T references in the chat

7     logs and for which he sought commissions were capable of

8     being used as part of the conspiracy to steal service

9     and uncap.  This is analogous to *Martinez*, at 324 to

10    328, and *Dynalectric*, 1581 to 1582, which discuss

11    circumstantial evidence based on context on the content

12    of the statement itself.

13          In addition, the government represents that it

14    intends to present testimony from Phillips, Lindquist,

15    and Hanshaw that Mr. T was a friend of the defendant's,

16    was a real reseller of TCNISO equipment, and was a

17    regular participant in the company's website forums

18    where activities relating to the conspiracy, like

19    trading of MAC addresses and configuration files, were

20    routinely characterized.

21          There's similar evidence regarding MooreR being a

22    member of the conspiracy at the time the statements at

23    issue were made.  There are statements by MooreR about

24    the naming of CoaxThief.  Additional extrinsic proof is

25    required.  One form of that extrinsic evidence comes

from other statements by MooreR in previous chat logs

discussing CoaxThief plus an additional portion of the

August 4, 2005 chat log which the government does not

seek to introduce as evidence where MooreR talks about

offering his MAC-changing software on the defendant's

website.

There's also independent nonhearsay corroborating

evidence which it's been represented will include the

defendant's statements in the chat logs referencing

MooreR's role in designing CoaxThief and evidence that

CoaxThief and MAC-changing software, which the defendant

and MooreR are discussing in the chat logs, is capable

of being used as part of the conspiracy to steal service

and to uncap.

In addition, the government represents that it

expects to present testimony by Phillips, Lindquist, and

Hanshaw that MooreR was a software coder who helped with

TCNISO's packet sniffer and MAC-charger software.

So I think --

MR. BOOKBINDER:  Your Honor, it's worth noting

that, um, as to the testimony from Phillips, Lindquist,

and Hanshaw, I don't know that, um -- you know, they

will testify, if we were to ask them, did they know of

these names?  I'm not sure they're going to be able to

provide a lot of testimony about the detail of these

1  people's involvement.  So I think it's worth noting

2  that, at this point, that as we talked to them further,

3  that while they're familiar with both Mr. T and MooreR,

4  I doubt that any of them are going to be able to testify

5  in any detail about what their roles were.

6          THE COURT:  Is that different than what you

7  gave me in your submission?

8          MR. BOOKBINDER:  It is somewhat different,

9  your Honor.  It's, um, something that we've asked them

10  as we've talked to them in the last week or so in

11  anticipation of trial and in an effort to try to nail

12  down exactly what they know and what they didn't.

13      And so, um, to the extent that the Court -- now it

14  may be useful, and largely this may not be an issue,

15  because the Mr. T and MooreR chats we would be

16  offering -- we would be seeking to admit initially or at

17  least lay a foundation for it through Craig Phillips

18  because he's the one that preserved it.  But we're not

19  intending actually to use them with him and we don't

20  need to necessarily offer them with him.  We would be

21  intending to actually show them to the jury and to

22  discuss them with Special Agent Russell who is going to

23  be at the end of the trial.

24      And so while I think we need to ask Craig Phillips

25  a couple of questions about them for foundational

1  purposes, um, it may make sense for us not to offer them

2  at that point at all, the Court would not need to rule

3  on them, and then we could see --

4          THE COURT:  So you don't intend to mention

5  them in your opening then?  That's part of the reason --

6          MR. BOOKBINDER:  Um, let me confer, your

7  Honor, on that.

8          (Pause.)

9          MR. BOOKBINDER:  Well, your Honor, at least as

10  to, at least, one of two excerpts, Ms. Sedky will be

11  doing the opening and would like to refer to them.  And

12  maybe the answer is that at this point we don't expect

13  the testimony to be terribly helpful on a co-conspirator

14  analysis.  We would, um, rely on the statements of

15  Harris and of MooreR and Mr. T in the chats and ask the

16  Court to rule on that basis at this point.

17          THE COURT:  I don't understand -- I don't

18  understand what you're saying.  If it's not admissible

19  as co-conspirator hearsay, it has to be admissible on

20  some other basis.

21          MR. BOOKBINDER:  Oh, absolutely, and we're

22  suggesting that they are co-conspirators and the Court

23  can find that based on Mr. Harris's statements and

24  the --

25          THE COURT:  That's what I was getting to.  I

 1    mean, I did zero in on what I had understood from

 2    previous submissions was likely to be the direct

 3    testimony, but I actually put that at the end because --

 4    well, in the way I just recited this because there's

 5    other admissible and inadmissible testimony.  It's all

 6    being conditionally admitted.  In the overall scheme of

 7    things, even if it's not finally admitted, I don't know

 8    how important these two will be, Mr. T and MooreR.

 9        But let's -- let's go back.  Let me ask this, I

10    trust, rhetorically.

11        Have you been turning over -- you just said you

12    had further discussions with some of the witnesses and

13    you now know they're not going to be able to say much

14    about MooreR or Mr. T, particularly.

15             MR. BOOKBINDER:  Correct.

16             THE COURT:  Have you disclosed that previously

17    to the defendant?

18             MR. BOOKBINDER:  Yes, specifically the one

19    that we had raised this with most directly is

20    Mr. Phillips and there's a letter that we disclosed

21    to -- we just disclosed or maybe did it earlier in this

22    week --

23             MR. McGINTY:  Well, I, just to be very clear

24    about this, I have it right here in front of me, so.

25             MR. BOOKBINDER:  -- to Mr. McGinty, we've

 1   asked about each of these people and what he knows,

 2   because he was the one we had hoped would have been most

 3   helpful, but he's not as helpful as we had hoped.  We

 4   have been turning them over and we'll continue.  Each

 5   time we talk to a witness generally we generate at least

 6   some kind of a report.

 7              THE COURT:  Well, maybe I ought to get those,

 8   too, because I have the ***Jencks***.

 9              MR. BOOKBINDER:  We can do that, too, your

10   Honor.

11              THE COURT:  All right.

12              MR. McGINTY:  Can I address, sort of in-line

13   with this, um, the government was first suggesting that

14   this wouldn't be raised in the opening statement.

15              THE COURT:  Would or would not?

16              MR. McGINTY:  That it would not, and it was

17   mentioned that some of it might be, but I wasn't quite

18   sure what --

19              THE COURT:  Well, I was going to say --

20         What do you want to use in your opening

21   statement?

22              MR. BOOKBINDER:  Well -- if you would hold on

23   a minute, your Honor, I think I can answer that right

24   now.

25              (Pause.)

```
1              MR. McGINTY:  Your Honor, while we're doing
2       this, there was one thing I wanted to --
3              THE COURT:  Just one thing at a time.  They
4       have to hear you and you have to listen to this.
5              (Pause.)
6              MR. BOOKBINDER:  Your Honor, there are, um,
7       three statements from the MooreR chats that we are at
8       least considering using in the opening.
9              THE COURT:  Okay.  Go ahead.
10             MR. BOOKBINDER:  But they are all statements
11      of Harris, not of MooreR.
12             THE COURT:  And these are statements that are
13      mentioned in your motion in limine that we're going
14      through?
15             MR. BOOKBINDER:  I don't think they're
16      mentioned in our motion in limine because they're not
17      co-conspirator statements, they are statements of Harris
18      himself.
19             THE COURT:  So you're not offering any
20      statement of Mr. T or MooreR that you want to reference
21      in the opening?
22             MR. BOOKBINDER:  That's right, your Honor.
23      And we apologize for the confusion.  These are
24      statements by Harris to these people in the chats.
25      We've identified them for Mr. McGinty as well.  But we
```

1    didn't put them in the motion because they're not

2    co-conspirator statements.  And we've given him a list

3    of the specific ones.

4              THE COURT:  All right.  So basically you don't

5    want me to rule in limine now on MooreR or Mr. T, you're

6    not going to --

7              Look, there's no way he can listen to you and

8    listen to me.  If you need to confer, I'll give you an

9    opportunity.  But both of you need to listen to me.

10             Am I correct to understand that none of the

11   statements in the memorandum in support of the

12   government's motion in limine, 94, does the government

13   intend -- that are attributable to MooreR or Mr. T, does

14   the government intend to reference in its opening and

15   you're suggesting that I now wait until -- um, the

16   government's not going to offer any of those statements

17   until it gets to its last two witnesses and at that

18   point I should focus on this again, but I don't need to

19   rule now?

20             MR. BOOKBINDER:  I believe that's right, your

21   Honor.  And if I could have a minute?

22             THE COURT:  Yes.

23             (Pause.)

24             MR. BOOKBINDER:  Your Honor, as to -- to the

25   extent the question is are we going to refer to them in

1    the opening?  The answer is "No."  The Court can either

2    rule now or it can defer on it.  We don't expect that

3    the testimony will be particularly helpful in this

4    regard.  So if the Court wants to rule based on the --

5            THE COURT:  Okay.  I'm inclined to

6    conditionally admit these based on what I know even

7    putting aside what I thought was going to be the direct

8    testimony, but -- and these are not to be -- but

9    statements by Mr. T and MooreR are not to be referenced

10   in the opening, unless you come back to me for further

11   guidance, and as the trial goes on -- and my clerks and

12   I are going to keep track of the admissible evidence

13   that would link them to the alleged conspiracy, and I've

14   just cataloged some of the evidence that's either

15   inadmissible or is not going to be offered to the jury,

16   which I can consider, but we'll come back to this before

17   you offer any of the statements.  You cannot have any of

18   these statements presented to the jury until you raise

19   the issue again with me, I have further discussion with

20   you, and I rule.

21           MR. BOOKBINDER:  That makes sense, your

22   Honor.  And we would simply just be asking Mr. Phillips,

23   without offering the exhibit, to just ask him whether he

24   recognizes the chat log and --

25           THE COURT:  All right.  And at that point I

```
 1    would -- it wouldn't be shown to the jury.

 2              MR. BOOKBINDER:  Correct.

 3              THE COURT:  We would give it a letter for

 4    identification.  It would be marked for identification

 5    but not admitted into evidence.

 6         And then which witness do you want to offer this

 7    through?

 8              MR. BOOKBINDER:  Special Agent Russell.

 9              THE COURT:  So before Mr. Russell comes up

10    you'll tell me whether you're going to try to get it in

11    or whether you've decided to forget about it and, if

12    necessary, I'll hear you further and I'll rule.  Okay?

13              MR. BOOKBINDER:  Yes, your Honor.

14              THE COURT:  And is that the same with the

15    posts?

16              MR. BOOKBINDER:  If I could, your Honor?

17              (Pause.)

18              MR. BOOKBINDER:  Your Honor, we would be

19    seeking to offer the posts and use them only with

20    Special Agent Russell.  So it would come at the end of

21    the trial.  The posts, again, are another thing that we

22    were planning to, um -- in that case we were going to at

23    least refer to the general topics of the posts in the

24    opening.

25              THE COURT:  Meaning what?
```

1              MR. BOOKBINDER:  That there are posts about

2    people uncapping and swapping MAC addresses and things

3    like that.  So that probably does implicate the issue of

4    whether these are going to come in.

5          And so, you know, I'm happy to address some of

6    that now, if you'd like, your Honor --

7              THE COURT:  Well, my thinking -- before we get

8    to the posts, um, Mr. McGinty, is there anything you --

9    you don't have to say anything, but is there anything

10   you want to say about MooreR or Mr. T?

11             MR. McGINTY:  There was just one ingredient

12   here.  I thought the Court to say that there was

13   evidence that Mr. T was a customer because he was on the

14   forum.  I don't think the government disputes this, that

15   access to the forum is not limited to customers.

16             THE COURT:  Okay.  Good.  I'm trying to keep

17   up with you, but it's a moving target.  That's helpful.

18   Okay.

19          All right.  Then, you know, with regard to the

20   posts, as I said, I didn't analyze these -- well, I've

21   analyzed them, but it seems to me that it's going to be

22   more challenging to prove that any particular post is

23   admissible under Rule 801(d)(2)(E).  I don't view them

24   as verbal acts.  If they're not being offered for the

25   truth, I don't -- there are two problems.  I'd have to

1    give a limiting instruction, what are they being offered

2    for?  I'd have to have confidence that the instruction

3    would be followed.  And I'd have to do a Rule 403

4    balancing.

5         So which particular posts do you want to refer to

6    before we get to Mr. Russell?

7              MR. BOOKBINDER:  Your Honor, we wouldn't be

8    talking about any post in particular, but rather the

9    fact that there are posts in which people are all -- but

10   we could talk about what the basis for that is.

11             THE COURT:  I mean, I'm going to tell them

12   that the openings are not evidence, but there's two

13   problems.  One, if no evidence is admitted, um, the

14   defendant's going to complain there should be a

15   mistrial, you told them about something that there's no

16   evidence to support, and your own credibility is going

17   to be -- well, the credibility of your case is going to

18   be injured because you didn't prove what you said you

19   were going to prove, there were posts, so.  This could

20   raise in a motion in limine --

21        Well, you know, show me the two that you think

22   you've got your best chance of persuading me are

23   admissible.

24             MR. BOOKBINDER:  Sure.  On Page 23, your

25   Honor, the memorandum we've been walking through, the

```
 1    memorandum in support of our motions in limine, those
 2    are -- these come from Exhibit 22.  We were hoping to be
 3    able to offer the entire threads that these come from,
 4    but let's start with these two posts because I think
 5    they're the clearest examples.
 6              THE COURT:  So it says:  "I have MACs, a lot
 7    of MACs, willing to trade," by Sean19661.  "I have some
 8    MACs to trade.  What areas are you in?  Insight DD MACs
 9    by Aspeer.  Insight MACs from Springfield.  I'll need
10    some from somewhere else, PM.  Me."
11         Um, what's PM?
12              MR. BOOKBINDER:  "Private Message," your
13    Honor.
14              THE COURT:  All right.
15         Is there any evidence that any of the people who
16    made these posts are customers?
17              MR. BOOKBINDER:  These two are, your Honor.
18              THE COURT:  So you would say -- okay.  So
19    what's -- and is there -- so there'd be statements
20    themselves and you say there's evidence that they bought
21    products?
22              MR. BOOKBINDER:  They did, your Honor.
23              THE COURT:  Is there evidence of what products
24    they bought?
25              MR. BOOKBINDER:  Um, there is, your Honor, but
```

1   I can't -- if I can just take a look.

2            (Pause.)

3            MR. BOOKBINDER:  So for Sean19661, um, his

4   name, if you would like to know, is Sean Davidson,

5   according to the TCNISO records at Go Daddy, and, um, I

6   believe what's described as a "10-pack of a solderless

7   adaptor," which I understand to be a connector that the

8   company sold.

9            THE COURT:  You know, but something like

10  CoaxThief sounds like it's -- you know, it's a bad

11  thing, but is that just a device that would have a

12  legitimate and, arguably, illegitimate uses?

13           MR. BOOKBINDER:  I don't know, your Honor.  If

14  I could actually consult with Mr. Russell very briefly,

15  I could answer that more intelligently.

16           THE COURT:  Yeah, is this sugar or morphine?

17           MR. McGINTY:  Sugar.

18           THE COURT:  I thought you might say that.

19           (Pause.)

20           MR. BOOKBINDER:  Your Honor, Mr. Russell tells

21  me that it's an electronic component.  It can be used

22  for -- probably for both legitimate and illegitimate

23  uses.

24           THE COURT:  Well, I don't know that I would

25  draw any inference of a conspiracy from buying an

1     innocent product alone.  It doesn't add much.

2        That's what Sean bought?

3           MR. BOOKBINDER:  Yes.  And for the second

4     customer, "Aspeer," is Andrew Spear is the customer's

5     name.  He bought two, um, what are listed as "SB-5100

6     Combo," and that's the, um, Surfboard 5100.  That is a

7     modem.  That's a -- that's the modified modem that

8     TCNISO is selling.

9           THE COURT:  It's modified to do what?

10          MR. BOOKBINDER:  With their software, to

11     include the Sigma software.

12          THE COURT:  And the Sigma software does what?

13          MR. BOOKBINDER:  It's the software that allows

14     someone to change their MAC address, obtain a service

15     for a -- a free internet service for --

16          THE COURT:  So he bought -- or she bought a

17     suspicious product?

18          MR. BOOKBINDER:  Correct, your Honor.  And so,

19     I mean, we really have two bases for a fraud rim case

20     and one is the co-conspirator statement that we've been

21     discussing and the other, though, is to the extent that

22     they're making requests, not an assertion of fact, um,

23     we suggest that they fall outside of the hearsay rule

24     altogether and, um --

25          THE COURT:  Well, the first one from Sean

```
 1   says, "I have some MACs to trade.  What area are you
 2   in?"  That's not a question.  "What area are you in?"
 3   is a question, but, I mean, it only has relevance and
 4   probative value if, I think, if you take it for the
 5   truth, "I have MACs to trade," because you're trying to
 6   show that Mr. Harris was part of a conspiracy in which
 7   the co-conspirators were interdependent, they had to
 8   trade MACs, and this is evidence of both knowledge and
 9   intent to trade MACs.
10             MR. BOOKBINDER:  Well, it is a -- I mean, this
11   could be evidence that they actually traded MACs.
12   However, what we suggest, and actually what's far more
13   important about this evidence -- and we'll have
14   customers testify that they traded MACs, um, is that --
15   is that on Mr. Harris's own forums, on his website,
16   people are posting offers to trade.  Whether they
17   actually meant them, whether they actually executed
18   these trades, is not important for this purpose.
19             THE COURT:  What's the evidence going to be
20   that Mr. Harris would know what's -- you know, would
21   have read these posts?
22             MR. BOOKBINDER:  There's several things, your
23   Honor.  First of all, the, um -- the website.  We've got
24   the Go Daddy records showing that he is the owner
25   essentially, the registrar of the website.  It's
```

1    registered to him.  He gets the bill.  He pays it.  It's

2    in his name.  Second, we'll have Craig Phillips and

3    Isabella Lindquist, both will testify that they

4    discussed with him, um, things that were posted on the

5    forums and both of them -- that testimony we do expect

6    to get.

7              THE COURT:  And what years did they discuss

8    it?

9              MR. BOOKBINDER:  Well, let's think about this,

10   your Honor.

11             THE COURT:  These are posts in 2007.

12             MR. BOOKBINDER:  Um, yes, your Honor.

13        So Mr. Phillips was involved through, um --

14   certainly into 2007, um, from 2003 when the company

15   started or at least shortly thereafter, 2004, at least

16   into 2007, and I don't know the exact dates when he is

17   no longer involved, but what he will testify is that

18   it's a frequent topic of discussion.  He will not be

19   able to say that "Mr. Harris and we talked about these

20   posts" or anything about that.  Um, Ms. Lindquist stayed

21   involved longer until -- if I could just check, I think

22   it's 2008.  Okay.  Either '07 or '08.  So around the

23   same time, um, she's no longer involved in the company

24   as well.

25        So what they will testify is that it is on an

1  ongoing basis that this was something they talked about

2  and that it was relevant not just as a matter of idle

3  curiosity, but to knowing what people were doing,

4  successfully and unsuccessfully, problems they were

5  having, was relevant to their running the company.

6         THE COURT:  So you say, one, that's sufficient

7  to admit this for the truth as co-conspirator hearsay

8  and, two, um, even if not for the truth, of whether Sean

9  actually had some MACs to trade, to show that Mr. Harris

10  knew that his devices were being used in connection with

11  false MAC addresses to steal servers.

12         MR. BOOKBINDER:  And just for the fact that

13  people were making posts on his website, seeking to

14  trade MAC addresses, goes to what he believed that

15  people were doing with his products, his knowledge and

16  his intent.

17         THE COURT:  All right.  Mr. McGinty?

18         MR. McGINTY:  The web post here is December

19  24th, '07.  The purchase is, um, June 28, '07, reflected

20  on the records.  So there's a five-month hiatus.  So

21  there's no continuity between purchase and post.

22      The item that's purchased is a SB-5100 Combo.  An

23  SB-5100 Combo would be a modem unmodified, so it doesn't

24  have the software, as well as a BlackCat cable

25  separately provided.  So you don't have an integrated

1     modified unit, you have the capability of different

2     things, you don't have a product that is susceptible of

3     immediate application, it depends on how it's going to

4     be done by the person.

5          So some six months later the person is

6     communicating about something, um, during the

7     conspiracy, um, not in connection with the purchase, in

8     furtherance of the conspiracy, but not in connection

9     with the purchase.  No linking between this and the

10    purchase which would be integral to making this somehow

11    probative.  Interestingly, the government, in its

12    original argument about this, said that these were

13    verbal acts precisely because it didn't want to argue

14    that this was a co-conspirator statement and it also

15    said that they're not being offered for the truth,

16    presumably also recognizing that it wouldn't serve that

17    purpose, but now in an effort to get this in, if not one

18    way, but another way.

19              THE COURT:  Well, I've been looking at it as

20    potential co-conspirator hearsay.

21          What do you say to their argument that this isn't

22    offered for the truth, it's to show what information

23    Mr. Harris had which is relevant to showing his intent

24    to conspire in some way?

25              MR. McGINTY:  Obviously it's offered for the

 1    truth.  Insight MAC's from Springfield.  I mean, it's an

 2    instant message, so it has the -- you know, some of the,

 3    um, words are compacted or compressed.  It's perfectly

 4    plain, you know, "We have MACs from Springfield.  I need

 5    some from elsewhere."  Um, if we take the truth out of

 6    that, um, the government doesn't offer it, and the truth

 7    is that they're engaged in selling MACs.

 8                 THE COURT:  Well, that may go to the efficacy

 9    of a limiting instruction on the 403 balancing.

10          All right.  I understand this better.  I'll give

11    you guidance on this on Tuesday.  You won't be opening

12    until then.  All right?

13                 MR. McGINTY:  Can I add one more factor on

14    this?

15                 THE COURT:  Yes.

16                 MR. McGINTY:  Again, on the moderator side of

17    things, the government uses "moderator" as if there's a

18    single moderator who controls all of the discussions.

19    Um, there are different moderators in different

20    compartments of this.  Um, additionally, this is not a

21    time when Isabella Lindquist or Craig Phillips is

22    involved in any respect actively or even minimally in

23    the operation of TCNISO.

24                 THE COURT:  In December of 2007?

25                 MR. McGINTY:  In December of 2007.

1    So, um, you know, the suggestion that somehow

2    they're going to come in and make this sort of an

3    integrated co-conspirator admission, I think, is a

4    stretch.

5              THE COURT:  Well, I'll think about this one a

6    little further.

7         Is there anything else we ought to discuss today?

8              MR. McGINTY:  Um, there is an important

9    matter, which is that we have several times suggested

10   that the Court ought to make some instructions at the

11   beginning of the case so the jury can get context.

12             THE COURT:  I intend to give preliminary

13   instructions and I intend to discuss them with you

14   before I do it.  I've given priority, in the limited

15   time I've had to deal with this, because the briefing

16   was only done yesterday, to focus on the evidentiary

17   issues.  I intend to work on the weekend on the

18   instructions and if we pick the jury in time, we'll talk

19   about them Tuesday.  Well, we'll talk about them at some

20   point on Tuesday and we'll certainly talk about them

21   before I give you some preliminary instructions on

22   Wednesday.

23        How specific they are?  Um, and you would like

24   some specific points, and if I'm going to do that, maybe

25   the government would, too.  But I don't know.  It will

1    depend on my degree of comfort, although I will tell the

2    jury that I expect -- not only are they going to get

3    more detailed instructions at the end of the case, but

4    my own understanding of the law may evolve, so if

5    anything I say at the beginning sounds different than

6    what I say at the end of the case, they have to follow

7    the instructions I give at the end of the case.

8              MR. McGINTY:  You know, the government's

9    opening is going to be, um, as it appears in the grand

10   jury presentation, as it appears elsewhere in the case,

11   um, is an attempt to characterize not only the larger

12   aspect of all of this, but each particular aspect of it

13   as meaningfully bad or illegal.  So the grand jury

14   transcripts are sort of replete with things like, Is

15   this legitimate, for example, um, to harvest MAC

16   addresses?  Whether there's any reason to get a MAC

17   address?  Whether there's any reason to have the

18   capability of doing that?  Whether there's any reason to

19   have a change in a config file?  All of these, um, in

20   the grand jury, as a sort of a harbinger of what the

21   trial will be like, the government suggests, not in the

22   larger scheme of a wire fraud where it's a cumulative

23   activity, but each of these things is in itself wrong,

24   or to use their word, frequently used through the grand

25   jury, "illegitimate."

1          Now, the jury is going to be sitting through the

2     trial and they're going to be hearing about CoaxThief,

3     they're going to be hearing about other things that are

4     part of the software, without guidance, you know, in a

5     conceptual framework where to understand what is

6     charged, differentiated from what discrete acts are or

7     are not unlawful within that, um, is important because

8     without that they will be adrift and they will be

9     assuming, from the tenor of the government's

10    presentation, that each of those things is in itself

11    wrong and that cumulatively the whole project is wrong.

12    And, you know, unlike a bank robbery case where a jury

13    doesn't have to be told that going into a bank and

14    pointing a gun is probably a very bad thing, um, here

15    what passes for a crime in the area of the sale of

16    software is going to be very important and the

17    orientation is going to be important and doing that at

18    the end is going to cause them to have to go back and

19    revisit things that they didn't have the context to

20    understand when they were first --

21              THE COURT:  That's why I do preliminary

22    instructions to help them, you know, get a sense of what

23    the questions will be at the end.

24              MR. McGINTY:  But these issues all -- I mean,

25    where the rubber's going to meet the road, Tuesday,

1    Wednesday, or it's going to be the following week, but

2    at some point, um, the rubber's going to have to meet

3    the road on the **Direct Sales** issue.

4            THE COURT:  And I'm going to work on **Direct**

5    **Sales**, but -- you know, part of what I'll tell them, to

6    the extent I get to this level of detail, my preliminary

7    instruction is, you know, I was saying that this and

8    this and this -- you know, he's not charged with -- it's

9    not charged that he committed a crime by selling

10   anything, but it is charged that this was an element of

11   a larger crime, a wire fraud scheme, and that if

12   something might not be illegal alone, it could be part

13   of an unlawful scheme.  I would say something like that.

14           MR. McGINTY:  All right.  But then what's the

15   "it"?  Is the "it" reverse engineering?  Is it

16   harvesting MAC addresses?  Are MAC addresses entitled to

17   some measure of confidentiality such that if Google

18   grabs them, there's something wrong?  All of those are

19   "its."

20           THE COURT:  I keep going back to my hammer.

21   Even if it was as innocent as a hammer, it could be, um,

22   an element of the conspiracy, um, or evidence of a

23   conspiracy, or part of an unlawful wire fraud scheme.

24           MR. McGINTY:  But again --

25           THE COURT:  But --

1              MR. McGINTY:  The hammer problem is if I say

2      to you, "I will take the hammer you sell me at Home

3      Depot and I will go and I will put it in the skull of

4      somebody in about five minutes," then you don't sell it

5      to them, otherwise you're complicit in what they told

6      you they were going to do.  The problem here is that the

7      government is suggesting that knowledge of how something

8      might be used -- actually less than that.  The raw

9      capability of a thing to be used in a way suffices to

10     prove, um, a conspiracy with end users whom you didn't

11     know, didn't interact with, didn't communicate with, and

12     that can't be right, it can't be right, because on those

13     instructions, um, the entire software industry, starting

14     with VCRs and moving to the IPOD, all of them in the

15     software industry, and frankly everyone at Home Depot,

16     is at some risk from a proposition run loose and, in a

17     way, um, this isn't just Ryan Harris's case.  The issue

18     is how do you contain the proposition of liability on

19     the criminal side in cases where, on the civil side, the

20     law hasn't come close to this?

21             So it's that, I think, that the jury has to

22     understand, um, hammers and whether someone's selling

23     cocaine on the street corner, are perhaps not the prism

24     that the jury ought to see this from, they ought to see

25     it differently.

1           THE COURT:  Well, it's helpful for me to hear

2      this.  If the government wants to say anything to

3      balance it out, you can, but I'll do more work on it

4      certainly between now and Tuesday.

5           MS. SEDKY:  Thank you, your Honor.  I will be

6      very brief.

7           To the extent that the Court is inclined to give a

8      preliminary instruction to the jury, we would suggest

9      that the approach that would be the most accurate in the

10     law and the best help to the jury is to simply set out

11     the legal principle that we all agree on, which is that

12     we have to prove that Ryan Harris intended to help his

13     customers steal free and faster Internet service, and

14     we've proposed our Instruction Number 2.  If you would

15     want to front-load that earlier on in the jury

16     instructions, we could certainly contemplate that.  I

17     mean, I don't think we would object to that.  But the

18     format of whatever jury instruction gets given about

19     this supplier context, we believe the best and most

20     accurate and most effective instruction lays out the

21     unrefuted un -- everybody agrees with the legal

22     principle, that we have to show intent, and then there

23     is a list of factors that we are asking the jury to

24     consider in deciding whether, based on those factors,

25     either (a) those factors have been proven, and (b) if

they want to choose to infer intent from that?  And that
is a riskless proposition.  We don't have to get into
the *Falcone* versus *Direct Sales* meeting of the minds and
try to parse out what *Direct Sales* said about what
*Falcone* did and which part was -- which part was what.
It's clean, it's accurate, and we do not think that it
is appropriate to instruct the jury that any one single
factor either can or cannot alone suffice.  We believe
that we should stay silent on that factor.

THE COURT:  Well, I'll consider it, but with
regard to my final instructions and once I understand
what alone would not be sufficient, but can be
considered, in the totality of the evidence, to show a
conspiracy or a scheme, then I may tell the jury that
because I think it will help their understanding.  But
I'm not there yet.

MR. McGINTY:  And one more slightly brief
thing?  Infused in this case is a conflation of the
knowledge of a product capability with the government's
argument that that is sufficient to establish a separate
element, which is the intent to engage in that activity,
and their instruction that talks about the product
capability is suggesting that that knowledge -- also
because there's no other evidence offered that makes
that -- that adds a plus factor to the intent, that

 1   knowledge suffices to establish intent, and conflating

 2   those two is the structural problem in the case.

 3            THE COURT:  I don't -- from what I understand

 4   from the government's case, they're not relying on the

 5   mere knowledge, I mean, of some of these chats or some

 6   of these, you know, of what's represented to be what the

 7   foreseeable testimony is, I think the government's not

 8   relying on just what their mere knowledge is, aren't

 9   you?

10            MS. SEDKY:  Absolutely, your Honor, but with

11   that said, we don't want an instruction that ties the

12   jury's hands if it's not accurate under the law.

13            THE COURT:  We'll see what you want at the

14   end.  You want to do two things, you want to get a

15   conviction and you want it to be sustained on appeal,

16   and, you know, about two weeks ago you and

17   Mr. Bookbinder, each speaking for the United States,

18   weren't on the same page.  But maybe the way the

19   evidence comes in, you'll think it's prudent not to seek

20   the most expansive instruction.  But I'll just think

21   about it.  I just have more work to do on it.

22        All right.  I will see you at 9:00 with Mr. Harris

23   on Tuesday morning.  The Court is in recess.

24            (Ends, 12:15 p.m.)

25

1              C E R T I F I C A T E

2

3

4       I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5   hereby certify that the forgoing transcript of the

6   record is a true and accurate transcription of my

7   stenographic notes, before Chief Judge Mark L. Wolf, on

8   Friday, February 17, 2012, to the best of my skill and

9   ability.

10

11

12   /s/ Richard H. Romanow 11-06-12

13   _____
     RICHARD H. ROMANOW   Date

14

15

16

17

18

19

20

21

22

23

24

25