1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                         No. 1:09-cr-10243-MLW

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    RYAN HARRIS

10

11                   * * * * * * * *

12

13                 For Jury Trial Before:
                 Chief Judge Mark L. Wolf

14

15                   Jury Selection

16

17                 United States District Court
                 District of Massachusetts (Boston.)
                 One Courthouse Way

18                 Boston, Massachusetts 02210
                 Tuesday, February 21, 2012

19

20                   * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                 Official Court Reporter

23              United States District Court
           One Courthouse Way, Room 5200, Boston, MA 02210

24                 bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    ADAM J. BOOKBINDER, ESQ.
          United States Attorney's Office
 4        John Joseph Moakley Federal Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          (617) 748-3112
 6        E-mail: Adam.bookbinder@usdoj.gov
     and
 7    MONA SEDKY, ESQ.
          U.S. Department of Justice
 8        601 D. Street, N.W.
          Washington, D.C. 20530
 9        (202) 353-4304
          Email: Mona.sedky@usdoj.gov
10        For the United States of America

11

12    CHARLES P. McGINTY, ESQ.
          Federal Public Defender Office
13        District of Massachusetts
          51 Sleeper Street, 5th Floor
14        Boston, Massachusetts 02210
          (617) 223-8080
15        E-mail: Charles_mcginty@fd.org
          For the defendant

16

17

18

19

20

21

22

23

24

25
```

1                     I N D E X

2

3          Preliminary Matters.....................    4

4          Jury Selection..........................   26

5          Motions in Limine.......................  242

6

7                   E X H I B I T S

8

9                    (None marked.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (Begins, 9:00 a.m.)
 3              THE CLERK:  Criminal Matter 09-10243, the
 4    United States of America versus Ryan Harris.  The Court
 5    is in session.  You may be seated.
 6              THE COURT:  Good morning.  Would counsel
 7    please identify themselves for the Court and for the
 8    record.
 9              MR. BOOKBINDER:  Good morning, your Honor.
10    Adam Bookbinder and Mona Sedky for the United States.
11              MR. McGINTY:  And, your Honor, Charles McGinty
12    and Christine Demaso for Ryan Harris.  Ryan Harris is
13    seated right at counsel table.
14              THE COURT:  Okay.
15         On the agenda today, this morning, and to some
16    extent this afternoon, I have jury selection addressing
17    the evidentiary issues relating to the first witness,
18    Mr. Phillips, um, finishing the discussion of the
19    admissibility of certain posts, um, I understand there
20    are no evidentiary issues relating to the second
21    witness, Kohler, and I'll discuss with you further the
22    preliminary instructions.  In addition, I want to get
23    clarification of the revised exhibit list and revised, I
24    think, redacted exhibits that I have received a short
25    time ago.
```

1          Is there anything else that we should plan to

2     discuss today?

3               MR. BOOKBINDER:  I don't believe so, your

4     Honor.

5               MR. McGINTY:  No, your Honor.

6               THE COURT:  Okay.  Well, let me do this.

7          I just received the revised exhibit list and what

8     I understand to be redacted exhibits that now conform

9     with the rulings that I've been making.  Is that

10    correct?

11              MR. BOOKBINDER:  They do, your Honor, for the

12    chats for sure and for the posts I know there were some

13    that the Court had reserved on.  In those cases we left

14    in there more than may ultimately be admitted and if so

15    we'll redact them further.

16              THE COURT:  And did you add one additional

17    exhibit?

18              MR. BOOKBINDER:  We did, your Honor, it's

19    Exhibit 32.

20              THE COURT:  And did you also give me some

21    additional *Jencks*?

22              MR. BOOKBINDER:  We did.

23              THE COURT:  Who or what is that for?

24              MR. BOOKBINDER:  It is the *Jencks* that was

25    created in the past maybe two weeks or so since we

1   provided you with our binder set, just during the course

2   of the witness prep.

3          THE COURT:  All right.  Let me ask you this

4   before I review with you the questions that I intend to

5   ask the potential jurors.

6       Trying from 9:00 until 1:00, recognizing that the

7   openings will be tomorrow, what's the best estimate of

8   how long the case will take before it gets to the jury

9   to decide?

10         MR. BOOKBINDER:  Your Honor, we certainly will

11  finish our case next week and we'll go into next week at

12  least into, I would say, Tuesday at least, I'll probably

13  be with witnesses, maybe until Wednesday.  I don't think

14  -- I would expect that we'll finish witnesses by

15  Wednesday.

16         THE COURT:  That's fine.

17         MR. BOOKBINDER:  That's my best guess.

18         THE COURT:  Okay.  And, Mr. McGinty, does the

19  defendant anticipate presenting any evidence?

20         MR. McGINTY:  Um, your Honor, not at this

21  time, and I think that's a fair estimate.  You know,

22  maybe Thursday.  But I think that's a fair estimate.

23         THE COURT:  I'll tell them that we expect

24  we'll finish the evidence next week, but it could

25  conceivably go into the following week.  This is just so

1      they can tell me if they have particular issues with

2      regard to the schedule.

3            All right.  I told you we're going to get 68

4      jurors.  Mr. Hohler has the list.  He'll give it to you

5      when I tell him to.  And Juror Number 1 on that list

6      will be to my far left in the first row and we'll go

7      down.  At present I propose to ask 15 questions.  If the

8      answer from any juror is "yes," the juror will stand and

9      tell me his or her name and number, and we'll all make a

10     note, including my clerks, of what questions each juror

11     has answered "yes" to.  When that process is complete --

12           Um, could the Court Security Office identify

13     himself please.

14                 COURT OFFICER:  Thomas Chamberlein.

15                 THE COURT:  Yes.  Mr. Chamberlein, as you

16     know, I'm going to go back to the jury room to question

17     the jurors individually.  That is a public proceeding.

18     I will say that if anybody in the courtroom wants to

19     observe it, when we go back, can come.  It's essential

20     that you and anybody who substitutes for you know that

21     and tell anybody who comes into the courtroom that if

22     they want to observe the jury selection process, you'll

23     take them back to the jury room.  Okay?

24                 COURT OFFICER:  I understand.

25                 THE COURT:  Thank you.

1    All right.  So we'll go back there, I'll follow up

2  on why people have answered "yes" and ask if there's

3  anything else they feel they should have answered "yes"

4  to.  When I have qualified 32 jurors, we'll select the

5  jury.  The defendant will have 10 and the government 6

6  discretionary challenges to the first 28 and you'll have

7  one each for the remaining 4.  And we'll go over the

8  order in which they'll be exercised at sidebar.

9    Is there any questions about the process?

10    MR. BOOKBINDER:  No, your Honor.

11    THE COURT:  Okay.  Here are the questions at

12  the moment I intend to ask and, in fact, I'll let you

13  comment, if you want, on the first one before I go

14  through the rest.

15    The first question is:  "In this case the

16  defendant Ryan Harris is charged with a conspiracy and

17  scheme to defraud internet service providers by selling

18  cable modem hacking products and doing other things to

19  help people who use them to obtain internet cable -- to

20  obtain cable internet service from those providers

21  without paying for those services.  Has anyone read or

22  heard anything about the case?

23    MR. McGINTY:  Well, first of all, your Honor,

24  the "without paying," um, there's several different

25  purposes they've set up in the indictment.  One is to

1   get free cable service without paying, another is to get

2   increased service, um, a third is to secure anonymity on

3   the internet.  And each of those are alleged and each of

4   those should be indicated to the jury.

5           THE COURT:  Well, I don't know about the last

6   one.  I think I could amend this.  It's very helpful.

7   It's just what I wanted.

8           (Pause.)

9           THE COURT:  I could say "would use them, the

10  modem hacking products, to obtain cable internet service

11  from the providers without making required payments for

12  those services."  In other words, this is the point in

13  which I'm just trying to find out if they've heard

14  anything about the case.  Okay?  But thank you.  That's

15  helpful.

16      Okay.  That was Question 1.  But now I'm going to

17  go through the other 14 and you'll comment at the end.

18      Second, I'm going to ask the attorneys to

19  introduce themselves and the defense counsel to

20  introduce Mr. Harris.

21      Third, I'm going to ask Mr. Hohler to read the

22  list of the potential witnesses, and for both those

23  questions I'll ask whether they or anybody close to them

24  knows any of you or any of the potential witnesses.

25      Fourth, I'll explain the schedule, that we're

 1    going to start tomorrow, that we will sit from 9:00

 2    until 1:00, that the case is expected to take about

 3    seven days to present, and it may take a few days more,

 4    and that once the jury is deliberating, they'll have to

 5    plan to be here until at least 4:30 in the afternoon.

 6    I'll ask whether that schedule will make it very

 7    difficult or impossible for anybody to serve?

 8         Fifth, I'll ask if any of them have ever served on

 9    a jury or a grand jury?

10         Sixth, I'll ask if they or anyone close to them

11    has ever been involved in a criminal matter as a victim,

12    witness or a defendant.

13         Seventh, I'll ask whether they or anybody close to

14    them has ever been employed in law enforcement as a

15    police officer or an agent, a prosecutor, or a

16    corrections officer or in any other way?

17         Eighth, I'll ask if any of them are able to --

18    well, I'll ask if they feel they are able to judge the

19    testimony of a law enforcement officer like the

20    testimony of anyone else and not assume that person is

21    more or less likely to be telling the truth because he

22    works in law enforcement?

23         Ninth, I'll ask whether they or anybody close to

24    them has ever been employed by a cable company or other

25    internet service provider?

1          Tenth, I'll ask if they or anyone close to them

2     has ever obtained cable television or internet service

3     without paying the required fee?

4          Eleventh, I'll ask whether they or anybody close

5     to them has ever had a favorable or unfavorable

6     experience with law enforcement that might affect their

7     ability to be impartial?

8          Twelfth, I will tell them that one or more of the

9     witnesses in this case has been convicted of a federal

10    crime and in order to get certain benefits has agreed to

11    assist the government in the investigation and

12    prosecution of this case.  This is a permissible law

13    enforcement technique.  You will be instructed to

14    examine the testimony of such witnesses and any other

15    witness given immunity for his or her testimony with

16    special care, but you may rely on it if you find it

17    truthful.  Do you have any attitude toward criminals who

18    cooperate with the government or witnesses who receive

19    immunity for their testimony that might injure your

20    ability to follow this instruction?

21         Thirteenth, I will tell them there are certain

22    fundamental principles in every criminal case like this

23    one.  The defendant is presumed innocent.  The burden of

24    proof is on the government to prove the defendant is

25    guilty beyond a reasonable doubt.  The defendant does

1    not have to prove he is innocent.  The defendant does

2    not have to testify and if he chooses not to testify,

3    you may not draw any suggestion that he is guilty from

4    the fact that he did not testify.  Jurors must decide

5    the case based on the facts proven by the evidence and

6    follow the law as I describe it putting aside any idea

7    the juror may have regarding whether the law is wise or

8    not.  If the defendant is proven guilty beyond a

9    reasonable doubt, the jury must find him guilty.  If the

10   defendant was not proven guilty beyond a reasonable

11   doubt, the jury must find the defendant not guilty.

12   Then I'll ask whether anyone feels he or she could not

13   follow these essential principles in this case?

14        Fourteenth, I'll ask whether any of them have any

15   difficulty hearing or understanding English or any other

16   problem that would make it difficult for them to be a

17   juror?

18        Fifteenth, I'll ask whether there's any other

19   reason anyone feels he or she could not be a fair and

20   impartial juror in this case?

21             MR. BOOKBINDER:  Your Honor, I have very

22   little to suggest.  There's only one thing.

23        I believe you said you were going to ask whether

24   anyone or their family members have been employed in law

25   enforcement, and I was wondering whether you could add

1    to that "or by a defense attorney"?

2            THE COURT:  All right.

3            MR. BOOKBINDER:  There maybe a very few of

4    those, there probably are not a lot, but it seems to be

5    a fair addition to the question.  The vast resources of

6    the defense counsel.

7            THE COURT:  All right.  (Writes.)   All

8    right.  I'll do that.

9            MR. BOOKBINDER:  And one other.

10      The question about whether someone has obtained

11    cable television or internet without paying, there's

12    another -- there are historical cases like this

13    involving satellite TV, and so I'm wondering whether

14    rather than getting specific about the technologies,

15    whether it would be simpler just to say, whether anyone

16    has obtained television or internet access without

17    paying, which then would cover whatever technology

18    somebody was using?

19            THE COURT:  Well, the reason I didn't do that

20    originally is that some of us are old enough to remember

21    where you could get television for free lawfully.

22            MR. BOOKBINDER:  Your Honor, the question, I

23    guess, we propose is without paying the required fees.

24    It assumes that.  But, you're right, of course about

25    that.

1           THE COURT:  All right.  (Writes.)  I'll say "a

2     required fee."  It's not always required.

3           MR. BOOKBINDER:  Sure.

4           THE COURT:  Mr. McGinty, do you have any --

5           MR. McGINTY:  I don't, your Honor.  Thank you.

6           THE COURT:  All right.

7     Mr. Hohler has the list of -- he can give them to

8     you now.

9           (Passes out list.)

10          THE COURT:  All right.

11    So we don't have the jurors ready yet?

12          THE CLERK:  No, Judge.

13          THE COURT:  All right.  The jurors are not

14    available yet.  I think we might profitably use this

15    time to work on some of the evidentiary issues and I

16    think the most immediate relate to Phillips.  We haven't

17    discussed these previously, but I think this goes back

18    to the defendant's original motion in limine, which is

19    Docket 96 and 99.  The government responded on February

20    5th on the docket.  That's Number 106.

21    Here's the general principles that I intend to

22    apply.  Do you have the papers you need?  Mr. McGinty

23    may be looking.

24          MR. McGINTY:  I have 106.  I'm sorry.  And the

25    other docket is?

```
1              THE COURT:  Your motion is 96 and the memo is
2    99.
3              MR. McGINTY:  Thank you.
4              THE COURT:  Here are the general principles I
5    intend to apply to Mr. Phillips' testimony.
6         As I understand it, Phillips is an unindicted
7    co-conspirator.  The conspiracy alleged in the
8    indictment went from about 2003 to 2009, although I
9    understand that he and Mr. Harris parted company at some
10   point in about 2007.  Phillips' testimony regarding his
11   own knowledge, his intent, his state of mind, his
12   action, are all potential evidence of the existence of a
13   conspiracy between Phillips and Mr. Harris and Phillips'
14   membership in it.  So that would be admissible.
15        Phillips can testify regarding what the defendant
16   said and did in 2003 through 2007 or probably before
17   2003.  If, as I recall, their relationship began
18   earlier, that would be evidence of the defendant's
19   knowledge, intent and possible overt acts.
20        Phillips was not designated as an expert,
21   therefore you cannot provide expert evidence or
22   testimony.  However, as I understand it, with regard to
23   the admissible testimony that he has, I don't find that
24   Rule 403 would operate to exclude otherwise admissible
25   identified evidence as I understand it.
```

1          So those are the general applicable principles, I

2    would say.  If you want, we can go through particular

3    matters in the defendant's motion in limine, Document

4    95.  I'm sorry.  Document 99.

5          And I'm told that Mr. Phillips is expected to

6    testify.

7          How do you pronounce the name of the company?

8               MR. BOOKBINDER:  TCNISO.  That's how we've

9    been pronouncing it.

10              THE COURT:  Okay.  TCNISO.  To the extent that

11   Phillips wants to testify or is able to testify that

12   Harris showed him how to use the company's products to

13   get free or enhanced internet and saw Harris use the

14   products to do so, that would be admissible.  They would

15   be statements by a defendant offered by a party

16   opponent, they would be intrinsic to the alleged

17   conspiracy, at least if they were during the period of

18   the alleged conspiracy, and would provide context.  They

19   are relevant to Mr. Harris's knowledge, which *Direct*

20   *Sales*, as well as common sense, indicates.  It's

21   relevant to intent, proving intent.

22         The fact that the government's not charged Harris

23   with his own use of the company's products doesn't

24   render the evidence irrelevant.  First of all, he's

25   charged with engaging in this scheme and his own use

1  would be part of the scheme.  The government will have

2  to prove that Mr. Harris intended to engage in a scheme

3  or intended to conspire to get free internet and his own

4  activities are relevant to doing that.

5      With regard to the operation of TCNISO, I think

6  it's not correct to say that Phillips does not have

7  personal knowledge about how the company was run at the

8  time of the charged purchases.  I would think that some

9  of handshaw's purchases occurred prior to -- well, one

10  of them occurred prior to 2007 and another one was in

11  2007, if I can recall correctly?

12          MR. BOOKBINDER:  Your Honor, that's when

13  Hanshaw obtained the products, that's right, but that's

14  the only correction, that he didn't buy them, he just

15  got them through the website and was given access by

16  TCNISO someplace.  But, yes --

17          THE COURT:  But in any event, the operation of

18  the company in the period that Mr. Phillips has personal

19  knowledge is relevant as part of the period of the

20  alleged conspiracy.

21          MR. McGINTY:  Well, I think the government has

22  acknowledged a vulnerability thing which is that, um,

23  Nathan Hanshaw says that in 2005 he downloaded a free

24  product from the website, um, and that is the only, um,

25  transaction that's part of the proof here that coincides

 1    with Phillips' part of the company.  That interaction,

 2    that downloading activity, is not part of the sales and

 3    production of product that occurred while Phillips was

 4    there.  So Phillips' testimony, possible testimony about

 5    what was done back then, how it was done, who packed

 6    things, um, who presented them, who responded to

 7    customers complaints and so forth, does not get made

 8    relevant to the subsequent sales by anything involving

 9    Mr. Hanshaw.  So that stuff is not relevant to the sales

10    that are at issue here.

11         THE COURT:  Let me -- I may have to look at

12    the indictment.

13         (Pause.)

14         THE COURT:  Why is it irrelevant?  It may not

15    be sufficient to prove it, but --

16         MR. McGINTY:  Well, what the government wants

17    to do is to have an inference drawn from, um, what

18    Phillips is saying, which is that Harris himself had

19    responded to orders and suggests that's what happened in

20    '08, which would then give knowledge -- Mr. Harris

21    inferentially knowledge of who the customers were to the

22    buy in '08.  So they want to make that jump from

23    something that Mr. Phillips would say in a different

24    time frame, um, to Harris' knowledge in '08 with respect

25    to the two people that purchased products in '08.  So

```
 1    there's not -- you know, there's a probative absence
 2    here.  The government would like to benefit from --
 3                THE COURT:  And what does the government say
 4    about that?
 5                MR. BOOKBINDER:  I guess I'm not clear about
 6    that or understand their argument.
 7                THE COURT:  Try to speak in the microphone,
 8    please.
 9                MR. BOOKBINDER:  I apologize.  I'm not sure I
10    totally understand the argument.
11        The conspiracy here is charged from between 2003
12    and 2009.  Mr. Hanshaw will testify that he downloaded a
13    series of products he was given access to beginning
14    around 2003 and going to about 2007 and specifically the
15    2005 download is charged to his account, but -- and the
16    conduct that this case is about and the conspiracy,
17    which goes through this long period of time,
18    Mr. Phillips was involved for a good chunk of that time
19    and he should be able to describe how -- how his
20    involvement in the company --
21                THE COURT:  Count 2 isn't downloading 2005?
22                MR. McGINTY:  I'm sorry?
23                THE COURT:  Count 2 isn't --
24                MR. McGINTY:  It's downloading 2005, correct,
25    but it's downloading --
```

1          THE COURT:  That's a time when Phillips was

2     there?

3          MR. McGINTY:  That's correct.  Um, it does not

4     involve the packaging and selling of an item to

5     Mr. Hanshaw.  So what Phillips knew from the time he was

6     there and whether that bears on what happened in 2008

7     are two different questions.

8          What the Court ought to perhaps be alerted to is

9     that the government has charged that Mr. Hanshaw had

10    obtained, um, software and firmware on two different

11    occasions, '05 and '07.  What the evidence is going to

12    show, um, is that on those occasions, the first of them,

13    he downloaded something, paid nothing for it, and there

14    wouldn't have been any notification to TCNISO about that

15    activity, simply accessing the internet and the download

16    of some items.  And the second one is, um, is code that

17    he induced someone else to give him -- this Isabella

18    Lindquist, for consideration of $100.  So what you have

19    here is Harris linked to neither of those and what the

20    government ought to be aware of is that not only is

21    there a worry here about whether there's an outer rim to

22    this conspiracy, but there's a temporal problem here

23    where the government is pulling in a time frame, based

24    on what Hanshaw is presumably going to contribute to the

25    case, when Hanshaw's ultimate testimony is going to be

1    he never dealt with Harris, um, that Harris was hostile

2    to him, and that anything he got he got by means other

3    than getting them from TCNISO.

4         So, you know, in terms in inviting the kind of

5    variance that's going to prove ultimately to be

6    prejudicial here, the Court ought to be aware to this.

7    And I think the government is inviting in some

8    considerable problems through Mr. Hanshaw's testimony.

9         THE COURT:  Well, this is helpful to me, but

10   it -- but based on what I know, it doesn't persuade me

11   that the Phillips' testimony is inadmissible.

12        MR. McGINTY:  Well, were the Court to give an

13   instruction that Mr. Phillips' testimony relating to

14   what happened in '05, um, can't be used to draw

15   inference as to the conduct of the company in '08,

16   that's one thing, but if it's coming in in a plenary

17   way, that's something quite different.  And just sort of

18   backing up my point about the temporal concern here --

19        THE COURT:  Yeah, I guess I don't understand

20   why the government has to prove -- the argument -- the

21   allegation is that Mr. Harris devised or aided and

22   abetted a scheme -- I mean, you're focused on the

23   conspiracy for now.  I do think there are complexities

24   concerning the conspiracy given the way the case is

25   indicted.  Um, but I'm focused, at the moment, I think

1    it's simpler, on the alleged scheme to defraud, the

2    substantive wire fraud count, and even assuming there's

3    no conspiracy charge, um, Mr. Harris could be found

4    guilty as a principal or as an aider and abetter.  Let's

5    say Hanshaw was the principal.

6            MR. McGINTY:  And if we look at that, then

7    that substantive proof has to be tailored to the

8    proposition that Harris either encouraged Hanshaw to do

9    something, meaning that he motivated him to do it in

10   some direct way for which there would have to be direct

11   evidence, and incidentally there isn't any, or secondly

12   he aided and abetted someone with knowledge of how he

13   was contributing to that person's effort.  And if it's

14   downloading here a piece of software without there being

15   any notice to Harris that this was ever done, then the

16   only predicate that's going to make that wire fraud

17   possible is a predicate that rests solely on the

18   capability of the product, um, and --

19           THE COURT:  Yeah, I don't think so.  I mean, I

20   don't think he has to -- you can -- hold on a second.  I

21   gave you this in my *DiMasi* instructions.  I think you'll

22   find it on Page 37.  And I expect I'm going to instruct

23   with regard to the use of the wires.

24           "It must be made as part of an attempt to execute

25   or accomplish the scheme.  The defendant does not have

1    to be personally responsible for the wire, but the

2    government must prove beyond a reasonable doubt that he

3    knew or reasonably could have foreseen that the use of

4    the wires would follow in the course of the scheme."

5         MR. McGINTY:  And let's grant that -- let's

6    grant that, and then the issue is, is the raw act of

7    downloading -- because Harris would not have known about

8    the downloading, it's simply someone on the net and

9    pressing the "download" button.  But would the raw act

10   of downloading somehow inferentially create knowledge on

11   Harris's part that he's aiding and abetting a person

12   whose conduct he doesn't even know about solely by

13   virtue of the capability of the object?

14        THE COURT:  I expect I'm going to -- I've done

15   more work on *Direct Sales* and later today we'll talk

16   more about the preliminary instructions and then I'll

17   draft something for tomorrow.  I think it's going to be

18   pretty basic.  And then the final instructions, which

19   would be in about a week from now, um, it would be

20   substantial and balanced.

21        But I think there's going to need to be -- I'm

22   probably going to instruct that there's going to need to

23   be something more than selling a product with knowledge

24   that it could or even would be used illegally, you know,

25   something that shows he's promoting the venture beyond

1   that.  But as it's been explained to me, the

2   government's got proof of -- you know, it has evidence

3   of that and it will argue that a jury can prove, um,

4   that that occurred.  And therefore, you know, the

5   downloading -- based on what's been explained to me, it

6   seems that the evidence will permit, but not require,

7   the jury to conclude that Mr. Harris should reasonably

8   foresee that the wires would be used to download

9   equipment that would be used to steal internet service

10   and that's evidence, although not alone sufficient

11   proof, that he engaged in the alleged wire fraud scheme.

12              MR. McGINTY:  It sort of begs the question of

13   what's the additional proof that's going to be the plus

14   factor.

15              THE COURT:  Well, I mean, as I've been going

16   through the -- you know, some of the proof --

17        Does the government have evidence of Mr. Harris's

18   own communications about trading MACs -- about sniffing

19   MACs and trading MACs?

20              MR. BOOKBINDER:  Yes, your Honor.

21              THE COURT:  Yeah, that type of thing.

22              MR. McGINTY:  Well, can I make a specific -- I

23   know that the Court had said, um, that, um, his own use

24   may be part of a scheme, um, that there are schemes

25   where personal conduct is alleged to be part of a

```
 1    scheme, but this isn't one of them.  The scheme here is
 2    the sale of things which can be used for, it's not that
 3    Harris as part of achieving that scheme necessarily had
 4    to be contributing to that by himself getting on the
 5    internet and himself doing this --
 6              THE COURT:  No, the wires -- I don't think --
 7    I don't read the indictment to say that Mr. Harris
 8    didn't personally participate in the scheme, um, the
 9    wires that are charged in furtherance of the scheme are
10    not wires that he sent himself, um, they're wires that
11    the government, I believe, alleges he caused to be sent
12    or reasonably should have foreseen would be sent in
13    execution of this scheme.
14              MR. McGINTY:  Can you have a scheme with
15    someone you don't know?
16              THE COURT:  Yeah.
17              MR. McGINTY:  When the scheme is between you
18    and him.  I mean, there's no other persons.  It's
19    between you and him.  Can you have a scheme with
20    somebody you don't know?
21              THE COURT:  We've been through this, um, yes.
22              MR. McGINTY:  Well, in --
23              THE COURT:  Well, here, look, we'll come back
24    to this later.  And we're going to have continuous
25    conversations, I expect, right up until the time I
```

```
 1    instruct the jury and maybe even afterwards.
 2              MR. McGINTY:  There's one other thing I was
 3    hoping to address, which is the Court had said that
 4    there may be -- that the government may elicit testimony
 5    relating to Mr. Phillips.
 6              THE COURT:  We're going to come back to all of
 7    this this afternoon, or I expect this afternoon, but
 8    after we pick the jury.  Okay?  I'm not ending this
 9    discussion, but the jurors are on their way up, so this
10    is the time for me to take a recess so they can be
11    seated.
12              MR. McGINTY:  I'm sorry, your Honor?  That we
13    may take a recess?
14              THE COURT:  I'm going to take a recess until
15    the jurors are seated.  The Court is in recess.
16              (Recess, 9:50 a.m.)
17              (Resumed, 10:00 a.m.)
18              THE CLERK:  Criminal Matter 09-10243, the
19    United States of America versus Ryan Harris.  The
20    Honorable Mark L. Wolf presiding.  You may be seated.
21              (Venire is seated.)
22              THE COURT:  Ladies and gentlemen, good
23    morning.
24              THE JURY VENIRE:  (In unison.)  Good morning.
25              THE COURT:  I've been impaneling jurors for
```

1    almost 27 years and I haven't lost a juror yet.  It's

2    going to be fun.

3         Good morning.

4              THE JURY VENIRE:  (In unison -- but louder.)

5    Good morning.

6              THE COURT:  There you go.

7         I am Mark Wolf, I'm the Chief Judge of the United

8    States District Court.  I will be presiding in this

9    criminal case.

10         In a moment I'm going to ask you 15 questions,

11    each of which can be answered "yes" or "no."  If the

12    answer for you is "yes" or you're not sure what the

13    correct answer would be, you should stand up and then

14    we'll start on my far left in the first row and I'll ask

15    you to give me your name, and when you give me your

16    name, I'll give you the number that you are on this

17    sheet, 1 through 68, and that's a number that's

18    different than any number you had before, so please try

19    to remember it, because if you get up to answer another

20    question, if you can tell me your name and your number,

21    or even just your number, um, that would cause things to

22    go even more quickly.

23         After I've asked all 15 questions, I'm going to go

24    with the parties back in the jury room and I'm going to

25    see you individually to ask you why you answered "yes"

1   to certain questions, and even if you didn't answer

2   "yes" to any questions, whether on reflection there's

3   anything you feel you should have answered "yes" to.

4        It's very important that you answer these

5   questions accurately.  They -- the information they

6   illicit serves two purposes.  First, it may be that some

7   of you should be excused for cause.  For example, in the

8   process of selecting the jury I'm going to have the list

9   of the potential witnesses read to you and if one of

10  those witnesses is your cousin, for example, then this

11  is not a case in which you can be an impartial juror,

12  although you might be a great juror for another case.

13  In addition -- and then you'd be excused for cause.

14       In addition, from among those of you who could be

15  fair and impartial in this case, the parties have some

16  discretionary challenges and the information that you

17  will provide will give them information they need to

18  decide how to exercise those discretionary challenges.

19       As I said, it's very important that you answer the

20  questions I'm going to ask you truthfully and to

21  emphasize that I'm going to ask Mr. Hohler, the Deputy

22  Clerk, to administer to you your oath as potential

23  jurors.

24            THE CLERK:  Members of the jury pool please

25  rise and raise your right hand, please.

1              (Jury venire, rises.)

2              THE CLERK:  Do you solemnly swear that you

3     will make the true answers to such questions as should

4     be put to you by the Court in the matter now pending, so

5     help you, God?

6              THE JURY VENIRE:  (In unison.)  Yes.

7              THE CLERK:  You may be seated.

8              (Jury venire, seated.)

9              THE COURT:  Here is the first question.

10         In this case the defendant, Ryan Harris, is

11    charged with conspiracy, a scheme to defraud internet

12    service providers by selling cable modem hacking

13    products and doing other things to help people who use

14    them to obtain cable internet service from the providers

15    without making required payments for the services.  Have

16    any of you read or heard anything about the case?

17              (Silence.)

18              THE COURT:  There is no response.

19         Next I'm going to ask the lawyers to introduce

20    themselves and the defense lawyer to introduce

21    Mr. Harris and I'm going to want to know whether you or

22    anybody close to you knows any of them?

23              MR. BOOKBINDER:  Good morning.  I'm Assistant

24    U.S. Attorney Adam Bookbinder.

25              MS. SEDKY:  Good morning.  My name is Mona

```
 1    Sedky and I work with the Department of Justice.

 2              MR. McGINTY:  And my name is Charles McGinty.

 3    I represent Ryan Harris, who is here and with me seated

 4    at the table.

 5              MS. DEMASO:  My name is Christine Demaso and I

 6    also represent Ryan Harris.

 7              THE COURT:  All right.

 8         Do you or anybody close to you know any of the

 9    lawyers or Mr. Harris?

10              (Silence.)

11              THE COURT:  There's no response.

12         I'm going to have Mr. Hohler read to you the list

13    of people who might be witnesses in the case and then

14    again ask if you or anybody close to you knows any of

15    them.

16              THE CLERK:  Craig Phillips.  Christopher

17    Kohler.  Isabella Lindquist.  Benjamin Brodfuehrer.

18    Jose Larosa.  William Madeira.  Nathan Hanshaw.  Go

19    Daddy recordkeeper.  Timothy Russell.  And Jason Ryan.

20              THE COURT:  Do you or anybody close to you

21    know any of the possible witnesses?  Again, there's no

22    response.

23         Now I'm going to tell you about the schedule for

24    this case.  We'll select the jury today and the jury

25    will be excused after it is chosen.  We'll begin
```

1    tomorrow at 9:00.  Each day we'll go from 9:00 until

2    1:00 with a break for about 15 minutes at around 11:00.

3         I expect that the case will take about seven days

4    to try and the evidence should be completed next week,

5    but sometimes it takes a little longer.  So it's

6    possible that the case will go into the week after

7    next.  Once all the evidence is presented and you've

8    heard the closing arguments and my instructions, the

9    jury will begin to deliberate.  While the jury is

10   deliberating, it will have to be here in the afternoon

11   or afternoons until about 4:30, unless the jury wants to

12   stay longer.

13        I'd like to know whether that schedule would make

14   it very difficult or impossible for any of you to serve

15   in this case?  If the answer is "yes," please stand.

16   Please stand.

17             (People stand.)

18             THE COURT:  Tell me your name and then I'll

19   tell you your number.

20             THE JUROR:  Joan Lovely.  I'm Juror Number 4.

21             THE COURT:  you're right, you're Juror Number

22   4, and you've answered "yes" to Question Number 4.

23        Right here in the front row.  Go ahead.

24             THE JUROR:  Abdellah Benchikhi.

25             THE COURT:  All right.  You're Juror Number 3.

```
1                THE JUROR:  Laurie Warner.

2                THE COURT:  Juror Number 6.

3                THE JUROR:  Daniel Rogier.

4                THE COURT:  Juror Number 7.

5                THE JUROR:  Joseph Foresi.

6                THE COURT:  Juror Number 11.

7                THE JUROR:  Ryan Kerrigan.

8                THE COURT:  Hold on just one second, please.

9    Who's next?

10               THE JUROR:  Ryan Kerrigan.

11               THE COURT:  Actually I'd like the people in

12   front of me, please.

13               THE JUROR:  Joanne Collins.

14               THE COURT:  All right.  You're Number 24.

15               THE JUROR:  Jodi Garie.

16               THE COURT:  Number 25.

17               THE JUROR:  Ryan Kerrigan.

18               THE COURT:  Number 28.

19               THE JUROR:  Svetlana Dobkin.

20               THE COURT:  Number 29.

21               THE JUROR:  Ann Fitzgerald.

22               THE COURT:  46.

23               THE JUROR:  Harish Patel.

24               THE COURT:  48.

25               (Pause.)
```

```
 1              THE COURT:  How about back there.

 2              THE JUROR:  Winnie Ho.

 3              THE COURT:  49.

 4              THE JUROR:  Andrew Hyman.

 5              THE COURT:  You're 66.

 6              THE JUROR:  John Caron.

 7              THE COURT:  Again, please.

 8              THE JUROR:  John Caron.

 9              THE COURT:  54.

10              THE JUROR:  Peter Gale.

11              THE JUROR:  55.

12              THE JUROR:  Susan Collina.

13              THE COURT:  56.

14              THE JUROR:  Nancy Cass.

15              THE COURT:  57.

16          Who do we got in front of you there?

17              THE JUROR:  William Wing.

18              THE CLERK:  Number 40.

19              THE COURT:  Okay.  Thank you.  Number 40.

20              THE JUROR:  Robert Cannon.

21              THE COURT:  Number 41.

22              THE JUROR:  Pamela Woleyko.

23              THE COURT:  Yes, 44.

24              (Pause.)

25              THE COURT:  All right.
```

```
 1          Fifth, I'd like to know whether any of you have
 2     ever served on a jury or on a grand jury?
 3          Just stand up.  If the answer is "yes," just stand
 4     up.
 5               (Juror stands.)
 6               THE COURT:  Say that again?
 7               THE JUROR:  You want my name, right?
 8               THE COURT:  Yes.
 9               THE JUROR:  April Gendall.
10               THE COURT:  And you're Number 2.  You've
11     answered "yes" to Number 5.
12               THE JUROR:  Number 3.
13               THE COURT:  Okay.
14               THE JUROR:  Number 7.
15               THE COURT:  No, we're going to -- try to do
16     it, you know, in numerical order.  It will make it a
17     little easier for me and simpler.
18          So you are Number 7?
19               THE JUROR:  Yes.
20               THE COURT:  Mr. Rogier.
21               THE JUROR:  Number 11.
22               THE COURT:  Are you Mr. Foresi?
23               THE JUROR:  That's correct.
24               THE COURT:  Okay.
25               THE JUROR:  Number 15.
```

```
 1              THE COURT:  Ms. Kiernan?

 2              THE JUROR:  Yes.

 3              THE COURT:  All right.

 4              THE JUROR:  Andrew Barnaby.

 5              THE COURT:  Number 18.

 6              THE JUROR:  Kathleen Seville, Number 26.

 7              THE COURT:  You are 26.  Thank you.

 8              THE JUROR:  Mary McDonough.

 9              THE COURT:  32.

10              THE JUROR:  Marybeth Robinson.

11              THE COURT:  33.

12              THE JUROR:  Katherine Heinze.

13              THE JUROR:  36.

14              THE JUROR:  Robin Zahner.

15              THE COURT:  I'm sorry.  Could you tell me that

16      again?

17              THE JUROR:  Robin Zahner.

18              THE COURT:  Okay.  38.

19              THE JUROR:  40.

20              THE COURT:  Okay, 40.  Okay.

21              THE JUROR:  Maureen Bradley, 42.

22              THE COURT:  Correct.

23              THE JUROR:  Pamela Woleyko, Number 44.

24              THE COURT:  Okay.

25              THE JUROR:  Brian Downey.
```

```
 1                THE COURT:  50.

 2                THE JUROR:  Edward Demers.

 3                THE COURT:  You're 51.

 4                THE JUROR:  55, Peter Gale.

 5                THE COURT:  Okay.

 6                THE JUROR:  Charles Upton.

 7                THE COURT:  67.  All right.

 8          Sixth, I'd like to know whether you or anybody

 9    close to you has ever been involved in a criminal matter

10    as a victim, a witness, or a defendant?  If the answer

11    is "yes," please stand.

12                (People stand.)

13                THE JUROR:  Adam Crosbie, 14.

14                THE COURT:  Okay, and you've answered "yes" to

15    Question 6.

16                THE JUROR:  Lorraine Melling.

17                THE COURT:  35.

18                THE JUROR:  Winnie Ho, Number 49.

19                THE COURT:  Okay.

20                THE JUROR:  Number 44.

21                THE COURT:  Just one second.  I've been making

22    my notes incorrectly.

23                (Pause.)

24                THE COURT:  All right.  Could you tell me the

25    last one, please, whoever gave me the last one.
```

```
1                    THE JUROR:  44, Pamela Woleko.

2                    THE COURT:  Thank you very much.

3            All right.  Who else have we got?

4                    THE JUROR:  Number 67.

5                    THE COURT:  Okay.

6                    THE JUROR:  Joseph Witt.

7                    THE COURT:  Okay, you're 61.

8                    THE JUROR:  John Loughlin.

9                    THE COURT:  You're 58.

10                   THE JUROR:  Robert Plourde.

11                   THE COURT:  You're 65.

12                   THE JUROR:  66.

13                   THE COURT:  56?

14                   THE JUROR:  66, Andrew Hyman.

15                   THE COURT:  66.  All right.

16           Seventh, I'd like to know whether you or anybody

17      close to you has ever been employed in law enforcement

18      as a police officer or an agent or a prosecutor or a

19      corrections officer or in any other way or whether any

20      of you has ever been employed as or by a defense

21      attorney in criminal cases?

22                   (People stand.)

23                   THE COURT:  All right.  In the front row.

24                   THE JUROR:  15.

25                   THE COURT:  All right.  And you've answered
```

1    "yes" to Question Number 7.

2          In the second row now.

3                THE JUROR:  Charlie Daly.

4                THE COURT:  You're Number 12.

5                THE JUROR:  Cathleen Sheehan.

6                THE COURT:  17.

7                THE JUROR:  19, Scott Travis.

8                THE COURT:  Okay.

9                THE JUROR:  25, Jodi Garie.

10               THE COURT:  All right.

11               THE JUROR:  27, Christopher Ciampa.

12               THE COURT:  All right.

13               THE JUROR:  28, Ryan Kerrigan.

14               THE COURT:  Okay.

15               THE JUROR:  Breton Tolles.

16               THE COURT:  You're Number 47.

17               THE JUROR:  33.

18               THE COURT:  Okay.

19               THE JUROR:  35.

20               THE COURT:  Okay.

21               THE JUROR:  Kevin Demello, 43, I believe.

22               THE COURT:  That is correct.

23               THE JUROR:  Justin Quinlan.

24               THE COURT:  I'm sorry.  Could you tell me that

25    again?

```
 1              THE JUROR:  Justin Quinlan.

 2              THE COURT:  You're Number 63.

 3              THE JUROR:  66.

 4              THE COURT:  Okay.

 5              THE JUROR:  Catherine Umina, 53.

 6              THE COURT:  Okay.

 7              THE JUROR:  55.

 8              THE COURT:  Okay.

 9              THE JUROR:  Susan Collina, 56.

10              THE COURT:  Okay.

11              THE JUROR:  John Loughlin, 58.

12              THE COURT:  Okay.

13              THE JUROR:  61, Joseph Witt.

14              THE COURT:  All right.

15         Eighth.  If you're a juror in this case you'll be

16    required to judge the testimony of a law enforcement

17    officer like the testimony of anyone else and not assume

18    that that person is more likely or less likely to be

19    telling the truth because he works in law enforcement.

20    Is there anybody who feels that he or she could not

21    judge the testimony of a law enforcement officer like

22    the testimony of anyone else?

23              (Silence.)

24              THE COURT:  There's no response.

25         Next I'd like to know whether you or anybody close
```

1    to you has ever been employed by a cable company or any

2    other internet service provider?  If the answer is

3    "yes," please stand.

4                    (People stand.)

5                    THE JUROR:  63.

6                    THE COURT:  And that is Question 9.

7                    THE JUROR:  Charles Upton.

8                    THE COURT:  Okay.  And you're 67.

9                    THE JUROR:  67?

10                   THE COURT:  67.

11        Next, I'd like to know whether you or anybody

12   close to you has ever obtained television or internet

13   service without paying a required fee?  If the answer is

14   "yes," please stand.

15                   (Laughter.)

16                   (People stand.)

17                   THE COURT:  No, it's essential that you answer

18   this truthfully.  You're not going to be prosecuted for

19   it, but this is critical information.  This is the world

20   we live in, it's a relevant question, but it's one that

21   has to be -- it's absolutely essential that you answer

22   it honestly.

23                   THE JUROR:  Laurie Warner, Number 6.

24                   THE COURT:  And this is Number 10.  Just a

25   moment.

```
 1              THE JUROR:  Crosbie, 14.

 2              THE COURT:  Okay.

 3              THE JUROR:  Bruce Demello.

 4              THE COURT:  21.

 5         Let's see.  Who do we got right here?

 6              THE JUROR:  35.

 7              THE COURT:  Okay.

 8              THE JUROR:  Leana Pomales.

 9              THE COURT:  You're Number 37.

10         Who do we have in the front row?

11              THE JUROR:  Number 8, Thomas Popson.

12              THE COURT:  Okay.

13              THE JUROR:  Peter Shelley.

14              THE COURT:  Okay, you're Number 34.

15              THE JUROR:  43.

16              THE JUROR:  55.

17              THE JUROR:  56.

18              THE JUROR:  66.

19              THE COURT:  All right.

20         Eleventh, I'd like to know whether you or anybody

21    close to you has had a favorable or unfavorable

22    experience with law enforcement that might affect your

23    ability to be fair and impartial for both sides in this

24    case?

25              (Silence.)
```

```
 1                THE COURT:  There's no response.  Twelfth --
 2      I'm sorry.  Go ahead.
 3                THE JUROR:  55, Peter Gale.
 4                THE COURT:  55?
 5                THE JUROR:  Yes.
 6                THE COURT:  That's Question Number 11.
 7                THE JUROR:  56.
 8                THE COURT:  All right.
 9           Twelfth.  I'll tell you that one or more of the
10      witnesses in this case has been convicted of a federal
11      crime and in order to get certain benefits has agreed to
12      assist the government in the investigation and
13      prosecution of the case.  This is a permissible law
14      enforcement technique.  You will be instructed to
15      examine the testimony of such a witness and any other
16      witness given immunity for their testimony with special
17      care, but that you may rely on it if you find it to be
18      truthful.  Do you have any attitude towards criminals
19      who cooperate with the government or witnesses who
20      receive immunity for their testimony that might injure
21      your ability to follow that instruction?
22                (People stand.)
23                THE COURT:  Okay.  This is Question 12.
24                THE JUROR:  3.
25                THE JUROR:  6.
```

```
1              THE COURT:  Okay.

2              THE JUROR:  15.

3              THE JUROR:  Rich Destefano.

4              THE COURT:  You're Number 20.

5              THE JUROR:  21.

6              THE JUROR:  25.

7              THE JUROR:  32.

8              THE COURT:  I'm sorry.  What number?

9              THE JUROR:  32.

10             THE JUROR:  34.

11             THE JUROR:  41.

12             THE JUROR:  43.

13             THE JUROR:  48.

14             THE JUROR:  56.

15             THE JUROR:  57.

16             THE JUROR:  58.

17             THE JUROR:  61.

18             THE COURT:  All right.

19         Thirteenth, I want to explain to you the

20     fundamental principles that apply in this and every

21     other criminal case.  First among them is the defendant

22     is presumed innocent.  The burden of proof is on the

23     government to prove the defendant is guilty beyond a

24     reasonable doubt.  The defendant does not have to prove

25     that he is innocent.  The defendant does not have to
```

```
 1    testify, and if he chooses not to testify, you may not
 2    draw any suggestion that he is guilty from his decision
 3    not to testify.  You must decide the case based on the
 4    facts that are proven by the evidence and apply the law
 5    as I describe it, putting aside any idea you may have as
 6    to whether the law is wise or not.  If the defendant is
 7    proven guilty beyond a reasonable doubt, you, as a
 8    juror, must find him guilty.  If the defendant is not
 9    proven guilty beyond a reasonable doubt, you must find
10    him not guilty.
11         Is there anyone who feels that he or she cannot
12    follow these essential principles?
13              (Silence.)
14              THE COURT:  There's no response.
15         Fourteenth, I would like to know whether any of
16    you have any difficulty hearing or understanding English
17    or any other problem that would make it difficult for
18    you to be a juror?
19              THE JUROR:  Upton, 67, your Honor.
20              THE COURT:  Okay.  And that's Question 14.
21              THE JUROR:  Marie Brandao.
22              THE COURT:  You're Number 52.
23              THE JUROR:  Number 23, Daniel Wong.
24              THE COURT:  Okay.
25              THE JUROR:  Number 29.
```

```
 1              THE COURT:  Okay.

 2              THE JUROR:  48.

 3              THE JUROR:  45.

 4              THE COURT:  Yes?

 5              THE JUROR:  58.

 6              THE COURT:  And fifteenth, having heard all

 7    those questions, is there any other reason that any of

 8    you feel that you cannot be a fair and impartial juror

 9    in this case?

10              THE JUROR:  Could I hear Number 6 again?

11              THE COURT:  Yes.

12         Sixth, I asked whether you or anybody close to you

13    had ever been involved in a criminal matter in any way

14    as a victim, a witness, or as a defendant?

15              THE JUROR:  Yes.

16              THE COURT:  And you're Number 1.

17         All right.  Now --

18              (Juror standing.)

19              THE COURT:  Oh, I'm sorry.  Is this to the

20    question of whether there's some other reason why you

21    could not be a --

22              THE JUROR:  I'd like to go back, if possible,

23    I think, to Number 10, if you've had a negative

24    influence by an officer or --

25              THE COURT:  Right.  The question was, have you
```

1    or anybody close -- no, that wasn't 10.  11, actually.

2        Have you or anyone close to you had a favorable or

3    unfavorable experience with law enforcement that might

4    affect your ability to be impartial in this case?

5            THE JUROR:  I would like to change my answer

6    to "yes."

7            THE COURT:  All right.  And can you give me

8    your name and number, please?

9            THE JUROR:  Brenton Tolles, Number 47.

10           THE COURT:  All right.  Thank you.

11       And I'm going to ask you all, when we go back,

12   whether having had more time to think about it, there's

13   something else you feel you should have answered "yes"

14   to.

15           (Interruption by juror.)

16           THE COURT:  All right.  Let's see.  With

17   regard to question -- I'm not sure.  With regard to

18   Question 6, whether you or anybody close to you has ever

19   been involved in a criminal matter in any way, um, I had

20   Number 67, which is Mr. Upton, answering "yes."

21       Did you answer that question "yes," Mr. Upton?

22           THE JUROR:  What was the question?

23           THE COURT:  Whether you or somebody close to

24   you had ever been involved in a criminal matter in any

25   way?

```
 1                    THE JUROR:  I think I'm 57.
 2                    THE COURT:  Oh, 57.  Here, stand up.  What's
 3       your name?
 4                    THE JUROR:  Nancy Cass.
 5                    THE COURT:  I may have misheard you.
 6                    (Pause.)
 7                    THE COURT:  All right.
 8                    (Interruption by juror.)
 9                    THE JUROR:  Number 58, the same.
10                    THE COURT:  Okay.  I actually had you
11       answering that one "yes."  Thank you.
12            All right.  Thank you.  You've done a great job so
13       far.  Now I'm going to go back with the parties and
14       start seeing you one at a time.
15            Please don't discuss with each other what I've
16       just asked you or what you've answered, because if
17       there's some reason that you're disqualified, I don't
18       want you to infect somebody else.  So you can talk about
19       whether it's ever going to snow again or whether the
20       Celtics are ever going to win a game again or whether
21       the Red Sox are going to redeem themselves this year,
22       but don't talk about the little you know about this
23       case.  This process is going to take a while, probably a
24       couple of hours, so I'll thank you in advance for your
25       perseverance, if not patience.  This is a crucial part
```

```
 1    of the trial and you're making a great contribution to
 2    the administration of justice by participating.
 3           The Court will be in recess.
 4                 (Short recess, 10:30 a.m.)
 5                 (Resumed in jury room, 10:45 a.m.)
 6           THE COURT:  All right.  Do you have Mr. Harris
 7    and the members of the public and perhaps the media
 8    present?
 9                 (Pause.)
10           THE COURT:  All right.  Do you mind saying who
11    you are.
12                 MS. NORTON:  My name is Gwen Norton.  I'm with
13    "Wired."
14           THE COURT:  Okay.  And, Ms. Norton, you're
15    welcome to be here.  But I think, because of the nature
16    of some of the questions, that I'll need to tell the
17    prospective jurors that there is a member of the media
18    here and if they feel uncomfortable answering certain
19    questions, that you may have to be excused for parts of
20    this, that I will close the proceedings in certain
21    circumstances.  Okay?
22                 (First juror enters.)
23           THE COURT:  But, actually, I wasn't quite
24    ready yet.
25           Would you just step out for just a minute.
```

```
1                  THE CLERK:  Yes, your Honor.
2                  (First juror steps out.)
3                  THE COURT:  So, as I went over it with you,
4      I'm going to question the prospective jurors to follow
5      up on what they answered "yes" to.  I will look at you
6      to see if you have any questions or any reactions, you
7      can signal me, but you don't have to express them in
8      front of the potential juror.  If I have a question for
9      you or you seem to have an objection, then I'll excuse
10     the juror and we'll discuss it.  Then I'll have the
11     juror back.  Our goal is to get 32.  Okay?
12                 MR. BOOKBINDER:  Your Honor, one thing before
13     we begin.  I was walking back in from the bathroom and
14     one of the jurors in the back stopped me on my way in
15     and asked me, "Are you the Bookbinder from Newton?"  I
16     said, "Yes, I do live in Newton."  And he said, "Oh,
17     you're with" -- and there's a law firm in Newton with
18     "Bookbinder" in the name, and he may have said the first
19     name of that person, and I said, "No, that's not me."
20                 THE COURT:  The better thing would be to say
21     "I can't talk to you."
22                 MR. BOOKBINDER:  Yes, your Honor, you're
23     correct.  Frankly I thought he was asking me where the
24     bathroom is, so I thought I should --
25                 THE COURT:  All right.  All right.  Well, do
```

1    you know who the juror is?

2              MR. BOOKBINDER:  I don't know.  He's one of

3    the ones on the last row on the left.

4              THE COURT:  Well, when he comes in you can

5    identify him.

6              MR. BOOKBINDER:  Yes, your Honor.

7              THE COURT:  Okay.

8              MS. NORTON:  Your Honor, when I go out, can I

9    leave my stuff here?

10             THE COURT:  Yes.

11             (First juror enters.)

12             THE COURT:  Hello.  Right here, please.

13             THE CLERK:  Judge, there's a spectator outside

14   waiting to come in.

15             THE COURT:  We'll do this first.

16        Would you please say your name for the record.

17             THE JUROR:  Susan Laventure.

18             THE COURT:  All right.  Ms. Laventure, in

19   addition to the parties and my staff, there's actually a

20   member of the media here and there may be one coming in

21   from the public.  If there are any of these questions

22   that you think are so personal that you would not want

23   to answer them, including what I'm about to ask you, um,

24   just tell me and I'll ask them to step out.  I can do

25   that.  But generally they have a right to be here.

1          So I think the first question, the only question

2    to which you answered "yes," is whether you or somebody

3    close to you had ever been involved in a criminal matter

4    in any way?  Are you comfortable telling me with the

5    presence of the public and the media here?

6                    THE JUROR:  Yes, that's fine.

7                    THE COURT:  Okay.  What caused you to answer

8    "yes" to that question?

9                    THE JUROR:  My son was charged with assault

10   and battery on a police officer.

11                   THE COURT:  Okay.  And what happened as a

12   result of that?

13                   THE JUROR:  He -- there wasn't a trial.  He

14   pled guilty, um, just to get it over with.  It was in

15   his youth.  It was just to get it over with.

16                   THE COURT:  All right.  How long ago was

17   that?

18                   THE JUROR:  Maybe three years.  Yeah, maybe

19   three years.

20                   THE COURT:  Okay.  And is there anything about

21   that experience that would injure your ability to be

22   fair to both sides in this case?

23                   THE JUROR:  Well, I believe that he was

24   racially profiled.  He's a man of color and I believe

25   that he was racially profiled, and I was pretty upset

1    about it.

2         THE COURT:  And in this case I expect some law

3    enforcement officers will testify and, of course, it's

4    the United States government that's prosecuting the

5    defendant.  But do you think you would be able to put

6    aside -- not forget, but just put aside what happened

7    with your son and decide this case based solely on the

8    evidence --

9         THE JUROR:  Um --

10        THE COURT:  -- and the law as I describe it?

11        THE JUROR:  I think so.  I also needed -- you

12   also said if someone close to you had been in law

13   enforcement, and I am divorced from him, he was my

14   second husband, but he was a state police sergeant.

15        THE COURT:  All right.  Um, maybe I have to

16   revise the formal question.  But -- all right.  Well --

17        THE JUROR:  And it just so happens, the child

18   I'm talking about, he was his father.

19        THE COURT:  All right.  But in this whole

20   constellation of things, of course, you know, what

21   happened to your son has nothing to do with the evidence

22   or the law relating to this case, but there are no right

23   or wrong answers, there just has to be honest answers.

24        Do you feel you can sort of put aside whatever you

25   feel about your ex-husband, um, whatever you feel about

```
 1    what happened to your son?  And I didn't say forget it,
 2    I said to put it aside and not let it influence how you
 3    decide this case.
 4            THE JUROR:  Yeah, I think I could put it
 5    aside.
 6            THE COURT:  All right.
 7        And, you know, I told you that if you're a juror
 8    in this case, among other things, you'll be called upon
 9    to judge the credibility, the believability possibly of
10    the testimony of some law enforcement people.  You know,
11    given the fact that you're divorced from a state
12    policeman, do you feel you could treat the testimony of
13    a law enforcement officer like the testimony of anybody
14    else, be open minded, and not assume he's more likely or
15    less likely to be telling the truth because he's
16    employed in law enforcement?
17            THE JUROR:  Yeah, as long as it's no more and
18    no less, yeah, I could treat them -- I would give it no
19    more credence.  But, yeah, I could treat them fairly.
20            THE COURT:  All right.  And having more time
21    to think about it, is there any other reason you feel
22    you could not be a fair and impartial juror in this
23    case?
24            THE JUROR:  No.
25            THE COURT:  All right.  Well, you're eligible
```

```
 1    to be a juror and now you're the first that's eligible.
 2    And I should have said this outside, but we're actually
 3    looking for 32 before we pick the jury.  So go back and
 4    take your seat and wait, please.
 5               THE JUROR:  Yes.
 6               THE COURT:  All right.  Thank you.
 7               (Juror leaves.)
 8               THE COURT:  The next person answered "yes" to
 9    Question Number 5 as to whether she had ever served on a
10    jury.
11               (Person from public enters jury room.)
12               THE COURT:  Hello.  Do you want to watch this?
13               THE SPECTATOR:  Correct.
14               THE COURT:  Okay.  And you're a member of the
15    public?
16               THE SPECTATOR:  Correct.
17               THE COURT:  Okay.  As I said earlier, there
18    may be a point in which I have to ask you and the other
19    member of the public to step out, but it will just be
20    for a short period of time.  Okay?
21               THE SPECTATOR:  Not a problem.
22               (Next Juror.)
23               THE COURT:  All right.  Could you please say
24    your name for the record.
25               THE JUROR:  April Gendall.
```

 1          THE COURT:  And, Ms. Gendall, in addition to

 2   the parties and my staff, we have two members of the

 3   public here and one is a member of the media.  If there

 4   is anything that I ask you that you don't feel

 5   comfortable answering with them here, um, I'll ask the

 6   member of the media and the member of the public to step

 7   out for a minute.  Okay?

 8          THE JUROR:  Sure.

 9          THE COURT:  Okay.  I think the only question

10   to which you answered "yes" to is the question whether

11   you had ever served on a jury or a grand jury, is that

12   right?

13          THE JUROR:  Correct.

14          THE COURT:  When and where did you serve on a

15   jury?

16          THE JUROR:  Last March in Waltham,

17   Massachusetts.

18          THE COURT:  Is there anything about that

19   experience that you think would affect your ability to

20   be a juror, listen to the evidence, apply the law, and

21   decide this case?

22          THE JUROR:  No.

23          THE COURT:  No?  All right.

24       And is there anything else, having a little more

25   time to have thought about it, that you think you should

```
1    have answered "yes" to?
2              THE JUROR:  No.
3              THE COURT:  All right.  Well, you're eligible
4    to be a juror, you're the second, and when I get 32
5    we'll pick and see if you're actually going to be one.
6    Okay?
7              THE JUROR:  Thank you, very much.
8              (Juror leaves.)
9              THE COURT:  The next person, according to my
10   notes, answered "yes" to 4 about the schedule, 5, jury
11   service, and, um, 12, which is an attitude towards
12   cooperating witnesses.
13             (Next juror.)
14             THE COURT:  Good morning.
15             THE JUROR:  Good morning.
16             THE COURT:  Would you please say your name for
17   the record.
18             THE JUROR:  Abdellah Benchikhi.
19             THE COURT:  And let me tell you that, in
20   addition to the parties and my staff, we have two
21   members of the public, one of whom is a reporter.  If
22   there's anything I ask you that you feel uncomfortable
23   saying in front of the media or a member of the public,
24   I can ask the two of them to step out.  Everybody else
25   has to stay.
```

```
 1            THE JUROR:  Sure.

 2            THE COURT:  I think there are a couple of

 3    questions to which you answered "yes" and one of them is

 4    whether the schedule would impose so great a hardship

 5    that it would be difficult or impossible for you to

 6    serve.

 7            THE JUROR:  Sure.  The length.  You mentioned

 8    that it might go beyond next week and my wife is

 9    scheduled to be out of town.  I have a 2-year old and an

10    8-year old and if I'm here in the court, um, there's no

11    one to pick up any of my kids if there's an emergency or

12    something.

13            THE COURT:  Yeah.  If you were on the jury,

14    um, and I do think we'll probably end next week, but

15    this is exactly why I give a very expansive definition.

16    If you're on the jury and you're not deliberating and

17    there was a family emergency, then I'm going to have

18    some alternates, some extras, so I could let you go and

19    that wouldn't be a problem.  But if we were in jury

20    deliberations, um, that would be more difficult, but not

21    impossible, because I keep the alternates here.  But if

22    I understand you right, you have somebody to take care

23    of them other than you, it's just a question of whether

24    there was an emergency?

25            THE JUROR:  Um, yes.  My wife, she's going to
```

 1   North Carolina for business and if she's not here, then

 2   at least one of us has to be available in case anything

 3   happens.

 4            THE COURT:  Yeah.  Well, one way or another I

 5   would let you go in an emergency.  I mean, even if we

 6   were deliberating, I would just send everybody home and

 7   say "Come back tomorrow."

 8            THE JUROR:  Okay.  That's my concern.

 9            THE COURT:  Well, it's a good concern.

10       And I think you also told me, in response to

11   Question 12, that you had some attitude about people who

12   are themselves criminals and cooperate with the

13   government or get immunity, that that might not affect

14   your ability to scrutinize their testimony with

15   particular care, but to trust it and rely on it if you

16   found it was truthful.  Can you explain to me what

17   caused you to answer "yes"?

18            THE JUROR:  Um, I've been through another case

19   where the chief, um, person that was, you know, for the

20   defense was someone with a criminal record and that

21   affected how, you know, the deliberation in that case

22   went on.  So, in my opinion, I looked at someone who is

23   going to help to free themselves as -- you know, it's

24   very difficult for me to see how, you know, truthful

25   they're going to be.

1          THE COURT:  Well, what I will tell the jury in

2     more detail is -- well, where were you a juror before?

3          THE JUROR:  Um, Suffolk.

4          THE COURT:  Suffolk.  And was the witness that

5     was cooperating somebody called by the defense or by the

6     prosecution?

7          THE JUROR:  He was called by the defense,

8     actually.

9          THE COURT:  Okay, by the defense.

10        Well, I will tell the jurors that you have to

11    examine the testimony of --

12         THE JUROR:  I'm sorry.  By the prosecutor.

13         THE COURT:  Oh, by the prosecutor.  That's the

14    way it usually goes.

15         THE JUROR:  Yeah.

16         THE COURT:  Okay.  I'll tell the jurors that,

17    you know, if somebody has criminal charges or could have

18    criminal charges against him and is testifying pursuant

19    to a grant of immunity, that nothing he says will be

20    used against him, um, that you should scrutinize his

21    testimony with particular care because a person in that

22    position has an incentive to make things up to help

23    himself.  But if you believe he's being truthful, if you

24    find it's corroborated by other evidence and you believe

25    it, you know, then you can and should rely on it.  And,

1   of course, every case is unique.

2           THE JUROR:  Sure.

3           THE COURT:  So do you feel you would be able

4   to follow that instruction in this case, in other words,

5   examine that witness's testimony with particular care

6   because, as you already know, such a person may have a

7   motive to make things up, but, you know, also be open to

8   believing it if he impresses you as credible,

9   believable, or if there's other evidence that supports

10  what he said?

11          THE JUROR:  Um, I still find it kind of hard

12  for me to, um, look at his or her testimony as being 100

13  percent truthful.

14          THE COURT:  Okay.  And let me ask you

15  something else.  You're an IT consultant?

16          THE JUROR:  Yes, I am.

17          THE COURT:  Um, and do you know anything

18  about, you know, like how somebody would hack into --

19  I'm not asking if you've done it, but --

20          THE JUROR:  Sure.

21          (Laughter.)

22          THE COURT:  I did ask you that, and you

23  didn't.  But do you -- do you know about sort of the

24  technology of hacking?

25          THE JUROR:  Sure.

1          THE COURT:  All right, I'm going to excuse

2     you.  There are no right or wrong answers.  I know

3     you've been candid.  But you have to be able to follow

4     all of the instructions and I think you have a degree of

5     skepticism about cooperating witnesses that would make

6     it difficult if not impossible for you to follow this.

7     And -- and people with IT expertise are not necessarily

8     going to be disqualified from serving on the jury, but I

9     would have asked you a whole series of questions, um --

10    you have to rely on the evidence and not on what you

11    know, so you can't come back to the jury room and say,

12    "I'm an IT consultant, you know, and because of this I

13    know this is right and this is wrong."

14          Okay.  So I'm going to excuse you in this case.  I

15    appreciate your candid responses.  Go downstairs.  You

16    may get sent home.  Um, but don't tell anybody else why

17    you've been excused, please.

18               THE JUROR:  Thank you so much.

19               (Juror leaves.)

20               THE COURT:  Okay.  The next person also

21    answered "yes" to 4, she's a teacher.  Maybe she's going

22    to go back to school next week.

23               MR. McGINTY:  They have a week off from school

24    this week, your Honor.

25               (Next juror.)

```
 1                THE COURT:  Good morning.

 2                THE JUROR:  Good morning.

 3                THE COURT:  Would you please say your name for

 4     the record.

 5                THE JUROR:  Joan Lovely.

 6                THE COURT:  Ms. Lovely, um, in addition to the

 7     parties and my staff, we have two members of the public,

 8     one is a reporter, and if I ask you any questions that

 9     you feel uncomfortable about answering with the members

10     of the public or the media here, let me know and I can

11     excuse them.  Okay?

12                THE JUROR:  Okay.

13                THE COURT:  Okay.  I think you said the

14     schedule imposed a special hardship on you.  Why is

15     that?

16                THE JUROR:  It's not a real hardship, but I

17     have a flight to Philadelphia a week from Thursday

18     afternoon.

19                THE COURT:  Um, we may not be finished then.

20     What are you going to Philadelphia for?

21                THE JUROR:  My daughter has business and I'm

22     going with her.

23                THE COURT:  And when did you make those

24     arrangements?

25                THE JUROR:  A few weeks ago.
```

1          THE COURT:  And did you know you might be

2    called for jury service now?

3          THE JUROR:  Yeah, but I thought it was over

4    before this trial, I thought it was three weeks and it

5    was over on Friday.

6          THE COURT:  All right.  Are you working as a

7    teacher now?

8          THE JUROR:  I'm retired.

9          (Pause.)

10         THE COURT:  Did you ever hear the story about

11   W.C. Fields, he said, "First prize, one week in

12   Philadelphia, second prize, two weeks in Philadelphia"?

13         (Laughter.)

14         THE JUROR:  I know.  It's just to spend some

15   time with my daughter, you know.

16         THE COURT:  All right.  You're excused.

17         THE JUROR:  I actually would like to serve.

18         THE COURT:  Well, actually, I'd like you to

19   serve.  Well -- all right.

20         THE JUROR:  Thank you.

21         (Juror leaves.)

22         THE COURT:  The next person, I think, did not

23   answer "yes" to anything:

24         (Next juror.)

25         THE COURT:  Hello.

```
 1                    THE JUROR:  Hi.

 2                    THE COURT:  Please say your name for the

 3         record.

 4                    THE JUROR:  Joanne Sebeika.

 5                    THE COURT:  Ms. Sebeika, in addition to the

 6         parties and my staff, there are two members of the

 7         public here, one of whom works for the media.  And if

 8         there's anything I'm going to ask you that you feel

 9         uncomfortable answering in front of the public or the

10         media, let me know and I can excuse them.  Okay?

11                    THE JUROR:  Okay.

12                    THE COURT:  I don't think you answered "yes"

13         to anything, but having had a little more time to think

14         about it, is there anything you feel you should have

15         answered "yes" to?

16                    THE JUROR:  No.

17                    THE COURT:  And what do you do for work?

18                    THE JUROR:  I'm a worker's comp. claims

19         adjustor.

20                    THE COURT:  Okay.

21              Well, you're eligible to be a juror, you're the

22         third, and when I get 32, we'll see if you're actually

23         going to be one.

24              So if you would go take your seat, we'll get back

25         to you as soon as I get those 32.
```

```
1                    THE JUROR:  Thank you.

2                    (Juror leaves.)

3                    THE COURT:  The next person answered "yes" to

4       4, on the schedule, and 12, to attitude on cooperating

5       witnesses.

6                    MS. DEMASO:  And 6.

7                    THE CLERK:  6?  I'm sorry?

8                    MS. DEMASO:  Juror Number 6 is "yes" to

9       Question 10.

10                   THE COURT:  To Question 10?  Do the parties

11      have that, too?  I might have put it in --

12                   (Next juror.)

13                   THE COURT:  Hello.

14                   THE JUROR:  Hi.

15                   THE COURT:  All right.  Would you say your

16      name for the record.

17                   THE JUROR:  Laurie Warner.

18                   THE COURT:  And, Ms. Warner, in addition to

19      the parties and my staff, we have two members of the

20      public here, and one works for the media.  If you feel

21      uncomfortable answering any of these questions with the

22      public or the media here, let me know and I'll excuse

23      them.  Okay?

24                   THE JUROR:  Okay.

25                   THE COURT:  I think the first question to you
```

```
 1    which you answered "yes" to is whether the schedule
 2    would impose a special hardship on you.  What caused you
 3    to answer "yes"?
 4              THE JUROR:  Yes.  My son moved in with me
 5    about two months ago, with my grandchildren, and one is
 6    8, another is two months old, um, because their mother
 7    is a serious drug addict.  So he has a job, he just
 8    started six months ago and he has no time off, so I take
 9    care of the kids and --
10              THE COURT:  You're excused.  Good luck.
11              THE JUROR:  Thank you so much.
12              (Juror leaves.)
13              THE COURT:  I have the next person answering
14    "yes" to 4, 5 and 10.  She answered "yes" to -- he
15    answered "yes" to --
16              (Pause.)
17              THE COURT:  I must have misplaced that 10.
18    Okay.
19              (Next juror.)
20              THE COURT:  Hello.
21              THE JUROR:  Hello.
22              THE COURT:  Would you please say your name for
23    the record.
24              THE JUROR:  Daniel Rogier.
25              THE COURT:  And, Mr. Rogier, in addition to
```

1    the parties and my staff, we have two members of the

2    public here, one of whom is a reporter.  If there is

3    anything I ask you that you feel uncomfortable answering

4    with the public or the media here, let me know and I'll

5    ask that they step out.  Okay?

6              THE JUROR:  Sure.

7              THE COURT:  I think the first question you

8    answered "yes" to is whether the schedule would impose a

9    special hardship on you.  Why is that?

10             THE JUROR:  Um, I'm closing on a house

11   tomorrow.

12             THE COURT:  What time?

13             THE JUROR:  2:00 in the afternoon.

14             THE COURT:  Where?

15             THE JUROR:  In Norwell.

16             THE COURT:  You can get there for 2:00.  We're

17   going to be finished by 1:00.

18             THE JUROR:  Okay.

19             THE COURT:  And are you a teacher?

20             THE JUROR:  I am.

21             THE COURT:  Well, would they get a substitute

22   for you next week or something if you're on this jury?

23             THE JUROR:  I believe they do for a number of

24   days, but I'm not really sure how many days.

25             MR. McGINTY:  Isn't school out, your Honor?

1          THE COURT:  So you teach in the Brockton

2    Public Schools.  What do you teach?

3          THE JUROR:  Middle school history.

4          THE COURT:  Okay.  I think you said you served

5    on a jury before?

6          THE JUROR:  Yeah.

7          THE COURT:  Is there anything about that case

8    or your experience in that case that would affect your

9    ability to listen to the evidence here, follow the law

10   as I describe it, and decide it based on the evidence

11   and the law?

12         THE JUROR:  Um, I don't know.  It was awful.

13         THE COURT:  Why was it awful?

14         THE JUROR:  I was chosen as an alternate

15   juror.  I had to sit in a room for six and a half hours

16   doing nothing.  I was physically sick the next day.

17         (Laughter.)

18         THE COURT:  Well, if you're a juror in this

19   case, you wouldn't be an alternate.  The alternates are

20   selected separately towards the end.

21         THE JUROR:  Well, I did have one other thing I

22   answered "yes" to.

23         THE COURT:  Sure.

24         THE JUROR:  I think it was 7 or 8, but anyone

25   in my family who works for the cable company.  I have an

```
 1    uncle and my wife has another uncle who both work for
 2    Comcast.
 3               THE COURT:  And have you ever talked to them
 4    about anything relating to the theft of cable services?
 5               THE JUROR:  Just casual conversation.
 6               THE COURT:  What types of things, do you
 7    recall?
 8               THE JUROR:  Like "Did you ever catch anybody
 9    with a black box?"
10               THE COURT:  You asked them that?
11               THE JUROR:  Yeah.  It's somebody that I see
12    very frequently.  It's come up in conversation.  Um,
13    because he works from home now.  He changed from working
14    in an office to working at home and stuff.  We've talked
15    about it a little bit.
16               THE COURT:  That's one of the uncles?
17               THE JUROR:  That's one of the uncles.  That's
18    my wife's uncle.
19               THE COURT:  And what do you recall he said to
20    you?
21               THE JUROR:  Um, nothing, off the top of my
22    head.
23               THE COURT:  And given the fact that you have
24    two relatives who work for cable companies and you've
25    had these casual conversations, do you feel comfortable
```

1    you could decide this case based on the evidence and not
2    based on anything they may have said to you?
3                THE JUROR:  I probably would be more for what
4    the company is for.
5                THE COURT:  Would it make a difference if one
6    of the companies was Comcast?
7                THE JUROR:  Yeah.
8                THE COURT:  It would?
9                THE JUROR:  Yeah.
10                THE COURT:  All right.  You're excused.
11                THE JUROR:  Okay.  Thank you.
12                THE COURT:  You have to go downstairs.  Please
13    don't tell anybody why you've been excused.
14                THE JUROR:  Okay.
15                (Juror leaves.)
16                THE COURT:  The next person answered "yes" to
17    10, obtaining free service.
18                (Next juror.)
19                THE COURT:  Hello.  Would you please say your
20    name for the record.
21                THE JUROR:  Thomas A. Popson.
22                THE COURT:  Mr. Popson, in addition to the
23    parties and my staff, we have two members of the public
24    present, including one who is a reporter.  If you would
25    prefer not to answer any of the questions with the

```
 1    public and the media here, I will ask them to step out.

 2    Okay?

 3              THE JUROR:  Okay.

 4              THE COURT:  In fact, I'm going to ask you

 5    about your response about whether you or anyone close to

 6    you ever obtained television or internet service without

 7    paying a required fee.

 8         Would you like me to have them step out or are you

 9    okay with them being here?

10              THE JUROR:  Um, could you give me legal advice

11    or --

12              (Laughter.)

13              THE JUROR:  Then, yeah, I might as well if

14    you're offering that option.

15              THE COURT:  All right.  Then why don't you

16    step out, please.  It's important that I get

17    uninhibited, candid responses.  And please don't talk to

18    anybody who's out in the hallway.

19              (Public and reporter step outside.)

20              THE COURT:  All right.  What prompted you to

21    answer "yes" to the question whether you or anybody

22    close to you had ever obtained television or internet

23    service without paying the required fee?

24              THE JUROR:  Well, I had to think about it for

25    a while, but about 10 years ago I was looking at a condo
```

1    or a townhouse and my neighbor had satellite through

2    Direct TV, Direct Wave, he ran a cable underneath, and

3    we split the fee.  So probably Direct TV would have

4    preferred me to get my own satellite connection.

5             THE COURT:  All right.

6         And in this case the defendant, Mr. Harris, is

7    charged with essentially running a business, um, that

8    was a scheme to assist people in getting internet

9    service without paying the required fee.

10            THE JUROR:  Uh-huh.

11            THE COURT:  And you heard me explain what the

12   jurors would be required to do, presume he's innocent,

13   listen to the evidence, decide based on the law as I

14   describe it whether it proves he's guilty beyond a

15   reasonable doubt, and find him guilty if the government

16   has met that high burden, and find him not guilty if it

17   has not.

18        Do you feel you could do that and put aside your

19   own experience or do you think the fact that you did

20   what you just described, um, would or might have some

21   impact on how you decide the case?

22            THE JUROR:  I don't think it would have an

23   impact.

24            THE COURT:  And why is that?

25            THE JUROR:  Well --

1          THE COURT:  Just explain it to me.

2          THE JUROR:  Um, I think my presumption is that

3      there's a bigger scale that we're talking about here and

4      it was, um, a magnitude of difference.

5          THE COURT:  Yeah, allegedly.

6      All right.  And what do you do for work?

7          THE JUROR:  I work in mortgage banking.  I'm a

8      loan officer.

9          THE COURT:  All right.  Why don't you step out

10     for just a minute.

11          (Juror leaves.)

12          THE COURT:  Is there any objection to

13     Mr. Popson?

14          MR. BOOKBINDER:  Yes, your Honor.  In light of

15     his experience, between doing something very similar to

16     what's charged in this case, and notwithstanding his,

17     you know, statement that the scope would matter to him,

18     I would suggest that it's too close, that he would base

19     his judgments and his assessment of testimony, at least

20     in part, on his own experiences.

21          MR. McGINTY:  I don't agree.  I think his

22     description of the magnitude of difference indicates

23     that he would differentiate between this situation and

24     the situation he was in.  So I differ.

25          THE COURT:  Yeah, I'm not going to sustain the

1    objection.  I don't -- I think often I would, but I have

2    to do this case by case, and he seemed to me to be

3    thoughtful, candid, and in a way he went, you know, to

4    what arguably is the heart of the matter, and you're

5    prosecuting somebody who allegedly is being in the

6    business of doing this.

7         MR. BOOKBINDER:  Although, your Honor, the

8    specific counts in this case relate to individuals, or

9    one person obtaining free access, and that's in -- in

10   each of the wire fraud counts are based on -- are based

11   on that, and Mr. Harris is just one individual.

12        THE COURT:  I understand.

13        All right.  The objection is overruled.  Maybe

14   this is why we have peremptory challenges.  But I'm

15   satisfied Mr. Popson's eligible to be a juror.  Okay?

16   Bring him in.

17        (Juror returns.)

18        THE COURT:  Okay.  Mr. Popson, in reliance on

19   your assurance that you'll be fair to both the

20   government and the defendant -- well, let me ask you

21   this.  You know, let me you a little more about the

22   case.

23        The defendant is charged with conspiring or

24   engaging in this scheme with individual users and there

25   are allegations of wire fraud for the use of the wires

1    by individual users who are obtaining free internet

2    service.  When I tell you that, as you think about it,

3    does it change your sense of whether, you know, you

4    could be fair and if the evidence proves a crime beyond

5    a reasonable doubt, find the defendant guilty, even

6    though you'll be hearing from some people who did

7    something that's arguably similar to what you did many

8    years ago?

9            THE JUROR:  Um, the question is can I be

10   impartial?

11           THE COURT:  Yeah.

12           THE JUROR:  I think I can be.

13           THE COURT:  And I do, too.

14       All right.  You're eligible to be a juror.  When I

15   get 32, we'll see if you're actually going to be one.

16   Okay?

17           THE JUROR:  Okay.

18           (Juror leaves.)

19           THE COURT:  The next person, I think, did not

20   answer "yes" to anything.

21           (Same three people from the public and press

22   enter again.)

23           (Next juror.)

24           THE COURT:  Would you please say your name for

25   the record.

```
1                    THE JUROR:  Julianna Morrall.

2                    THE COURT:  Ms. Morrall, in addition to the

3       parties and my staff, we have two members of the public,

4       one of whom is a reporter, and if there's anything

5       you're uncomfortable answering with the media or the

6       public here, let me know and I'll ask them to step out.

7            I don't think you answered "yes" to anything.

8       Having had more time to think about it, is there

9       anything you think you should have answered "yes" to?

10                   THE JUROR:  No.

11                   THE COURT:  And it says here that you're

12      involved with nonprofit management "Flying Kites."  What

13      is that?

14                   THE JUROR:  I'm a director of development for

15      "Flying Kites," is the organization's name, and we run a

16      school and orphanage in Kenya.  The name is misleading.

17      It's supposed to invoke childhood.  It has nothing to do

18      with flying kites.

19                   THE COURT:  That's great.

20           All right.  Well, you're eligible to be a juror,

21      and you're the 5th, and when I get 32, we'll see if

22      you're actually going to be one.  All right?

23                   THE JUROR:  Okay.  And that's it?

24                   THE COURT:  Well, is there anything else you

25      think you should have answered "yes" to?  Oh, I asked
```

```
1     you that already.
2                THE JUROR:  No.
3                THE COURT:  Okay.  That wasn't so bad, was
4     it?
5                THE JUROR:  No.
6                THE COURT:  Okay.
7                (Juror leaves.)
8                THE COURT:  The next person answered "yes" to
9     4 and 10, I believe.
10               MR. BOOKBINDER:  4, 5 and 10.
11               THE COURT:  Oh, wait a minute.
12               (Next juror.)
13               THE COURT:  I have 4 and 10 down.
14          Hello.
15               THE JUROR:  Hello.
16               THE COURT:  Would you say your name, please.
17               THE JUROR:  Antonette Mitchell.
18               THE COURT:  And, Ms. Mitchell, in addition to
19     the parties and my staff, I have two members of the
20     public and one's a reporter, so if there's anything I
21     ask you that you don't feel comfortable answering with
22     the public or the media here, let me know and I'll ask
23     them to step out.  Okay?
24               THE JUROR:  Okay.
25               THE COURT:  Did you answer "yes" to any of the
```

```
 1   questions?
 2              THE JUROR:  No.
 3              THE COURT:  Well, I guess somebody else did
 4   and I wrote it by your name.  Sorry.
 5        But having had more time to think about it, is
 6   there anything you think you should have answered "yes"
 7   to?
 8              THE JUROR:  Number 6.
 9              THE COURT:  Whether you or somebody close to
10   you had ever been involved in a criminal matter?
11              THE JUROR:  Yeah, but I'm not sure really.
12              THE COURT:  Well, tell me what raises the
13   question.
14              THE JUROR:  My sister got in trouble in
15   California, but I don't know any of the details.
16              THE COURT:  Okay.  And do you think you could
17   put aside whatever happened to your sister and decide
18   this case based solely on the evidence and the law as I
19   describe it?
20              THE JUROR:  Yes.
21              THE COURT:  All right.
22        And you work?  What do you do for work?
23              THE JUROR:  An intake coordinator.  Insurance.
24              THE COURT:  All right.  And what does your
25   husband do?
```

```
 1              THE JUROR:  A wire technician.

 2              THE COURT:  Who does he work for?

 3              THE JUROR:  Precision Coding.

 4              THE COURT:  Precision Coding.

 5        What does a wire technician do?

 6              THE JUROR:  I have no idea.

 7              (Laughter.)

 8              THE COURT:  That makes two of us.

 9              THE JUROR:  I think he coats the wires for all

10    the electrical stuff.

11              THE COURT:  All right.  But it doesn't have

12    anything to do with internet service?

13              THE JUROR:  Oh, no.  No.  No.  No.

14              THE COURT:  All right.

15        Well, you're eligible to be a juror and you're the

16    sixth, and when I get 32, we'll see if you're actually

17    going to be one.  Okay?

18              THE JUROR:  Okay.

19              THE COURT:  Thank you.

20              (Juror leaves.)

21              THE COURT:  Now, what did the next juror

22    answer "yes" to, 4, 5 and 7, but not 10?  All right.

23              (Next juror.)

24              THE COURT:  Would you please say your name for

25    the record.
```

1            THE JUROR:  Joseph Foresi.

2            THE COURT:  And, Mr. Foresi, in addition to

3    the parties, I have two members of the public here, one

4    who works for the media.  If there's anything that I ask

5    you that you don't feel comfortable answering with the

6    media and the public here, I'll ask them to step out.

7    Okay?

8            THE JUROR:  Okay.

9            THE COURT:  I think the first thing that you

10   answered "yes" to is whether the schedule would impose a

11   special hardship.  Why is that?

12           THE JUROR:  I work in the investment community

13   and the stock market's open most days between 9:00 and

14   5:00 and it's been a little bit volatile lately and so

15   that creates a distraction.

16           THE COURT:  What do you do?

17           THE JUROR:  I'm a securities analyst.

18           THE COURT:  So you're analyzing securities,

19   not trading them?

20           THE JUROR:  Right.

21           THE COURT:  So you say it creates a

22   distraction.  But it's very important that jurors be a

23   cross-section of the community, people who do a wide

24   range of things, and people with responsibilities as

25   well as those who don't have as many, and that's

1    actually part of the reason that the trials just go from

2    9:00 until 1:00, so people can get to work and keep up

3    or you can work extra hours, you know, to sort of keep

4    your head above water.  But, you know, you said it would

5    be a distraction.

6        If it turned out, despite what you told me, that

7    you're a juror in this case, do you think you would be

8    able to pay careful attention to the evidence when

9    you're deliberating, take whatever time is necessary to

10   decide the case, and not just go along with somebody

11   else to get it over with?

12              THE JUROR:  Yes.

13              THE COURT:  All right.  And then I think you

14   said you also had some experience on a jury?

15              THE JUROR:  Yes.

16              THE COURT:  Where and when was that?

17              THE JUROR:  Um, it was at the state level.  I

18   was a foreman on a jury.

19              THE COURT:  And is there anything about that

20   experience that you think would injure or affect your

21   ability to decide this case based on its unique

22   evidence?

23              THE JUROR:  No.

24              THE COURT:  All right.  I appreciate your

25   candor.  I'm not going to excuse you because of the

1    schedule for just the reasons I described to you.  Um,

2    but I'm going to get 32 people before we figure out

3    which 14 are going to be jurors, so don't panic yet.

4              THE JUROR:  All right.  That's fine.

5              THE COURT:  Okay.

6              (Juror leaves.)

7              THE COURT:  The next person, I think, answered

8    "yes" to 7 about employment in law enforcement.

9              (Next juror.)

10             THE COURT:  Hello.

11             THE JUROR:  Hi.

12             THE COURT:  would you please say your name for

13   the record.

14             THE JUROR:  Charles James Daly.

15             THE COURT:  And, Mr. Daly, in addition to the

16   parties and my staff, there are two members of the

17   public here, one of whom is a reporter.  So if there's

18   anything I ask you that you prefer to respond to without

19   the public and the media here, let me know and I'll

20   excuse them.

21             THE JUROR:  All right.

22             THE COURT:  I think the only question to which

23   you answered "yes" is whether you or somebody close to

24   you had been employed in law enforcement.  Is that

25   right?

```
1                    THE JUROR:  Yes.

2                    THE COURT:  And what prompted you to answer

3      that?

4                    THE JUROR:  Um, my cousin Donnie works as a

5      Haverhill police officer.

6                    THE COURT:  Okay.  And do you talk to him

7      about his work from time to time?

8                    THE JUROR:  From time to time, yeah.

9                    THE COURT:  Does it have anything to do with

10     the alleged theft of internet services or television

11     services?

12                   THE JUROR:  No.

13                   THE COURT:  And you heard me say if you were a

14     juror in this case you would be required to judge the

15     testimony of a law enforcement officer like the

16     testimony of anyone else and not assume that he's more

17     or less likely to be telling the truth than somebody

18     else.  Do you feel you could do that?

19                   THE JUROR:  Yes.

20                   THE COURT:  Would it be uncomfortable for you,

21     with regard to your cousin, if it turned out you were on

22     a jury that found the defendant not guilty?

23                   THE JUROR:  Um, no, I can't say that it would

24     cause a lot of discomfort.

25                   THE COURT:  Would it cause any?
```

```
 1                    THE JUROR:  Well, I don't talk to him that
 2      frequently.
 3                    THE COURT:  All right.  And, actually, do you
 4      understand that if you're a juror, you can't talk to
 5      your cousin or anybody else about the evidence as you're
 6      hearing the case?
 7                    THE JUROR:  Yes.
 8                    THE COURT:  All right.
 9           What do you do for work?
10                    THE JUROR:  I'm a compliance consultant, the
11      federal securities laws.
12                    THE COURT:  Okay.
13           Well, you're eligible to be a juror and you're the
14      8th, and when I get 32, we're going to see if you're
15      actually going to be a juror.  So if you go take your
16      seat, persevere, we'll get to you as soon as possible.
17                    THE JUROR:  Thank you.
18                    (Juror leaves.)
19                    (Next juror.)
20                    THE COURT:  The next person, I think, did not
21      answer "yes" to anything.
22           Hello.
23                    THE JUROR:  Hello.
24                    THE COURT:  Please say your name for the
25      record.
```

1          THE JUROR:  Therese Bissinger.

2          THE COURT:  And, Ms. Bissinger, in addition to

3     the parties and my staff, I have here two members of the

4     public, one of who is a reporter.  If there's anything I

5     ask you that you don't want to answer with the media or

6     the public here, let me know and I'll have them step

7     out.  Okay?

8          But I don't think you answered "yes" to anything.

9     Having more time to think about it, is there anything

10    you think you should have answered "yes" to?

11         THE JUROR:  The only thing I have a question

12    about is law enforcement.  Is that fire department

13    also?

14         THE COURT:  Um, it can be.

15         THE JUROR:  My husband is a retired

16    firefighter.

17         THE COURT:  All right.  And would that affect

18    -- you know, are you able to judge the testimony of a

19    law enforcement officer like the testimony of any other

20    person?

21         THE JUROR:  I believe so.

22         THE COURT:  All right.

23         You'll eligible then to be a juror, you're the 9th

24    eligible person, and when I get 32, we'll see if you're

25    actually going to be one.  Okay?

```
 1                    THE JUROR:  Okay.

 2                    THE COURT:  Thank you.

 3                    (Juror leaves.)

 4                    THE COURT:  I think the next person answered

 5        "yes" to 6 and 10.

 6                    (Next juror.)

 7                    THE COURT:  Hello.

 8                    THE JUROR:  Hello.

 9                    THE COURT:  Would you please say your name for

10        the record.

11                    THE JUROR:  Adam Crosbie.

12                    THE COURT:  Mr. Crosbie, in addition to the

13        parties and my staff, I have two members of the public,

14        one of whom is a reporter, here.  But if any -- if you

15        would prefer that the members of the public and the

16        reporter not be here to discuss these questions that you

17        answered "yes" to about whether you or somebody close to

18        you had been involved in a criminal case, whether you or

19        anybody close to you had obtained television or internet

20        services without paying, then I'll ask them to step

21        out.  Would you prefer they step out or are you okay

22        with having them here?

23                    THE JUROR:  I'm okay with having them here.

24                    THE COURT:  Okay.  And what prompted you to

25        answer "yes" concerning whether you or anyone close to
```

1   you had ever been involved in a criminal case?

2            THE JUROR:  Well, I've known a fair amount of

3   people who have been arrested before, but none of them

4   have gone to trial.  But I've known a fair amount of

5   people who have been under police custody.

6            THE COURT:  And what kinds of things were they

7   arrested for?

8            THE JUROR:  Um, drunk driving, minor drug

9   stuff, fights, generally.

10           THE COURT:  And do you have a sense of whether

11  they were treated fairly or unfairly?

12           THE JUROR:  Um, one of my friends wasn't

13  Mirandized at all one time they brought him in.  So

14  that's pretty much it.

15           THE COURT:  All right.  And given the

16  experiences that your friends have had, do you feel

17  comfortable you could be fair to the government, the

18  prosecution, and the defendant as well as in this case?

19           THE JUROR:  I mean, I probably could, but I

20  feel like they could get away with certain things that

21  other people can't get away with.

22           THE COURT:  Who can get away with some

23  things?

24           THE JUROR:  The government.

25           THE COURT:  All right.  And I think you also

1    told me that you or somebody close to you had obtained

2    internet or television service without paying the

3    required fee.  Who is that?

4             THE JUROR:  I've known a lot of hackers since

5    like high school and stuff, like people who have been

6    jumping onto my high school's account like way back.

7    Just stuff like that.

8             THE COURT:  Well, in this case the defendant

9    is charged essentially with running a business that --

10   um, and doing, you know, selling products and doing

11   other things that help people hack into internet service

12   providers and get free service and some of the

13   witnesses, although they're not one of the defendants,

14   are going to be individual people who did that.  You

15   know, given the fact that you know a fair number of

16   people who did that, do you feel comfortable that you

17   could be fair to the government as well as the defendant

18   and find the defendant guilty if the evidence shows he's

19   guilty beyond a reasonable doubt or do you have some

20   hesitation on that?

21            THE JUROR:  I have a little bit of hesitation.

22            THE COURT:  Yeah, based on the two things that

23   you just described, I'm going to excuse you.  There's no

24   right or wrong answers, I just need honest answers, and,

25   you know, in the circumstances this is not the right

```
 1    case for you.  Okay?

 2               THE JUROR:  Okay.

 3               THE COURT:  All right.  Just go downstairs and

 4    don't tell any of the potential jurors why you were

 5    excused.

 6               THE JUROR:  Okay.  Thank you.

 7               (Juror leaves.)

 8               THE COURT:  The next person answered "yes" to

 9    5, jury service, 7, employment in law enforcement, 12,

10    attitudes towards cooperating witnesses.

11               (Next juror.)

12               THE COURT:  Hello.  Would you please say your

13    name for the record.

14               THE JUROR:  Eileen Kiernan.

15               THE COURT:  And, Ms. Kiernan, I think -- well,

16    let me tell you first that in addition to the parties we

17    have here two members of the public, one's a reporter,

18    and if you're uncomfortable answering any of my

19    questions with representatives of the public or media

20    here, let me know and I'll ask them to step out.  Okay?

21    You have to say "yes" or "no" for the record.

22               THE JUROR:  Yes.

23               THE COURT:  All right.  I think one of the

24    questions you answered "yes" to is whether you have some

25    attitudes toward people who cooperate with the
```

```
 1    government after having committed crimes themselves and

 2    get immunity or other people who get immunity and

 3    whether you would be able to follow my instruction that

 4    you should scrutinize the testimony of a person in that

 5    situation with special care, but that you could rely on

 6    it if you found the person credible or corroborated by

 7    other evidence.  What caused you to answer "yes" to that

 8    question?

 9              THE JUROR:  I just think -- my first feeling

10    would be is I would be doubtful.

11              THE COURT:  You would be doubtful?  You said

12    that would be your first feeling.

13              THE JUROR:  My first feeling is I would doubt

14    the legitimacy of it.

15              THE COURT:  And why would you doubt it?

16              THE JUROR:  I guess because I think they're

17    criminals.

18              THE COURT:  Because they're criminals.

19         And I would tell the jury that you should

20    scrutinize it with special care, that you should be

21    skeptical, because a person in that instance has an

22    incentive to make things up to help themselves.  But

23    there are people in that position who also, sometimes,

24    testify truthfully, and while you're examining it with

25    special care, you should be open-minded, and if you
```

1    listen to it and it sounds believable or you listen to

2    it and it's supported by other believable evidence, then

3    you can rely on it.  Do you feel you could do all of

4    that, even starting with the skepticism that you

5    described, or do you think it's almost certain that you

6    wouldn't believe such a person?

7              THE JUROR:  I wouldn't say it's almost

8    certain, no, but I would be dubious at the start.

9              THE COURT:  Okay.  And I think you said -- you

10   also answered "yes" to the question about whether you

11   know anybody who works in law enforcement.  Who is

12   that?

13             THE JUROR:  My son-in-law.

14             THE COURT:  What does he do?

15             THE JUROR:  He works for Northeastern and he's

16   in criminal justice and he's been working at

17   Northeastern about 20 years, as security.

18             THE COURT:  And do you feel, as I said, that

19   you could judge the testimony of a law enforcement

20   officer like the testimony of anybody else and not

21   assume that person is more or less likely to be telling

22   the truth because he works in law enforcement?

23             THE JUROR:  I would be all right with that,

24   yes.

25             THE COURT:  And do you understand you couldn't

1   discuss this case while it's going on with your son-in-

2   law or anybody else if you're a juror?

3                   THE JUROR:  Uh-huh.

4                   THE COURT:  You have to say "yes" or "no."

5                   THE JUROR:  Oh, yes.

6                   THE COURT:  Okay.  And would it be awkward or

7   uncomfortable for you with your son-in-law if it turned

8   out you were on a jury that found a defendant not

9   guilty?

10                  THE JUROR:  No.

11                  THE COURT:  All right.  Why don't you step out

12  for a minute.

13       Oh, actually I think you answered "yes" to another

14  question.

15       Did you say you also served on a jury at one

16  time?

17                  THE JUROR:  Yes, in Salem.

18                  THE COURT:  Is there anything about that

19  experience that would --

20                  THE JUROR:  Actually it wasn't in Salem, I

21  think it was in Lowell.

22                  THE COURT:  And is there anything about that

23  experience that you think might injure your ability to

24  decide this case based on its unique evidence and reach

25  a decision?

```
1                    THE JUROR:  No.

2                    THE COURT:  Why don't you step out for just a

3      minute.

4                    (Juror steps out.)

5                    THE COURT:  Is there any objection to

6      Ms. Kiernan?

7                    MR. BOOKBINDER:  Yes, your Honor.  She seems

8      to be coming from a position of bias against the

9      cooperator and I think that's different than what the

10     instruction the Court plans to give to people.

11                   MR. McGINTY:  If I might?  Her words were

12     "dubious at the start," which followed, I think, closely

13     by what it was that your Honor was instructing her on.

14     So I thought she was conveying with clarity exactly what

15     the instruction would direct her to do.

16                   THE COURT:  Yeah, but I would tell them to

17     scrutinize it with particular care because -- yeah, I'm

18     going to overrule that objection, too.  I think that her

19     skepticism is based on the factors that I'll be

20     instructing, which should cause them to examine it with

21     care, but she struck me as a thoughtful person that

22     would listen to the evidence and not disregard anybody's

23     evidence just because her initial skepticism proved to

24     be supported.  So that objection is overruled.

25                   MR. BOOKBINDER:  One other thing, your Honor?
```

1    She notes that her spouse is retired.

2              THE COURT:  Okay.  I'll ask her about that.

3    Sure.

4              MR. BOOKBINDER:  Also, your Honor, if you

5    would ask what she teaches, to get some more specificity

6    about that?

7              THE COURT:  It may be a special needs school.

8              (Juror returns.)

9              THE COURT:  Okay.  Just a couple of more

10   questions.

11        You're a teacher?

12             THE JUROR:  A technology teacher.

13             THE COURT:  A technology teacher.  Oh, so what

14   do you teach?

15             THE JUROR:  I teach kids how to use computers

16   and consult with other teachers on software and stuff

17   that they should use.

18             THE COURT:  All right.  This case involves,

19   you know, an alleged scheme to facilitate hacking and

20   getting internet service without paying for it.  Do you

21   know anything about the technology of how that would be

22   done?

23             THE JUROR:  No, not really.  I don't know

24   anything about how it would be done, no.

25             THE COURT:  Because if you're a witness in

```
 1    this case -- if you're a juror in this case, you'll have
 2    to decide the case based on the evidence and they'll be
 3    testimony about, you know, the technology and how
 4    hacking is done, and you would have to rely on the
 5    evidence that you find believable, but it wouldn't be
 6    appropriate or permissible for you to be in the jury
 7    room and say, "Well, wait a minute.  I understand
 8    technology and although nobody told us this, here's some
 9    information."
10              THE JUROR:  Well, we have strong principles at
11    our school and about people using it and --
12              THE COURT:  What do you mean by strong
13    principles?
14              THE JUROR:  Well, about kids bringing their
15    own devices to the school, they need to go through
16    school privacy, they need to sign papers, and go along
17    with the standards of the school.
18              THE COURT:  All right.  And what is the
19    Cotting School?
20              THE JUROR:  It's a school for physically
21    disabled kids.
22              THE COURT:  That's that I thought.
23         And it says your husband is retired.  What did he
24    do before he retired?
25              THE JUROR:  He was a graphic designer.
```

```
 1                    THE COURT:  All right.  You're eligible to be
 2          a juror, you're the 10th, and when I get 32, we'll see
 3          if you're actually going to be one.  Okay?  Thank you.
 4                    (Juror leaves.)
 5                    THE COURT:  The next person, I think, did not
 6          answer "yes" to anything.
 7                    (Next juror.)
 8                    THE COURT:  Hello.
 9                    THE JUROR:  Hi.
10                    THE COURT:  Would you please say your name for
11          the record.
12                    THE JUROR:  Malcom Lele.
13                    THE COURT:  Mr. Lele, in addition to the
14          parties and my staff, we have two members of the public,
15          one of whom is a reporter, and if there's anything I ask
16          you that you feel uncomfortable answering with the
17          public or the media here, let me know and I'll ask them
18          to step out.  Okay?
19              I don't think you answered "yes" to anything.
20          Having more time to think about it, is there anything
21          you feel you should have answered "yes" to?
22                    THE JUROR:  Um, did you ask about civil cases
23          or just criminal cases?
24                    THE COURT:  I asked if anybody close to you
25          had ever been involved in a criminal case.
```

1           Have you ever been involved in a civil case?

2                THE JUROR:  Yeah.

3                THE COURT:  What were the circumstances?

4                THE JUROR:  I got sued a number of times.

5                THE COURT:  Okay.  And what were the suits

6      about?

7                THE JUROR:  Um, I own a bicycle store and I

8      got sued there two or three times.

9                THE COURT:  All right.  And is there anything

10     about those experiences that you think would impact your

11     ability to be fair to both sides in this case?

12                THE JUROR:  Well, probably not.

13                THE COURT:  All right.  When you say "probably

14     not," maybe you're just being careful.  But this is a

15     criminal case on very different facts and, you know, do

16     you have any feelings about the legal process or the

17     court system that you couldn't put aside and assume or

18     presume Mr. Harris is innocent and listen to the

19     evidence and decide based on the evidence and the law as

20     I describe it whether he's been proven guilty beyond a

21     reasonable doubt.  Can you do that?

22                THE JUROR:  Yes.

23                THE COURT:  Okay.  Well, you're eligible to be

24     a juror, you're the 11th, and when I get 32, we'll see

25     if you're actually going to be one.  Okay?

```
 1                    THE JUROR:  Okay.

 2                    THE COURT:  Thank you.

 3                    (Juror leaves.)

 4                    THE COURT:  The next person, I think, answered

 5          "yes" to 7, employment in law enforcement.

 6                    (Next juror.)

 7                    THE COURT:  Hello.

 8                    THE JUROR:  Hello.

 9                    THE COURT:  Would you say your name for the

10          record.

11                    THE JUROR:  Cathleen Sheehan.

12                    THE COURT:  Ms. Sheehan, in addition to the

13          parties and my staff, I have two members of the public

14          here and one of them is a reporter.  If there is

15          anything I ask you that you prefer not to answer with

16          the public or the media here, let me know, and I'll have

17          them step out.

18                    THE JUROR:  Okay.

19                    THE COURT:  I think you answered "yes" to

20          Question 7 whether you or somebody close to you has ever

21          been employed in law enforcement or as a defense

22          lawyer.  Who is that?

23                    THE JUROR:  My father, he was an IRS agent.

24                    THE COURT:  All right.  And do you know what

25          kind of work he did, did he do criminal work or -- he
```

1  did criminal work?

2         THE JUROR:  White collar, but, yeah.

3         THE COURT:  Okay.  And is he retired now?

4         THE JUROR:  He passed away.  He passed away in

5  2007.

6         THE COURT:  Okay.  And did you used to talk to

7  him about his work from time to time?

8         THE JUROR:  Um, he was very quiet about it,

9  so, no.

10         THE COURT:  All right.  And do you feel that

11  you could judge the testimony of a law enforcement

12  officer like the testimony of anyone else and not

13  presume that person is more likely or less likely to be

14  telling the truth because he works in law enforcement?

15         THE JUROR:  Yes, I believe that's the case.

16         THE COURT:  Okay.  And, you know, your father

17  was an investigator for the federal government and this

18  case will be prosecuted, you know, by the federal

19  government.  Do you feel that you could properly presume

20  Mr. Harris is innocent, listen to the evidence, and

21  decide whether it proves he's guilty beyond a reasonable

22  doubt and find him not guilty if you're not satisfied

23  that it's done that?

24         THE JUROR:  Um, yeah, I really do believe that

25  because, um, you know, my father just believed in the

```
 1    truth and I think there are a lot of people that he
 2    worked that he wasn't all that impressed with or was
 3    impressed with.  It just depended on who the person
 4    was.  So I think that I would make a judgment based on
 5    the facts.
 6                THE COURT:  All right.  Why don't you step out
 7    for just a second.
 8                THE JUROR:  Okay.
 9                THE COURT:  Thank you.
10                (Juror steps out.)
11                THE COURT:  Okay.  Mr. McGinty?
12                MR. McGINTY:  There's one IRS agent and I have
13    a question whether she knows him or not.
14                THE COURT:  Who is that?
15                MR. BOOKBINDER:  Jason Ryan.
16                THE COURT:  Hold on a second.
17          But other than that, do you anticipate having an
18    objection to it?
19                MR. McGINTY:  No, I don't.
20          And where is Ryan based in, would it be the same
21    office or --
22                MR. BOOKBINDER:  Well, right now he's in a
23    drug task force that I believe is in Watertown, but he's
24    generally been based out of Boston.
25                THE COURT:  I'm just concerned the office is
```

```
 1    -- it's Jason Ryan?

 2              MR. BOOKBINDER:  Jason Ryan

 3              (Juror returns.)

 4              THE COURT:  Let me ask you this.  Do you know

 5    in which office your father worked when he worked for

 6    the IRS?

 7              THE JUROR:  It was back when he retired, in

 8    '55, and so it was about 30 years ago.

 9              THE COURT:  So he worked 30 years ago?  He

10    retired 30 years ago?

11              THE JUROR:  Yeah, he retired 30 years ago.

12              THE COURT:  All right.

13        Well, you're eligible to be a juror, you're the

14    12th, and when I get 32, we'll see if you're actually

15    going to be one.  Okay?

16              THE JUROR:  Okay.

17              THE COURT:  Thank you very much.

18              THE JUROR:  All right.

19              (Juror leaves.)

20              THE COURT:  And the record should reflect that

21    Mr. McGinty silently signaled me that he was withdrawing

22    his question when he heard her father worked almost --

23              MS. SEDKY:  Yeah, I think our agent is 25.

24              (Laughter.)

25              THE COURT:  The next person answered "yes" to
```

1    5, service on the jury, and it says he's a system

2    architect.  I think I'll ask what that is.

3              MR. BOOKBINDER:  Thank you, your Honor.

4              (Next juror.)

5              THE COURT:  Hello.

6              THE JUROR:  Hi.

7              THE COURT:  Would you say your name for the

8    record, please.

9              THE JUROR:  Andrew Barnaby.

10             THE COURT:  Mr. Barnaby, in addition to the

11   parties and my staff, we have two members of the public,

12   one of whom is a reporter.  But if there's anything I

13   ask you that you're uncomfortable answering with the

14   public or the media here, I'll ask them to step out.

15             THE JUROR:  Thank you.

16             THE COURT:  This says you're a system

17   architect for Boston University.  When does that mean?

18             THE JUROR:  I design computer systems for

19   Boston University.

20             THE COURT:  All right.  In this case you heard

21   me say that it's charged that Mr. Harris engaged in a

22   scheme to sell devices that would permit people to hack

23   into internet service providers, get free service, and

24   do other things to help you do that.  Do you know about

25   the technology that, you know, would be used in any such

```
 1   alleged scheme?
 2              THE JUROR:  It's not really my area of
 3   expertise.
 4              THE COURT:  What is your area?
 5              THE JUROR:  Designing reporting systems and
 6   transaction processing systems.
 7              THE COURT:  All right.  Because you understand
 8   that if you, like any other person, were a juror in this
 9   case, then you have to decide the case based on the
10   evidence, and they'll be evidence about the technical
11   aspects of hacking, I expect, but it wouldn't be proper
12   for you or anybody else to come back to the jury room
13   and say, "Well, we didn't hear any testimony on this,
14   but I know the following."  Do you feel you could follow
15   that instruction and decide the case based on the
16   evidence and not on your own outside experience?
17              THE JUROR:  Um, it's a tough question to
18   answer.  (Pause.)  I think I might have difficulty doing
19   that.
20              THE COURT:  Okay.  Why don't you --
21              THE JUROR:  Just based on the things that I
22   know about networking.
23              THE COURT:  So you know things that relate to
24   hacking or networking?
25              THE JUROR:  Well, no, nothing about hacking.
```

```
 1                    THE COURT:  Nothing about hacking.
 2          All right.  And I think you also said that you had
 3      served on a jury before?
 4                    THE JUROR:  Yes.
 5                    THE COURT:  When and where was that?
 6                    THE JUROR:  That was in Middlesex District
 7      Court.
 8                    THE COURT:  Is there anything about -- I'm
 9      sorry?
10                    THE JUROR:  It was two or three years ago.
11                    THE COURT:  Okay.  Is there anything about
12      that experience that you think would injure your ability
13      to listen to the evidence and decide this case based on
14      the unique evidence and the applicable law?
15                    THE JUROR:  I don't think so, no.
16                    THE COURT:  All right.  So let me see if I
17      understand this right.  Basically you don't feel you
18      know about the technology that would relate to hacking.
19      Or do you know about altering modems, for example?
20                    THE JUROR:  No.
21                    THE COURT:  But when I asked you that general
22      abstract question, you know, if there was something that
23      was within your knowledge and expertise, you know, you
24      would not be sure you would be able to disregard what
25      you know, if it wasn't testified to.
```

```
 1                THE JUROR:  I would have a hard time giving

 2      you a definitive answer on that.

 3                THE COURT:  Yeah.  Yeah.  I can see that.

 4           Why don't you step out for a minute.

 5                THE JUROR:  Sure.

 6                (Juror steps out.)

 7                THE COURT:  Is there any objection or concern

 8      about Mr. Barnaby?

 9                MR. BOOKBINDER:  Your Honor, I guess there's

10      some concern about his answer that he would have trouble

11      disregarding his personal experience.  Yes, I think

12      that's a concern.  It's hard to know what portions --

13      there will be a variety of portions of technical

14      testimony about internet access and computer software

15      and it's hard to know what portions may stray into areas

16      that --

17                THE COURT:  Yeah, and I may sustain the

18      objection, but I want to hear from the defendant first,

19      though, but I actually thought he was being very careful

20      in saying, "I can't tell you definitively that I

21      wouldn't rely on my knowledge."  But I'm just wondering

22      if he really does know anything relating to this case.

23                MR. BOOKBINDER:  And, your Honor, I certainly

24      don't question his candor, but I think if we get into

25      one of those areas that --
```

1          THE COURT:  Yeah, and what does the defendant

2     say?

3          MR. McGINTY:  Your Honor, I think what he is

4     explaining is he does has a foundational understanding

5     of the technology, but he does not have any specific

6     information or learning about this.  So I'm not

7     concerned about any intrusion of his sort of

8     foundational knowledge with this specific knowledge.

9     He's sort of in the nature of a lawyer who is going to

10    be potentially sitting on a jury, yet the lawyer knows

11    the law in a general sense, but so long as the lawyer

12    doesn't know the specific law relating to the case,

13    there's no bar against him serving on the jury.

14         So I think he was candid.  I think that if he had

15    specific information or specific knowledge about modems,

16    he would have acknowledged that and it would have been

17    sort of to the point.  But the fact that he has general

18    knowledge is not a basis for --

19         THE COURT:  Yeah, I just don't know enough

20    myself to question him that thoroughly to see whether

21    there's overlap.  I'm going to excuse him.

22         MR. McGINTY:  My concern about this is I don't

23    want stricken from the jury people that have ranges of

24    experience and technical experience.

25         THE COURT:  That have what?

1           MR. McGINTY:  If someone has, um, you know, a

2    technical background or a computer background, but it's

3    not specific to this, I think striking him on this basis

4    is inappropriate.

5           THE COURT:  I didn't strike him just because

6    he has a computer background, I struck him because he

7    didn't give me an adequate assurance that he would

8    decide the case based solely on the evidence.

9        You can bring him in.

10          MR. McGINTY:  Your Honor, note my objection.

11          THE COURT:  Okay.

12          (Juror returns.)

13          THE COURT:  And, Mr. Barnably, I'm going to

14   excuse you.  I really appreciate the care and candor

15   with which you answered my questions and I'm not capable

16   now, and I might never be, of explaining to you exactly

17   what the evidence is going to be on the technology, so I

18   can't be -- like you, I can't be assured that it won't

19   overlap with things that you know independently.  But

20   you shouldn't be interjecting into jury deliberations,

21   so I'm going to excuse you.  I think you would be a

22   great juror for another case, although it possibly won't

23   be today.  But why don't you go downstairs and tell them

24   that I excused you and I expect they'll send you home.

25   All right?  Thank you very much.

1                    THE JUROR:  Thank you.

2                    (Juror leaves.)

3                    THE COURT:  The next person answered "yes" to

4       7, employment in law enforcement or with a defense

5       lawyer.

6                    (Next juror.)

7                    THE COURT:  Right here.  Hello.

8                    THE JUROR:  How are you doing?

9                    THE COURT:  Okay.  Would you please say your

10      name for the record.

11                   THE JUROR:  Scott Travis.

12                   THE COURT:  Mr. Travis, in addition to the

13      parties, I have two members of the public, one of whom

14      is a reporter.  So if there's anything you feel

15      uncomfortable answering with the public or the media

16      here, let me know and I'll ask them to step out.

17                   THE JUROR:  Okay.

18                   THE COURT:  I think the only question to which

19      you answered "yes" is the question whether you or

20      somebody close to you has been employed in law

21      enforcement or by a defense lawyer.  Who is that?

22                   THE JUROR:  I have an uncle who was a Boston

23      cop, Joe Travis, and he's actually downstairs screening

24      the scanner there.

25                   THE COURT:  Oh, he's a Court Security

1    Officer?

2              THE JUROR:  Yeah.  I didn't know that until I

3    saw him today.

4              THE COURT:  All right.

5         Do you understand that if you're a juror in this

6    case, you can't discuss the evidence while you're

7    hearing it with him or anybody else?

8              THE JUROR:  Yes.

9              THE COURT:  And do you feel comfortable that

10   you could judge the testimony of a law enforcement

11   officer like the testimony of anyone else and not assume

12   that person is more likely or less likely to be telling

13   the truth because he works in law enforcement?

14             THE JUROR:  Yes.

15             THE COURT:  And would it be at all

16   embarrassing or uncomfortable for you with your uncle if

17   it turned out you were on a jury that found the

18   defendant not guilty?

19             THE JUROR:  No.

20             THE COURT:  All right.

21        Well, you're eligible to be a juror, you're the

22   13th, and when I get 32, we'll see if you're actually

23   going to be one.  Okay?

24             THE JUROR:  All right.

25             (Juror leaves.)

1           THE COURT:  The next person answered "yes" to

2     12, which is attitudes towards cooperating individuals.

3           (Next juror.)

4           THE COURT:  Would you please say your name for

5     the record.

6           THE JUROR:  Richard Destefano.

7           THE COURT:  Mr. Destefano, in addition to the

8     parties and my staff, there are two members of the

9     public here and one of them is a reporter.  If there's

10    anything you feel uncomfortable answering with the

11    public or the media here, let me know and I'll ask them

12    to step out.  Okay?

13          THE JUROR:  Okay.

14          THE COURT:  I think the only question to which

15    you answered "yes" is 12 as to whether -- with regard to

16    a person who, um, had been convicted of a federal crime

17    or was otherwise given immunity, um, that you would be

18    able to scrutinize that person's testimony with care,

19    but rely upon it if you thought it was believable or

20    found it was corroborated by other evidence and

21    therefore was believable.

22          What was the thinking that prompted you to answer

23    "yes" to the question about whether you had some

24    attitude that would make it hard for you to follow that

25    instruction?

```
 1              THE JUROR:  Um, the problem I see is if the

 2    prosecution cuts a deal with someone and says -- and it

 3    depends on the crime, but the way I look at it, just

 4    from a human-type of perspective, if you go to someone

 5    and say, "Hey, no jail time if you testify against XYZ

 6    guy," to me you would look at it and say, "Hey, that

 7    sounds like a good deal to me, I'll testify so I won't

 8    have to serve any jail time."  I mean, I don't know a

 9    lot about the law, but can't they just summons him to

10    come in and testify?

11              THE COURT:  Well, here, the way it works, and

12    I'll tell you a little more.  The short answer is "no"

13    because under the Constitution of the United States you

14    have a Fifth Amendment right not to say anything that

15    may tend to incriminate you.  So the government can, um,

16    get a court order -- if they ask for it, they get it,

17    that gives a person immunity, um, that says -- that

18    places the Fifth Amendment right that says that nothing

19    you say can be used against you in a criminal

20    prosecution except for perjury, or if you lied.  Um, or

21    they can enter into an agreement with somebody and say,

22    you know, "If you agree to testify, we promise not to

23    use anything against you."

24              In addition -- and somebody might be convicted of

25    a crime or be vulnerable to being convicted and they can
```

1    make a deal and I'll tell the jury that, you know, if

2    you have somebody they've made a deal with who has been

3    convicted or could be convicted, or at least prosecuted,

4    or if they've given somebody immunity, that you should

5    examine that person's testimony with particular care,

6    rely on it with caution, because a person in that

7    circumstance, a witness in that circumstance has an

8    incentive to make things up to help himself, to try to

9    get a lower sentence, to try to not to get prosecuted,

10   but while you're examining it with care, you should keep

11   an open mind.  And if you believe it, because the person

12   seems credible when he's testifying or because there's

13   other evidence that supports what he's saying, then, you

14   know, you can and should rely on that testimony and if

15   you believe it, rely on it in part in deciding the

16   case.

17         Now that I've explained that to you more fully, do

18   you think you could follow that instruction?

19              THE JUROR:  The immunity thing, that to me

20   kind of makes sense against -- you know, if you come in

21   and you know you're going to plead the fifth, so you're

22   immune from anything you testify, but when the

23   prosecution goes in and says, "No jail time if you come

24   in and testify," to me that just makes this person want

25   to testify, you know.  I don't know if that makes sense

 1    or not.

 2              THE COURT:  No, that's what I'm trying to get

 3    at.  That's why I asked the question.

 4        I'm going to excuse you from being a juror in this

 5    case.  You've got a thoughtful and deep feeling about

 6    this and I'm concerned that you wouldn't be able to

 7    follow the law in the sort of balanced way that I

 8    instructed.  And there are no right or wrong answers in

 9    this, there's just honest answers, and you gave me

10    that.

11        So go downstairs, tell them that I excused you.  I

12    think they'll probably send you home.

13              THE JUROR:  Okay.  Have a good day.

14              (Juror leaves.)

15              THE COURT:  The next person answered "yes" to

16    10.

17              MR. McGINTY:  I thought he would be an

18    exemplary juror.

19              (Laughter.)

20              THE COURT:  The record should reflect that

21    Mr. McGinty is laughing.

22        This person answered "yes" to 10, whether anyone

23    close to him obtained internet or cable without paying a

24    fee, and, 12, about attitudes toward cooperating

25    witnesses.

```
 1                    (Next juror.)

 2                    THE COURT:  Hello.  Come right here, please.

 3         Please say your name for the record.

 4                    THE JUROR:  Bruce Demello.

 5                    THE COURT:  Mr. Demello, in addition to the

 6         parties and my staff, I have two members of the public

 7         here, one's a reporter.  If you would prefer, because of

 8         the nature of what I'm going to ask you, like did you or

 9         somebody close to you ever get free internet or

10         television service?  If you would prefer that they not

11         be here, then I'll ask them to step out.  It's important

12         that you give me candid and complete answers.  Okay?

13                    THE JUROR:  Uh-huh.

14                    THE COURT:  You have to say "yes" or "no" for

15         the record.

16                    THE JUROR:  No, I don't care.

17                    THE COURT:  Okay.  The first question in which

18         you answered "yes" is whether you or someone close to

19         you had ever obtained television or internet service

20         without paying the required fee.  Why did you answer

21         "yes"?

22                    THE JUROR:  Um, I have done it, I think.  I

23         have had it.

24                    THE COURT:  And how did you do it?

25                    THE JUROR:  I got a box from a guy.  It cost
```

1    about 100 bucks.  This is going back probably 15 years

2    ago.  And I had TV for probably two months and then it

3    died and I never did it again, because my wife was like

4    out of her mind.

5              (Laughter.)

6              THE COURT:  When you say she was out of her

7    mind, what do you mean?

8              THE JUROR:  She threw that box out of here,

9    because supposedly it wasn't legal.  I mean, we were

10   getting cable, but we weren't getting paid channels.  We

11   weren't supposed to be getting paid channels.

12             THE COURT:  So it upgraded your service?

13             THE JUROR:  It upgraded my service.

14             THE COURT:  And that's one of the allegations,

15   one of the charges in this case, is that Mr. Harris

16   devised and developed those devices and did other things

17   to help people either get internet service for free or

18   to get premium service without paying the extra cost.

19       Given the fact that you did this yourself -- well,

20   excuse me.

21       Given the fact that you did what you just

22   described to me, because you didn't describe it to me as

23   income of a business, but given the facts of what you

24   just described to me, do you feel comfortable that you

25   could presume Mr. Harris is innocent, listen to the

1    evidence, and if the evidence is going to include

2    testimony from people who bought these devices and used

3    them, but they're not being prosecuted in this case,

4    that they've been given immunity, and that's the next

5    thing that you answered to, but do you feel comfortable

6    that if the evidence proves Mr. Harris guilty beyond a

7    reasonable doubt you would vote to find him guilty and

8    that you would be able to totally put aside and not be

9    influenced by your experience that seems still kind of

10   emotional to you and to me?

11           THE JUROR:  I'm sweating as we speak.  Um,

12   honestly I'm not comfortable putting, you know, anybody

13   in jail, whether it be six months or five years.  I'm

14   very uncomfortable with that.  I'm just -- I know

15   sometimes evidence can seem really, you know, strong

16   towards that defendant, but at the same time I -- my

17   heart says, you know, I'm just really not comfortable

18   being that person.  I don't know why.  I just --

19           THE COURT:  Actually that's a question that I

20   sometimes ask, but nobody asked me to do it now, um,

21   about judging somebody else.

22       I'm going to excuse you from being a witness in

23   this case.  I can see for you it's very uncomfortable

24   right now about sending somebody away who sold devices

25   allegedly like the device that you had and it would get

1    harder not easier in my experience.

2              THE JUROR:  I believe it would.

3              THE COURT:  Okay.  So you're excused.  Just

4    don't tell any potential juror why you were excused.

5              THE JUROR:  Thank you very much.  And good

6    luck to you.

7              (Juror leaves.)

8              THE COURT:  The next person, I think, didn't

9    answer "yes" to anything.

10             MR. McGINTY:  If only he had 11 friends.

11             (Laughter.)

12             THE COURT:  Well, according to the number of

13   people who answered Question 10 "yes," he has 11

14   friends, they just may not get on the jury.  Or they

15   just might.  Some do and some don't.

16             (Next juror).

17             THE COURT:  Hello.  Good morning.  Would you

18   say your name for the record, please.

19             THE JUROR:  Thomas Fitzgerald.

20             THE COURT:  Mr. Fitzgerald, you just sat in

21   Mr. Hohler's seat.  I might have to have you work for

22   me.

23             THE JUROR:  Pardon, sir?

24             THE COURT:  You just sat in what's usually

25   Mr. Hohler's seat.  I was going to get you closer to me,

1    but you're fine right there.

2              THE JUROR:  Oh, excuse me, sir.

3              THE COURT:  All right.

4         In addition to the parties and my staff, we have

5    two members of the public here, one's a reporter.  If

6    there's anything I ask you that you're uncomfortable

7    saying with the public or the media here, then I'll ask

8    them to step out.

9         I don't think you answered "yes" to anything.  Now

10   that you have more time to think about it, is there

11   anything you think you should have answered "yes" to?

12             THE JUROR:  No.

13             THE COURT:  And this says you used to be an

14   electrician?

15             THE JUROR:  I am an electrician.

16             THE COURT:  You're an electrician but you're

17   not working right now?

18             THE JUROR:  Right.  I'm retired.

19             THE COURT:  Okay.  What kind of electrical

20   work did you do?

21             THE JUROR:  We did building maintenance and

22   machine wiring.  I worked for Polaroid for 30 years.

23             THE COURT:  All right.  Did you have anything

24   to do with internet or internet services?

25             THE JUROR:  No.

```
 1              THE COURT:  All right.  And have you had any
 2   trouble hearing me today?
 3              THE JUROR:  No, not at all.
 4              THE COURT:  All right.  Well, you're eligible
 5   to be a juror, you're the 14th, and when I get 32, we'll
 6   see if you're actually going to be one.  Okay?
 7              THE JUROR:  Okay.  Have a nice day.
 8              THE COURT:  Thank you.  You, too.
 9              (Juror leaves.)
10              THE COURT:  The next person answered "yes" to
11   14 about some difficulty hearing or understanding
12   English.
13              (Next juror.)
14              THE COURT:  Good morning.  Oh, actually now
15   it's good afternoon.
16         Would you please say your name for the record.
17              THE JUROR:  Daniel Wong.
18              THE COURT:  Okay.  Mr. Wong, in addition to
19   the parties and my staff, there are two members of the
20   public here, and one of them is a reporter.  So if
21   there's anything I ask you that you don't feel
22   comfortable answering with the public or a reporter
23   here, I'll ask them to step out.  Okay?
24              THE JUROR:  Okay.
25              THE COURT:  You have to say "yes" or "no," so
```

```
 1    he can hear you.
 2                THE JUROR:  Oh, "yes."
 3                THE COURT:  I think you answered "yes" to
 4    Question 14 as to whether anybody had any difficulty
 5    hearing or understanding English or any other problem
 6    that would make it hard for them to be a juror.  Why did
 7    you answer "yes"?
 8                THE JUROR:  I'm hearing impaired.  I rely on a
 9    hearing aid.
10                THE COURT:  Okay.  So you rely on a hearing
11    aid.
12                THE JUROR:  Yes.
13                THE COURT:  Have you been able to hear me
14    fine?
15                THE JUROR:  Well, I wanted to ask you, can you
16    repeat Question 1?
17                THE COURT:  All right.  I described the case.
18    Well, I'm going to excuse you.  I mean, I think we have
19    devices that would amplify sound for jurors, but you
20    already have a hearing aid, and I think there's going to
21    be like -- I don't know, I can tell you what Question 1
22    is, but I'm just afraid -- do you think if you were on
23    the juror you would have trouble following the
24    testimony?
25                THE JUROR:  Yes, but the problem with my
```

```
 1   hearing is I sometimes -- you're still like lagging
 2   behind, and I'm interpreting the words, and when things
 3   go fast, I get confused very easily.
 4              THE COURT:  All right.  I'm going to excuse
 5   you.  I appreciate your explaining that to me.  I think
 6   otherwise you would be a great juror.  But it does go
 7   fast and there are jury deliberations and there would be
 8   a lot of people talking.  All right?
 9              THE JUROR:  Well, out of curiosity, what was
10   Question 1?
11              THE COURT:  I said what the case was about.
12   In this case I said that Mr. Harris is charged with a
13   conspiracy and a scheme to defraud internet service
14   providers by selling cable modem hacking products and
15   doing other things to help people who use them obtain
16   cable internet service without making the required
17   payments, and then I asked if you've read or heard
18   anything about this case.  Okay?
19              THE JUROR:  Okay.
20              THE COURT:  All right.  Now you know what the
21   case is about that you're not going to help us decide.
22   But thank you very much.
23              THE JUROR:  Okay.  Thank you.
24              (Juror leaves.)
25              THE COURT:  The next person answered "yes" to
```

 1    4 about the schedule.

 2              (Next juror.)

 3              THE COURT:  Hello.

 4              THE JUROR:  Hi.

 5              THE COURT:  Would you please say your name for

 6    the record.

 7              THE JUROR:  Joanne Collins.

 8              THE COURT:  Ms. Collins, in addition to the

 9    parties and my staff, we have two members of the public,

10    one of whom is a reporter.  If there's anything you

11    would prefer not to answer with the public or the media

12    here, let me know and I'll have them step out.

13              THE JUROR:  All right.

14              THE COURT:  One question which you answered

15    "yes" related to whether the schedule would impose so

16    great a hardship that it would be difficult or

17    impossible for you to serve.  Why did you answer "yes"?

18              THE JUROR:  Um, I work for a Boston-based bank

19    that was acquired a couple years ago by a Spanish-based

20    bank and we are currently going through a conversion.

21    The "big bang," as they call this, is supposed to happen

22    in the beginning of April, but they're actually taking

23    the substantive branches the first weekend in March and

24    converting them.  I work in the operations area.  We're

25    working 12-hour days.  We're working weekends to ensure

```
 1    that the transition for the customers is smooth.

 2              THE COURT:  All right.  I'm going to excuse

 3    you.  I don't always, but in your case I will.

 4              THE JUROR:  Thank you.

 5              (Juror leaves.)

 6              THE COURT:  I think this juror answered "yes"

 7    to 4 and 7.

 8              (Next juror.)

 9              THE COURT:  Would you say your name, please.

10              THE JUROR:  Jodi Garie.

11              THE COURT:  And, Ms. Garie, I think you

12    answered -- well, two things.

13         In addition to the parties and my staff, we have

14    two members of the public here, one of whom is a

15    reporter, and so if there's anything I ask you that you

16    would prefer not to answer with the public or the media

17    here, let me know and I'll ask them to step out.

18              THE JUROR:  Yes, sir.

19              THE COURT:  I think you answered "yes" to the

20    question whether the schedule would impose so great a

21    hardship that it would be difficult or impossible for

22    you to serve.  Why is that?

23              THE JUROR:  Yes, sir.  I'm self-employed, I'm

24    a personal trainer, and I have clients that are booked

25    well in advance, and I believe seven days of me missing
```

```
 1    work, it's my sole income, and missing my clients would
 2    create a hardship for me paying the bills and surviving
 3    the week.
 4              THE COURT:  All right.  You're excused.  You
 5    can go.
 6              THE JUROR:  Thank you.  I appreciate that.
 7              (Juror leaves.)
 8              THE COURT:  I don't think we're going to get
 9    32 by 1:00, so I think, to avoid any rush in the
10    cafeteria, we'll stop in about 15 to 20 minutes.
11              (Next juror.)
12              THE COURT:  Would you please say your name for
13    the record.
14              THE JUROR:  Kathleen Seville.
15              THE COURT:  Ms. Seville, I think that in
16    addition to the parties and my staff, we have two
17    members of the public, one of whom is a reporter.  If
18    anything I ask you you prefer not to answer with the
19    public or the media here, let me know and I expect I'll
20    excuse them.  Okay?
21              (Silence.)
22              THE COURT:  All right.  I think you answered
23    "yes" to the question whether you or somebody close to
24    you has been employed in law enforcement or was a
25    defense lawyer.  Why is that?
```

1          THE JUROR:  I didn't answer "yes" to that one.

2          THE COURT:  You didn't?

3          THE CLERK:  No, 5, jury service.

4          THE COURT:  For some reason I'm writing down

5     "7" a number of times.

6       What did the next one answer "yes" to?

7          (Pause.)

8          THE COURT:  I think you answered "yes" to

9     whether you had ever served on a jury, is that correct?

10         THE JUROR:  Yes.

11         THE COURT:  When and where did you do that?

12         THE JUROR:  Somerville District Court, in

13    state court, about three years ago.

14         THE COURT:  And is there anything about that

15    experience which you think would injure your ability to

16    be a juror in this case?

17         THE JUROR:  No.

18         THE COURT:  Well, you're eligible to be a

19    juror, you're the 15th, and when we get 32, we'll see if

20    you're actually going to be a juror.

21         THE JUROR:  Okay.

22         THE COURT:  Is there anything else you think

23    you should have answered "yes" to?

24         THE JUROR:  Well, you mentioned something

25    about having internet or cable access and at one point I

1  was paying for my cable with Comcast, but they provided

2  me more than what I was paying for.

3          THE COURT:  Did they provide you more than

4  what you were paying for because they made a mistake?

5          THE JUROR:  Yeah.

6          THE COURT:  Or did you get more than you paid

7  for because you had some kind of a device?

8          THE JUROR:  No, no device.

9          THE COURT:  Because in this case part of the

10 allegations are that Mr. Harris ran a business that sold

11 products, and he did other things, to help people either

12 get internet service from Comcast and others for free or

13 to get premium service without paying the premium.

14         THE JUROR:  Yeah, I didn't have any device.  I

15 got my device from Comcast.  I hooked it up, set it up,

16 I paid my monthly bill, but they just gave me more than

17 what I paid for.

18         THE COURT:  All right.  Do you think that

19 experience would in any way injure your ability to be

20 fair to the government and the defendant?

21         THE JUROR:  I don't think so.

22         THE COURT:  I don't either.

23     Okay.  You're eligible to be a juror.  Thank you

24 for telling me.

25         THE JUROR:  Okay.

```
 1                    (Juror leaves.)

 2             THE COURT:  Dan, we'll going to go through

 3      about four or five more then stop for lunch.

 4             THE CLERK:  Yes, Judge.

 5             (Next juror.)

 6             THE COURT:  The next person answered "yes" to

 7      7, I believe.

 8           Hello.  Please say your name for the record.

 9             THE JUROR:  Chris Ciampa.

10             THE COURT:  And, Mr. Ciampa, in addition to

11      the parties and my staff, we have two members of the

12      public here, one of whom is a reporter.  If there's

13      anything I ask you that you would prefer not to say with

14      the public or the media here, let me know and I'll ask

15      them to step out.  Okay?

16             THE JUROR:  Okay.

17             THE COURT:  Um, I think you answered "yes" to

18      the question of whether you or somebody close to you has

19      been employed in law enforcement or in a defense

20      lawyer's office.  What caused to you answer "yes"?

21             THE JUROR:  A cousin who was a corrections

22      officer.

23             THE COURT:  And do you feel comfortable you

24      could judge his testimony like the testimony of anyone

25      else?
```

```
 1                    THE JUROR:  Absolutely.

 2                    THE COURT:  I mean in law enforcement.

 3                    THE JUROR:  Right.  Yes.

 4                    THE COURT:  And do you understand that you

 5    can't discuss this case with your cousin, while it's

 6    going on, or with anybody else?

 7                    THE JUROR:  I do.

 8                    THE COURT:  And would it be uncomfortable for

 9    you or your cousin if it turned out you were on a jury

10    that found a defendant not guilty?

11                    THE JUROR:  No.

12                    THE COURT:  Then you're eligible to be a

13    juror.

14                    THE JUROR:  Can I just ask one question?

15                    THE COURT:  Yes.

16                    THE JUROR:  I apologize.

17                    THE COURT:  No.  No.

18                    THE JUROR:  The time period, I wanted to just

19    clarify that.  You had mentioned the case would be from

20    9:00 until 1:00?

21                    THE COURT:  Yes, that's right.

22                    THE JUROR:  But you also mentioned something

23    about staying until 4:30?

24                    THE COURT:  Yeah.  It will be 9:00 until 1:00

25    while we're hearing the evidence, but then when the
```

```
 1    jury's deliberating, the jurors will be required, if the
 2    deliberations aren't over, to continue in the afternoon
 3    until at least 4:30, and then if they wanted to stay
 4    longer, we would stay longer.
 5              THE JUROR:  It's only one day I have trouble
 6    with.  I'm in grad school and I have classes at 5:00 on
 7    Mondays.  Other than that I could commit to that, but
 8    not on Mondays.
 9              THE COURT:  Where are you in school?
10              THE JUROR:  Waltham, Bentley University.
11              THE COURT:  Um, it's conceivable the jury
12    would be deliberating a week from Monday.  I hope we'll
13    be finished before then.  But if that were the case, if
14    you remind us -- if you're on the jury and you remind
15    us, then, you know, maybe I'll send everybody home by
16    5:00.  If you remind us.
17              THE JUROR:  Okay.  Thank you.
18              THE COURT:  All right.
19              (Juror leaves.)
20              THE COURT:  The next person, I believe, is
21    just 4 and 7.
22              THE CLERK:  Yes.
23              (Next juror.)
24              THE COURT:  Hello.
25              THE JUROR:  Hi.
```

1          THE COURT:  Please say your name for the
2    record.
3          THE JUROR:  Ryan Kerrigan.
4          THE COURT:  Mr. Kerrigan, in addition to the
5    parties and my staff, we have two members of the public
6    here, and one is a reporter.  So if there's anything
7    that I ask you that you would prefer to answer without
8    the public or the media here, let me know and I expect
9    I'll have them step out.  Okay?
10          THE JUROR:  Okay.
11          THE COURT:  I think the first question that
12    you answered "yes" to is a question about whether the
13    schedule would impose so great a hardship on you that it
14    would be difficult or impossible for you to serve.  Why
15    is that?
16          THE JUROR:  I work for myself.  I'm in the
17    process of renovating a house for resale value, um, and
18    that would pretty much completely stop, um, if I were --
19          THE COURT:  Is this a house you own?
20          THE JUROR:  I own it and I'm currently paying
21    a mortgage payment on it.
22          THE COURT:  Where is the house?
23          THE JUROR:  In Falmouth.
24          THE COURT:  That's part of the reason we sit
25    from 9:00 until 1:00, you know, you can get back and get

1   some work done.

2           THE JUROR:  I also have two employees who

3   would not be working while I was gone.

4           THE COURT:  All right.  You're excused.

5           THE JUROR:  Thank you.

6           THE COURT:  Good luck.

7           (Juror leaves.)

8           THE COURT:  The next person answered "yes" to

9   4 and 14.

10          (Next juror.)

11          THE COURT:  Hello.

12          THE JUROR:  Hello.

13          THE COURT:  Would you please say your name for

14   the record.

15          THE JUROR:  Svetlana Dobkin.

16          THE COURT:  Ms. Dobkin, in addition to the

17   parties and my staff, there are two members of the

18   public here and one is a reporter.  If there's something

19   I ask you that you would prefer to answer without

20   representatives of the public or the media here, let me

21   know and I expect I'll excuse them.

22       I think the first question to which you answered

23   "yes" to is whether the schedule imposes so great a

24   hardship that it would be difficult or impossible for

25   you to serve.  Why is that?

1          THE JUROR:  Well, I'm an anesthesiologist and

2     I have work responsibilities.  I was really -- I was

3     okay for the day, but I have to take my calls.  So in

4     seven days I have to --

5          THE COURT:  Where do you work?

6          THE JUROR:  I work for Anesthesia Associates

7     of Massachusetts.  My call is at Northshore Medical

8     Center, Salem Hospital.

9          THE COURT:  All right.  And did you know you

10    were scheduled to be called for jury service this week?

11         THE JUROR:  Yes, so I was waiting for the day,

12    but I didn't know about missing so much of my

13    responsibilities.  I thought I would return --

14         THE COURT:  I'm sorry.  You'll do what?

15         THE JUROR:  That I would return to work after

16    jury duty.

17         THE COURT:  Yeah, I know, but jury duty is, in

18    the federal courts, is not for a day, as you now know.

19    But I'm going to excuse you, though.  You can go.

20         (Juror leaves.)

21         THE CLERK:  Judge, one more?

22         THE COURT:  Actually I was hoping to get the

23    next two at least.

24         All right, we'll do one, then stop for lunch.

25    Because we're not going to get this done before 1:00.

```
1              So far nobody has come in, as they usually do, and
2      said, "Well, I have a long criminal record.  I was
3      embarrassed to stand up," but we'll see.  We're getting
4      there slowly, but I hope surely.
5                   (Next juror.)
6                   THE COURT:  Hello.
7                   THE JUROR:  Hi.
8                   THE COURT:  Would you please say your name for
9      the record.
10                  THE JUROR:  Moira Clawson.
11                  THE COURT:  And, Ms. Clawson, in addition to
12     the parties and my staff, we have two members of the
13     public, one is a member of the media.  If there's
14     anything I ask you that you prefer not to answer with
15     the public or with a reporter here, then I expect I'll
16     ask them to step out, if you tell me.  Okay?
17                  THE JUROR:  Okay.
18                  THE COURT:  I don't think you answered "yes"
19     to any question, but having more time to think about it,
20     is there anything you think you should have answered
21     "yes" to?
22                  THE JUROR:  No, not really.  I am thinking
23     back.  My uncle was a cop, but he retired but I was
24     born, so.
25                  THE COURT:  All right.  This says you're not
```

1    working now.  Have you worked?

2              THE JUROR:  Yeah, I've worked as a waitress,

3    but right now I'm a full-time student, so.

4              THE COURT:  And where are you at school?

5              THE JUROR:  Mass Bay.

6              THE COURT:  Do you have classes in the

7    morning?

8              THE JUROR:  No, I don't actually start up my

9    classes again until next month.

10              THE COURT:  All right.

11        Well, you're eligible to be a juror, you're the

12    17th, and when I get 32, we'll see if you're actually

13    going to be one.  All right?

14              THE JUROR:  Yes.

15              THE COURT:  Here, why don't you go back in.

16    I'll go in and explain to them what's going on and then

17    we'll take about 45 minutes for lunch.  All right?

18        In fact, you can take them down and give them an

19    hour, have them eat in the jury assembly area.  Thank

20    you very much.

21              (Juror leaves.)

22              THE COURT:  All right.  So why don't you

23    relocate.  I'm concerned with how long it will take to

24    get them down and get them back.  So we'll give them an

25    hour, we'll come back, finish this process, and then

1    we'll go and look at other issues that need to be

2    cleaned up.  Okay?

3            MR. BOOKBINDER:  Your Honor, just one quick

4    scheduling matter for tomorrow.  As we talked about, we

5    expect that Mr. Phillips, on direct tomorrow, will go

6    probably -- his direct will go until the afternoon and

7    then obviously Mr. McGinty will have some time on cross.

8            THE COURT:  Yes, Mr. Phillips will be plenty

9    for tomorrow.

10           MR. BOOKBINDER:  Yes, that's -- thank you,

11   your Honor.  It will make life easier.

12           THE COURT:  Was that the question?

13           MR. BOOKBINDER:  That was the question.

14           THE COURT:  All right.  And my present

15   understanding is the next witness is Kohler?

16           MR. BOOKBINDER:  Yes, Kohler.

17           THE COURT:  That you've accommodated the

18   objection to the anticipated testimony.  Okay.  Go back

19   out.

20           (Recess, jury room, 12:25 p.m.)

21           (Resumed, in courtroom, 12:30 p.m.)

22           THE COURT:  Ladies and gentlemen, let me tell

23   you where we are and where we're going and where we're

24   going imminently is to lunch.

25           This process -- I know how to do this faster, but

1   I don't know how to do it better.  It's an important

2   part of the trial.  And I would -- I had hoped -- I

3   don't think I said this earlier, but to get 32 of you

4   qualifying as eligible to be jurors and from the 32 we

5   will select 14, but right now I only have 17, and the

6   cafeteria gets pretty crowded at 1:00, so I don't expect

7   I'd have 32 by 1:00.  Therefore I'm going to excuse

8   you.  I'm going to ask the Court Security Officer,

9   Mr. Chamberlein, to take you down as a group, as much as

10  possible, to go get your lunch and then to go eat in the

11  jury selection area, in the lounge there.

12          You may see the lawyers and other people involved

13  in the case down in the cafeteria.  They're not

14  permitted to speak to you.  If they don't speak to you

15  they're not being impolite, they're just following

16  orders.  So please don't misunderstand that.

17          Please don't discuss, among yourselves, the little

18  you know about the case or those of you whom I have

19  already talked to, what you've said to me.  I expect

20  we'll continue to make good progress when you come back,

21  which will be -- you should be back before 1:30, and

22  we'll pick the jury this afternoon.

23          Okay.  Is there anything else before we adjourn?

24          (Silence.)

25          THE COURT:  The Court is in recess.

1          (Short recess, 12:30 p.m.)

2          (Resumed, in jury room, 1:30 p.m.)

3          THE COURT:  All right.  We're going to start

4    with Number 31 and hopefully accelerate our progress.

5    Everybody is back, including the reporter.

6          Can I ask the gentleman who just came in, if he

7    doesn't mind, to identify himself for the record.

8          MR. WILLOUGHBY:  Sure.  My name is Gary, last

9    name is Willoughby.

10         THE COURT:  Mr. Willoughby.  Okay.  Thank

11   you.

12         (Next juror.)

13         THE COURT:  Hello.  Would you please say your

14   name for the record.

15         THE JUROR:  Bryan Cole.

16         THE COURT:  And, Mr. Cole, in addition to the

17   parties and my staff, we have members of the public,

18   including at least one reporter.  If there's anything I

19   ask you that you prefer to answer without the public or

20   the media present, let me know and I expect I'll excuse

21   them.

22         I don't think you answered "yes" to anything.

23   Having had more time to think about it, is there

24   anything you think you should have answered "yes" to?

25         THE JUROR:  Well, I remembered that my

1  grandfather used to work for a cable company, but he's

2  retired now.

3            THE COURT:  About how long ago was that?

4            THE JUROR:  10 years ago.

5            THE COURT:  Do you know which cable company?

6            THE JUROR:  It was Time Warner when he

7  retired.

8            THE COURT:  And do you know whether he had

9  anything to do with internet service?

10            THE JUROR:  I don't remember.

11            THE COURT:  Okay.  And I see that you're an IT

12  manager, is that right?

13            THE JUROR:  Yes.

14            THE COURT:  What do you do in your work?

15            THE JUROR:  It's a nebulous term.  Um, I

16  manage everybody from support technicians to network

17  administrators and programers.

18            THE COURT:  Do you have anything to do with

19  acquiring internet service?

20            THE JUROR:  Yes.

21            THE COURT:  And what do you do relating to

22  acquiring internet service?

23            THE JUROR:  We actually are acquiring new

24  offices and hospitals, so we have to get the internet

25  place for our LAN, we have to get drops put in.

```
 1              THE COURT:  Okay.  And in this case I expect
 2     there's going to be testimony -- essentially the charges
 3     are that Mr. Harris engaged in a scheme to sell devices
 4     that would permit obtaining internet service without
 5     paying anything, or without paying for premium service,
 6     or did other things to promote that activity.  And
 7     there's going to be some testimony, as I understand it,
 8     about modified modems and other technology.  If you're a
 9     juror, like every other juror, you're going to be
10     required to decide the case based on the evidence and
11     not based on what you know independently.
12              THE JUROR:  Okay.
13              THE COURT:  And I see you smiled.
14              THE JUROR:  There's a lot to know.
15              THE COURT:  There's a lot to know.  And the
16     fundamental issues, as far as I know, are not so much
17     about -- well, I mean, there may be some questions, for
18     example, about whether this is technology that could be
19     only used for an illegitimate purpose or whether it
20     could also be used for other purposes, and there's going
21     to be testimony about that, and the jurors are going to
22     have to decide the case based on the evidence and, as I
23     said, not on some expertise or experience that they have
24     independently.
25              Do you think you would be able to do that in this
```

1    case?

2              THE JUROR:  I don't think so.

3              THE COURT:  Probably not?

4              THE JUROR:  Yes.

5              THE COURT:  All right.  When you say "probably

6    not," why do you say that?

7              THE JUROR:  Well, just based on your

8    description of equipment that would have to be

9    proprietary to a scam, doesn't -- well, there's a lot of

10   equipment that could get you to do pretty much anything,

11   it's just how you use it.

12             THE COURT:  It's how you use it.  And in this

13   case somebody's going to testify as to how it could be

14   used, and that person will be cross-examined, so you'll

15   have that evidence, but do you think you'll be sitting

16   there thinking, "Well, you know, I understand this

17   technology, too, and I don't think that's right based on

18   what I know about the technology or about technology"?

19             THE JUROR:  I can see that happening.

20             THE COURT:  Okay.  Why don't you step out for

21   just a minute.

22             THE JUROR:  Okay.

23             (Steps out.)

24             THE COURT:  Are there any additional questions

25   you think I ought to put to this juror or do you have

1    any objections?

2             MR. BOOKBINDER:  Yes, the government does

3    object for exactly the reasons the Court identified,

4    that he's got -- this is not just someone who is a

5    scientifically sophisticated person.  I agree with

6    Mr. McGinty that we want people from all walks of life.

7    But this is someone who works in providing internet

8    technology and he just has an independent basis to know

9    or question the evidence.  I don't think there's any way

10   he can set aside that and he made that pretty clear.

11             THE COURT:  Mr. McGinty.

12             MR. McGINTY:  I'm concerned about the

13   availability of people on the jury, to serve on the jury

14   who do have technical internet background.  We've lost

15   Juror 3, who was excused for cause, we lost Juror 18

16   excused for cause, both of them -- one of whom was an

17   assistant architect at BU, the other one a consulting

18   individual at the Federal Reserve Bank, both of them

19   having expertise in the internet area.  He has internet

20   expertise, but he has not indicated that he has internet

21   modem expertise or a special knowledge that would be

22   integral to the specific subject here.

23        We expect people to have backgrounds, we expect

24   them to bring those backgrounds to bear, but we don't

25   want that to crowd away the specific knowledge that

```
 1    they're been given in connection with this particular

 2    case here.  But asking him whether he can, um, whether

 3    he could view skeptically the use of, um, you know,

 4    internet systems, um, given his experience, well, his

 5    answer has got to be, yeah, he would be, to some degree.

 6              THE COURT:  I don't think I asked him that

 7    question.

 8              MR. McGINTY:  But, you know, I think the --

 9    the issue is whether he knows anything about modems or

10    whether he knows anything about modem technology, and if

11    he doesn't --

12              THE COURT:  Okay, I'll ask him.

13              MR. McGINTY:  And if he doesn't, um, I would

14    object to him being --

15              THE COURT:  Well, I'll ask him some more

16    questions.

17              (Juror returns.)

18              THE COURT:  Mr. Cole, let me ask you a couple

19    of other questions.

20              THE JUROR:  Sure.

21              THE COURT:  Do you know anything about modems

22    and modem technology?

23              THE JUROR:  Yeah.

24              THE COURT:  You do?

25              THE JUROR:  Yeah.
```

1          THE COURT:  Well, do you know how modems might

2    be modified and how modified modems might be used?

3          THE JUROR:  (Pause.)  Probably.  I mean, yes.

4    They have to be modified per the signal depending on who

5    the carrier is and what have you.

6          THE COURT:  Do you know whether modems can be

7    modified to, um, show that they have a -- do you know

8    what a MAC address is?

9          THE JUROR:  Yes.  You can clone the MAC

10   address and display it to somebody else.

11         THE COURT:  You know about that?

12         THE JUROR:  Yes.

13         THE COURT:  All right.  I'm going to excuse

14   you because you have not just internet experience, you

15   have independent knowledge -- well, it sounds like you

16   could be a witness in this case and you can't -- well,

17   you've got to decide the case based on the evidence.

18      But let me ask you one other question.  Do you

19   have any attitude about -- one way or the other, about

20   the theft of internet services by people?

21         THE JUROR:  Oh, I don't like paying for cable

22   either.

23         THE COURT:  What's that?  You don't like

24   paying for cable either?

25         THE JUROR:  No.

```
1              THE COURT:  You're excused because you can't
2    decide the case based solely on the evidence.
3              (Juror leaves.)
4              THE COURT:  The next person, I think, answered
5    "yes" to 5, jury service, and 12, cooperating
6    witnesses.
7              (Next juror.)
8              THE COURT:  Hello.
9              THE JUROR:  Hello.
10             THE COURT:  Please say your name for the
11   record.
12             THE JUROR:  Mary McDonough.
13             THE COURT:  Ms. McDonough, in addition to the
14   parties and my staff, we have two representatives, two
15   people from the public, including one who's a reporter.
16   If there's anything I ask you that you prefer not to
17   answer with the public or the media here, let me know
18   and I expect I'll excuse them.  Okay?
19             THE JUROR:  Okay.
20             THE COURT:  I think you answered "yes" to
21   Question 12 which asked whether you could follow an
22   instruction to examine the testimony of somebody
23   convicted of a crime or anybody else given immunity for
24   their testimony with special care, um, but decide
25   whether it's truthful based on your view of the
```

1   credibility of the person testifying or whether there's

2   other evidence that corroborates or supports their

3   testimony and rely on it if you find it was truthful or

4   whether you'd have trouble following that instruction?

5        Why did you answer "yes" when I asked, "You might

6   have trouble following that instruction?"

7             THE JUROR:  When you asked the question it

8   just hit me that I would have difficulty in it.  I don't

9   really know how to express how it would be, it just

10  would be that I would feel -- I guess -- well, I

11  wouldn't just accept it.  I don't know.

12            THE COURT:  But actually let me explain it

13  more, because I'll give you a bigger instruction or a

14  more complete explanation on what the instruction would

15  be.

16            THE JUROR:  Okay.

17            THE COURT:  The instruction, in essence, would

18  be that you've heard some testimony from somebody, or

19  more than one person, who committed a crime and, um, is

20  testifying pursuant to an agreement with the government

21  that he hopes will benefit him, will get him not

22  prosecuted or a lower sentence, and maybe from other

23  witnesses who haven't been prosecuted or admitted to a

24  crime, but have immunity, which means what they say

25  can't be used against them, so they don't have a Fifth

1        Amendment right not to testify.  And it's permissible

2        for the government, you know, to use witnesses that it

3        has agreements with or have been granted immunity.  But

4        people, in that circumstance, have a particular motive

5        to lie, to make things up, you know, to tell the

6        government what it wants to hear.  So therefore you

7        should examine the testimony of such a witness

8        especially carefully and rely on it with caution, but,

9        you know, you should be open to believing it if after

10       examining it closely you find it's truthful either

11       because of --

12                THE JUROR:  Because of other information?

13                THE COURT:  -- because of other information.

14       Yeah.

15            Do you think you'd be able to follow that

16       instruction?

17                THE JUROR:  I still have a reaction like if

18       they're benefitting, I just don't know if -- I just

19       can't accept it.

20                THE COURT:  All right.  Why don't you step out

21       for just a second.

22                THE JUROR:  Okay.

23                THE COURT:  Thank you.

24                (Steps out.)

25                THE COURT:  Is there an objection?

```
 1              MR. BOOKBINDER:  Yes, your Honor.

 2              THE COURT:  Because she can't follow the

 3    instruction?

 4              MR. BOOKBINDER:  Yes.

 5              THE COURT:  Okay.  Do you want to be heard on

 6    that?  But I'm inclined to excuse her.

 7              (Pause.)

 8              THE COURT:  Okay.  You can bring her back.

 9              (Juror returns.)

10              THE COURT:  All right.  I'm going to excuse

11    you.  There are no right or wrong answers, just honest

12    answers, and I appreciate your candor.  You can go.  I

13    expect you'll get sent home.

14              (Juror leaves.)

15              THE COURT:  The next person, I think, answered

16    "yes" to 5, jury service, and 7.

17              (Next juror.)

18              THE COURT:  Hello.

19              THE JUROR:  Hello.

20              THE COURT:  Please say your name for the

21    record.

22              THE JUROR:  Marybeth Robinson.

23              THE COURT:  And, Ms. Robinson, in addition to

24    the parties and my staff, there are two members of the

25    public and at least one is a reporter.  If there is
```

1    anything I ask you that you prefer not to answer with

2    the public or the media here, let me know and I expect

3    I'll excuse them.

4         I think you answered "yes" to the question whether

5    you or someone close to you was employed in law

6    enforcement, or by a defense lawyer.  Who was that?

7              THE JUROR:  I had a sister who was a retired

8    police officer.

9              THE COURT:  Where did she work?

10             THE JUROR:  Billerica police.

11             THE COURT:  And do you feel you could judge

12   the testimony of a law enforcement officer like the

13   testimony of anybody else and not assume that person is

14   more likely or less likely to be telling the truth

15   because he works in law enforcement?

16             THE JUROR:  Yes.

17             THE COURT:  And do you understand you couldn't

18   discuss the case while it's going on with your sister or

19   anybody else?

20             THE JUROR:  Correct.

21             THE COURT:  Would it be uncomfortable for you

22   with your sister if it turned out you were on a jury

23   that found a defendant not guilty?

24             THE JUROR:  No.

25             THE COURT:  And I think you said also that you

```
 1   had had jury duty?
 2             THE JUROR:  Yeah, within the last year.
 3             THE COURT:  Where was that?
 4             THE JUROR:  The Superior Court in Woburn.
 5             THE COURT:  And is there anything about that
 6   experience that would injure your ability to listen to
 7   the evidence, decide the case based on the evidence and
 8   the law as I describe it, and reach a verdict?
 9             THE JUROR:  No.  It was a three-day jury
10   trial.
11             THE COURT:  Well, you're eligible to be a
12   juror, you're the 18th, and when I get 32, we'll see if
13   you're actually going to be one.  Okay?
14             THE JUROR:  Okay.
15             THE COURT:  Thank you.
16             (Juror leaves.)
17             THE COURT:  The next person answered "yes" to
18   10, 12, theft of jury service, and attitudes towards
19   cooperating witnesses.
20             (Next juror.)
21             THE COURT:  Hello.
22             THE JUROR:  Hello, sir.
23             THE COURT:  Would you please say your name for
24   the record.
25             THE JUROR:  Peter Shelley.
```

```
 1                 THE COURT:  Mr. Shelley, in addition to the
 2     parties and my staff, there are two members of the
 3     public, including at least one reporter.  And in view of
 4     what I'm going to ask you, if you would prefer that the
 5     public and the media be excused, um, I'll ask them to
 6     step out.
 7                 THE JUROR:  That's fine with me.
 8                 THE COURT:  All right.
 9          Well, the first question to which you answered
10     "yes" is whether you or anybody close to you had ever
11     obtained television or internet service without paying
12     the required fee.  What prompted you to answer "yes"?
13                 THE JUROR:  I know a few people who have done
14     that, yes.
15                 THE COURT:  And what do you think about it?
16                 THE JUROR:  Well, in a way it's not a big
17     deal, but when you look at the overall effect of it, of
18     everybody doing it, then, yeah, it is a big deal.  So I
19     guess I'm not okay with it.
20                 THE COURT:  You're not okay with it?
21                 THE JUROR:  No.
22                 THE COURT:  In this case, when you say you
23     know some people who did it, without naming their
24     names -- well, let me ask you this.  Did you ever do
25     it?
```

```
 1              THE JUROR:  No, I never had to.  I always got
 2     caught for everything I did.
 3              (Laughter.)
 4              THE COURT:  All right.  And how close are
 5     these people you know to you?
 6              THE JUROR:  One is a real good friend of mine.
 7              THE COURT:  Okay.  And in this case the charge
 8     is -- well, in this case some of the witnesses, I'm
 9     told, will be people who allegedly buy products from
10     Mr. Harris's company and, you know, would testify about
11     how they used them to effectually steal internet
12     services.  So arguably people similarly situated to your
13     friends.  And Mr. Harris is not charged essentially with
14     stealing internet service for himself, but allegedly
15     conspiring and engaging in a scheme or business to
16     promote those thefts.
17         Do you feel comfortable that you could be fair to
18     both the government and the defendant in a case like
19     this and if the evidence proves the defendant guilty
20     beyond a reasonable doubt, vote to find he's guilty, and
21     if it doesn't, vote to find him not guilty?
22              THE JUROR:  Um, the only reason I would not be
23     able to do that is I do have an issue with people
24     testifying for --
25              THE COURT:  That's what I was going to ask
```

1   you.  But is there anything about the particular nature

2   of the charges?

3            THE JUROR:  No, it's just that if you have

4   people that are getting off on a deal or something, that

5   I do have issue with that.

6            THE COURT:  All right.  What would you say

7   your issue with that is?

8            THE JUROR:  Well, I've been exposed to four or

9   five people that have gotten deals or reduced charges

10  and they're usually worse than the people that -- every

11  one of them was worse than the people that they were

12  testifying against.  One of them was an outright liar.

13           THE COURT:  Well, in this case, you know, just

14  to explain a little more, I expect there's going to be

15  at least one witness who has been convicted of a crime

16  who has entered into an agreement with the government

17  and others who will testify that they bought these

18  devices or acquired these devices and used them to steal

19  internet service and they've been given immunity, which

20  means nothing they say can be used against them, because

21  otherwise they'd have a Fifth Amendment right not to

22  testify.  And I'll tell the jury that it's permissible

23  for the government to enter into these agreements and to

24  grant immunity, because essentially it's up to the

25  government as to who gets immunity and this is a

1    permissible technique.  But, you know, a person who is

2    facing possible prosecution or who has been convicted

3    has an incentive to make up a story to satisfy the

4    government and to try to help himself.

5         So therefore, if you're on the jury, you should

6    scrutinize that person's testimony particularly

7    carefully and rely upon it with caution.  But you should

8    be willing to decide, after scrutinizing it that way,

9    whether it's true, whether the person comes across to

10   you as believable, whether what he says is supported by

11   other evidence, and if you find it believable, to rely

12   on it and give it whatever weight you think it

13   deserves.

14        Do you feel you could follow that instruction or

15   do you think the views you've expressed, based on your

16   experience about cooperating witnesses, would

17   basically --

18             THE JUROR:  Honestly I'd have to say it would

19   be kind of like they would have to prove to me that they

20   were telling me the truth.

21             THE COURT:  And can you imagine they might

22   persuade you or do you think it would be extremely

23   hard?

24             THE JUROR:  I just think they tend to

25   embellish it themselves for themselves to look better.

```
 1    That's honestly how I feel.
 2              THE COURT:  All right.  And there's no right
 3    or wrong answers, just honest answers, is what I need.
 4         Could you step out for a minute, please.
 5              (Steps out.)
 6              THE COURT:  All right.  Is there any objection
 7    to him, Mr. Bookbinder?
 8              MR. BOOKBINDER:  Yes, your Honor.
 9              MR. McGINTY:  Could the Court ask one more
10    question?
11         Notwithstanding your concern about whether they
12    would embellish or not, are you able to follow my
13    instruction, that nonetheless to evaluate the
14    credibility and --
15              THE COURT:  I've already asked him that
16    question and he wasn't able to say or he wouldn't say
17    "Yes."  I'll ask him -- well, I'll ask him again.  But
18    I'm inclined to excuse him.  There's a kind of depth to
19    this, um, that based on personal experience, and not
20    just an idea of knowing particular people, that he would
21    identify with the witnesses whom he's never encountered,
22    because they have to start with every witness with an
23    open mind and then you have to scrutinize some of the
24    testimony with particular care.  But he's got a strong
25    presumption, if not assumption, that such witnesses are
```

1     not going to tell the truth.

2          Well, bring him in.

3               (Juror returns.)

4          THE COURT:  I'd like to ask you essentially

5     the same question in a somewhat different way.

6          If I tell you it's your obligation to start with

7     every witness, a law enforcement witness, somebody who's

8     not in law enforcement, and somebody's who's got an

9     agreement with the government, with on open mind and to

10    scrutinize the testimony of somebody who has been given

11    immunity because of his own criminal conduct with

12    particular care and rely on it with caution, but, you

13    know, to be open to believing it if he seems credible

14    and maybe if evidence supports it, do you think you

15    could start with that open mind or not?

16               THE JUROR:  Well, I think in my experience I

17    tend to be a little prejudiced.

18               THE COURT:  Yeah, I'm going to excuse you.  As

19    I said, there's no right or wrong answers, only honest

20    answers.  I appreciate your candor.

21               THE JUROR:  Sorry.

22               MS. SEDKY:  Thank you.

23               (Juror leaves.)

24               THE COURT:  The next person answered "yes" to

25    6, 7 and 10.  6 is involvement in criminal activity, 7,

1    employment in law enforcement, 10, obtaining television

2    or internet service.

3                    (Next juror.)

4                    THE COURT:  There you go.  Please say your

5    name.

6                    THE JUROR:  Lorraine Melling.

7                    THE COURT:  All right.  Ms. Melling, I think

8    one of the questions -- I'm sorry.  Let me take a step

9    back.

10         We have the parties and my staff, but also two

11    members of the public, at least one of whom is a

12    reporter, and if you would prefer that I ask them to

13    step out, because I'm going to ask you about why you

14    answered whether you or somebody close to you had ever

15    been involved in a criminal matter or have you or

16    anybody close to you ever obtained television or

17    internet service without paying.  If you would prefer

18    that I excuse them, then I'll do that.

19                    THE JUROR:  Nope.  It doesn't matter.

20                    THE COURT:  Okay.  Why don't we work

21    backwards.

22         I asked you whether you or somebody close to you

23    had ever obtained television or internet service without

24    paying a required fee.  Why did you answer that "yes"?

25                    THE JUROR:  Um, I used to have a black box

 1    that you got with more stations than you were paying

 2    for, through cable.

 3              THE COURT:  And in this case, one of the

 4    charges is that Mr. -- or part of the charge is that

 5    Mr. Harris sold these devices and did other things that

 6    either permitted people to get internet service for free

 7    or to get premium service without paying a premium.

 8              THE JUROR:  Uh-huh.

 9              THE COURT:  And some of the witnesses are

10    going to be people who I understand will say, you know,

11    "I got these devices and that's what I used it for."

12              THE JUROR:  Uh-huh.

13              THE COURT:  Similar to what, perhaps, to

14    having one of those black boxes.

15              THE JUROR:  Uh-huh.

16              THE COURT:  Do you feel, given what you just

17    described, that you could be fair to both the government

18    and the defendant and decide this case based on the

19    evidence?

20              THE JUROR:  Um, I really don't know.

21              THE COURT:  All right.  And just explain

22    that.  I see your grimace, but just explain it in a

23    little more words to me.

24              THE JUROR:  Well, I know it's against the law,

25    but I don't kind of see any harm in it, too, so.

```
1              THE COURT:  All right.  And -- all right.  I'm
2   going to excuse you.  Thank you very much.
3              THE JUROR:  Okay.  Thank you.
4              (Juror leaves.)
5              THE COURT:  The next person answered "yes" to
6   5, regarding jury service, and she's retired, as is her
7   spouse, and I'll see what she and her spouse did.
8              (Next juror.)
9              THE COURT:  Hello.
10             THE JUROR:  Hello, Judge.
11             THE COURT:  Would you please say your name for
12  the record.
13             THE JUROR:  Kathryn Heinze.
14             THE COURT:  Ms. Heinze, in addition to the
15  parties and my staff, I have two members of the public,
16  at least one of whom is a journalist.  If there's
17  anything I ask you that you would prefer to discuss
18  without the public or the media here, let me know.
19         I think you said that at some point you've served
20  on a jury, is that right?
21             THE JUROR:  Yeah, it was about 20 years ago.
22             THE COURT:  Is there anything about that
23  experience that you think would injure your ability to
24  be a person who decides this case?
25             THE JUROR:  Um, I don't think so.
```

```
 1              THE COURT:  And this says you're retired.
 2   What did you do before you were retired?
 3              THE JUROR:  I was a school nurse for many
 4   years.
 5              THE COURT:  And it says your spouse is
 6   retired.  What did he do?
 7              THE JUROR:  He was a claims adjuster.
 8              THE COURT:  All right.  Well, you're eligible
 9   to be a juror, you're the 19th, and when I get 32, we'll
10   see if you're actually going to be one.  Okay?
11              THE JUROR:  Okay.
12              THE COURT:  Thank you very much.  I appreciate
13   your perseverance, if not patience.
14              THE JUROR:  You're quite welcome, your Honor.
15              (Juror leaves.)
16              THE COURT:  The next person answered "yes" to
17   10 about the payment for free service.
18              (Next juror.)
19              THE COURT:  Hello.
20              THE JUROR:  Hello.
21              THE COURT:  Would you please say your name for
22   the record.
23              THE JUROR:  Leana Pomales.
24              THE COURT:  Ms. Pomales, in addition to the
25   parties and my staff, we have two representatives of the
```

```
1    public here, at least one of whom is a reporter.  In
2    view of what I'm going to ask you, your answer to the
3    question about whether you or somebody close to you ever
4    obtained television or internet service without paying
5    the required fee, if you would feel more comfortable
6    answering with them outside the room, then I'll ask them
7    to go out.  It's up to you.
8              THE JUROR:  I'm okay.
9              THE COURT:  Okay.  Well, why did you answer
10   "yes" to the question about whether you or somebody else
11   close to you ever obtained television or internet
12   service without paying a required fee?
13             THE JUROR:  My brother, actually when I lived
14   with him, he didn't pay for it.
15             THE COURT:  To get what, television or
16   internet or both?
17             THE JUROR:  It was all combined.  It was just
18   a package.
19             THE COURT:  I see.  And how did he get it?
20             THE JUROR:  I want to say -- well, I'm not too
21   sure.
22             THE COURT:  All right.  And how long did you
23   live with him while this was going on?
24             THE JUROR:  Um, probably about three or four
25   months.
```

1          THE COURT:  And how long ago was it?

2          THE JUROR:  Um, it was five or six years ago.

3          THE COURT:  All right.

4      And in this case Mr. Harris is charged, in effect,

5  with running a business and having a scheme where he's

6  sold or provided devices and did other things to

7  encourage people to get either internet service for free

8  or premium service without paying the extra amount, and

9  some of the witnesses, um, I expect, are going to be

10  people who will say, "I bought or got these devices and

11  that's how I used them," essentially to steal service,

12  and it may be similar to what you just described your

13  brother did.  As I said, if you're a juror, your

14  obligation is to presume Mr. Harris is innocent, listen

15  to the evidence, and if it proves him guilty beyond a

16  reasonable doubt, find he's guilty, and if it doesn't

17  prove he's guilty beyond a reasonable doubt, find him

18  not guilty.  But essentially you'd be required to put

19  aside your brother's experience and not be influenced by

20  what he did or what you think about what he did.

21      Do you feel you could do all of that in this case?

22          THE JUROR:  Um --

23          THE COURT:  There's no right or wrong answer,

24  I just need an honest answer.

25          THE JUROR:  No.

```
 1                    THE COURT:  You don't feel you could do that?

 2                    THE JUROR:  No.

 3                    THE COURT:  All right.  You're excused.  Thank

 4   you.

 5                    (Juror leaves.)

 6                    THE COURT:  The next person answered "yes" to

 7   5, about jury service.

 8                    (Next juror.)

 9                    THE COURT:  Hello.

10                    THE JUROR:  Hello.

11                    THE COURT:  Would you please say your name for

12   the record.

13                    THE JUROR:  Robin Zahner.

14                    THE COURT:  And, Ms. Zahner, in addition to

15   the parties, we have two members of the public, at least

16   one is a member of the media, a reporter.  If I ask you

17   anything that you'd feel more comfortable answering

18   without the reporter or the public, let me know and I

19   expect I'll ask them to step out.

20        But I think you only answered "yes" to the

21   question whether you had ever been on jury service?

22                    THE JUROR:  Yes.

23                    THE COURT:  What prompted you to answer

24   "yes"?

25                    THE JUROR:  That was twenty years ago and I
```

 1   was on a case in Dedham court.

 2              THE COURT:  Is there anything about that

 3   experience that might affect your ability to participate

 4   in deciding this case?

 5              THE JUROR:  No.

 6              THE COURT:  Well, you're eligible to be a

 7   juror, you're the 20th, and when I get 32, we'll see if

 8   you're actually going to be one.  Okay?

 9              THE JUROR:  Okay.

10              (Juror leaves.)

11              THE COURT:  The next person answered "yes" to

12   4, on the schedule, 5, jury selection.

13        Do you have something else?

14              (Pause.)

15              THE COURT:  Oh, actually, she didn't answer

16   "yes" to anything, 39, Cheryl Ropelle.  Nothing.  I was

17   looking at 40.

18              (Next juror.)

19              THE COURT:  Hello.

20              THE JUROR:  Hi.  How are you?

21              THE COURT:  Fine, thanks.  How are you?

22              THE JUROR:  Good.

23              THE COURT:  Would you say your name for the

24   record.

25              THE JUROR:  Cheryl Ropelle.

```
 1              THE COURT:  Ms. Ropelle, in addition to the
 2     parties and my staff, we have two members of the public,
 3     at least one of whom is a reporter.  If anything I ask
 4     you you feel more comfortable answering without the
 5     public or the reporter, let me know.
 6         You didn't answer "yes" to anything.  Having more
 7     time to think about it, is there anything you feel you
 8     should have answered "yes" to?
 9              THE JUROR:  No.
10              THE COURT:  All right.
11         And where does your husband work?
12              THE JUROR:  At home.
13              THE COURT:  All right.  Well, you're eligible
14     to be a juror, you're the 21st, and when I get 32, I'll
15     see if you're actually going to be one.  Okay?
16              THE JUROR:  Okay.
17              THE COURT:  Thank you.
18              (Juror leaves.)
19              THE COURT:  The next person, Number 40,
20     answered "yes" to 4, schedule, 5, jury service.
21              (Next juror.)
22              THE COURT:  Hello.
23              THE JUROR:  Hello.
24              THE COURT:  Please say your name for the
25     record.
```

1              THE JUROR:  William Wing.

2              THE COURT:  Mr. Wing, in addition to the

3       parties and my staff, there are two members of the

4       public here, at least one of them is a reporter.  If

5       there's something you would feel more comfortable

6       discussing in the absence of the public or a reporter,

7       let me know.  I may well excuse them.

8          I think the first thing you answered "yes" to is

9       whether the schedule would impose a particular hardship

10      on you.  Why is that?

11             THE JUROR:  Um, would it be possible for the

12      reporter not to be here for that?

13             THE COURT:  Yes.

14          I'd like both of you to leave.

15             (Public leaves.)

16             THE JUROR:  I've served on juries before and I

17      know this is important and I know you guys need me.  I

18      understand that.  But I am in a bad position at the

19      moment.  My world is coming apart.

20          I own a small printing company in Framingham and,

21      um, TD Bank called in my credit line in January because

22      two of my biggest customers went bankrupt in January and

23      I was using a credit line to pay for companies and when

24      they found out that that money was never paid, they took

25      the line away from me.  And --

1            THE COURT:  So this is a hard time for you in

2    business?

3            THE JUROR:  Yes.  I'm sorry.

4            THE COURT:  You're excused.  I understand.  I

5    can see you would do this if you could.

6            THE JUROR:  I would have.

7            THE COURT:  I know you would have.  All

8    right.  Good luck.

9            THE JUROR:  Thank you.

10           (Juror leaves.)

11           THE COURT:  The next person answered "yes" to

12   4 and 12, the schedule, and cooperating witnesses.

13           (Next juror.)

14           (Public enters again.)

15           THE COURT:  Hello.

16           THE JUROR:  Good morning.  Afternoon.

17           THE COURT:  Would you come right here.

18      Could you say your name for the record, please.

19           THE JUROR:  Robert Cannon.

20           THE COURT:  Mr. Cannon, in addition to the

21   parties and my staff, there are two members of the

22   public, at least one of whom is a reporter, and if

23   there's anything that you would prefer to answer without

24   the public or the media here, let me know and I expect

25   I'll ask them to step out.

1              I think the first question to which you answered

2       "yes" to is whether the schedule would impose a special

3       hardship.  Why is that?

4                   THE JUROR:  My wife just got her job back

5       after a long time.  My son's got vacation this week.

6       I'm a small business owner.  I can't take time off.  And

7       on top of it, the two guys that I have working for me,

8       if I'm not there working -- I own a plumbing company,

9       then they're not working.

10                  THE COURT:  All right.  You're excused.  You

11      can go.

12                  THE JUROR:  Thank you.

13                  (Juror leaves.)

14                  THE COURT:  The next person answered "yes" to

15      5, on jury service.

16                  (Next juror.)

17                  THE COURT:  Right here.  Hello.

18                  THE JUROR:  Hi.

19                  THE COURT:  Would you please say your name for

20      the record.

21                  THE JUROR:  Maureen Bradley.

22                  THE COURT:  Ms. Bradley, in addition to the

23      parties and my staff, we have two members of the public

24      here, one's a reporter.  If there's anything I ask you

25      that you feel more comfortable discussing without the

1   public or the media here, let me know and I expect I'll
2   excuse them.
3        I think the question you answered "yes" to was
4   whether you had ever served on a jury before.  What
5   caused you to answer "yes"?
6              THE JUROR:  Because I have.
7              THE COURT:  When and where.
8              THE JUROR:  Probably about six or seven years
9   ago and it was in Brockton.
10             THE COURT:  All right.  Is there anything
11  about that experience that would injure your ability to
12  decide this case?
13             THE JUROR:  I don't think so.
14             THE COURT:  I don't either.
15       All right.  You're eligible to be a juror, you're
16  the 22nd, and when I get 32, we'll see if you're
17  actually going to be a juror.  Okay?
18             THE JUROR:  Okay.
19             THE COURT:  Thank you.
20             (Juror leaves.)
21             THE COURT:  The next person answered "yes" to
22  7, 10 and 12.
23       I'll have to phrase that question differently.
24             MR. McGINTY:  Or watch out for spontaneous
25  answers, I guess.

1          THE COURT:  I guess so.

2          (Next juror.)

3          THE COURT:  Would you please say your name for

4    the record.

5          THE JUROR:  Kevin Demello.

6          THE COURT:  Mr. Demello, in addition to the

7    parties and my staff, there are two members of the

8    public here, at least one of them is a reporter, and

9    given what I'm going to ask you about your questions you

10   answered "yes" to, if you would feel more comfortable

11   answering without the public and the reporter here, then

12   I'll ask them to step out.

13          THE JUROR:  Nope, I'm fine.

14          THE COURT:  You're fine?

15          THE JUROR:  Uh-huh.

16          THE COURT:  Okay.

17      I think one question you answered "yes" to was

18   whether you or anyone close to you ever obtained

19   television or internet service without paying a required

20   fee.

21          THE JUROR:  Uh-huh.

22          THE COURT:  What were the circumstance that

23   prompted you to answer "yes"?

24          THE JUROR:  Well, I didn't want to, um, but

25   it's basically that I had just been divorced and I had

1    moved into an apartment building and my daughter had --

2    and I told her we weren't going to have cable for a

3    while because I couldn't afford it, and -- I said but

4    just plug all the wires in because sometimes you get

5    better reception through the whole house, you get some

6    basic channels, and cable was on it.  I think it was

7    just poor wiring from the rest of the building, but it

8    was on, and I said, "Oops, there you go."  I just left

9    it until I could pay for it.  It was about six months,

10   solid.

11              THE COURT:  And then you paid for it?

12              THE JUROR:  Ever since.

13              THE COURT:  All right.

14        Now, in this case the defendant is charged with

15   running a business, in essence a scheme, but a business

16   that provided devices to people that would permit them

17   to get internet service without paying for it or a

18   premium service without paying the premium and it's

19   charged that he did other things, too, to promote that

20   activity.  And some of the witnesses are going to be

21   people testifying, I think, under plea agreements or

22   immunity agreements who will say that, "I acquired these

23   devices or one of these devices and I used it to get

24   internet service without paying for it."  And as I told

25   you, if you're a juror in this case, you'll be required

1    to presume that Mr. Harris is innocent, listen to the

2    evidence and if this evidence proves he's guilty beyond

3    a reasonable doubt, find him guilty, and if it fails to

4    prove he's guilty beyond a reasonable doubt, find him

5    not guilty.

6         Given what you've just described to me, um, do you

7    feel you could perform those duties and essentially not

8    be influenced by your own experience of what you did for

9    six months?

10             THE JUROR:  Um, I think so.  I can't imagine I

11   wouldn't be.  I mean, I've never been in the environment

12   to have to question myself about it, but I think I would

13   be.

14             THE COURT:  And I think you also answered

15   "yes" to the question of whether you would have

16   difficulty following the instruction I described, that

17   is, that some of the witnesses are going to be people

18   who've either been convicted of stealing internet

19   services or would be vulnerable to being convicted and

20   they've entered into an agreement with the government or

21   they've been given immunity, which is essentially the

22   government's choice, um, that says, you know, anything

23   you say can't be used against you.  It's their Fifth

24   Amendment right.  And I will tell the jurors that this

25   is a permissible law enforcement technique, however,

1    people, you know, who could be prosecuted themselves and

2    enter into agreements with the government have a

3    particular motive to make up their testimony, say what

4    the government wants to hear, in the hopes of getting a

5    benefit themselves.  So you should, as a juror,

6    scrutinize their testimony with particular care, rely on

7    it with caution, but, you know, after starting with an

8    open mind and scrutinizing it, if you find the person is

9    believable or, you know, in the way they testify, or

10   that what the person says is corroborated or supported

11   by other evidence, then you can believe what that person

12   says and give that evidence whatever weight you think it

13   deserves.

14        Do you feel you would be able to do that?

15        THE JUROR:  Um, I think so, and I say "I think

16   so" just because I always -- you know, I guess just like

17   anybody else, if you have nothing to lose, it really

18   doesn't matter what you say.  So I think I would be okay

19   at least listening to it and making my best decision on

20   it.  I've never been put in the position, so it's kind

21   of hard to say, when someone's faced with it, you know,

22   how they'd react to it, but I think I'd be all right

23   with it.

24        THE COURT:  But basically what I'd be

25   directing you to do is to start with an open mind, and

1  you're saying you would be skeptical, and I'm saying,

2  you know, you should examine it particularly carefully

3  --

4             THE JUROR:  Right.

5             THE COURT:  -- but, you know, sometimes people

6  in that position tell the truth, sometimes they don't

7  tell the truth, so to just use your best judgment.

8        Do you think you would be able to do that?

9             THE JUROR:  I think so.  I hope I can.

10             THE COURT:  Do you have any serious doubts or

11  concerns?

12             THE JUROR:  Again I've never been put in the

13  position.  So, I mean, I would think that I would be

14  perfectly capable of sitting there and listening to

15  somebody telling me something and have the most open and

16  objective way of doing it.

17             THE COURT:  Okay.  And I think you said that

18  you or somebody close to you had been employed in law

19  enforcement?

20             THE JUROR:  I have family.

21             THE COURT:  Who is that?

22             THE JUROR:  My uncle on my father's side is a

23  lieutenant in Major Crimes in Fall River.  I have a

24  cousin who is just a regular officer in Fall River.  And

25  then a second cousin, really, who is the Chief of Police

```
 1    of Westport.
 2              THE COURT:  All right.  And do you feel you
 3    could judge the testimony of a law enforcement officer
 4    like that of anyone else and not assume that person is
 5    more likely or less likely to be telling the truth
 6    because he works in law enforcement?
 7              THE JUROR:  Oh, yeah, that doesn't matter.
 8              THE COURT:  And do you understand you couldn't
 9    talk about the case with your relatives or anybody else
10    while it's going on?
11              THE JUROR:  Yes.
12              THE COURT:  Would it be uncomfortable for you
13    if it turned out you were on a jury that found the
14    defendant not guilty?
15              THE JUROR:  Nope.
16              THE COURT:  All right.
17          Why don't you step out for just a minute.
18              THE JUROR:  Sure.
19              (Steps out.)
20              THE COURT:  Is there any objection to
21    Mr. Demello?
22              MR. BOOKBINDER:  No.
23              MR. McGINTY:  No, your Honor.
24              THE COURT:  Okay.  Have him brought back.
25    Bring him back, please, Dan.
```

```
 1                    (Juror returns.)

 2               THE COURT:  All right.  Mr. Demello, you're

 3    eligible to be a juror, you're the 23rd, and when I get

 4    32, we'll see if you're actually going to be one.  Okay?

 5               THE JUROR:  Okay.

 6               THE COURT:  Thank you.

 7               (Juror leaves.)

 8               THE COURT:  The next person answered "yes" to

 9    4, schedule, 5, jury service, 6, involvement in a

10    criminal matter.

11               (Next juror.)

12               THE COURT:  Hello.

13               THE JUROR:  Hi.

14               THE COURT:  Right here.  Please say your name

15    for the record.

16               THE JUROR:  Pamela Woleyko.

17               THE COURT:  Ms. Woleyko, in addition to the

18    parties and my staff, we have two members of the public,

19    at least one of whom is a reporter.  If there's anything

20    I ask you that you would rather discuss without the

21    public or the reporter here, let me know and I'll ask

22    them to step out.

23          But I think the first thing to which you answered

24    "yes" to is whether the schedule would impose a special

25    hardship on you.  Why is that?
```

1        THE JUROR:  Well, I don't know if it will --

2   it's just my very close friend is dying right now of

3   cancer and the chances are -- I don't know, you know,

4   whether at some point in the next week he would need me,

5   but I want to be there in the evenings.

6        THE COURT:  You can be there in the evenings,

7   you can be there in the afternoons, and the other thing

8   I'll tell you is that I'm going to have alternates and

9   if it's something really dire, and it's a situation

10  where you feel you really should be there --

11       THE JUROR:  Okay.

12       THE COURT:  Certainly before the jury is

13  deliberating, I would let you go.  You know, you would

14  tell Mr. Hohler and I would let you go.  Certain things

15  are more important than jury service.  And if you're

16  deliberating, I might still let you go, and then they'll

17  have to start the deliberations again with one of the

18  alternates.

19     Do you feel okay about going ahead on that basis?

20       THE JUROR:  Oh, absolutely.

21       THE COURT:  All right.

22     Then I think you said that you or somebody close

23  to you had been involved in a criminal matter in some

24  way?

25       THE JUROR:  Um, criminal in that it went to

```
 1    trial?

 2              THE COURT:  Well, no.

 3              THE JUROR:  Okay.  But just to be on the safe

 4    side, I was the victim of a carjacking like 20 years

 5    ago.  I was like the first one in Boston.

 6              THE COURT:  The first carjacking?

 7              THE JUROR:  Yeah, they didn't even know what

 8    it was, the detectives were like, what?  And then right

 9    after that they were -- well, I wasn't really very

10    afraid because I had no idea what was happening.  So

11    that's it.  I survived.

12              THE COURT:  All right.  And, you know, do you

13    think there's anything about that experience that would

14    affect your ability to be fair both to the government

15    and the defendant here?

16              THE JUROR:  No.  Absolutely not.  I just told

17    you that to be on the safe side.

18              THE COURT:  Okay.

19         And I think you also answered "yes" to the

20    question of whether you had ever served on jury duty?

21              THE JUROR:  Yeah.

22              THE COURT:  When and where did you do that?

23              THE JUROR:  That was, um -- let's see, it was

24    when I was living in Boston.  So I would say 18 years

25    ago.
```

```
 1                  THE COURT:  And is there anything about that
 2      experience that would injure your ability to decide this
 3      case?
 4                  THE JUROR:  No, it was about a video store, a
 5      contract.
 6                  THE COURT:  All right.
 7            Well, you're eligible to be a juror, you're the
 8      24th, when I get 32, I'll see if you're actually going
 9      to be one.  Okay?
10                  THE JUROR:  Okay.  Thank you.
11                  (Juror leaves.)
12                  THE COURT:  The next person answered "yes" to
13      14, about having some problem understanding English or
14      hearing or something like that, and he's also -- it's a
15      he -- he's a software engineer.
16                  (Next juror.)
17                  THE COURT:  Hello.
18                  THE JUROR:  Hi.
19                  THE COURT:  No reason to be nervous.
20                  THE JUROR:  Okay.
21                  THE COURT:  What if I say "Neehow Mow," would
22      that make you less nervous?
23                  THE JUROR:  Oh, yes.
24                  THE COURT:  It means, "How are you doing?" in
25      Chinese, right?
```

```
 1                THE JUROR:  Yes.  Where did you learn that?
 2                THE COURT:  In China, but it's half of my
 3       vocabulary.  When you leave I'll say "Shea Shea," and
 4       you'll know the other half.
 5                (Laughter.)
 6                THE COURT:  Would you say your name for the
 7       record, please.
 8                THE JUROR:  Xiaoyun Wang.
 9                THE COURT:  Okay.  And in addition to the
10       parties and my staff, I have here two members of the
11       public, one of whom is a reporter, and so if there's
12       anything you would prefer to answer without the public
13       or the reporter here, I'll ask them to step out.  Okay?
14                THE JUROR:  Okay.
15                THE COURT:  I think you answered "yes" to
16       Question 14 as to whether you had any difficulty
17       understanding English or hearing or something like that
18       that would make it hard for you to be a juror?
19                THE JUROR:  Yeah, because I honestly don't
20       quite understand the case today.  I don't quite
21       understand the Question Number 14.  I kind of guessed.
22                THE COURT:  How long have you been in the
23       United States?
24                THE JUROR:  Um, I came here in 1995.  I did
25       barely speak any English, so --
```

```
1              THE COURT:  And do you have trouble
2    understanding some of the questions?
3              THE JUROR:  Yeah, like 13 and 14.
4              THE COURT:  Well, 13 is very important because
5    it's the basic rules that apply in any criminal case.
6              THE JUROR:  Yeah, 80 percent, I think.
7              THE COURT:  You understood 80 percent?
8              THE JUROR:  Yes.
9              THE COURT:  I'm going to excuse you, okay?
10   All right?  So you don't have to be so nervous anymore.
11             THE JUROR:  Okay.  Thank you.  Goodbye.
12   "Shehee."
13             (Juror leaves.)
14             THE COURT:  The next person had a problem with
15   the schedule.
16             (Next juror.)
17             THE COURT:  Hello.  Right here.  I'll explain
18   the crowd.
19         Will you say your name for the record, please.
20             THE JUROR:  Ann Fitzgerald.
21             THE COURT:  Ms. Fitzgerald, in addition to the
22   parties and my staff, there are two members of the
23   public, at least one of whom is a reporter.  If there's
24   anything I ask you that you prefer to answer without the
25   public or the reporter, let me know and I expect I'll
```

```
 1   ask them to step out.
 2               THE JUROR:  Sure.
 3               THE COURT:  I think you said that the schedule
 4   would impose a special hardship on you.  Why is that?
 5               THE JUROR:  I'm self-employed and I'm in the
 6   middle of a job, which won't be over for probably five
 7   or six days, and I initially called and requested to see
 8   if I could come in March and they said "No."  It's like
 9   feast or famine.
10               THE COURT:  Okay, I'm going to help you.  I'm
11   going to excuse you for today, but you're going to get
12   recalled in March or April.
13               THE JUROR:  Okay.  Could they make it in
14   March?
15               THE COURT:  Yeah, I'll ask them to make it in
16   March.
17               THE JUROR:  Thank you, your Honor.
18               THE COURT:  I'm sorry.  Good luck.
19               THE JUROR:  Yes.
20               (Juror leaves.)
21               THE COURT:  The next person answered "yes" to
22   7, which is employment in law enforcement, and 11, which
23   I think is experience favorable or not favorable to law
24   enforcement.
25               (Next juror.)
```

1          THE COURT:  Hello.  Please say your name for

2     the record.

3          THE JUROR:  Brenton Tolles.

4          THE COURT:  Mr. Tolles, in addition to the

5     parties and my staff, we have two members of the public,

6     at least one of them's a reporter.  If there's anything

7     I ask you that you prefer to answer without the reporter

8     or the public present, let me know and I'll probably ask

9     them to step out.

10          I think one of the questions you answered "yes" to

11     is whether you had or someone close to you had an

12     experience with law enforcement, favorable or

13     unfavorable, that might affect your ability to be

14     impartial in this case.  Why is that?

15          THE JUROR:  I've just had -- my son had a

16     run-in with the -- um, I forgot what they're called,

17     they're the surveillance from the ponds where we live,

18     and they gave him a hard time.  And I was just thinking

19     back over it now and I guess they didn't arrest him, but

20     they were trying hard.  And I've sort of forgotten about

21     it until you said that and I said to myself, "Should I

22     report this or not?"  And, you know --

23          THE COURT:  It's just what I wanted to get

24     at.  You know, in this case the case is prosecuted by

25     the federal government, um, and they'll be testimony, I

```
 1    think, from an IRS agent and an FBI agent and, of
 2    course, they're not the people who dealt with your son,
 3    that the facts are very different.
 4         Do you think you would be able to not forget about
 5    what happened to your son, but set it aside, and judge
 6    the testimony of those officers and all the evidence,
 7    but, you know, without being impacted by what happened
 8    to your son?  And there are no right or wrong answers.
 9    I just need honest answers.
10              THE JUROR:  I think I would try to do the best
11    I could.  I don't think it would impact me too much.
12              THE COURT:  Do you think it would have some
13    influence?
14              THE JUROR:  I doubt it.
15              THE COURT:  All right.  And how do you feel
16    about those officers?
17              THE JUROR:  Well, I have mixed feelings.  They
18    were out there, I assume, trying to do their job, but we
19    had lived on the pond for years and years and years and
20    we were just out fishing and they were trying to arrest
21    him and, you know --
22              THE COURT:  All right.  And I think you also
23    said that you or somebody close to you had been employed
24    in law enforcement.  Who is that?
25              THE JUROR:  My son.
```

1              THE COURT:  Your son?

2              THE JUROR:  But that was many years later.

3              (Laughter.)

4              THE JUROR:  That one I do have some bad

5     feelings about.  I think they gave him a raw deal.  The

6     town hired him, he moved up there, and then they canned

7     him in about thirty days for reasons that neither of us

8     could think of.

9              THE COURT:  All right.  Um, I'm going to

10    excuse you from being a juror in this case.  I just

11    think it's -- that even before you heard any of the

12    evidence, it's dredging up a lot of stuff that I can see

13    is very emotional for you, and it would get harder not

14    easier as you're sitting here for a week.  So you can

15    go.

16             THE JUROR:  Okay.  Thank you.

17             (Juror leaves.)

18             THE COURT:  All right.

19         The next person had a problem with the schedule,

20    with cooperating witnesses, and maybe in understanding

21    or speaking English, although he appears to be a medical

22    researcher.

23             (Next juror.)

24             THE COURT:  Hello.

25             THE JUROR:  Hello.

```
 1                    THE COURT:  Please say your name for the
 2    record.
 3                    THE JUROR:  Harish Patel.
 4                    THE COURT:  And, Mr. Patel, in addition to the
 5    parties and my staff, we have two members of the public,
 6    at least one of whom is a reporter.  If there's anything
 7    you feel more comfortable discussing without the public
 8    or the reporter, let me know and I may well, ask them to
 9    step out.
10                    THE JUROR:  Sure.
11                    THE COURT:  I think the first question to
12    which you answered "yes" to is whether the schedule
13    would impose a special hardship on you.  Why is that?
14                    THE JUROR:  The reason is my mother-in-law is
15    terminally ill.  I just got back from India about a
16    month ago and I got the notice that I was a juror.  And
17    the situation is not stable.  That was the reason.  And
18    also when I got back, there's a little change in our
19    organization at work here, there's a lot of changes
20    going on, and it's the duration actually, as you
21    mentioned, about seven or eight days.  So that's the
22    reason I answered "yes."
23                    THE COURT:  Well, with regard to your mother-
24    in-law, for example, if she were to pass away or you
25    needed to go back to India, then I'll have alternates,
```

1    so I could let you go.  And part of the reason we sit

2    from 9:00 until 1:00 is so that people can keep up with

3    their work.

4         Do you think you would be able -- if I kept you on

5    the jury, do you feel you would be able to pay careful

6    attention, take whatever time is necessary to decide, or

7    do you think you would be distracted and rushing to get

8    out?

9             THE JUROR:  I think I would be distracted and

10   difficult actually because of the reorganization at work

11   as well.

12            THE COURT:  All right.  I'm going to excuse

13   you.  You can go.

14            THE JUROR:  Thank you.

15            THE COURT:  Good luck.

16            (Juror leaves.)

17            THE COURT:  The next person has a problem with

18   the schedule and an involvement in a criminal matter.

19            (Next juror.)

20            THE COURT:  Hello.

21            THE JUROR:  Hello.

22            THE COURT:  Would you please say your name for

23   the record.

24            THE JUROR:  Winnie Ho.

25            THE COURT:  And, Ms. Ho, in addition to the

```
 1    parties and my staff, we have two members of the public,
 2    at least one of whom is a reporter, and if there's
 3    anything you would feel more comfortable discussing with
 4    the public or the reporter not here, then I'll ask them
 5    to step out.  Okay?
 6              THE JUROR:  Okay.
 7              THE COURT:  I think the first question you
 8    answered "yes" to was whether the schedule would impose
 9    a special hardship on you.  Why is that?
10              THE JUROR:  Um, I have a vacation planned like
11    last year and we're going to Europe, so there's no --
12              THE COURT:  It was planned last year?
13              THE JUROR:  Yes.
14              THE COURT:  And when is the vacation?
15              THE JUROR:  Um, Thursday, on February 23rd.
16              THE COURT:  The day after tomorrow?
17              THE JUROR:  Yeah, Thursday.
18              THE COURT:  And when are you going to be
19    back?
20              THE JUROR:  Um, March 1st.
21              THE COURT:  All right.  I'll excuse you.
22         And you made these arrangements a year ago?
23              THE JUROR:  A year and a half.
24              THE COURT:  Before you knew you had jury
25    duty?
```

```
 1                THE JUROR:  Oh, definitely, yes.

 2                THE COURT:  I'm going to excuse you, but

 3     you'll be called back in March or April.

 4                THE JUROR:  Okay.

 5                MS. SEDKY:  Have fun.  Enjoy your trip.

 6                THE JUROR:  Thank you.

 7                (Juror leaves.)

 8                THE COURT:  The next person answered "yes" to

 9     jury service.

10                (Next juror.)

11                THE COURT:  Hello.

12                THE JUROR:  How do you do, your Honor.

13                THE COURT:  Would you please say your name for

14     the record.

15                THE JUROR:  Brian P. Downey.

16                THE COURT:  And, Mr. Downey, I think you

17     answered "yes" to the question of whether you -- well,

18     let me tell you this.  We have the parties here, we have

19     my staff, and we have two members of the public, at

20     least one of whom is a reporter.  If there's anything

21     you feel more comfortable discussing without the public

22     or the reporter, then I'll ask them to step out.  Okay?

23                THE JUROR:  Okay.

24                THE COURT:  I think the question to which you

25     have answered "yes" to is whether you had ever served on
```

1    a jury before.  Is that right?

2                THE JUROR:  Yes.

3                THE COURT:  When and where had you served on a

4    jury?

5                THE JUROR:  Um, Hartford Superior Court, I

6    believe, and it was about 1983.

7                THE COURT:  Okay.  Is there anything about

8    that experience that would impact on your ability to

9    listen to and decide this case?

10               THE JUROR:  No.

11               THE COURT:  And, having had more time to think

12   about it, are there any questions, other than that one,

13   that you think you should have answered "yes" to?

14               THE JUROR:  Um, only that the company that I

15   work for, um, National Grid, sometimes they've

16   experienced problems with the theft of electricity,

17   known in our business as "diversion," which might be

18   comparable to theft of cable or theft of --

19               THE COURT:  All right.  And it says you're a

20   utility worker?

21               THE JUROR:  Yeah.

22               THE COURT:  Do you know what people do to

23   divert electricity?

24               THE JUROR:  Yes, I do.

25               THE COURT:  All right.  And do you do any work

```
 1   with internet service providers like Comcast?

 2             THE JUROR:  Well, only insofar as identifying

 3   what wires belong to them from pole to pole, um, and the

 4   same with telephone, AT&T, and the various services

 5   between the poles.

 6             THE COURT:  All right.  And do you have any

 7   particular attitudes about the diversion of electrical

 8   services?

 9             THE JUROR:  Yes.

10             THE COURT:  What are your attitudes?

11             THE JUROR:  Well, our company goes after the

12   people and, you know, for restitution or reimbursements

13   or to bring them to court, depending on the amount.

14             THE COURT:  And, you know, in this case, you

15   know, the question for the jury was not going to be, you

16   know, "Do you like the theft of internet service or

17   dislike it?" the question is going to be -- there's a

18   particular charge in the case, Mr. Harris is charged

19   essentially with engaging in a scheme to sell products

20   that permit people to get internet service without

21   paying for it or premium service without paying the

22   premium and doing other things, um, and the question is

23   going to be whether the government has proved that

24   beyond a reasonable doubt.  And if you're a juror, you

25   would be called upon to put aside, you know, your
```

1    feelings about the diversion of electrical services or

2    for something that's arguably comparable, and decide

3    whether the evidence that proves the charge or any of

4    the charges beyond a reasonable doubt.

5          Do you think you would be able to do that or do

6    you think you would be impacted by your attitude about

7    the diversion of service?

8                THE JUROR:  I think I would be impacted.

9                THE COURT:  And just explain that to me a

10   little, please.

11               THE JUROR:  Well --

12               THE COURT:  Why is that?

13               THE JUROR:  Well, being in the utility

14   industry, I mean, I'm --

15               THE COURT:  All right.  I'm going to excuse

16   you.  You can go.  There's no right or wrong answers,

17   just honest answers.  All right.  You can go.

18               (Juror leaves.)

19               THE COURT:  You know, I know this is a

20   ponderous process, it takes a long time, but there was

21   no glimpse of that sitting in court hours ago, and the

22   person would get on the jury and not be able to follow

23   my instructions.

24         All right.  The next person, also jury service.

25               (Next juror.)

1                    THE COURT:  Hello.  Would you please say your

2      name for the record.

3                    THE JUROR:  Yes, it's Edward Demers.

4                    THE COURT:  Mr. Demers, in addition to the

5      parties and my staff, there are two members of the

6      public present, and at least one of them is a reporter.

7      If there's anything that you would prefer we discuss

8      without the public or the reporter, let me know.

9           I think the only question to which you answered

10     "yes" is whether, um, you had been on a jury before.

11                   THE JUROR:  Yes.

12                   THE COURT:  When and where were you on a

13     jury?

14                   THE JUROR:  I don't know exactly when, but

15     I've served in the county level three times.

16                   THE COURT:  And is there anything about those

17     experiences that would impact your ability to decide

18     this case?

19                   THE JUROR:  No, it was an excellent

20     experience, um, in each case.

21                   THE COURT:  All right.  Well, maybe you'll get

22     another one, because you're eligible to be a juror,

23     you're the 25th, and when I get 32, we'll see if you're

24     actually going to be one.  Okay?

25          Is there something else?  Go ahead.

1            THE JUROR:  As we went to lunch, I think one

2    of the questions was about if you knew anyone who had

3    used --

4            THE COURT:  Right.

5            THE JUROR:  Well, I realize that a woman I use

6    to work with, 8 years ago, had illegal cable.

7            THE COURT:  And in this case I think some of

8    the witnesses are going to be people who will testify,

9    under agreements or immunity from the government, that

10   they, in effect, stole internet services.

11       Do you think you could put that woman's

12   experiences aside and just decide this case based on the

13   evidence?

14           THE JUROR:  Absolutely.  Yes.

15           THE COURT:  Okay.  You're eligible to be a

16   juror.  Thank you.

17           (Juror leaves.)

18           THE COURT:  The next person answered "yes" to

19   14 about not having some other reason why she couldn't

20   be a juror.

21           (Next juror.)

22           THE COURT:  Hello.

23           THE JUROR:  Hi.

24           THE COURT:  Would you please say your name for

25   the stenographer.  You can sit down.

```
 1                    THE JUROR:  Maria Brandao.
 2                    THE COURT:  All right.  Ms. Brandao, in
 3       addition to the parties and my staff, we have two
 4       members of the public here and one at least is a
 5       reporter.  But if there's something you would feel more
 6       comfortable discussing without the public or the
 7       reporter here, I'll ask them to step out.  Okay?
 8                    THE JUROR:  Okay.
 9                    THE COURT:  I think you answered "yes" to the
10       question of whether you had some trouble understanding
11       English or hearing or something like that that would
12       make it hard for you to be a juror.
13                    THE JUROR:  Understanding English.
14                    THE COURT:  You have trouble understanding
15       English?
16                    THE JUROR:  Yes.
17                    THE COURT:  Let's see.  Where are you from
18       originally?
19                    THE JUROR:  Cape Verde.
20                    THE COURT:  And how long have you been in the
21       United States?
22                    THE JUROR:  Um, 25.
23                    THE COURT:  25 years?
24                    THE JUROR:  Yes.
25                    THE COURT:  I see you're not working now.  Did
```

```
 1    you work at one time?
 2              THE JUROR:  Yes.
 3              THE COURT:  Where did you work?
 4              THE JUROR:  Um, I used to work at a cleaning
 5    company, um, John Hancock Accident Cleaning Company.
 6              THE COURT:  So you worked at John Hancock at a
 7    cleaning company?
 8              THE JUROR:  Yes.
 9              THE COURT:  Okay.  Did you go to school in the
10    United States?
11              THE JUROR:  I go to high school.
12              THE COURT:  And were you taught in English or
13    in another language?
14              THE JUROR:  ESL, usually.
15              THE COURT:  English as a Second Language?
16              THE JUROR:  Yeah.
17              THE COURT:  And when you were working and you
18    spoke to other people, what language did you talk to
19    them in?
20              THE JUROR:  Um, most likely Spanish, you know,
21    Cape Verdean people only.
22              THE COURT:  Have you been able to understand
23    me so far?
24              THE JUROR:  Um, I guess so.  I think in, you
25    know, in making a decision on a jury, you know, I don't
```

```
 1    know how complicated it is, and that's my concern.
 2              THE COURT:  Well, I appreciate you're
 3    discussing that with me.  Why don't you step out for a
 4    minute.  Okay?
 5              (Steps out.)
 6              THE COURT:  What are your thoughts about this
 7    potential juror?
 8              MR. BOOKBINDER:  No objection from the
 9    government.
10              MR. McGINTY:  I think she appreciates the
11    difference between understanding conversational English
12    and understanding in a courtroom, and I think what she's
13    probably doing is reflecting on the important
14    responsibility and being candid about whether she could
15    take on this added responsibility of really
16    understanding the testimony.  So I would not object if
17    the Court excused her.
18              THE COURT:  I'll talk to her a little more.  I
19    think I might excuse her.  I guess I want to see whether
20    she's just being careful or having difficulty
21    understanding.  This case is more technical than most
22    and, you know, she would have to be in deliberations and
23    feel confident enough to speak.  So --
24         Actually I think I'm going to excuse her.
25              (Juror returns.)
```

```
 1              THE COURT:  All right.  I'm going to excuse
 2    you.  I'm going to let you go.  I think it's a close
 3    question, your English is not bad, but this case is
 4    technical and complicated, and you might have difficulty
 5    following all of the evidence.  So I am going to excuse
 6    you.  But thank you very much.
 7              THE JUROR:  Okay.
 8              THE COURT:  Thank you.  Bye.
 9              (Juror leaves.)
10              THE COURT:  The next person answered "yes" to
11    7, which is employment in law enforcement.
12              (Next juror.)
13              THE COURT:  Would you say your name, please.
14              THE JUROR:  Catherine Umina.
15              THE COURT:  Ms. Umina, I have the parties
16    here, I have my staff, and two members of the public, at
17    least one of whom is a reporter.  If there's anything
18    we're going to discuss that you feel more comfortable
19    talking about without the reporter and the public, I'll
20    ask them to step out.  Okay?
21              THE JUROR:  Okay.
22              THE COURT:  I think the only question you
23    answered "yes" to is whether you or somebody close to
24    you has been employed in law enforcement?
25              THE JUROR:  Yes.
```

```
 1                    THE COURT:  Who is that?
 2                    THE JUROR:  My brother.  He's a police officer
 3        in Newton.
 4                    THE COURT:  In Newton?
 5                    THE JUROR:  Yes.
 6                    THE COURT:  And do you feel comfortable that
 7        you could judge the testimony of a law enforcement
 8        officer like the testimony of anybody else and not
 9        assume he's more or less likely to be telling the truth
10        because he works in law enforcement?
11                    THE JUROR:  Um, I think I could be honest.  I
12        could be impartial.
13                    THE COURT:  Okay.  And do you have any
14        substantial doubt about that?
15                    THE JUROR:  No, I don't.
16                    THE COURT:  And do you understand you couldn't
17        discuss this case with your brother or anybody else
18        while it's going on?
19                    THE JUROR:  Yeah.
20                    THE COURT:  Would it be uncomfortable for you
21        if it turned out you were on a jury that found the
22        defendant not guilty?
23                    THE JUROR:  No.
24                    THE COURT:  All right.  Well, you're eligible
25        to be a juror, you're the 26th, and when I get 32, we'll
```

1    see if you're actually going to be one.  Okay?

2              (Juror leaves.)

3              THE COURT:  The next person answered "yes"

4    with regard to the schedule.

5              (Next juror.)

6              THE COURT:  Hello.

7              THE JUROR:  How are you doing?

8              THE COURT:  Good.

9         Would you please say your name for the record.

10             THE JUROR:  John Caron.

11             THE COURT:  All right.  Mr. Caron, we have the

12   parties, we have my staff, and we have two members of

13   the public, one of whom, at least, is a reporter.  If

14   there is something you would prefer not to discuss with

15   the public and the reporter present, I expect I'll ask

16   them to step out.  Okay?

17             THE JUROR:  Yes.

18             THE COURT:  I think the only question to which

19   you answered "yes" is the question whether the schedule

20   would impose a special hardship on you.  Why is that?

21             THE JUROR:  Um, I own a pretty busy restaurant

22   in Boston.  One of my managers, um, I thought this was a

23   good week to -- one of my managers is away on vacation

24   and my job manager is getting married, so he has wedding

25   plans.  So I was kind of holding the fort for this week

```
1    and, um --
2              THE COURT:  Okay.  What are the hours you
3    usually work?
4              THE JUROR:  I work seven days a week from like
5    10:00 in the morning until 12:00, 2:00, or like 4:00 in
6    the morning.
7              THE COURT:  Because one of the reasons we sit
8    from 9:00 until 1:00 is so that busy people can go to
9    work later and, if I excuse you, you're going to have to
10   come back like next month or something when the other
11   managers are going to come back.
12        Is that going to be better?  You could end up on a
13   longer case.
14             THE JUROR:  Well, whatever.
15             THE COURT:  This is going to be -- well, let
16   me delve into that a little more deeply.  Sometimes I
17   excuse people because of the schedule, sometimes I
18   don't, but I just wanted you to understand the whole
19   thing.
20        You know, if you're a juror, you'll have to be
21   here between 9:00 and 1:00 for about a week hearing the
22   evidence, but, as I say, part of the reason we sit from
23   9:00 until 1:00 is so that the jury really can be a
24   cross-section of the community, people with substantial
25   responsibilities and others who don't have so much to
```

1   do, and it helps on that.  But when the jury's

2   deliberating, you're going to have to be here in the

3   afternoon, and I don't know how long that will take, it

4   could be one day, and that's it, and we might come back

5   a second day.  I just can't predict.  So there's that.

6   What I need is jurors who won't be so worried about

7   what's going on at work that they can't listen to the

8   evidence or jurors that once they're deliberating,

9   they'll be in such a rush to get it over with that they

10  won't conscientiously think it through.

11          So, you know, I could excuse you and say you'll

12  get called back in March or April or, you know, we could

13  see.  I'm trying to get 32 jurors and 14 are actually

14  going to -- 32 potential jurors and 14 are going to get

15  selected today.  You might or might not get selected.

16          But if you ended up on this jury, do you think you

17  could be able to take a deep breath, or have a drink

18  tonight, and come in and listen to the evidence

19  carefully and when it became time to deliberate and

20  decide, you know, take whatever time is necessary to do

21  that thoughtfully, or do you think you would be so

22  distracted and in such a rush that you couldn't do

23  that?

24              THE JUROR:  Well, I couldn't say I wouldn't be

25  thinking of it at all, um --

1          THE COURT:  You know, all I need is an honest

2     answer.  There's no right or wrong answer.  And I don't

3     get the impression that you're making this up.  So just

4     tell me.

5          THE JUROR:  No, we're a very busy restaurant.

6     Um, under the circumstances, with my managers being out,

7     no.  Had they not been out, it would have been a good

8     time.

9          THE COURT:  All right.  I'm going to excuse

10    you, but you're going to get recalled at some point.  So

11    you can go for today, but I suspect you'll get called in

12    March or April.

13         THE JUROR:  Okay.  Thank you.

14         (Juror leaves.)

15         THE COURT:  The next person answered "yes" to

16    4, 5, 7.

17      It's rare it takes me this long to get a jury.

18    Oh, yeah, 11.

19         (Next Juror.)

20         THE COURT:  Good afternoon.

21         THE JUROR:  Hello.

22         THE COURT:  Would you please say your name for

23    the record.

24         THE JUROR:  Dr. Peter Gale.

25         THE COURT:  And, Dr. Gale, we have the

1     parties, we have my staff, we have two members of the

2     public, and one is a reporter.  If there is anything you

3     would prefer to discuss without the public or the

4     reporter, then I'll probably excuse them.

5             You answered a number of questions "yes" including

6     the question whether the schedule would impose a special

7     hardship on you.  Why is that?

8             THE JUROR:  I work in a two-doctor clinic and

9     the other doctor is on vacation today.  I have 150

10    people scheduled in our neuromuscular skeletal practice

11    this week and God knows how many next week, and I have a

12    long-awaited vacation prepaid for next week.

13            THE COURT:  Did you make that before or after

14    you --

15            THE JUROR:  Four months ago.

16            THE COURT:  You're excused.  You can go.

17            THE JUROR:  Thank you.

18            (Juror leaves.)

19            THE COURT:  The next person answered 4, 7, 10

20    and 11.

21            (Next juror.)

22            THE COURT:  And 12.  I just can't read it.

23        Hello.

24            THE JUROR:  Hi.

25            THE COURT:  Please say your name for the

1    record.

2                  THE JUROR:  Susan Collina.

3                  THE COURT:  And, Ms. Collina, we have the

4    parties, we have my staff, we have two members of the

5    public, at least one of whom is a reporter.  If there's

6    anything we're going to discuss that you would prefer to

7    discuss without the public or the media, let me know and

8    I expect I'll ask them to step out.

9         I think the first question to which you answered

10   "yes" is whether the schedule would impose a special

11   hardship on you.  Why is that?

12                 THE JUROR:  Um, I hurt my knee and I have

13   X-rays next week.  I have a fragment of something in my

14   knee and I'm supposed to get an MRI next week, but I

15   have to postpone that and find out if I need surgery or

16   not.  So that's my main concern.

17                 THE COURT:  All right.  Did you say you also

18   knew somebody who got internet or TV service without

19   paying for it?

20                 THE JUROR:  Yeah, it's from my childhood when

21   cable first came out.  I think when it first came out

22   someone had a black box or something.

23                 THE COURT:  All right.  You're excused.

24                 THE JUROR:  Thank you.

25                 (Juror leaves.)

1          THE COURT:  The next person, if I can read my

2     writing, it's 4, 6 and 12.

3          (Next juror.)

4          THE COURT:  Hello.  Good afternoon.  Would you

5     please say your name for the record.

6          THE JUROR:  Nancy Cass.

7          THE COURT:  Ms. Cass, we have the parties, my

8     staff, two members of the public, at least one of them

9     is a reporter, and if there's something you feel more

10    comfortable discussing without the public or the

11    reporter, let me know and I expect I'll ask them to step

12    out.

13        I think the first thing you answered "yes" to is

14    whether the schedule would impose a special hardship on

15    you.  Why is that?

16         THE JUROR:  Yes, because this coming Monday is

17    the 27th and a good friend of mine has a court date in

18    Providence, Rhode Island.  He's being charged with

19    felony assault and I'm his character witness for that

20    date.

21         THE COURT:  Well, if I excuse you, you're

22    going to have to come back next month or something.

23         THE JUROR:  That is no problem.  It's the only

24    thing I have on my schedule.

25         THE COURT:  All right.  I'm going to excuse

```
 1    you.  But you'll have to come back in March or April.

 2              THE JUROR:  Okay, that's fine.  I just get

 3    something in the mail or something?

 4              THE CLERK:  I can help you.

 5              THE JUROR:  Oh, sorry.

 6              (Juror leaves.)

 7              THE COURT:  The next person is 6, 7, 12 and

 8    14.

 9              (Next juror.)

10              THE COURT:  Hello.

11              THE JUROR:  Good afternoon, your Honor.

12              THE COURT:  Would you please say your name for

13    the record.

14              THE JUROR:  John Joseph Loughlin, Jr.

15              THE COURT:  All right.  Mr. Loughlin, we have

16    the parties, we have my staff, we have two members of

17    the public, at least one of them is a reporter, and if

18    there's anything we're going to discuss that you would

19    prefer to discuss without the public or the reporter

20    present, let me know and I may excuse them.

21              THE JUROR:  No.

22              THE COURT:  Okay.  I think the first question

23    to which you answered "yes" is whether you or somebody

24    close to you had ever been involved in a criminal

25    matter.  What prompted you to answer "yes" to that
```

```
 1  question?
 2           THE JUROR:  Thirty years ago I was a police
 3  officer, sir.
 4           THE COURT:  What was that?
 5           THE JUROR:  I was a police officer for thirty
 6  years.
 7           THE COURT:  You were?
 8           THE JUROR:  In the City of Lowell Police
 9  Department for thirty years.
10           THE COURT:  Okay.  Do you feel comfortable
11  that you could judge the testimony of a law enforcement
12  officer like the testimony of anybody else?
13           THE JUROR:  Sure.
14           THE COURT:  And I think you also answered
15  "yes" to the question of whether you'd have difficulty
16  following an instruction that said that when there's a
17  person who's testifying pursuant to a plea agreement
18  with the government, because he's committed a crime, or
19  because he has immunity, that you should start with an
20  open mind, scrutinize that testimony with particular
21  care because such a person has an incentive to lie, but
22  if you find the person is telling the truth, either
23  because he appears credible or is corroborated by other
24  evidence, um, you know, you will find that he's being
25  truthful and give the testimony whatever weight you
```

```
 1    think it deserves.

 2          Do you have sort of a problem with that

 3    generally?

 4                  THE JUROR:  Yes.

 5                  THE COURT:  What is that?

 6                  THE JUROR:  I don't like people that are

 7    rats.  I don't like rats.  Even though it's part of

 8    police work.  I understand that.  But to me, if they're

 9    going to turn on their friends to gain something, then

10    they're not doing the public any good, I guess.

11                  THE COURT:  All right.  You're excused.  Thank

12    you.

13                  THE JUROR:  Thank you, sir.

14                  (Juror leaves.)

15                  THE COURT:  The next person didn't answer

16    "yes" to anything.

17                  (Next juror.)

18                  THE COURT:  Hello.

19                  THE JUROR:  Hello.

20                  THE COURT:  Would you please say your name for

21    the record.

22                  THE JUROR:  Dominic Dimanche.

23                  THE COURT:  Mr. Dimanche, we have here the

24    parties, my staff, two members of the public, one of

25    whom at least is a reporter, and if there's anything
```

1    we're going to discuss or you prefer to discuss without

2    the public or the reporter, please let me know.

3           I don't think you answered "yes" to anything, but

4    having more time to think about it, is there anything

5    you feel you should have answered "yes" to?

6                 THE JUROR:  Nope.

7                 THE COURT:  And what do you do at Best Buy?

8                 THE JUROR:  I work in electronics, video

9    games, computers, pretty much everything in there.

10                THE COURT:  All right.  Does your work at all

11   involve anything relating to theft of internet services,

12   or alleged theft of internet services?

13                THE JUROR:  No, we sell routers and things

14   like that, but any time people think about it, we just

15   kind of shoe-it-off.

16                THE COURT:  What do you mean by any time they

17   think about it?

18                THE JUROR:  You know, sometimes they'll

19   insinuate like how much range there is with a -- how

20   much a router can reach and, you know -- let's say

21   something like cable, we talk about that, or things of

22   that nature, where you provide them like -- Comcast or

23   something like that.

24                THE COURT:  All right.  You're eligible to be

25   a juror.  Why don't you go take your seat.  You're the

1   27th and I'm hoping to get 32 very soon and then we'll

2   see if you're actually going to be a juror.  Okay?

3                  THE JUROR:  Thank you, very much.

4                  (Juror leaves.)

5                  THE COURT:  The next person also didn't answer

6   "yes" to anything.

7                  (Next juror.)

8                  THE COURT:  Hello.  Would you say your name

9   for the stenographer, please.

10                  THE JUROR:  James Walsh.

11                  THE COURT:  Mr. Walsh, we have the parties, we

12   have my staff, we have two members of the public, at

13   least one of whom is a reporter, and if there's anything

14   you would like to discuss without the reporter or the

15   public, let me know and I will probably excuse them.

16        I don't think you answered "yes" to anything.

17   Having more time to think about it, is there anything

18   you think you should have answered "yes" to?

19                  THE JUROR:  Yes, I do now, about the time

20   off.  You said this could be a 7-day-plus case?

21                  THE COURT:  Yeah.

22                  THE JUROR:  I just assumed that my work would

23   cover that, and I made a phone call, and it's only for

24   two days.  My wife is out of work.  I'm the only one

25   pulling a paycheck right now.  I can't afford any time

 1    off of work right now.  Plus I'm the only warehouse guy

 2    at my job.  But for you to -- I can't afford to take one

 3    day off without pay.  It will just put us in a big, big

 4    hole.  Deeper in a hole.  We're already in arrears.  I

 5    would have said "yes" to this in the beginning, but --

 6            THE COURT:  And you know we do pay something

 7    for jury service?

 8            THE JUROR:  Yeah, but it won't cut it.

 9            THE COURT:  You're excused.

10            THE JUROR:  Okay.  All set?  Thank you very

11    much.  I'm sorry about that.

12            THE COURT:  Okay.

13            (Juror leaves.)

14            (Next juror.)

15            THE COURT:  The next person is 6, 7 and 12.

16       Hello.

17            THE JUROR:  Hi.

18            THE COURT:  Please say your name for the

19    record.

20            THE JUROR:  Joseph Witt.

21            THE COURT:  All right.  Mr. Witt, we have the

22    parties, we have my staff, and we have two members of

23    the public, at least one of whom is a reporter, and if

24    there's anything you would like to discuss without the

25    reporter or the member of the public, then I'll ask them

```
 1    to step out.  Okay?

 2              THE JUROR:  Okay.

 3              THE COURT:  I think one question you answered

 4    "yes" to is whether you or anybody close to you had ever

 5    been involved in a criminal case.  Why did you answer

 6    "yes" to that?

 7              THE JUROR:  My brother.  He's been in and out

 8    of jail four times.  He was a witness in a murder case

 9    here in Boston, it was in the newspaper a little bit,

10    last year anyway.

11              THE COURT:  And, um, has your brother ever

12    been prosecuted in federal court as opposed to state

13    court?

14              THE JUROR:  Well, he was a witness in federal

15    court for a murder trial, so I don't know.  I'd have to

16    say "no" to that.

17              THE COURT:  Well, if he was in federal court,

18    the answer is "yes."

19              THE JUROR:  Right, but he wasn't on trial.

20              THE COURT:  Oh, he wasn't prosecuted?

21              THE JUROR:  Right, he was a witness.

22              THE COURT:  Oh, okay.  Do you know who the

23    defendant in that case was?

24              THE JUROR:  Last name began with a "C", a

25    murder trial.  White.  He was in jail at the time.  And
```

1   --

2              THE COURT:  And somebody got killed?

3              THE JUROR:  My brother was being like a little

4   sneak or a little rat, ratting out the inmate to get

5   better time off or whatever.

6              THE COURT:  Okay.  And you said you had some

7   concerns about witnesses who made deals with the

8   government and whether they would --

9              THE JUROR:  Yeah, because I think what he did

10  was wrong.

11             THE COURT:  What he?

12             THE JUROR:  I think what he did was wrong.

13             THE COURT:  All right.  I'm going to -- would

14  you be able to sort of put that aside completely in this

15  case?

16             THE JUROR:  Um, I don't know.  Because my

17  brother's a shit bag, you know.

18             (Laughter.)

19             THE JUROR:  You know, I'm sorry.  I just call

20  it like it is.

21             THE COURT:  Okay.  All right.  You're excused.

22             (Juror leaves.)

23             MR. McGINTY:  Well, I object.  The issue is

24  whether he could follow the instructions.  Certainly

25  he's got intimate knowledge of his brother's character

1    and apparently he told us too much, but --

2              (Laughter.)

3              THE COURT:  No, I could have spun that out.

4    But seeing his demeanor and his language and also -- and

5    hold on just a second.

6         And also the fact that his brother was a witness

7    for the U.S. Attorney's Office, apparently, um, I just

8    don't have any confidence that he would be able to put

9    it aside.  He just made that quickly clear to me without

10   having to ask a lot of questions, that he wouldn't

11   follow the instructions, and that he's going to be

12   impacted by the view of his brother.  So your objection

13   is noted, but it's overruled.

14        Go ahead.

15             (Next juror.)

16             THE COURT:  The next person, I think, did not

17   answer "yes" to anything.

18        Now is your turn.  Please say your name for the

19   record.

20             THE JUROR:  Emily Sterling-Graves.

21             THE COURT:  And, Ms. Sterling-Graves, we have

22   the parties, my staff, two members of the public, at

23   least one of them is a reporter, and if there's anything

24   you prefer to discuss without the reporter or the

25   public, let me know.

```
1              I don't think you answered "yes" to anything.  On
2     more reflection, is there anything you think you should
3     have answered "yes" to?
4                   THE JUROR:  No.
5                   THE COURT:  This says you're not working now.
6     Did you work at one time?
7                   THE JUROR:  Yes.
8                   THE COURT:  In what capacity?
9                   THE JUROR:  A social worker.
10                   THE COURT:  Okay.  It says your husband is a
11    lawyer?
12                   THE JUROR:  Yes.
13                   THE COURT:  What kind of lawyer?
14                   THE JUROR:  Immigration law.
15                   THE COURT:  Okay.
16             Well, you're eligible to a juror, you're the 28th,
17    I'm hoping to get 32 before we see which 14 actually
18    serve.  If you wait a little longer, we'll get there.
19                   (Juror leaves.)
20                   THE COURT:  The next person answered "yes" to
21    7, law enforcement, and 9, employment with a cable
22    company.
23                   MR. BOOKBINDER:  Your Honor, the next one says
24    "works for Pre Cause."  If you would just inquire what
25    that is?
```

```
 1                    (Next juror.)

 2                    THE COURT:  Hello.

 3                    THE JUROR:  Hi.

 4                    THE COURT:  Please say your name for the

 5       record.

 6                    THE JUROR:  Justin Quinlan.

 7                    THE COURT:  Mr. Quinlan, we have the parties,

 8       we have my staff, we have two members of the public, at

 9       least one of them is a reporter, and if there's anything

10       you would prefer to discuss without the public or the

11       reporter, let me know and I expect I'll ask them to

12       leave.

13                    THE JUROR:  Okay.

14                    THE COURT:  I think you answered "yes" to the

15       question whether you or somebody close to you has been

16       employed by a cable company or an internet service

17       provider?

18                    THE JUROR:  Yes.

19                    THE COURT:  Who is that?

20                    THE JUROR:  My fiance.

21                    THE COURT:  What does she do?

22                    THE JUROR:  She was a sales rep for Comcast

23       for four years and now she's working for a marketing

24       company and probably 80 percent of the business is with

25       Comcast and RCN.  And she's also on a nonprofit for
```

1      women in the cable and telecommunications industry.

2                    THE COURT:  All right.  And have you ever

3      talked to her about people getting internet service

4      without paying for it?

5                    THE JUROR:  Yeah, it comes up kind of when

6      some of the pricing discussions do.  We just kind of

7      talk about it at home.

8                    THE COURT:  And what kinds of things does she

9      say?

10                   THE JUROR:  Um, more how it just drives up the

11     price.

12                   THE COURT:  And if you are a juror in this

13     case you wouldn't be asked, "What do you think about

14     people getting internet service without paying for

15     it?" you would be asked, "Does the evidence prove beyond

16     a reasonable doubt that the charges in this case" --

17     essentially whether "Does it prove beyond a reasonable

18     doubt that Mr. Harris engaged in a scheme to sell

19     devices intended to be used to get internet services

20     without paying and did other things to promote that?"

21           Do you think you could put aside your fiance's

22     experience and those discussions and decide this case

23     based on the law as I described it and the evidence

24     exclusively or do you think you would or might well be

25     impacted by your fiance's experience and views?

```
 1                 THE JUROR:  I think I could be impacted.  I
 2     would like to have a clear mind, but just to be honest
 3     with you --
 4                 THE COURT:  Well, there's no right or wrong
 5     answers, just honest ones.  Thank you.  You're excused.
 6                 THE JUROR:  Thank you.
 7                 (Juror leaves.)
 8                 THE COURT:  The next person, I think, did not
 9     answer "yes" to anything.
10                 (Next juror.)
11                 THE COURT:  Hello.  Would you please say your
12     name for the record.
13                 THE JUROR:  John Medeiros.
14                 THE COURT:  Mr. Medeiros, I don't think you
15     answered "yes" to anything.  Having more time to think
16     about it, is there anything you feel you should have
17     answered "yes" to?
18                 THE JUROR:  No, I felt comfortable with that.
19                 THE COURT:  Okay.
20                 THE JUROR:  You know, I didn't have to answer
21     anything.
22                 THE COURT:  Okay.  And where do you work?
23                 THE JUROR:  New Bedford, it's called HCC
24     Amertag -- HCC Amertag, that's the name of the company.
25                 THE COURT:  What do you do there?
```

```
 1                    THE JUROR:  A machinist.
 2                    THE COURT:  Okay.  You're eligible to be a
 3          juror, you're the 29th, and hopefully when I get 32,
 4          we'll see if you're going to be one.  Okay?
 5                    THE JUROR:  Okay.
 6                    (Juror leaves.)
 7                    THE COURT:  The next person answered "yes" to
 8          6, to involvement with a criminal matter.
 9                    (Next juror.)
10                    THE COURT:  Hello.
11                    THE JUROR:  Good afternoon.
12                    THE COURT:  Good afternoon.  We have the
13          parties, we have my staff, we have two members of the
14          public, at least one of them is a reporter, and if
15          there's anything we're going to discuss that you would
16          feel more comfortable discussing without the reporter or
17          the public, I'll ask them to step out.
18                    THE JUROR:  Okay.
19                    THE COURT:  I think you answered "yes" whether
20          you or anybody close to you had ever been involved with
21          a criminal matter.  Why is that?
22                    THE JUROR:  I would like to have that off the
23          record, please.
24                    THE COURT:  Okay.  Please step out.
25                    (Public steps out.)
```

```
1                    THE COURT:  Okay.  Go ahead.

2                    THE JUROR:  I was convicted of indecent

3       assault and battery back in 1999, I believe.

4                    THE COURT:  All right.  And what happened as a

5       result of that?

6                    THE JUROR:  I received probation and

7       counseling.

8                    THE COURT:  And that was about '99?

9                    THE JUROR:  Yeah, around 1999.

10                   THE COURT:  And where were you prosecuted?

11                   THE JUROR:  In Salem District Court.

12                   THE COURT:  Okay.  And you said you got

13      probation and counseling?

14                   THE JUROR:  Yes.

15                   THE COURT:  And have you had any problems ever

16      since?

17                   THE JUROR:  No, I've been clean.  Perfect.

18                   THE COURT:  And indecent assault and battery

19      on whom?

20                   THE JUROR:  On a child under 14.  It was

21      inappropriate -- an inappropriate touching.

22                   THE COURT:  All right.  And how do you feel

23      about, you know, the law enforcement process in your

24      case?

25                   THE JUROR:  I thought I was treated very
```

```
 1   fairly.
 2              THE COURT:  Okay.  And that, you know,
 3   experience has nothing to do with the facts of this
 4   case.  Do you think you could not forget about it, but
 5   put it aside, presume the defendant is innocent, um,
 6   listen to the evidence, find he's guilty if it proves
 7   he's guilty beyond a reasonable doubt, and find he's not
 8   guilty if it doesn't prove that?
 9              THE JUROR:  Absolutely.  I felt the criminal
10   system, in my case, worked as it should.
11              THE COURT:  Why don't you just step out for a
12   minute.
13              (Steps outside.)
14              THE COURT:  Is there any objection to
15   Mr. Plourde?
16              MR. BOOKBINDER:  Your Honor, is he eligible?
17   I believe with felony convictions, at least, it makes
18   you ineligible for jury service rights.
19              THE COURT:  Well, it's a complicated issue.
20   You can have your rights restored.  That's actually a
21   complicated issue.
22              MR. BOOKBINDER:  Well, I suggest maybe you
23   should inquire about that, because if he's not eligible
24   --
25              THE COURT:  Well, what question do you propose
```

```
 1    I ask, because I actually haven't looked into this
 2    recently.
 3                MR. BOOKBINDER:  Whether that's a physical --
 4    whether there's any conviction would be a start, and if
 5    it's a misdemeanor, I don't think that that makes you
 6    ineligible.  But I think that's --
 7                THE COURT:  All right.  And let's say there's
 8    a satisfactory answer on that, um, then is there an
 9    objection?
10                MR. BOOKBINDER:  Um, then I don't think so,
11    your Honor.
12                THE COURT:  All right.
13                MR. McGINTY:  My understanding is that the
14    maximum is 2 1/2 house for indecent A & B.  I don't know
15    that there's a state prison alternative, but that would
16    only be if it was prosecuted in the Superior Court.  So
17    in the Superior Court his maximum would be 2 1/2, so it
18    would have been a state court misdemeanor.
19                THE COURT:  Well, let's bring him in.
20                (Juror returns.)
21                THE COURT:  All right.  Mr. Plourde, let me
22    ask you this.  In what court were you prosecuted in?
23                THE JUROR:  Salem District Court.
24                THE COURT:  In the District Court.  And do you
25    know whether your -- whether your case resulted in a
```

```
 1    conviction or were you given a --

 2              THE JUROR:  It was a plea.

 3              THE COURT:  A plea.  Did you plead guilty or

 4    was it a plea --

 5              THE JUROR:  It was a plea agreement.  I'm not

 6    clear as to whether I was -- they set it out --

 7              THE COURT:  Do you know whether you were just

 8    admitting to sufficient facts?

 9              THE JUROR:  I think I admitted to sufficient

10    facts in the case and that's what the agreement was.

11              THE COURT:  All right.

12         Has anybody ever told you that you have a felony

13    conviction?

14              THE JUROR:  I believe so, but I don't know for

15    sure.

16              THE COURT:  Has anybody ever told you whether

17    or not -- well, has your right to vote been affected by

18    this conviction?

19              THE JUROR:  No.  No, I can vote.

20              THE COURT:  Has anybody ever told you whether

21    your right to serve on a jury has been affected by this

22    conviction?

23              THE JUROR:  No, they have not.

24              THE COURT:  All right.

25         I think you're eligible to be a juror in the case
```

 1     and we'll put you down, you're the 30th, I'm hoping to

 2     get two more shortly, and then we'll see if you're

 3     actually one.  Okay?

 4                    THE JUROR:  Thank you, very much.

 5                    (Juror leaves.)

 6                    THE COURT:  And, Dan, before you bring in the

 7     next person, I want to talk to the lawyers, and before

 8     you bring back the others.

 9                    (Clerk leaves and then returns.)

10                    THE COURT:  Based on what I know, it doesn't

11     sound to me as if he's disqualified.  If the government

12     wants, I'll actually let you run his record, so long as

13     you give it to the defendant and to me, with your

14     position.  He's, at the moment, a potential alternate

15     and I don't know whether he'll get on or not.  If it

16     turns out he's disqualified, then I'll eliminate him,

17     you know, if he survives your peremptory challenges.

18     Okay?

19                    (Silence.)

20                    THE COURT:  Is that okay, Mr. McGinty?

21                    MR. McGINTY:  Yes, it is, your Honor.

22                    THE COURT:  All right.

23          The next is 4, 6 and 7.

24                    THE CLERK:  And 10.

25                    THE COURT:  I have 10 for the next person.

```
1                    (Next juror.)

2                    (Public reenters, also.)

3              THE COURT:  All right.  Hello.

4              THE JUROR:  Hi.

5              THE COURT:  Would you please tell me your name

6     for the record.

7              THE JUROR:  Andrew Hyman.

8              THE COURT:  And, Mr. Hyman, we have the

9     parties, my staff, two members of the public, at least

10    one of whom is a reporter, and if there's anything we're

11    going to discuss that you would prefer to discuss

12    without the reporter or the public, then I'll ask them

13    to go out.  Okay?

14             THE JUROR:  Yes.

15             THE COURT:  All right.  The first question you

16    answered "yes" to is whether the schedule would impose a

17    special hardship on you.  Why is that?

18             THE JUROR:  Well, I work for myself, so I need

19    to make income to pay the bills, and there's nobody

20    else.  If I don't do it -- well, it's the end of the

21    month and the photography business hasn't been great and

22    I need to do whatever I can do.  I really can't afford

23    to take the time off.

24             THE COURT:  Well, we're going to be sitting

25    from 9:00 till 1:00, which is part intended to let
```

1    people work in the afternoons.  Would that be a problem

2    for you?

3              THE JUROR:  Just with appointments that I have

4    set up and everything.

5              THE COURT:  Did you set those appointments up

6    before or after you knew you had jury service?

7              THE JUROR:  Well, before.

8              THE COURT:  All right.  You're excused.  Go

9    ahead.

10             (Juror leaves.)

11             THE COURT:  What do you have for 67?

12             MR. BOOKBINDER:  Your Honor, I would also note

13   for the record that Mr. Hyman is the one who asked me

14   whether I lived in Newton.

15             THE COURT:  Okay.  All right.  Go ahead.

16             (Next juror.)

17             THE COURT:  Hello.

18             THE JUROR:  Hi.

19             THE COURT:  Would you sit down, please.

20        Would you please say your name for the record.

21             THE JUROR:  Charles Upton, U-P-T-O-N.

22             THE COURT:  Mr. Upton, we have the parties, we

23   have my staff, we have two members of the public, one of

24   them is a reporter, at least, and if you would prefer

25   that the reporter and the member of the public leave

```
 1    while we talk, then I'll ask them to go.
 2                THE JUROR:  No, that's all right.
 3                THE COURT:  Okay.
 4         Now, one of the questions that you answered "yes"
 5    was Number 14 as to whether you had some difficulty
 6    hearing or understanding English or something like
 7    that.
 8                THE JUROR:  There is.  I have some medical
 9    issues.  I, for some time, have been on disability, and
10    so on.  But my hearing has deteriorated more.  In fact,
11    January 10th I went to Belltone for another hearing exam
12    and after two hours there my hearing is moderate to
13    severe bilaterally.
14                THE COURT:  And do you have a hearing aid or
15    anything?
16                THE JUROR:  No, because -- just cost-wise and,
17    you know, they keep coming up with new things and you
18    just don't want to wear them.  But they're on sale now.
19    If I bought it, I would have gotten a report.
20                THE COURT:  I see.  We have devices that will
21    enhance your hearing, although then you also have to
22    participate in the jury deliberations.
23         I'm going to excuse you.  I can see you're having
24    trouble hearing me.
25                THE JUROR:  Oh, I try to read lips.
```

```
1              THE COURT:  I know.

2         Would you like to be excused?

3              THE JUROR:  Yes.

4              THE COURT:  Then you can.

5              THE JUROR:  Okay.  Thank you.

6              (Juror leaves.)

7              THE COURT:  The last person, I think, did not

8    answer "yes" to anything.

9              (Next juror.)

10             THE COURT:  Hello.  You can sit down.  We

11   saved the best for last.

12        Could you say your name for the record.

13             THE JUROR:  Gary Delva.

14             THE COURT:  Mr. Delva, we have the parties, we

15   have my staff, we have two members of the public,

16   including at least one reporter.  If you would rather

17   talk without the public or the reporter, let me know and

18   I'll ask them to step out.

19        I don't think you answered "yes" to anything.

20   Having more time to think about it, is there anything

21   you think you should have answered "yes" to?

22             THE JUROR:  Um, it could be the last

23   question.  I didn't hear you.  So what's --

24             THE COURT:  Yeah, I asked whether you have

25   some trouble hearing or speaking English or any other
```

1    reason you couldn't be a good juror.

2         Do you have trouble hearing?

3              THE JUROR:  No.

4              THE COURT:  Okay.  And do you work for

5    yourself?

6              THE JUROR:  I'm not working.

7              THE COURT:  Okay.  What did you do when you

8    worked?

9              THE JUROR:  I used to drive cabs and I worked

10   doing dry cleaning.

11             THE COURT:  Dry cleaning.  All right.

12        Have you been able to understand me okay?

13             THE JUROR:  Yes.

14             THE COURT:  Okay.  Well, you're eligible to be

15   a juror, and if you go out, pretty soon we're going to

16   find out if you're actually going to be one.  Okay?

17             THE JUROR:  Okay.

18             THE COURT:  All right.  You can go.

19             (Juror leaves.)

20             THE COURT:  All right.  I am one short of what

21   I was aiming for, but rather than -- I have 21 more

22   downstairs, but rather than ask them all the 15

23   questions, I think what I'm going to do is the

24   following.

25        I'll have you exercise your challenges with regard

 1   to this group.  Ordinarily if -- and the defendant will

 2   get 6 -- I'm sorry, the defendant will get 10, the

 3   government will get 6, and we'll have four rounds at

 4   sidebar where the defendant goes first and then the

 5   government will go first on the last two alternates, and

 6   I'll explain this at sidebar.

 7        Ordinarily if you didn't exercise all 16

 8   challenges to the first 28, I would just eliminate the

 9   lowest numbers.  And you can exercise them in any

10   order.  You can exercise your first challenge to Number

11   28 and your last challenge to Number 1.  But if you

12   decided not to use all your challenges on the first 28,

13   then why don't we just leave the rest.  I suggest we

14   leave the rest as potential alternates.  Maybe we can do

15   that.  Otherwise you'll each get one challenge to 29,

16   30, 31, and I might go with just one alternate.  All

17   right?  It's 3:30 and we have some other things to do.

18   It's taking me a little longer than expected.

19        So why don't we --

20             MR. McGINTY:  I'm sorry.  So you said four

21   rounds.  And how would that work?

22             THE COURT:  I'm going to give you a chance to

23   go out there and look at them and then I'm going to see

24   you at sidebar, and I'm going to say "The defendant

25   should exercise two challenges, the government one," and

1    I'm going to do that four times, and at that point

2    you're going to have to same number of challenges left,

3    you should have two challenges left, and then I'll have

4    the government go first on the last two rounds.  And if

5    you exercise all your challenges, that will be 16, 12 of

6    the first 28 -- those challenges would be directed to

7    the first 28, and then I'll give you one challenge each

8    to the last three.  Okay?  All right?

9          And if you don't exercise all 16 to the first 28,

10   do you want to leave the extras in as potential

11   alternates?

12              MR. BOOKBINDER:  Yes, your Honor.

13              MR. McGINTY:  Yes.

14              THE COURT:  Okay.  We'll see where we are.

15         All right.  I'll give you a few minutes.

16              MR. McGINTY:  Can we just -- can three of us

17   go into the room outside the courtroom, be there for a

18   few minutes, so we can talk about it?

19              THE COURT:  Yes.

20              MR. McGINTY:  Thank you.

21              THE COURT:  All right.  I'm going to give you

22   5 to 8 minutes, but not too much.

23              MR. McGINTY:  Okay.

24              THE COURT:  And, Dan, tell Jim I'd like him to

25   hold the jurors, but I probably won't need them, but

```
 1     they can go in about 20 minutes.

 2               (Short recess, 3:20 p.m.)

 3               (Resumed, 3:40 p.m., in courtroom.)

 4               THE COURT:  May I see counsel at sidebar.

 5

 6               AT THE SIDEBAR

 7               THE COURT:  All right.  The defendant should

 8     exercise two challenges.

 9               MR. McGINTY:  33 and 38.

10               THE COURT:  33, is Robinson, and 38 is

11     Zahner.

12          Now the government should exercise one challenge.

13               MR. BOOKBINDER:  Number 1.

14               THE COURT:  Number 1, Laventure.

15          All right.  Two more for the defendant.

16               MR. McGINTY:  39.

17               THE COURT:  All right.  39 is Riopelle.

18               MR. McGINTY:  And 36.

19               THE COURT:  36 is Heinze.

20          And the government should exercise another one.

21               MR. BOOKBINDER:  Juror 8.

22               THE COURT:  Popson.

23          Okay.  Two more for the defendant.

24               MR. McGINTY:  22.

25               THE COURT:  Fitzgerald.
```

```
 1                    MR. McGINTY:  And 13.

 2                    THE COURT:  Bissinger.

 3           One more for the government.

 4                    MR. BOOKBINDER:  15.

 5                    THE COURT:  Kiernan.

 6           All right.  Let's see.  And two more for the

 7      defendant.

 8                    MR. McGINTY:  12.

 9                    THE COURT:  Daly.

10                    MR. McGINTY:  11.

11                    THE COURT:  Foresi.

12           Okay.  Now the government should exercise two, one

13      on this round and one on the next round.

14                    MR. BOOKBINDER:  Okay.  43.

15                    THE COURT:  Demello.

16                    MR. McGINTY:  I'm sorry.  Which number is

17      that?

18                    THE COURT:  43.

19                    MR. BOOKBINDER:  And 53.

20                    THE COURT:  Umina.

21           All right.  The defendant should exercise one.

22                    MR. McGINTY:  5.

23                    THE COURT:  5, Sebeika.

24           And the government one.

25                    MR. BOOKBINDER:  And we'll have one more
```

1    remaining?

2              THE COURT:  Yeah.

3              MR. BOOKBINDER:  Okay.

4              THE COURT:  Excuse me?

5              MR. BOOKBINDER:  Yes.  59.

6              THE COURT:  Dimanche.

7         Does the defendant want to exercise one more?

8              MR. McGINTY:  2.

9              THE COURT:  Gendall.

10        All right.  So the remaining -- this should come

11   out to 20.

12        Well, here, are you able to tell us?

13             THE CLERK:  Yes, Judge.  Number 9.  Number

14   10.  Number 16 --

15             THE COURT:  Lele.

16             THE CLERK:  Number 17.  19.  26, Seville.  27,

17   Ciampa.  30, Clawson.  42, Bradley.

18             THE COURT:  Just a minute.  Yes.

19             THE CLERK:  44, Woleyko.  51, Demers.  And the

20   last one is 62, Sterling-Graves.

21             THE COURT:  Yes.

22             (Counts.)

23             THE COURT:  That's 12.

24        All right.  You each get one challenge, if you

25   want to use it for the last -- so we can end up with one

```
 1   alternate, if you use them.
 2              MR. BOOKBINDER:  Um, yes.  65.
 3              THE COURT:  Okay.  Plourde.
 4        Does the defendant want to challenge one?
 5              MR. McGINTY:  The last three are --
 6              THE COURT:  Two left, Medeiros and Delva, if
 7   you don't use your challenge.
 8              MR. McGINTY:  Number 61.  Strike that.
 9              THE COURT:  All right.  So Madeiros is the one
10   alternate.
11              MR. BOOKBINDER:  Yes.  Could we -- like an
12   alternate jurors if --
13              THE COURT:  I can if I believe -- if you check
14   the rule, I have discretion to do that, although I'm not
15   required to do it.  I can also start the deliberations
16   over.
17              (Pause.)
18              THE COURT:  All right.  I don't think, it
19   being 20 to 4:00, that I'm going to question all twenty
20   downstairs, so -- well, all right.
21        Why don't you read, Mr. Hohler, the name and
22   numbers of the people who are going to be excused.
23              THE CLERK:  Okay, Judge.  One minute, please.
24              THE COURT:  All right.
25              (Pause.)
```

1            THE COURT:  Okay.  The people who are going to

2     be excused are --

3            THE CLERK:  Number 1.  Number 2.  Number 5.

4     Number 8.  Number 11.  Number 13.  Number 15.  Number

5     22, Fitzgerald.  Number 33, Robinson.  Number 36,

6     Heinze.  Number 38, Zahner.  Number 39, Riopelle.

7     Number 43.  Number 53.  Number 59, Dimanche.  Number 65,

8     Plourde.  And Number 60.

9            THE COURT:  That's correct.

10        Do you agree?

11            MR. BOOKBINDER:  Yes.

12            THE COURT:  Mr. McGinty, do you agree?

13            MR. McGINTY:  Yes.

14            THE COURT:  All right.  So ask the people who

15     are going to be excused to stand.

16            THE CLERK:  Okay.

17

18            (In open court.)

19            THE CLERK:  Ladies and gentlemen, when your

20     number is called, please stand.

21            THE COURT:  Why don't you read the names as

22     well as the number.

23            THE CLERK:  Number 1, Susan Laventure.  Number

24     2, April Gendall.  Number 5, Joanne Sebeika.  Number 8,

25     Thomas Popson.  Number 11, Joseph Foresi.  Number 12,

```
 1    Charles Daly.  Number 13, Therese Bissinger.  Number 15,
 2    Eileen Kiernan.  Number 22, Thomas Fitzgerald.  Number
 3    33, Marybeth Robinson.  Number 36, Kathryn Heinze.
 4    Number 38, Robin Zahner.  Number 39, Cheryl Riopelle.
 5    Number 43, Kevin Demello.  Number 53, Catherine Umina.
 6    Number 59, Dominic Dimanche.  Number 65, Robert
 7    Plourde.  And Number 68, Gary Delva.
 8              (People stand.)
 9              THE COURT:  All right.  Do the parties agree
10    that those standing are the potential jurors who should
11    be excused?
12              MR. McGINTY:  Yes.
13              MR. BOOKBINDER:  Yes, your Honor.
14              THE COURT:  Okay.
15        Ladies and gentlemen, those of you who are
16    standing have rendered a great service to the
17    administration of justice, but you will not be serving
18    as jurors in this case.  You may go downstairs with
19    Mr. MacAlear.
20        Mr. MacAlear, I won't need any additional jurors,
21    but thank the people who are waiting.
22              MR. MacALEAR:  Absolutely, your Honor.
23              (People leave courtroom.)
24              THE COURT:  Counsel may be seated.
25              (Pause.)
```

```
 1                    THE COURT:  Ladies and gentlemen, those of you
 2      who are remaining will serve as the jurors in this case
 3      and Mr. Hohler will get you in your seats.
 4                    THE CLERK:  Number 9, Julianna Morrall.
 5                    (Takes seat in box.)
 6                    THE CLERK:  Number 10, Mitchell Antonette.
 7      Number 16, Malcolm Lele.  Number 17, Cathleen Sheehan.
 8                    (Take seat in box.)
 9                    THE CLERK:  Number 19, Scott Travis.  Number
10      26, Kathleen Seville.  Number 27, Christopher Ciampa.
11      Number 30, Moira Clawson.
12                    (Take seat in box.)
13                    THE COURT:  Actually, Dan, why don't we put
14      her in the back row.
15                    THE CLERK:  That's right, the second seat in
16      the back row.
17                    (Moves to the back row.)
18                    THE CLERK:  42, Maureen Bradley.
19                    (Takes seat in box.)
20                    THE CLERK:  44, Pamela Woleyko.
21                    (Takes seat in box.)
22                    THE CLERK:  Number 51, Edward Demers.
23                    (Takes seat in box.)
24                    THE CLERK:  Number 62, Emily Sterling-Graves.
25                    (Takes seat in box.)
```

1          THE CLERK:  And Number 64, John Medeiros.

2          (Takes seat in box.)

3          THE COURT:  All right.  Ladies and gentlemen,

4   you have survived this painstaking and necessarily

5   painstaking and important process.  You will serve as

6   the jury in the case.

7          I would like to ask Mr. Hohler, the Deputy Clerk,

8   to administer to you your oath as jurors.

9          (THE JURY, sworn.)

10          THE COURT:  you may be seated.

11          Ladies and gentlemen, in a few moments you're

12   going to be excused for today.  You should come back at

13   9:00 tomorrow morning.  It's hard to predict probably

14   how long it will take you to get here by 9:00 tomorrow

15   morning, so try to leave ample time, and next week leave

16   more time.  The traffic about quarter to 7:00 this

17   morning was very light because it was school vacation

18   week, but it will probably be heavier next week.  So

19   come at 9:00.  I may have a few things to go over with

20   the lawyers before we start, but we'll keep working this

21   afternoon.  Then when you come in, I'm going to give you

22   instructions relating to your duty as jurors and about

23   the architecture of the trial and other matters.  But

24   for now, before I excuse you, I just want to tell you

25   the following.

1    You heard me say in the process of selecting you

2    that you have to decide the case based on the evidence

3    and that means a couple of things.  You can leave and

4    tell your family, your employers, your friends, that

5    you've become a juror in a case that's expected to take

6    about seven to ten days, that the case involves an

7    alleged scheme to steal internet services, but don't

8    discuss even the little you know now about the case with

9    anybody else.  If you discuss it with anybody who's not

10   on the jury, there's a risk that you'll be influenced by

11   something other than the evidence.

12       In addition, when you come back don't discuss

13   among yourselves the little that you know about the

14   case.  When I give you your instructions I'll tell you

15   that you have to keep an open mind until the end of the

16   case and that the evidence will come in like bits and

17   pieces of a jigsaw puzzle and if you begin to discuss

18   the evidence before it's time to deliberate and decide,

19   there's a risk that you'll make up your mind based on

20   incomplete evidence.

21       Don't do any research related to the case.  You

22   have to decide the case based on the evidence.

23   Everything -- the evidence will be presented from the

24   witness stand in the form of exhibits.  Don't do any

25   research on the internet, for example, or in any other

1    way.  That would be improper.

2         And don't read or listen or watch anything in the

3    media about the case, and there may be media reports

4    about the case.  If you hear it on the radio, turn it

5    off.  If you glimpse it in the newspaper, skip it.

6    Everything you need to know and everything you're

7    entitled to consider will be presented here in the

8    courtroom.

9         I thank you for your perseverance and I hope

10   patience in this process.  I've been working with the

11   lawyers before today to get things well organized and

12   we're going to continue to work when you're not in the

13   jury box so things will go as efficiently as possible

14   and I hope as coherent as possible for you.  I think

15   you've embarked on -- I know you've embarked on

16   something that's very important to the parties, to the

17   administration of justice, and I hope and trust you're

18   going to find it to be a fulfilling responsibility to

19   discharge as a citizen.

20        So with that I will excuse you for today and get

21   back to work with the lawyers.  All rise for the jury.

22   We'll be in recess briefly for the jury.  Well, actually

23   we'll stay.  The jury is excused.

24             (Jury leaves, 3:50 p.m.)

25             THE COURT:  All right.  Let's see what's

1    necessary to get us going for tomorrow morning.  And

2    some of this is a little later than I expected it to

3    be.

4         But before the jurors came up, we were talking

5    about the permissible -- I was planning on explaining

6    the permissible parameters of the Phillips testimony.

7              (Pause.)

8              THE COURT:  I think I was on Page 3 of the

9    defendant's memo.  I was explaining that Phillips could

10   testify about the day-to-day operations of TCNISO during

11   the period he was there and that's part of the period of

12   the alleged conspiracy.

13        As I said earlier, he's not going to be allowed to

14   give expert testimony -- the testimony there would only

15   be admissible as expert testimony under Rule 703, but he

16   wasn't designated as an expert, so he can testify

17   regarding his own knowledge, his own intention, his own

18   actions, he can testify to what Mr. Harris said, but if

19   there's opinion evidence beyond that, I expect, on

20   objection, I'll find that inadmissible.

21        Are there any particular questions about the

22   testimony as opposed to the exhibits that you'd like to

23   ask?

24              MR. McGINTY:  Your Honor, I -- I'm concerned

25   about the Court's ruling that the personal conduct of

```
 1    Mr. Harris can be part of a scheme.  I'm not sure the --
 2    his personal conduct isn't alleged as an integral part
 3    of the scheme.  The personal conduct is being made a
 4    basis for an inference of his knowledge of the existence
 5    of a conspiracy.  It will provide an ultimate foundation
 6    for a consciousness of guilt instruction as well as
 7    support for the architecture of the conspiracy.  Um, all
 8    of those things are taking personal conduct, which ought
 9    to be separate from conduct that's part of the scheme,
10    and making it the basis for a --
11               THE COURT:  Why should it be separate?
12               MR. McGINTY:  Because it's not part of the
13    scheme.  This is the equivalent of **Veragopolis** where a
14    person's separate conduct involving fire is not the same
15    as the insurance scheme, that was entirely separate, and
16    in **Veragopolis** the case got reversed.  So here --
17               THE COURT:  I'll look again at **Veragopolis**,
18    but the --
19               MR. McGINTY:  And the danger here is that --
20               THE COURT:  In fact, let they have it.
21               MR. McGINTY:  The danger here is that whether
22    Mr. Harris uses this for connecting to an ISP for free
23    service or for enhanced service, either way, that may
24    show the capability of the firmware, but that's not in
25    dispute.  We're not saying that this can't be used in
```

1    that fashion.  What instead it's being used at is a way

2    of prejudicing him without probative effect, because it

3    doesn't go to an issue that matters, and it's not part

4    of the scheme.

5              THE COURT:  Why isn't it part of the scheme?

6              MR. McGINTY:  Because the scheme is for him to

7    sell this to others and whether he uses it personally is

8    quite immaterial.  I mean, whether he does something in

9    his personal life or not -- um, if he's a drug user --

10   how many times have I tried to get you a case -- of drug

11   use in a drug case where he was told it doesn't bear on

12   his drug activity because his drug activity is the

13   dealing, not whether he was using it or not.  So whether

14   he uses it or not, I don't see how that's probative in a

15   way that balances out the 403 prejudice, um, in how it

16   can be used in a fashion that's being proposed here.

17   Certainly if you look at the scheme there's nothing

18   saying that part of the ability to deliver on this was

19   Harris in the middle of this using the modem for a

20   purpose of doing something else.

21        So I'm at a loss to understand how --

22              THE COURT:  I think I understand, but let's

23   see what the government says.

24              MR. BOOKBINDER:  Um, your Honor, first of all,

25   the testimony about Mr. Harris's use is not as simple as

1     --

2                THE COURT:  Excuse me just one second.

3                (Pause.)

4                THE COURT:  Go ahead.

5                MR. BOOKBINDER:  First of all, this is not

6     just a question of showing that these products are

7     capable theoretically or practically of being used this

8     way, it's a question of how people were actually using

9     them, and the fact that Mr. Harris was actually using

10    them to steal service and to steal faster service is

11    relevant to his knowledge about what these -- about what

12    others were actually using the products for.  The fact

13    that we've not specifically named him as one of the

14    users, and there were thousands of users in this case,

15    and that suggests that we would be able to call, um,

16    potentially any of them as a witness to describe what

17    people who bought his products were doing.  The fact

18    that he isn't named in the indictment like those other

19    people would not preclude their testimony from being

20    relevant.  No one is suggesting it's dispositive of any

21    issue, it's not, but it is relevant.

22          Furthermore, your Honor, in the case law

23    describing buyer/seller conspiracies there are -- one of

24    the factors that several of the cases talk about is

25    whether the personal law-breaking by the seller, if the

1    seller is committing a crime charged, that that is at

2    least a relevant factor that juries can consider in

3    deciding whether he's participating in a scheme with

4    buyers.  So for all of those reasons --

5              (Pause.)

6              THE COURT:  Go ahead.

7              MR. BOOKBINDER:  Your Honor, for all of those

8    reasons, I would suggest that this testimony is integral

9    to the scheme in the conspiracy charged.

10             THE COURT:  Well, as I said, um, I'm not

11   persuaded that it should be excluded.  It appears to me,

12   as I understand it, that this is conduct by Mr. Harris

13   during the period of the alleged conspiracy.  If this

14   was an alleged conspiracy to possess cocaine with intent

15   to distribute it and Mr. Harris was the defendant and

16   other people distributed it and he did, too, his own

17   distribution would come in.  I do think it's relevant to

18   knowledge, intent, membership in the conspiracy, um, I

19   think potentially overt acts.  I'll look at **Veragopolis**

20   perhaps again.  But when I looked at it, I regarded it

21   as distinguishable.  I thought it was a prior arson that

22   was admitted.

23             MR. McGINTY:  It was, but the question was was

24   that it was too close and whether the -- whether the

25   proximity of the prior conduct to the current conduct

1   creates undue prejudice?  And here, the allegation that

2   relates to the interaction between Phillips and Harris

3   relates to what they were doing as rooming together in a

4   place they were sharing together.  So, you know, somehow

5   that bears probative effect on the scheme that's charged

6   of Harris selling to other persons.

7          I don't know of any case in the drug area where it

8   talks about the use of a person of drugs being probative

9   of the existence of a conspiracy.  I know of situations

10  where a person disavows the existence of drugs in their

11  house, um, where their drug use becomes probative of

12  that fact, but how it becomes probative of a conspiracy

13  I'm at a loss to understand.  And frankly, your Honor --

14          THE COURT:  I guess I'm repeating myself.  I

15  understand that it's intrinsic and not extrinsic and I

16  understand that it can demonstrate -- its probative of

17  whether Mr. Harris devised the scheme, which is the

18  charge in Paragraph 60.  So that's the ruling I make,

19  subject to my considering it further, if possible.

20          MR. McGINTY:  And, your Honor, also with

21  respect to Mr. Phillips, um, the Court said that it was

22  possible to get into testimony of the interrelationship

23  between Mr. Phillips and Mr. Harris prior to the

24  inception of the conspiracy.  Um, they've gone to school

25  together, so it goes back some years.  During that time,

1    um, they had discussed a number of things including some

2    conduct by a firm that was involved in, um, providing

3    internet service for LAN city modems.  I presume that

4    that is not going to be the subject of testimony from

5    Mr. Phillips.

6              THE COURT:  It hasn't -- I don't recall that

7    being mentioned in any of the motions in limine.  Was

8    it?

9              MR. McGINTY:  No, it was outside the scope of

10   the conspiracy.  I didn't make a motion in limine about

11   the --

12             THE COURT:  I think it's very standard

13   evidence relating to the relationship of the

14   co-conspirators, even if it's not within the period of

15   the conspiracy, and it's ordinarily relevant.  Now,

16   there may be another reason to exclude it, but it's --

17        Does the government intend to introduce evidence

18   prior to 2003?

19             MR. BOOKBINDER:  Yes, your Honor, we will be

20   asking Mr. Phillips about how he met Mr. Harris, um, and

21   how they first started talking about the subject of

22   cable modem hacking.  And, um, I believe that is before

23   -- well, it's around 2001 and 2002.

24             THE COURT:  Okay.  Well, I appreciate your

25   alerting me to this.  If there's an objection, I'll

listen to it, and of course I'll decide it.  But, you

know, generally speaking, background relationships in

the period of the alleged conspiracy are relevant and

depending on what the question is, what the answers may

be, um, I'll decide how to rule on the objection.

With regard to the Phillips exhibits, um, there's

no objection to 1 and 2.  There is an objection to Pages

3 to 6 of Exhibit 3.  And I did, based on what I could

glean from looking at the pages, think that those pages

were problematic.  I need to know what is the

relevance?  It indicates that Mr. Harris was not the

moderator of this.

Is this a 4?

MR. BOOKBINDER:  Yes, it's a list of topics

within one forum, correct.

THE COURT:  It's a list of topics.  It's not

the whole message, is it?

MR. BOOKBINDER:  No, it's a topic list.

THE COURT:  Yeah, there may be a question of

completeness.  I don't know.  But he's not the

moderator.  I don't know how the government proposes to

prove -- well, I don't know what the relevance of this

is.  I don't know how the government proposes to prove

that Mr. Harris read the information.  It's not clear to

me, to the extent this is hearsay, what rule the

```
 1    government is relying on, um, to get some particular

 2    document in.  And I'm not quite sure about the 403

 3    analysis.

 4         So what is this and -- and you know what my

 5    general questions are.

 6              MR. BOOKBINDER:  Your Honor, the first part of

 7    the response is, I actually don't intend to use this

 8    with Mr. Phillips.  I thought initially I would.  I also

 9    had it listed for Mr. Russell and I think the plan would

10    be to use the exhibit later on.  So the first thing is

11    if the Court would rather save this for a later day, we

12    can do that.

13              THE COURT:  Well, why don't we talk about it

14    since I --

15              MR. BOOKBINDER:  Well, I'm happy to address it

16    now as well.

17         So these are a list of topics within one of the

18    general areas of the forums and it's true that

19    Mr. Harris is not listed as a moderator of this

20    particular portion of the forum page.  But again, um, he

21    is the one -- the website is registered to him, he owns

22    it, he runs the company, and we will have testimony from

23    Mr. Phillips or Ms. Lindquist, at least from the two of

24    them, that they discussed with him things that were on

25    the forums regularly.
```

```
1                    THE COURT:  In 2008?
2                    MR. BOOKBINDER:  No, let's think about that.
3                    THE COURT:  But this is a document in 2008.
4                    MR. BOOKBINDER:  Correct, your Honor.  And
5         they will -- Ms. Lindquist was only involved -- I think
6         they're both involved until 2007, um, so they were not
7         involved at the time, but they were involved for years
8         with him.  And there's a course of conduct that they're
9         also going to testify --
10                   THE COURT:  And they're going to testify that
11        he read every post?
12                   MR. BOOKBINDER:  No, they will not testify
13        that he read every post, they will testify that they
14        discussed things that were on the forums with him.
15        These are not individual posts, it's worth noting, these
16        are again basic topic areas, and so you don't have to
17        dig down to the specific posts to see what they're
18        talking about.
19                   THE COURT:  I'm too old.  That doesn't
20        communicate anything to me.
21            Is this the way it would have come up on the
22        screen?
23                   MR. BOOKBINDER:  Yes.  Your Honor, so what
24        happens is the first two pages of that exhibit are the
25        very general topic areas, there are, I believe nine on
```

```
 1    the first -- I think they may be all on the first page.
 2    So there are nine general topic headings there.  Then if
 3    you click on the one that says, I think it's "docsis," I
 4    don't have it right in front of me, your Honor, but if
 5    you click on the one, the top area that says "docsis,"
 6    what you get is what comes up in pages, I think it's 3
 7    through 6 of that exhibit, which is a sort of a more
 8    narrow list of topic headings.  It's kind of like you've
 9    got the big table of contents with just the chapter
10    headings and then you've got a more detailed table of
11    contents, but it's still the contents, not the text.
12              THE COURT:  Now you're talking my language.
13    Go ahead.
14              MR. BOOKBINDER:  Thank you, your Honor.
15         Um, so it's a more detailed table of contents.
16    And then if you click on any one of those items that's
17    there, you would go to the actual thread, which is a
18    series of posts by people, and if it's one post, it
19    could be a hundred posts on that topic area.  So these
20    are the threat headings.
21         So I would suggest that this is something that's
22    prominently on his website and it is reasonable to
23    infer -- although certainly Mr. McGinty could argue and
24    question about whether in fact the defendant looked at
25    them.
```

1          And the second thing is, I'd suggest, as far as

2     the hearsay issue is, these are not -- they're not in

3     general, they're just topics that often mention an area,

4     a name of an ISP, they're not assertions, they're not

5     statements, and they're not being offered to prove

6     anything in particular.

7               THE COURT:  Well, some of them are.  If you

8     look at Page 3-03.  Do you have the exhibits?

9               MR. BOOKBINDER:  Your Honor, if I could just

10    grab -- I gave Mr. McGinty an extra copy.

11         Do you have another copy?  Okay.  Yes, your Honor,

12    I've got 3-03, your Honor.

13              THE COURT:  Four up from the bottom.  It says,

14    "Anyone want to trade MACs" and maybe that's a question

15    mark, but arguably that's not hearsay.  It says, "I have

16    the 5100 Optimum on line."  Isn't that an assertion?

17              MR. BOOKBINDER:  That portion of it is, yes.

18    But, again, it's a question of whether -- I mean, we

19    would not be offering this to prove that someone out

20    there actually has the 5100 optimum on line, whatever

21    that is, um, rather to show that there are these topic

22    headings where people are posting, where people are

23    asking about trading MACs and --

24              THE COURT:  Yeah, and do you have other

25    evidence that shows that Mr. Harris knows that people

1    are trading MACs?

2              MR. BOOKBINDER:  Do we have other?  Um, I

3    believe that we do.  I --

4              THE COURT:  I think you have some of it --

5              MR. BOOKBINDER:  I think he himself made a

6    post.

7              THE COURT:  Right.  Right, he himself offers

8    MACs, right?

9              MR. BOOKBINDER:  Yes, your Honor.

10             THE COURT:  Even I saw that yesterday.  So --

11   and what's the marginal probative value of this?

12             MR. BOOKBINDER:  Well, while his own personal

13   conduct is certainly relevant, the fact that his forums

14   are full of topics on the subject of trading MACs of

15   different ISPs is again relevant to whether -- um, this

16   is just a case where just Mr. Harris is out there using

17   the product this way or whether lots of people are at

18   least asking about using the product this way.

19             THE COURT:  Aren't Phillips and Hanshaw going

20   to testify about trading MACs and that they discussed

21   trading MACs with Harris?

22             MR. BOOKBINDER:  Um, I believe -- well, yes,

23   Hanshaw will say that.  Absolutely, yes, they will.

24             THE COURT:  At the moment, I -- I mean, I do

25   think this could be admitted under 104(b), you know, if

1    I find there's enough evidence that the jury could find

2    that he read it.  Maybe.  But it's to show, as I

3    understand it, his knowledge that MACs are being

4    traded.

5         And, you know, I'll listen to the evidence about,

6    you know, how likely it is that he read these, but even

7    if he did, you know, there aren't -- you know, there are

8    just a lot of pages.  And some of them are statements

9    like, "I have the 5100 optimum," and many of these don't

10   seem to fall into -- um, but I'm not persuaded it's

11   admissible.  You know what my concerns are.  I mean, I'm

12   not persuaded I shouldn't exclude it under Rule 403 and

13   I think I have to go almost line by line to see whether

14   some of them are problematic, that they are offered for

15   the truth.

16        So you don't want to offer this through Phillips,

17   you want to offer it -- you can't offer it unless you

18   come back to me and persuade me it's permissible and

19   appropriate.

20            MR. BOOKBINDER:  Okay, your Honor.

21            THE COURT:  And then, as far as I could tell,

22   exhibits on your list, um, 5 through 29, that you want

23   to get in with Phillips, either have no objections or

24   they're the chats that I've already ruled on, right?

25            MR. BOOKBINDER:  Correct.

1          THE COURT:  And you say you've made the

2    necessary redactions?

3          MR. BOOKBINDER:  We have, we've made the

4    redactions, we've given Mr. McGinty copies, and they're

5    electronically redacted as well, so.

6          THE COURT:  Okay.  So "electronically

7    redacted" means what, like on your computer?

8          MR. BOOKBINDER:  Right.  What it means, your

9    Honor, is that when we, um, show them to the jury and

10   during the trial, and they may appear on the juror's

11   disk, they will be redacted in the same way that they're

12   on the page.

13         THE COURT:  Right.  And this leads to an

14   important point.  I now have in my jury room, but I've

15   never used it myself in one of my cases, you know, the

16   capacity to give the jurors a disk with the exhibits and

17   it will come up on the screen, and you saw the screen.

18   But you're going to have to be careful to make sure that

19   what's on the disk is what's been admitted into

20   evidence.

21         MR. BOOKBINDER:  Yes, your Honor, and I

22   understand that we will -- I know my office is preparing

23   this right now, which has the exhibits as they stand

24   now, but they will certainly change.  For example, it

25   may be that, count by count, like half of Exhibit 3 may

1   not come in and if that's the case, we'll need to revise

2   both the original paper document before it comes in and

3   also -- and I think this is the way the system is

4   supposed to work, that at the end of the trial we'll

5   talk and we'll make sure that what's on the disk is the

6   final version and not --

7           THE COURT:  But the parties will have to

8   basically agree that what's going back there on the disk

9   is everything that should go and nothing else.  All

10  right?  Maybe Mr. Harris can help you figure this out.

11          MR. McGINTY:  Can I have a moment with

12  Mr. Bookbinder?

13          THE COURT:  Yes.

14          (Pause.)

15          THE COURT:  All right.  Here, where are we?  I

16  actually have a question for you regarding Exhibits 18

17  to 20.

18          MR. McGINTY:  Could we, just for a moment,

19  your Honor, the chats that the government has given us a

20  copy of -- and let me just back up a second.  The

21  parties have been trying to iron this out and on

22  Saturday or Sunday, I guess it was Saturday, um, the

23  Saturday past, um, we, on two of the chats, offered the

24  contacts, so it made the chat to be broader, um, but

25  unbeknownst to us that created some technical problems

1    and frankly I guess some considerable technical problems

2    in the U.S. Attorney's Office.  Um, and I didn't intend

3    Ms. Sedky and Mr. Bookbinder to be spending part of

4    Saturday, um, trying to rectify that.  But what it's

5    created though is, um, the parts that we've added, to be

6    looking different from the parts that were originally

7    segregated by the government as to what that exhibit

8    looked like.

9        The second part of this is that the government has

10   throughout this highlighted what they say are Harris's

11   statements.  So they have taken the little snippets and

12   they sort of have drawn out of that and highlighted the

13   parts that are Mr. Harris's statement, basically, um,

14   sort of a "look at me" characteristic of what they're

15   offering as an exhibit.  We have, in other cases,

16   objected to this, um, using the highlighter to try to

17   amplify this on an exhibit, we would submit, is

18   improper.

19            THE COURT:  So you're objecting?

20            MR. McGINTY:  We are objecting.

21            MR. BOOKBINDER:  Your Honor, can I address

22   that?  Um, this is not an attempt at a "look at me"

23   technique.  As you've seen, there are many cases that

24   there are long chats with, um, the indication of who the

25   speaking party is, who the receiving party is and what

        1    the text is.  To try to make it clear who is saying

        2    what, we have consistently throughout -- and we have not

        3    done this in the excerpts that we like or in the

        4    excerpts that we don't like, we've always put

        5    Mr. Harris's statements in just with the yellow

        6    highlighting, so that it's clear which one is him and

        7    which one is someone else.  We've done it just to make

        8    it easier for the jury and for the witnesses to read and

        9    to understand who is saying what.  But particularly

       10    because, um -- and Mr. McGinty objected to many of the

       11    other statements, but it's much clearer that in all

       12    these cases Harris's statements are clearly admissible.

       13    So we thought it was a safe way to try to distinguish,

       14    um, so that someone looking at a page could see -- could

       15    just pick out the fact that this is dialogue between two

       16    people and which parts go to which.

       17              THE COURT:  Well, is that what the page would

       18    have looked like if you went on the website or is it

       19    enhanced by the government?

       20              MR. BOOKBINDER:  Um, no, it's enhanced, it is

       21    enhanced to make it -- and in an effort to make it

       22    clearer to read, your Honor.

       23              MR. McGINTY:  It's also ripping it from the

       24    context, that's the problem.

       25              THE COURT:  Well, I don't know about ripping

 1    it from the context.  I don't know why this is coming up

 2    since we've been talking about these things for weeks.

 3    But basically, you know, while you're in court you can

 4    highlight something, you can blow it up, but basically

 5    the pages probably should look the way they looked on

 6    the -- the pages that are entered as exhibits should

 7    look the way they look on the website.

 8            MR. McGINTY:  Your Honor, just so it's clear,

 9    we have exchanged parts of these or the government has

10    provided parts of these and over time has sort of

11    indicated which parts of the chats it wants to admit.

12    On these we've had to sort of, handwritten and circled,

13    as this has gotten more refined, circled the parts that

14    the government wanted to put in.  What we weren't

15    getting is it highlighted to tell us that basically

16    where this goes in as an exhibit, we intend to highlight

17    what Harris says as distinct from whatever the

18    contextual background is of this.  And frankly in some

19    of the chats the reason that the context is important,

20    um, is whether something's fanciful enough or that

21    something is intended to be serious or not.  They could

22    pull out that statement and just sort of throw it out,

23    it catches the eye, and --

24            THE COURT:  They're two different things.  If

25    there's information that should be in there as an

1    interest of completeness, there's a rule of evidence

2    that requires that and I understand the government's

3    trying to accommodate those concerns.  I thought you

4    were talking now about certain statements by Mr. Harris

5    being bolded on the exhibits that weren't bolded on the

6    websites that they come from, correct?

7                MR. McGINTY:  That's correct.  And my point is

8    --

9                THE COURT:  I know what your point is.

10   Essentially I'm inclined to agree with you.

11               MR. McGINTY:  In that case I'll sit down.

12               THE COURT:  Although I'm concerned that it

13   wasn't raised earlier.

14               MR. McGINTY:  But as I said, I didn't know to

15   raise it, because I --

16               THE COURT:  I mean to me.

17               MR. McGINTY:  I didn't know to raise it

18   because I didn't get it offered in this fashion.  So I

19   didn't know this was going to be what it looked like.

20               THE COURT:  I know.  All right.

21               MR. BOOKBINDER:  Your Honor, and again, this

22   is not an effort to highlight any particular statements

23   --

24               THE COURT:  Putting aside what the purpose is,

25   the document -- you know, you're citing in part like

 1    pages, you know, 3 through 6, the posts, and some of

 2    these things are bolded, you know, like the headers, and

 3    I assume that that's the way they looked on the website,

 4    isn't it?

 5            MR. BOOKBINDER:  Correct.  Yes.

 6            THE COURT:  All right.  So, you know, it

 7    should look the way it looked on the website.  Is that

 8    feasible at this point?

 9            MR. BOOKBINDER:  Well, I suppose, your Honor,

10    um -- I don't know, because we spent an enormous amount

11    of time trying to get this right, um, and we sort of

12    burned them into the images so that they would look that

13    way on the printed copies, so --

14            THE COURT:  Well, I don't know that you have

15    to get it -- I'm not going to delay the trial because of

16    this because when you're showing them, as I said, you

17    can put it on the document presenter, blow it up,

18    highlight it, it can be shown that way, but we're going

19    to have to figure out what goes back to the jury.

20            MR. BOOKBINDER:  Right.  And it may be that we

21    can accomplish getting the printed originals, um, to

22    have the highlighting removed essentially and to have an

23    image created on the jury's disk that doesn't have that

24    on them.  I just don't know because, as I said, we've

25    had to burn in these so that they could be page numbered

1    and without screwing everything up, so --

2              THE COURT:  I'm not saying that they can't see

3    it this way tomorrow, but we're going to have to figure

4    out what goes back to the jury.  It raises two other

5    issues for me.  One, should the jurors have paper copies

6    of these, so they can write on them?  Maybe not.

7              MR. BOOKBINDER:  Your Honor, I mean, we could

8    certainly, if the Court wanted, provide paper binders,

9    but the problem is, as the Court knows, is that -- and

10   this is frankly the reason that we did the highlighting,

11   is that the text is so small, in some cases, that the

12   advantage of the electronic monitors is we can blow up

13   and we will blow up the portions that we're talking

14   about.  I don't know that paper copies will be

15   particularly helpful.

16             THE COURT:  All right.  And also paper copies

17   might have the bolding.

18        But I think I'm going to let the jurors take

19   notes.  Does anybody have an objection to that?

20             MR. BOOKBINDER:  We don't.

21             MR. McGINTY:  No, I don't.

22             THE COURT:  With the usual admonition.  But

23   let me ask you the following thing.

24        I'm reminded that two of the exhibits you want to

25   use with Phillips are 18 and 20, but those are chats,

1    but they aren't chats that were mentioned in the motion

2    in limine, so I haven't focused on them.

3            Are there any problems with 18 and 20?

4            MR. BOOKBINDER:  I believe, your Honor, and

5    again I'll take a look, but I believe that in both cases

6    the only things we're offering are Harris's statements

7    themselves and therefore they don't implicate the

8    co-conspirator or any of the other exceptions.  The

9    other thing, your Honor, again, um, is that these chats,

10   with the exception of the Phillips's chats in Exhibit 5,

11   um, we do intend to ask Mr. Phillips about them because

12   he's the one who copied them.

13           THE COURT:  What's that?

14           MR. BOOKBINDER:  We intend to ask him just

15   simply to identify the document and then say, "What is

16   this?"  "Oh, this is a chat log or a portion of a chat

17   log I copied when I left the company," and that's it.

18   We don't actually intend to offer it with him.  So these

19   would be come in -- we'd be offering them with the FBI

20   agent.

21           THE COURT:  Well, how do you offer them with

22   the FBI agent?

23           MR. BOOKBINDER:  Because Mr. Phillips copied

24   them and then he provided them to the agent who then

25   excerpted them and that is how he got them.  So it sort

1    of provides the, um, chain of custody.  But again to the
2    extent that they are admitted as either Harris's own
3    statements or co-conspirator statements, in the context
4    of MooreR, for example, we're just going to review them
5    with the FBI agent rather than with Mr. Phillips, who
6    doesn't have any other knowledge about them.  Also, the
7    FBI agent, as the Court knows, there are some technical
8    terms in there and some sort of internet chat terms and
9    the agent will be in a position, and has been designated
10   as an expert witness, to explain some of that language
11   to the jury.
12              THE COURT:  I mean, what are the
13   authentication problems?
14              MR. McGINTY:  The authentication problems are
15   that, um, Phillips had taken these documents, apparently
16   taking a selective number of them, he had preserved
17   these chats, presumably using some sort of search
18   method, preserved the searchable chats, but did not
19   preserve the others, and then he, um, two years ago or
20   two and a half years later, um, provides them to the
21   government.  Um, and we are, um, without any letting on
22   if he edited them or the authenticity of these
23   documents, we --
24              THE COURT:  So you'll question them.
25              MR. McGINTY:  Yes, we'll question them.

```
 1                    THE COURT:  Okay.  So I'll be alert to the
 2       foundation issues.
 3                    (Pause.)
 4                    THE COURT:  Well, as far as I know, that takes
 5       care of the issues to the extent possible concerning
 6       Phillips.
 7              Then does the government still want to refer to
 8       some of the posts in the opening?  You can talk.
 9                    (Pause.)
10                    MR. BOOKBINDER:  Your Honor, the plan from the
11       government would be not to -- we don't intend to
12       highlight or display any of the posts of any individual,
13       but Ms. Sedky is intending or hoping to refer to the
14       fact that there were these forums on which people
15       offered and traded MAC addresses.  And the basis for
16       that would be -- we had some discussion with the Court,
17       when we last discussed this, about at least whether
18       those particular posts would be seen as outside the
19       hearsay rule because they are offers of --
20                    THE COURT:  Well, have I been shown all of
21       them or just samples of them?
22                    MR. BOOKBINDER:  Well, your Honor, you have
23       been -- so on the MAC trading area, you've been shown --
24       there are samples in our motion itself, two samples, and
25       the rest of them are in the -- there are two entire
```

1    threads, about five pages worth, that are in Exhibit --

2              THE COURT:  Well, I haven't looked at the

3    exhibits.  I'm going to tell them that what the

4    government says is not evidence and you're engaged in

5    risky business if you say "We're going to show you the

6    following evidence" and then I find it's not admissible.

7              MR. BOOKBINDER:  And, your Honor, it may be

8    that this sort of issue really isn't such a problem

9    because to the extent that Ms. Sedky doesn't say,

10   "You're going to see these," but rather, "These forums

11   are out there and people use them."  We also have

12   testimony about that, they'll be testimony from several

13   witnesses who will say, "Yeah, I went to their forums

14   and I got MAC addresses that way."  So that, I think,

15   will provide a sufficient foundation for the opening and

16   I think will avoid promising that they're going to see

17   these particular products.

18             THE COURT:  All right.  Because I hadn't

19   finished my analysis of the samples.  I was tentatively

20   of the view that the posts by Andrew Spear could be --

21   the post, the one that's in the motion in limine, by

22   Andrew Spear, um, could be conditionally admitted under

23   Rule 801(d)(2)(E) as co-conspirator hearsay.  As I

24   understand it, Spear bought -- you say the evidence is

25   going to show that Spear bought an SB-5100 Combo, which

1    can be used to steal internet service, and he asks for

2    MAC addresses in the post indicating arguably an

3    intent -- well, indicating an intent to use an

4    interdependence -- and understanding the

5    interdependence, that it was not useful to have the

6    device alone unless you've got the MAC addresses.

7        So the evidence appears to be adequate to show and

8    be conditionally admitted that the defendant sells a

9    product which could be used to steal internet service,

10   the evidence would indicate the defendant intended to

11   agree with others and the agreement to steal would be

12   evidence of a scheme.  So it seems that particularly the

13   way you represented the evidence now, that I'm likely to

14   find by a preponderance that Spear was in a conspiracy

15   with Harris and the posts were in furtherance of the

16   conspiracy.

17       I hadn't got quite as far with the Sean19661 post,

18   but as far as I know at the moment, Sean bought --

19       What are the Spear exhibits that have the whole

20   thread?

21           MR. BOOKBINDER:  Um, that's Exhibit 22, your

22   Honor, and the threads that we would be offering on MAC

23   trading are actually -- they were Pages 7 to 12, but I'm

24   sure they're not anymore because the pages have changed,

25   and again I didn't bring a copy down, but perhaps I

1    could --

2              THE COURT:  Okay, I'll take a look at it.

3              MR. BOOKBINDER:  Okay.  Thank you, your Honor.

4              THE COURT:  But Sean, as I understand it, is

5    Sean Davidson, and he brought only an adaptor, which

6    doesn't have an inherently sinister purpose.  I'm

7    skeptical about whether Sean's statements could get in

8    under 801(d)(2)(E) and I question whether they would be

9    admitted for the effect on the defendant.  I'd have to

10   hear what the evidence would be to indicate -- to prove

11   -- that it would be enough to prove that the defendant

12   read those posts and I'd have to do a 403 balancing.

13       That's about as far as I got.  I still have to

14   develop my preliminary instructions.  As I said, I think

15   they're going to be fairly basic, sort of the black

16   letter law concerning the conspiracy including what --

17   that the government has to prove the conspiracy charged

18   in the indictment, not some other conspiracy.  I may

19   give something on the black letter law concerning single

20   and multiple conspiracies or I may not, but I think

21   *Portella* essentially gives me those elements.

22       I may say something about buyer/seller along the

23   lines that, you know, merely selling a product that's

24   capable of being used to steal internet service and even

25   knowing that if somebody was going to use it to steal

1    internet service is not enough to prove the crimes, you

2    know, to prove a conspiracy, but it is evidence that can

3    be considered and along with other things -- well, it

4    can be considered and along with other things with

5    regard to the defendant's knowledge, an intent to agree,

6    an intent to conspire, an intent to devise a scheme.

7    Something along those lines.

8            MR. McGINTY:  And with respect to **Direct**

9    **Sales,** the Court's intentions are?

10           THE COURT:  That is **Direct Sales**.

11           MR. McGINTY:  Oh, but that's with respect to

12   buyer/seller.

13           THE COURT:  Well, I view **Direct Sales** now as

14   essentially a buyer/seller case.  I, at the moment, I

15   think they're closely related, if not the same.

16       I don't know that I'll say this much tomorrow, but

17   I'm inclined to say something like -- and this would be

18   in context.

19       "The mere sale of a product to a buyer who uses it

20   to commit a crime is not enough to conclude that a

21   conspiracy exists between a buyer and a seller.  This is

22   true even if there are multiple sales between these

23   parties and even if the illegal use is a known or

24   foreseeable consequence of the sale.  There's no

25   conspiracy if the seller does not know the buyer's

intent to commit the specific substantive crime in this
case, wire fraud, nor can you infer that a conspiracy
exists because of the seller's mere knowledge that the
buyer will use the goods illegally.  Thus, while
knowledge is necessary to show intent, without knowledge
there can be no intent, knowledge itself is not enough.
If the seller knows the buyer will use a device to
commit a crime but does not intend to agree that it
should be committed and act in order to assist its
commission, no conspiracy between them exists.  The
seller must both know the buyer's aims and intend to
achieve them."  And I may say, "He must, in some sense,
promote the conspiracy himself and make it his own and
have a stake in the outcome," which I think is language
from **Falcone** I just quoted.

        But basically the way the evidence has been
characterized to me, the government's going to be able
to do that.  But doesn't the government intend to show
more than the sale of the products, that Mr. Harris was
looking for MACs or advising people on how to trade
MACs?

                MR. BOOKBINDER:  We do intend to show more
than just the mere sale, your Honor.  Yes, we do have
some concern about whether -- again it's sort of a pure
matter of law whether we need to, but we do intend to

1    have evidence that is beyond that.

2            THE COURT:  I may tell them something like

3    "There are a number of" -- not tomorrow, but at the end,

4    that:

5        "There are a number of things you may consider in

6    determining whether the seller has the required intent,

7    the intent to agree and the intent to commit wire

8    fraud.  One thing you may consider is the nature of the

9    product that was sold.  As you heard, in this case the

10   parties disagree about the nature of the products

11   Mr. Harris sold, specifically the purpose for which

12   these products were designed and whether they had both

13   lawful and unlawful uses.  The nature and purpose of

14   this product -- or products is for you to decide based

15   on the evidence you have heard.  The nature of the

16   product can help inform your decision about whether the

17   seller had the required knowledge about how the product

18   would be used and whether he had the required intent

19   that wire fraud be committed.  You may also consider

20   other evidence of the seller's knowledge and intent.

21   For example, if it is proven that a buyer intends to use

22   a product unlawfully" -- I'm sorry.  "If it is proven

23   that the seller knows that a buyer intends to use a

24   product unlawfully, his efforts to promote the sale of

25   the product to the buyer may or may in some

circumstances be evidence of an intention to promote and
cooperate in that illegal use.  The seller's knowledge
and intent to aid in the commission of a crime, on one
side, in proving the conspiracy, but are not themselves
enough, there is no conspiracy unless the buyer also
intends both to agree and to commit the substantive
crime, wire fraud.  In deciding whether it has been
proven that a conspiracy to commit a particular crime
exists between a buyer and a seller, you may look to the
history of dealings between the parties, the
circumstances of a particular transaction or
transactions, the communications between the parties,
and other evidence relating to whether an agreement
between the parties existed and that the purpose of the
agreement was to commit wire fraud."  I will instruct
them that "They can also consider whether the defendant
did more than sell items such as providing support,
instruction, and assistance to the buyers, and the
illegal release of the items."

       Well, those are essentially what I'm thinking
about now.  If you want some guidance from me,
particularly in the morning, um, if you're going to say
anything about the law, I'm going to tell them, at some
point, that I've discussed the law with you, that I
haven't finally decided what my instructions are, and

```
1    they have to follow the law as I give it at the end of

2    the case.  But as always I'll try to keep you involved

3    and informed of my evolving views so you won't peg your

4    theory of the case on something I'm not going to

5    instruct on.  All right?

6              (Silence.)

7              THE COURT:  Anybody have any questions at this

8    point?

9              (Silence.)

10             THE COURT:  No.

11             MR. BOOKBINDER:  No, your Honor.

12             THE COURT:  All right.

13        Is there anything further we ought to discuss

14   today?

15             MR. McGINTY:  I think not.

16             THE COURT:  All right.  We're off.  I'll go

17   over with you tomorrow morning what I intend my

18   preliminary instructions to be and hopefully there won't

19   be anything else before we bring the jury in.  But if

20   there is --

21             MR. McGINTY:  Um, would those be e-mailable

22   earlier?

23             THE COURT:  No.  No, because I'll probably

24   write them in the morning on my yellow pad.

25             MR. McGINTY:  Given the chance, we could help
```

1    edit them.

2            THE COURT:  What's that?

3            MR. McGINTY:  I said given the chance, we

4    could help edit them.

5            THE COURT:  They're going to be pretty basic.

6    I think they're not going to be much more than what I

7    told you at the outset.  But given, you know, the First

8    Circuit elements of conspiracy, I might tell them, you

9    know, something about a single versus multiple

10   conspiracies and I think I'll say very little about

11   buyer/seller *Direct Sales,* but that they can consider

12   the nature of the product as evidence.  But there

13   probably needs to be more.

14           MR. McGINTY:  Can I ask?  I mean, the nature

15   of the product sort of begs the question, "What's the

16   categories that differentiate their natures?"  And

17   *Direct Sales* has restricted and unrestricted --

18           THE COURT:  Yeah, I don't, at the moment,

19   think that that's dispositive.  I think if something is

20   inherently susceptible to an unlawful use, um, that has

21   value.  The government's theory is there's no legal

22   purpose for some of these devices and if the government

23   proves that, that's sufficient -- well, that's evidence,

24   but not alone sufficient proof of a conspiracy or the

25   scheme charged.

```
 1              MR. McGINTY:  But not to belabor the point,
 2     but in the U.S. it's not whether something is inherently
 3     susceptible to misuse, it's whether it's prohibited.  I
 4     can sell anything literally indifferent to how it's used
 5     so long as it's not restricted.  And the interesting
 6     thing about *Direct Sales* is that the reason that they
 7     use the words "susceptible to misuse" is they're doing
 8     it in connection with the notice part that goes with a
 9     product that's restricted.  So that seems to be the key
10     to *Direct Sales* and that's the part that I think the
11     government --
12              THE COURT:  Well, I'm sure I'll read *Direct
13     Sales* yet again, but at the moment I doubt that I'll
14     give an instruction that's that categorical.
15              MS. SEDKY:  Your Honor, may I address the
16     single versus multiple conspiracy or would you rather do
17     that tomorrow?
18              THE COURT:  No, that's okay.  Go ahead.
19              MS. SEDKY:  We submitted some pattern jury
20     instructions, I mean, I tried to find every pattern
21     instruction I could on single and multiple conspiracies
22     and culled what I thought was an amalgamation of
23     different circuits.  I am concerned that if the Court is
24     inclined to just announce the *Portella* standard, it
25     won't necessarily be that, um -- it's a confusing
```

1    standard, in my opinion -- in my humble opinion,

2    standing by itself, and I would just urge the Court to,

3    um, consider at least some of the pattern instructions

4    from other circuits.

5                THE COURT:  Yeah, I'll look at some of the

6    others, but you're here from Washington, but you're in

7    the First Circuit, right?

8                MS. SEDKY:  Right, I couldn't find any in the

9    First Circuit, so I --

10               THE COURT:  Well, they're not pattern

11   instructions, but we went for a long time without

12   pattern instructions.  If there's a material difference

13   between *Portalla* and an instruction in another circuit,

14   um, I've got to the follow the First Circuit.  To the

15   extent you're saying that the First Circuit law, you

16   know, perhaps should be stated more clearly, for the

17   purpose of this case, than just the elements in

18   *Portalla*, I will definitely look at all of that before

19   the end.  But -- I don't have to give any preliminary

20   instructions tomorrow at all, but I regularly do it

21   because I think it helps the jury listen to the

22   evidence, but I always admonish them that they'll get

23   much more detailed instructions at the end and they have

24   to follow the instructions at the end if they seem

25   different than what I told them at the beginning, and I

1   think that admonition will be particularly appropriate

2   and important in this case.

3              MS. SEDKY:  Thank you.

4              THE COURT:  All right.  Thank you.

5         The Court is in recess until 9:00 tomorrow

6   morning.

7              (Adjourned, 4:45 p.m.)

8

9              C E R T I F I C A T E

10

11        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

12   hereby certify that the forgoing transcript of the

13   record is a true and accurate transcription of my

14   stenographic notes, before Chief Judge Mark L. Wolf, on

15   Tuesday, February 21, 2012, to the best of my skill and

16   ability.

17

18

19   /s/ Richard H. Romanow 11-06-12
     _____
20   RICHARD H. ROMANOW  Date

21

22

23

24

25