```
1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                              No. 1:09-cr-10243-MLW

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    RYAN HARRIS

10

11                         * * * * * * * * *

12

13                     For Jury Trial Before:
                       Chief Judge Mark L. Wolf
14

15

16                     United States District Court
                       District of Massachusetts (Boston.)
17                     One Courthouse Way
                       Boston, Massachusetts 02210
18                     Monday, February 27, 2012

19

20                         * * * * * * * *

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23               United States District Court
         One Courthouse Way, Room 5200, Boston, MA 02210
24               bulldog@richromanow.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3    ADAM J. BOOKBINDER, ESQ.
          United States Attorney's Office
 4        John Joseph Moakley Federal Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          (617) 748-3112
 6        E-mail: Adam.bookbinder@usdoj.gov
     and
 7    MONA SEDKY, ESQ.
          U.S. Department of Justice
 8        601 D. Street, N.W.
          Washington, D.C. 20530
 9        (202) 353-4304
          Email: Mona.sedky@usdoj.gov
10        For the United States of America

11

12    CHARLES P. McGINTY, ESQ.
          Federal Public Defender Office
13        District of Massachusetts
          51 Sleeper Street, 5th Floor
14        Boston, Massachusetts 02210
          (617) 223-8080
15        E-mail: Charles_mcginty@fd.org
          For the defendant

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2

3   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

4

5   NATHAN HANSHAW

6       By Mr. Bookbinder:   24              91

7       By Mr. McGinty:              50                   92

8

9   PETROZZIELLO MOTION............................ 95

10

11

12                    E X H I B I T S

13

        EXHIBIT 11............................. 43
14
        EXHIBIT 12............................. 46
15
        EXHIBIT 27............................. 48
16
        EXHIBIT 34............................. 88
17

18

19

20

21

22

23

24

25
```

```
1                  P R O C E E D I N G S
2              (Begins 9:00 a.m.)
3              THE CLERK:  Criminal matter 09-10243, the
4    United States of America versus Ryan Harris.  The Court
5    is in session.  You may be seated.
6              THE COURT:  Good morning.  Would counsel
7    please identify themselves for the record.
8              MR. BOOKBINDER:  Good morning, your Honor.
9    Adam Bookbinder and Mona Sedky for the United States.
10             MR. McGINTY:  Your Honor, Charles McGinty and
11   Christine Demaso for Ryan Harris.  Mr. Harris is here at
12   counsel table, your Honor.
13             THE COURT:  All right.
14         Since we recessed Friday, I have received the
15   government's revised exhibits, 3 and 22, the defendant's
16   supplemental motion in limine regarding Exhibit 3, the
17   statement that the defendant does not intend to testify,
18   and filed last evening, the defendant's objections to
19   the testimony by Special Agent Jason Ryan, and to
20   Exhibit 25.
21         Is there anything else I should have received and
22   read?
23             MR. McGINTY:  There is not, your Honor.
24             MR. BOOKBINDER:  No.
25             THE COURT:  All right.  The jurors are all
```

 1    here.  I want to finish Mr. Larosa and get through

 2    Mr. Hanshaw before, as I say, having further substantial

 3    -- that there needs to be substantial discussion

 4    concerning Special Agent Russell's testimony, which I

 5    think is substantially addressed in the motions in

 6    limine, and that implicates the chats from Mr. T and

 7    MooreR, is that correct?

 8             MR. BOOKBINDER:  Yes, your Honor.

 9             THE COURT:  And there may be some other

10    exhibits.

11        And then I thought the issues were the same with

12    regard to Mr. Ryan and I actually perhaps

13    misunderstood.  I had asked whether there were problems

14    with the summaries and maybe there were not problems

15    with regard to their accuracy, but there are other

16    issues.  But I'm inclined to take those up, as I said,

17    after we hear from Mr. Hanshaw.  We can either have the

18    jury wait or conceivably send them home for the day and

19    finish the testimony tomorrow, if we're going to be a

20    while on the evidentiary issues and aren't going to

21    finish today, in any event.

22        Well, Mr. McGinty, what's the -- I've read it, but

23    what's the essence of the problem from the defendant's

24    perspective with regard to Ryan?

25             MR. McGINTY:  Your Honor, the government had,

1     in an exhibit, which is Number 25 appended to the

2     motion, it listed a number of calculations, total

3     revenue, total customers, um, they list the total

4     payments to Phillips and total payments to Lindquist,

5     which are already in evidence and are not in dispute

6     here, and then they had a figure of total retained by

7     Harris for personal use.

8           The total revenue figure is not probative of any

9     issue in the case except whether Harris was running a

10    for-profit business.  The government already has, even

11    though we didn't view it as relevant, um, they already

12    have a stipulation to a PayPal record which lists as

13    revenues through PayPal alone the sum of about

14    $776,000.  And the reason we stipulated to that and it

15    didn't get in the way, so to speak, is something that we

16    thought the government didn't need to have as part of

17    its case, is that we're not going to be standing in the

18    way of a simple, in effect, gesture that, yes, this was

19    a for-profit business.  So we stipulated to that.

20          What the government wants to put in beyond that

21    is, um, a calculation of revenues based in part on

22    GoDaddy records which have not been the subject of a

23    stipulation.  They want to reach a figure relating to

24    Harris' personal profit from this.  Um, it's one thing

25    to say it's a for-profit business, but it's another

1    thing to calculate what his perceived benefit of that

2    would be.  Um, the government --

3              THE COURT:  Well, when I looked at this I

4    assumed that this starts with total revenue and the only

5    expenses are payments to Phillips and Lindquist and

6    whoever did the chart must have been taking out some

7    other unidentified expenses.

8              MR. MCGINTY:  I think that's right and that's

9    -- see, in terms of what the government wants, the

10   government wants it's for-profit, it's got that, it

11   wants to get in the number of customers.  Um, Harris, in

12   his book, has said that he has an excess of 15,000

13   customers.  So that's in as well.  So the revenues of

14   the business generally, the scope of the business

15   already in.  Um, this chalk has a way of --

16             THE COURT:  It's not a chalk.  They want it as

17   an exhibit.

18             MR. McGINTY:  Well, they want it as an

19   exhibit.  We had objected to it.  This summary does not

20   fairly address any issue that's in dispute here and

21   creates a misimpression --

22             THE COURT:  Well, but they -- they don't have

23   to -- I mean, even if you stipulated to some of these

24   things, under **Old Chief** and its progeny, they can offer

25   some evidence of it.  And I thought that personal profit

1  to Mr. Harris would be relevant on the conspiracy charge

2  that's showing he has a stake in the enterprise, the

3  *Falcone* concept, and in the scheme to defraud he's got a

4  motive to engage in the scheme, he wants to be rich,

5  and, um, is making money.

6       So I don't -- I -- at the moment, I want to hear

7  from the government and then we'll come back to it, but,

8  um, I don't think it's irrelevant and I don't think that

9  if the chart were otherwise admissible, Rule 403 would

10  operate to exclude it.  But there does seem to be a

11  missing number there or a business-expense-type thing.

12  But, here, let me hear from Ms. Sedky.

13       MS. SEDKY:  Thank you.  Um, we were planning

14  on eliciting testimony from Special Agent Ryan about the

15  types of business expenses that he extracted from the

16  total revenue number to get to the monies that were

17  retained by Mr. Harris.  Our position is that the PayPal

18  document is not a substitute for the $1.1 million

19  revenue figure, that PayPal pay period is over a 10-year

20  period, whereas Mr. Ryan's analysis is over a 5-year

21  period and it shows $1.1 million in revenue.

22       THE COURT:  What five years?

23       MS. SEDKY:  It's '05 to '09, which paints a

24  dramatically different picture about the scope of this

25  enterprise.  So that's the total revenue that the

1    GoDaddy -- I'm sorry, the PayPal number is not a

2    substitute, it does not accurately reflect how big this

3    enterprise was.

4              THE COURT:  And if the summary comes in --

5    well, the argument is that the GoDaddy records aren't

6    authenticated.  How do you respond to that?

7              MS. SEDKY:  The only number in the chart that

8    relies, in part, on the GoDaddy numbers is the 10,000

9    user figure.  We are happy to substitute that with a

10   15,000 user figure and use the defendant's own

11   admissions for that, if that's --

12             THE COURT:  Well, no, I pointed this out to

13   you before.  You can't summarize testimony in a charge

14   if you want it as an exhibit.  Remember when I told you

15   about **Muffleman** and the difference between the chalk

16   that can be shown to the jury and a summary that has to

17   summarize documents.  I didn't think I needed to refresh

18   myself on this, and I will before I rule on it today,

19   but if this is going to be a chart, then it has to

20   summarize a set of -- well, if it's going to be admitted

21   as an exhibit and not just be used to illustrate

22   testimony, it's going to be admitted under Rule 901, and

23   not just be an educational device, then there would have

24   to be voluminous records and this has to summarize

25   them.  If you're conflating testimony or something

1    that's in a book with something that's, you know, found

2    in the voluminous records, then I'm not going to admit

3    it.

4              MS. SEDKY:  Well, Mr. Ryan will testify that

5    he has seen on the website, there's a posting on the

6    TCNISO website, it's Exhibit 2, Page 13, and it's -- on

7    the website Mr. Harris says, "We have had over 15,000

8    orders as of May of 2008."

9              THE COURT:  That's fine.  It can go on a

10   chalk, perhaps.  It's not something that, on the First

11   Circuit precedent that I brought to your attention weeks

12   ago, um, is properly part of the summary.

13             MS. SEDKY:  In terms of the number of

14   customers, Mr. Ryan will also be able to testify that

15   the PayPal records, um, what happened was in basically

16   '07 to '09, that's the only time period where GoDaddy

17   came into the picture.  The PayPal records themselves

18   can also substantiate that there were thousands of

19   customers.  But we can leave out the 10,000, we can

20   redact it before the jury sees it, without a problem.

21             THE COURT:  So you say other than the number

22   of customers, all of this, is it from the GoDaddy

23   records?

24             MS. SEDKY:  Yeah, the agent will testify that

25   in the way he calculated this was the primary bank

1    account that the defendant used was Washington Mutual

2    and PayPal he used as what was de facto another bank

3    account, a checking account.  So the money in gets

4    calculated through a combination of the PayPal account,

5    of which you saw the $775,000 as an example, and

6    Washington Mutual.  There were essentially -- he'll

7    testify that there were two ways that people could buy

8    products, they could use credit cards or they could pay

9    through PayPal.  So if they paid through PayPal, the

10   PayPal records showed the revenues.  If they paid by

11   credit card, there were merchant account transfers into

12   the Washington Mutual account that were the credit card

13   purchases.  So he doesn't rely on GoDaddy to come up

14   with the $1.1 million.

15            THE COURT:  Well, when I -- I pointed out to

16   you weeks ago, well before trial, the distinction and

17   interaction between Rules of Evidence 1006 and 611, what

18   can go in as a summary and what can go in as a chalk --

19   it gets a letter, but doesn't go in the jury room.

20        Did you read the cases I brought to your

21   attention?

22            MS. SEDKY:  We did.  But I have to confess, I

23   don't have them off the top of my head, but there were

24   two of them.

25            THE COURT:  Well, when I rule on this I'm

1    going to analyze it in the context of that

2    jurisprudence, and probably *Milkowicz* --

3              MS. SEDKY:  Well, your Honor --

4              THE COURT:  Can I finish?  -- most

5    prominently, but at the moment I don't think these

6    figures are irrelevant, um, but I'm skeptical about

7    whether they'll go in as an exhibit as opposed to a way

8    of illustrating the testimony during the trial.  We'll

9    talk about it more further.

10             MS. SEDKY:  Your Honor, we'll offer them as a

11   chalk, just to simplify matters.

12             THE COURT:  Okay, that simplifies it.

13        And, Mr. McGinty?

14             MR. McGINTY:  Um, the stipulations here are

15   important.  We did not stipulate to the PayPal records.

16   We did not stipulate to the GoDaddy records.  The

17   stipulations are to a PayPal account summary for Harris,

18   which is reflected in the documents here, it's a single

19   page.  We did not stipulate to the authenticity of the

20   GoDaddy records.  Now, what the agent presumably does is

21   he culls from the GoDaddy records, the record purchases,

22   he presumably culls from the PayPal records the sum of

23   the activity.  Um, he has to go to the Washington Mutual

24   records, which, by the way, were not stipulated to.  The

25   Washington Mutual Bank account agreement is stipulated

1    to, the content of the records is not, for the precise

2    reason that we took the position that this was

3    irrelevant, and frankly we maintain that it's

4    irrelevant.  Um, whether Harris garners profit from this

5    or not, it was a for-profit endeavor, um, and if that's

6    the predicate that's relevant here, they have that

7    predicate.  But if what they're trying to do is build a

8    house where the foundation is necessarily a stipulation

9    or a witness, they have neither.

10            THE COURT:  Well, as I said, I had asked you

11   repeatedly whether there's any problem with the

12   summaries and I wasn't alerted to this one previously,

13   so we're going to finish Mr. Hanshaw and come back to

14   this.  But the question -- and this is helpful and it

15   comes into sharper focus, is does the government have to

16   show that this is a summary of admissible documents, and

17   if it's just for the purpose actually of Rule 611, then

18   they might not need these records.  But if the documents

19   are not admissible, they're not admitted, then it's hard

20   for the defendant to challenge them and particularly for

21   the jury to decide if the testimony is reliable.

22            (Pause.)

23            THE COURT:  And, again, this is something of a

24   preview of what we'll discuss further after Hanshaw, um,

25   but are the objections to Agent Ryan's --  I'm sorry,

1   Agent Russell's testimony -- well, they include the

2   Mr. T and MooreR chats, right, and that's part of what

3   you want to get in through Mr. Russell?

4             MR. BOOKBINDER:  Yes, your Honor.

5             THE COURT:  All right.

6        Have I heard any testimony regarding Mr. T or

7   MooreR yet?  I thought I was going to hear some

8   testimony, for example, that, Mr. T, you know, was a

9   friend of Mr. Harris's, but at the moment I don't recall

10  whether that was presented.

11            MR. BOOKBINDER:  I believe where we left last

12  on these motions in limine, well, I think what we had

13  told the Court was that after speaking to our witnesses

14  in preparation, we didn't expect that there was going to

15  be testimony that was going to be terribly helpful and

16  that what we're relying on was Mr. -- to the extent --

17  and I think it's, I guess, probably MooreR, and I'd have

18  to look, where we are trying to get in his statements,

19  and not just Mr. Harris's statements, but what we were

20  relying on to show that MooreR was a co-conspirator, for

21  example, was the things that Mr. Harris said to him in

22  those chats and that was what we were relying on and

23  that we were not going to get testimony at trial that

24  was helpful of this and that turned out to be the case.

25            THE COURT:  All right.  Well, I'll refresh

1    myself on that.  I did think that Mr. Harris's -- well,

2    and the other general principle is I can rely on

3    information that has not been presented to the jury, A,

4    and, B, it doesn't even have to be admissible, as long

5    as it's not privileged, in making admissibility

6    determinations.  So we'll come back to this, too.

7        Are there forum posts implicated with

8    Mr. Russell?

9          MR. BOOKBINDER:  There are.  There are

10    relatively few of them left and I'm guessing that we can

11    move -- and there will generally be -- the Court will

12    rule on them categorically, so I don't think it's going

13    to take a lot more time, we've gone through these in

14    depth, but we will need to look at them again, I think.

15          THE COURT:  All right.  We'll do that after

16    Hanshaw.

17        And I actually, as I was working on this over the

18    weekend, I don't have the whole book that Mr. Harris

19    wrote, I just have the excerpts.  And one of the things

20    that I'm going to have to focus on is what evidence

21    there is that is necessary to get -- to trading MACs, to

22    get them from outside somebody's own neighborhood.  Is

23    there anything in the book about that?

24          MR. BOOKBINDER:  No, your Honor.  The book

25    focuses on uncapping, not on MAC trading and outright

1    theft of service.

2         To the extent the Court would like it, we'll leave

3    the original book here, which we'll use as the original

4    exhibit, and we can certainly pass that up.

5              THE COURT:  Well, for present purposes I think

6    that's sufficient.

7              (Pause.)

8              THE COURT:  All right.  Well, I continue to be

9    skeptical about the admissibility of posts, but we can

10   discuss that later.  I'm still inclined to conditionally

11   admit the chats.

12        All right.  When we left off -- oh, excuse me.

13   When we left off on Friday, um, we were dealing with an

14   issue of two driver's licenses with Mr. Larosa's

15   picture, right?

16              MR. McGINTY:  That's exactly right, your

17   Honor.

18              THE COURT:  What's the relevance of the

19   licenses?

20              MR. McGINTY:  The relevance is his identity.

21   Um, one of them is an application for a Mass. ID that --

22              THE COURT:  Here, do you have copies for me?

23              MR. McGINTY:  I do.  I have the exhibits

24   here.

25              (Passes up.)

```
 1              MR. McGINTY:  These are B and F.  These are

 2      the originals.  They're marked for identification.

 3              THE COURT:  All right.

 4          One is "Jose L. Larosa," the other has the name

 5      "Jose Dellarosa," and they have slightly different

 6      Social Security numbers, correct?

 7              MR. McGINTY:  That's precisely right.

 8              THE COURT:  All right.  So what's the

 9      relevance?

10              MR. McGINTY:  The relevance is to his

11      identity.

12              THE COURT:  Well -- are you seeking to admit

13      the two documents?

14              MR. McGINTY:  I am.

15              THE COURT:  And what rule authorizes that?

16              MR. McGINTY:  These are, um -- under 803, your

17      Honor, these are records that are public records.  These

18      are records of matters observed personally by the duties

19      imposed by law, 8038.

20              THE COURT:  I'm not sure.  I'm skeptical about

21      whether that's right.  But you may have another basis

22      for getting them in, um, subject to Rule 403.

23          But what's the government's say?

24              MS. SEDKY:  Your Honor, we object to this

25      whole line of questioning and certainly the
```

1    admissibility of extrinsic evidence.

2         Mr. Dellarosa, or Mr. Larosa, has been using a

3    slightly more, I think, perhaps Hispanic or ethnic

4    version of the same name.  It is not an alias.  It is

5    not uncommon for someone, who has moved here from

6    another country, to slightly change their name from

7    "Dellarosa" to "Larosa."  And to the extent that there

8    is a difference in the Social Security numbers, it

9    appears to be one number which has been transposed,

10   perhaps accidentally.  So we think this is not probative

11   of Mr. Larosa's veracity or truthfulness.

12        And in terms of getting in those two documents per

13   under 8033, these are not certified, we have not

14   stipulated to the authenticity of the documents, there

15   has been no foundation laid that they were obtained by a

16   government agency, and, um, we object to the use of the

17   questions and the documents themselves.

18             THE COURT:  Well, let's talk this through just

19   a bit.  One, when you say you want to know who he is,

20   and I think Ms. Sedky is right that these are

21   essentially two versions of the same name, um, do you

22   want these in to challenge his credibility?  What's the

23   relevance?  You want to know who he is.  Why do you want

24   to know who he is?

25             MR. MCGINTY:  Well, I think that when a person

1    raises their right hand and affirms who they are in his

2    testimony, um, and if there's an issue of his identity,

3    your Honor, then we would move to strike his testimony.

4         THE COURT:  Well, I doubt I would do that.

5    Um, here's, I think, the proper analytical framework,

6    although I will say I didn't focus on 8033 -- um, but

7    under 8038, the set of requirements.  Um, one, if this

8    was only to challenge Larosa's credibility under Rule

9    608(b), then no extrinsic evidence would be permissible,

10   both licenses, E and F, would not go into evidence.

11   However, if it's for some other purpose, extrinsic

12   evidence is permitted subject to Rule 403.  There's

13   actually a Supreme Court case and a First Circuit case

14   that are helpful on this.  The Supreme Court case is

15   *Abel*, 469 U.S. 45, the First Circuit case is

16   *Winchenback,* 197 F.3d 548 at 557 to 558, which relates

17   to prior inconsistent statements.  And *Winchenback,* as

18   well as *Abel*, teach that if a -- if there's evidence of

19   a prior statement, um -- you know, evidence of a prior

20   inconsistent statement that is inconsistent with what

21   was said in court, um, is admissible under Rule 613(b).

22   If there's -- so, you know, arguably if he gave one name

23   "Larosa" and this says "Dellarosa," then arguably

24   they're inconsistent because he said his name was

25   "Larosa."

1       He hasn't testified about a Social Security number

2  and it's not inconsistent with that.  I mean, there's no

3  testimony for the Social Security number to be

4  inconsistent with.  It's also not clear whether he gave

5  an incorrect Social Security number or somebody made a

6  mistake.  And I have to do the Rule 403 balancing.  So

7  far I thought that Mr. Larosa actually was pretty good

8  for the defendant because he didn't go trade MAC

9  addresses, he drove from Dorchester to Roxbury to get

10 his, which is evidence of a lack of interdependence.

11      So there's not a material -- as I read this, it's

12 not like he's saying "Smith" and "Jones," as I

13 understand it, for Spanish names, you know, these are

14 essentially different versions of the same name.

15      MR. McGINTY:  Well, rather than duly

16 complicate things, my only cross, again, is on this

17 issue and I would, um, under the circumstances, withdraw

18 that cross and conclude my cross-examination.

19      THE COURT:  All right.  Just continue -- well,

20 when you say "withdraw," you mean you're not any longer

21 seeking the admission of these documents?

22      MR. McGINTY:  Correct.  And since that's the

23 only subject that I could raise on cross, if I withdraw

24 that line of questioning, um --

25      THE COURT:  What do you mean by withdraw the

```
1    line of questioning, do you want me to instruct the jury
2    to disregard the testimony about the licenses?
3              MR. McGINTY:  No, so far there has been no
4    testimony about the licenses.  What he has done is he
5    has looked at a photograph and said, "That's me," and
6    he's looked at documents and said, "That's me," so
7    there's no content -- I mean, my only cross so far has
8    introduced no content to the jury whatsoever.
9              THE COURT:  All right.  I just wanted to
10   understand.
11        Okay.  Do you have any further questions for the
12   witness?
13             MR. McGINTY:  I don't, your Honor.
14             THE COURT:  All right.  Is there going to be
15   any redirect?
16             MS. SEDKY:  May I have a moment, your Honor?
17             THE COURT:  Sure.
18             (Pause.)
19             MS. SEDKY:  I think we have nothing further.
20   And if the Court would allow us, we'll just excuse
21   Mr. Larosa.
22             THE COURT:  No, I think I'll excuse him.
23             (Laughter.)
24             MS. SEDKY:  Oh, okay, that's fine.
25             THE COURT:  How long do you expect Mr. Hanshaw
```

1    to be?

2              MR. BOOKBINDER:  Um, no more than 45 minutes,

3    your Honor.

4              THE COURT:  All right.  Let's bring in

5    Mr. Larosa and have Mr. Hanshaw right on deck.

6              (Pause.)

7              THE COURT:  Oh, actually, that's a good

8    point.  Here, I'll tell Mr. Larosa he's excused.  Okay.

9              (Mr. Larosa enters.)

10             THE COURT:  All right.  Mr. Larosa, your

11   testimony is complete.  You can go home.  All right?

12   Thank you very much.

13             THE WITNESS:  Okay.  Thank you.

14             (Witness steps down.)

15             THE COURT:  Okay.  Let's bring Mr. Hanshaw

16   into the box.

17             (Witness takes stand.)

18             THE COURT:  Am I correct that there are no

19   foreseeable issues regarding Mr. Hanshaw's testimony?

20             MR. McGINTY:  I think that's correct, your

21   Honor.

22             THE COURT:  Okay.

23             MR. McGINTY:  Um, the only thing I would say,

24   your Honor, is I would anticipate there would be

25   objections with respect to the forum issue.

```
 1              THE COURT:  To the what?
 2              MR. McGINTY:  To the forum issue and the
 3   questions in the nature of inquiries about forum.  So I
 4   just want the Court to be aware of it.
 5              THE COURT:  What do you mean by "the forum"?
 6              MR. McGINTY:  Um, the posts, there's an issue
 7   about -- the government plans to elicit testimony
 8   relating to forum posts.  There may be issues that arise
 9   in that context.  We want to alert the Court that that
10   may be a primary area of contest.
11              MR. BOOKBINDER:  In light of where the Court
12   remembers our discussion on this issue last week, that
13   unless the Court has had a change of heart, my
14   understanding was that we're not to elicit any
15   substantive statements.
16              THE COURT:  I haven't really focused on --
17   well, my thinking hasn't changed because you've given me
18   many other things to think about and this is not the
19   only thing I've been doing.
20              MR. BOOKBINDER:  That's fine, your Honor.  So
21   we won't elicit any statements about posts.
22              THE COURT:  Fine.  We'll get the jury.
23              (Jury enters, 10:45 a.m.)
24              THE COURT:  Ladies and gentlemen, good
25   morning.  Welcome back.  Um, some issues arose over the
```

```
 1    weekend, as often happens when people have time to think

 2    about things, and I've been dealing with that.  It turns

 3    out that the parties have no further questions for

 4    Mr. Larosa.  So he's been excused.  And now you're going

 5    to be hearing the next witness.

 6         My goal, I think, will be to finish the testimony

 7    of this witness before we take a break and we'll see

 8    where we are.  I have some more issues I have to discuss

 9    with the lawyers.  It's possible I'll send you home

10    early today, but we'll see.  Okay?

11         The witness should stand and be sworn.

12              (NATHAN HANSHAW, sworn.)

13

14              * * * * * * * * * * * * * *

15              NATHAN HANSHAW

16              * * * * * * * * * * * * * *

17

18    DIRECT EXAMINATION BY MR. BOOKBINDER:

19    Q.  Would you state your name and spell your last name

20    for the record, please.

21    A.  Nathan Hanshaw, H-A-N-S-H-A-W.

22    Q.  How old are you, Mr. Hanshaw?

23    A.  20 years old.

24              THE COURT:  Mr. Hanshaw, pull that microphone

25    a little closer to you, please, and speak into it loudly
```

1    and clearly, because your audience is in the back row of
2    the jury.  Okay?
3                  THE WITNESS:  Yes.
4    Q.  Mr. Hanshaw, where did you grow up?
5    A.  In Athol, Massachusetts.
6    Q.  Athol?
7    A.  Yes.
8    Q.  Where is that?
9    A.  Um, west of Worcester.
10   Q.  At some point did you move out of Athol?
11   A.  Yes, I did.
12   Q.  Where did you move to?
13   A.  Worcester.
14   Q.  When was that?
15   A.  Approximately 2004, 2005.
16   Q.  When you moved to Worcester, what kind of place did
17   you live in?
18   A.  An apartment complex.
19   Q.  Who did you live there with?
20   A.  My mother, my father, and my brother.
21   Q.  When you moved to Worcester and lived in that
22   apartment with your family, did you initially have
23   internet access?
24   A.  Yes.
25   Q.  What kind of internet access did you have?

1    A.   Dial-up.

2    Q.   At that point, in 2004, 2005, was the internet

3    something you used a lot?

4    A.   Yeah, it was.

5    Q.   At some point did you go to the website

6    "tcniso.net"?

7    A.   Yes, I did.

8    Q.   What caused you to go to that website?

9    A.   Um, a search engine, um, Google.  I was looking for

10   ways to get free high-speed internet.

11   Q.   Why were you looking for free internet?

12            MR. McGINTY:   Objection.

13            THE COURT:   Overruled.

14   A.   Because my internet was to be cut off.

15   Q.   When you say it was to be cut off, why were you

16   going to lose internet access?

17   A.   Um, my father was going to quit paying for it.

18   Q.   So you went to Google and what did you look for in

19   Google?

20   A.   Um, ways to get free internet.

21   Q.   Okay.  And that led you to the TCNISO website?

22   A.   Yes, it did.

23   Q.   Approximately when was this?

24   A.   I believe 2004, early 2005.

25   Q.   Did you get any software products from that website?

1    A.   Yes, I did.

2    Q.   What was the first product that you got?

3    A.   The firmware Sigma 1.3.

4    Q.   Did you buy that?

5    A.   No, I did not.

6    Q.   How did you get it then from the website?

7    A.   It was freeware available with a download.

8    Q.   And did you do that, did you download it from that

9    website?

10   A.   Yes, I did.

11   Q.   Did you later get other software products from that

12   website?

13   A.   Yes, I did.

14   Q.   Which other ones?

15   A.   A software called "One Step Zup," um --

16   Q.   Let me stop you right there.  I'm sorry.  What was

17   that name again?

18   A.   "One Step Zup."

19   Q.   "One Step Zup"?

20   A.   Yes.

21   Q.   How do you spell "Zup"?

22   A.   Z-U-P.

23   Q.   Okay.  All right.  Go on.

24   A.   Um, also Sigma X.

25              THE COURT:  Excuse me.  Just one moment.

1          (Pause.)

2          THE COURT:  I'm sorry.  Why don't you go

3     ahead.

4          Actually, why don't you ask that question one

5     more time.

6          MR. BOOKBINDER:  Sure.

7     Q.  So I think you mentioned that you'd gotten Sigma

8     1.3, something called One Step Zup, and Sigma X?

9     A.  Yes.

10    Q.  Were there other pieces of software that you got

11    from that website?

12    A.  Yes, um, "CoaxThief," "DefileThief," "SourceCat,"

13    which is called "BlackCat."

14    Q.  Okay.  Let me stop you there again.  What was the

15    first name you said before "BlackCat"?

16    A.  "SourceCat," that was just the, um, I guess official

17    name of the software.

18    Q.  "SourceCat"?

19    A.  "SourceCat," but it's part of BlackCat.

20    Q.  All right.  Let's take these in pieces.

21         That BlackCat software, how did you get that?

22    A.  Um, the TCNISO website.

23    Q.  How is it -- was that available free?

24    A.  Um, there was a freeware version, but you had to

25    register, um, a BlackCat key to be able to download it.

1    Q.  Did you have a BlackCat key?

2    A.  I did.

3    Q.  And how did you get that?

4    A.  Um, Christopher Watts, an employee of TCNISO, he had

5    sent me a list of keys and names.

6    Q.  When you say "TCNISO," is that the name you use for

7    "TCNISO," that's how you pronounce it?

8    A.  Yeah, that's how I pronounce it.

9    Q.  Right.  So you say --

10                THE COURT:  What's a key?

11                THE WITNESS:  It allows you to download

12   further specific things.  It allowed me to download a

13   copy of Sigma X and BlackCat software from the TCN

14   website.

15   Q.  Is it some kind of a code that you have to punch in?

16   A.  It's a code that I had to punch in.

17   Q.  And Christopher Watts gave that to you?

18   A.  Yes, that's correct.

19   Q.  And did you get, um, software or software keys from

20   any other -- from anybody else at TCNISO other than

21   Christopher Watts?

22   A.  Yes, Isabella Lindquist.

23   Q.  What did she give you?

24   A.  Um, copies of the source code of Sigma 1.3, all the

25   way up to 1.7, among other things.

1    Q.  Now -- well, I'll ask you about it.  Actually, why

2    don't you, while we're talking about this, can you

3    explain the circumstances of how you got those things

4    from Isabella Lindquist?

5    A.  I was talking to both developers of TCN for a

6    certain period of time and over time I received software

7    from them that otherwise I wouldn't have access to.

8    Q.  Did you pay Isabella Lindquist for source code?

9    A.  I don't recall.  It's been a quite a while.

10   Q.  Now, um, this software that you downloaded from the

11   website, did you use it?

12   A.  Yes.

13   Q.  How did you know what to do with it?

14   A.  Um, there's various instructions on the TCNISO

15   website.

16   Q.  When you say "instructions," what form did those

17   instructions take?

18   A.  Sometimes -- well, some stuff had video

19   instructions, a video tutorial that showed you exactly

20   how to -- for instance, to install, I believe it was,

21   BlackCat or a serial cable, um, and then other times on

22   the forums you get specific instructions on how to do it

23   with help from other members and, um, some of the

24   software came packaged with a text file explaining how

25   to use it.

1    Q.  All right.  Did -- to use that TCNISO software, did

2    you have to do anything with the MAC address on your

3    modem?

4    A.  Um, you didn't have to do anything to the MAC

5    address, but I used it to alter my MAC address.

6    Q.  And did you have to get a new MAC address to change

7    yours, too?

8    A.  Um, yeah, I did.

9    Q.  How did you get new MAC addresses?

10   A.  Um, I either trade them on the TCN forums or the TCN

11   chat room and/or I would scan via SMP other nodes.

12   Q.  So let's write these down.  I think you identified

13   three different things, right?  The first thing you said

14   is using the TCNISO forums.  Is that something you did,

15   did you trade MAC addresses that way?

16   A.  Yes, I did.

17   Q.  All right.  Then you mentioned a chat room.  What

18   chat room was that?

19   A.  Um, Pound Surfboard.

20   Q.  And how did you find that particular chat room?

21   A.  Um, I was linked to it off of TCN's website.

22   Q.  Did you go to the chat room?

23   A.  I did.

24   Q.  And was that a place that you traded MAC addresses?

25   A.  Yes, it was.

1   Q.  I think the third thing you mentioned was sniffing

2   for MAC addresses, correct?

3   A.  Um, scanning.

4   Q.  Scanning.  Okay.  And what software did you use to

5   do that?

6   A.  Um, I don't recall what it was, but it had allowed

7   me to -- basically once I had the reiteration to my

8   internet provider, it's kind of like a password-like

9   visa, it allowed me to scan the network, kind of like an

10  administrator, to which I would have access to MAC

11  addresses and the associated information with them.

12  Q.  Um, when you traded for MAC addresses on the TCNISO

13  forums, mechanically how did that work?

14  A.  Um, usually --

15          MR. MCGINTY:  Objection.

16          THE COURT:  Overruled.

17  Q.  I'm not asking you about anything in particular you

18  read or wrote, just mechanically how did it go?

19  A.  Well, basically you find someone else with the same

20  internet provider, tell them, "Hey, I have this.  You're

21  on the same provider.  Do you want to trade?"

22  Q.  And then what would happen?

23  A.  We would trade MAC addresses.

24  Q.  Would you be doing that through open posts that

25  everyone on the forums could see?

```
1   A.  Um --
2             MR. McGINTY:  Objection.
3             THE COURT:  Excuse me.  Here, let me explain
4   it to you.  If there's an objection, then you should not
5   answer the question.
6             THE WITNESS:  Okay.
7             THE COURT:  Until I rule on it.  If I say
8   "overruled," that means you may answer.  If I say
9   "sustained," that means you may not answer.
10            THE WITNESS:  Okay.
11            THE COURT:  Okay?
12        Why don't you put the question again.
13  Q.  Um, the --
14            THE COURT:  You're asking him essentially to
15  describe what a forum is.
16  Q.  Well, actually what I'm asking is did you exchange
17  this discussion, was this -- did this take place during
18  public hosts on forums that were available to other
19  members or was there some more private way in which you
20  were communicating?
21  A.  Usually a more private way I was communicating.
22  Q.  So there would initially be a public post and then
23  it would change, is that how it worked?
24  A.  Yes.
25  Q.  Okay.  How did the private message work?
```

1    A.   Um, basically I would send a person a message or

2    they would send me a message asking if our MAC addresses

3    were for, at that time, Charter Communications, and of

4    course I would.

5    Q.   Let me stop you there.  When you said they would

6    send you a message, what was that called?

7    A.   A "private message."

8    Q.   A "private message."  Was that a function available

9    through the TCNISO website?

10   A.   Yes, it was.

11   Q.   Go on.

12   A.   And they would see the MAC address list and use it

13   to get on line.

14   Q.   Why was it necessary for you to trade MAC addresses

15   with somebody else?

16   A.   Because if I had a MAC address on my node and I

17   tried to use it, I would be kicked off.

18   Q.   So once you got these MAC addresses from other

19   areas, what did you do with them?

20   A.   I put them on my modem.

21   Q.   Were you able then to get free internet access?

22   A.   Yes, I was.

23   Q.   From what company?

24   A.   Charter Communications.

25   Q.   What period of time did you have this free access?

1    A.   From 2004, early '05 to May 1st, 2008.

2    Q.   During that time period, um, you owned a TCNISO-

3    modified modem?

4    A.   Yes, I did.

5    Q.   Are you familiar with what's called "uncapping"?

6    A.   Yes, I am.

7    Q.   What do you understand that to mean?

8    A.   To remove the speed limitation imposed by your

9    internet service provider.

10   Q.   Did you uncap your modems as well?

11   A.   Yes, I did.

12   Q.   What version of software did you first use for

13   uncapping?

14   A.   I believe it was Sigma 1.3.

15   Q.   How much did the uncapping increase your modem

16   speed?

17   A.   Approximately tenfold.

18   Q.   So do you remember what the basic speed of the modem

19   was before it was uncapped?

20   A.   Yeah, about 3 megabits a second.

21   Q.   3 megabits per second?

22   A.   Yeah.

23   Q.   And what was it after it was uncapped?

24   A.   30.

25   Q.   And for how long did you have that kind of speed?

1    A.   Almost the whole time.

2    Q.   Why did you want an uncapped modem, faster speed?

3    A.   Um, it allowed me to download files faster, video

4    files, upload faster.  Um, otherwise something that

5    would take four days might take me a couple of hours

6    instead.

7    Q.   You mentioned earlier the Pound Surfboard chat

8    room.  Did you -- what name did you use when you were in

9    that chat room?

10   A.   Um, I used different names, "DShocker," among other

11   names.  They were just random.

12   Q.   When you were in that chat room, do you remember

13   whether any TCNISO employees were in there at the same

14   time?

15   A.   Yes.

16   Q.   Who?

17   A.   Um, DerEngel, um, Isabella, Chris Watts, and

18   somebody who used the nickname YourMomma.

19             THE COURT:  What is it?

20             THE WITNESS:  YourMomma.

21   Q.   Did you have any kind of a special status in that

22   chat room?

23   A.   For a period of time I had voice status.

24   Q.   Voice status?

25   A.   Yes.

1    Q.   What does that mean?

2    A.   Basically that -- from my understanding I was

3    helping people out, I got voice status, and if the

4    channel became what's called "moderated," then I could

5    still talk and regular users couldn't.

6    Q.   Who gave you that status?

7    A.   Um, Chris Watts.

8                THE COURT:  Could I clarify something.  When

9    you say "talk," you mean --

10               THE WITNESS:  Chat.

11               THE COURT:  Chat.  So you could chat when

12   other people were not permitted to?

13               THE WITNESS:  Right.

14   Q.   And obviously when you say "talk" or "chat" you're

15   typing?

16   A.   I'm typing, right.

17   Q.   Okay.  Other than the Pound Surfboard group chat

18   room, did you have other means of communication with

19   people involved in TCNISO?

20   A.   Yes.

21   Q.   And what were those communications?

22   A.   Um, Windows Messenger, MSN Messenger.

23   Q.   MSN Messenger.  So those were instant message chats

24   essentially?

25   A.   Yes.

1    Q.   All right.  Who did you chat with?

2    A.   Um, Craig Phillips, Isabella Lindquist, um, at one

3    point Brian Harris.  Um, pretty much everybody who was

4    involved in Surfboard.

5    Q.   Chris Watts, also?

6    A.   Yes.

7    Q.   Okay.  Let me ask you about each of them.

8         How often did you chat with Craig Phillips?

9    A.   Um, quite a bit.

10   Q.   What name did he use when you chatted with him?

11   A.   "YourMomma."

12   Q.   So when you say someone who used that name, you know

13   who that person was?

14   A.   Right.

15   Q.   Okay.  When you say you chatted with him quite a

16   bit, what do you mean by that, every day, every week,

17   every month?

18   A.   Usually it was every day for quite a while.

19   Q.   And did Craig Phillips give you access to anything

20   on the TCNISO website?

21   A.   Um, member's area access.

22   Q.   What did he give you that allowed you to use the

23   member's area?

24   A.   Um, a membership, um, he -- he added a user name to

25   the membership database that allowed me access without

1    eventually having to pay for access.

2    Q.  All right.  And you mentioned Isabella Lindquist.

3    How frequently would you say you chatted with her, how

4    many times?

5    A.  Um, quite a few times.  Um, I mean, enough to know

6    where she lived in Kentucky, um, and I talked to her

7    enough to know that she wasn't happy with her pay grade

8    and all of that.  So quite a bit.

9    Q.  And how about Chris Watts, how much did you chat

10   with him?

11   A.  Um, quite a few times.  He was the one who

12   originally helped me get my modem on line.

13   Q.  And, Ryan Harris, you said you chatted with him as

14   well.  What name did he use when you chatted with him?

15   A.  "DerEngel."

16   Q.  And how many times did you chat with him?

17   A.  Only one or twice.

18   Q.  Um, and in those chats do you remember what name you

19   used?

20   A.  No.

21   Q.  At some point, um, did you ever ask to be a

22   moderator of the TCNISO forums?

23   A.  Yes.

24   Q.  Who did you ask?

25   A.  Craig Phillips.

1    Q.   What did he say?

2    A.   Um, to ask Harris.

3    Q.   Did you do that?

4    A.   I did.

5    Q.   And what did Harris say?

6    A.   Um, I don't recall.  I remember, at one point, I

7    believe he did tell me "No."

8    Q.   Did he ever allow you to be a moderator?

9    A.   No.

10   Q.   All right.  Do you remember any other specific chats

11   you had with Ryan Harris?

12   A.   Yeah, I had a chat with him under a random nickname

13   about bit files.

14   Q.   Bit files?

15   A.   Yes.

16   Q.   And, um, what if anything do you remember him saying

17   or asking him?

18   A.   Just basically that if I could tell him how to

19   change the firmware in modems without the need of

20   software and he'll give me a reward.

21   Q.   Did that ever end up happening?

22   A.   No.

23   Q.   Did your relationship, your on-line relationship

24   with Ryan Harris, change over time?

25   A.   Yeah.

```
1    Q.   Would you describe that?
2    A.   First I was all right with him, I didn't really care
3    or whatever, and over time, um, his attitude on line
4    changed, like he was acting cocky, so I did the same
5    thing.
6              THE COURT:   He was what?
7    A.   Kind of like a cocky attitude, so I kind of did the
8    same thing towards him.
9    Q.   So he had a cocky attitude and so you took on a
10   cocky attitude as well?
11   A.   Yes.
12   Q.   Did your relationship deteriorate at that point?
13   A.   Yeah.
14   Q.   Um, are you familiar with the forums, the TCNISO
15   forums?
16   A.   Yes, I am.
17   Q.   Did you make posts on those forums?
18   A.   Yes, I did.
19   Q.   Under what names, if you remember?
20   A.   Um, there were multiple, "DShocker," "Modem," and I
21   know there are others, but it's been awhile, so I don't
22   remember.
23   Q.   The posts you made on forums, um, how long do they
24   stay up there?
25   A.   Um, usually they weren't taken down.
```

1   Q.   They were not taken down?

2   A.   Not usually.

3   Q.   Meaning they lasted for how long, approximately?

4   A.   Um, till whoever decided to go to the forums and

5   delete them.  Um, I've had my posts up there for six

6   months or so and, as far as I know, they wouldn't get

7   deleted.

8   Q.   At some point, um, did you get banned from the

9   forums?

10  A.   I did.

11  Q.   Did you end up getting back on later?

12  A.   I did.

13  Q.   How is it that you were able to get back on the

14  forums?

15  A.   Just, um, I registered under a new user name.

16  Q.   All right.

17             MR. BOOKBINDER:  Your Honor, I'd like to show

18  Mr. Hanshaw a document that's not yet in evidence, on

19  the screen, marked for identification, and at this point

20  as Exhibit 11.  But I think the jury monitors may still

21  be on.  I don't know.

22             THE COURT:  I just turned them on.

23             MR. BOOKBINDER:  Okay.  They're off.  Thank

24  you.

25             (Pause.)

1    Q.  Now, um, Mr. Hanshaw, do you recognize that

2    document?

3    A.  I do.

4    Q.  What is it?

5    A.  It seems to be an MSN Messenger conversation between

6    myself and a gentleman named Brad Dennis.

7    Q.  So by a "conversation," are you talking about that

8    it's a chat log?

9    A.  A chat log, yeah.

10   Q.  Now, there's two, um -- okay.  So you were one of

11   the speakers here and you say the other person is Brad

12   Dennis?

13   A.  Yes.

14          MR. BOOKBINDER:  All right.  The government

15   offers Exhibit 11.

16          THE COURT:  As I understand it, there's no

17   objection, so it is admitted.

18          MR. BOOKBINDER:  Thank you.

19          (Exhibit 11, marked.)

20   Q.  Now, what's the date on this log?

21   A.  Um, Monday, January 15th, 2007.

22   Q.  And it looks like one of the speakers is -- what's

23   written on there is "Source."  Who is that?

24   A.  Brad Dennis.

25   Q.  When you were chatting with him, did you use the

1    name "source" or is that something that's been written
2    over later?
3    A.  It's been written over later.
4    Q.  The other speaker is kind of a -- it's five wavy
5    lines.  Who's that?
6    A.  That would be me.
7    Q.  You used that as a nickname at this point?
8    A.  I don't believe so.
9    Q.  Okay.  So, again, that's been changed as well?
10   A.  Yes.
11   Q.  So you recognize this as a conversation you had?
12   A.  Yes, I do.
13   Q.  Now, I'm not going to ask you about any of the
14   details of this conversation, but at the time you were
15   speaking with Brad Dennis, do you know where he was,
16   where he was living?
17   A.  In Washington.
18   Q.  Is that Washington, D.C. or the State of Washington?
19   A.  The State of Washington.
20   Q.  How do you know that?
21   A.  I had obtained his information from customer service
22   records and I sent SWAT to his address.
23   Q.  All right.  Well, I'm going to ask you more about
24   that in a minute.  But you said from customer service
25   records, customer service records from where?

1    A.   An internet provider.

2    Q.   You essentially hacked into an internet provider and

3    got that customer record showing his address?

4    A.   Yes, I believe that's how I would have obtained it.

5    This is how I obtained everyone else's information at

6    that point.

7    Q.   All right.  And you said that later on, um, you sent

8    police to his house?

9    A.   That's correct.

10   Q.   I'll ask you more about that in a minute.

11         But, um, at this time, and this is January of

12   2007, were you using a Sigma-modified modem for internet

13   access?

14   A.   Yes.

15   Q.   And you were living where?

16   A.   Um, Worcester, Massachusetts.

17              MR. BOOKBINDER:  Your Honor, I'd like to now

18   show, um, Mr. Hanshaw another document not yet in

19   evidence.

20              THE COURT:  Actually what number is this?

21              MR. BOOKBINDER:  It's marked for

22   identification as Exhibit 12.

23              THE COURT:  All right.  And I think there's no

24   objection to that one either.

25              MR. BOOKBINDER:  Oh, all right, that's --

1    THE COURT:  Is that correct, Mr. McGinty?

2    MR. McGINTY:  That's correct.

3    MR. BOOKBINDER:  All right.  Then the

4  government offers Exhibit 12.

5    THE COURT:  Exhibit 12 is admitted.

6    (Exhibit 12, marked.)

7  Q.  What's Exhibit 12?

8  A.  Exhibit 12 is a conversation between myself and Brad

9  Dennis.

10  Q.  Again, when you say a "conversation," you mean a

11  chat log?

12  A.  A chat log.

13  Q.  Here what name is Brad Dennis using?

14  A.  "Brdennis@gmail.com."

15  Q.  What name are you using?

16  A.  "Ddos@serialS."

17  Q.  You say "ddos," that's D-D-O-S?

18  A.  Yes.

19  Q.  Is that some kind of internet attack, basically?

20  A.  Yes.

21  Q.  If I scroll down to the bottom of the page, what's

22  the date on this one?

23  A.  December 6th, 2007.

24  Q.  Where was, um, Brad Dennis living at that time, if

25  you know?

1   A.   Washington state.

2   Q.   And where were you?

3   A.   Worcester, Massachusetts.

4   Q.   Is it fair to say that one thing you used your

5   internet access for was to commit crime?

6   A.   That's correct.

7   Q.   In fact, you pled guilty in 2008 in federal court to

8   a series of computer crimes, is that correct?

9   A.   That's right.

10  Q.   Were some of those hacking crimes?

11  A.   Yes, they were.

12  Q.   You mentioned earlier, um, sending police to

13  someone's house.  What's that called?

14  A.   "Swatting."

15  Q.   "Swatting," S-W-A-T-T-I-N-G?

16  A.   Yes.

17  Q.   Can you explain what "swatting" is?

18  A.   Um, attempt to trick emergency services to raid an

19  enemy's house.

20  Q.   So when you say "raid," you're trying to get the

21  SWAT team basically to show up at someone's house that

22  you don't like?

23  A.   Right.

24  Q.   Did you succeed in getting that to happen?

25  A.   I did.

1    Q.  Is it fair to say that's a pretty dangerous thing to

2    do?

3    A.  Yes.

4    Q.  Um, are you familiar with something called

5    "carding," C-A-R-D-I-N-G?

6    A.  Yes.

7    Q.  Is that something you did also?

8    A.  It is.

9    Q.  What's that?

10   A.  Um, you sell credit cards to order goods and

11   merchandise on line.

12   Q.  I'd now like to show you what's marked as Exhibit

13   27.  I don't think there's an objection to this one

14   either.

15              THE COURT:  Okay.  27 is admitted.

16              (Exhibit 27, marked.)

17   Q.  Now, on the screen is the first page of a multipage

18   document.  What is this?

19   A.  It's my plea agreement.

20   Q.  What's the date on that?

21   A.  Um, september 15th, 2008.

22   Q.  And, um, in this agreement, um -- actually, yeah,

23   why don't you describe what you, um, agreed to do in

24   this plea agreement.

25   A.  I agreed to be truthful with the government about

1    any and all of my crimes.  I agreed to testify at any

2    grand jury, hearing, or trial.  Um --

3    Q.  Did you also agree to plead guilty?

4    A.  Yes, I agreed to plead guilty.

5    Q.  And does this plea agreement contain an agreement on

6    what sentence you would receive if you pled guilty?

7    A.  Yes.

8    Q.  When you committed the crimes that are subject to

9    this plea agreement, how old were you?

10   A.  Um, 16.

11   Q.  So you were a juvenile?

12   A.  I was.

13   Q.  What was the sentence that you and the government

14   agreed on?

15   A.  11 months of incarceration.

16   Q.  Did you actually receive that sentence?

17   A.  I did.

18   Q.  Have you served your time already?

19   A.  Yes, I have.

20   Q.  At this point what if anything are you expecting

21   from the government in return for your cooperation?

22   A.  Nothing.

23   Q.  Are you in custody now?

24   A.  Yes.

25   Q.  Why?

1    A.   Um, a probationary violation.

2    Q.   So you served your sentence and you were out on

3    probation --

4    A.   Yes.

5    Q.   -- and you committed other crimes or violated your

6    terms of probation?

7    A.   Yes.

8    Q.   And now you're back in jail?

9    A.   That's right.

10            MR. BOOKBINDER:  Your Honor, if I could just

11   have a moment?

12            THE COURT:  Yes.

13            (Pause.)

14            MR. BOOKBINDER:  No further questions.

15

16   CROSS-EXAMINATION BY McGINTY:

17   Q.   Mr. Hanshaw, good morning.

18   A.   Good morning.

19   Q.   You have spoken a few times with the government in

20   preparation for your testimony today, have you not?

21   A.   Yes, I have.

22   Q.   Tell us how many times you've spoken with the

23   government?

24   A.   Um, in total I believe it was three times.

25   Q.   Three times.

1         Do you remember talking to the government shortly
2    after you were arrested?
3    A.   Yes.
4    Q.   And that would have been May 1st of 2008.  Do you
5    remember that?
6    A.   Yes.
7    Q.   Do you remember a short time after that you met with
8    them again on May the 7th and May the 9th to discuss
9    matters further, am I right?
10   A.   Um, I don't know the exact dates, but I did discuss
11   further with them.
12   Q.   Do you remember meeting with the government in
13   September of '08?
14   A.   I met with them multiple times, but I don't remember
15   the exact dates.
16   Q.   Do you remember meeting with them in March and May
17   of '09?
18   A.   Um, I do remember meeting them in May of '09.
19   Q.   Do you remember meeting with them in January of this
20   year and also February 14th, just a few days ago?
21   A.   Um, I remember meeting with them this year, yes.
22   Q.   So would it be fair to say that a number of times
23   you met with the government after your arrest probably
24   comes up to eight times, is that fair to say?
25   A.   Um, I'm not quite sure.  I wouldn't say -- I don't

1   believe it was that many, but --

2   Q.  Would you say it's significantly more than three?

3   A.  I would say it was at least three times.

4   Q.  Now, you are by skill a "social engineer"?  You know

5   what that means, right?

6   A.  I guess so.

7   Q.  And so you're a "social engineer," right?

8   A.  I wouldn't call myself a "social engineer."

9              THE COURT:  Excuse me just a second.

10             (Pause.)

11  Q.  Would you agree with me that a "social engineer" is

12  someone who manipulates people into doing things or

13  divulging confidential information?

14  A.  Yes.

15  Q.  And you have, several times, you've used the skill

16  of social engineering to get information, including

17  confidential information, from people who were deceived

18  about who you were?

19  A.  Yeah, that's correct.

20  Q.  Now, that's the essence of what "social engineering"

21  is, isn't it?

22  A.  Yes.

23  Q.  And the skill of the social engineer is to learn

24  what somebody else doesn't want to surrender, isn't that

25  true?

1    A.   Um, I guess.

2    Q.   To get from them something they don't want to give,

3    am I right?

4    A.   That's correct.

5    Q.   If they knew who you were, right?

6    A.   Right.

7    Q.   And when you did your social engineering with

8    Motorola, with Roadrunner, with Comcast, with any number

9    of ISPs, did you ever tell them who you were?

10   A.   No, not my true identity.

11   Q.   When you penetrated the ISPs and got into their

12   confidential websites, in getting there did you ever

13   tell the people that you got that information from who

14   you were?

15   A.   No, I did not.

16   Q.   You're very skillful, aren't you?

17   A.   Um, you could -- well, I'm not going to say I am,

18   but you could say I am.

19   Q.   You know what a "botnet" is, don't you?

20   A.   Yes, I do.

21   Q.   A "botnet," and tell me if I'm wrong, is a network

22   of thousands of compromised computers, is that true?

23   A.   Yeah, that's true, but it doesn't have to be

24   thousands, though.

25   Q.   It could be a number of compromised computers,

1    right?

2    A.   That's right.

3    Q.   And you can infect them with a malicious software

4    code, right?

5    A.   A "botnet" is actually a malicious code.

6    Q.   Now, typically the person who owns the computer

7    doesn't know that you've captured them, does he?

8    A.   No.

9    Q.   So you crawl in someone's computer to bend it to

10   your will and to make it do malicious things, fair to

11   say?

12   A.   Um, yes.

13   Q.   Among the things you did was to perform multiple

14   denial-of-service attacks on people you didn't like,

15   right?

16   A.   That's correct.

17   Q.   And a denial-of-service attack means marshaling all

18   those captive, infected computers --

19   A.   Yes.

20   Q.   -- of people who don't even know you, right?

21   A.   Yes.

22   Q.   -- and directing them in a malicious way toward an

23   innocent website, am I right?

24   A.   Yes.

25   Q.   And shutting it down, right?

A.   Um, yes.

Q.   Destroying it, if you can, right?

A.   Well, not so much to destroy, it's just that it
can't handle any traffic at the moment, so, um, why it's
called a "denial of service" is you deny service at that
time, but the website is not permanently destroyed.

Q.   It takes a lot of skill to do this, right?

A.   I would say not.

Q.   It's just an average skill someone has to direct a
herd of botnets to shut down a website, just the kind of
skill that lots of people have, right?

         MR. BOOKBINDER:  Objection.

         THE COURT:  I'm sorry.  Just ask him once.

Q.   It's an unusual skill, is it not?

A.   Um, I wouldn't say so much it's unusual.  I've known
plenty of people who knew exactly what a botnet was and
is.

Q.   Um, you were a swatter, you testified about that on
direct, am I right?

A.   Yes.

Q.   And when you swat you obtain a swatting victim's
phone numbers and physical addresses usually by hacking
into the ISP that's got that information to learn that
information, am I right?

A.   That's right.

1    Q.  So you have the ability to penetrate into an ISP to

2    get the confidential information, am I right?

3    A.  Yes.

4    Q.  To use that confidential information for purposes of

5    marshaling an attack against that person, am I right?

6    A.  Yes.

7    Q.  You would then use 911 or other emergency service

8    calls in order to, um, call in the police to that

9    location, am I right?

10   A.  Yes.

11   Q.  And you would claim that somebody is being harmed,

12   correct?

13   A.  Um, yes, usually.

14   Q.  So this would hoax an emergency call to get a SWAT

15   team to arrive at their house, right?

16   A.  Yes.

17   Q.  While people were eating dinner, right?

18   A.  Um, no, not just any person, um, a lot of them are

19   pedophiles.

20   Q.  In Seattle, you called the Seattle police, am I

21   right?

22   A.  That's correct.

23   Q.  And you were spoofing, falsifying, right, so people

24   didn't know it was you doing it, you were spoofing a

25   phone number, correct?

1    A.   That's correct.

2    Q.   So you made a call to the Seattle police, right?

3    A.   Yes.

4    Q.   You spoof their number so no one knows it's you,

5    right?

6    A.   Yes.

7    Q.   It appears to be that victim's number, am I right?

8    A.   Yes.

9    Q.   And you claimed that someone was armed and had just

10   shot someone at that victim's address, am I right?

11   A.   Well, I don't have the exact details, but, yeah,

12   that sounds correct.

13   Q.   Now, this was an awful lot of fun, wasn't it?

14   A.   Um, it wasn't really so much it's fun, it's just

15   more of an ego thing.

16   Q.   An ego thing.  Sometimes you had people listening in

17   on the line so that they would hear the response of the

18   people, am I right?

19   A.   Um, yes.

20   Q.   That was the fun part, right?

21   A.   Um, yes.

22   Q.   And the police then show up in this Seattle

23   location, right, their weapons are drawn, and at gun

24   point -- at gun point they detain the victim and his

25   mother, right?

1    A.   Yes.

2    Q.   And that must have been world-class fun, right?

3    A.   Not really.

4    Q.   They held the mother and the son at gun point while

5    they searched the house, right?

6    A.   I don't know the exact details, but I would imagine

7    so.

8    Q.   And while this is happening they're frightened for

9    their lives on the floor, am I right?

10   A.   Um, I wouldn't know.  I know that --

11   Q.   And maybe --

12              THE COURT:  I'm sorry.  He hasn't finished his

13   answer.

14   A.   I know that Brad Dennis, who you're speaking of,

15   knew it was coming because he dared me to do it.

16   Q.   He dared you to do it.

17        Do you think the victim and the victim's mother

18   knew this was coming?

19   A.   I knew the victim knew it was coming because he's

20   the one who told me that I couldn't do it.

21   Q.   Do you think the mother knew it was coming?

22   A.   Probably not.

23   Q.   You reported a bomb threat to a high school in

24   Florida, am I right?

25   A.   Yes.

1    Q.   You reported an armed gunman at a school?

2    A.   Yes.

3    Q.   You caused the authorities to evacuate that school?

4    A.   I believe so.

5    Q.   You did this about 17 times, right?

6    A.   Yes.

7    Q.   Oh, actually 17 times that we know about, right?

8    A.   Yes.

9    Q.   You also got stolen credit cards from people,

10   right?

11   A.   Yes.

12   Q.   This was also information you got by your skill at

13   penetrating into providers' secret confidential computer

14   databases, am I right?

15   A.   No.

16   Q.   You obtained these numbers in order to get credit

17   cards, am I right?

18   A.   Um, would you repeat the question?

19   Q.   You obtained stolen credit card numbers and you used

20   these numbers to charge purchases on those victim credit

21   card accounts, am I right?

22   A.   Yes.

23   Q.   (Pause.)  Your family, do I understand correctly,

24   had cable TV, am I right?

25   A.   Yes.

1    Q.   So they had a cable service coming into their

2    apartment, correct?

3    A.   Yes.

4    Q.   You were using a means to try to get internet

5    service on a live cable TV modem, do I understand that

6    right?

7    A.   Um, yes.

8    Q.   Now, you used other ways to access the internet

9    apart from this DSL line.  Do you remember that you

10   accessed the internet from open WIFI access points in

11   your neighborhood.  Do you remember that?

12   A.   Um, I did at some point, but not often.

13   Q.   Not often.  Okay.

14        Now, when you told this to the government, it was

15   shortly after you were arrested, am I right?

16   A.   Um, it may have been.  I don't remember exactly

17   when.

18   Q.   Now, when you -- let me back up a second.

19        So you agree that you did access the internet from

20   open WIFI access points in the neighborhood?

21   A.   At one point I did.

22   Q.   Okay.  And how many times did you do that?

23   A.   Well, I don't know exactly, but it wasn't that many

24   because I had a modem.

25   Q.   Okay.  Now, this is called "war driving," am I

1  right?

2  A.  Yes.

3  Q.  All right.  Now, "war driving" creates several

4  different possibilities of theft of service, am I right?

5  A.  Yes.

6  Q.  Now, you can sit outside somebody's house and

7  basically piggyback on their service while you're

8  sitting there with your computer in your lap, am I

9  right?

10  A.  Yes.

11  Q.  And while you're there, you can use their WIFI and

12  download things on your computer, am I right?

13  A.  Yes.

14  Q.  And when you do it, you're not downloading it

15  through your house's cable wire, are you?

16  A.  Not through mine specifically, but it might be

17  through theirs.

18  Q.  It might be through theirs, right?

19  A.  Right.

20  Q.  But they may have DSL, right?

21  A.  Right.

22  Q.  So when you squat on a live WIFI, you're squatting

23  on whatever service they have which could be wire,

24  cable, it could be DSL, am I right?

25  A.  Yes.

1   Q.   It could be other forms of high-speed internet,

2   right?

3   A.   Yes.

4   Q.   And you don't care, do you?

5   A.   No.

6   Q.   And while you do that, you have the capability of

7   downloading that information, right?

8   A.   What information?

9   Q.   The information that you're squatting there to

10   steal, am I right?

11   A.   Um, would you elaborate a little bit.

12   Q.   I asked you a short time ago whether among the

13   things you can do when you war drive is sit outside

14   someone's house and squat on their service, basically

15   use their service from outside?

16   A.   Yes.

17   Q.   Now, the other thing you can do is you can steal

18   their confidential information, am I right?

19   A.   Yes.

20   Q.   Including their MAC address, am I right?

21   A.   Yes.

22   Q.   Including their IP address, right?

23   A.   You can steal their IP address, um, but for their IP

24   address you need only -- only one can be on line at one

25   time or you can't steal their IP.

1    Q.   Now, that service that you're stealing from is an

2    unsecured WIFI service, right?

3    A.   Yes.

4    Q.   Probably a lesser challenge for someone of your

5    skills than hacking into Roadrunner or Charter or

6    Comcast, fair to say?

7    A.   Yeah, it was easy.

8    Q.   Must have been child's play, right?

9    A.   It would that at first.

10   Q.   So when you met with the government, you told them

11   that you had received modified modems from individuals

12   on Max Fraud.  Do you remember telling them that?

13   A.   Um, I don't recall.  It's been quite a while.

14   Q.   Do you recall meeting with the government on May 9th

15   of 2008?

16   A.   Again, it's been a long time, so I don't remember

17   the specific dates.

18   Q.   (Pause.)  Do you remember meeting with the

19   government on May the 9th of 2008?

20   A.   I don't recall the dates as I have previously

21   stated.

22            MR. McGINTY:  I'm going to put this on the --

23            THE COURT:  I've turned the jurors' monitors

24   off.

25   Q.   Now I'm directing your attention to where my finger

1    is and I ask you to read that sentence there to

2    yourself.  And would you also look at other parts of

3    that and see if it refreshes your recollection as to

4    what you had said to the government on May 8th of 2008.

5    A.  (Reads.)

6    Q.  Does it refresh your recollection?

7    A.  Um, yeah.

8    Q.  Do you recall telling the government that you had

9    frequented the network Max Fraud and received modified

10   modems from individuals on Max Fraud?

11   A.  Um, I do remember telling them I was on Max Fraud.

12   I don't remember receiving modified modems from Max

13   Fraud.

14   Q.  Now, you testified that every time you accessed the

15   internet you did it using TCNISO software, do you

16   remember saying that in your direct testimony?

17   A.  Yes.

18   Q.  Isn't it the case that you had modified modems that

19   you got from other places, isn't that true?

20   A.  Yes.

21   Q.  You were friends with a gentleman called Chris

22   Dixon, were you not?

23   A.  I was.

24   Q.  And he shared information with you and you with him,

25   fair to say?

A.   Yes.

Q.   And parts of the information related to, um, access
into the Charter internet network, correct?

A.   Yes.

Q.   In other words, the confidential information inside
the server of Charter, right?

A.   Yes.

Q.   Dixon provided you with credit card information, did
he not?

A.   He did.

Q.   You would use that information in order to buy goods
and services on the internet, am I right?

A.   Yes.

Q.   Dixon also sold modified modems, didn't he?

A.   Yes.

Q.   You knew a person who went by the name
"F-D-R-C-S-A," am I getting that right?

A.   The first name.

Q.   The first name.  Who is that?

A.   A programmer.

Q.   And what is his name?

A.   I don't know his name.

Q.   Had you been in contact with him?

A.   Um, I have at one point.  I believe I talked to him.

              THE COURT:  All right.  You're going to have

1    to keep your voice up, please.

2    A.  Yeah, at one point I do believe I talked to him.

3    Q.  Okay.  What's that one point that you talked to him?

4    A.  Um, this was years ago so I don't really remember,

5    but I was dealing with other stuff in my life, so I

6    don't remember exactly everything.

7    Q.  Okay.  Now, you knew that he created a hacked

8    version of Sigma X, you knew that, right?

9    A.  Yes.

10   Q.  In other words, the Sigma program that was sold by

11   TCNISO had been duplicated and sold by other vendors, am

12   I right?

13   A.  I don't believe it was actually sold, um, I believe

14   it was released and for people to use, but they had to

15   pay for it.

16   Q.  And that was a modified form of Sigma X, am I right?

17   A.  Yes, but I believe the only real modification was

18   the background was changed a little bit and it was made

19   so that you don't have to have a license to use it.

20   Q.  Okay.  And that software was available through this

21   download that you say you spoke to once, am I right?

22   A.  Yeah, I mean I may have spoken to him more than

23   once.  I don't really recall.

24   Q.  Did he have a website?

25   A.  Um, I don't recall.

1    Q.   Did he have a name?

2    A.   The first name you mentioned is what he went by.

3    Q.   Did you ever mention this to the government?

4    A.   Um, I don't know.

5    Q.   Maybe the answer is "No, you didn't," is that the

6    answer?

7              THE COURT:   No, that's not --

8    Q.   Isn't it the case that you had not mentioned his

9    name to the government?

10   A.   Um, if I didn't it's probably because I'd seen no

11   reason to mention his name to the government because I

12   didn't think it would be interested in a modified

13   version of Sigma.

14   Q.   Sigma worked on the Motorola 4100 series, am I

15   right?

16   A.   Yes.

17   Q.   And the BlackCat worked on the 5100 series, am I

18   right?

19   A.   BlackCat had all the ability to program all the

20   modems, the 4100 and the 4200.

21   Q.   Now, when you were asked on direct about Sigma and

22   you were asked, "What was the first program that you got

23   from TCNISO?"  You said, "I believe Sigma 1.3"?

24   A.   Yes.

25   Q.   So you didn't say "Sigma 1.3," you said, "I believe

1   Sigma 1.3," correct?

2   A.   That's correct.

3   Q.   When you were asked about -- in a different moment

4   in the direct, and you were asked about what the first

5   product was that you got from TCNISO, you said "firmware

6   similar to 1.3," didn't you?

7   A.   No, I said "firmware Sigma 1.3."

8   Q.   So you didn't say "similar to," you said "firmware

9   Sigma"?

10  A.   Yeah.

11  Q.   Now, the Sigma that you got was free on the website,

12  am I right?

13  A.   Yes.

14  Q.   And it was in essence freeware, correct?

15  A.   Yes.

16  Q.   Now, this was also true of the BlackCat firmware

17  that you talked about as well, both of them "freeware"

18  as you described it, am I right?

19  A.   Yes.

20  Q.   And "freeware" means that you go to the website and

21  you download it -- that's your testimony, right?

22  A.   Yeah.

23  Q.   So you're never purchasing anything, are you?

24  A.   Um, you would have to purchase BlackCat to be able

25  to program the SB-5100.

1        THE COURT:  Mr. Hanshaw, try to keep your

2   voice up, please.

3   A.  You would have to purchase BlackCat to be able to

4   program Sigma X onto the modem.

5   Q.  Now, when you -- so when you testified about

6   getting -- well, strike that.

7        Before you have any dealings with TCNISO, you

8   undertake your preparations for the call, is that fair

9   to say?

10  A.  Yeah.

11  Q.  Because you don't call someone and hold and --

12  without having figured out exactly what it is you want

13  to get and how it is you want to get it, correct?

14  A.  Correct.

15  Q.  So you don't call TCNISO and say, "Gee, I'd like a

16  product," do you?

17  A.  Um, you can't order it, so, yeah.

18  Q.  So you then, using your social engineering skills,

19  you learn as much as you can about TCNISO, am I right?

20  A.  I wouldn't say, at that time, specifically related

21  to learning about TCN, um, I more or less just wanted to

22  be a software developer because I found it intriguing, a

23  device such as that would do so many things.

24  Q.  Now, um, you contacted at some point Craig Phillips?

25  A.  Yes.

1   Q.   And it was Phillips -- and as you describe it in

2   your discussions with him, you began to "suck up to

3   Phillips," those are the words you used, am I right?

4   A.   That's right.

5   Q.   And in sucking up to him you're trying to impress

6   him with how much you know, am I right?

7   A.   That's right.

8   Q.   Now, this is basically the same technique you used

9   on Isabella Lindquist, am I right?

10  A.   Um, yeah, I would say so.

11  Q.   And the trick with her is you had to persuade her

12  that you had some source code in order to get the rest

13  of the source code from her, am I right?

14  A.   No.

15  Q.   Isn't it true that you had some of the source code

16  for Sigma?

17  A.   Yes.

18  Q.   And that when you got it, you had hacked in order to

19  get it?

20  A.   In order to get it, I didn't hack, I, um, received

21  it from developers.

22  Q.   From developers.  You got it from someone else,

23  right?

24  A.   Um, from the employees at TCNISO.

25  Q.   Okay.  Now, the employees of -- so when you get this

```
 1   from the developers, are you paying for it?
 2   A.  No.
 3   Q.  And when you got it from them, did you tell them who
 4   you were?
 5   A.  They knew who I was.
 6   Q.  They knew who you were and -- how did you identify
 7   yourself, as "DShocker"?
 8   A.  That's correct.
 9   Q.  And when you identified yourself as "DShocker," did
10   you say to them, "I'd like to get the source code for
11   Sigma"?
12   A.  In a roundabout way I eventually got it from them.
13   Q.  And the roundabout way is you used deception, am I
14   right?
15   A.  No, no, I wouldn't say so, I just talked to them,
16   you know, kind of in a regular basis, you know, person
17   to person.
18   Q.  And you kind of tried to persuade them that you
19   already had part of it, right?
20   A.  Excuse me?
21   Q.  You tried to persuade them that you already had part
22   of it, right?
23   A.  Um, I don't believe so, because they're the ones who
24   gave me the source code.
25   Q.  Now, over time you'd work on them until they give
```

1    you part of this source code, you describe, that's your

2    testimony, right?

3    A.  Um, yeah.

4    Q.  By you don't get all of it, do you?

5    A.  I do, actually.

6    Q.  You do.  But the way you do is you call Isabella

7    Lindquist, right?

8    A.  Um, I talk to her over the internet.

9    Q.  Now, originally -- strike that.

10          At some point you were talking to Isabella

11   Lindquist using a private communication, just you and

12   her, right?

13   A.  That's right.

14   Q.  And in the private communications, you were

15   complaining about Ryan Harris, weren't you?

16   A.  Um, at some point I may have, but I don't recall,

17   no.

18   Q.  Because he didn't like you, did he?

19   A.  Um, I wouldn't imagine so.

20              THE COURT:  I'm sorry.  I couldn't hear you.

21              THE WITNESS:  I wouldn't imagine so.

22   Q.  Now, um, you had once tried to be -- you had once

23   tried to be a moderator on the forum, right?

24   A.  Yes.

25   Q.  And Harris's response to you was, "I don't know who

```
 1   you are," isn't that right?

 2   A.  Um, I believe so.

 3   Q.  Now, when you did this you were using your name,

 4   "Nathan," right, you weren't using "DShocker," right?

 5   A.  I don't know.  I was probably using -- um, if I was

 6   talking in MSN Messenger, I was probably using my

 7   nickname "Nate57" --

 8              THE COURT:  What's that?

 9              THE WITNESS:  If I was using Messenger, I was

10   talking -- I believe I was probably using

11   "Nate57@hotmail.com."

12   Q.  I'm going to show you a document and ask you to look

13   at it and see if it helps you remember this

14   communication.

15              THE COURT:  Wait a minute.  Wait a minute.

16              (Pause.)

17   Q.  The record is --

18              THE COURT:  Excuse me.  I'm not -- is this

19   something that's in evidence?

20              MR. McGINTY:  Yes.

21              MR. BOOKBINDER:  No, it isn't.

22              THE COURT:  Here, Dan.

23              MR. MCGINTY:  I'm sorry, your Honor.  May I

24   have a moment?

25              THE COURT:  Yes.  The jurors' monitors are not
```

1   on.

2                    (Pause.)

3   Q.  Have you had a chance to review this?

4   A.  Um, I have.

5   Q.  Now, did you remember -- well, does this help you

6   refresh your recollection about what your communication

7   was?

8                    THE COURT:  And let me explain.  You're not

9   to, um -- the question is -- well, actually, when you

10  say "What's your communication?"  In order to refresh

11  his recollection, first of all, it has to be something

12  that he didn't remember.  So he was talking about what

13  name he was using --

14                   MR. McGINTY:  And he hadn't remembered.

15                   THE COURT:  Right.  So you should focus your

16  question on that.  And then the issue is going to be not

17  what does it say on a piece of paper, but having seen

18  that, does it cause you to have an independent memory,

19  as you sit here today, something you didn't remember

20  before you saw it?  But this isn't intended to have you

21  tell the jury what's on the paper, unless you have a

22  personal memory of it now.

23  A.  (Looks.)

24  Q.  Does this refresh your recollection about what name

25  you used?

```
1   A.  Um, yeah.  Yes.

2   Q.  And what name did you use?

3   A.  My name "Nathan."

4   Q.  So you didn't identify yourself as "DShocker," did

5   you?

6   A.  No.

7   Q.  And do you recall that the conversation related to

8   whether Mr. Harris would permit you to be a moderator on

9   the forum, do you remember that?

10  A.  Yes.

11  Q.  And do you remember that Harris's response to you --

12          THE COURT:  In fact, there's no reason for

13  them to keep that up right now.

14  Q.  Do you remember Harris's response to be, "I don't

15  know you"?

16  A.  Um, I don't recall what his response was.

17  Q.  And, um, do you recall that you were not made a

18  moderator on the forum?

19  A.  Yes.

20  Q.  Now --

21          THE COURT:  I'm sorry.  Here.  Okay.  You want

22  to let him finish the answer, so the jury can hear it.

23      Go ahead.

24          MR. McGINTY:  Now, um, your Honor, I would

25  move to admit this and I'd like to go through this with
```

 1   the witness.

 2              MR. BOOKBINDER:  No objection.

 3              THE COURT:  The government has no objection?

 4              MR. BOOKBINDER:  Actually, this has already

 5   been marked, your Honor, as Exhibit 10, and we can use

 6   that version, if you'd like.

 7              THE COURT:  Oh, it's Exhibit 10?

 8              MR. BOOKBINDER:  Yes.

 9              THE COURT:  All right.

10         But it hasn't been admitted?

11              MR. BOOKBINDER:  It's not been admitted.

12              THE COURT:  All right.

13         Mr. McGinty, is there any problem with it being

14   Exhibit 10?

15              MR. McGINTY:  No, your Honor.

16              (Hands up.)

17   Q.  Mr. Hanshaw, I'm going to ask you --

18              MR. McGINTY:  Your Honor, is this on the

19   screen?

20              THE COURT:  It is -- well, let me put it this

21   way, it should be.

22              (On screen.)

23              THE COURT:  Now it is.

24   Q.  Mr. Hanshaw, why don't you read your contribution to

25   the post and I read Mr. Harris's reply.

```
 1    A.  All right.  "Hi."

 2    Q.  I'm sorry?

 3    A.  I start off with "Hi."

 4    Q.  "Yes."

 5    A.  "I was wondering about becoming a forum moderator.

 6    I have experience."

 7    Q.  "I don't know you.  You don't have every product

 8    from us."

 9    A.  "Your woman does know me."

10          THE COURT:  Try to keep your voice up, please.

11    A.  "She has taught me.  I talked to Isabella and more.

12    I have had solid forums helping members.  I have helped

13    numerous people.  I go through forums every day and

14    report back to you, among other things, who sends

15    inappropriate posts.  I give him a link and he delays

16    steps, so I kind of had some experience with him."

17    Q.  "Okay, I'll talk to him then."

18    A.  "YourMomma:  Okay.  Thank you.  Let me know what

19    happens.  Thank you for your time.  Hi.  Hi.  Hey.  Hi,

20    DerEngel."

21    Q.  "Yes."

22    A.  "It's me.  I was wondering what was happening with

23    me becoming a moderator."

24    Q.  "I told you I'm not looking for new moderators."

25    A.  "Okay.  DerEngel, do you want a separate version of
```

1    TCNISO $10 a month?  Hi."

2    Q.  (Pause.)  You testified that you would go onto the

3    forums and you'd use different names.  Do you remember

4    saying that?

5    A.  Yes.

6    Q.  That you didn't just use the name "DShocker"?

7    A.  No.

8    Q.  Do you remember telling the agents, on January 24th,

9    2012, in an interview with them, that when you chatted

10   in surfboard or posted on the TCNISO forums, you did so

11   as "DShocker."  Do you remember telling them that?

12   A.  I had done so as "DShocker."

13   Q.  But do you remember telling them that when you

14   posted, that you posted in the name "DShocker"?

15   A.  Yeah.

16   Q.  And -- are you aware that in search of the forums,

17   there are no posts for DShocker?

18   A.  They were probably removed.

19   Q.  Removed.  And the reason they were removed was

20   because you were banned from the forums, am I right?

21   A.  You're right.

22   Q.  And you were banned because Brian Harris didn't like

23   you, did he?

24   A.  I wouldn't imagine so.

25   Q.  Right.  And the Nathan who communicates, asking to

1    be moderator, doesn't identify himself as the DShocker

2    who is trying to get on the forum, am I right?

3    A.   Um, I believe later on he did know who I was because

4    I was in communication -- I caused communication with

5    employees of TCNISO who -- and I used the nickname

6    "DShocker" associated with my e-mail that I communicated

7    to him on.

8    Q.   You never associated your name with the name

9    "DShocker," isn't that the case?

10   A.   I don't recall, but I know my -- when I communicated

11   with him on MSN Messenger, I used "Nate57@hotmail.com",

12   and people knew I was "DShocker" on that e-mail.

13   Q.   Did they know that you were Nathan Hanshaw?

14   A.   Nobody knew my full name, no.

15   Q.   No one knew your full name ever, am I right?

16   A.   You're right.

17   Q.   And that's because it took the police a calendar

18   year and more to find out who the guy was that was

19   swatting, who was committing the crimes you were

20   committing, isn't that right?

21   A.   Yes --

22   Q.   Isn't that true?

23             THE COURT:  No, he was answering the question.

24   A.   Yes, that's true because of the anonymity of the

25   modem.

1   Q.   Did the government ever suggest that you answer a

2   question that way?

3   A.   No.

4   Q.   All right.   Um, in the eight-odd meetings that you

5   had with the government, did they ever tell you that the

6   capability of anonymity in this modem is going to be an

7   important part of this trial?

8   A.   No, I knew that, myself, the modem allowed me

9   anonymity and that's why -- that's the main reason I

10  used it.

11  Q.   So when you just contributed the thought that the

12  modem attributes anonymity, that's not because, um, you

13  think that contributes to the government's case, do I

14  understand that right?

15  A.   Yes.

16  Q.   Now, Mr. Harris had a contentious relationship with

17  you, did he not?

18  A.   Yes.

19  Q.   That's with the "DShocker" who never said who he

20  was, am I right?

21  A.   Yes.

22  Q.   But he didn't like you, right?

23  A.   No.

24  Q.   He hated you, right?

25  A.   I would imagine.

1   Q.  Did Craig Phillips ever say that Ryan Harris called
2   you an "idiot"?
3   A.  Um, I don't recall.
4   Q.  Did Craig Phillips, in his communications with you,
5   ever tell you that Harris didn't want Phillips
6   communicating with you.  Did he ever say that?
7   A.  Could you repeat the question?
8   Q.  Did Phillips ever say to you that Harris didn't want
9   Phillips communicating with him?
10  A.  I don't believe so.
11  Q.  Now, you were communicating with Phillips via MSN,
12  right?
13  A.  Yeah, via MSN.
14  Q.  Okay.  And MSN, unless you block the logging
15  feature, permits the recording of chats, am I right, it
16  logs them?
17  A.  Yes.
18  Q.  So if -- so your testimony is that you had many
19  chats, daily chats with Mr. Phillips, am I right?
20  A.  Yeah.
21  Q.  So these chats would be reflected both on your
22  computer as the -- as one end of the chat, but also on
23  Phillips's computer on the other end of the chat, am I
24  right?
25  A.  Um, not necessarily.  Um, I didn't log and Phillips

1    may not have logged either.  And there's also the

2    possibility that he would delete the log.

3    Q.  Now, Harris banned you from the forums about 30

4    times, am I right?

5    A.  No, I don't know how many times.

6    Q.  It was a lot, wasn't it?

7    A.  I wouldn't say it was 30 times.

8    Q.  It was quite a number, right?

9    A.  It was -- I'll give him at least three times.

10   Q.  And you got even by hacking into the forum, am I

11   right?

12   A.  Um, I had gained, at one point, authorized access,

13   yes.

14   Q.  Even though Harris didn't want you to be there, am I

15   right?

16   A.  Right.

17   Q.  Through Mr. Phillips you meet Isabella, right?

18   A.  Right.

19   Q.  And Isabella, or Becca, you started trying to --

20   what shall we say, to work Isabella.  You understand

21   what I mean?  You tried to get her to give you

22   something, am I right?

23   A.  I tried to build a rapport with her, yes.

24   Q.  A rapport.  And the rapport wasn't because you liked

25   her, it was because you were trying to get something

1    from her, right?

2    A.  Um, I liked her, too, but that was also a part of

3    it, yes.

4    Q.  All right.  And what you wanted from her was the

5    code for Sigma, am I right?

6    A.  You're right.

7    Q.  And you started chatting with her privately, right?

8    A.  Yes.

9    Q.  On the Internet Relay Chat, right?

10   A.  Yes.

11   Q.  You were trying to work her so she would give you

12   that code, am I right?

13   A.  Right.

14   Q.  She gave you, for free, the TCNISO code?

15   A.  I received multiple copies of TCNISO code.

16   Q.  And when you say "multiple copies" of this, you, at

17   some point, showed her partial code of Sigma, right?

18   A.  I don't recall.  I may have.

19   Q.  Do you remember showing her partial code to try to

20   persuade her to give you the rest of the code.  Do you

21   remember that?

22   A.  I don't recall it.

23   Q.  Do you remember saying to her that if she did that,

24   you would give her $100?

25   A.  Um, I don't recall.

1    Q.   Do you remember that she paid you $100 -- or you

2    paid her $100 for that code, do you remember?

3    A.   No.

4    Q.   Do you remember blocking the payment so she wouldn't

5    get the $100 that you promised?

6    A.   No.

7    Q.   None of that?

8    A.   No.

9    Q.   That you cheated her.  Do you remember that?

10   A.   No.

11   Q.   (Pause.)  You chatted with her and you chatted with,

12   um, Watts -- your testimony is you chatted with them on

13   Surfboard, right?

14   A.   Um, in private messages.

15   Q.   But you also chatted with them on Sidney Wonderland,

16   didn't you?

17   A.   Sidney Wonderland was a theme park in Australia, I

18   believe, that Chris Watts was telling me about.  They

19   had gotten them shut down or it was due to be shut down.

20   Q.   All right.  And you had a chat capability, you told

21   the agents, through Sidney Wonderland?

22   A.   Sidney?  I'm not sure what you're --

23   Q.   Through Pound Sidney Wonderland.

24   A.   I think there might be some misinformation because

25   Sidney Wonderland was a theme park in Australia, I

1    believe, that Watts was telling me about.  Again, I

2    communicated with Watts on a personal level.  And he was

3    telling me about Sidney Wonderland, what a theme park it

4    was, and that it was being shut down, and he had a say

5    about Sidney Wonderland.

6    Q.  Now, um, you got access to Isabella's site,

7    "blea.ch," correct?

8    A.  That's correct.

9    Q.  And on there she had documents and programs that she

10   had created, correct?

11   A.  Yes.

12   Q.  And that included Sigma?

13   A.  Um, I don't recall if it had Sigma on it.

14   Q.  And did she give you the access to that or did you

15   hack that?

16   A.  I don't recall.

17   Q.  She maintained a site at "ble.ch.lind," do you

18   remember that site?

19   A.  "Blea.ch" --

20   Q.  -- ".ch/lind"?

21   A.  It's something similar to that, but, yeah, I

22   remember it, the "blea.ch."

23   Q.  She kept program files on that site, didn't she?

24   A.  Um, I believe so.

25   Q.  And you hacked that, too, didn't you?

1    A.  Um, I don't believe I hacked it.  Um, I believe I

2    actually might have got that information from one of her

3    public websites that linked to that.  I don't exactly

4    recall how I got access to that.

5                  (Pause.)

6              THE COURT:  Mr. McGinty, I'm not trying to cut

7    this off, but could you give me an estimate, though, of

8    about how much longer you think you have with

9    Mr. Hanshaw?

10             MR. McGINTY:  I think not more than 10

11   minutes.

12             THE COURT:  Okay.  Go ahead.

13   Q.  Um, Mr. Hanshaw, at some point you pled guilty to a

14   charge in federal court, am I right?

15   A.  Yes.

16   Q.  And the document was called an "information,"

17   correct?

18   A.  Yes.

19   Q.  But you understood the information to be the charge,

20   am I right?

21   A.  Um, yes, it's what I allegedly did.

22   Q.  All right.  And in the information you pled guilty

23   to, um, computer fraud?

24   A.  No, I pled guilty to juvenile delinquency in

25   relation to computer fraud.

1   Q.  Okay.  So you pled to -- you acknowledged

2   delinquency in connection with certain kinds of charges,

3   am I right?

4   A.  Yes.

5   Q.  So among the charges that you had pled guilty to

6   were charges that related to computer fraud, am I right?

7   A.  Yes.

8   Q.  Also wire fraud, am I correct?

9   A.  Yes.

10  Q.  Now, the wire fraud charges that you pled guilty to

11  related to a wire transmission from New Hampshire to

12  Worcester to Seattle in connection with falsely-

13  reporting a violent crime, am I right?

14  A.  I don't know where New Hampshire is?

15  Q.  You were communicating by telephone call -- I'm

16  sorry.

17  A.  I think you might be taking my initials.

18  Q.  I'm sorry.  I'm thinking "NH" is New Hampshire, but

19  "NH" is "Nathan Hanshaw"?

20  A.  Yes.

21  Q.  This is a call from Worcester to Seattle that

22  falsely reported a violent crime, am I right?

23  A.  Yes.

24  Q.  That was the hacking incident -- that was the

25  spoofing incident we talked about a short time ago?

A.  Yes.

Q.  Um, there was a telephone call from you to Georgia
also reporting a swatting?

A.  Yes.

Q.  There was a use by you of a credit card for an
on-line purchase of a Sony P3, or a PS-3, correct?

A.  That's correct.

Q.  And also you got a credit card for an on-line
purchase of a spoof card?

A.  Yes.

Q.  And those were the four charges that related to wire
fraud, am I right?

A.  Yes.

Q.  And finally you had a charge of interstate threats,
am I right?

A.  Yes.

        MR. McGINTY:  Um, I'm going to move to admit
the information.

        THE COURT:  Is there any objection?

        MR. BOOKBINDER:  No.

        THE COURT:  The next number is?

        THE CLERK:  34, Judge.

        THE COURT:  It is admitted as Exhibit 34.

        (Exhibit 34, marked.)

Q.  Now, in exchange for your cooperation, you got a

1    recommendation to an 11-month committed sentence, am I

2    right?

3    A.   That's correct.

4    Q.   That packaged together all the instances of

5    swatting, right?

6    A.   Yes.

7    Q.   All the penetrations into ISPs' internal security

8    systems, correct?

9    A.   Yes.

10   Q.   Your credit card violations, am I right?

11   A.   Yes.

12   Q.   All in all a pretty sweet deal, would you say?

13   A.   It was a good deal, but you have to remember that

14   juvenile charges are different from adult charges.

15   Q.   And, um, one of the things you were supposed to do

16   as a condition of your cooperation with the government

17   is not commit any further crimes, isn't that true?

18   A.   Um, that's correct.

19   Q.   You were stopped by police on December 30th, 2011,

20   were you not?

21   A.   I was.

22   Q.   You were in a car not your own, am I right?

23   A.   You're right.

24   Q.   When you were questioned by the police, what name

25   did you give?

1    A.   Mike Grant.

2    Q.   Mike Grant.  Is that your name?

3    A.   No.

4    Q.   You lied to them, didn't you?

5    A.   I did.  I had an anxiety attack.

6    Q.   (Laughs.)  I'm sorry.  An anxiety attack

7    precipitated you giving your name as Michael Grant?

8    A.   Yeah, it's on record, I have a medical condition of

9    anxiety, I take medication for it, and even while I'm in

10   custody I take medication for it, and at the time I

11   wasn't taking my medication, and I knew that -- um,

12   after I did it, that I messed up and I gave them my real

13   name.

14   Q.   And, um, you are currently in custody, correct?

15   A.   Yes.

16   Q.   Serving a committed sentence for your violations?

17   A.   I am.

18              MR. McGINTY:  A moment, your Honor?

19              THE COURT:  Yes.

20              (Pause.)

21              MR. McGINTY:  I have no further questions of

22   this witness.

23              THE COURT:  Is there redirect?

24              MR. BOOKBINDER:  Just briefly, your Honor.

25

REDIRECT EXAMINATION BY MR. BOOKBINDER:

Q.  Mr. Hanshaw, Mr. McGinty asked you about, um,
whether you got modems from a variety of different
places.  Do you remember those questions?

A.  Yes.

Q.  And is it fair to say that you didn't actually buy
or get any physical modems from TCNISO?

A.  I would say so.

Q.  You got them from different sources out there?

A.  That's correct.

Q.  And, um -- and then once you had them, did you
modify them?

A.  Yes.

Q.  And what software did you modify them with?

A.  Sigma.

Q.  The Sigma software, um, that you used, that you
modified those modems with, where did you get that Sigma
software?

A.  The TCNISO website.

Q.  It wasn't some hacked version of Sigma you got
somewhere else?

A.  No, it was a legitimate version.

Q.  In, um, the chat with Mr. Harris that Mr. McGinty
showed you, um, you had some discussion about work that
you were doing with Craig Phillips, do you remember

1    that?

2    A.   Yes.

3    Q.   Can you describe what that was?

4    A.   Um, Phillips, um, was expressing to me that it was

5    becoming increasingly harder to overcome Roadrunner

6    security to get on-line for free and uncap and we were

7    -- and he asked me to assist him in trying to figure out

8    a way to do such.

9    Q.   Did you also help him in some way with the forums,

10   the TCNISO website forums?

11   A.   Um, sometimes I would go on there and find links

12   that were set up that way, um, that would damage the

13   reputation of TCNISO or Phillips himself, and give him

14   the links back to when they were posted.

15   Q.   Were there other kinds of matters -- well, let me

16   strike that.

17        During the chats you had with Mr. Harris, did he

18   ever tell you to stop using his products?

19   A.   No.

20             MR. BOOKBINDER:   No further questions.

21

22   RECROSS-EXAMINATION BY MR. McGINTY:

23   Q.   When you talked about Max Fraud to the agents, you

24   were talking about having gotten modified modems from

25   them, did you not?

A.   From Max Fraud?  I don't recall if I got modified

modems from them because Max Fraud was a, um --

Q.   I'm asking you simply whether you told them that you

had gotten modified modems from Max Fraud?

A.   I don't recall.

          MR. McGINTY:  No further questions.

          THE COURT:  Okay.

     Mr. Hanshaw, your testimony is complete.  You're

going to go out when the jury goes out.

     May I see counsel at sidebar.


          AT THE SIDEBAR

          THE COURT:  Okay.  Once I decide the issues

with regard to the agents, how long do you think the

testimony of each of them will take?

          MR. BOOKBINDER:  I think Mr. Russell would be

45 minutes maybe.

          MS. SEDKY:  And 15 minutes for Mr. Ryan.

          THE COURT:  So about an hour.  I'm trying to

decide whether I should keep the jury here.  Because if

we're not going to finish today, then I'd be inclined to

send them home and just finish the last two witnesses

tomorrow.  I've got some other things pressing on me.

Even if there's a chance we could finish today, I don't

think I'm going to have them back until Wednesday

1    anyway, because we have some serious Rule 29 issues and

2    we need to talk about the jury instructions.  So I think

3    I'm going to send them home.

4         I want to raise some issues and I want to talk to

5    my law clerks about one of them first, a most recent

6    one, and so I'm going to send them home.  We're going to

7    resume at about quarter to 12:00 and I'll give you some

8    guidance for tomorrow.  Tomorrow we'll finish the

9    witnesses and move into the other matters.

10        All right?

11             MR. BOOKBINDER:  Yes.

12

13             (In open court.)

14             THE COURT:  Ladies and gentlemen, there are

15   two more witnesses, um, but there are matters that I

16   have to rule on relating to their testimony, some of

17   which were only raised last night, and, um, I don't know

18   whether we would -- um, I don't think we'd -- that I

19   would be able to do that and finish both witnesses

20   today, in any event, and you'll have to come back

21   tomorrow.  So if you don't mind, I'm going to send you

22   home early today and you'll come back tomorrow at 9:00

23   and I expect we'll finish the evidence -- I expect, but

24   I don't promise, and you'll probably also go home early,

25   and then I'll have you back on Wednesday for the

1    arguments, my jury instructions, and to at least begin

2    your deliberations.  So for planning purposes you should

3    plan to be here Wednesday afternoon and then, if

4    necessary, continue your deliberations on Thursday.

5         It continues to be important that you keep an open

6    mind, don't discuss the case among yourselves or with

7    anybody else, don't read or watch or listen to anything

8    about the case that may be in the media, don't

9    communicate about the case through any social media or

10   on the internet, and keep up your great record of coming

11   back promptly.  I hope we'll start right at 9:00

12   tomorrow, but if not, that's because we're working.  All

13   right?

14        The Court is in recess for the jury.

15             (Jury leaves, 11:20 a.m.)

16             THE COURT:  You may be seated.

17        Mr. Hanshaw, you're excused.  Thank you.  We'll be

18   in recess until about quarter to 12:00.

19        The Court is in recess.

20             (Recess, 11:20 a.m.)

21             (Resumed, 12:15 p.m.)

22             THE COURT:  All right.  Like most things, that

23   took me longer than I had hoped.  But I'll tell you my

24   present thinking with regard to Exhibit 25 and Agent

25   Ryan's proposed testimony.  And this analysis is based

1    largely but not exclusively on discussion in *Milkowicz,*

2    which is 470 F.3d 390 at 397, a case that I brought to

3    the parties' attention several weeks ago before trial.

4         It's my current view that the GoDaddy, and other

5    records, must be admissible before Special Agent Ryan

6    can testify about them and before the proposed chart,

7    that's been premarked as Exhibit 25, can be admitted

8    under Rule 1006, as a summary, or under Rule 611(b) as a

9    chalk.  Authenticity is an element of admissibility.

10        The First Circuit wrote in *Milkowicz:*  "Evidence

11   admitted under Rule 1006 must be otherwise admissible

12   and remain subject to usual objections under the Rules

13   of Evidence."  In 31 "Wright & Gold," as it's now known,

14   Federal Practice and Procedure, Section 8043, the

15   treatise states:  "Most notably, Rule 1006 evidence

16   normally is objectionable if the voluminous source of

17   material on which it is based is admissible."  "Even

18   where 1006 evidence is relevant and authentic, the Court

19   has the discretion to exclude the evidence where its

20   probative value is substantially outweighed by unfair

21   prejudice or other Rule 403 dangers."

22        In *Milkowicz*, the First Circuit wrote, at 397:  "A

23   summary chart used as a pedagogical device must be

24   linked to evidence previously admitted and usually is

25   not itself admitted into evidence."  So that

1    communicates to me a kind of common-sense consideration

2    that Mr. Ryan cannot give an oral summary of information

3    or make calculations based on GoDaddy records, for

4    example, unless they're admissible.  If the evidence is

5    admissible, it need not actually be admitted, as the

6    First Circuit noted in *Milkowicz* at 397, also.

7         It appears to me that the GoDaddy and other

8    records -- if there are others in dispute, may be

9    admissible as business records under Rule 8036, however

10   it would be necessary for a custodian to appear and

11   testify because as far as I know there was no

12   certification of those records, those business records

13   provided before trial, as required by Rule 902(b)(11).

14        So in my current conception the government could

15   call recordkeepers tomorrow and seek to establish the

16   admissibility of the documents, but absent that I don't

17   see how the -- I don't see a proper basis for letting

18   Agent Ryan testify to the information in Exhibit 25 or

19   show it to the jury.

20        Do the parties want to be heard on that analysis?

21             MR. BOOKBINDER:  Your Honor, could we just

22   have a moment?

23             THE COURT:  Yes.

24             (Pause.)

25             MR. BOOKBINDER:  Your Honor, in light of that

```
 1    I think we will, um -- we will use the number that's on

 2    the PayPal reference, that 750,000 figure that document

 3    is stipulated to, and we won't use Exhibit 25.  And

 4    we'll have to discuss how this may limit -- well, there

 5    probably will be some brief testimony from Special Agent

 6    Ryan about that PayPal record.  Um, I don't know whether

 7    there's anything else we'll do, but it will certainly

 8    shorten his testimony, that wasn't going to be that long

 9    to start.

10                THE COURT:  Okay.  And I think that's what you

11    were advocating, Mr. McGinty, right, reliance on the

12    stipulated PayPal?

13                MR. McGINTY:  Yes, your Honor.

14                THE COURT:  Okay.

15          Then let's -- well, who is going to seek to

16    introduce the statements by Mr. T and MooreR?

17                MR. BOOKBINDER:  Those would be with Special

18    Agent Russell.

19                THE COURT:  Okay.  Then perhaps it would make

20    sense to go through specifically what your proposed --

21                MR. BOOKBINDER:  Yes, your Honor.

22                THE COURT:  Okay.  Hold on just one second.

23                (Pause.)

24                THE COURT:  Because I think, when I did my

25    original analysis -- well, there are a couple of
```

things.  I mean, the general principles, I think, are to
conditionally admit it, but at this point I'm really not
conditionally admitting it, it's the last witness and if
there's not enough, then there's not enough.  I'd have
to, myself, be satisfied, by a preponderance of the
evidence, that the statements were made in furtherance
of a conspiracy with Mr. Harris.  It doesn't necessarily
have to be the conspiracy charged in the indictment, the
cases that indicate that include *Marino*, 277 F.3d 11 at
26 to 26, in *Amoratti*, 996 F.2d 456 at 486 and Note 12,
in *Dworkin*, 855 F.2d 12 at 24, but there has to be some
conspiracy between Mr. Harris and the speaker and the
statement has to be in furtherance of the conspiracy.

I can consider -- that there has to be some
independent extrinsic evidence to corroborate -- well,
to contribute to the conclusion that this statement is
admissible under Rule 801(d)(2)(E) or at least that it's
made by a member at a time when he was a member of the
conspiracy.

So those are the general rules.  To some extent,
in my earlier analysis, I've relied on statements in the
trial brief as to what the government, at that time,
expected its evidence would be and the government, I
think, told me before trial, after the trial brief, and
as far as I know it reiterates today, that contrary to

1    what was in its trial brief, it has not presented

2    testimony by Phillips, Lindquist, or Hanshaw that Mr. T

3    is friends with the defendant, was a reseller of

4    TCNISO's equipment, and was a regular participant in the

5    company's website forums where activities relating to

6    the alleged conspiracy, like trading MAC addresses and

7    configuration files, were routinely carried out.

8         You will remind me if I've overlooked anything or

9    basically I should disregard --

10        Has there been any evidence on any of those

11   points?

12             MR. BOOKBINDER:  No, your Honor, and that's

13   why we said we would rely on Mr. Harris's own

14   statements.

15             THE COURT:  All right.  So that's helpful.

16   That clarifies that.

17        Then on Page 15 of the government's memorandum in

18   support of its motion in limine, Document 94, there is a

19   discussion of Mr. T's statements and then I think it

20   went on to the MooreR statements.

21        These become issues with Russell, correct?

22             MR. BOOKBINDER:  Yes.

23             THE COURT:  All right.  As I understand it,

24   there's no objection to Exhibit 2, the website screen

25   shots.

1          Exhibit 3 -- I have a revised exhibit, I think,

2     right?

3               MR. BOOKBINDER:  Yes, your Honor, over the

4     weekend we revised it.

5               THE COURT:  Right.  And these are TCNISO

6     website forum indices.

7          And the defendant wants these excluded, correct?

8               MR. McGINTY:  That's exactly right, your

9     Honor.

10               MR. BOOKBINDER:  My understanding is that he

11     does not object to the first two pages, but does to the

12     remaining.

13               MR. McGINTY:  That's correct.  The entire

14     exhibit is six pages.  The first two, there's no

15     objection, but we're objecting to Pages 3 through 6.

16               THE COURT:  All right.  That's --

17          Why does the government feel these are admissible?

18               MR. BOOKBINDER:  Well, your Honor, what we've

19     done in redactions is we've -- in light of the Court's

20     -- our past discussion about this, is we've taken out,

21     um, what are assertions, someone saying, "I have this

22     program" or "I have MACs that I'm looking to trade," for

23     example, and what we've left are two categories of

24     topics.  And the first thing to point out are these are

25     topic headings and if -- what the testimony would be is

```
 1    if you click on one of these, then you get a string of
 2    posts about that topic.  So these are topic headings.
 3    Some of them, though, as the Court pointed out, include
 4    statements and assertions of some kind.  We've taken
 5    those out.
 6        So what we have left here are general headings
 7    like the first one, "Cablevision," that's an ISP, um,
 8    and "Charter" is the next one, um, and "BPI Plus Cox,"
 9    "Las Vegas Cox," is another ISP.  And the next one,
10    "Comcast MAC Trading."  Again, these are topic
11    headings.  I suggest they're not assertions of one kind
12    or another.  And then some of them are questions like,
13    down a couple of -- um, after the redaction is, "Anyone
14    want to trade MACs?"  Um, that's a question, it's not an
15    assertion.
16        So I'd suggest those are admissible because they
17    simply fall outside of hearsay.  They are -- they're
18    either a topic or they're a question and therefore are
19    not admitted for the truth of any assertion made.  And
20    they're relevant, um, to -- to the way that the forum is
21    operated, to what was on the topics that people were
22    discussing, and to Mr. Harris's knowledge that people on
23    there were -- um, that there were topic areas where
24    people were asking or inquiring about trades and there
25    were other topic areas that were organized by ISP, and
```

```
 1    again those are --
 2                THE COURT:  What is the evidence that
 3    Mr. Harris would have seen these?
 4                MR. BOOKBINDER:  He is the -- well, we've had
 5    testimony from both Mr. Phillips and Ms. Lindquist that
 6    Mr. Harris ran the website, controlled the website, in
 7    fact we had some of the posts we went through with
 8    Mr. Phillips, I believe, where someone is asking to get
 9    access to the website and it's -- and Mr. Phillips is
10    saying, "You need to activate this person," and
11    Mr. Harris does it, he says "Activate it."  And there's
12    one of the chats, actually the first one with Mr. T,
13    where he says specifically that, "Can you add me to the
14    website member section?" and DerEngel says essentially
15    "Don't," ultimately "Here's your log in with your
16    password, it's done."
17         So we've got several different forum testimony,
18    we've got chats, we also have the, um -- I believe this
19    is to go into the one GoDaddy record that is the sort of
20    subscriber information, I don't think there's an
21    objection to that, I think it's Exhibit 31.  It is
22    Exhibit 31.  And that shows that the domain name,
23    "TCNISO.net," was billed to Ryan Harris.
24                THE COURT:  And what are these documents
25    relevant to?
```

1              MR. BOOKBINDER:  The topic -- this portion of

2     Exhibit 3, your Honor?

3              THE COURT:  Yes.

4              MR. BOOKBINDER:  They're relevant to two

5     things.  First of all, to show that, again, on

6     Mr. Harris's website there are topics dedicated to

7     people asking about trading MACs --

8              THE COURT:  But I'm trying to sort this out

9     because I have a growing sense of whether the conspiracy

10    charge is going to get to the jury and I'm skeptical,

11    although you'll get to argue it.  Um, but if it's only

12    relevant to -- and I thought maybe this was relevant to

13    the interdependence aspect of proving the rim of the

14    alleged conspiracy, and if I'm satisfied that that's not

15    going to be proven -- I mean, that conspiracy is not

16    going to be proven or a conspiracy charged in the

17    indictment is not going to be proven, um, that it raises

18    some interesting issues about the difference between a

19    variance and a constructive amendment.  And I can give

20    you some more cases to read, although you're supposed to

21    be giving them to me.

22         Um, the -- is this relevant to the wire fraud

23    charge if there's no conspiracy charge?

24              MR. BOOKBINDER:  Your Honor, so I think you

25    understand what our assertion is, it's the conspiracy

1    charge and --

2            THE COURT:  Is that what it is really?

3            MR. BOOKBINDER:  No.  No.  No.

4            THE COURT:  Well, what is your assertion on

5    conspiracy?

6            MR. BOOKBINDER:  Oh, sorry.  As to the

7    conspiracy charge, yes, certainly there's -- well, it

8    shows two things.  One, it does show interdependence

9    that people are asking each other about trading MAC

10   addresses, for example, they're posting to each other

11   about different IPS.  So that there's interdependence.

12   There's also -- again it goes to Mr. Harris's knowledge

13   and this, I'd suggest, is relevant both to the

14   conspiracy and to wire fraud that he, um, clearly needs

15   to at least know, um, and intend to assist his customers

16   under both conspiracy and wire fraud.

17           THE COURT:  Well, for wire fraud -- you see, I

18   think that the burden may be less on you for wire

19   fraud.  I've long thought that was, to be colloquial,

20   your "cleaner shot," but --

21           MR. BOOKBINDER:  I suggest that that's true,

22   your Honor.  I agree.

23           THE COURT:  You know, if he had to have

24   devised or participated in a scheme to defraud and had

25   known or reasonably foreseen that the wires would be

```
 1     used in executing the scheme -- although I don't expect
 2     I'm going to hear him testify that he had to know about
 3     a particular use -- you know, a use by a particular
 4     person if it was foreseeable.  And there are cases on
 5     this.
 6                 MR. BOOKBINDER:  Right.
 7                 THE COURT:  So, you know, in exchanging MACs,
 8     it is evidence of a scheme, but it's not an essential
 9     element as it is to some extent on the conspiracy
10     charge.
11                 MR. BOOKBINDER:  That's absolutely right, your
12     Honor.  But I would suggest it's still certainly
13     relevant to what he intended the products to be used for
14     and what his scheme was.
15                 THE COURT:  And your claim is that these are
16     not hearsay because, whether they're true or not, they
17     would be statements -- like "Anyone want to trade MACs,"
18     these questions are usually not hearsay, which would
19     lead him to know or believe that people were using his
20     devices in connection with traded MACs to steal internet
21     service.
22                 MR. BOOKBINDER:  Absolutely.  There's
23     testimony from both Mr. Kohler and Mr. Brodfuehrer that
24     there's no other reason to trade MACs and that this is
25     evidence that people are -- it may not be dispositive,
```

 1    but certainly asking and inquiring about MACs.  I mean

 2    -- and the names of the ISPs is certainly relevant to

 3    the question of what people are doing with his products.

 4              THE COURT:  All right.

 5         And, Mr. McGinty, what do you say?

 6              MR. McGINTY:  Your Honor, first of all, if we

 7    could just back up to the prior page.  The way this is

 8    structured is that TCN has forums, the forums are set

 9    out on the first page which indicates what the topics

10    are for the particular forum and who the moderators are

11    for that forum.  The 03-03 page, the first of the pages

12    that we are objecting to is within the DOCSIS forum,

13    which is the forum on Page 1, um, the fifth forum down.

14    And so when a person gets on the DOCSIS forum, they can

15    invite a conversation about the subject.

16         For example, I can invite a conversation about the

17    subject -- I don't know, "Cablevision."  There it is.

18    And the Cablevision heading is saying, in effect, "I

19    will be talking about Cablevision."  So the

20    parenthetical there, the statement there is, "I will be

21    talking about Cablevision," and parenthetically, "Is

22    anybody else interested in talking about Cablevision?"

23    The government says it's not admitted for the truth of

24    the matter.  The defense says that the topics are

25    dedicated to people talking about -- they said MACs,

1    Cablevision, whatever the topic is.  And a way of

2    framing it that frames it exactly as we do, um, the

3    statement of what the topic is is a simple declarative

4    sentence of what the content is and it's being offered

5    for the truth of the matter.  Were it not that, the

6    government wouldn't be offering this.

7         So the first topic here is "Cablevision" and the

8    statement is "I will be talking about Cablevision,"

9    offered for the truth of the matter.  Now, what's

10   interesting about each of these is hearsay generally

11   doesn't have a Trojan Horse component to it, but this

12   does.  So with Cablevision, um, you look to the right

13   and see that no one was interested in replying to

14   "Cablevision."  So the tree fell in the woods and no one

15   heard about it.  So the first topic "Cablevision," um,

16   evoked nothing but silence.  Apparently there were 19

17   views, people looked at it and went (Yawns.) and nobody

18   contributed to the subject.

19        If we move down, the fourth one that's here,

20   "Comcast MAC trades," the simple sentence is, "I will be

21   talking about MAC trades," and the Trojan Horse

22   component of this is, if we go to "Replies," 27, if we

23   goes to "Views," 5136, the back door effect of this is

24   the -- the, um, sort of the tail wagging the dog, of

25   there were 5136 people who were interested in the

1    subject and there were 27 people who actually commented

2    on it.

3         So I don't know how this is not offered for the

4    truth of the matter.  I would note that the moderator is

5    not Harris.  Um, I would note that the creation of the

6    topic is the creation of the individual who suggests the

7    topic and begins that thread.  So with "Comcast," it

8    would be "Routy," a person we don't know anything

9    about.  So "Routy" comes on there and says, "I want to

10   talk about Comcast MAC trades" --

11             THE COURT:  Where do you see that?

12             MR. McGINTY:  So it's "Comcast MAC trade,"

13   then right under it it says "By Routy."

14             THE COURT:  Oh, I see.  Yes.  Yes.

15             MR. McGINTY:  So "By Routy."

16        So apparently Routy, interested in talking about

17   this, um, posts a header, the header is "Comcast MAC

18   trade," and he invites a string of comment, "Does anyone

19   want to talk about this?"  He gets it started.  It's

20   under the egis of the moderator, but the moderator is

21   the moderator of the forum which is now conclusive of a

22   potential string chat created by that Routy fellow.  And

23   Routy's chat, his conversation then, either germinates

24   other things or, as with "Cablevision," germinates

25   nothing.

1           So the "Comcast MAC trades" is a combination of

2      the obvious statement, that "I am you talking about

3      Comcast MAC trades," as well as 5136 people who are

4      interested in that topic.  So Harris wasn't the

5      moderator, Phillips never said that he saw this at any

6      time, that he could verify "This is the way it looked."

7      At the time this is offered and we look now to these --

8                THE COURT:  All right.  I think, given the

9      limits on time, that's enough, but at the moment -- and

10     I'll give you more definitive answers tomorrow, but at

11     the moment I'm inclined to exclude this.

12           There's general jurisprudence that the question,

13     "Does anyone want to trade MACs?" is not hearsay.  I

14     understand that.  But even to the extent that that's

15     true, I think this little -- I'd have to give the jury

16     an instruction that none of this is offered for the

17     truth as to whether anybody was trading MACs, it's for

18     Mr. Harris's knowledge and belief.  He's not the

19     moderator of this.  The primary probative value on this

20     would be to show the interdependence of the named

21     co-conspirators and at the moment -- although I'm

22     interested in hearing from you, I'm leaning towards

23     granting a Rule 29 motion on the conspiracy -- the

24     conspiracy charged in the indictment, I'm inclined to

25     find the jury could not find beyond a reasonable doubt,

1    um, with regard to anybody in Massachusetts.

2         If Hanshaw, given, you know, the testimony of

3    Phillips, for example, saying that Harris said he was an

4    idiot and Hanshaw's own testimony about how he kept

5    getting kicked out, um, shows -- you know, would permit

6    a finding that he intended to conspire, but I think it's

7    not sufficient to prove beyond a reasonable doubt, even

8    on view in the light most favorable to the government,

9    that Mr. Harris agreed with Hanshaw to engage in wire

10   fraud.

11        With regard to Madeira, for some reason his motive

12   didn't require trading MACs, and the government didn't

13   ask him any questions, that I can recall, about his

14   frame of mind, which *Portella* makes important.  You

15   know, you have to be able to prove beyond a reasonable

16   doubt to prove that he was in a conspiracy with the

17   others in Massachusetts, as well as Harris, that he

18   thought that the success of a venture by him, or his

19   success in the venture, depended on the activities of

20   others in addition to Mr. Harris.  That's my current

21   conception.

22        And Larosa didn't trade MACs.  He drove from

23   Dorchester to Roxbury to get his.

24        But interestingly, you know, it's possible you

25   could prove or -- nevertheless prove a conspiracy with

1    Mr. Harris, you know, you would say one of them, Larosa
2    or -- well, I don't know that there's enough to prove a
3    conspiracy with either of them because I don't think
4    there's any showing that Mr. Harris knew of their
5    existence.  He knew of Hanshaw's existence, but he
6    wouldn't let him on the team.  So it doesn't appear he
7    can be proven to -- that he intended to agree with
8    Larosa or with Madeira.
9         Then usually you get a variance, an impermissible
10   or a prejudicial variance, one that's not permissible if
11   something expands a conspiracy, it doesn't contract it.
12   So I've been giving some thought to, um, whether, you
13   know, a conspiracy between Lindquist, Phillips, and
14   Harris, for example, could be prosecuted in
15   Massachusetts and I know the FBI, I think in 2008,
16   purchased something that was sent to Massachusetts, but
17   by that time Phillips and Lindquist were out of the
18   conspiracy.  Unless I'm -- so that's my present thoughts
19   about the conspiracy, why I'm analyzing most of this
20   evidence on its probative value to the wire fraud
21   charges, which doesn't require proof of the trading of
22   MACs.
23        Is there other evidence that the jury's already
24   heard about the trading of MACs?
25             MR. BOOKBINDER:  Um, yes, your Honor,

```
1    Mr. Phillips testified that he traded MACs, um, as did
2    Mr. Hanshaw, and I, um --
3              THE COURT:  Well, let me ask -- put the
4    question more precisely.
5         Is there evidence that Mr. Harris -- did Phillips
6    provide evidence that Harris knew that MACs were being
7    traded?
8              MR. BOOKBINDER:  Well, um, your Honor, there
9    is Harris's own post, which it's worth noting -- and I
10   understand the Court's inclination on this Exhibit 3,
11   but, um, in that same DOCSIS subheading that this topic
12   list comes from, there is the --
13             THE COURT:  Which exhibit?
14             MR. BOOKBINDER:  So in Exhibit 3, these set of
15   topics that we were just talking about is within the
16   bigger heading "DOCSIS," D-O-C-S-I-S, and Mr. McGinty
17   properly points out that Mr. Harris is not a moderator
18   of that particular portion of the forums.  However, he
19   did post there.
20             THE COURT:  Where is that?
21             MR. BOOKBINDER:  If you look at Exhibit 22,
22   you can see from the front page of Exhibit 22, which
23   just has the headings.
24             THE COURT:  So this one's going to come in.
25   But actually, you see, this one, in my conception,
```

```
 1    weighs against admitting Exhibit 3, not in favor,
 2    because the marginal probative value is diminished by
 3    the much more direct admissible evidence.  He knows that
 4    these are being used to trade MACs, he says, "I'm
 5    checking up on something for a friend.  Does anyone have
 6    any verified MAC addresses and/or config files for" --
 7              MR. BOOKBINDER:  Correct.
 8              THE COURT:  So you should proceed on the
 9    assumption that Exhibit 3 is out.
10              (Pause.)
11              THE COURT:  Exhibit 4, the GoDaddy records.
12              MR. BOOKBINDER:  Your Honor, we're not
13    offering Exhibit 4.
14              THE COURT:  Okay.  So that's withdrawn.
15              (Pause.)
16              THE COURT:  The GoDaddy ads on the Superbowl
17    were so interesting that I was looking forward to seeing
18    the custodian of the records.
19              MR. BOOKBINDER:  I believe Danica Patrick's
20    busy this week, so I don't think she could be here, but
21    --
22              THE COURT:  Well, I don't know who that is,
23    but I'm sure it's connected.
24         Okay.  Exhibit 7, no objection.  Exhibit 13, no
25    objection.  Exhibit 14 -- Exhibit 14.
```

```
 1                MR. BOOKBINDER:  Your Honor, we're not going

 2      to be using Exhibit 14.

 3                THE COURT:  Okay, so that's withdrawn.

 4           Exhibit 16, no objection.  Exhibit 17.  Now it's

 5      Mr. T as to which *Petrozziello* rulings -- so here,

 6      essentially I have to look and see whether the DerEngel

 7      statements sufficiently add to Mr. T's statements to

 8      persuade me, by a preponderance, that Mr. T was a

 9      co-conspirator.

10           That's the analytical framework, right?

11                MR. BOOKBINDER:  Yes, your Honor.  And in

12      addition to the ones that are actually left in this

13      exhibit, we'd be talking about the additional statements

14      set down on Page 15 and 16 of our motion -- in support

15      of our motion in limine.

16                THE COURT:  All right.

17                (Pause.)

18                THE COURT:  So okay.  16, let me get your

19      motion, because I've done these before.  It's on Page

20      15.

21           All right.  So Exhibit 17 is where in the original

22      motion in limine?

23                MR. BOOKBINDER:  Pages 15 and 16, your Honor.

24                THE COURT:  Pages 15 and 16.

25                (Pause.)
```

1           THE COURT:  Well, "Can you add me to the

2    website" -- all right.  Well, here, give me the

3    argument, please, I know I've done this once before, but

4    on Exhibit 17.  What is it --

5           MR. BOOKBINDER:  Sure, your Honor.

6           THE COURT:  Remind me of the overall evidence

7    that persuades me, by a preponderance, or that should

8    persuade me that here in 2005 Mr. T was in a conspiracy

9    with Harris and these statements were made in

10    furtherance of it.

11           MR. BOOKBINDER:  Okay.  Your Honor, if you

12    look at the chats that are on page -- particularly the

13    ones on Page 16 of our motion in limine, essentially

14    what's happening here is that Mr. T is asking Harris,

15    "I'm wondering if you can give me commissions if I --

16    I wonder if you could give me a commission or something

17    like that if I get some people to uncap using TCNISO

18    software/hardware?"  And Harris responds in that

19    initial, um, chat, "I'm sure we can work something

20    out."  And then in the second one, again, Mr. T says,

21    "If you could arrange something, if I could refer people

22    to you," well, how would the mechanics work,

23    essentially?  And Harris says, "Just refer them, you'll

24    need to give me the order numbers," um, and the next --

25           THE COURT:  Well, maybe I wrote this wrong, or

```
 1    I read this wrong, but --
 2         Is this on Page 16 of your motion?
 3              MR. BOOKBINDER:  It is, I'm looking at that
 4    one.  I want to make sure you're looking at the right
 5    one.  It's the memorandum in support of our motion in
 6    limine.
 7              THE COURT:  Yes, it's Number 094.  Because I
 8    thought, on February 8th, you told me that this was
 9    withdrawn.  Maybe I --
10              MR. BOOKBINDER:  Well, we're not seeking to
11    introduce --
12              THE COURT:  Oh, but you want me to rely on
13    them?
14              MR. BOOKBINDER:  We want you to rely on them
15    --
16              THE COURT:  And I can.
17              MR. BOOKBINDER:  Yes.  It's also worth noting,
18    your Honor, that it may be the case that for the three
19    excerpts that we're actually offering, um, there are
20    questions that Mr. T is asking to Harris.  So it may not
21    even be necessary to make a *Petrozziello* ruling and
22    maybe we should start there.
23              THE COURT:  All right.  So the three are what
24    numbers, 17?
25              MR. BOOKBINDER:  It's Exhibit 17.
```

```
 1              THE COURT:  So what's the next one?

 2              MR. BOOKBINDER:  Um, they're all Exhibit 17.

 3              THE COURT:  Oh, you're talking about the

 4    statements in 17?

 5              MR. BOOKBINDER:  Yes.

 6              THE COURT:  All right.

 7         And, Mr. McGinty, do you want to be heard?  Why

 8    shouldn't I -- it wouldn't be the conspiracy charged in

 9    the indictment, in my present conception, but as I said,

10    it can be any conspiracy, according to *Marino* and

11    *Amorrati* or from *Count Dairy Silva,* you don't even have

12    to have a conspiracy charged in the indictment.

13              MR. McGINTY:  Well, the government formerly

14    had suggested that it would be some, um, dimension to

15    Mr. T, right now he is only a name, we know nothing

16    about him, we don't know whether he's got any

17    acquaintance with anyone.  The part that is not being

18    admitted here for which the government suggests provides

19    some context in this is an offer to do something by

20    someone who is unknown, and the probity of that, um,

21    doesn't seem very high.  The part they're trying to

22    glean goes like this --

23              THE COURT:  Well, the real name isn't known,

24    but, as I said, I think back on February 8th, I don't

25    think that's at all fatal.
```

1          Go ahead.

2               MR. McGINTY:  Well, the Court ruled that it's

3     not fatal to the admissibility, but for the jury to

4     evaluate this and for it not to have a 403 effect, um,

5     there has to be some dimension to Mr. T so that they

6     understand what the nature of his contribution to the

7     evidence is.

8          Now, the part that the government is offering on

9     1701, um, is a question for Mr. T.  If you take out the

10    question, um, the Harris contribution is, "Yeah, what's

11    your pass, done, login," and the name of the login.  In

12    other words, um, this provides, I suppose, some access

13    to, um, a -- to the forums of TCNISO.  There's nothing

14    that is indicative of a conspiracy in letting a person

15    into the forums.  So I don't know what that's probative

16    of.

17         The second page, um, the Court had considered this

18    before and reserved judgment on it because -- I mean,

19    again, in order for this thing to be meaningful, it has

20    to be some sort of a conspiratorial agreement in part,

21    and it's not necessarily a charge on there with some

22    other conspiracy, and this isn't that.

23              THE COURT:  Well, I think it is.  Um, this I'm

24    admitting.  I'm persuaded, by a preponderance of the

25    evidence, that Mr. T and Mr. Harris were in a

1   conspiracy, but not the conspiracy necessarily charged

2   in Count 1, at the time this statement was made and

3   these were statements in furtherance of it.

4        So as I think I said on February 8th, I've relied

5   in part on the chat log from March 31, 2005 showing

6   Harris gave Mr. T access to the forum, a chat log from

7   April 20, 2005, which has not been admitted, showing

8   Mr. T solicited commissions from the defendant finding

9   people to buy modems and Sigma licenses on TCNISO.net, a

10  chat log from July 10, 2005, which has not been

11  admitted, where the defendant told Mr. T that he was

12  sending him $50 versus PayPal chat logs from March 31

13  and from April 18, 2005, which the government does not

14  seem to admit, showing Mr. T has been prosecuted for

15  theft of services, and additional portions of the chat

16  log are part of a chat log from April 20, 2005, which

17  the government doesn't seek to admit, where Mr. T asked

18  the defendant if he got feedback on whether Sigma was

19  working for users in Quebec, so he could be sure that

20  they'll work with him.  Um, also a chat log from April

21  20, 2005, which is not admitted, where Mr. T asked the

22  defendant whether people with Sigma can get on line with

23  MAC cloning or with a legitimate address.

24        So those are -- then there's independent

25  nonhearsay corroborating that those statements are

1    admissible under 801(d)(2)(E), as required by **Portella**,

2    167 F.3d at 703, and **Padro Burgos**, 239 F.3d at 75 to

3    76.  And some of them are right here in Exhibit 17.

4    Mr. T is asking for a commission for selling the

5    defendant's products and the defendant says, "I'm sure

6    we can work something out."  This is the defendant's own

7    statements.  Generally, in the chat logs, it indicates

8    that Mr. T was acting as a broker for TCNISO and

9    seeking -- and there's also abundant evidence in the

10   case that the products, the modems sold by TCNISO, the

11   software, were designed to be used to steal internet

12   service, either to get it for free or to get premium

13   uncapped service without paying for it.  And while there

14   are many statements of Mr. Harris's, and I haven't

15   recited them all, but they persuade me, by a

16   preponderance, that Mr. T is a co-conspirator.

17        So what's the next one?

18        MR. McGINTY:  If I might?  The Court is

19   suggesting a finding that this was built -- that this

20   software was for a singular purpose.  Um, I respectfully

21   submit that the evidence is to the contrary.

22        THE COURT:  All right, but I'm not telling the

23   jury this.  I find that this software and hardware was

24   built to steel internet service.  That's what I'm

25   finding for present purposes, for **Petrozziello** purposes.

1          All right.  What's the next exhibit that I need to

2     rule on?

3               MR. BOOKBINDER:  Your Honor, I don't believe

4     that -- well, Exhibits 18 and 19 are just Harris's

5     statements.  I don't know whether there's any objection

6     to those.

7               THE COURT:  I think there is.  Yeah, there

8     were objections under 403 and 404(b), but these are

9     intrinsic, as we've discussed before.  So in 18,

10    Mr. Harris says:  "On September 13th, 2005, I created

11    the entire cable modem hacking scene."  That's a

12    statement within the period of the conspiracy, it's an

13    admission, it's admissible under Rule 801(d)(2)(A).  So

14    that's admitted.  It doesn't even have to be within the

15    period of the conspiracy, but it is.  But that's not

16    what I'm relying on because I can't see who is making

17    the statement.  Okay?

18         What's the next one?

19              MR. BOOKBINDER:  19, your Honor.

20              THE COURT:  This is a chat with "X-Factor"?

21              MR. BOOKBINDER:  Yes, but again it's just

22    Harris's statement.

23              THE COURT:  All right.  So you're not asking

24    me to make a **Petrozziello** ruling on X-Factor?

25              MR. BOOKBINDER:  No.

1          THE COURT:  Okay.  This is June 21, 2005 and
2     saying what he makes on advertising.  So that's
3     admissible, also.  That's a statement of a party
4     opponent.
5          What's the next one?
6          MR. BOOKBINDER:  20.
7          THE COURT:  And Rule 403 doesn't exclude it.
8          MR. BOOKBINDER:  This is a chat with somebody
9     by the name "Shaggy," but again, um, it's Harris's
10     statement.  There is a question in the middle of it from
11     Shaggy, but we're not asking for any *Petrozziello* ruling
12     here.
13          THE COURT:  DerEngel says:  "I love Sigma, 230
14     KB upload consistent."  He's asked, "What did you do,
15     flash the firmware on the modem at the hotel?"  And the
16     answer is, "I'm at Craig's now using his spare uncapped
17     modem on RR."
18          "RR" is an ISP?
19          MR. BOOKBINDER:  "Roadrunner," yes.
20          THE COURT:  So the relevance of this is
21     showing, "I'm using an uncapped modem."  He knows.
22     Okay, that's admissible.
23          MR. McGINTY:  And, your Honor, does that
24     include the statement there of Shaggy, "What did you do,
25     flash the firmware or modem at the hotel?"  That's

1    unresponded to.

2              THE COURT:  Well, that's not hearsay because

3    it's a question, um, but is there any problem redacting

4    the question?

5              MR. BOOKBINDER:  Um, a minute, your Honor.

6              THE COURT:  Because I think Mr. McGinty is

7    right, but the part you're interested in doesn't seem to

8    be responsive to the question.

9              MR. BOOKBINDER:  Well, actually I think it

10   is.  If the question is, "What did you do, flash the

11   firmware on the modem at the hotel?"  The answer is "I'm

12   impressed," so --

13             THE COURT:  Well, it's a question and there

14   are cases -- that I don't have on the top of my tongue

15   right now, that indicate that questions are not hearsay.

16             MR. McGINTY:  Right, but it's a 403

17   consideration.

18             THE COURT:  Given the way this -- no, the

19   probative value of this -- it didn't have any context to

20   make it intelligible.  It's not substantially outweighed

21   by any risk of unfair prejudice.

22        So what's next?

23             MR. BOOKBINDER:  Exhibit 21, your Honor.

24             THE COURT:  This is MooreR?

25             MR. BOOKBINDER:  Yes.  And here, just to be

1      clear, um, there is a lot in this exhibit that's in here

2      because the defense has asked for it, um, and I can

3      highlight for -- including the first two pages and then

4      a significant portion of the third page, too, and I can

5      highlight for the Court what we'd actually be using, but

6      maybe it makes sense for Mr. McGinty to articulate his

7      objection.  Whatever is easier.  The whole thing would

8      come in as the exhibit, so I guess Mr. McGinty --

9              THE COURT:  Is the principal objection that

10     it's not co-conspirator hearsay or what is it?

11             MR. McGINTY:  It is that it's not

12     co-conspirator hearsay, your Honor.

13         This is a conversation where a fellow named

14     MooreR, um, again we're in the same situation where we

15     don't have any content of who this person is.  The

16     Phillips testimony was that the person who had designed

17     the software, um, was "L3X," it was not this "MooreR."

18     The probative offering here, from the government, is

19     that this is a contribution from MooreR.  So there's a

20     representation -- there's, in effect, a statement here

21     offered that there's software being provided by MooreR

22     when the testimony that the government has offered by

23     Mr. Phillips is to the contrary.

24             THE COURT:  I'm sorry.  Say that again?

25             MR. McGINTY:  In other words, we're talking

 1    here about an application that supposedly is from MooreR

 2    and he's offering it.  The testimony of Mr. Phillips was

 3    that it came from some other person.

 4              THE COURT:  What came from some other person?

 5              MR. McGINTY:  The software, your Honor, the,

 6    um, CoaxThief software.

 7              THE COURT:  All right.  So is Exhibit 21 where

 8    MooreR -- is where the defendant refers to MooreR's role

 9    in designing CoaxThief?

10              MR. BOOKBINDER:  That's right, your Honor.  I

11    mean -- I think Mr. McGinty may be right, that I, off

12    the top of my head, remember that Mr. Phillips was

13    asked, "Who designed CoaxThief?" and then he may have

14    said it was somebody else.  But this chart makes it very

15    clear.  There's no question.  There's this back and

16    forth conversation between the defendant and MooreR and

17    the defendant talks about how much he likes the sniffer

18    that MooreR designed.

19              THE COURT:  Where is that?

20              MR. BOOKBINDER:  That is on Page 3, about the

21    middle, it's 5:43:08 p.m.  MooreR says, "So you'd like"

22    --

23              THE COURT:  I'm sorry.  What is it?

24              MR. BOOKBINDER:  I'm sorry.  It's 543.

25              THE COURT:  5:43.

1          MR. BOOKBINDER:  And it may be -- this is also

2     in our memo, your Honor, if it's easier for you to find

3     and look at.

4          THE COURT:  All right.  I've got it.

5          MR. BOOKBINDER:  MooreR says, "You like the

6     sniffer?"  Harris says, "It's very well designed.  Love

7     the gooey," which is the interface with the user.  And

8     then Harris goes on to say, "Did you decide on a name

9     yet?"  MooreR says, "No, I've been away, but "CoaxThief

10    Sniffer" or "Thief" is pretty promising," and then

11    there's some back and forth dialogue.

12         THE COURT:  And where is that?

13         MR. BOOKBINDER:  Again, this is just

14    continuing to read.

15         THE COURT:  All right.  I see.  That's

16    MooreR's statement.  And Harris is asking him how it

17    works and he said, "Look, the CoaxThief would be a cool

18    act to put on the website."

19         MR. BOOKBINDER:  Yeah.  I mean, I think it's

20    fairly clear from what I've --

21         THE COURT:  Yeah, I'm persuaded that there is

22    a conspiracy by the preponderance of the evidence.

23    Basically I have the defendant's statements and the chat

24    logs referencing MooreR's role in designing CoaxThief,

25    evidence that CoaxThief is MAC-changing software, which

1    I understand the defendant and MooreR are discussing in

2    the chat logs as being capable of being used to steal

3    services, to uncap services and, in fact, that's what

4    they intended to be used for.

5        All right.  So that one is admissible.  That one

6    being 21.

7        Then 22, 23 and 24 are posts, right?

8            MR. BOOKBINDER:  Correct.

9            THE COURT:  Is the government still hoping to

10   use them?

11           MR. BOOKBINDER:  Well, certainly 22, Pages 1

12   and 2.

13           THE COURT:  Which one?

14           MR. BOOKBINDER:  Exhibit 22.

15           THE COURT:  Okay.  This is DerEngel saying,

16   "I'm checking up on something for a friend.  Does

17   anybody have any verified MAC addresses or any config

18   files?"

19           MR. BOOKBINDER:  Right.

20           THE COURT:  Okay, that's admissible.

21           MR. BOOKBINDER:  Page 3 is posts by users and

22   we've talked about this, whether these people are

23   co-conspirators or not, um, and the first one is a

24   question --

25           THE COURT:  Page what?

```
1              MR. BOOKBINDER:  Page 3 of Exhibit 22.

2              THE COURT:  At the moment I want to get -- oh,

3    I'm sorry, yeah, Exhibit 22?  Oh, no, I've got it.

4    Consider those out.

5              MR. BOOKBINDER:  Yes.

6              THE COURT:  I mean, the moderator is somebody

7    other than the defendant.  You're not offering them for

8    the truth.  I'd have to give a limiting instruction.

9    You've got them on a previous page demonstrating that he

10   has knowledge that MAC addresses are being exchanged.

11   The marginal probative value of this and the potential

12   for confusion with a limiting instruction cause 403

13   problems and I will exclude them.

14             MR. BOOKBINDER:  Your Honor, Exhibit 23, we

15   are withdrawing.

16             THE COURT:  Right.

17             MR. BOOKBINDER:  And that gets us to 24, which

18   for some reason -- um, yeah, I think that --

19             THE COURT:  24.  Do you have it as -- on Page

20   2, Post 5 is the defendant?

21             MR. BOOKBINDER:  Yeah.  I can look at it right

22   here, your Honor, on the computer.  I apologize.  For

23   some reason my copy is missing it.

24             (Looks.)

25             MR. BOOKBINDER:  Yes, Page 2 is opposed by the
```

```
 1   defendant, so obviously we would be seeking to use

 2   that.  The remaining portions, I think, are -- the Court

 3   will be -- I'm sorry.  Page 5.

 4            THE COURT:  Okay, let's do this.  Page 2 is

 5   in, it's the defendant's own statement.  3 and 4 are

 6   out.  They would come in as co-conspirator statements

 7   and that's not proven.

 8            MR. BOOKBINDER:  Right.

 9            THE COURT:  Page 5?

10            MR. BOOKBINDER:  The defendant's statement

11   again.

12            THE COURT:  The defendant's statement.  Do you

13   want it?

14            MR. BOOKBINDER:  I, for now, um, yes, your

15   Honor, we'll decide whether we're still using that.

16            THE COURT:  All right.  Well, that comes in.

17       And I think that's the end of the issues, right?

18            MR. BOOKBINDER:  Yes.

19            THE COURT:  So you win some, you lose some.

20            MR. BOOKBINDER:  Um, your Honor, there's maybe

21   -- I don't know if there's an objection to Exhibit 28.

22   There may be.

23            (Pause.)

24            MR. BOOKBINDER:  It's a private message

25   written by Harris, but I don't know if --
```

1              THE COURT:  Yeah, this is where he expresses

2    his outrage that people were stealing his stuff.

3              MR. BOOKBINDER:  Among other things, your

4    Honor.

5              THE COURT:  Well, this is the defendant's own

6    statement.  What's the date?  Is it 9-21, 2010?

7              MR. BOOKBINDER:  Um, your Honor, I can't tell

8    right now.  I could ask the agent.  Whether that's the

9    download -- whether that's the date that this website

10   was downloaded or whether that's the date of the post?

11   I'm not sure.  I can find the answer to that.

12             THE COURT:  All right.  And while you're doing

13   that --

14             (Pause.)

15             MR. BOOKBINDER:  Your Honor, Special Agent

16   Russell tells me that's the date that he created the

17   report, that's not the date of the post.  At least as

18   it's set out here, we don't have a date and I would

19   suggest it doesn't matter given the subject matter of

20   the post, except that it was before.

21             THE COURT:  Well, it depends on whether --

22   what's that?

23             MR. BOOKBINDER:  Your Honor, the, um -- that

24   given that particularly if it's not admitted in the

25   context of the conspiracy, to the extent the defendant

1    is making these statements about products that are the

2    subject of fraud charges, um, I'm not sure that it makes

3    much of a difference what the date is.  We may be able

4    to find that if that's important.

5                THE COURT:  I think the date is -- well,

6    anyway.  Go ahead.

7                MR. McGINTY:  Um, we don't know what the

8    origin of this was.  The assumption is that this came

9    from the GoDaddy records.  Um, I don't know what the

10   government is --

11               THE COURT:  Well, where did it come from?

12               MR. BOOKBINDER:  Um, your Honor, if I could

13   just have a minute again?

14               (Pause.)

15               MR. BOOKBINDER:  Your Honor, yes, that did

16   come from the records that were obtained by the search

17   warrant at GoDaddy.  But I'd suggest, your Honor, that

18   this isn't a business record, that this is a statement

19   of the defendant.  Mr. Russell can testify certainly as

20   to how he got it.  A search warrant on GoDaddy was

21   given, their contents relating to this website.  And

22   this was among -- um, you know, Mr. McGinty can

23   certainly cross-examine and argue that it may have been

24   altered at some point, but we're not here in --

25               THE COURT:  Well, I don't know.  I mean, I

1    think the document has to be admissible.  The fact that

2    it was obtained in the search warrant doesn't

3    necessarily make it admissible.

4              MR. BOOKBINDER:  Right.

5              THE COURT:  You have to prove that at least --

6    you have to prove to me, by a preponderance of the

7    evidence, I think, for Rule 801(d)(2)(A) purposes, that

8    he made the statement.

9              MR. BOOKBINDER:  Yes, your Honor, and we can

10   do that.  Mr. Russell will explain that he has reviewed

11   -- um, that he has reviewed the records of the private

12   messages, that the author ID number there, both the

13   author ID and the user ID are 86, which is listed in the

14   records as being DerEngel's, Mr. Harris's.

15             THE COURT:  Yeah, but this is the same thing,

16   that unless the records are admissible in some fashion,

17   then you can't rely on the records.

18             MR. BOOKBINDER:  Um, he can also testify, your

19   Honor, that he reviewed that he did searches for those

20   user IDs himself and what came back is that every post

21   related to these user IDs --

22             THE COURT:  At the moment this is excluded,

23   but I'll think about it more.

24             MR. BOOKBINDER:  Okay.

25             THE COURT:  And then I think the late exhibit

1    was 32.

2         Is there any problem with 32?

3              MR. BOOKBINDER:  Um, your Honor, we're not

4    offering 32.  That was something with Motorola.

5              THE COURT:  All right.  But at the moment, my

6    thinking about 28, to go back, is, um, you know, the

7    mere fact that it was obtained in a search warrant, um,

8    doesn't mean it's not hearsay, and then you have to fit

9    it into some exception and the exception you want to fit

10   it into is it's a statement by Harris.  If you want this

11   -- well, sleep on it.  If you want it, I'll do a voir

12   dire of the witness before the jurors come in tomorrow

13   morning.  Okay?

14             MR. BOOKBINDER:  We'll think about that, your

15   Honor.

16             THE COURT:  Okay.  Another thing.  So the

17   jurors are going to -- we're going to finish with the

18   jury tomorrow morning, we'll take a break, and I'll

19   address the Rule 29 motion.  But I don't, at the moment

20   -- I'm not, at the moment, as I told you, inclined to

21   feel there's sufficient evidence to prove the exact

22   conspiracy charged in the indictment beyond a reasonable

23   doubt, using the standards I used in *DiMasi*.  There's

24   enough evidence to prove a narrower conspiracy,

25   certainly between Lindquist, Phillips and Harris.

1    Mr. T -- well, those three.  But I don't think you can

2    get that one into Massachusetts.

3         And you might want to look at, in terms of

4    variance, **Mubayid**, 658 F.3d 35 at 48.  **Muffleman**, 470

5    F.3d 33 at 39.  And there are other cases.

6         You know, it's possible that there's some theory

7    on which the conspiracy charge would be saved.  It would

8    invite very complicated instructions and interesting

9    compelling issues.  But the wire fraud, at the moment,

10   strikes me as a straighter shot.  The government should

11   think about how hard it wants to argue to save the

12   conspiracy charge.  The evidence just -- it happens in

13   cases, it just doesn't develop the way you expect.

14              MR. BOOKBINDER:  Your Honor, whatever the

15   Court's decision is on the conspiracy at this point,

16   certainly in light of the issues, um, we want to make

17   sure that if there is not a conspiracy charge going to

18   the jury, then there is no **Pinkerton** instruction.

19              THE COURT:  Oh, there would not be a **Pinkerton**

20   instruction.

21        And one of the things I want to talk to you

22   tomorrow about is, um -- and we haven't researched this

23   point, but I've had this discussion before, that if we

24   had a **Pinkerton** charge, you'd have to prove the

25   conspiracy charged in Count 1, that it's not like

1    co-conspirator hearsay where you'd include some other

2    conspiracy.  Um, that's my view.

3            You should also think about whether you want an

4    aiding and abetting charge, which the way this has come

5    in, I expect I'm going to instruct, you know, that if

6    Mr. Harris is guilty, he's proved beyond a reasonable

7    doubt to have devised or participated in a scheme, um,

8    to -- you know, with intent to defraud, um, and/or using

9    false representations like, I guess, the MAC addresses

10   -- and I will talk about the MAC addresses, but you've

11   argued that, and, um, he knew or could reasonably

12   foresee that the wires would be used in furtherance of

13   the scheme.

14           So, you know, he's the creator, you're going to

15   argue, he devised the scheme, um, he wanted to get for

16   people free internet service, and, you know, even if he

17   didn't know about Larosa and Madeira, or certainly

18   Hanshaw, um, he would foresee that people would use, you

19   know, the devices he distributed as part of the scheme

20   to steal internet service.

21           And on the aiding and abetting?  I mean, it's

22   always there -- and I use the standard charge that

23   sometimes you can aid and abet somebody you didn't know,

24   but again, not having thought this all the way through,

25   I don't know how you can get a conviction on aiding and

```
 1    abetting and not as a principal.  I don't know what --

 2    and on the instructions as I'm inclined to give them

 3    now.  But we'll discuss this all tomorrow.  It's just

 4    more for you to think about.

 5          All right.  The Court is in recess.

 6              (Adjourned, 1:30 p.m.)

 7

 8               C E R T I F I C A T E

 9

10          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

11    hereby certify that the forgoing transcript of the

12    record is a true and accurate transcription of my

13    stenographic notes, before Chief Judge Mark L. Wolf, on

14    Monday, February 27, 2012, to the best of my skill and

15    ability.

16

17

18

19    /s/ Richard H. Romanow 11-07-12
      _____
20    RICHARD H. ROMANOW  Date

21

22

23

24

25
```