1                  UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3                              No. 1:09-cr-10243-MLW

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    RYAN HARRIS

10

11                         * * * * * * * * *

12

13                     For Jury Trial Before:
                     Chief Judge Mark L. Wolf
14

15

16                   United States District Court
                   District of Massachusetts (Boston.)
17                   One Courthouse Way
                   Boston, Massachusetts 02210
18                   Tuesday, February 28, 2012

19

20                         * * * * * * * *

21

22             REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23                United States District Court
        One Courthouse Way, Room 5200, Boston, MA 02210
24                bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    ADAM J. BOOKBINDER, ESQ.
          United States Attorney's Office
 4        John Joseph Moakley Federal Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          (617) 748-3112
 6        E-mail: Adam.bookbinder@usdoj.gov
      and
 7    MONA SEDKY, ESQ.
          U.S. Department of Justice
 8        601 D. Street, N.W.
          Washington, D.C. 20530
 9        (202) 353-4304
          Email: Mona.sedky@usdoj.gov
10        For the United States of America

11

12    CHARLES P. McGINTY, ESQ.
          Federal Public Defender Office
13        District of Massachusetts
          51 Sleeper Street, 5th Floor
14        Boston, Massachusetts 02210
          (617) 223-8080
15        E-mail: Charles_mcginty@fd.org
          For the defendant

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3    WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS

4

5    SPECIAL AGENT TIMOTHY RUSSELL

6         By Mr. Bookbinder:      9                  61

7         By Mr. McGinty:              45

8

9    PETROZZIELLO RULING............................  65

10   RULE 29 MOTION.................................  65

11   CHARGE CONFERENCE..............................  70

12

13

14

                         E X H I B I T S

15

16        EXHIBIT 2.............................  12

17        EXHIBIT 7.............................  24

18        EXHIBITS 17 through 21.................  36

19        EXHIBIT 22.............................  19

20        EXHIBIT 30.............................  28

21

22

23

24

25

```
 1                P R O C E E D I N G S
 2            (Begins, 9:00 a.m.)
 3            THE CLERK:  Criminal Matter 09-10243, the
 4   United States versus Ryan Harris.  The Court is in
 5   session.  You may be seated.
 6            THE COURT:  Good morning.  Would counsel
 7   please identify themselves for the record.
 8            MR. BOOKBINDER:  Good morning, your Honor.
 9   Adam Bookbinder and Mona Sedky for the United States.
10            MR. McGINTY:  And Charles McGinty and
11   Christine Demaso for Mr. Harris, who is here seated at
12   the table.
13            THE COURT:  Okay.
14        Is the government going to have one or two
15   witnesses today?
16            MR. BOOKBINDER:  One.
17            THE COURT:  So that would be Mr. Russell?
18            MR. BOOKBINDER:  Yes.
19            THE COURT:  All right.  And I may have been
20   somewhat equivocal about this yesterday, but Exhibit 3,
21   Pages 3 through 6, are excluded.  I said you should
22   proceed on that assumption.
23        And have the remainder of the exhibits you'd like
24   to use with Mr. Russell been revised?
25            MR. BOOKBINDER:  Yes, your Honor.
```

1          THE COURT:  All right.  And about how long do
2   you think his testimony will be?
3          MR. BOOKBINDER:  Um, you know, probably not
4   more than half an hour.  Maybe less.
5          THE COURT:  Okay.  That's fine.
6       And then there are some stipulations.  I don't
7   think they've been read yet to the jury.  Have they?
8          MR. BOOKBINDER:  No.
9          THE COURT:  Are you planning on doing that?
10          MR. BOOKBINDER:  Sure.  We might as well.
11          THE COURT:  You might as well?  If you don't
12   read them, they're not in evidence.
13          MR. BOOKBINDER:  I think the factual
14   stipulations are fairly basic, but we should do it.
15          THE COURT:  If you want the jury to rely on
16   it, unless I mark them as an exhibit, they have to be
17   read.
18          MR. BOOKBINDER:  Yes, but just the factual
19   stipulations, your Honor.
20          THE COURT:  Well, let me see.  Yes.  Well,
21   that relates to my second question concerning the -- are
22   you content just to read them or are you asking that any
23   of them -- I think in this case -- well, sometimes the
24   stipulations get marked and go to the jury as exhibits.
25   But here you have three factual stipulations, correct?

1           MR. BOOKBINDER:  Correct, and I think it's

2   fine to --

3           THE COURT:  I think it's sufficient to just

4   read them, is that what you're saying?

5           MR. BOOKBINDER:  Yes.

6           THE COURT:  I agree.

7       Okay.  Is that acceptable, Mr. McGinty?

8           MR. McGINTY:  It is, your Honor.

9           THE COURT:  All right.

10      Then after you rest I will make my final

11  *Petrozziello* rulings regarding Phillips, Lindquist,

12  Mr. T and MooreR.

13      Is there anybody else whom I need to make

14  *Petrozziello* rulings?

15          MR. BOOKBINDER:  If I could have a minute,

16  your Honor?

17          (Pause.)

18          MR. BOOKBINDER:  That's it, your Honor, at

19  this point.

20          THE COURT:  That's what I thought.

21      All right.  And then I'll excuse the jury, we'll

22  have the defendant's Rule 29 motion, we'll discuss the

23  jury instructions.  You'll tell me how much time you

24  would like for your closings.

25      You're going to have to make some special effort

1    to assure that the exhibits that are on the disk that

2    goes back to the jury room are the exhibits as they

3    actually came in.  This is the first time we've had that

4    system back there for the jurors, so I want to be

5    especially carefully about that.

6              MR. McGINTY:  And we're going to be, um --

7    around noontime or 1:00, recording the few exhibits that

8    we have to try to make sure this is seemless, um, to

9    make sure that everything is on that disk, and we'll

10   review that.

11        And me, too.  I am, um, technologically

12   handicapped, so this is a -- this is a new thing for me.

13             THE COURT:  Your client should help you.

14             (Laughter.)

15             MR. McGINTY:  I'm doing my best to try to make

16   sure this goes in.

17             THE COURT:  No, I think it's so far so good.

18   Famous last words, perhaps, but so far so good.

19        All right.  Why don't we get the jurors.  And the

20   other thing I hope I'll remember to tell them is they're

21   predicting bad weather tomorrow, and I'll confirm this,

22   but if the Boston schools are closed, then they don't

23   come in, but if the Boston schools are open, then

24   they'll be here.  Although I may give them a later

25   reporting time so I can go over what I propose to be the

1    final jury instructions, which should be tomorrow, but

2    we'll see.

3          All right.  We'll get the jury.  Unless you have

4    something else, then we'll get the jury.

5                (Jury enters, 9:10 a.m.)

6          THE COURT:  Ladies and gentlemen, welcome

7    back.  I spent time after you left yesterday, a lot of

8    time, making a number of evidentiary rulings.  We have

9    one more witness and he may not be that long.  So

10   continue to pay careful attention.  I'd expect you'll be

11   excused quite early today and then I'll let you know

12   about the schedule tomorrow.

13         The government may call the next witness.

14         MR. BOOKBINDER:  The government calls Timothy

15   Russell.

16             (SPECIAL AGENT TIMOTHY RUSSELL, sworn.)

17         MR. BOOKBINDER:  Your Honor, if this is an

18   acceptable time, before we begin Mr. Russell's

19   testimony, I would like to read the stipulations the

20   parties have entered into?

21         THE COURT:  Yes.

22         MR. BOOKBINDER:  The parties agree that the

23   following facts are true.

24         THE COURT:  And actually before you do that,

25   let me just remind the jurors.

1          Ladies and gentlemen, a stipulation are facts --

2     are an agreement to facts that -- a stipulation, um,

3     relates to facts that the parties agree are true and

4     that you may accept as true in deciding the case.

5          Okay.

6               MR. BOOKBINDER:  "(1) the defendant, Ryan

7     Harris, also used the internet name "DerEngel."  (2)

8     Harris was the founder, owner, and President of TCNISO,

9     Inc.  And (3) TCNISO is incorporated in California with

10     its principal place of business in the San Diego area."

11          That's it.

12

13          ****************************

14          SPECIAL AGENT TIMOTHY RUSSELL

15          ****************************

16

17     DIRECT EXAMINATION BY MR. BOOKBINDER:

18     Q.  Good morning, Mr. Russell.

19     A.  Good morning.

20     Q.  What do you do for work?

21     A.  I'm a Special Agent with the Federal Bureau of

22     Investigation.

23     Q.  How long have you been an FBI agent?

24     A.  For approximately 10 years.

25     Q.  Are you assigned to a particular squad at the FBI?

```
1    A.  I guess I am.  I am assigned to the Cyber Crimes
2    Squad of the Computer Crimes Squad.
3    Q.  Do you have a background in computer matters?
4    A.  Yes, I do.  While employed by the FBI, I received
5    specialized training in various computer matters.
6    Additionally I've held a number of computer-related jobs
7    prior to my employment with the Bureau.
8    Q.  Can you just very briefly explain what your work was
9    before you became an FBI agent?
10   A.  Yes.  I held a title as a Computer Scientist, I've
11   also been a District Computer Engineer, and I was the
12   Director of MIS for a hospital in Florida.
13   Q.  What's MIS?
14   A.  Um, Management Information Systems.
15   Q.  Okay.  If you could just bring the microphone a
16   little closer to you and speak up a little bit to make
17   sure all the jurors can hear you.
18       And what kinds of cases do you investigate as a
19   member of the Cyber Crime Squad of the FBI?
20   A.  Um, typically I investigate computer cases, I've
21   also investigated --
22            MR. McGINTY:  Objection.
23            THE COURT:  Overruled.
24   A.  I've also investigated internet fraud-type cases,
25   intellectual property right cases, and on occasion I've
```

1    also investigated administrative computer cases.

2    Q.  Are you familiar with the ways that people access

3    and communicate over the internet?

4    A.  Yes, I am.

5    Q.  And do you have experience reading communications

6    that people have had with each other over the internet?

7    A.  Yes, I do.

8    Q.  Are you the FBI agent assigned to the case

9    investigation involving Ryan Harris?

10   A.  Yes, I am.

11   Q.  Who -- what other kinds of agents have you worked

12   with during the course of this investigation?

13   A.  I've worked with other FBI agents, Special Agents in

14   the FBI office, as well as other divisions throughout

15   the country.  I've also worked with agents from the IRS.

16   Q.  Are you familiar with the software and the hardware

17   that TCNISO sold?

18   A.  Yes, I am.

19   Q.  How is it that you are personally familiar with

20   those products?

21   A.  I'm familiar with the products having reviewed the

22   TCNISO website by conducting a number of interviews and

23   also having purchased and viewed the products myself.

24            MR. BOOKBINDER:  Your Honor, I'd like to show

25   the defendant what's been marked as Exhibit 2.  I don't

1    believe there's any objection to that.  So if I could

2    just offer that now.

3                    THE COURT:  Yes.  Exhibit 2 is admitted.

4                    (Exhibit 2, marked.)

5    Q.   Before I blow this up to make it look bigger for

6    everybody, what is Exhibit 2?  And let me clarify.  What

7    you see on your screen right now is one page, correct?

8    A.   That's correct.

9    Q.   Is Exhibit 2 a multipage document?

10   A.   Um, yes, it is.

11   Q.   And what is in Exhibit 2?

12   A.   Exhibit 2 appears to be, um, screen shots or

13   captures of the TCNISO website.

14   Q.   How are these particular screen captures preserved?

15   A.   Um, these were preserved, um, once they were

16   downloaded they were saved on CDR media and stored in,

17   um, the FBI Boston office's evidence control.

18   Q.   Who downloaded them, or was that something the FBI

19   did?

20   A.   Yes, another agent in my office, um, downloaded

21   these files.

22   Q.   Approximately when?

23   A.   Approximately, I believe, in September of 2008.

24   Q.   And, um, what is this first page, and this is Page 1

25   of Exhibit 2?

1    A.   Um, Page 1 appears to be the main landing page of

2    the TCNISO website.

3    Q.   So if you type in "TCNISO.net" on your browser, this

4    is what you would see as of September of 2008?

5    A.   Um, that's correct.

6    Q.   Um, let me, um -- I'm going to now blow up on the

7    screen a portion of this page.  (Blows up.)

8         Okay.  Can you -- well, why don't you read the

9    text here and what's after the bullets and then I'll ask

10   you some questions about it.

11   A.   Okay.  "The SB-5100 combo is by far the most popular

12   cable modem in use today.  This package includes

13   everything you need, the SB-5100 cable modem, a

14   preinstalled pin header, the BlackCat USB programmer,

15   USB and Cat V cable, includes Sigma X2 firmware, buy at

16   price $99.99 right now."

17   Q.   Is this the product, one of the products that you

18   bought from the TCNISO website?

19   A.   Yes, it is.

20   Q.   And, um, is this a, um -- and this modem has been

21   modified or tell me what software is loaded onto this

22   modem?

23   A.   This modem had the Sigma software loaded onto it.

24        MR. BOOKBINDER:  We should pull up another

25   portion of this landing page.

1    Q.  And I ask you to read it as well.

2         Okay.  There's now a section in the center of the

3    page, it's titled "Sigma."  Can you read what it says

4    under that?

5    A.  Yes.  "Sigma X2 build 140 stable beta has been open

6    for all members to try.  Download build 140 here and

7    follow the instructions included to install.  Please

8    post your experiences in our forums.  Update build 142

9    has been released.  Download a copy in the member's

10   area."

11   Q.  It says "beta" there.  What's a "beta"?

12   A.  Um, "beta" is a stage in a program of software

13   developed when a company would release a stable version

14   of the software to a select group of users to try, and

15   then the users would report back to the developer any

16   kind of bugs or problems with the software.  Um, beta

17   versions usually precede a final release copy of the

18   software.

19   Q.  And when it says, um, "Please post your experiences

20   in our forum."  What do you understand "our forum" to

21   mean?

22   A.  I understand that to mean the forum that's located

23   on the TCNISO website.

24   Q.  Now, I'd like to, um, show you exhibit -- I'm sorry,

25   Page 13 of this exhibit.  Is this another portion of the

1  website?

2  A.  Yes, it is.

3  Q.  And we'll get an enlarged part of this.  (Blows up.)

4  Just a little bit bigger.

5       Can you read what it says under "Welcome to the

6  official TCNISO shop"?

7  A.  "This is a place where you can purchase many of the

8  items you have seen or heard about all over the

9  internet.  We are an experienced company with more than

10  15,000, as of May, 2008, processed and shipped orders.

11  If you have any questions, don't hesitate to call or

12  e-mail us.  And for your protection and privacy, the

13  entire shop is safely secured with a 128-bit

14  encryption."

15  Q.  Now, I'd like to show you Page 15.  I'll try to blow

16  up the portion.  (Blows up.)  Under the headline on the

17  heading "Tutorial Description," there are a list of

18  things under that, under that title.  What are those?

19  What's going on here?

20  A.  Um, that's a list of various tutorials that's

21  offered to users on the TCNISO website.

22  Q.  And to the right of most of them there's something

23  that says "Read" and it's underlined.  What are those?

24  A.  Those are links to the corresponding tutorials.

25  Q.  When you say "tutorial," did you look at some or all

1  of these?

2  A.  Um, yes, I did.

3  Q.  What form do the tutorials take?

4  A.  Um, the tutorials can take the form of, um, either

5  video or text that, um -- text instructions that the

6  user would have to read.

7  Q.  All right.  Can you read just the first three items

8  under "Tutorial Description."

9  A.  Yes.  "Traditional uncapping.  Change firmware using

10  a console cable ethernet boot using BlackCat to modify a

11  SB-5100 cable modem."

12  Q.  That's enough for now.

13       And for each of those there's a link to an article

14  describing that information?

15  A.  That's correct.

16  Q.  Let me show you now Page 18 and blow up -- there are

17  33 items on this page and we'll blow one of them up so

18  everybody can see it.  And ask you --

19       First of all, um, so it says -- this item says

20  "TCNISO Video Number 1."  Can you read the text below

21  that.

22  A.  "Something we should have done a long time ago, make

23  an official how-to-video, everything you need to know in

24  order to install a serial cable and flash with Sigma,

25  shown step by step.  Enjoy."

1    Q.  When it says "install a serial cable and flash with

2    Sigma," what does that mean?

3    A.  A serial cable is a type of computer cable that

4    connects the modem to a user's computer and flashing

5    with Sigma simply means to install the Sigma program

6    onto the cable modem.

7    Q.  And there's -- below that information there's a link

8    or there's something that says "download."  Did you --

9    have you actually clicked on those links?

10   A.  Yes, I have.

11   Q.  What does that get you to?

12   A.  It actually downloads a video file.

13   Q.  And what's shown in this particular video file?

14   A.  In this particular video file it shows someone

15   installing a serial cable and flashing signal onto a

16   modem.

17   Q.  In your review of this, um, the TCNISO website, did

18   you see the name "Ryan Harris" anywhere on that

19   website?

20   A.  Um, I don't recall ever seeing the name on the

21   website.

22   Q.  How about "DerEngel"?

23   A.  That I have.

24   Q.  Now, I'm going to show you what's been marked as --

25              MR. BOOKBINDER:  And this is documents not yet

1     in evidence, as Exhibit 22.  So, I guess, your Honor,

2     this should not yet go to the jury.

3                 THE COURT:  The jury's monitors are off.

4                 MR. BOOKBINDER:  Thank you.

5     Q.  What is -- again this is a document with more than

6     one page, is that correct, based on your review of it in

7     the past?

8     A.  Um, yes.

9     Q.  And what is this portion?

10                MR. McGINTY:  Objection.

11                THE COURT:  Well, okay.  I think the objection

12    is one that we discussed yesterday.  So the first page

13    is admissible under Rule 801(d)(2)(A), as I understand.

14                MR. BOOKBINDER:  The first page and the second

15    page, your Honor.

16                THE COURT:  I don't think so.  The second page

17    -- Oh, okay, the first page and the second page.  Fine.

18    The first page and the second page are admissible.  The

19    third page I excluded.

20                MR. BOOKBINDER:  That's right, your Honor.

21                THE COURT:  Okay.

22    Q.  So what is this?  What are we looking at?  What is

23    Exhibit 22 at least an excerpt of?

24    A.  Exhibit 22 is an excerpt of one of the pages of the

25    TCNISO forum.

1    Q.  And, um, fair to say that this is a portion of a

2    thread on those forums?

3    A.  That's correct.

4    Q.  What's a "thread"?

5    A.  A "thread" on the forum is when someone posts a

6    subject matter or a topic on the forum and a "thread"

7    are the responses to that topic on the forum.

8    Q.  And was this portion of the website downloaded by

9    the FBI at the same time as Exhibit 2 that we just

10   looked at?

11   A.  Um, yes, it was.

12            MR. BOOKBINDER:  Your Honor, the government

13   offers Exhibit 22.

14            THE COURT:  It is admitted as -- Pages 1 and 2

15   are admitted.

16            MR. McGINTY:  Your Honor, with the note made

17   of the prior objections.

18            THE COURT:  Yes, the objections have been

19   overruled.

20            (Exhibit 22, marked.)

21   Q.  Now that the jury is looking at this, can you, um --

22            MR. BOOKBINDER:  Why don't we blow up a

23   portion of this.

24   Q.  All right.  So up at the top it says "board index"

25   and then "TCNISO development discussions" and then

1    "DOCSIS."  What is that?

2    A.   That's the actual topic area of the forum that we're

3    currently inside of.

4    Q.   So is it fair to say that there's a board index,

5    that's the overall sort of index, and then there's a

6    subtopic that's "TCNISO development discussions," and

7    then another subtopic that's "DOCSIS," is that right?

8    A.   That's correct.

9    Q.   Okay.  And then here it says -- and then below that

10   it says "Cox Communications configs."  What is that?

11   A.   Cox Communications is a cable ISP in the U.S. and

12   "configs," I believe, refers to the cable modem

13   configuration files.

14   Q.   And this is the particular topic that this thread is

15   about, is that correct?

16   A.   That's correct.

17   Q.   All right.  Now, there's nothing below that and

18   that's because those the postman redacted on this

19   particular version, correct?

20   A.   That's correct.

21   Q.   Okay.  Now, we look at the second page.

22        All right.  Can you read that?  What is this?  Is

23   this a post?

24   A.   Um, yes, it is.

25   Q.   Who is this by?

1    A.   That appears to be by DerEngel.

2    Q.   And the date?

3    A.   March 27th, 2007.

4    Q.   Can you read it.

5    A.   "I am checking up on something for a friend.  Does

6    anyone have any verified MAC addresses and/or config

7    files for Phoenix, Arizona?  It's sensitive.  Just PM

8    me.  Rewards will follow."

9    Q.   What do you understand a "verified MAC address

10   and/or config file" to be?

11   A.   I believe that to refer to the, um, cable modem MAC

12   addresses that have been verified to operate on the

13   ISP's network.

14   Q.   Which ISP in this case?  Is this related to a

15   particular topic we saw earlier?

16   A.   Yes, it's under the "Cox Communications forum topic"

17   and this is referring to a Cox verified MAC addresses.

18   Q.   And it says that at the end -- towards the end, I

19   suppose, it says "if sensitive, just PM me, rewards will

20   follow."  What do you understand "PM me" to mean?

21   A.   In this context, um, I believe it refers to a

22   private message, which is a capability that forums have

23   for reasons of communicating.

24   Q.   To communicate privately, not posting for the world

25   to see?

1    A.   That's correct.

2    Q.   And, um, then the right-hand part of this post, it

3    says "DerEngel" and what does it say below that?

4    A.   "Posts 230, joined" --

5    Q.   Go ahead.

6    A.   " -- joined Wednesday, April 21st, 2004."

7    Q.   And the "Posts 230," what do you understand that to

8    mean?

9    A.   I understand that to mean the amount of posts

10   DerEngel has made on the forums.

11   Q.   Okay.  You mentioned earlier that you had bought

12   products from the TCNISO website?

13   A.   That's correct.

14   Q.   Approximately when was that?

15   A.   Um, it's approximately, um, November, December of

16   2008.

17   Q.   Did you use your real name to make those purchases?

18   A.   No, I did not.

19   Q.   Why not?

20   A.   Um, we didn't want to alert TCNISO of law

21   enforcement involvement.

22   Q.   So what kind of name did you use?

23   A.   I used a covert name.

24   Q.   What did you buy?

25   A.   I purchased a SB-5100 BlackCat combo and I believe I

1    also purchased the SB-4200 modified cable modem.

2    Q.  So two modems?

3    A.  Um, two different types of modems, yes.

4    Q.  Anything else?

5    A.  I also purchased the "Hacking" -- the cable modem

6    book.

7    Q.  Um, if I could take a look at -- I'm going to ask

8    you about Exhibit 16 of this.

9         I'm showing you now the two modems --

10             MR. BOOKBINDER:  Sorry, your Honor, I forgot

11   to ask to approach.

12   Q.  Um, one of the two modems that has been marked as

13   Exhibit 16.  Do you recognize that?

14   A.  (Looks.)  Yes, I do.

15   Q.  And is that one of the modems that you bought from

16   TCNISO?

17   A.  Yes, it is.

18   Q.  And did you -- and so you ordered it, but did you

19   actually receive from them in the mail or in some other

20   form?

21   A.  Yes, I did.

22   Q.  And did you give it to anybody to test it?

23   A.  Um, yes.  Once I received it, I sent, um, one of

24   each type of the modems I received to Motorola to test.

25   Q.  Now, I'd like to, um -- I'd like to show you Exhibit

```
1    7 --
2              MR. BOOKBINDER:  And I believe there's no
3    objection.  It's not in evidence yet.  But there's no
4    objection to it.
5         So the government would offer Exhibit 7.  And
6    that's the --
7              THE COURT:  Exhibit 7 is the book, correct?
8              MR. BOOKBINDER:  Yes, it is the book.
9              THE COURT:  It is admitted.
10             (Exhibit 7, marked.)
11   Q.  Now, I'm just going to show you a portion of it on
12   the screen.  (On screen.)  All right.  It's now on the
13   screen.
14        Is that the cover of the book that you bought?
15   A.  Yes, it is.
16   Q.  And can you just read what it says on the cover?
17   A.  "Hacking the Cable Modem.  What Cable Companies
18   Don't Want You to Know.  DerEngel."
19   Q.  I'd like to show you the, um, second page of this
20   exhibit.
21        And what is this?
22   A.  Um, it appears to be the second copyright page of
23   the book.
24   Q.  So the inside cover essentially of the book or one
25   of the inside pages?
```

1    A.   Um, yes.

2    Q.   Is, um -- do you see Ryan Harris's name on this page

3    anywhere?

4    A.   Yes, I do.

5    Q.   Where is it, could you just describe it?  Let me

6    just highlight it.  (Highlights.)  Okay.  I've now

7    highlighted it.

8         Is that on the top line after it says "copyrighted

9    in 2006," does that say "by Ryan Harris"?

10   A.   Yes, it does.

11   Q.   Um, based on your review, is that the only place in

12   the book where his name appears?

13   A.   Um, that's only place I noticed his name.

14   Q.   Let me show you exhibit -- Page 3 of this exhibit

15   and ask you to read the highlighted portion.  Go ahead.

16   A.   "This book is dedicated to all the righteous hackers

17   that have been silenced by greedy corporations."

18   Q.   This is the dedication?

19   A.   Yes.

20   Q.   And it goes on to talk about or say something about

21   his wife after that?

22   A.   That's correct.

23   Q.   I'm showing you now Page 4 and I ask you to read a

24   portion of this. (Blows up.)

25        Okay.  Can you read, um, the beginning of this

1    page and I'll just let you know when to stop.

2    A.  Okay.

3        "My life is very different from that of most

4    people.  My dream world begins after I wake up.  Every

5    day is a new challenge.  There's always progress to be

6    made or work that is never finished.  I make my living

7    by pioneering hacking techniques and writing software

8    from my clandestine residence in Hong Kong.  I describe

9    myself as a "hacker," but I'm not one of those people

10   who spends every waking moment trying to breach computer

11   networks.  My name is DerEngel and I hack cable modems.

12       It all began five years ago when a close friend

13   and I were attempting to make our cable modems go faster

14   using hardware modifications to remove barriers that we

15   believe were installed to limit their speed.  Once we

16   accomplished this task, I designed a small website that

17   described how others could do the same and then,

18   ironically enough, hosted the website on the very

19   computer with the newly-uncapped cable modem.

20       I published that website in April, 2001 under the

21   name, 'TCNISO,' which stands for 'Telesign Industrious

22   Standard Organization'."

23   Q.  Okay.  You can stop right there.  I'm now showing

24   you, um, Page 9 of this exhibit.  Again, just read, um

25   -- would you read just the highlighted portion under

1    "Always hack responsibly."

2    A.   "Although I have been the source of many cable modem

3    hacking techniques, I do not condone theft of service."

4    Q.   Is this what you would describe as a "disclaimer"?

5    A.   Um, yes, it is.

6    Q.   I show you now, um, Page 12 and again I just ask you

7    to read the highlighted portion in this section that's

8    entitled "The cap."

9    A.   "This provider-imposed limitation soon came to be

10   known as 'the cap.'  Commonly people trading files on

11   internet would query another cable user with 'What is

12   your upload cap?'  Users with higher upload speeds had

13   higher priority when it came to file trading.  Once we

14   realized that this cap could be removed, I came up with

15   a term, 'uncap,' and published a few HTML files on line

16   that expose this limitation and how to get around it.

17   My goal was clear.  I wanted to uncap as many cable

18   modems as possible.  The war had begun."

19   Q.   Okay.

20              MR. BOOKBINDER:  Your Honor, the government

21   now offers Exhibit 30, to which again there's no

22   objection.  This is the PayPal summary record.

23              THE COURT:  Exhibit 30?

24              MR. BOOKBINDER:  Yes.

25              THE COURT:  Okay.  It is admitted.

```
 1                    (Exhibit 30, marked.)
 2                    MR. BOOKBINDER:  I'll blow up a portion of
 3       this.
 4       Q.  And as I do that, Special Agent Russell, could you
 5       explain to the jury what this is?
 6       A.  This is a PayPal subscriber, um, business record
 7       document.
 8       Q.  Okay.  And what is the, um -- what's the name listed
 9       under "user info"?
10       A.  Um, Ryan Harris.
11       Q.  How about the company name below that?
12       A.  TCNISO.
13       Q.  Can you see what the date on here is that this
14       PayPal account was created?
15       A.  Under "time created," has November 5th, 2001.
16       Q.  And what's the date that this particular record was
17       generated off the top of your head?
18       A.  February 17th, 2009.
19       Q.  And do you see on here an entry indicating the total
20       amount of money received into this PayPal account?
21       A.  Um, yes.
22       Q.  What is that?
23       A.  It appears to be a little over $772,000.
24       Q.  $772,000, and now that just reflects the amount of
25       money that just came into the PayPal account, is that
```

1    correct?

2    A.  That's correct.

3    Q.  When you bought your products from TCNISO, did you

4    pay with PalPal?

5    A.  No, I did not.

6    Q.  How did you pay?

7    A.  I paid with a credit card.

8    Q.  So credit card purchases with customers are not

9    reflected in that $772,000 figure?

10   A.  That's correct.

11   Q.  There's been some discussion in the course of this

12   trial about the concept of someone being anonymous over

13   the internet.  Are you familiar with the ways that

14   people can make themselves anonymous?

15   A.  Um, yes, I am.

16   Q.  All right.  And so if somebody wants to do something

17   on the internet and they don't want it coming back to

18   them, um, how are some -- well, what are some simple

19   ways that people can make that happen?

20   A.  Um, there are -- one way is there are a number of

21   websites that offer anonymous-type of browsing.  A user

22   could go to that website.

23   Q.  Do you know any in particular?

24   A.  Um, ones that site -- I believe it's

25   "Anonymizer.com."

Q.  All right.  And so if you go to that website, then
what?  What do you do?

A.  Basically the website offers you a type of proxy
service, so, um, you would essentially -- that
anonymizer.com would be browsing for you.  So they would
be leaving these sort of tracks over the internet and it
wouldn't come back to the user.

Q.  All right.  So we've got the website anonymizer.com
and sites like that that you're familiar with?

A.  Oh, yes, a number of them.

Q.  So that's one option.

      What other ways might someone -- where someone
could go physically, for example, if they wanted to have
anonymous web browsing?

A.  Um, again, individuals can -- if they have a WIFI-
enabled device, they can go to a number of free hot
spots such as coffee shops, libraries, things of that
sort and again they could brows using those free hot
shots.

Q.  So you could go to Starbucks, for example?

A.  That's correct.

Q.  And you mentioned the library, do you need your own
computer if you want to get the internet access at the
library?

A.  Um, I believe most libraries offer computer

1    services.

2    Q.  So you could just go there and use one of their

3    computers, too?

4    A.  That's correct.

5    Q.  And were these things -- and particularly focusing

6    on the period at issue in this case, from 2003 to 2009,

7    are these things that people would have to pay for if

8    they wanted to get anonymous internet access?

9    A.  Um, to my knowledge all of these services were free.

10   Q.  Now, um, I want to ask you now about a series of

11   documents that have not yet been admitted.  These are --

12   they've been marked for identification as, I believe,

13   Exhibits D3 through D6, and maybe I'll just hand them to

14   you, if you want.

15             (Pause.)

16             THE COURT:  Okay.

17             MR. BOOKBINDER:  Your Honor, I'll ask some

18   questions that apply to all of them, I thought it would

19   be easier just to hand him all the exhibits first, and

20   when we go to them specifically, I'll be showing them on

21   the screen.

22             THE COURT:  Okay.

23             (Pause.)

24             MR. BOOKBINDER:  Oh, sorry, your Honor.  It's

25   D4 to D7 that I want to show to him.

```
 1            (Pause.)
 2            THE COURT:  Okay.
 3  Q.  If you would just take a look at those for a
 4  second.  I want to make sure I have all of those.
 5  A.  (Reads.)
 6            MR. BOOKBINDER:  There's one more, your Honor,
 7  as well.
 8            THE COURT:  Okay.
 9  Q.  If you would take a look at that one as well and
10  then I'll ask you questions that apply to all of these.
11  A.  (Looks.)
12  Q.  Do you recognize these documents, Special Agent
13  Russell?
14  A.  Um, yes, I do.
15  Q.  And what are they, generally?
16  A.  Um, these are excerpts from chat logs.
17  Q.  Have these documents been received during the course
18  of your investigation?
19  A.  Yes, they have.
20  Q.  Where did you get them from?
21  A.  Um, I received these from Craig Phillips's attorney.
22  Q.  Approximately when?
23  A.  Um, approximately January of 2010.
24  Q.  And when you received them, what did you do with
25  them?  Well, actually, let me strike that.  Let me
```

1    rephrase it.

2         In what form did you recently get these documents?

3    A.  Um, they were saved on a DVR, a recordable device.

4    Q.  So a recordable DVD, right?

5    A.  Correct.

6    Q.  And when you received them, what did you do with

7    them?

8    A.  Um, I placed them in our evidence control.

9    Q.  Did you alter them in any way?

10   A.  No, I did not.

11   Q.  Now, what is marked for identification of these

12   exhibits, are they the complete logs of the chats that

13   you received?

14   A.  No, they're not.

15   Q.  They're portions of them, is that right?

16   A.  That's correct.

17   Q.  And even those pages, those particular pages have

18   been redacted so that only some information is on them?

19   A.  That's correct.

20        MR. BOOKBINDER:  Your Honor, the government

21   offers Exhibits 17 through 21.

22        MR. McGINTY:  Previously objected to, your

23   Honor.

24        THE COURT:  All right.  Well, I find that

25   they've been proven to be authentic, based on

1    Mr. Phillips's testimony and the testimony I just heard,

2    and for the reasons I stated yesterday, I believe on

3    February 8th, each of them is admissible.

4              MR. McGINTY:  Your Honor, may we approach?

5              THE COURT:  Okay.

6

7              AT THE SIDEBAR

8              THE COURT:  Actually, I stated that wrong.  Go

9    ahead, state your objection, and then I'll --

10             MR. McGINTY:  The Court had stated -- the

11   Court had stated in front of the jury that these are

12   proven to be authentic.  I think the Court's rulings on

13   admissibility are different.  That when the Court said

14   these are, in fact, authentic, and made that comment in

15   public, the Court has suggested to the jury to find that

16   they are authentic, which is the jury's actual

17   determination, which, I would submit, is improper.  I

18   would submit that the jury, as to the evidence, be

19   instructed that the Court has made no such finding on

20   that to the jury.

21             THE COURT:  I'll do that.  I'll tell them --

22   all right.  Let me just -- I will tell them that they

23   will -- essentially this is the issue of Phillips.  I

24   personally am satisfied of two things.  Personally I'm

25   satisfied it has been shown by a preponderance of the

```
1    evidence that Phillips took these off the network
2    computers.  I'm also satisfied there's enough evidence
3    for the jury to find that.  And I'll tell them right now
4    that they actually have to make that determination.  But
5    that when I said "authentic," I was talking shorthand,
6    and I meant that these were admissible and they'll have
7    to decide what they are and where they came from.
8              MR. McGINTY:  Well, I think that --
9              THE COURT:  What would you like me to tell
10   them?
11             MR. McGINTY:  I think the Court should say
12   that the Court had misspoken and that it directs them
13   now to understand that there is no finding that these
14   were authentic.
15             THE COURT:  All right.  Okay.
16
17             (In open court.)
18             THE COURT:  Ladies and gentlemen, I want to
19   correct something I just said.  I misspoke.  What I
20   meant to say is that these documents are admissible,
21   that it's proper for you to see them, but that it's up
22   to you to decide whether they're authentic, whether they
23   are what -- well, to decide what they are, where they
24   came from, and who made any of the statements in them.
25   Okay?
```

1          (Exhibits 17 through 21, marked.)

2              MR. BOOKBINDER:  Your Honor, the government --

3     well, so if they've all been admitted, I'd like to show

4     --

5              THE COURT:  Well, part of the problem is --

6     here.  Okay.  Go ahead.  Which --

7              MR. BOOKBINDER:  I'd like to start with

8     Exhibit 17, your Honor, and I'd like to show that to the

9     witness and to the jury.

10             THE COURT:  All right.

11             MR. BOOKBINDER:  Specifically I'm going to

12    show you Page 2 of Exhibit 17 and -- well, all right.

13    Q.  Now, as with the --

14             MR. BOOKBINDER:  Actually let me scroll over

15    for a second so we can get the date and time here.

16    Okay.

17    Q.  So what's the date of this particular chat?

18    A.  April 6th, 2005.

19    Q.  And these are around 4:00 in the afternoon, is that

20    right?

21    A.  That's correct.

22    Q.  And who are the two parties that are chatting?

23    A.  Mr. T and DerEngel.

24    Q.  As with the ones we showed earlier, are the DerEngel

25    portion of these chats highlighted and the Mr. T

1   portions not?

2   A.  Yes.

3   Q.  All right.  So the first column, the leftmost

4   column, is the speaker, and the column on the right is

5   essentially the listener, correct?

6   A.  That's correct.

7   Q.  All right.  Now I'm going to scroll over so we're

8   not going to see those columns because I want to make

9   sure it's big enough for people to read it.

10       If you could -- for this one, if you could read

11  the Mr. T portion of the chat that's included in that

12  box and I'll read the DerEngel lines.

13  A.  Okay.  Um, "So I was trying to find a way to get

14  some extra cash and you might come in handy to help me

15  get some decent apartments, LOL."

16  Q.  "And I might come in handy?"

17  A.  "Yeah.  Well, I was wondering if you could give me a

18  commission or something like that if I get people to

19  uncap using TCNISO software/hardware, but if you can't,

20  I totally understand."

21  Q.  "LOL.  I'm sure we can work something out."

22           MR. BOOKBINDER:  Now I'll go to the next page

23  and this is Page 3 of Exhibit 17.  And I'll blow up a

24  portion of it.

25       What's the date here?

1    A.  April 20th, 2005.

2    Q.  Again this is Mr. T and DerEngel?

3    A.  That's correct.

4    Q.  Can you again read the Mr. T portion?

5    A.  "Well, I mean, is Sigma working 100 percent with all

6    ISP?"

7    Q.  "Everyone except Adelphia, yes, and maybe one in

8    Australia."

9    A.  "Okay.  Cool.  What are those ISP doing?"

10   Q.  "Something with the modem's cert.  We will have it

11   cracked soon."

12   A.  "Yes."

13   Q.  What's an "Adelphia"?

14   A.  "Adelphia," that's a cable ISP.

15   Q.  And so where it says "everyone except Adelphia,"

16   that's one particular ISP?

17   A.  That's correct.

18   Q.  And then down below, um, DerEngel said -- the

19   question is:  "What are those ISP doing?"  And the

20   answer is, from DerEngel, "Something with the modem's

21   cert, we will have it cracked soon."

22       What do you understand the "modem's cert" to be?

23   A.  Um, the modem's certification.

24   Q.  What's that?

25   A.  It's a type of security feature that some ISPs

1  employ to have the modem authenticate with the, um, CMTS

2  at the ISP.

3  Q.  So it's a way of essentially preventing hacking of a

4  modem?

5  A.  That's correct.

6  Q.  Then the -- "Something with the modem's cert.  We

7  will have it cracked soon."

8       What does "cracked" mean?

9  A.  "Cracked" is a term used to associate with the

10 cracking of the security in a certain type of software

11 or hardware.

12 Q.  It's essentially getting around a security feature?

13 A.  That's correct.

14 Q.  Um, all right.

15      Now, I want to show you Exhibit 18.  This is just

16 a one-page exhibit.  Actually there's just one line

17 there.

18      What's the date?

19 A.  September 13th, 2005.

20 Q.  And this is DerEngel chatting with someone by what

21 name?

22 A.  It appears to be "killswitch."

23 Q.  And the one line there is by which speaker?

24 A.  By DerEngel.

25 Q.  Could you read it.

1    A.   "And I created the entire cable modem hacking

2    scene."

3    Q.   Now I'd like to show you Exhibit 19.  This is a

4    one-page document and I'd ask you what the date is here?

5    A.   June 21st, 2005.

6    Q.   And who is DerEngel chatting with in this one?

7    A.   It appears to be X-Factor.

8    Q.   And who is the speaker in this portion?

9    A.   DerEngel.

10   Q.   Can you read what he says.

11   A.   "I still can't believe I get 15K a month and I have

12   never advertised.  It's unbelievable."

13   Q.   I'm showing you Exhibit 20.  And, again, the first

14   page of this exhibit.

15        What is the date there?

16   A.   July 13th, 2005.

17   Q.   Who is DerEngel chatting with in this one?

18   A.   It appears to be "Shagy."

19   Q.   S-H-A-G-Y?

20   A.   That's correct.

21   Q.   And, um, I'll read the DerEngel portions if you

22   read -- actually I have to blow it up a little bit

23   differently.  Let's see.  (Blows up.)  Okay.  Um, I'll

24   read the DerEngel portion, you read the Shagy.

25        "Dude, I love Sigma, 230 KB upload consistent."

1   A.  "What did you do, flash the firmware on the modem at

2   the hotel?"

3   Q.  "I'm at Craig's now using his spare, uncapped modem

4   on RR."

5        What's "RR"?

6   A.  I believe "RR" stands for "Roadrunner," which is a

7   cable ISP.

8   Q.  Now, I want to show you Exhibit 21 and I'm going to

9   the third page of this exhibit.  And I'll blow this up.

10  (Blows up.)  Okay.

11       What's the date of this chat, Exhibit 21?

12  A.  August 5th, 2005.

13  Q.  And this time who is DerEngel chatting with?

14  A.  MooreR.

15  Q.  That's M-O-O-R-E, capital R?

16  A.  That's correct.

17  Q.  And, again, um, I'll read the DerEngel portions, you

18  can read the MooreR portions.

19       "We have to pick on a name that is not, well,

20  Google friendly.  Example, 'Cable Modem Sniffer' is a

21  bad search result.  Make sense?"

22  A.  "Yeah."

23  Q.  "So let's play around with some names such as 'LAN

24  Thief,' 'CoaxThief,' 'Modem Thief,' 'LAN sniff,' et

25  cetera, et cetera."

A.   "Okay.  No problem.  So you liked the sniffer?"

Q.   "It's very well designed.  Love the GUI.  Did you

decide on a name yet?"

A.   "No, I have been away, but 'Coax Sniffer' or 'Thief'

is pretty promising."

Q.   Let me stop you right there and ask you about a few

things there.

     All right.  So at the beginning, um, when DerEngel

says "We have to pick a name that is not, well, Google

friendly," what do you understand that to mean?

A.   Um, Google is a search engine and, um, "Google

friendly," I believe that to mean --

          MR. McGINTY:  Objection.

          THE COURT:  Overruled.  You may answer.

A.   Um, and Google is a search engine and I believe

"Google friendly" is something that -- well, will

generate a common result.

Q.   So, um, and then there's a discussion about possible

names and then -- and there is a portion further down

where DerEngel says, talking about this sniffer program,

"It's very well designed.  Love the GUI."  What is --

it's "GUI."  What does that stand for?

A.   It stands for "Graphical User Interface," um, and

when someone's on a windows-type machine, it's the

display that they see.  It's usually associated with a

1   pointing and clicking-type of an icon.

2              THE COURT:  I'm sorry.  It's associated with

3   what?

4              THE WITNESS:  A pointing and clicking icon.

5   Q.  So it's the way that the user interacts with the

6   program, correct?

7   A.  That's correct.

8   Q.  All right.  Now, I want to scroll down to the bottom

9   of this page and the last line.  Again, this is

10  DerEngel, "Did you decide on a name?"  And then I want

11  to go to the next page.

12        Is the next page the continuation of that chat?

13  A.  Um, I can't see the whole thing.

14  Q.  Oh, I'm sorry.  Let me scroll over, so you can see

15  it.

16        So the question was, "Did you decide on a name?"

17  Can you read the next line.

18  A.  "I think we will do 'CoaxThief' or 'CM-Sniff'."

19  Q.  "I prefer CoaxThief, it has an edge to it."  And is

20  that DerEngel that says "I prefer CoaxThief, it has an

21  edge to it"?

22  A.  That's correct.

23  Q.  All right.  And then Page 5 of this exhibit, and

24  this is Exhibit 21 still.

25        What's the date of this portion of the chat?

1   A.   September 2nd, 2005.

2   Q.   It's still DerEngel and MooreR chatting?

3   A.   That's correct.

4   Q.   Since this is pretty much all DerEngel other than

5   one line, could you just read this.

6   A.   "You should know by now that I never answer personal

7   questions."

8   Q.   And then -- so that's DerEngel saying that, correct?

9   A.   That's correct.

10   Q.   And then MooreR says "Okay."  Go on.

11   A.   "To me everything is about hacking, to succeed you

12   must focus or you will never overcome the impossible."

13   "Dude, I think you forget, I'm a professional hacker as

14   in it's what I do for a living.  It's what pays my

15   bills.  I get paranoid just to check who's at my front

16   door."

17   Q.   And scrolling over, and I just want to be clear,

18   that this is all DerEngel except for the "Okay"?

19   A.   Yes.

20          MR. BOOKBINDER:  Your Honor, could I just have

21   a moment?

22          THE COURT:  Yes.

23          (Pause.)

24          MR. BOOKBINDER:  No further questions.

25

1   CROSS-EXAMINATION BY MR. McGINTY:

2   Q.   Agent, you mentioned that nowhere on the TCN website

3   was the mention of the name "Ryan Harris."  Do I

4   understand that correctly?

5   A.   Um, I said I didn't recall seeing it in Brian

6   Harris's website.

7   Q.   Now, you note on the website the book, "Hacking the

8   Cable Modem, What Cable Companies Don't Want You to

9   Know" is prominently featured, am I right?

10  A.   That's correct.

11  Q.   And you turned -- when you referred us to Page 2,

12  the copyright page, you indicated that on there it

13  indicated that the copyright for "Hacking the Cable

14  Modem" was "by Ryan Harris"?

15  A.   That's correct.

16  Q.   In his name, am I right?

17  A.   That's correct.

18  Q.   Um, again, the book sold on the website, am I right?

19  A.   That's correct.

20  Q.   And, um, you didn't mention that at the back of the

21  book there was this photograph of Mr. Harris, am I

22  right?

23  A.   That's correct.

24  Q.   And this book -- and I'm now putting it up on the --

25  the book is Exhibit 7.  I'm simply putting up the back

1    page, the back cover, which if I can --

2         Now, on the back cover of the book, does it not

3    indicate:  "Warning, the practice of modifying a cable

4    modem violates service agreements."  Do you see that?

5    A.  Yes, I do.

6    Q.  "And hackers risk being banned for life by service

7    providers," does it not say that?

8    A.  Yes, it does.

9    Q.  "This book is not intended to be used for stealing

10   internet service or for any other illegal activity."  Do

11   you see that?

12   A.  Yes, I do.

13   Q.  Now, when it talks about "the practice of modifying

14   a cable modem violates service agreements," you

15   understand that to mean that if someone modifies their

16   cable modem, it could be viewed by the cable company as

17   a violation of the contract between the user and the

18   ISP, am I right?

19   A.  That's correct.

20   Q.  And that what this book indicated was an awareness

21   that should you modify your cable modem, the beef would

22   be with the ISP in terms of the agreement between the

23   customer and the ISP, am I right?

24   A.   That's what it would be -- yeah, that the statement

25   refers to.

1    Q.  Did you notice at the bottom, perhaps a little bit

2    whimsy, but did you notice at the bottom it says "the

3    finest" -- if I could just blow that up a bit.  (Blows

4    up.)  And then you have "The finest in geek

5    entertainment."

6         Have you ever seen that before?

7    A.  Um, yes, I have.

8    Q.  Now, do you understand that, um, this book is

9    published by a publisher called "No Starch Press"?

10   A.  That's correct.

11   Q.  And you're familiar with "No Starch Press," are you

12   not?

13   A.  I've heard of them, yes.

14   Q.  Now, this book was available for sale in this store,

15   um, in California, right?

16   A.  That's correct.

17   Q.  And at this store, um, you at some point called this

18   store, and this was November 24th of 2008, am I right?

19   A.  Um, I believe the date is correct.

20   Q.  And on that date you spoke with a person named

21   "Ryan," am I right?

22   A.  That's correct.

23   Q.  But you at some point understood that that "Ryan"

24   was an employee of the store front not Mr. Harris, do I

25   understand that right?

1    A.  Um, I never determined, um, which "Ryan" I spoke

2    with on the phone, but it's possible it was the employee

3    who worked at the store front.

4    Q.  Right, because a subsequent search indicated that

5    there was another employee there with the first name

6    "Ryan," am I correct?

7    A.  That's correct.

8    Q.  Now, um, the store sold a lot of these books, did it

9    not?

10   A.  Um, I personally did not visit the store, but it was

11   reported to me that it did.

12   Q.  And also that the store sold various computer parts,

13   wasn't that reported to you?

14              MR. BOOKBINDER:  Objection, your Honor.

15              THE COURT:  Sustained.

16   Q.  Did you learn anything -- and you were in

17   communication with the agents that were conducting the

18   search, am I right?

19   A.  Um, after the search was conducted, I read their

20   reports.

21   Q.  Right.  Did you communicate with them directly about

22   what they learned about the store?

23   A.  Um, one of the agents I did.

24   Q.  Okay.  And you -- when you say you learned it from

25   that agent, you had communicated -- you spoke to that

1    agent about what that agent had learned about the store,

2    am I right?

3    A.   That's correct.

4    Q.   And part of what you tried to do is integrate all of

5    the information that you could get relative to the

6    investigation, is that fair to say?

7    A.   Um, that's fair.

8    Q.   And you also reviewed photographs of the store, did

9    you not?

10   A.   I did.

11   Q.   There were photographs taken of the store, were

12   there not?

13   A.   Yes, there were.

14   Q.   And didn't the photographs indicate that there were

15   various computer parts sold at the store?

16   A.   Um, I believe it did.

17   Q.   And that the store had advertised itself as a

18   PC-repair-type shop, am I right?

19   A.   Um, yes, it did.

20   Q.   Now, when you purchased, um, the modems that you

21   talked about getting, which was the 5100 combo and the

22   4200, you were buying modified firmware, were you not?

23   A.   I was buying modems that contained modified

24   firmware, correct.

25   Q.   And you had done that purchase after you reviewed

1    the website to see what was offered, am I right?

2    A.  That's correct.

3    Q.  Because you were making a purchase off the website,

4    weren't you?

5    A.  That's correct.

6    Q.  And you wanted to make sure that whatever you got

7    was stuff that had the modified capability, am I right?

8    A.  That's correct.

9    Q.  You also saw on the website that there were items

10   for sale, modems for sale that were not modified?

11   A.  I believe there were, um, one or two types of

12   modems, that were not modified that were offered for

13   sale.

14   Q.  Now, um --

15            MR. McGINTY:  May I have a moment, your

16   Honor?

17            THE COURT:  Yes.

18            (Pause.)

19   Q.  Do you see the page --

20            THE COURT:  Hold on a second.

21            MR. McGINTY:  This is in evidence.  It's

22   Exhibit 2.

23            THE COURT:  No, but we have to change the

24   device.

25            MR. McGINTY:  Oh, okay.

```
 1   Q.  This is Page 0208, and if I might highlight the

 2   first item.

 3            This is a Motorola SB-5101 cable modem.  Do you

 4   see that?

 5   A.  Yes, I do.

 6   Q.  And this is not the 5100 --

 7                THE COURT:  Hold on.  Just a second.  The

 8   jurors may not --

 9                Do the jurors have it?

10                THE JUROR:  No.

11                THE COURT:  There's something wrong with the

12   device then.

13                (Pause.)

14                THE COURT:  Did it come up now?

15                THE JUROR:  Oh, there it is.

16                THE COURT:  I'm sorry.  Has it come up on your

17   computer now?

18                THE JUROR:  Yes.

19                THE COURT:  All right.

20   Q.  Now, this is not one of the items that you had

21   ordered, do I understand that right?

22   A.  That's correct.

23   Q.  And what this one indicates is that it comes with

24   default stock firmware non-modified, am I right?

25   A.  That's correct.
```

1    Q.  And the ones that you were purchasing were ones that

2    you intended to be modified and you purchased because

3    you understood they were modified, am I right?

4    A.  I'm sorry.  Could you repeat the question again?

5    Q.  The ones you purchased were the ones you understood

6    were modified and you purchased them for that purpose,

7    am I correct?

8    A.  Um, I purchased the most -- what was listed as the

9    most common product on the website, which I understood

10   to be modified, yes.

11   Q.  Now, um, further down that page there is reference

12   to a modem which is an engineering prototype.  Do you

13   understand this one as well to be a nonmodified cable

14   modem?

15   A.  Um, the description here doesn't list it as being

16   modified or nonmodified.

17   Q.  Now, that's different from the SB-4200 that you

18   bought which is identified as "custom," am I right?

19   A.  Um, I'm sorry?

20   Q.  The one you purchased is further down the page and

21   it's the "4200 custom"?

22   A.  The modem I purchased was listed on the first page

23   of the website that had the -- it was listed under

24   "BlackCat combo."  I'm not certain that this listing

25   here refers to that modem also.

1   Q.   I see.   But looking at the website, did you not see

2   a clear differentiation between things that were custom

3   and things that were nonmodified?

4   A.   A clear distinction?   No.

5   Q.   Well, did you understand that the modified ones were

6   referred to as "custom" -- I'm sorry, that the

7   nonmodified ones, the vanilla Motorola modems were not

8   listed as "custom"?

9   A.   The only thing I understood from reading the website

10  was that if a modem was nonmodified, it would be listed

11  as having -- either stating "nonmodified" or was listed

12  as having "default stock firmware."

13  Q.   Now, um, the modem that you got or the modems that

14  you got, you understood functioned as -- well, could

15  function as ordinary modems, am I right?

16  A.   The modems that I received could function as

17  ordinary modems?   Yes, that's correct.

18  Q.   So apart from whatever additional capability they

19  had, um, they would function in the ordinary course as

20  regular old modems if you use them for that purpose, is

21  that fair to say?

22  A.   That's correct.

23  Q.   Now, you had testified about certain chats, did you

24  not?

25  A.   Yes, I did.

1    Q.  And your testimony about the chats is that you had

2    gotten these from Craig Phillips's lawyer, do I

3    understand that right?

4    A.  Um, yes.

5    Q.  Now, you were not present when the chats were, um,

6    copied onto disks, were you?

7    A.  Um, copied onto the DVD in which I received?

8    Q.  Correct.

9    A.  That's correct.

10   Q.  You were not present when they may have been

11   originally copied from whatever source they were copied

12   from, do I understand that right?

13   A.  That's correct.

14   Q.  Did you ever ask Craig Phillips how it was that he

15   never copied chats between himself and anyone other than

16   Ryan Harris.  Did you ever ask him that?

17   A.  I referred to my reports and my interviews with

18   Craig Phillips and I don't recall that question

19   specifically.

20   Q.  (Pause.)  The person, Nathan Hanshaw, that has been

21   identified here as or has used the name "DShocker," did

22   you check to see whether he had any presence on the TCN

23   forums?

24   A.  Um, yes, I did.

25   Q.  And do you remember in your review of those that,

1    um, there were no posts under the on-line name

2    "DShocker"?

3    A.  Um, that's correct, the name "DShocker" was listed,

4    but there were no posts attributed to him.

5    Q.  And when you say the name was "listed," the name

6    appeared somewhere, do I understand that right?

7    A.  That's correct, it appeared in the list of users

8    that --

9    Q.  But you couldn't find any posts that had been

10   preserved with his name on it, do I understand that

11   right?

12   A.  That's correct.

13   Q.  All right.  Now, you testified about your expertise

14   as an agent who, um, does computer-related

15   investigations, did you not?

16   A.  Well, I wouldn't call it an "expertise," just the

17   field in which I work.

18   Q.  You're being unnecessarily modest?

19   A.  Perhaps.

20   Q.  All right.  Now, um, you're familiar with the use of

21   a MAC as a hardware identifier, are you not?

22   A.  I am.

23   Q.  And you're aware that the MAC as a hardware

24   identifier is collected by a lot of companies on the

25   internet for a lot of different reasons, am I right?

A.  Um, again I'm not familiar with what companies
collect, but I know the MAC address is used for a number
of different functions.

Q.  Right.  Now, you've been present during the entirety
of the trial, have you not?

A.  I have been.

Q.  And you've been seated up here in the first row, am
I right?

A.  That's correct.

Q.  And I had made inquiry of a witness or you heard me
make inquiry about the use by Google, for example.
Now, you testified about Google, am I right?

A.  That's correct.

Q.  You testified about Google searches and what those
are, correct?

A.  That's correct.

Q.  And you testified about characteristics of Google
searches, am I right?

A.  That's correct.

Q.  Now, are you aware that Google uses MAC addresses
for purposes of its location services, its locator?

A.  The only, um -- I'm not aware that --

Q.  Yes or no, are you aware of that?

A.  No.

Q.  Um, are you aware that, among other things the

1    locator service does, is it compares MAC addresses sent

2    by users' devices, compares them with known MAC

3    addresses, and uses that to identify geo-coded

4    locations, in other words, longitude and latitude.  Are

5    you familiar with that?

6    A.  I'm familiar with geo-coded locations, that's

7    correct.

8    Q.  But are you aware that they triangulate using MACs

9    captured from nearby devices so that Google can tell us

10   where a device is situated using MACs.  Are you aware of

11   it?

12   A.  Yes.

13   Q.  Are you aware of sniffing tools such as "Wire

14   Shark"?

15   A.  Yes, I am.

16   Q.  "TCP Duck"?

17   A.  Yes, I am.

18   Q.  Are you aware that those can be used to capture MAC

19   addresses?

20   A.  Yes, they can.

21   Q.  Are you aware that these are part of -- that they

22   are a part of a family of "permissive-free software

23   licenses"?

24   A.  "Permissive-free software licenses"?

25   Q.  Yes.

1    A.  I'm not familiar with that term.

2    Q.  Are you aware that the license for "Wire Shark, VSP"

3    was used by the Berkeley Software Distribution.  Do you

4    know what the Berkeley Software Distribution is?

5    A.  Yes.

6    Q.  It's a UNIX-like operating system, is it not?

7    A.  That's correct.

8    Q.  And are you aware that the license for Wire Shark

9    was used as part of that operating system?

10   A.  Um, I was made aware of it during the course of the

11   trial.

12   Q.  So you went and verified it, right?

13   A.  Yes.

14   Q.  So when I said it, you took it down, you went and

15   you checked it out, and it turned out to be the case,

16   right?

17   A.  That's right.

18   Q.  And did you check whether the original owners of VSP

19   were the Regents of the University of California?

20   A.  No, I did not.

21   Q.  But you are aware that those capabilities can be

22   used to capture MAC addresses?

23   A.  Um, you're referring to the program Wire Shark?

24   Q.  Yes.

25   A.  That's correct.

1    Q.   And you testified about the characteristic of

2    anonymity.  Do you recall that testimony?

3    A.   Yes, I do.

4    Q.   One of the things that the TCN products made

5    possible was for a person to be anonymous on the net, am

6    I right?

7    A.   That's correct.

8    Q.   And there are lots of legitimate reasons why a

9    person would want to be anonymous on the net, am I

10   right?

11   A.   Um, yes.  Yes.

12   Q.   Now, there are illegitimate reasons to be invisible

13   on the net, am I right?

14   A.   That's correct.

15   Q.   But a lot of people don't like their business out

16   there, am I right?

17   A.   That's correct.

18   Q.   Because their business may be their political

19   communication, am I right?

20   A.   That's correct.

21   Q.   In fear of a government that may do them harm, am I

22   right?

23   A.   That's correct.

24   Q.   They may also be concerned about business

25   communications that they don't want other people to know

1    about, am I right?

2    A.   That's correct.

3    Q.   There are industrial sabotage or commercial sabotage

4    firms that try to identify vulnerabilities to try to get

5    communications or divulge confidential information, am I

6    right?

7    A.   Um, could you rephrase the question?

8    Q.   There are firms that spy on other commercial firms,

9    do they not?

10   A.   That is true.  That's correct.

11   Q.   And they try to penetrate communications at whatever

12   vulnerable spot they can find, am I right?

13   A.   However they can get the information, I suppose.

14   Q.   And one of the ways that a person might defeat that

15   is by using anonymity in their communications, am I

16   right?

17   A.   That is correct.

18   Q.   You testified about other ways that anonymity may be

19   obtained, am I right?

20   A.   That's correct.

21   Q.   "Anonymizer," am I right?

22   A.   That's correct.

23   Q.   Have you ever conducted an investigation to shut

24   down Anonymizer?

25   A.   No, I have not.

1    Q.  To bring it down, have you?

2    A.  No, I have not.

3    Q.  To put it in custody -- strike that.

4              MR. BOOKBINDER:  Objection.

5              THE COURT:  Yes, the jurors should disregard

6    that comment.  Go ahead.

7    Q.  As far as you know has there been any investigation

8    of Anonymizer.com?

9    A.  To my knowledge, no.

10             MR. McGINTY:  May I have a moment, your

11   Honor?

12             THE COURT:  Yes.

13             (Pause.)

14             MR. McGINTY:  I have no further questions of

15   this witness.

16             MR. BOOKBINDER:  Your Honor, if we could have

17   a moment?

18             THE COURT:  Yes.

19             (Pause.)

20

21   REDIRECT EXAMINATION BY MR. BOOKBINDER:

22   Q.  When Mr. McGinty asked you about the name "DShocker"

23   and the -- um, with reference to the website, the TCNISO

24   website.  Do you remember those questions?

25   A.  Yes, I do.

1    Q.  You were saying, I think, that his name appeared on

2    a list, is that right?

3    A.  That's correct.

4    Q.  But you didn't find any actual posts still sitting

5    on the website, posts by him?

6    A.  That's correct.

7    Q.  What was that list a list of?

8    A.  Um, a list of users which had posted on the TCNISO

9    forums.

10   Q.  So he was listed as someone who had posted, but

11   those posts just were no longer there in 2008?

12   A.  That's correct.

13   Q.  Mr. McGinty also asked you some questions about

14   something called "Wire Shark," is that correct?

15   A.  Correct.

16   Q.  And that's essentially a sort of sniffer program, a

17   publicly-available sniffer program?

18   A.  That's correct.

19   Q.  Um, as a law enforcement agent, are you able to use

20   Wire Shark whenever you want to sort of investigate

21   somebody, just get on the internet and use it?

22   A.  Um, no, I'm not.

23   Q.  What would you have to do if you wanted to use it?

24   A.  Um, I would have to get a search warrant, I believe,

25   some type of a legal document.

 1                    MR. BOOKBINDER:  No further questions.

 2                    MR. McGINTY:  I have no questions.

 3                    THE COURT:  Thank you.  Your testimony is

 4        complete.

 5               Does the government wish to present any additional

 6        evidence?

 7                    MR. BOOKBINDER:  No, your Honor, the

 8        government rests.

 9                    THE COURT:  And does the defendant wish to

10        present any evidence?

11                    MR. McGINTY:  Your Honor, subject to a motion,

12        no, the defense is resting as well.

13                    THE COURT:  I'm not sure I understand that.

14        Are you talking about Rule 29?

15                    MR. McGINTY:  Yes.

16                    THE COURT:  Okay.

17               All right.  Ladies and gentlemen, that concludes

18        the evidence.  So I'm going to send you home for today.

19               With regard to tomorrow, the weather forecast is

20        bad.  As I understand, they've told you that if the

21        Boston public schools are delayed or canceled, then your

22        jury service is canceled for that day and you should

23        report Thursday.  Hopefully that won't occur.  I think

24        I'm going to let you sleep in a little tomorrow and have

25        you get here by 9:30 because I anticipate that although

1    I'll work with the lawyers today, they'll be some things

2    I'll need to discuss with them tomorrow and I want to

3    minimize if not eliminate your time waiting for us.

4        Although you've heard all the evidence, it's

5    especially important that you not discuss this case now,

6    among yourselves or with anybody else, or begin to make

7    up your minds individually.  Until you hear the closing

8    arguments and perhaps especially my jury instructions --

9    well, until you hear the jury instructions, you can't

10   know what the relevant questions are or what standards

11   you're required to use in answering those questions.

12       So just continue to keep an open mind.  Don't

13   discuss the case among yourselves or with anyone else.

14   Don't read, watch or listen to anything about the case.

15   Don't do any research on the internet or elsewhere.  And

16   don't communicate about the case on the internet or any

17   other social media.  I hope and expect that the weather

18   will let us proceed tomorrow.

19       You'll hear the closing arguments of the parties,

20   then I'll give you my final instructions, then you'll

21   begin your deliberations.  So you need to plan to be

22   here tomorrow afternoon.  I don't know how long the

23   deliberations will take, but you should plan to be here

24   at least until about 4:30.  If your deliberations are

25   not complete, you'll have to let me know whether you

```
 1    want to go home and return on Thursday or whether you

 2    want to keep working.  That will be up to you.

 3         So I will excuse the jurors and meet with

 4    counsel.  The Court is in recess for the jury.

 5              (Jury leaves, 10:30 a.m.)

 6         THE COURT:  All right.  With regard to my

 7    Petrozziello rulings, I find that the government has

 8    proven by a preponderance of the evidence that Phillips,

 9    Lindquist, Mr. T, and MooreR were each members of a

10    conspiracy that included Mr. Harris, um, at the time

11    they made the statements conditionally admitted and that

12    those statements were made in furtherance of a

13    conspiracy.  Um, therefore that evidence is finally

14    admitted.

15         Mr. McGinty, is your Rule 29 motion in writing or

16    oral?

17              MR. McGINTY:  It is.

18              THE COURT:  It's in writing.  All right.  Oh,

19    I'm sorry.  Do you, by any chance, have two copies for

20    me?  If not, I'll get it copied.

21              (Passes up.)

22              MR. McGINTY:  I have three.

23              THE COURT:  Actually, here, give the two to

24    the government and I'll make it.  No, here, go ahead.

25    You take it.
```

1          It's now about 10:35.  I'd like to read this.  So

2     why don't you plan to return at 11:00.  I'll hear your

3     argument.  We'll have some discussion about the jury

4     instructions and about the closings.  Okay?

5          The Court is in recess.

6          MR. McGINTY:  Your Honor, perhaps for the sake

7     of formality, I should say on the record that the

8     defendant has submitted a written Rule 29 incorporating

9     the arguments, challenging the sufficiency of the

10    government's proof, and that the contents of the

11    arguments set out in the attached filing, um, I submit

12    this for purposes both of the Rule 29 at the conclusion

13    of the government's proof as well as after the defendant

14    has rested.

15         THE COURT:  Okay.  And here, have a seat.  Let

16    me ask the following just again to sort of button things

17    up.  I was told and the government was told on Sunday by

18    counsel that Mr. Harris did not wish to testify.  Of

19    course that's his right.  But I'd just like to ask him

20    and confirm that he knows he has the right to testify

21    and that's his decision.

22         Mr. Harris, do you understand that you had a right

23    to testify in this case, if you wanted to, and also a

24    right not to testify?

25         THE DEFENDANT:  Yes, I did.

1          THE COURT:  And did you discuss with

2   Mr. McGinty whether you wanted to testify?

3          THE DEFENDANT:  Yes, I did.

4          THE COURT:  And did you, after consulting him,

5   decide not to testify?

6          THE DEFENDANT:  That is correct.

7          THE COURT:  And are you fully satisfied with

8   his work as your lawyer in this case?

9          THE DEFENDANT:  Extremely.

10         THE COURT:  Okay.

11      All right.  I think that does it.  We'll come back

12   at 11:00.  The Court is in recess.

13         (Recess, 10:45 a.m.)

14         (Resuming, 11:20, a.m.)

15         THE COURT:  Okay.  I've read the Rule 29

16   motion and given it some thought.  I'm interested in

17   hearing the argument particularly with regard to

18   conspiracy.  I may reserve on the wire fraud.  But we'll

19   see.

20      But at the moment I'm inclined to grant the Rule

21   29 motion with regard to the conspiracy charge.  It

22   appears to me, applying the standards I used in *DiMasi*,

23   that there's insufficient evidence, even when viewed in

24   the light most favorable to the government, to prove the

25   conspiracy the government said it would prove, which is

1    one in which the Massachusetts buyers, um, brought an

2    overarching conspiracy.  There's a lack of

3    interdependence.

4          I think that -- at the moment, that there's

5    insufficient evidence to prove a conspiracy with any one

6    of them.  Mr. -- I don't think there's any evidence that

7    Mr. Harris communicated with or knew Larosa or Madeira.

8    It's true that -- I think if there was a conspiracy with

9    any one of the people in Massachusetts, it probably

10   wouldn't be an impermissible variance.  There are a

11   number of cases that say the defendant's not prejudiced

12   when a narrower conspiracy is proven and here the

13   evidence would have been admissible on the wire fraud

14   charges anyway.  So there's not evidentiary spillover

15   that's impermissible.

16         But, as I understand the evidence, there's none

17   that Mr. Harris knew Larosa or Madeira, um, and while

18   it's true that you don't have to know all of your

19   co-conspirators, I think to get venue in Massachusetts,

20   based on Larosa or Madeira, it would have to be proven

21   that Mr. Harris, you know, knew of their existence and

22   tended to agree with that.  That's my current state of

23   mind.

24         With regard to Mr. Hanshaw, there were

25   communications between Harris and Hanshaw, including

1    some discussion that Mr. Harris, you know, would pay

2    Mr. Hanshaw something if he were able to fix some

3    problem, but mere discussion of a crime's not a

4    conspiracy, and Phillips testified that Mr. Harris told

5    him that Hanshaw was an idiot and he shouldn't deal with

6    him and Hanshaw again testified that, you know, to the

7    fact that Harris didn't want to deal with him, he kept

8    kicking him off the forums.  So at the moment I doubt

9    that there's evidence sufficient to prove that

10   Mr. Harris and Mr. Hanshaw were in a conspiracy.

11        The -- there's ample evidence to prove that

12   Harris, Phillips, Lindquist, MooreR, and Mr. T were in a

13   conspiracy, at some point, but Phillips and Lindquist

14   left by -- in or before 2007, and then the only overt

15   act in Massachusetts would be the 2008 downloading of --

16   by Agent Ryan.  So I doubt that the jury could find an

17   overt act in Massachusetts.

18        So that's my current tentative thinking on the

19   conspiracy charge.

20        Since I'm leaning toward the defendant, does the

21   government want to be heard first?

22             MS. SEDKY:  Your Honor, we understand the

23   Court's ruling and we have nothing further to add.

24             THE COURT:  All right.  So I'm granting the

25   Rule 29 motion on the conspiracy charge.

1          The defendant's motion on the wire fraud, I'm

2     interested in hearing argument on, um, but it, to some

3     extent, I think -- well, I gave you my *DiMasi*

4     instructions back in December on wire fraud and, um, I

5     think one thing -- one place where the defendant's view

6     is different than what I've instructed before and I'm

7     inclined to instruct again, with regard to the wires, is

8     that if Mr. Harris is proven to have devised or

9     participated in a scheme to defraud, it will have to

10    be -- and with intent to defraud, um, it's going to have

11    to be proven that he transmitted or caused to be

12    transmitted the wire communication in question for the

13    purpose of furthering the scheme.  And that, I would

14    tell the jury, as I did in *DiMasi,* in effect, that it's

15    "not necessary to prove that the defendant personally

16    executed the wire transmissions, rather it's enough if

17    the government proves that the defendant caused the wire

18    transmission to occur by doing some act from which it

19    was reasonably foreseeable that the wires would be

20    used," and that's *Pimental*, 380 F.3d 575 at 584, *Sawyer*,

21    239 F.3d 31, at 39 to 40, *Silvano*, 812 F.2d 754 at 760,

22    *Moreau*, 39 F.3d 1228, at 1237, and the First Circuit

23    pattern instruction 4.18.1343.  Another way to state

24    that is I might tell the jury that:  "If it is proven

25    that Mr. Harris participated in the alleged scheme and

1    did something relating to it which he knew or reasonably

2    could foresee would result in the acquisition of

3    internet service without payment to an ISP, the jury may

4    find, if interstate wires were involved, that element

5    would have been proven."  Something like that.

6         So that's, you know, my -- that's one of my

7    current thoughts on that.

8         But, Mr. McGinty, do you want to address the mail

9    fraud?

10              MR. McGINTY:  I do, your Honor.  And just

11   referring to that last instruction, um -- and if he was

12   -- if it was proven participation in a scheme and the

13   defendant did something related to the scheme, um, which

14   related to the obtaining of internet service without

15   paying, now, the jury has got to evaluate --

16              THE COURT:  Well, let me just -- the important

17   part of that -- well, let me just explain.  I think what

18   I just said, rooted in those cases, is an accurate

19   statement of the law.  That's one.  Two, what that means

20   is, and my current conception, is he doesn't have to

21   know Mr. Larosa -- whether Mr. Larosa used his hardware,

22   the defendant's hardware and software, to steal internet

23   service, it would be enough if he reasonably foresaw

24   that somebody like Mr. Larosa, you know, who bought the

25   hardware and software, if he bought both, you know, um,

 1   would do that and, in fact, Mr. Larosa did do it.  At

 2   the moment that's what I think is an accurate or correct

 3   statement of the law.

 4              MR. McGINTY:  Well, I differ because that

 5   would suggest that the character of the hardware or the

 6   software and the sale of it by Harris would be

 7   sufficient to anticipate, um, that the ultimate user

 8   would use it in a particular fashion.

 9              THE COURT:  And conceivably -- and I'm not

10   going to, at the moment, instruct -- well, I don't

11   intend to instruct that it would be sufficient.  I think

12   in some cases it could be.  If it had only one use --

13   and I think you have evidence that there were multiple

14   uses, but as a general matter, if it had only one use

15   and that were proven, you know, then you could -- you

16   know, then they could.  But there's evidence, you know,

17   of more than selling the devices here.

18              MR. McGINTY:  Well, there's evidence of

19   selling the device, there's evidence of the device's

20   capability in terms of a couple of or a handful of

21   chats, but in terms of the fundamental capability -- and

22   Isabella Lindquist talked about it's diagnostic

23   capability, but the agents acknowledged that, among

24   other things, it provided for anonymity, it provided for

25   changes in packet size, filters, and, um, that it could

1    be used to resist cable throttling, which we got from

2    the -- from Mr. Kohler.  In other words, there's a host

3    of things this thing makes possible.  The government

4    puts in what it views as incriminating statements

5    relative to one of the capabilities, but that doesn't

6    exclude the others.

7              THE COURT:  It doesn't, but I have to look at

8    the evidence in the light most favorable to the

9    government right now.  So the jury could reasonably find

10   that Mr. Harris said, "I'm the creator of internet

11   hacking.  We're going to take on the greedy internet

12   companies," intent to defraud, you know, "get their

13   money -- get their services without paying for it," the

14   jury could reason, "and here are the devices that I've

15   developed, I've sold, I've instructed you on how to use,

16   so go do it."

17             MR. McGINTY:  Well, were this a situation

18   where the government's evidence was uncontested, and the

19   testimony was that this was a single-use item, um, then

20   that's one thing.  Where the government witnesses, in

21   part, say "single use," but yield on a balance of other

22   uses that are entirely permissible, including uncapping

23   under certain circumstances, then how does the Court

24   tell the jury that the evidence is satisfactory to

25   permit an instruction about single use and whatever

```
 1    inferences may arise from single use?

 2              THE COURT:  Well, I don't --

 3              MR. McGINTY:  So if I understand *DiMasi,* if I

 4    understand the Court's instruction in *DiMasi* --

 5              THE COURT:  Well, I don't --

 6              MR. McGINTY:  I mean, it seems like the

 7    sufficiency and the instructions sort of go hand and

 8    hand.

 9              THE COURT:  Well, no, that's definitely true.

10              MR. McGINTY:  And as I understand the *DiMasi*

11    instruction is that if the government gets an

12    unequivocal proposition, "It's a bad thing," and it's

13    not met and mitigated in some fashion, they get the

14    "It's a bad thing" instruction and --

15              THE COURT:  Well, they're going to get an

16    instruction along the lines that the mere -- my present

17    inclination is to instruct along the lines of -- well,

18    wait a minute.

19              (Pause.)

20              THE COURT:  That "The mere sale of the

21    product" -- something along the lines that "The mere

22    sale of the product is not," or these products, "is not

23    proof of a scheme to defraud, but, you know, any proven

24    nature of the products can be taken into account in the

25    jury's decision as to whether a scheme to defraud, um,
```

```
1    has been engaged in, whether Mr. Harris devised or
2    participated in a scheme to defraud," and then you'd
3    argue about the implications of the evidence that they
4    heard about, the various uses.  But if the jury is
5    persuaded that the primary, if not exclusive, use of
6    Sigma or BlackCat was to, um -- or the primary exclusive
7    intended use of Sigma or BlackCat by Mr. Harris was to
8    steal internet service, um, then they can take into
9    account the nature of the crime.
10            MR. McGINTY:  Well, I mean, doesn't this lead
11   to anomalous results?  For example, if the primary
12   purpose -- if the jury takes into account the primary
13   purpose and views it as stealing service and the Court
14   instructs that you could take into account that primary
15   use in evaluating whether Harris is culpable for
16   participation in a wire fraud with Mr. Larosa, even
17   though Harris doesn't have to know Larosa and he, um,
18   doesn't -- and it's sufficient if Harris merely foresaw
19   that someone like Larosa would use it -- Larosa could
20   get it as a doorstop.
21            THE COURT:  Could get it where?
22            MR. McGINTY:  As a doorstop.  Larosa could
23   have gotten it because he liked "Popular Mechanics" and
24   wanted to pry it open.  It could be that he's a geek and
25   just wanted to check into it.  But on that instruction
```

1    Larosa's use of the object would be irrelevant to

2    evaluate whether Harris was in a scheme to defraud with

3    him --

4              THE COURT:  Well, that's the point, that's

5    where I think you confused, conflated -- respectfully,

6    confused and conflated conspiracy with wired fraud.  And

7    it may be -- and now I'm talking about convicting

8    Mr. Harris as a principal of wire fraud and not aiding

9    and abetting, and we get into that more nuanced area

10   whether you can aid and abet somebody you don't know.

11   But now I've heard all the evidence and I think the

12   government's strongest possible case is on Mr. Harris as

13   a principal, um, that he devised this scheme, "I'm the

14   creator, I invented, you know, internet hacking of

15   modems.  We want to deprive these greedy ISPs of the

16   money they're hoping to earn.  The war is on."

17             So, you know, that -- you know, viewed in the

18   light most favorable to the government, there's ample

19   evidence to prove that beyond a reasonable doubt, and

20   then it's your contention these devices had many

21   possible indeed intended uses, the government's

22   contention is, and the evidence would be sufficient to

23   support it, that it had -- that some of these items had

24   a single intended use by Mr. Harris and that was to

25   steal internet service, um, and, you know, it's what you

1      argue to the jury.

2             MR. McGINTY:  Well, I'm arguing it against an

3      instruction that arguably is at odds with itself, it

4      talks about how product capability alone is not

5      sufficient and then says that so long as the capability

6      was of this nature, um, it's immaterial whether he knew

7      who got it or what the person did with it.  So to me

8      these --

9             THE COURT:  Have you read those cases that

10     I've -- that you saw there?  You could have seen they

11     were cited -- well, maybe Ms. Demaso could have, because

12     you've been busy, you know, and you have a very

13     satisfied client, but that that's what the law is.

14            MR. McGINTY:  Well, the law doesn't say that

15     the scheme to defraud exists independent of the, um --

16     of the effect on the intended victim.  Now, you don't

17     have to prove injury to the intended victim, but no case

18     says that you don't have to know that there doesn't have

19     to be an intended victim who is the intended object of

20     the scheme.  I mean, a scheme has got to have

21     definitional parameters to it.  And what I'm hearing

22     from the Court is --

23            THE COURT:  Well, if you have a scheme -- why

24     can't you have a scheme to defraud every ISP in the

25     country or in the world, what would be the legal flaw?

```
 1              MR. McGINTY:  Well, based on product
 2    capability alone.
 3              THE COURT:  You can keep saying it, but that's
 4    not what I'm going to instruct them on.  Maybe you don't
 5    hear me, maybe you don't understand me, but I don't
 6    think we ought to keep going back and forth on that.
 7    And I will tell you, um, tomorrow morning, you know, now
 8    that I know the conspiracy is out, I'll have to revise
 9    what I tentatively thought I might say about *Direct*
10    *Sales* and that line of cases and I'll tell you, before
11    you argue, what I propose to say and I'll listen to you
12    and I might refine it.  But, you know, maybe if you
13    genuinely don't understand what I'm saying, which is
14    consistent with what I gave the jury in my preliminary
15    instructions, you can talk about it with Ms. Demaso.
16              MR. McGINTY:  Well, I, um -- your Honor, I
17    think the word's "disagree," I disagree with the Court's
18    instruction on this.  I would respectfully say that the
19    Court's instruction at the beginning of the case, um, is
20    at variance with this, um, because it referred to
21    knowledge how a product would be used.
22              THE COURT:  Right.  Well, let me see what I
23    said.
24              MR. McGINTY:  If the proof is indifferent to
25    who used it and how, then I don't understand how that
```

1   instruction stands.  And that it would be used imports a

2   knowledge that the scheme was for the purpose of the

3   user and acknowledges how the user was going to use

4   this.

5              THE COURT:  Actually, I -- you know, *Pimental*,

6   for example, said Judge Gertner correctly instructed --

7   "It was simply the use of the mails," in that case, "in

8   the course of the scheme rather than the particular

9   mailing at issue that must be reasonably foreseeable for

10  the causation element of the mail fraud offense."  "The

11  principle, that is, the use of the mails rather than the

12  specific mailing that is charged that must be reasonably

13  foreseeable as a result of the scheme," is affirmed by

14  one of the primary cases on which *Pimental* relies, and I

15  have previously cited to you the same, or at least some

16  of them, *Sawyer, Moreau* and *DiMasi*.

17         But, you know, this is useful for two purposes.

18  I'm listening to you and I'll work on the jury

19  instructions, I'll try to get them accurate and complete

20  and balanced, and, you know, as always I don't want you

21  to be reasonably mistaken about what I'm going to

22  instruct the jury on and argue some theory that will be

23  defeated by the instructions.

24         You can argue, you know -- well, what does the

25  government say about wire fraud?

1        MS. SEDKY:  Your Honor, we believe that, um --
2    we agree with everything in the Court's assessment of
3    what we're required to prove about what Mr. Harris's
4    level of intent was.  He has to have intended to
5    defraud, that intent he has to have.  He has to intend
6    to participate in a scheme to defraud.  Each individual
7    wire doesn't even have to successfully accomplish the
8    intended goal.  Nothing -- no fraud ever has to take
9    place.  So he doesn't have to have any mens rea about
10   the specifics of a particular wire, the wire has to be
11   done reasonably foreseeable to him.  It doesn't even
12   have to be actually foreseeable, it has to be reasonably
13   foreseeable.
14        THE COURT:  He doesn't have to have actually
15   known about it, he has to have reasonably foreseen that
16   --
17        MS. SEDKY:  Correct, it's an objective test
18   not a subjective test and he does not have to know any
19   specifics about the wire.  There's no case law that I'm
20   aware of where he has to -- where the person who has
21   devised and/or is participating in the scheme needs to
22   know specific -- which specific ISP receives the wire.
23   No ISP has to receive the wire.
24        THE COURT:  Well, if there are, for example,
25   mail fraud schemes where somebody is seeking to defraud

an insurance company and knows that he'll get the checks

from the insurance company in the mail and you don't

know who's going to send the checks and you don't know

when they're going to be sent, but it's reasonably

foreseeable that the mails will be used in furtherance

of the scheme by some unknown person.  I think that's --

that principle I feel comfortable with.

I almost hate to ask this -- well, I don't hate to

ask this question, but I think there's an issue that you

all haven't addressed that we need to think about.  It's

no in the Rule 29 motion.

What's the evidence that the wires -- well, two

things.  I'm curious about the evidence on each

particular wire.

But what's the evidence that whatever wires were

used were interstate wire transmissions?

MS. SEDKY:  That's a good question, your

Honor.  We elicited testimony from each of the users

about physically where they were located at their

computer at the times that they both acquired the -- the

-- they went to the TCNISO website and that website --

from Massachusetts, and these internet wires travel

interstate, they were sitting in Massachusetts --

THE COURT:  How do I know they went

interstate?

1          MS. SEDKY:  Um, well, Mr. Harris was in either

2     San Diego, Arizona, um, or, I believe, Portland or Hong

3     Kong at the time that he eventually gets the order, and

4     then that's for the acquisition wire.

5          THE COURT:  Yeah.  You know, the question I

6     have is if this had been a telephone call, I would have

7     felt very comfortable, and you may be right, so the --

8          Does it matter where the site was hosted?  I don't

9     think I heard the testimony I expected that the website

10    was hosted in Arizona.

11         MS. SEDKY:  I think we got that in.  But if he

12    -- in order to have the product fulfillment take place

13    -- and you heard Hanshaw downloaded it, and so he got

14    it, the others bought it and it was shipped to them.  So

15    we do know where Harris was.

16         THE COURT:  So all of this, you say, the

17    evidence is sufficient to prove is done through cables?

18         MS. SEDKY:  Through the internet.

19         THE COURT:  Yeah, I know, through the

20    internet.

21         MS. SEDKY:  Right.

22         THE COURT:  But what makes the internet an

23    interstate wire transmission.  I started to look at this

24    before the trial, but --

25         MS. SEDKY:  We -- I believe in our memorandum

```
1    in support of the jury instruction, I'm not sure if we
2    cited a case to it, but we, in our proposed instruction
3    for wire fraud, we put in internet as a definition of
4    the wire.
5             THE COURT:  I know, but -- and I asked my law
6    clerk before the trial started, while I was doing my
7    preliminary instructions, to give me a current version
8    of Section 1343, because the mail fraud statute, 1341,
9    has been amended to use private carriers like Federal
10   Express.  But as far as I know, 1343 --
11            MS. SEDKY:  I am very happy to provide the
12   Court with authority.
13            THE COURT:  I really wish you would.
14            MS. SEDKY:  I believe it's, um -- well, let me
15   just make sure it's not in our --
16            THE COURT:  Well, maybe it is.
17            MS. SEDKY:  I believe it's, um --
18            THE COURT:  Where is it?  What document are
19   you looking at?
20            MS. SEDKY:  Actually, um, we put it in the
21   end, I think.  I don't think that's the -- um, I
22   apologize.  If the Court will give me 25 seconds, I have
23   it in my Ipad and I can get you the cite.
24            THE COURT:  Go ahead.
25            MS. SEDKY:  It might take me longer than 25
```

```
 1   seconds.

 2              THE COURT:  That's fine.

 3              (Pause.)

 4              MS. SEDKY:  I'm sorry, your Honor.  Rather

 5   than take up the Court's time, this will take me 25

 6   seconds when I get back to my office.

 7              THE COURT:  Hold on just a minute.

 8              (Pause.)

 9              THE COURT:  Yeah, I don't see it quickly

10   looking at the government's -- I mean, I literally -- I

11   mean, how does the internet work?  Did Mr. Harris have

12   to be on --

13              MS. SEDKY:  The case law will, I believe, um,

14   give --

15              THE COURT:  Did he have to be on a cable or is

16   my FIOS a wire?

17              MS. SEDKY:  I guess it is.

18              THE COURT:  Well -- all right.

19              MS. SEDKY:  E-mail -- I will absolutely

20   satisfy the Court that the case law is very solid that

21   e-mail and internet is the use of the interstate wires

22   and especially in this case where we have that the

23   product fulfillment took place in another state.  Um, it

24   had to have made its way.  And that the use of the --

25              THE COURT:  I know, but I thought I might hear
```

 1     some testimony on this from Mr. Ryan or somebody.  Maybe

 2     it's okay.  Maybe it's not.  Well, I mean, because I

 3     guess Phillips testified that they hooked up the cables

 4     in California, I think.

 5              MS. SEDKY:  He testified that the website for

 6     an extended period was hosted by GoDaddy.  GoDaddy is

 7     based in Arizona.

 8              THE COURT:  I don't -- did anybody testify to

 9     that?

10              MS. SEDKY:  No, not to my knowledge.

11              THE COURT:  Yeah, that's what I'm talking

12     about.

13              (Pause.)

14              MS. SEDKY:  Right.  I think that the way the

15     logic goes is Mr. Harris had to have received

16     information through the wire.  Because he was located in

17     California, there was no way for him to have gotten the

18     information.  There was no phone call.  There was no

19     mail in the order.  The only way he got the information

20     was through the internet.  And we will certainly find

21     case law that says that electronic communications

22     through the internet is a wire communication within the

23     meaning of Section 1343.

24              THE COURT:  Well, get it to me as soon as

25     possible.

1          MS. SEDKY:  I will do that.  I apologize, your

2     Honor.

3          THE COURT:  Within an hour after we suspend

4     because I have to write my instruction.

5          MS. SEDKY:  No problem, your Honor.

6          MR. McGINTY:  Your Honor, if I might?

7     First of all, I would orally like to amend Rule 29

8     to include this ground.  Secondly --

9          THE COURT:  Yeah, it's a pretty good one.

10     No, look, it's just -- I've got to give jury

11     instructions and I'm going to, you know, continue to

12     work hard to get them right and, um, I'm not trying to

13     help one side or the other, but --

14          MR. McGINTY:  I want to sort of revisit the

15     issue of the instruction because I think it is critical

16     and I think the Hanshaw, um, situation sort of puts it

17     in perhaps a slightly different contrast.

18     When the Court talks about the "proven nature,"

19     um, the "proven nature" suggests that there's some proof

20     that the government put in sufficient to support the

21     nature being improper or illegal.

22          THE COURT:  Um, there is.  Viewed in the light

23     most favorable to the government, there's plenty of

24     evidence of that.

25          MR. McGINTY:  Right.  And focusing on *DiMasi*,

1   which seemed to suggest that if the government's

2   evidence is undermined -- is undermined in a fashion

3   that contests that, the government's responsibility is

4   to address that or they lose the presumption that the

5   facts are sufficient to support the --

6           THE COURT:  No, I don't think they lose the

7   presumption, I think you just have to look at all the

8   evidence and not just some of it.  But the government --

9   um, the jury could disbelieve the answers you elicited,

10   that there are other uses.

11           MR. McGINTY:  It was their witnesses.

12           THE COURT:  It doesn't matter.  It doesn't

13   matter who called the witness.  That's one.

14       Two, the jury could say, "These devices

15   theoretically could be used for other purposes, but, you

16   know, we see what Mr. Harris said and his intent was

17   that they be used to steal internet service."  Okay?

18   There's ample evidence for the jury to find that beyond

19   a reasonable doubt.

20           MR. McGINTY:  And on that determination is the

21   Court's view that it's got to give instructions

22   sufficient to support that as a predicate for

23   conviction.

24           THE COURT:  Yes.

25           MR. McGINTY:  Then --

1          THE COURT:  Well, if it's proven that -- that

2     he developed these products, that he distributed them,

3     that he taught people how to use them as part of a

4     scheme to defraud, if that's proven beyond a reasonable

5     doubt, and the other elements are proven, they can

6     properly convict him.

7          MR. McGINTY:  And that would be strict

8     liability irrespective of how the recipient of it uses

9     it, if I understand it correctly.

10         THE COURT:  No, it would have to be -- no,

11    because the use would have to be in furtherance of the

12    scheme.  It would have to have been a reasonably

13    foreseeable use that Mr. Larosa did it to get service or

14    faster service without paying for it.

15         MR. McGINTY:  Right.  But is that irrespective

16    of how Larosa actually used it or irrespective of how

17    Madeira actually used it?

18         THE COURT:  No, they would have to -- no, if

19    Mr. Larosa just got it, because he was a geek and -- or

20    he saw it on the internet and he thought it was pretty,

21    um, he wouldn't have used it to send any wire, he just

22    would have kept it on his desk.

23         MR. McGINTY:  Right.

24         THE COURT:  And then -- if that's the only

25    thing that Larosa did -- if he downloaded it -- well, we

```
 1   would have to get to -- we would have to think this
 2   through, but --
 3              MR. McGINTY:  Let's change this to Madeira.
 4   Madeira doesn't get a config file, he doesn't try to get
 5   a MAC address, he plugs it in, um, he says it works, um,
 6   there's no indication of what the significance is of
 7   plugging in two modems at the same time.  So for all the
 8   jury could reasonably infer, um, the thing operated
 9   because, um, the stringing of the modems together didn't
10   affect his service in any which way and he simply got
11   the service.
12         Now, if Madeira makes some misrepresentation,
13   because he doesn't change the MAC, he doesn't change the
14   config, is Harris potentially culpable for a wire fraud
15   with Mr. Madeira who didn't do anything inconsistent
16   with the interests of the internet service provider?
17   It's quite apart from the issue of the identification of
18   the --
19              THE COURT:  He doesn't change the MAC?
20              MR. McGINTY:  He doesn't change the MAC, he
21   doesn't change the config file, he does nothing except
22   plug it in and "wallah" it works.
23              THE COURT:  And he gets free service?
24              MR. McGINTY:  No, he gets service.  He gets
25   service.  But on the government's theory, he couldn't
```

```
 1    get service because he didn't change the MAC, he didn't
 2    change the config file.  So he gets service and what
 3    appears to be the case is in plugging it in, it didn't
 4    disrupt his paid service, which was what he was getting.
 5          So Madeira takes the thing, he plugs it in, now we
 6    don't know exactly what he did with it, but he doesn't
 7    change anything and he doesn't misrepresent doing
 8    anything.  So on those facts is the knowledge that
 9    Harris has of the character of what he's selling,
10    because he -- because people talk about it, they say it
11    could be used this way, and Harris even acknowledges it,
12    I mean, all the background noise about what the
13    capabilities are, um, combined with the fact that it has
14    other possible uses, but is it sufficient on the nature
15    of the thing -- and I call it "product capability," but
16    the Court calls it -- but on the nature of the thing to
17    convict, even though Madeira didn't use it for
18    impermissible purposes?
19          THE COURT:  Well, this is part of the reason
20    I'm going to reserve judgment on the Rule 29 motion with
21    regard to wire fraud at least until after I hear the
22    closing argument because what I haven't done, and I
23    don't know if it would be a profitable use of our time
24    today, to -- but what I haven't done is gone count by
25    count.
```

1          MR. McGINTY:  Could I make a suggestion on

2     it?  Let's take Hanshaw, for example.

3          Hanshaw is, by his own admission, a social

4     engineer.  What he does is he insinuates himself into

5     the confidence of people so that he can get confidential

6     information, and the confidential information he wants

7     isn't Harris's product, he wants the code.  Now, you

8     don't need the code to hook up to the internet, the code

9     functions differently.

10          Now, it happens that, um, Mr. Hanshaw is familiar

11     with a fellow named "Furksa" and what Furksa does is

12     Furksa takes Harris's software and he either clones it

13     or works with it or changes it in a way where he can

14     make it useful in some other way.  We also know that

15     Hanshaw had other access to the internet because he both

16     war drove, going around looking for exposed WIFIs, he

17     also used cloned modems that he got from Max Fraud.  So

18     we don't have evidence sufficient to show that he used

19     the cable modem for the purposes --

20               THE COURT:  This is what I need to --

21               MR. McGINTY:  Well, can I go just one more

22     point?

23               THE COURT:  Go ahead.  Yes.

24               MR. McGINTY:  Hanshaw is acting at variance

25     with the commercial interest of TCNISO, which is trying

1    to sell modems and make a profit on the sale of modems.

2    So he is on a private, um, wire with Isabella Lindquist

3    making a deal with her for the $100 in order that he

4    gets the code and in each instance he gets the code for

5    purposes that aren't consistent with the interests of

6    Mr. Harris.  So what we have here is a scheme, let's say

7    --

8            THE COURT:  But this is where you're

9    conflating again conspiracy and wire fraud.  For

10   conspiracy, they would need a meeting of the minds.  Not

11   for wire fraud.

12           MR. McGINTY:  But for participation in a

13   scheme, his scheme, the sale for profit, Hanshaw's

14   scheme --

15           THE COURT:  No, I don't see the scheme as

16   primarily or exclusively sale for profit, the scheme is

17   to steal service without paying for it from internet

18   companies.

19           MR. McGINTY:  Well, that's not, I would

20   respectfully submit, what's charged, um, and not only

21   that but, um, it would seem as if -- for there to be a

22   scheme to defraud where Harris is the principal and

23   there's a particular defendant -- and the Court asked

24   before, "Can you have a scheme that's inclusive of every

25   ISP," in the preparation of, let's say, a one-trick

1    pony, um, "for purposes of generalized fraud against

2    ISPs?"

3         You have Count 1, um, the use of the wire in

4    connection with a generalized wire fraud against

5    everyone in the world who happens to be an ISP.  That's

6    one thing.  Here the claim is -- the scheme to defraud

7    is for purposes of effecting a scheme, a scheme here

8    identifying as -- as, um, in the indictment --

9         Judge, I had it here a moment ago.

10        -- for the purpose of executing a scheme to

11   defraud and aiding and --

12             THE COURT:  You're going too fast.

13             MR. McGINTY:  I'm sorry.

14        A scheme -- to defraud and obtain money, but a

15   scheme was devised:  "For the purpose of executing a

16   scheme to defraud and aiding and abetting others to do

17   so as set forth below particularized by Hanshaw

18   downloading, Count 2, Hanshaw downloading, Count 3,

19   Hanshaw using, Count 4, Hanshaw Using, Count 5."

20             THE COURT:  Okay.

21             MR. McGINTY:  So based on the product -- I'm

22   sorry, the nature of the product -- and I keep saying

23   "capabilities," because I don't know the difference, um,

24   and the Court has used the primary purpose and has

25   talked about the nature --

1              THE COURT:  No, it's -- the nature of the

2    product is only evidence of a couple of relevant things,

3    one, did he have intent to defraud?  It's evidence, but

4    not proof, if they find that its sole or primary purpose

5    is to steal internet for free, it's evidence of whether

6    there's a scheme.  A scheme, you know, at some point --

7    is to defraud or is a plan to cheat somebody out of

8    something.  If you devise software that's going to

9    operate -- that can operate to cheat people, it's

10   evidence, it's not proof, they can consider it with all

11   the evidence.

12              MR. McGINTY:  But I thought I asked whether a

13   scheme could consist of proof of the product

14   irrespective of the customer's use, and I understood the

15   Court to say "Yes."

16              THE COURT:  Well, actually you can.

17              MR. McGINTY:  And it's resting on --

18              THE COURT:  No, this is part of -- I discussed

19   this with you before, it was big in or it was relevant

20   in **DiMasi.**  And in **Potter**, you know, there was a scheme

21   to bribe a Rhode Island state legislator by making

22   payments to his law firm, the legislator didn't know

23   about it, and apparently the money didn't get to Potter,

24   as I recall.  But the racing interests that were making

25   the payments for that purpose had the scheme and they

```
 1    used the mails in furtherance of the scheme.
 2            MR. McGINTY:  But in Potter's case, um, the
 3    scheme doesn't have to be successful, but it was for the
 4    purpose of achieving that objective.  And here you're
 5    saying that the proof can be satisfied by no proof that
 6    the scheme was going to be achieved at the far end by
 7    the person who was going to get the money.  And here
 8    there's no proof that --
 9            THE COURT:  They could have -- some crimes
10    are -- somebody could get arrested and convicted on mail
11    fraud before anybody was actually defrauded.  It focuses
12    on devising the scheme and using, in this case, the
13    wires, the interstate wires in furtherance of the
14    scheme.  It doesn't have to succeed.
15        Look, I think the best way for us to spend our
16    time is -- and this is helpful to me and I'll go work on
17    the instructions and I'll talk to you about the
18    instructions tomorrow morning and then you'll argue the
19    case.  But it sounds to me like you and I, at the
20    moment, Mr. McGinty, are repeating ourselves.
21            MS. SEDKY:  Your Honor, may we be heard
22    briefly?
23            THE COURT:  What's that?
24            MS. SEDKY:  May we be heard briefly about the
25    instruction?
```

```
 1                    THE COURT:  Yes.

 2                    MS. SEDKY:  We do not intend to seek an aiding

 3       and abetting instruction at this time.

 4                    THE COURT:  Good.  I was going to get to that.

 5                    MS. SEDKY:  Just to inform the Court of that.

 6             And there was one particular instruction that we

 7       wanted to, um, flush out and get a better understanding

 8       of the Court's likely ruling and that is with respect to

 9       the cooperating witnesses.

10             As the, um, proposed instruction currently reads,

11       and I believe --

12                    THE COURT:  Well, I'll tell you what I'm

13       likely to say about the cooperating witnesses.  Okay?

14                    (Pause.)

15                    THE COURT:  Something along the following --

16       people with an immunity agreement.  All right.  Wait a

17       second here.

18                    (Pause.)

19                    THE COURT:  It will be something like the

20       following.

21             "You heard testimony that certain witnesses

22       testified pursuant to an order of immunity or were given

23       immunity by the government.  The immunity order or

24       agreement provides that no testimony by the witness can

25       be used against him or her directly or indirectly except
```

1   in a prosecution for perjury if he testifies falsely or

2   otherwise violates the terms of the immunity.  The

3   government is entitled to provide or apply for an

4   immunity order and present the testimony of an immunized

5   witness.

6        Some people, in the position of the immunized

7   witnesses, are entirely truthful when testifying.

8   However, the testimony of such witnesses should be

9   examined by you with greater care than the testimony of

10  an ordinary witness.  You should scrutinize it closely

11  because a witness who provides information, or pursuant

12  to a grant of immunity, and perhaps to avoid being

13  prosecuted himself or herself, has a greater motive to

14  provide false information than someone who's not been

15  given immunity.

16       As with all the evidence, in deciding whether a

17  jury will credit some or all of an immunized witness's

18  testimony, you should consider, among other things,

19  whether it was contradicted or corroborated by other

20  evidence in the case.  You should scrutinize such

21  testimony with great care and rely on it with caution.

22  If after doing so you find some or all of the testimony

23  from an immunized witness to be true, you should give it

24  such weight as you believe it deserves."

25       I mean, something along those lines.

```
 1            MS. SEDKY:  And, your Honor, in the context of

 2    a cooperation agreement -- for example, Mr. Phillips is

 3    the only witness who is testifying pursuant to an

 4    existing cooperating agreement, we think that this

 5    instruction would relate directly to his testimony.  We

 6    take a different view about an immunized witness because

 7    we're not clear about what their incentive is to

 8    fabricate.

 9            THE COURT:  Why did you give them immunity if

10    you -- well, what's their incentive to fabricate?  You

11    won't give them immunity unless they tell the government

12    useful information, things that tends to incriminate --

13    they wouldn't have gotten immunity, at least from me,

14    unless they had a valid Fifth Amendment right not to

15    testify, unless they were at least a subject of an

16    investigation, not an independent third-party witness,

17    and they might be a target of an investigation in the

18    Department of Justice lexicon.  So they do have

19    incentives.

20            MS. SEDKY:  To fabricate their testimony on

21    the stand?

22            THE COURT:  Yes.  This is -- this is

23    essentially -- if you look at the First Circuit pattern

24    instruction 2.07, it says:  "You have heard the

25    testimony of X.  He provided evidence under an agreement
```

1    with the government.  He participated in the crime

2    charged against the defendant.  Some people in this

3    position are entirely truthful when testifying.  Still

4    you should consider the testimony of these individuals

5    with particular caution, they may have had reason to

6    make up stories or to exaggerate what others did because

7    they wanted to help themselves."

8           That's the jurisprudence of the First Circuit.

9              MS. SEDKY:  And my understanding, and please

10   correct me if I'm wrong, but I thought that that was

11   really geared towards a cooperating witness as opposed

12   to --

13             THE COURT:  You're wrong.

14             MS. SEDKY:  Okay.  Thank you for telling me.

15             THE COURT:  Well, why did you give them

16   immunity?  Look, you could have prosecuted Lindquist.

17             MS. SEDKY:  We gave them -- we offered

18   immunity to all of the witnesses because we thought it

19   was the right thing to do.

20             THE COURT:  But you could argue -- I'm not --

21   I'm instructing them to examine this with particular

22   care.  You should say, "Mr. Larosa didn't even know

23   Mr. Harris, he's got no reason to" -- you can argue what

24   you want to argue, within reason, but you wanted to know

25   what I'm going to tell them and that's what I'm going to

1    tell them.

2              MS. SEDKY:  Thank you, your Honor.

3              MR. McGINTY:  Your Honor, in view of the

4    dismissal of Count 1, the conspiracy charge, um,

5    Mr. Harris moves for a mistrial on account of the

6    evidentiary spillover in the indictment, secondly, the

7    reading of the indictment which included matters that

8    it's going to be difficult for a jury to disregard, and

9    finally, um, the government's opening statement, which I

10   had, at the time, made a motion for a mistrial, where

11   they made repeated reference to a black market and MAC

12   addresses and so forth, all things about what the forum

13   was going to be and what the proof of it was going to

14   be.  And, um, each of those things contribute to an

15   enduring impression and, um --

16             THE COURT:  Well, what evidence -- there are

17   two things.  All of the allegations of the conspiracy

18   count are incorporated by reference, I believe, in the

19   wire fraud counts.  I don't -- and I didn't admit

20   anything with a limiting instruction.

21             (Pause.)

22             THE COURT:  The grand jury alleges Paragraphs

23   1 to 13 and 16 to 58 -- and this is in Paragraph 50.  I

24   didn't admit any evidence with a limiting instruction.

25   I directed the jury and I've instructed the jury that

1   the indictment is only an accusation, it's not evidence

2   or proof, and it's also -- I've also instructed the jury

3   that anything the prosecutors say and anything you say

4   is not evidence.  The motion for a mistrial is denied.

5            MR. McGINTY:  One point I haven't mentioned.

6   The Court's ruling with respect to the personal conduct

7   of Mr. Harris, having admitted that as evidence of the

8   conspiracy, which I respectfully submit would not be

9   admissible with respect to substantive counts.

10            THE COURT:  And the jurisprudence is -- I can

11   give it to you.  The jurisprudence is -- and I cited it

12   yesterday.  It doesn't even have to be a charge in the

13   indictment for evidence to come in -- a conspiracy

14   charged in the indictment for evidence to come in as

15   co-conspirator hearsay.  The First Circuit said in

16   **Candalaria-Silva**, 162 F.3d 698 at 706, quote; "It is not

17   necessary for the indictment to charge a conspiracy in

18   order to admit co-conspirator statements under

19   801(d)(2)(E)".

20        So let me think through what I'm saying here.  All

21   right.  Well, let me think through whether you've got

22   something.

23            (Pause.)

24            THE COURT:  The only co-conspirator statements

25   I've admitted, um, are Lindquist, Phillips, Mr. T, and

MooreR, and I continue to be completely comfortable that those conspiracies, with Mr. Harris, were proven by a preponderance of the evidence.  The reason I said I was inclined to admit -- to allow the Rule 29 -- or I did allow the Rule 29 motion on conspiracy is that, um, there wasn't sufficient proof with regard to Larosa, Madeira, or Hanshaw, and there wasn't sufficient proof that the conspiracy with Lindquist and Phillips endured into 2008 when the downloading by the FBI in Massachusetts, um, would have been the act causing venue.

So whatever came in with regard to Lindquist, Phillips, um, Mr. T, and MooreR is utterly independent of my analysis on Rule 29.  Mr. Harris's own statements came in under Rule 801(d)(2)(A), they're admissions by a party opponent.

MR. McGINTY:  With respect to what part of the indictment gets to the jury, um, the -- previously the dismissed counts involving Mr. G-E-N-O-H, Genoh, um, were excised from the indictment.  Um, the conspiracy here ought to be excised from the indictment.

But may I inquire if the Court would inform the jury about the fall of the conspiracy, um, and what impact that has on their evaluation of the evidence.

THE COURT:  Whose evaluation?

1              MR. McGINTY:  The jurors.  I mean, when the

2    jury heard this, there was a charge of conspiracy.  It

3    had the indictment read to them, so --

4              THE COURT:  But they -- well, it may -- I mean

5    this is good.  Maybe I ought to see you later this

6    afternoon.  But I'll tell the jury that they're not

7    going to -- I'd be inclined -- and this is off the top

8    of my head, it's a good question of yours, like many

9    others, that --

10             MR. McGINTY:  Even I repeat myself.

11             THE COURT:  Yeah, this is a different point.

12             (Laughter.)

13             THE COURT:  Well, I mean, you and the

14   government can talk about whether there's anything that

15   should be redacted, but, you know -- and probably what

16   should be redacted are the, perhaps, the paragraphs that

17   are not -- well, let's see what those paragraphs are.

18             (Pause.)

19             THE COURT:  14 and 15 are not realleged.  14

20   and 15 actually are the -- 15 is the charging paragraph

21   and 14 is the incorporation of 1 to 30.  It's possible

22   that should be redacted.

23        But I'm going to tell them that they're not going

24   to be called upon to decide whether a conspiracy has

25   been proven, that they can consider all the evidence,

```
 1    unless it was admitted with a limiting instruction, and
 2    I don't recall any, and they have to decide whether wire
 3    fraud's been proven and I'll explain to them the
 4    elements of wire fraud.
 5         Does that sound like the right approach to the
 6    government?
 7              MR. BOOKBINDER:  Yes, your Honor.
 8              THE COURT:  All right.  And will the
 9    government redact the indictment to take out the counts
10    that are not incorporated in the wire fraud counts?
11              MR. BOOKBINDER:  We will.
12              THE COURT:  All right.  If you can get me that
13    this afternoon, it would be valuable.
14              MR. McGINTY:  May I just have a moment, your
15    Honor?
16              THE COURT:  Yes.
17              (Pause.)
18              THE COURT:  What's that?
19              MR. McGINTY:  May I just have a moment, your
20    Honor?
21              THE COURT:  Yes.
22              (Pause.)
23              MS. SEDKY:  Your Honor, we have one suggestion
24    to allay the -- we could add a line that says "scheme to
25    defraud" and take out "manner and means of conspiracy
```

1    and overt acts," because we would submit it's all the

2    same evidence, it goes to the scheme to defraud.

3              MR. McGINTY:  I think we have a fundamental

4    disagreement.  The government's view is that the count

5    that would be excised would be simply the -- it's here

6    in Paragraph 14, I believe, in the indictment

7    incorporated as 15.

8              THE COURT:  Actually, I don't have -- this

9    shouldn't change anything, but I don't have the present

10   version of the indictment for some reason.  This is the

11   same.

12             (Pause.)

13             MR. McGINTY:  The only difference is that

14   there was a paragraph that related to Mr. Genoh and

15   because he was eliminated, that reduced the paragraph.

16   So Paragraph 15 became 14, so --

17             THE COURT:  Oh, hold on a second.  I

18   apologize.

19             (Pause.)

20             THE COURT:  All right.  So that's right.  So

21   it's 13 and 14 that should be removed.

22             MR. BOOKBINDER:  And, your Honor, we would

23   simply take right below that it says "manner and means

24   of the conspiracy."  It may be simplest just to take

25   that heading out.

```
 1              THE COURT:  Like I say, take that heading
 2    out.  The headings are not allegations.
 3              MR. BOOKBINDER:  And later on I believe it
 4    says "overt acts."  It doesn't specifically reference a
 5    conspiracy, so we could leave it or take it out, either
 6    way.  I don't know.
 7              MR. McGINTY:  Well, the problem here is that
 8    this is replete with things that were unproven.  I mean,
 9    looking at Paragraph 21, I believe formerly 22, um, it
10    also -- and this is in the third line down, "It also
11    contains forums" -- and this is the website, "forums,
12    bulletin boards that allow Harris and his
13    co-conspirators and users to exchange information about
14    product updates and provide tutorials and advice about
15    installing and using Harris's cable modem hacking
16    products."
17              THE COURT:  Well, we had evidence on that.
18              MR. McGINTY:  "Harris and several
19    co-conspirators moderated and personally participated in
20    these on-line discussion forums."  Um --
21              THE COURT:  I'm sorry.  You say there's no
22    evidence of that?
23              MR. McGINTY:  And if you go to the next
24    paragraph --
25              THE COURT:  Well, I don't know, are you saying
```

1    there's no evidence of that?

2         MR. McGINTY:  I'm saying there's no evidence

3    relating to forums and participation in forums for

4    purposes of doing that, yes.  They had it.  And then on

5    the next paragraph:  "Through these forums users discuss

6    with Harris's co-conspirators and each other acquiring

7    and exchanging stolen MAC addresses."

8         THE COURT:  You see, this is -- the indictment

9    -- this is not charging language in the indictment for

10   the conspiracy count, that was in the revised

11   indictment, Paragraph 14.  Um, I mean, I'm going to tell

12   them the indictment is not evidence or proof and I'm

13   going to tell them what has to be proven.

14        MR. McGINTY:  But the -- but in here it talks

15   about co-conspirators, it mentions them as

16   co-conspirators, suggesting that Harris is with them a

17   conspirator, which is not what's charged.  It refers to

18   the forums, it refers to discussions about techniques

19   that ISPs employ, detect and to block the use of

20   Harris's cable.  This is not admitted.  It's not part of

21   the evidence.  So this is a narrower --

22        THE COURT:  Why do you say it's not admitted?

23   I heard testimony about techniques that are used to

24   frustrate Mr. Harris and people like him.

25        MR. McGINTY:  But you didn't hear that the

 1  forums were the means by which that was exchanged.  And

 2  this becomes a --

 3           THE COURT:  I'm sorry.

 4           MR. BOOKBINDER:  There's plenty of testimony

 5  about people using the forums and Mr. Phillips testified

 6  about it, Mr. Hanshaw testified about it.

 7           THE COURT:  Didn't I -- weren't there posts

 8  from Mr. Harris's --

 9           MR. BOOKBINDER:  The book, Mr. Harris's own

10  book.

11           THE COURT:  What we had this morning about

12  "I'm looking for a friend to trade MACs."

13           MR. BOOKBINDER:  Right.

14           THE COURT:  I mean, talk to the government

15  about whether there's something in here that ought to go

16  out.  But I think my general instruction that this is

17  not evidence or proof and --

18           MR. McGINTY:  If we go to Page 6 where it says

19  "overt acts," "Harris and his co-conspirators committed

20  the following overt acts within the District of

21  Massachusetts," followed by a laundry list of

22  predicates, um, and then we have a TCNISO.net forums

23  which describes what the forum content was, not as to

24  what the witness testified to, but forum content as if

25  this was derived directly from the forums, for which

1    there is no evidence to support it.

2           THE COURT:  I know, but the indictment is not

3    evidence.

4           MR. McGINTY:  Oh, the indictment is not

5    evidence, but the indictment can be prejudicial and

6    giving them a narrative of --

7           THE COURT:  All right.  File a written memo

8    this afternoon.  Give me some authority.  Rule 29 and

9    the motions are granted, um, and the indictments are

10   redacted.  The difficulty I think you have here is that

11   the allegations generally, they're incorporated, and

12   there were facts alleged to be relevant to both the

13   conspiracy and the scheme to defraud.  And at the

14   moment, as I say, I didn't let in any evidence with a

15   limited instruction, that you should consider this just

16   on the conspiracy and not on the wire fraud.

17          MR. McGINTY:  No, but if I might just go at

18   this in a slightly different way.  Were there an

19   indictment on wire fraud which consisted only of the

20   Paragraph 54 and 55 on Pages 11 and 12, in other words,

21   the spare wire fraud charges, if I were to move to

22   dismiss that, my dismissal would be denied, because it

23   provides sufficient notice of the scheme, the dates, um,

24   and the conduct.  So why the government gets the

25   narrative of the conspiracy to come in when there is a

1    spare recitation of what the charge is, um, I'm at a

2    loss to understand.

3              THE COURT:  You could have made that motion

4    before trial.  But this, um -- at the moment I don't

5    perceive a problem, given the instructions that I'm

6    going to give.

7         All right.  Um, a couple other issues.

8         How long does the government want for its closing

9    argument including the rebuttal, which needs to be a

10   brief rebuttal, not a second closing argument?

11             MR. BOOKBINDER:  Correct, your Honor.  We'd

12   like -- at this point can we reserve an hour combined?

13   I expect it will be somewhat less than that, but we just

14   want to be sure.

15             THE COURT:  And you're going to break it up?

16             MR. BOOKBINDER:  Yes, it will be about, you

17   know, say 45 minutes for --

18             THE COURT:  No, I mean between the two of you.

19             MR. BOOKBINDER:  Oh, yes, I'm sorry, your

20   Honor, I'll do the closing and then Ms. Sedky will do

21   the rebuttal.

22             THE COURT:  And how long do you think the

23   rebuttal is going to be?

24             MR. BOOKBINDER:  Um, you know, again, for the

25   purposes now, 45 minutes for the closing and 15 minutes

```
 1    for the rebuttal.  But I project it will be even shorter

 2    than that.  Maybe 40 minutes and 10 minutes.

 3              THE COURT:  Okay.  I guess that depends on

 4    what I hear.

 5         And, Mr. McGinty, do you want about an hour?

 6              MR. McGINTY:  Yes, that's fine.

 7              THE COURT:  The government will go first and

 8    last.  All right.

 9         And then, you know, you've got a lot to do, but

10    before the exhibits go back there, you have to be

11    satisfied with them beforehand, you know, a paper set of

12    the exhibits and also a disk that you're confident has

13    the right things on it.  And if you get the paper -- and

14    I'll be old fashioned, but if you get the paper exhibits

15    in shape and you have to do some more work to double-

16    check the disk, then that's okay.

17              MR. McGINTY:  There's one thing we haven't

18    thought about, which is the book.  Part of the book, a

19    chapter of the book has been provided electronically by

20    the government and the book itself is in evidence, so

21    part of it is here electronically and part of it is

22    available in hardcopy.  I -- we were discussing what the

23    options there were and my preference would be that the,

24    um, part of the book that's there electronically should

25    be removed, that the items -- it's a single item, so the
```

1    jury should consider it a single item rather than only

2    looking at a part of it on the electronic presentation.

3    So my preference would be that --

4               THE COURT:  Does the government object to

5    that?

6               MR. BOOKBINDER:  No.

7               THE COURT:  Okay.  I think that's fine.

8               MR. McGINTY:  I do that just to shorten the

9    amount of time it's going to take us to go through the

10   exhibits.

11              THE COURT:  No, no, the government's agreed,

12   so I don't have to allow the request, which I would have

13   been inclined to do.

14       All right.  You've got closings to prepare and

15   I've got jury instructions to prepare.  I don't think

16   I'll plan to see you again today.

17              MR. BOOKBINDER:  Your Honor, just one matter.

18   We provided to Mr. McGinty two charts or posters that we

19   expect to use in the closing, one is a summary of the

20   wire fraud elements based on the Court's previous

21   instructions.

22              THE COURT:  No, you can't do it.

23              MR. BOOKBINDER:  Can't use them?

24              THE COURT:  Cannot.  In fact, there's First

25   Circuit law that says I can't show them a summary of the

1    instructions, that it would be misleading or give

2    improper emphasis.

3              MR. BOOKBINDER:  All right.  We won't do

4    that.

5         Then the second one is the chart -- it's taken

6    from the chart in the indictment that sets out the

7    specific wire fraud counts, the date, and the wire

8    transmission --

9              THE COURT:  That's okay.

10             MR. BOOKBINDER:  -- and we've served notice of

11   what the wire transmission is because there's three or

12   four lines of text in the indictment.  But we'd like to

13   use that as well, if that's one is fine?

14             THE COURT:  Yeah, that's fine.

15             MR. McGINTY:  Your Honor, the --

16             THE COURT:  Go ahead.  I mean, in concept it's

17   fine.

18             MR. McGINTY:  Your Honor, what they've done is

19   the original offer that the government made was to

20   include all the language that's found on Page 11 and 12,

21   which is sort of the spreadsheet that has the count and

22   the approximate date of the wire transmission on Page 11

23   and 12.  All of that language was included.  The

24   government then changed it to delete, um, certain

25   language, um --

```
 1                 THE COURT:  Because there was no evidence?

 2                 MR. McGINTY:  No, because it just referred to

 3     --

 4                 MR. BOOKBINDER:  Because it's a chart and it's

 5     shorter and simpler and easier for the jury to see.  I'm

 6     happy to show the Court a copy if you would like to see

 7     it.

 8                 THE COURT:  Yeah, why don't you show it to

 9     me.

10                 (Pause.)

11                 THE COURT:  What's the next letter?

12                 (Pause.)

13                 THE COURT:  I think if you're going to use a

14     chart, it should be what's in the indictment.  And some

15     of it, I think, you don't have evidence of, right?  So

16     maybe Mr. McGinty wants to redact it for the -- this I

17     have another copy of the indictment.

18                 (Pause.)

19                 THE COURT:  But, Mr. McGinty, would you prefer

20     they use exactly what's in the indictment?

21                 MR. McGINTY:  Yes, your Honor.

22                 THE COURT:  Okay, you can use that.

23                 MR. BOOKBINDER:  Okay, then that's what I'll

24     do.

25                 THE COURT:  All right.  Well, I'll look
```

1    forward to Ms. Sedky's cases and read them to see

2    whether this is a legal matter or a factual matter.  And

3    unless I otherwise order it, I'll see you at 9:00

4    tomorrow morning.

5          The Court is in recess.

6               (Adjourned, 12:40 p.m.)

7

8               C E R T I F I C A T E

9

10         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

11   hereby certify that the forgoing transcript of the

12   record is a true and accurate transcription of my

13   stenographic notes, before Chief Judge Mark L. Wolf, on

14   Tuesday, February 28, 2012, to the best of my skill and

15   ability.

16

17

18

19   /s/ Richard H. Romanow 11-07-12

20   _____
     RICHARD H. ROMANOW   Date

21

22

23

24

25