1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                        No. 1:09-cr-10243-MLW

4

5

6   UNITED STATES OF AMERICA

7

8   vs.

9

10   RYAN HARRIS

11

12

13                   *********

14

15            For Jury Trial Before:
              Chief Judge Mark L. Wolf

16

17            United States District Court
              District of Massachusetts (Boston.)
18            One Courthouse Way
              Boston, Massachusetts 02210
19            Wednesday, February 29, 2012

20

21                   ********

22         REPORTER: RICHARD H. ROMANOW, RPR
              Official Court Reporter
23            United States District Court
      One Courthouse Way, Room 5200, Boston, MA 02210
24            bulldog@richromanow.com

25

1                    A P P E A R A N C E S

2

3   ADAM J. BOOKBINDER, ESQ.
        United States Attorney's Office
4       John Joseph Moakley Federal Courthouse
        One Courthouse Way, Suite 9200
5       Boston, Massachusetts 02210
        (617) 748-3112
6       E-mail: Adam.bookbinder@usdoj.gov
   and
7   MONA SEDKY, ESQ.
        U.S. Department of Justice
8       601 D. Street, N.W.
        Washington, D.C. 20530
9       (202) 353-4304
        Email: Mona.sedky@usdoj.gov
10      For the United States of America

11

12   CHARLES P. McGINTY, ESQ.
        Federal Public Defender Office
13      District of Massachusetts
        51 Sleeper Street, 5th Floor
14      Boston, Massachusetts 02210
        (617) 223-8080
15      E-mail: Charles_mcginty@fd.org
        For the defendant

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3      Voir Dire of Special Agent Russell......   26

4      Closing Argument by Mr. Bookbinder......   74

5      Closing Argument by Mr. McGinty.........  108

6      Rebuttal Argument by Ms. Sedky..........  136

7      Judge's Charge to the Jury..............  147

8      Jury Note...............................  175

9

10                     E X H I B I T S

11

12

      EXHIBIT H...............................  107
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE CLERK:  Criminal matter 09-10243, the
 4  United States of America versus Ryan Harris.  The Court
 5  is in session.  You may be seated.
 6          THE COURT:  Good morning.  Would counsel
 7  please identify themselves for the record.
 8          MR. BOOKBINDER:  Good morning, your Honor.
 9  Adam Bookbinder and Mona Sedky for the United States.
10          MR. McGINTY:  Your Honor, Charles McGinty and
11  Christine Demaso for Mr. Ryan Harris, who is seated here
12  at counsel table.  Good morning, your Honor.
13          THE COURT:  All right.
14          Since I saw you yesterday, I received the
15  government's motion to reopen the evidence and included
16  in it were cases intended to persuade me that the --
17  define that the internet is inherently involved in
18  interstate commerce for the purpose of the wire fraud
19  statute.  I just received a short time ago the
20  defendant's motion for a supplementary instruction.  I
21  issued an order directing the government to provide a
22  redacted version of the indictment that removes the
23  allegations in Paragraphs 1 to 54 that related to the
24  conspiracy as well as mail fraud.  So I can consider
25  further whether the revised form of the indictment, as a
```

```
 1    matter of fairness, is the most appropriate one to go to
 2    the jury since the conspiracy charge has been dismissed
 3    on the defendant's Rule 29 motion, and the government
 4    has provided that redacted indictment.
 5           Is there anything else I should have received and
 6    read?
 7                MR. McGINTY:  No, your Honor.
 8                MR. BOOKBINDER:  No, your Honor.
 9                THE COURT:  All right.  So I've got on my
10    agenda, before we bring in the jury, the government's
11    motion to reopen the evidence, the question of the
12    redacted indictment, and then the jury instruction
13    issues including the issue raised in the filing that I
14    received about 30 minutes ago from the defendant.
15           Is there anything else that ought to be on that
16    agenda?
17                MR. McGINTY:  I think not, your Honor.
18                MR. BOOKBINDER:  No, your Honor.
19                THE COURT:  Okay.  Well, with regard to the
20    government's motion to reopen, and I'm interested in
21    hearing you on this, um, I've read all the cases that
22    the government's cited and I'm not, at the moment,
23    persuaded that as a matter of law I could find that the
24    internet involves interstate wire communications.  I
25    think Judge Ponsor had it exactly right in *Phillips*.
```

1   The only thing I would add to his analysis is I don't

2   think he referenced 18 United States Code, Section 10,

3   which defines "interstate commerce."  It says:  "The

4   term 'interstate commerce,' as used in this title,

5   includes commerce between one state, territory,

6   possession within the District of Columbia, and another

7   state, territory, possession within the District of

8   Columbia.  The term 'foreign commerce,' as used in this

9   title, includes commerce with a foreign country."

10       I believe it's a factual matter.  Many of the

11  cases cited by the government don't involve a wire fraud

12  statute, they involve a child pornography statute, and

13  some of the cases discuss that there's a difference

14  between the jurisdictional requirement in some statutes

15  that require using instrumentalities of interstate

16  commerce and a requirement that something be itself in

17  interstate commerce.  Judge Ponsor discusses that in

18  *Phillips*.  I thought that the Eastern District of

19  Pennsylvania decision in *Fumo*, which is a wire fraud

20  case, conflated those two concepts.  My present view is

21  that communications from one state to another in

22  furtherance of an alleged wire fraud scheme have to be

23  proven as a matter of fact.

24       I'm inclined to allow the government to present

25  additional evidence, essentially the evidence I would

1    have permitted yesterday before the government rested.

2    The government didn't cite any First Circuit cases in

3    its submission yesterday, but the First Circuit has

4    helpful standards rooted in Rule 611(a).  Those cases

5    include *Peterson*, 233 F.3d 101 at 105, *Pandozzi*, 878

6    F.2d 526 at 534, a decision written by then Judge

7    Breyer, *Lindser*, 81 F.3d 1148 at 1160.  In addition, the

8    cases the government did cite, *Alderette*, 614 F.2d 726

9    at 727, and *Marino*, 562 F.2d 941 at 944, are relevant.

10            The standards, as I understand them at the moment,

11   are essentially as follows.  Rule 611(a) gives the Court

12   discretion to allow the opening.  Fairness is the key

13   criteria.  It appears to me, at the moment, that failure

14   to present certain evidence, like Exhibit 31, which the

15   parties had stipulated was admissible, was inadvertent

16   -- as I understand it the government forgot to offer it,

17   and evidently the same with regard to the evidence of

18   where the websites were hosted and where the wire

19   transmissions, if there were wire transmissions, went to

20   or came from.

21            To the extent the defendant had notice -- well, it

22   doesn't seem to me at the moment the defendant would be

23   unfairly prejudiced by the admission of evidence that

24   would have been admissible yesterday before the

25   government rested.  I note that the defendant, in his

1    Rule 29 motion, didn't argue an absence of proof on

2    interstate wire communications.  That's an issue the

3    Court raised.  And I continue to think that there isn't

4    any evidence.

5         I think yesterday the government said that

6    Phillips had testified that GoDaddy hosted the site.

7    That's not in our notes and it's not in the draft of the

8    transcript on my computer.  It's possible that it was

9    overlooked by me, but I can't find it.  And my clerks

10   are directed to write down the answer to every question

11   and they can't find it either.

12        As I understand it, the admissible testimony would

13   not come as a surprise to the defendant.  There's been

14   discussion for months about who hosted the site.

15        I am somewhat concerned that a late-filed motion

16   in limine by the government, that we discussed on

17   February 17th, contributed to the government's error,

18   and that went to the question whether there would be a

19   reference to Russia as the original host of the site and

20   the government hadn't, um, had a chance to respond to it

21   and so I said, "Don't mention Russia unless and until

22   you come back to me," um, so I can decide.  I wasn't

23   focusing on, you know -- evidently the government wasn't

24   focusing on the requirement to prove the transmission in

25   interstate or foreign commerce because that's a

 1    jurisdictional element and I didn't understand I was

 2    excluding the evidence of the -- of where the site was

 3    hosted, just the fact that it was Russia as opposed to

 4    some other place outside of Massachusetts.  If we had

 5    focused on this, I might have, on reflection, I probably

 6    would have let the evidence concerning Russia in in the

 7    absence of the stipulation that the website was hosted

 8    someplace other than in Massachusetts.

 9         As I understand it, the evidence will not much

10    delay the progress of the trial.

11         The proposal, as I understand it, that Agent

12    Russell introduced Exhibit 31, a PayPal receipt showing

13    that TCNISO had a GoDaddy site in 2008, and it's

14    represented that Russell has personal experience that

15    would permit him to testify that GoDaddy's site is

16    located in Arizona.  I might permit some brief voir dire

17    on that to see if he does have sufficient personal

18    knowledge to testify.

19         The second proposal, as I understand it, is that

20    he testify, quote:  "Given the setup of the internet

21    access of the internet website by an individual in

22    Massachusetts necessarily involves interstate

23    communications because the access must go through one of

24    six national hubs, none of which is located in

25    Massachusetts."  Well, that may be expert testimony and

1    Russell wasn't designated as an expert.  I don't know

2    that the defendant is in a position to deal with that.

3         Just hold on just a second.

4              MR. BOOKBINDER:  Okay.  Sure.

5              THE COURT:  And I don't know if Mr. Russell

6    has any possible testimony based on admissible

7    information that the website, before being in Arizona,

8    was in Russia or in a foreign country, because, as I

9    recall, the -- it was represented to me that the website

10   was transferred to Arizona from Russia in 2007, maybe,

11   and some of the charges in the indictment precede 2007.

12        So as to the problem, I want -- you know, this is

13   a trial, not a game, so it should be fair to both sides,

14   the public, which the government represents, and the

15   defendant.  Well, that's my present tentative state of

16   mind on that.

17              MR. BOOKBINDER:  Now, your Honor, a couple of

18   things.  First, Special Agent Russell was designated as

19   an expert.  We told the defense that --

20              THE COURT:  Hold on a second.

21              (Pause.)

22              THE COURT:  Okay.  Good.

23              MR. BOOKBINDER:  In the form of, um,

24   essentially summaries in our discovery letters, we told

25   the defense that he would be describing, testifying

 1    generally about, um -- and I don't have the language

 2    right in front of me, but essentially about operations

 3    of internet websites, communications over the internet,

 4    we gave them his background that would qualify him to be

 5    an expert.

 6              THE COURT:  Do I have that in the *Jencks*?

 7              MR. BOOKBINDER:  Your Honor, I apologize, that

 8    was probably in one of our many discovery letters --

 9    yeah, I know it was in one of our discovery letters, and

10    I don't know that that is one that --

11              THE COURT:  But as a practical matter, is that

12    right, Mr. McGinty?

13              MR. McGINTY:  I remember -- your Honor, I

14    remember a disclosure that the government gave about the

15    scope of the expert testimony.  I don't recall

16    specifically, but I can trust --

17              THE COURT:  Well, who has it?  I'm sorry.

18         Do you object to him giving that evidence, that

19    testimony?

20              MR. McGINTY:  I'm sorry?

21              THE COURT:  Well, let Mr. Bookbinder go ahead.

22              MR. BOOKBINDER:  So, um, that's --

23              THE COURT:  And, actually, Mr. McGinty, why

24    don't you listen to this and then I'll give you a chance

25    to look for what you need to look for.

1              MR. McGINTY:  Thank you.

2              MR. BOOKBINDER:  So he was designated and I

3    would suggest that his testimony is within the scope

4    certainly of his experience.

5         And the other thing to keep in mind is that while

6    I understand the basis for the Court's decision not to

7    take judicial notice or instruct as a matter of law that

8    this is an interstate transmission, it goes to -- but

9    the fact that several cases have at least suggested

10   that's the case goes to sort of the expert nature of the

11   testimony.  This is pretty close to common knowledge to

12   the extent that --

13             THE COURT:  What case does that?  Almost all

14   the cases I read last night the government called an

15   expert.

16             MR. BOOKBINDER:  Well, your Honor, I suggest

17   that to the extent that the courts are saying that as a

18   matter of law --

19             THE COURT:  They're not saying it as a matter

20   of law.  And I read those cases.  They're dealing with

21   it as a matter of fact.  And the Department of Justice

22   brings an expert.  The Department of Justice brings an

23   expert.

24             MR. BOOKBINDER:  Right.

25             THE COURT:  Well, let me just say this, um,

1   because it will make me feel better.  You know, we've

2   been working so hard to get this case done and you've

3   been doing a very good job, you know.  The Department of

4   Justice, according to the media, recently lost a highly-

5   publicized mail fraud case, the disabled pension fraud

6   case of the bodybuilder firefighter, because it offered

7   inadequate evidence.  The jurors said that mailings were

8   foreseeable.  You know, this is a jurisdictional element

9   of the offense, but it's been a prominent issue here.

10  And, you know, we've got the experts from the Department

11  of Justice Cyber Crimes Section, and I'm reading the

12  cases you cited, and in almost all of those cases there

13  were experts who testified on the operation of the

14  internet.

15       So I guess I'm just surprised and disappointed

16  that I've got the jury sitting back there while we're

17  having this discussion.

18            MR. BOOKBINDER:  And you're right, your Honor,

19  it's a mistake.  It's a mistake on our part.  It was --

20  you know, we've been discussing so many different things

21  that we lost sight of this particular aspect, and

22  there's no question that -- and the case law is --

23            THE COURT:  Well, let me ask you a question.

24  I've seen Mr. Hyman come into the courtroom for part of

25  this.  Is he the supervisor?

1              MR. BOOKBINDER:  Yes, he's my supervisor in

2      this case.

3              THE COURT:  Right.

4              MR. BOOKBINDER:  Yeah, and, as I said, there's

5      no question this was a mistake and I take responsibility

6      for that.  It was certainly an oversight.  And, um, I'd

7      suggest that there certainly wasn't any -- in all this

8      discussion about Russia and about Arizona, that there's

9      no -- there's no actual factual issue, um, and there's

10     certainly no question of surprise to the defense.

11             THE COURT:  Well, that -- you know, you

12     understand me exactly and I really -- I'll see if

13     Mr. McGinty says the same thing.  I do need to protect

14     against unfair surprise.  And on the other hand, as I

15     said, you know, this is not a game, it's not going to

16     take too long, and this is testimony that would have

17     been admitted yesterday before you rested.  So I'm

18     inclined to admit it.

19             MR. BOOKBINDER:  Certainly as to Russia, your

20     Honor, we should have and we did not articulate for the

21     Court that basis for admitting it, and again that was a

22     mistake, but this was evidence that we had hoped and

23     intended to offer, but Mr. McGinty had objected to it

24     and was able to get it excluded.

25             THE COURT:  But I actually didn't -- I mean

1    I've looked quickly, since I've had the jury

2    instructions and other things, at the draft of the

3    transcript.  The problem was naming Russia and we didn't

4    discuss the jurisdictional implications of that at all

5    and I think the transcript will reflect that where it

6    was left was, I said with regard to Russia:  "The

7    government shouldn't offer the evidence until you

8    respond," till the government responds to the motion in

9    limine that I think had been filed the day or the night

10   before the hearing on February 17th, "and I rule on

11   it."  And you said, "We'll either respond and explain

12   our basis and provide some legal support.  If we decide

13   on balance it's not necessary, then we understand the

14   Court to be saying we can't offer it unless we persuade

15   you we can."  And I can tell you, if you pointed out to

16   me that it's a jurisdictional element in some of the

17   counts, you would have persuaded me that the absence of

18   a stipulation be put in evidence that it was hosted in a

19   foreign country, probably in Russia.  But anyway.  There

20   we are.

21           MR. BOOKBINDER:  Yes, your Honor.

22           THE COURT:  And if somebody can find a --

23   well, let me hear from Mr. McGinty.  You know what my

24   inclination is.

25           MR. McGINTY:  I do.

1          Your Honor, I looked at the discovery letters and

2     there are a number of instances where there is a

3     description of the anticipated testimony of Agent

4     Russell.  I can't find one that addresses testimony on

5     this aspect.  And I have -- I think I have all the

6     discovery letters here.

7          If we sort of go back to the conversation

8     yesterday, the government's response was not, um, "We

9     neglected to ask the witnesses," the response was "We

10    think we satisfied the element."  So the decision to

11    bring in the evidence was a deliberate decision.

12         Now, the Court is being asked now to provide an

13    opportunity that rests on a claim of inadvertence.  If

14    someone -- if a party makes a tactical decision and the

15    tactical decision is to put something in, not to put it

16    in, to advances a claim, not advance a claim, then they

17    do that -- that there are consequences from that.  And I

18    think it's plain that the government was of the view

19    that it had satisfied that element.

20         Now, having the benefit of the Court's take on

21    this, um, the government's view is, "Well, we could get

22    some evidence in to satisfy the Court's legal structure

23    of analysis."  I don't know that that --

24              THE COURT:  I think you used exactly the right

25    word, if I thought or think, and maybe I didn't hear

1    anything that, you know, the government was being asked

2    to be relieved of the consequences of a tactical

3    decision.  You know, they had some witness that they

4    decided not to call because they thought he was doing

5    more harm than good.  Um, I think I would say they're

6    stuck with that.

7        This, you know, if there was a misunderstanding as

8    to what they need to prove -- oh, I don't know, if the

9    Cyber Crimes Division of the Department of Justice

10   thinks you don't need expert testimony, I don't know why

11   you've given it to every judge except me, or to every

12   jury except mine.  I don't see it at the moment, but

13   I'll listen to --

14       I don't know.  Was it a tactical decision?

15          MS. SEDKY:  I'll take responsibility because I

16   answered the question.  No, it was not tactical, it was

17   a complete embarrassing oversight on my part and I was

18   caught completely off guard and the first thing I could

19   think of -- it's so axiomatic to me -- I apologize.

20   This is really a problem for me.  I am so seeped in the

21   internet in my job and my life, this is so axiomatic to

22   me.  I overlooked it.  And when you asked, I -- this is

23   what I grabbed for.  It was not a tactical decision, it

24   was an omission on my part.  And I called my section, as

25   soon as we were done, and I told my boss that I forgot.

1    And, um, I'm embarrassed and, um, it was not tactical.

2              THE COURT:  Now I see that Mr. Hyman has come

3    into the courtroom.

4         Mr. Bookbinder told me you were supervising him on

5    this and what I've said -- you know, I'm forced to

6    reiterate, because I'm going to decide this, you know,

7    but some of this -- some of these issues recur and I

8    have discretion.

9         You know, there was a highly-publicized mail fraud

10   case in this district just months ago, um, a bodybuilder

11   disability pension from the fire department who was

12   charged with mail fraud and when the government lost the

13   case the interview showed the juror said to the

14   reporter:  "We found that there was inadequate evidence

15   to prove that he foresaw the mails would be used."  So

16   it's prominent in this district that the jurisdictional

17   requirements can be decisive.  And I would think that

18   it's particularly surprising that the jury's sitting

19   back there while we're having this conversation.

20             But, as I said, this is not a game, I have the

21   discretion to do what's fair and -- if you want to be

22   heard a little further, Mr. McGinty, on anything other

23   than the sort of expert part of the testimony, um, I'm

24   going to be open to the testimony.  But what I wanted to

25   do is get us back to where -- because I'm satisfied this

 1    wasn't a tactical decision, it was a -- it was a

 2    mistake, and it's a mistake that I caught, as I said, it

 3    wasn't a Rule 29 issue.

 4         But is it your contention, Mr. McGinty, that you

 5    would be -- that Mr. Harris would be unfairly prejudiced

 6    if in addition to talking about, um, Exhibit 31 and

 7    Arizona, that Agent Russell talked about the operation

 8    of the internet?

 9         MR. McGINTY:  I do think that.  I don't know

10    that we got a disclosure.  I don't want to make a

11    definitive statement, but it appears as if we did not

12    get a disclosure.

13         THE COURT:  Do you have all of the letters

14    there?

15         MR. McGINTY:  I have all of the letters here

16    except for -- I have the letters up to February 3rd, but

17    there were several letters after that, but they were in

18    the nature of, you know, "We just got the report last

19    night," like that, as opposed to during the course of

20    discovery.

21         THE COURT:  So you have the letters that

22    relate to Mr. Russell?

23         MR. McGINTY:  I do.

24         THE COURT:  Why don't you show them to the

25    government and if you want I'll take them.

1      You don't have a copy of them here,

2  Mr. Bookbinder?

3           MR. BOOKBINDER:  No, I don't have them right

4  in front of me, your Honor.

5           (Pause.)

6           MR. BOOKBINDER:  Your Honor, I think

7  Mr. McGinty is correct, although I don't have all the

8  letters.  Now, I don't think in the sense that we did

9  disclose Mr. Russell as an expert and his expertise in

10  the areas of the internet and that he would talk about

11  internet communications, but we did not talk -- we did

12  not -- and the kinds of language and things like that

13  that were used.  But I don't believe that we said that

14  his testimony would include, um, specifically the

15  discussion of the architecture of the internet.

16           THE COURT:  Well, I'm interested in -- may I

17  see the letter?  I want to do this as a matter of

18  fairness.  But if you look at your trial brief, you

19  identified two experts, Kohler and Brodfuehrer, and then

20  I asked you about this on February 7th and I said:  "The

21  government mentioned in its trial brief that it proposed

22  to elicit expert testimony from two witnesses, Kohler

23  and Brodfuehrer, is that right?"  Mr. Bookbinder said,

24  "It is, your Honor."  And I asked, "Have you made expert

25  disclosures by February 16th, I don't know if there was

1    a deadline?"  And you said, "I don't know that you gave

2    us a deadline, but we did make the disclosures."  And

3    then I asked the defendant if he was going to provide

4    any expert testimony, or offer any? and he said, "Not at

5    this time."  And then I said, "Since the government has

6    disclosed its expert evidence, Rule 16 required the

7    defendant to do the same," and so I gave him until

8    February 14th, the defendant, to do that.

9                 MR. BOOKBINDER:  Again, your Honor, I don't

10   think there's a dispute that we -- and you're right, we

11   did not identify him for the Court, we did disclose him

12   for the -- we didn't tell the defendant --

13                THE COURT:  The important issue is not whether

14   I knew, it's whether the defendant had notice and an

15   opportunity to prepare.

16           Can somebody show me the relevant letter?

17                (Pause.)

18                MR. BOOKBINDER:  Your Honor, there are three

19   of them here, they're discovery letters 10, 12 and 13.

20   I believe there's another one that we don't have handy

21   where we just provide his background.  But those are, I

22   think, the ones that discuss the nature of his

23   testimony.

24                (Pause.)

25                THE COURT:  This doesn't seem -- the earliest

 1    dated -- well, February 3rd says:  "There's one

 2    additional piece of testimony we expect to elicit from

 3    Special Agent Russell that may be -- that might be

 4    considered expert testimony, that there are many ways

 5    to, without paying, be anonymous on the internet.

 6    Russell will give several examples which will include

 7    commercial anonymizing websites, which is

 8    anonymizer.com, et cetera.

 9         But is there anything -- and that's discovery

10    letter 13 and I also have 10 and 12.

11         I mean, is there anything else which the

12    government said -- you know, talked about his expertise

13    with regard to the internet?  Are these the only three

14    letters you think where he's discussed?

15              MR. BOOKBINDER:  Your Honor, I think there is

16    another one -- and again I apologize, I don't have it

17    handy, but we certainly disclose that he's going to

18    describe -- talk about technical jargon, about the

19    internet as it relates to the posts and the chats, which

20    is again based on his expertise.

21         What I guess I would suggest, your Honor, is that

22    given -- I understand the issue here is one of prejudice

23    to the defendant and one of fairness.  Um, given the

24    nature of the information he'd be testifying about, as

25    described in the case law, that internet communications

1    inherently are interstate, I would suggest that even

2    with notice there's not -- that this is not a principle

3    that the defense could realistically challenge.  So even

4    with -- I understand the requirements, the Court's

5    requirements, um, and there's no question about the fact

6    that we did not, or I don't believe we disclosed this

7    particular testimony, but I would suggest that any

8    violation, inadvertent as it was, of the Court's order,

9    um, would not prejudice the defendant if the Court were

10   to allow this testimony now.

11            THE COURT:  Do you think Mr. Russell has any

12   admissible testimony with regard to Russia, you know,

13   the website being hosted in Russia?  Because some of

14   these transmissions --

15            MR. BOOKBINDER:  Could I just have a minute to

16   ask him?

17            THE COURT:  Yes.

18            (Pause.)

19            MR. BOOKBINDER:  Your Honor, I'd suggest that

20   the admissible evidence about Russia are the things that

21   we talked about earlier and that the Court excluded

22   because we didn't raise this issue.

23            THE COURT:  No, but --

24            MR. BOOKBINDER:  No, Mr. Russell does not have

25   any --

1            THE COURT:  But I think it's your contention

2    that if Mr. Russell's permitted to testify about how the

3    internet operates generally, as you represented

4    yesterday, that would be sufficient to prove interstate

5    or foreign commerce without having to identify Russia as

6    the place that hosted one of the sites.

7            MR. BOOKBINDER:  It absolutely would.  There

8    is also, your Honor, the statements of Harris that we

9    talked about weeks ago in the chats where he's talking

10   about being hosted in Russia and the advantages of

11   that.  And so his own statements would be admissible if

12   they weren't excluded for other reasons.

13           THE COURT:  Well, I didn't -- just to be

14   clear, I told you not to talk about them until you

15   responded to the motion in limine and I could rule on it

16   and you didn't respond.

17           MR. BOOKBINDER:  Oh, your Honor, this mistake

18   is on us.  There's no question.

19           THE COURT:  I'm going to say this one more

20   time to be cathartic and then we're going to do a voir

21   dire of Mr. Russell.  And it's very unfortunate the

22   jurors are sitting back there.  But I want to see what

23   he's got to say and, you know, whether the defendant is

24   able to deal with it.

25           MR. McGINTY:  Your Honor, there's two prongs

1    here.  Um, the second prong is the expert prong.  I

2    didn't prepare for an examination that related to one of

3    six national hubs that internationally --

4              THE COURT:  No, I want to see what he's got to

5    say and that's what I'm pointing out.  And it's -- we'll

6    see what he's got to say.  You'll get a chance to

7    challenge it.  And I might grant a continuance if I

8    think it's in the interest of justice.  But just for one

9    final catharsis for me, because it's very disserving

10   that the jury is sitting back there waiting, that I find

11   it astonishing particularly after the highly-publicized

12   media report that a prominent mail fraud case against a

13   firefighter was -- didn't result in a conviction because

14   the jury did not find adequate evidence to prove that

15   mailings were foreseeable, that the government, the

16   prosecutor from Massachusetts and somebody from the

17   Cyber Crimes Unit of the Department of Justice would

18   forget to put in evidence of the interstate wire

19   communications that's essentially in each count for each

20   element of Counts 2 through 9.  So now I've got that off

21   my chest again.

22        Call Agent Russell and let's see what you want to

23   ask him to present to the jury.

24              MR. BOOKBINDER:  Your Honor, the United States

25   calls Special Agent Russell.

1                (Voir dire testimony.)

2     DIRECT EXAMINATION BY MR. BOOKBINDER:

3     Q.  Special Agent Russell, when you testified yesterday,

4     I guess it was, you testified about your background and

5     your familiarity with internet communications and

6     internet uses, correct?

7     A.  That's correct.

8     Q.  And are you familiar -- is part of that background,

9     and given your experience, with how traffic moves when

10    someone accesses the internet?

11    A.  Yes, I am.

12    Q.  All right.  Now, in a typical example, if someone is

13    sitting at their computer in Massachusetts and they type

14    in "www.google.com" or "amazon.com," does -- and that

15    website comes to their computer, does that, um -- does

16    that internet traffic have to go, their transmission

17    have to go through some kind of centralized server?

18    A.  Well, the internet itself is not centralized, it's

19    decentralized, um, but communications from a user is

20    basically broken down into two distinct steps.  The

21    first step is the request.  Once you type "www.dot"

22    whatever into your browser, the request is sent out, um,

23    which ultimately reaches the internet, um, requesting

24    the location, um, the numerical location of that

25    address.  The "www" is typed in there which helps people

1    to remember it's a website, but the computer

2    transmission will actually occur with numerical

3    numbers.  So a request is sent out requesting the

4    location of -- a numerical location of that website.

5           That request first goes through the user's ISP and

6    from the user's ISP it makes it way up to what are known

7    as "internet route servers" and there are a number of

8    these internet route servers that respond to these

9    requests worldwide.  It then sends the location, the

10   numerical location of that website back to, um -- down

11   through the internet, which is ultimately seen by the

12   ISP, which then is sent back to the user.  Once that

13   location is received, um, then the website -- the user's

14   data basically via random route is connected to that

15   website and that communication to and from that website

16   commences.

17   Q.  You mentioned, I think you called them, "route

18   servers," is that correct?

19   A.  That's correct.

20   Q.  Are any of those route servers, that the internet

21   uses, in Massachusetts?

22   A.  I'm sorry.  Could you repeat that?

23   Q.  Are any of those route servers in Massachusetts?

24   A.  As far as my knowledge, no.

25                THE COURT:  Well, do you know where all the

1    route servers are?

2              THE WITNESS:  Basically there are 13 companies

3    that control the route servers.  The route servers are

4    distributed throughout the world.  I know there's one in

5    New York.  There's one in Washington D.C.  There's one

6    in California.  There's one in Seattle.  I don't know if

7    they're all in -- well, a number of them are overseas as

8    well.

9    Q.  Are you aware of any other route servers -- well,

10   you mentioned those that are in the United States and,

11   again, you're not aware of any others in Massachusetts,

12   correct?

13   A.  Um, no, when we're talking about route servers,

14   there are none in Massachusetts, but there are data

15   centers located in almost every major state.  There's a

16   data center that's located in Massachusetts and a data

17   center helps facilitate the transmission of internet

18   traffic over the internet.  But data centers are not

19   route servers.  They have different functions.

20   Q.  And as you said, if someone types in a website, a

21   portion of that communication has to go through one of

22   these route servers, correct?

23   A.  That is correct.

24             MR. BOOKBINDER:  That would be essentially the

25   testimony --

1    A.   Well, actually, can I make a correction?

2    Q.   Sure.

3    A.   The data doesn't actually go through the route

4    servers, it just communicates with the route servers.

5              MR. BOOKBINDER:   Thank you.

6              THE COURT:   Does it go through something?

7              THE WITNESS:   I think it goes through a number

8    of computers, it goes through routers basically that are

9    hosted by major ISPs.

10             THE COURT:   At major ISPs?

11             THE WITNESS:   That's correct.  They're called

12   "hearing stations."

13             MR. BOOKBINDER:   Maybe I could clarify that.

14   Q.   When it communicates with the route server, it's

15   sending an electronic signal or a wire to that server

16   and receiving one back?

17   A.   Um, indirectly, yes.

18   Q.   Okay.  So therefore if it's sending a signal to a

19   server that's outside Massachusetts, there's some kind

20   of electronic communication outside of Massachusetts,

21   correct?

22   A.   If you could -- I'm sorry.

23             THE COURT:   Put the question again.

24   A.   I'm sorry.

25   Q.   So what you're saying is there is some kind of an

     1    electronic communication with one of these route servers

     2    that is outside of Massachusetts, is that correct?

     3    A.  Um, with a typical communication, yes.

     4              MR. BOOKBINDER:  That would be the testimony,

     5    your Honor.

     6              THE COURT:  Well, I wanted you to elicit all

     7    the testimony.

     8         But here, hold on just one second.

     9              (Pause.)

    10              THE COURT:  I'm actually sorry to break this

    11    up, but, I mean, maybe there's a reason that the

    12    defendant didn't raise the lack of evidence on this and

    13    I did yesterday.

    14         I'm reading the defendant's motion in limine

    15    regarding the Russian web host that was filed on

    16    February 16th and we had the hearing on February 17th,

    17    and the government didn't have a chance to respond to

    18    it, as I said.  And it says:  "Defendant Ryan Harris

    19    moves to exclude any testimony or evidence regarding the

    20    fact that the TCNISO website was at some time hosted by

    21    a company in Russia.  The evidence is unduly prejudicial

    22    without being probative of any disputed issues and it

    23    would only serve to distract and confuse the jury."  And

    24    then at the beginning of the third paragraph:  "The

    25    uncontested fact that Harris moved the website from

1    Russia to the United States negates any relevance to

2    evidence regarding the Russian host -- any evidence the

3    Russian host might have in terms of consciousness of

4    guilt."  The defendant, before trial, characterized this

5    as "undisputed," but it didn't turn out to be stipulated

6    to.

7            But I -- on this particular issue, maybe I ought

8    to, rather than have expert testimony on this, which

9    having read the cases I read last night, I have

10   questions about, that maybe I should just deny this

11   motion in limine and we'll see if there's some evidence

12   that's not unduly prejudicial, but not for consciousness

13   of guilt.  I'll tell them there's nothing wrong with

14   using a website outside of the United States.  Maybe

15   some of those chats or statements by Mr. Harris should

16   go in.

17           MR. McGINTY:  Well, you know, the government

18   was of the view -- and I think this was apparent

19   yesterday when the government responded to your

20   question, but the government was of the view that it has

21   sufficiently shown this element.  The Court is now

22   addressing what could be done about that in terms of

23   whether the government would be permitted, um, to reopen

24   the evidence.  The Court is now saying that the defense

25   should face a choice and the choice is that it imperils

1  its case, um, if it dare go down this road.

2          THE COURT:  I'm sorry.  Dare go down what

3  road?

4          MR. McGINTY:  Down the road of taking the

5  Court's invitation that the government might put in the

6  Russia element.  The Russia element was the subject of a

7  motion in limine because of the association between

8  Russia and a possible adverse inference, it was not

9  intended to obviate the government's burden of proof.

10 And the idea, um, that the back door should be open on

11 the Russia element of this, um, has somehow alleviated

12 the government's responsibility to address an element

13 that is fairly, you know, conspicuous.

14         THE COURT:  We're all having to react to this

15 quickly necessarily, but one of the things I'm reminded

16 on is that your motion in limine, which I never really

17 ruled on, I just said it raised questions, that I was

18 concerned about it, that the government would have to

19 respond and I'd have to rule before they could mention

20 Russia, um, you know, here you say -- twice here on the

21 first page, and on the second page, that it's -- you

22 know, that Russia was not probative of any disputed

23 issue and it was an uncontested fact that Harris moved

24 the website from Russia to the United States.

25         You know, the jury could be told, but it would

1   have to be through admissible evidence or a stipulation,

2   you know, that the website was hosted outside -- you

3   know, it was, at all times relevant to this case, hosted

4   outside of Massachusetts, you know, a stipulation to

5   that fact, and you don't have to, and there wouldn't

6   need to be any evidence on it, otherwise there would

7   need to be some admissible evidence on it, and

8   Mr. Ryan's own statement, Mr. Harris's own statements,

9   are admissible.  So if you find some of those discrete

10  pieces of evidence, I could consider letting that in.

11          As I said, I really don't want to strike -- I

12  don't want Mr. Harris to be worse off than he would have

13  been, you know, if we were having this discussion

14  yesterday before the government rested.  On the other

15  hand, um, if I am persuaded that we're in this position

16  not because of some tactical decision by the government

17  that's gone wrong, but by virtue of a surprising

18  oversight, um, I'm still inclined to exercise my

19  discretion to let in evidence that I would have let in

20  yesterday, if it's not too time-consuming.  I am

21  concerned about this proffered expert evidence in terms

22  of notice to the defendant and also its reliability, if

23  what this witness would say sounds any different than

24  some of what I read in the cases that you gave me last

25  night.

1          So why don't you --

2              MR. McGINTY:  I'm sorry.  May I just have one

3      moment?

4              THE COURT:  Yes.

5              (Pause.)

6              MR. McGINTY:  I just want to understand what

7      the Court's thinking is at the moment.

8          The government is offering two different types of

9      evidence.  One, um, experience -- that the agent knows

10     from personal experience that GoDaddy is located in

11     Arizona.

12             THE COURT:  Yeah, which I expected him to ask,

13     if he has admissible -- I think you want to get in

14     Exhibit 31, it's the GoDaddy receipt.

15             MR. BOOKBINDER:  Yes, your Honor, I'm happy to

16     ask him that as well.  I thought we were focused on the

17     expert --

18             THE COURT:  Well, we'll do that.

19         But I do want you to clearly understand what my

20     fluid thinking is.  I necessarily, you know, have to

21     take the general principles that were from the cases I

22     cited that have fairness as a touchstone and try to

23     figure out what the right balance is.  And I'll tell you

24     what my thinking is.  I want to give you a chance to

25     have a voir dire to see whether he has personal

1    knowledge that would permit him to testify that GoDaddy

2    is in Arizona -- that the GoDaddy site is hosted in

3    Arizona.

4         I'm considering whether, at this point, I'm not

5    inclined to allow him to give expert testimony which

6    wasn't disclosed to you previously.  It's a complicated

7    area.  Although I'm not inclined to let him do that

8    today.  I think I would have to grant a continuance and

9    the delay of the trial is one of the factors that weighs

10   against reopening here.  But if there's other admissible

11   evidence, particularly including Mr. Harris's own

12   statement, that would prove that for purposes of certain

13   counts the company website is hosted in Russia, um, it's

14   a jurisdictional matter.  I have to weigh probative

15   value against the -- and determine whether probative

16   value is substantially outweighed by the risk of unfair

17   prejudice.

18        We did many, many things on February 17th and I

19   had just found your motion in limine before you came

20   into court.  You know, you said it was undisputed, in

21   effect, that it had been in Russia and it was moved to

22   Arizona and your concern is with the reference to

23   Russia.  So right now I think the probative value of any

24   statement by Mr. Harris that would tend to prove that

25   the site was hosted in Russia is substantial.  It might

1    be the only proof of an essential element.  And I don't

2    think a reference to Russia will substantially outweigh

3    the probative value, but I understand your concern.

4         And, you know, if it was redacted and said

5    "foreign country" or indeed if you just had a simple

6    stipulation that didn't draw great attention to this,

7    you know, just one more stipulation, you know:  "At all

8    times relevant to this case the site -- the TCNISO site

9    was hosted on service outside of Massachusetts," just

10   that, um, you know, I think that would cut through all

11   of this.  But I'm absolutely not ordering you to do

12   this.  Everything that's being said and the documents

13   I'm pulling out of the file, um, you know, are

14   influencing my evolving thinking.

15        If you want, I'll take a recess and, you know, let

16   you think about all of this and talk about it.  I don't

17   want anybody to feel coerced into doing anything he or

18   she doesn't want to do.  And on the other hand, once

19   I've heard enough, I'll decide what to do.  But the one

20   thing we can do is go and look at those statements by --

21   the one thing I'll do, when you're talking, and if you

22   have time you can do it, too, and if I find them

23   promptly, I'll give them to you, but is to look at the

24   statements that are subject to the motion in limine, you

25   know, to see what would be going into evidence if I

1    allowed it to go into evidence.

2           MR. McGINTY:  Can I just make one point about

3    this?

4           THE COURT:  Yes.

5           MR. McGINTY:  The government says it was

6    inadvertence in that it failed to ask a particular

7    witness about a particular thing and the particular

8    thing was relating to the internet and traffic on the

9    internet.  The government had not earlier, in its effort

10   to get in the Russia chat, said this has a

11   jurisdictional component, and had there been the thought

12   on the government's part that this bore some

13   jurisdictional significance, it presumably would have

14   raised that in that connection.  I don't see how the

15   Court can aid the government in resurrecting something

16   that the government never viewed as admissible or

17   subject to proffer for the purpose that's now being

18   suggested.

19          THE COURT:  Right, that I understood they were

20   offering it to prove the jurisdictional element, not

21   just to prove consciousness of guilt.

22          MR. McGINTY:  I think they were presenting it

23   in order to show that Mr. Harris had control over the

24   website and made decisions about where the website would

25   be hosted.  In other words, it could have been in New

1    Jersey, it could have been in Germany.  He made the

2    decisions about where that website was hosted.  That was

3    the probative force.

4              (Pause.)

5              THE COURT:  See, I'm looking at the draft of

6    the February 17th, 2012 argument on this.  You filed

7    your motion late.

8         Here, Mr. McGinty, listen to this.

9              MR. McGINTY:  I heard you use the word "late."

10             THE COURT:  Yeah, and this goes back to other

11   matters of fairness.

12        I let you file all your motions late and, you

13   know, if you hadn't made a serious error -- I accept

14   your apology as I accept Ms. Sedky's, you know, that you

15   overlooked the deadline.  People make mistakes.  If you

16   had filed this when the motions in limine were due, the

17   government would have had notice of it and all of this

18   could have been done.  Now I think the government's

19   being prejudiced by your actions or that it at least

20   contributes to the predicament we're in.

21        But anyway, here's what Mr. Bookbinder said when

22   you filed it late, and I said I assume this is based on

23   a recent disclosure.  That I'd let you file it late.  I

24   told you earlier that you could file them even later

25   than when you did.  It was based on something the

1    government hadn't disclosed previously.

2         If we get into this, the government may tell me

3    you had this for a long time, you just didn't notice it

4    until later, but, I said, when you complained about the

5    statements Mr. Harris made about the Russian web host, I

6    asked Mr. Bookbinder, "Is this evidence that you want to

7    present?"  And Mr. Bookbinder said, "Your Honor, all I

8    intended to elicit is simply that for a period of time

9    the web was hosted at a hosting facility in Russia and

10   then it was Mr. Harris who moved it back to GoDaddy in

11   the United States in 2005 or 2006," and now, I think I

12   was told yesterday, it was later.  If it went to GoDaddy

13   in 2005, that could be proven.  I think the earliest

14   wire communication is in 2005.

15        (Pause.)

16        THE COURT:  And what we then went on to talk

17   about, you know, is whether a court order could be

18   enforced against a Russian company.

19        But basically I'm reminded that no one is perfect

20   and that I made a mistake yesterday and you properly

21   pointed it out to me, Mr. McGinty.  But if all of this

22   had been done on the schedule I ordered in December, I

23   know that we wouldn't be having the jury sitting there

24   for an hour now.

25        So we're going to take a break.  I'm going to go

```
 1    look at Mr. Harris's statements.  You should think about
 2    what you want to do, talk to each other, and we'll see
 3    where we go from here.  But before I take the break, why
 4    don't you do the voir dire of GoDaddy.
 5             MR. McGINTY:  Actually could I have the break
 6    for that purpose as well?
 7             THE COURT:  Well, no, let's see.  Let's hear
 8    what he has to say and then if you want I'll let you
 9    finish the voir dire after the break.  Okay?
10             MR. McGINTY:  Thank you.
11             THE COURT:  Because it may contribute, you
12    know, to your making an informed judgment as to whether
13    there's going to be a stipulation on any of this, and,
14    as I said, it's entirely up to you.  You'll make your
15    decision and then I'll make mine once I know what I have
16    to decide.  Go ahead.
17             MR. BOOKBINDER:  Thank you, your Honor.
18    Q.  Special Agent Russell, are you familiar with the
19    company, GoDaddy?
20    A.  Yes, I am.
21    Q.  What services does -- and how are you familiar with
22    GoDaddy?
23    A.  Um, through this investigation and prior
24    investigations.
25    Q.  And, um, what services does GoDaddy provide, as far
```

1    as you know?

2    A.   Well, the main service that GoDaddy provides is web

3    hosting.

4    Q.   What's web hosting?

5    A.   Um, the websites that individuals go to on the

6    internet need to actually be posted on a server and

7    published to the internet.   Um, GoDaddy provides that

8    service.

9    Q.   All right.   And, um, do you know where the company,

10   the GoDaddy.com, is located?

11   A.   Um, they're located in Arizona.

12   Q.   How do you know that?

13   A.   Again through this investigation and, um, prior

14   investigations I served legal documents on GoDaddy and

15   received, um, items in return from GoDaddy.

16   Q.   So when you say "served legal documents," you're

17   talking about things like search warrants and subpoenas?

18   A.   That's correct.

19   Q.   All right.   And when you served them, how had you

20   served them?

21   A.   Um, usually by faxing the document over.   Sometimes

22   the document is mailed over and sometimes the documents

23   are personally delivered over via agents and another FBI

24   officer.

25   Q.   So if you faxed them, um, you have to fax them to a

 1    particular phone number, is that correct?

 2    A.   That's correct.

 3    Q.   And if you mail them you have to have a particular

 4    address?

 5    A.   That's correct.

 6    Q.   And if they're being served by hand, in those cases

 7    you instruct agents in a different office to go serve

 8    them by hand?

 9    A.   That's correct.

10    Q.   So based on your experience -- and you testified

11    that GoDaddy is located in Arizona, is that correct?

12    A.   That's correct.

13    Q.   Okay.  Do you know what services GoDaddy provided to

14    TCNISO?

15    A.   They provided web hosting services.

16    Q.   And, um --

17                THE COURT:  How do you know that?

18    Q.   How do you know that?

19    A.   Um, a search warrant was served on GoDaddy and

20    GoDaddy agreed to meet with us, to provide the records.

21    Q.   And they provided you with records in return?

22    A.   That's correct.

23    Q.   And those records describe the services that were

24    provided?

25    A.   That's correct.

1    Q.   Did they also provide you, in addition to that, with

2    the actual content of the website?

3    A.   Um, the search warrant, yes, they did.

4    Q.   And did you review that content?

5    A.   Yes, I did.

6    Q.   And what did that content include or was it -- let

7    me see if I can phrase this more artfully.

8         Did that content include the contents of the web

9    page, the website?

10   A.   Yes, it did.

11              (Pause.)

12              MR. BOOKBINDER:   Could I have a moment, your

13   Honor?

14              (Pause.)

15   Q.   When did you serve that search warrant on GoDaddy,

16   if you remember, approximately?

17   A.   Um, within 2008.  I don't remember the date exactly.

18   Q.   And, um, do you know how long TCNISO used the

19   GoDaddy services?

20   A.   Um, I don't know the exact time period, but I know

21   it was at least a couple of years.

22   Q.   And how do you know that?

23   A.   Um, it was the start of the services they listed on

24   the reference provided by GoDaddy.

25              (Pause.)

1           MR. BOOKBINDER:  Your Honor, if I could have a

2    moment?

3           (Pause.)

4           MR. BOOKBINDER:  That would be essentially all

5    the government would seek to elicit, your Honor.

6           THE COURT:  I've got a few questions.  If

7    Mr. McGinty has some --

8        Well, do you want to ask any questions now without

9    prejudice to asking some more later?

10          MR. McGINTY:  I do, your Honor.

11

12   CROSS-EXAMINATION BY MR. McGINTY:

13   Q.  Agent Russell, you testified moments ago about how

14   GoDaddy was located in Arizona.  Am I remembering that

15   right?

16   A.  Correct.

17   Q.  And you said you communicated with Arizona or you

18   communicated with GoDaddy in Arizona, correct?

19   A.  That's correct.

20   Q.  Trying to get records from them, correct?

21   A.  Correct.

22   Q.  Okay.  So you understand that there is some

23   corporate office of some kind of GoDaddy in Arizona, am

24   I right?

25   A.  That's correct.

```
 1   Q.  Now, a corporate office is not necessarily the same
 2   as its server location.  Would that be fair to say?
 3   A.  That would be fair to say.
 4   Q.  And server locations can be in multiple places, can
 5   they not?
 6   A.  That's correct.
 7   Q.  So a company could host its serving capabilities in
 8   a variety of different locations, am I right?
 9   A.  That's correct.
10   Q.  And you don't know whether GoDaddy has a server
11   capability in Massachusetts?
12   A.  I do not.
13   Q.  Um, are you aware that, um, some ISPs host their
14   own, um, domain name servers?
15   A.  Yes, I do.
16   Q.  So that if I type in "Google," let's say, and I'm
17   transmitting that through the Charter ISP, the Charter
18   ISP would recognize that domain name, would they not?
19   A.  I'm sorry.  Can you repeat the question?
20   Q.  Charter would recognize that domain name that I
21   typed in?
22   A.  Right, and the ISP --
23   Q.  No, I'm not asking about the ISP, just would they
24   recognize it.
25   A.  Yes, they would.
```

1    Q.   Okay.   And if the ISP recognizes the domain name,

2    isn't it the case that it then communicates back to the

3    person sending the message, am I right?

4    A.   That's correct.

5    Q.   Okay.   Um, you mentioned that, um --

6              THE COURT:   Actually hold on just one second.

7              (Pause.)

8              THE COURT:   Go ahead.

9    Q.   You mentioned before that that data that is

10   transmitted doesn't go through a route server.   Do I

11   understand that right?

12   A.   That is correct.

13   Q.   It basically just communicates with the route

14   server, am I right?

15   A.   Well, it communicates -- the communication is with

16   the database, um, the website data doesn't go through

17   the route server.

18   Q.   Okay.   So when I send a message, um, that indirectly

19   communicates with the route server.   Did I understand

20   that right?

21   A.   Again, all internet traffic is indirect

22   communications with some type of server.   There's no

23   direct communications on the internet.

24   Q.   So if I understand this right, then the servers are

25   receiving indirectly, um, information that's part of a

 1    transmission.  Do I understand that right?

 2    A.  Well, what server are you --

 3              MR. McGINTY:  Actually here's where I should

 4    break off.  I mean, this is the problem of being

 5    uninformed and I am certainly --

 6              THE COURT:  Fair enough.  And you actually

 7    asked a question I was going to ask, about the

 8    distinction between the location of corporate offices

 9    and the servers.

10         Well, I'm going to go take a look at Mr. Harris's

11    own statements, because I never really ruled on that

12    motion in limine because I thought it related to a

13    matter that was characterized as undisputed by the

14    defendant, and you can think about your positions and

15    talk about whether you want to enter into some

16    stipulation on this.

17         Again, just to be as transparent as possible and

18    this is, by no means, a final answer, um, but if there's

19    no stipulation and there are statements by Mr. Harris

20    that were subject to the motion in limine filed late,

21    um, I may permit the admission of those statements, but

22    not before giving you a chance to address it.  But

23    that's just where I am in this fluid situation.

24              The Court is in recess.

25                   (Recess, 10:30 a.m.)

```
 1                    (Resuming, 11:00 a.m.)

 2              THE COURT:  Okay.  It's 11:00.  What are the

 3    parties's present positions?

 4              MR. McGINTY:  Your Honor, I think we've

 5    reached a resolution here.  Um, the Court had suggested

 6    a stipulation and, um, it is -- as I wrote it down,

 7    exactly what the parties would agree to, which is --

 8              THE COURT:  Okay.  Go ahead.

 9              MR. McGINTY:  That "At all relevant times the

10    TCNISO website was hosted on server" -- I should put

11    there "on a server located outside of Massachusetts."

12              MR. BOOKBINDER:  Yes.

13              MR. McGINTY:  -- "on a server located outside

14    of Massachusetts."

15              THE COURT:  Okay.  All right.

16         You can step down.

17                    (Witness leaves.)

18              THE COURT:  And so -- and let me just ask

19    this.

20         Mr. Harris -- may I ask Mr. Harris just a couple

21    of questions, Mr. McGinty, and if the two of you want to

22    talk, just tell me.

23              MR. McGINTY:  Yes, your Honor.

24              THE COURT:  Okay.

25         Mr. Harris, you've been at the sidebar for the
```

1    sidebar conferences and I've seen you conferring with

2    your attorney and, um, his colleague.

3         Do you feel you understand -- here.

4         You understand that I've been told that in the

5    circumstances that you've been observing, um, that you

6    want to agree with the government, um, that the jury can

7    be told, as a stipulation, that at all relevant times

8    the TCNISO website was hosted on a server outside of

9    Massachusetts.  Do you understand that's the proposed

10   stipulation?

11              THE DEFENDANT:  Yes, I do.

12              THE COURT:  And do you understand that as a

13   result of that I'll tell the jury that they, you know,

14   may find that that fact is true?  That that's what a

15   stipulation is.

16              THE DEFENDANT:  I understand.

17              THE COURT:  And do you understand that I

18   haven't made a final decision as to what additional

19   evidence, if any, I would let the jury hear in the

20   absence of a stipulation like that?

21              THE DEFENDANT:  I do.

22              THE COURT:  And have you talked with your

23   lawyer about whether you want to enter into that

24   stipulation?

25              THE DEFENDANT:  I have.

```
 1              THE COURT:  And do you indeed want to enter
 2    into that stipulation?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  All right.  And are you still
 5    fully satisfied with Mr. McGinty's representation of
 6    you?
 7              THE DEFENDANT:  Yes.
 8              THE COURT:  He's doing a good job, I think.
 9         All right.  Well, I'm satisfied that you're
10    competent, you're acting knowingly and voluntarily,
11    you're effectively represented, and this stipulation is
12    appropriate.  Thank you.
13         You may be seated.
14         So I'm going to permit that.  The jury, when they
15    come back, will be told that there's an additional
16    stipulation.
17         All right.  Let me go back.
18              (Pause.)
19              THE COURT:  Now, there was a question of
20    whether the redactions that Mr. McGinty requested
21    yesterday of all of the allegations leading up to the
22    charging language, whether all the paragraphs leading up
23    to the charging language should be redacted?
24              MR. BOOKBINDER:  Your Honor, in an effort to
25    try to save time here and in the spirit of accommodation
```

1    that we all seem to be working towards, the government

2    does not object to Mr. McGinty's request, and if the

3    Court would like to use the version that we've provided

4    that redacts all of that language, that's not a problem.

5              THE COURT:  And, Mr. McGinty, is that what you

6    would like?

7              MR. McGINTY:  That's 100 percent correct.

8              THE COURT:  All right.

9         Now we're back to where we were about this time

10   yesterday because that's what I would have decided if

11   the matter had been brought up in the overall

12   circumstances.

13        Now, the jury instructions.  Let me -- I'm going

14   to give the jury instructions in three parts.  The first

15   part will be general instructions that would apply in

16   any criminal trial, including a reminder of the

17   fundamental principles such as the presumption of

18   innocence, um, the government's duty to prove the

19   defendant guilty beyond a reasonable doubt, and the fact

20   that the defendant has no burden.  And the jury may not

21   consider the fact that he didn't testify as an

22   indication that he's guilty.  They shouldn't discuss or

23   consider that at all.

24        I'm going to give them a definition of reasonable

25   doubt that's consistent with the instruction the First

1    Circuit has approved in **Cleveland**, 106 F.3d 1056 at 1062

2    to 1063, and **O'Shea**, 426 F.3d 475 at 482.

3         In addition to the standard instructions about how

4    to evaluate evidence, I will give an immunized witness

5    instruction along the lines that I mentioned or

6    described yesterday.

7         Does the government still want me to say something

8    to the effect that the preparation or meeting with

9    witnesses is permissible, but the jury can consider the

10   fact that a witness met with one party or another in

11   deciding whether the testimony was biased and whether he

12   was influenced by any meeting.  Do you want that

13   instruction?

14             MS. SEDKY:  No, we don't have a problem with

15   that.

16             MR. McGINTY:  Actually I like it.

17             (Laughter.)

18             THE COURT:  Well, do you want me to do it?

19             MR. McGINTY:  Actually I would, in that form,

20   yes.

21             THE COURT:  All right.  I'll give it.

22        Does the government want me to give an

23   instruction -- does either party want me to give an

24   instruction that it's permissible to use an undercover

25   operation to surreptitiously acquire evidence?

1          MS. SEDKY:  Your Honor, we're pretty agnostic

2    and don't see the need for that instruction.

3          THE COURT:  All right.  And I'll give them an

4    instruction on expert witnesses.

5       Is there a request for an instruction, by either

6    side, on consciousness of guilt?

7          MS. SEDKY:  There is, your Honor, from the

8    government.

9          THE COURT:  All right.

10          MR. McGINTY:  I obviously would object to

11    that.

12          THE COURT:  Well, let's see.  What's the

13    evidence that is arguably consciousness of guilt?

14          MS. SEDKY:  Well, we have his own statements

15    where he talks about his clandestine residence in Hong

16    Kong.  We have his own statements to I believe it was

17    Mr. T where he says, "I'm a professional hacker.  I'm

18    paranoid to answer my front door."  We have his

19    statements -- we have Mr. Phillips's testimony that one

20    of the reasons he wanted to incorporate was to protect

21    himself from -- well, to protect his assets.  We have

22    his use of an alias on every single part and piece of

23    his website, anywhere, every host, every e-mail.  We

24    have the book being published under the name "DerEngel"

25    with one tiny print copyright owner, no caption under

1    the photo.

2              THE COURT:  Okay.

3              MR. McGINTY:  Your Honor, the consciousness of

4    guilt has to be probative of a charge and the fact that

5    someone is concerned about civil liability, um, that

6    someone is contemplating going into a corporate forum to

7    spare themselves the, um, liability for lawsuits or

8    claims about copyright infringement and all of that, um,

9    apart from being appropriate business planning, hardly

10   speaks to the consciousness of guilt of possible

11   criminal conduct.

12        The risk here is that the consciousness of guilt

13   instruction will conflate the intent requirement and

14   ease the government's way to a --

15             THE COURT:  I don't think it will.  Part of

16   what I'll say is, you know:

17        "You have to decide whether a statement was made

18   and if so whether it was false.  Similarly you should

19   decide whether the defendant did something to conceal

20   information.  If so, you should decide whether any false

21   statement or effort to conceal is evidence of a

22   consciousness of guilt concerning any or all of the

23   crimes charged in this case.  Feelings of guilt may

24   exist in innocent people and false statements or acts of

25   concealment do not necessarily reflect actual guilt of

1    particular crimes.  In your consideration of the

2    evidence, of the alleged false statements and alleged

3    acts of concealment, you should consider that there may

4    be reasons for a person's actions that are fully

5    consistent with innocence of the crimes charged in this

6    case.  It is up to you to decide if there is proof of

7    false statements or acts of concealment and if so

8    whether they show a consciousness of guilt concerning

9    the crimes charged here.  If these facts are proven, you

10   must decide what weight or significance to give them."

11          Does the government still want the instruction?

12              MS. SEDKY:  We do, your Honor.

13              MR. McGINTY:  I don't, your Honor.

14          And, you know, the facts the government has

15   pointed to that they claim are supportive of

16   consciousness of guilt include a book that has his name

17   in it and on the back page a photograph of himself and

18   his wife, um, the book is sold on the website and is

19   available --

20              THE COURT:  Here's -- here's -- I'm not going

21   to make -- I'm inclined to give it.  I don't make a

22   final decision as to what I'm going to instruct until I

23   hear the closing arguments.  But I actually -- well,

24   you'll listen to them, too.  This has been a little

25   circular, but I raised consciousness of guilt early on.

1    You didn't care for it.  At some point in the course of

2    the case since then, you suggested there should be one.

3    The government's going to make this argument --

4              MR. McGINTY:  I have never suggested that I

5    want a consciousness of guilt --

6              THE COURT:  I think I may have -- well, it

7    doesn't matter, but I think I may have misunderstood.

8         Let's wait until after the arguments and then we

9    can discuss this again.  But part of the reason I'm

10   inclined to do it is this is what the government's going

11   to argue and if I don't try to sort it out in this

12   fashion, um, then I think the jury may be confused.

13        But I'll reserve on whether I'm going to give that

14   instruction.

15             MR. McGINTY:  They may argue it, but my

16   suggestion is that their argument is going to be, um,

17   against the weight of the facts and a Court instruction

18   that highlights that sort of contributes, I think, to

19   the impression that such evidence exists.

20             THE COURT:  All right.  Well, I'll continue to

21   consider that.

22        Then with regard to the case-specific

23   instructions.

24             (Pause.)

25             THE COURT:  Then with regard to the case-

```
 1    specific instructions, at the moment -- and then we'll

 2    see about whether I'm going to say something further

 3    based on the defendant's supplemental proposed jury

 4    instruction filed this morning.  Well, it was filed

 5    maybe last night.

 6         At the moment it's my intention to essentially

 7    give mail fraud instructions that are in my own words

 8    and somewhat tailored to this case, um, but instructions

 9    that amplify the First Circuit pattern instructions on

10    mail fraud.  I have thought, until I got Mr. McGinty's

11    motion, so now I'm thinking again, but I had tentatively

12    decided that I was going to say nothing based on *Direct

13    Sales* and buyer/seller because *Direct Sales* is a

14    conspiracy case, um, and the other cases that we dealt

15    with were conspiracy cases, and in my preliminary

16    instructions I asked you -- and I think none of us had

17    thought about it, but you said, "Yeah, it's okay," you

18    know, "say the same thing for mail fraud."  So I had a

19    line in the preliminary instructions.  But we'll come

20    back to that.

21         But basically, you know, I'm going to tell them

22    there are eight charges of wire fraud, that the, you

23    know, the conspiracy charge has been removed.  Um, I'm

24    going to -- as the First Circuit does, I'm going to read

25    them Paragraph 55 and Counts 2 through 9 and tell them
```

1    that:

2         "To prove the defendant committed a wire fraud in

3    this case the government must prove the following things

4    beyond a reasonable doubt.  First, that there was a

5    scheme substantially as charged in the superseding

6    indictment to defraud or obtain something of value from

7    internet service providers by means of false or

8    fraudulent pretenses.  Second, that the defendant

9    knowingly and willfully participated in the scheme with

10   an intent to defraud.  And third, that on or about the

11   dates alleged, the defendant transmitted or caused to be

12   transmitted an interstate wire communication for the

13   purpose of furthering the scheme."

14        So that's essentially the black letter law.

15        I'm going to tell them that:

16        "It has to be proven that the defendant

17   participated in a scheme to defraud that involved

18   material, false or fraudulent pretenses."  I'll tell

19   them either:  "While a scheme is a plan of coercive

20   conduct, in terms of fraud, it means to deprive someone

21   of something of value by means of deception or

22   cheating.  A scheme to defraud ordinarily includes a

23   desire to bring about some gain or benefit to oneself or

24   some other person or a desire to cause some loss to

25   someone else.  The term 'false or fraudulent pretenses'

means any intentional material false representation or
omission including material direct false representations
and deliberate concealment of material facts.  A fact is
material if it has a natural tendency to influence or is
capable of influencing whoever or whatever is making a
particular decision.

In essence, in this case the government must,
among other things, prove beyond a reasonable doubt the
existence of a scheme to deprive internet service
providers of payment for internet service based on
intentional material false representations or omissions
concerning whether a particular device was authorized to
receive such service.  While the government must prove
that the scheme alleged in the indictment existed, it
does not have to prove it succeeded."

Then I'll define for them "knowing" and "willful"
in customary ways and tell them that:

"An intent to defraud means to act knowingly with
specific intent to deceive with a purpose of causing
some financial loss or to obtain money for the defendant
or someone else for the bulk of these purposes."

And with regard to the interstate wire
communications, I'll tell them:

"The last thing the government must prove beyond a
reasonable doubt is that on or about the date alleged in

1    the indictment, for the counts you're considering, the

2    defendant transmitted or caused to be transmitted an

3    interstate wire communication in furtherance of the

4    alleged scheme.  The use of the internet to send a

5    message such as an e-mail or a communication to a

6    website may be a wire communication.  An interstate wire

7    communication is a wire communication from one state to

8    another.  A wire communication does not have to be

9    essential to the scheme or be itself fraudulent, however

10   it must be made as part of an attempt to execute the

11   scheme to accomplish one of its goals.

12       To prove that the defendant caused a particular

13   interstate wire communication to occur, the government

14   does not have to prove that he sent the wire

15   communication himself.  It would be sufficient if the

16   government proved beyond a reasonable doubt that he knew

17   that the use of interstate wires would follow in the

18   course of the scheme or that it was reasonably

19   foreseeable that the interstate wires would be used as a

20   result of his actions."  This is based on *Silvano*,

21   812 -- well, let me go on.  -- "of his actions.  It is

22   the use of interstate wires generally rather than the

23   specific wire transmission that is charged that must be

24   proved to have been reasonably foreseeable as a result

25   of the scheme.

1          Therefore, if it is proven that Harris

2     participated in the alleged scheme and did something

3     relating to it which he knew or reasonably should have

4     foreseen would result in interstate wire transmissions

5     being used in an effort to execute that scheme or

6     accomplish its goals, you may find the use of interstate

7     wire communication -- you may find the use of interstate

8     wire communication an element to be proven."

9          That's essentially the substantive part.

10          Putting aside for the moment the issue Mr. McGinty

11     raised this morning, does anybody have a comment or

12     concern about what I've just given you?

13               MS. SEDKY:  No, your Honor.

14               MR. McGINTY:  Would your Honor just repeat the

15     part where you mentioned that the government has to

16     prove a scheme.  You mentioned it's the intentional

17     material omission concerning whether a particular device

18     was authorized to receive such service.  I want to make

19     sure that I --

20               THE COURT:  All right.  I will give you that

21     again, and I'm trying to tailor it to this case.

22          I'll say:  "In essence, in this case the

23     government must, among other things, prove beyond a

24     reasonable doubt the existence of a scheme to deprive

25     internet service providers of payment for internet

1   service based on intentional material false

2   representations or omissions concerning whether a

3   particular device was authorized to receive such

4   service."

5        Okay?

6        MR. McGINTY:  Based on representations

7   relating to that particular device and whether it's

8   authorized to receive --

9        THE COURT:  What I'm trying to capture here is

10  -- what I understand to really be the essence of the

11  scheme is hardware and software that misrepresent the

12  MAC address of the device getting internet service and

13  as a result getting it for free or paying less than

14  would otherwise be due.  That's the concept I'm trying

15  to capture.  And, you know, I could probably pencil in

16  what Mr. McGinty requested, but there doesn't seem to be

17  much of a distinction.

18       MR. McGINTY:  I submit that it does, because

19  the hardware misrepresented, um --

20       (Pause.)

21       THE COURT:  Go ahead.

22       MR. McGINTY:  That the hardware

23  misrepresented, um, the right to receive service is the

24  hardware that has imported into it the identifiers which

25  you see, those are not in the machine until those are

```
1   put in them, or it's not in the modem until it's put
2   in.  So it's a particularized representation by a
3   particularized machine, or modem.
4           THE COURT:  All right.  I'll consider that.
5   Then --
6           (Pause.)
7           THE COURT:  All right.  And, Mr. McGinty,
8   you've got that request for a supplemental instruction
9   derived from --
10          MR. McGINTY:  Well, your Honor, I want to
11  address one thing, which is --
12          THE COURT:  Okay.
13          MR. McGINTY:  The Court had mentioned that
14  there were eight charges of wire fraud.  In view of the
15  stipulation, there are no longer eight.
16          THE COURT:  How many are there?
17          MR. McGINTY:  Well, there are five -- I'm
18  sorry, three.
19          THE COURT:  No, there are eight.
20          MR. McGINTY:  Well, if the stipulation is to
21  TCNISO having a website hosted out of Massachusetts, the
22  access to the website, for purpose of ordering a
23  product, was alleged in counts --
24          THE COURT:  Hold on just one second.  I've got
25  a lot of paper here and I now need to lay my hands on
```

1    the indictment.

2              (Pause.)

3              THE COURT:  Go ahead.

4              MR. McGINTY:  The government broke out the --

5    they originally broke out the wire fraud counts and when

6    they broke it out, it broke it out in terms of the wire

7    fraud, the wire being the connection in which it was

8    obtaining the hardware and then the wire in connection

9    with the use of the firmware.  The three counts that

10   allege the obtaining are linked to the TCNISO website,

11   which is stipulated in the subject of interstate

12   activity.  The communications that are outside that, um,

13   are not similarly subject to stipulation and have no,

14   um, underpinning of support as an interstate wire.  Um,

15   so those counts are, on the stipulation, um, failing.

16             THE COURT:  Well, they arguably need other

17   evidence.

18             MR. BOOKBINDER:  Yes, your Honor, if I could

19   just address that.

20        So if we could just go through them count by

21   count.

22        Count 1 is Mr. Hanshaw's downloading --

23             THE COURT:  And that's the stipulation?

24             MR. BOOKBINDER:  Right, and he testified he

25   downloaded from the website.

```
1                THE COURT:  But there's the stipulation --
2                MR. BOOKBINDER:  And the stipulation is that
3      the website was in Massachusetts.
4                THE COURT:  Right.
5                MR. BOOKBINDER:  That's Count 2, also.  Again
6      he accessed the internet, he downloaded the Sigma X.
7      This is the one, if you remember, where he got the --
8                THE COURT:  So that survives as a result of
9      the stipulation?
10               MR. BOOKBINDER:  Well, he was given the code.
11          Um, so Counts 3 and 4, Mr. McGinty is right, they
12      don't involve going to the TCNISO.
13               THE COURT:  Well, I don't know, I think we've
14      been talking about wrong numbers.  Hold on a second.
15      Let me have --
16          Does somebody have an extra copy of the new
17      indictment?
18               MR. BOOKBINDER:  We do, your Honor.
19               (Passes up to judge.)
20               THE COURT:  In fact, do you have one more copy
21      of this that I can give to my law clerk?  Oh, we're
22      okay.  We're okay.
23               MR. BOOKBINDER:  Thank you, your Honor.
24               THE COURT:  So Number 1 and Number 2, the
25      interstate wire would be covered by the stipulation,
```

1    correct?

2            MR. BOOKBINDER:  Correct.  Numbers 3 and 4, it

3    is not.  However, those ones we have Exhibits 10 and 11,

4    which were the chats that Mr. Hanshaw engaged in, on

5    those particular dates, with someone who he testified

6    was in Washington state.

7            THE COURT:  Mr. Dennis.

8            MR. BOOKBINDER:  Mr. Dennis.

9            THE COURT:  So, Mr. McGinty, I thought that

10   testimony was sufficient for 3 and 4.

11           MR. McGINTY:  I think that's right.

12       Can I just address 2?  Um, the allegation here is

13   that he accessed the internet and he downloaded it.  His

14   testimony was that he got it from Isabella Lindquist.

15   In other words, he got it, um, through that deal where

16   he had offered her, for the raw code, the $100 and then

17   reneged on it, shall we say.

18           MR. BOOKBINDER:  And, your Honor, actually I

19   don't think that's the testimony.  The testimony is he

20   got the source code from her after she left the

21   company.  But he testified that he downloaded Sigma X

22   from the website using the key that Chris Watts gave to

23   him.  And obviously we can disagree about that, but --

24           THE COURT:  All right.  Okay.  That's

25   consistent with my present memory.  And if we get a

```
 1      conviction and I get a post-trial motion, um, this will
 2      go further under the microscope.  But go ahead.
 3                  MR. BOOKBINDER:  Okay.  So I think we're up to
 4      4.
 5           Count 5 is Jose Larosa going to the website.  So
 6      that's covered by the stipulation.
 7           Count 6 is not the website -- well, Count 6 talks
 8      about Jose Larosa accessing the internet, but what his
 9      testimony was was that he went on the internet and he
10      went back to the website, he ordered more products, and
11      he also had e-mail communications with someone at TCNISO
12      and we have testimony and a stipulation that the company
13      was located in San Diego.
14                  THE COURT:  Keep going.
15                  MR. BOOKBINDER:  So that covers 6.
16           Number 7 is Mr. Madeira going to the website.  So
17      that's covered by the stipulation.
18           Number 8, your Honor, I think Mr. McGinty may have
19      a point, which is Mr. Madeira accessing the internet
20      from Massachusetts.  And I don't -- um, he -- I don't
21      believe that we have evidence -- he testified that he
22      went back to the website to get directions about how to
23      use, um --
24           If I could just have a moment, your Honor?
25                  (Pause.)
```

1          MR. BOOKBINDER:  No, that's right.

2      Um, Ms. Sedky reminds me that his testimony was

3  that he had to go back to the website and get, first of

4  all, use the tutorials to get information and also to

5  download it, I think, once again the software because it

6  didn't work the first time.  So I would suggest that it

7  was not just his ordering, but his use actually that

8  brought him back to the website.  So I think we're

9  actually covered on Count 8, too.

10          THE COURT:  Okay.

11      Well, I'm not granting a Rule 29 motion on any of

12  these at this time and I've reserved judgment on all of

13  them.

14      Mr. McGinty, are you still -- do you still want me

15  to say something else related to your supplemental

16  proposed jury instruction filed last night because, as I

17  said, I thought I would essentially leave it to

18  argument, although it's possible you would persuade me

19  to add something along the lines that I said in

20  preliminary instructions.

21          MR. McGINTY:  Your Honor, what this tries to

22  capture is the idea that there's mixed -- you know,

23  where there's mixed evidence, um, the *Sawyer* issue, um,

24  where there's mixed evidence relating to activities, the

25  jury ought to be told that there has to be some

 1    additional evidence that establishes that that activity

 2    is wrongful activity.

 3              THE COURT:  Well, no, actually not that it's

 4    wrongful, that it's the crime charged in this case.  I

 5    was emersed in **Sawyer** last year, in **DiMasi**, and I think

 6    those honest services fraud cases that implicate

 7    violations of state statutes, like the gratuity statute,

 8    are unusual, um, arguably unique, they raise a high risk

 9    that the jury would be confused and find that a

10    violation of the state gratuity statute was synonymous

11    with a violation of the wire fraud statute.  So I don't

12    think anything further is legally required.

13         However, I am willing to consider saying, and

14    maybe it would be your agreement, essentially what I

15    said at the beginning.  I'd say something like this:

16    "It would not be enough to prove wire fraud to prove

17    that Harris only sold the product to someone he knew

18    would use it to commit a crime.  However, the nature of

19    the product sold and any knowledge Harris had as to how

20    it would be used are evidence that you can consider,

21    along with all the other evidence, in deciding whether

22    the government has proven any or all of the wire fraud

23    charges beyond a reasonable doubt."

24         Does the government have a problem with that?

25              MR. BOOKBINDER:  Could we have a minute, your

1    Honor?

2              (Pause.)

3              MS. SEDKY:  Your Honor, I -- I guess the

4    government's position is that we believe that this is

5    sort of a **Direct Sales** derivative instruction and given

6    the fact that we are not instructing on aiding and

7    abetting in this context, it really does loosen the link

8    between the seller and the buyer in terms of what our

9    burden of proof is.  And so we don't think that this,

10   um, this instruction is required when we are really

11   focusing on a principal wire fraud, it's Harris's

12   scheme, and it's really about his intent to defraud the

13   cable company, not his -- the sort of parameters of his

14   relationship with his buyers.

15             THE COURT:  All right.

16        And, Mr. McGinty, what's your reaction to what I

17   had proposed to say?

18             MR. McGINTY:  I would ask the Court to give

19   that instruction.

20             THE COURT:  Well, I guess I'll consider it.

21        Now it's 11:30 and I think that ends everything I

22   wanted to discuss with you before I had you argue to the

23   jury.

24             (Pause.)

25             THE COURT:  Okay.  I think what I'll do is

```
 1   I'll have the jury in, we'll have the government's --
 2   I'll give you a short break.  I have to clean up the
 3   bench and you need to get focused.
 4        I'll have them in.  We'll have the government's
 5   argument.  I understand it may take 45 minutes.  We'll
 6   have the stipulation and the government's argument and
 7   then maybe I'll let them go to lunch and by that time it
 8   will be at least 12:30.  Then we'll have the defendant's
 9   argument and the rebuttal, we'll take a brief break, and
10   then I'll instruct them.  Then they'll go home and when
11   they come back tomorrow morning, they'll ask me to
12   instruct them again.  That's what happens when you get
13   started so late.
14        Does that sound like a reasonable way to proceed?
15             MR. BOOKBINDER:  Yes, your Honor.
16        Do you intend to have them start deliberating
17   today or --
18             THE COURT:  We'll see what time it is, but,
19   yes.
20             MR. BOOKBINDER:  Thank you.
21             THE COURT:  All right?
22        Okay.  We're -- and you're going off to change the
23   verdict form, which we'll work on now.
24        All right.  We're going to be in recess until
25   quarter of 12:00 and I'll ask Mr. Hohler to let them
```

```
 1    know we're starting at quarter of 12:00.
 2                (Recess, 11:35 a.m.)
 3                (Resumed, 11:50 a.m.)
 4                THE COURT:  All right.  Let's see.  We'll get
 5    the jury.
 6         Who should tell them about the stipulation, do you
 7    want me to do that?
 8                MR. McGINTY:  Yes, I would prefer that, your
 9    Honor.
10                THE COURT:  I will tell them that the parties
11    have agreed and they may accept it as true that at all
12    relevant times that the TCNISO website was hosted on a
13    server outside of Massachusetts.  Okay?
14         The Government will have 45 minutes for its
15    closing.
16         All right.  Let's get the jury.
17                MR. BOOKBINDER:  Your Honor, it is worth
18    noting that I do intend to refer to a handful of
19    exhibits during the course of the closing and so I'd ask
20    that the Court have the jury monitors on and so we can
21    show those to the jury.
22                THE COURT:  Sure.
23                MR. BOOKBINDER:  Your Honor, I'll also be
24    using a chart which has the counts as I believe
25    Mr. McGinty requested and as I set out in the
```

1    indictment.

2              (Shows to Mr. McGinty.)

3              THE COURT:  Okay?  We'll get the jurors.

4              (Jury enters, 11:50 a.m.)

5              THE COURT:  Ladies and gentlemen, good

6    morning.  Welcome back.  I apologize for having kept you

7    waiting so long.  We've been working ever since you left

8    yesterday.  It just seems to be in the nature of trials

9    that even those that go very smoothly and efficiently up

10   to a point, they develop issues towards the end.  But

11   we're now ready for the closing arguments.

12        As I'm going to explain to you in my jury

13   instructions, the case has legally become more focused,

14   you're only going to have to decide the wire fraud

15   charges, not the conspiracy charge.  So I'll tell you

16   that now and repeat it later so you're not sitting there

17   thinking, "Why are we not hearing any argument on

18   conspiracy?"

19        I've given the parties up to an hour each for

20   their closing arguments.  Because the government has the

21   burden of proof, it goes first and then has an

22   opportunity for a brief rebuttal.  It's my intention

23   that we hear the government's closing argument.  I'll

24   send you to lunch.

25        Lunch has been ordered, I assume?

```
 1                THE CLERK:  Yes, Judge.

 2                THE COURT:  I'll send you to lunch.

 3           You'll come back.  You'll hear the defendant's

 4      closing argument.  You'll hear the government's

 5      rebuttal.  I'll give you another break.  And then I'll

 6      give you instructions depending on what time it is.  I

 7      might have to instruct you in the morning.  We'll see.

 8      Okay?

 9           But I thank you, if not for your patience, for

10      your perseverance, but famous last words.  But I think

11      we're ready to go.

12           Mr. Bookbinder.  Oh, and actually before we go --

13      before you go, I need to tell you something.

14           You remember that a stipulation is something the

15      parties agree is true and you may accept as true in

16      deciding the case.  Since you left yesterday, the

17      parties have stipulated and agreed that at all times

18      relevant to this case, the TCNISO website was hosted on

19      a server outside of Massachusetts.  Okay?

20           All right.  The closing arguments.

21

22      CLOSING ARGUMENT BY MR. BOOKBINDER:

23           Good afternoon.

24                THE COURT:  I'm sorry, Mr. Bookbinder.  I

25      failed to give you -- I don't want to break my almost 27
```

1    year streak.

2          Remember I told you at the beginning of the case

3    -- because I always tell the jury the same thing, that

4    what the lawyers say is not evidence?  But this is the

5    opportunity the lawyers have to argue the evidence as

6    they remember it and to argue what inferences they think

7    you should draw from the evidence.  I've again taken

8    your notebooks away.  I want you to listen to this and I

9    want you to keep in mind that it's not itself evidence.

10         All right.  You're on.

11              MR. BOOKBINDER:  The testimony you've heard

12   and the exhibits you've seen over the past week prove

13   that Ryan Harris, the defendant, came up with and

14   participated in a scheme to defraud the ISPs, the

15   Internet Service Providers.  He designed and he sold

16   products that he intended for people to use to steal

17   internet access.  And he and his customers used his

18   modems and his software for just that purpose.

19         The evidence you've heard also proves that he did

20   this for basically three reasons.  First, he wanted free

21   and super fast internet access for himself.  Second, he

22   wanted to make a lot of money selling these products to

23   other people.  And third, he wanted to punish the ISPs

24   for charging for internet service which he thought ought

25   to be free.

1       So if that's generally what the evidence proved,

2   then you may be wondering what it is more specifically

3   we have to show for you to find the defendant guilty of

4   wire fraud.  And that's what I want to spend most of my

5   time talking about.

6       The judge is going to instruct you on the -- what

7   are called the elements of wire fraud and it's his

8   instructions that will guide you during your

9   deliberation, but to help you consider the evidence that

10   you've heard and that I'm going to talk about, I want to

11   talk to you a little bit about how that evidence fits

12   into the wire fraud framework.  And so I'm going to talk

13   a little bit about what I anticipate the judge will

14   instruct are the elements.

15       The first is that there be a scheme to defraud

16   involving a material misrepresentation.  Secondly, the

17   defendant's willful participation in that scheme with

18   the intent to defraud.  And third, a reasonably

19   foreseeable interstate wire communication in furtherance

20   of that scheme.  What I want to discuss now is how the

21   evidence that you've heard satisfies each of those

22   elements and proves that Ryan Harris committed wire

23   fraud.

24       Let's start with the scheme to defraud.  Now, how

25   do you know that this was a scheme to defraud?  Well,

1    we'll begin by talking about the products, the products

2    that he designed, the products that he sold, and the

3    evidence has shown that these are products with one

4    purpose and that was stealing internet service.

5         Let start with the sniffer program.  Do you

6    remember the testimony about that?  The sniffer program

7    that Mr. Harris added to his Sigma product helped users

8    eavesdrop on their neighbor's internet connection and

9    when they were doing that it allowed them to pick up,

10   and to copy and to keep, their neighbor's MAC addresses

11   and configuration files.

12        You may remember the testimony from Mr. Kohler,

13   the employee of Motorola, the company that made the

14   modems, and also from Mr. Brodfuehrer, who worked for

15   Charter, the internet service provider you heard from,

16   and they both told you that there is no reason why a

17   user would be sniffing to pick up their neighbor's

18   traffic, their neighbor's MAC addresses and

19   configuration files, unless they were looking to steal

20   service.

21        You may also remember that one of the chats that

22   we saw, and I believe it was yesterday morning, a chat

23   between Mr. Harris and someone using the name MooreR,

24   um, and that person, as discussed in the chat, is the

25   person who actually wrote the sniffer program for Ryan

```
 1    Harris.  In the chat Mr. Harris comes up with a list of
 2    possible names for that program.  MooreR then narrows
 3    the list down to two that he thinks might work and then
 4    ultimately it's Ryan Harris who says, "I prefer
 5    CoaxThief, it has an edge to it."  And that's what he
 6    said in Exhibit 21 and, before I go any further, I want
 7    to mention that you're going to have all those exhibits
 8    with you back in the jury room.  I suggest you take a
 9    look at them and you'll see that chat.  So it's Ryan
10    Harris who picks the name "CoaxThief" for his sniffer
11    product and that tells you pretty much all you need to
12    know.  It tells you about the product, what it was
13    designed for, it tells you what Mr. Harris's intent was
14    for it.  And so you've got the sniffer function and then
15    you've also got the MAC changer function, something else
16    you heard testimony about.
17        Ryan Harris, the first thing he asked Isabella
18    Lindquist to do for him was to write this MAC changer
19    function for his program and it was designed to allow
20    the user to change their MAC address, from the one that
21    came with their modem, to one that they had either
22    sniffed from one of their neighbors or traded for from
23    somewhere else.  And then it allowed the TCNISO user to,
24    what was described as "cloning," to clone the modem of
25    the person whose MAC address they were using, the paying
```

1    subscriber, and to get -- to misrepresent to the

2    internet service provider that they were that paying

3    subscriber and to get service that they hadn't paid for

4    that someone else had.  Mr. Kohler, Mr. Brodfuehrer,

5    again, told you that as with sniffing for the MACs,

6    using this program to change your MAC address, the only

7    reason anybody would do this was to steal service.

8         And the next function in Mr. Harris's software

9    that I want to talk about is the uncapping function.

10   There was a lot of testimony about uncapping.

11   Uncapping, you heard, removes the limits, the speed

12   limits on your service.  It lets you get as much service

13   that that modem is capable of.  And you heard that this

14   is also theft of service.  Here what you're stealing --

15   you could be a paying customer paying for basic slow-

16   level service, but now what you're stealing, if you're

17   uncapping, is you're stealing premium faster service

18   that you're getting without paying for it.  What

19   Mr. Harris's product did was to let people take as much

20   bandwidth as they wanted, without paying, and again

21   that's stealing.

22        A couple of other features I want to touch on.  In

23   his Sigma products and in his other software were things

24   called "Stealth Mode" and the update blocking function.

25   You heard testimony that Stealth Mode prevented the

1   internet service providers, the ISPs, from seeing what

2   software was running on the TCNISO user's modem, so that

3   the ISP couldn't identify it as a modem that was

4   stealing service and it couldn't knock that person off

5   the network.

6        The update blocker does something a little bit

7   different, which is it prevents the modem from receiving

8   standard updates that cable companies would send out

9   over time upgrading their service, upgrading their

10  modems, and the reason it did that is because if the

11  modem got that update, that updated software from the

12  cable company, from the ISP, then it wouldn't be running

13  Sigma anymore, it would be running that product and all

14  of a sudden it wouldn't be able to get free access on

15  the network.

16       So Mr. Harris programmed into his product

17  something that would block those updates from actually

18  working on his modified modems.  And again you heard

19  testimony from Mr. Broadfuerhrer that there was no

20  reason to be blocking these updates unless you're

21  stealing service and you wanted to continue doing it.

22  So those are the features of Mr. Harris's products.

23       And Mr. Harris made it crystal clear what these

24  products were designed for in a chat that he had with

25  Mr. Phillips about the customer who wanted to buy 10,000

1    copies of his software, and that chat is Exhibit 5,

2    specifically it's on Page 14, it's on your monitors

3    right now, and I want to read that to you.

4         Mr. Phillips, who is in the nonhighlighted text,

5    says:  "How much do you want to sell Sigma licenses for

6    in mass volume, 10k, 10,000, SB-3100?  They want to use

7    these to steal service.  We have to show them how to

8    steal service, too."  How does Ryan Harris respond?  He

9    says, "$2 apiece, 20k, 20,000 U.S. dollars sounds good

10   to me."  Phillips says, "Okay."  Harris goes on to say,

11   "For 20,000 -- for 20k, man, I'll give them unlimited

12   licenses."

13        So Craig Phillips is telling Ryan Harris right

14   there "These people want to buy 10,000 copies of our

15   software, we've got to teach them how to use it to

16   steal," and Ryan Harris doesn't blink.  He's happy to

17   help people steal service from internet service

18   providers and he's particularly happy to do it if he can

19   make money in the process.

20        Another way that you know that Ryan Harris was

21   running a fraud scheme here is what Ms. Sedky described

22   in her opening as the "cat-and-mouse game" that he was

23   playing with his ISPs and with the modem manufacturers.

24   Not only did he initially design his products to steal

25   service, but Isabella Lindquist told you that he would

regularly tell her what the ISPs were doing to try to block the TCNISO users from stealing service and he would ask her to devise work-arounds, ways to get around those blocks so that people could continue to use his products.  And that, she said, was a major part of her job.  In fact, she told you that the updates to the Sigma program -- and you heard about Sigma 1.3, 1.4, 1.5, those were primarily new versions of the program that contained these work-arounds, so that people could continue to steal service with their modems from their ISPs.

Mr. Kohler and Mr. Brodfuehrer told you that these TCNISO work-arounds were very effective, that Motorola and Charter both kept adding new security features to the modems, to their networks, and then these security features often worked for a time, they would block, um, sometimes the TCNISO modems from getting on, but then TCNISO would come up with a work-around that allowed the users to get back on, to continue to get the free internet service and to get around these security measures.  So you've got the design of the products and you've got the regular modifications of them all proving that this was a fraud scheme.

You also know it's a fraud scheme because Mr. Harris himself and his customers did, in fact, use

the TCNISO modems for the intended purpose, which was

stealing internet service.  Craig Phillips testified

that he and Ryan Harris used a modified modem in the

apartment they shared together to get free, unpaid,

uncapped service and that the service that they got was

10 times faster than the paid service.  In fact, he told

you that he remembers Ryan Harris saying to him, "You

know, why are you paying for service?  We've got an

uncapped modem here."

So that's Phillips's testimony, but you also saw

Ryan Harris's own words.  You saw a chat in which he

talked about the fact that he loved Sigma because of its

speed, um, and not only did he say in his chats that he

liked using it, you've got Exhibit 17, Page 3, in front

of you where he talks to someone named Mr. T about the

fact that he knows his customers were using his

products, too.

I'm going to actually just see if I can get rid of

that red arrow.

(Makes adjustment.)

THE COURT:  I've got it.

MR. BOOKBINDER:  Thank you, your Honor.

So in this chat, um, Mr. T says, "Well" -- or

asks, "Well, I mean, is Sigma working 100 percent with

all ISPs?"  And what does Harris say in response?

"Everyone except Adelphia, yes, and maybe one in
Australia." "Okay. Cool. What are those ISPs doing?"
"Something with the modem cert. We will have it cracked
soon."

So, first of all, Harris there is saying, as far
as he knows, his products are working fine, every ISP,
except for one, and that's Adelphia, and second of all,
the one that they're not working on, he's trying hard to
crack that, too. And if you had any question about
whether this was stealing service or not, he's talking
about "cracking the modem cert thing" that Adelphia's
doing, and you heard Mr. Russell talk about "the modem
cert," which stands for "certificate," was one piece of
the cert security feature that the ISPs could put in
place. So the only ISP that's successfully allowed to
block him, successfully able to block him, at that point
he's working on cracking that and getting around it.

In addition to hearing Ryan Harris's own words,
you heard from three Massachusetts users who came in
here and told you, they admitted to you that they used
his modems to steal service. You heard from Mr. Larosa
who told you that he bought a series of modified modems
that he sniffed for MAC addresses, one of a friend's
house, I think he said he was from Mattapan, he went to
Roxbury, he sniffed for MAC addresses there, took them

1    back to his house, and he used them on his modems to

2    steal service for about two years.  And that he bought

3    dozens more modems, some for himself, to sort of upgrade

4    his product over time, but primarily he resold them to a

5    friend.  That was Mr. Larosa.

6        Mr. Madeira, you heard he said he was a paying

7    Comcast customer, he was paying for service the whole

8    time, but he bought a TCNISO modem because he wanted

9    uncapped, faster service without paying for it.  So he

10   bought a modem and he hoped that that modem was going to

11   be faster than his Comcast modem, but it turned out it

12   was about the same speed -- he told you he never changed

13   the configuration file, he didn't do anything to the MAC

14   address, so that may be why it was the same speed, but

15   then he told you what he did was he used both the

16   Comcast modem and the TCNISO modem at the same time.

17   Each of them was getting, I think he said, 8 megabytes

18   per second of bandwidth, and combined -- and he knew

19   something about computers, he was able to combine them

20   together, and then he got 16 megabits at once on his one

21   computer.  So he used them together and he got twice as

22   much service as he was paying for and he did that

23   without paying anything extra.  It only worked for about

24   a month and a half before his modified TCNISO modem

25   stopped working, but he was able to get that service.

1          And then you heard from Nathan Hanshaw, finally.

2     He told you he initially downloaded a free version of

3     Sigma 1.3 from Harris's website and he got later

4     versions from the website using keys that Chris Watts,

5     one of Harris's programmers, gave him.  And he told you

6     that he used that software on his modems, that he was

7     able to steal service and uncap his modems for years,

8     and that his service was about ten times faster with the

9     hacked modem.  So you know, from that testimony, that

10    the users were actually using these products to steal.

11         In addition to the evidence that people were

12    really using this stuff to steal service, you heard that

13    Ryan Harris hosted forums on his website, TCNISO.net,

14    and that he and his customers used those forums to swap

15    MAC addresses.  You may remember the testimony that, um,

16    if you want to use someone else's MAC address, it needs

17    to be from outside your local area, and so people

18    swapped with others.

19         Take a look at Exhibit 22, Page 2, it's up on your

20    screen right now, and this is a post on one of the

21    website forums by DerEngel, and that's him, and he

22    says:  "I'm checking up on something for a friend.  Does

23    anyone have any verified MAC addresses and/or config

24    files for Phoenix, AZ?  If sensitive, just PM me.

25    Rewards will follow."

1          So he's offering rewards in exchange for a

2     verified MAC address.  And Special Agent Russell

3     testified that his experience is that a verified MAC

4     address is one that's actually been determined to work

5     on a certain ISP.

6          So you've got Harris's own statement, he's looking

7     to trade MAC addresses on his forums, and you've also

8     got Craig Phillips and Nathan Hanshaw, and they told you

9     that each of them used the forums on the website to

10    trade MAC addresses with people and then they used those

11    MACs to steal service.

12         There's also the evidence that Harris was trying

13    to keep himself hidden throughout this enterprise, which

14    shows that this was a fraud scheme and not some kind of

15    an innocent business that he was are running.  And I

16    wanted you to take a look at Exhibit 21, Page 5, this is

17    another one of these chats, and this is Ryan Harris

18    again here saying:  "I'm a professional hacker.  It's

19    what I do for a living.  It's what pays my bills.  I get

20    paranoid just to check who's at my front door."  He's

21    describing himself as paranoid.  He's afraid to open his

22    front door.  It shows that he's worried, he's worried

23    about what he's doing.

24         Ms. Lindquist told you that she worked with Ryan

25    Harris for a year, talking to him or chatting with him

1    almost every day, and in that whole time he only

2    referred to himself, he only told her his name was

3    "DerEngel," he never gave her his real name.  He knew

4    her real name, he knew where she lived, but he wouldn't

5    tell her anything about himself.  He only uses the name

6    "DerEngel," you heard, on the website.  Special Agent

7    Russell testified to you that he never saw the name

8    "Ryan Harris."  And in his posts, again, only

9    "DerEngel."

10         Then there's the book that you saw, it's going to

11   be in evidence, it's Exhibit 7.  That book, again, Ryan

12   Harris wrote under the name "DerEngel," and in his book

13   he says that he writes software code, does hacking, from

14   his "clandestine residence in Hong Kong."

15         He wrote that book under the name of "DerEngel."

16   Now, Mr. McGinty, in his opening statement, made a big

17   deal about the fact that Harris's name actually does

18   appear somewhere in the book, and so we showed you that

19   when we went through the book with Special Agent Russell

20   and it is in there, it's in tiny little type on one of

21   the inside pages after the copyright information.  But

22   it's not clear that Mr. Harris is the author of the book

23   from that.  And, um, Mr. McGinty also pointed out to

24   you, in his opening, that Ryan Harris's photo is in the

25   book and, again, if you take a look at the book, you'll

1   see that that is true, it is there, but there's no

2   caption under it that says "This is Ryan Harris."  So

3   the photo isn't any good to anybody who doesn't already

4   recognize him, otherwise no one knows who that is, who's

5   in that photo.

6        So all this evidence that I've been talking about

7   so far proves that Harris devised and then participated

8   in a scheme to defraud the internet service providers,

9   specifically to steal internet service.

10       And as I mentioned earlier, there were three

11  reasons why Harris came up with this scheme.  You heard

12  about these all during the past week.  First, he wanted

13  free super fast internet service for himself, and you

14  heard that he got it.  Second, he wanted to make money

15  selling his theft kit to other people.  And you read

16  chats where he talked about how much money he was

17  making, "15k a month, no advertising, this was great,"

18  he talked about how much he wanted to make, he wanted to

19  buy a house, he wanted to become a millionaire.  And you

20  saw, in the PayPal record that went into evidence, that

21  he made almost $800,000, brought in almost $800,000

22  through PayPal alone.  You heard evidence that PayPal

23  wasn't the only way people could pay for things, people

24  used credit cards, in fact, Special Agent Russell did

25  when he bought his book, and that's not included in that

1    $800,000 PayPal figure.  So that was the second reason

2    why Mr. Harris wanted to set up and run this scheme.

3         And the third is that he wanted to punish the ISPs

4    for charging for internet service because he thought

5    that ought to be free.  And you read some excerpts from

6    the book about this.  I want to show you two of them

7    right now.  This is from Exhibit 7, the first one is

8    Page 3.  It says:  "This book is dedicated to all the

9    righteous hackers that have been silenced by the greedy

10   corporations."  And then the second one is Page 12.  And

11   here it says:  "My goal is clear.  I wanted to uncap as

12   many cable modems as possible.  The war had begun."

13        So you know a lot about this scheme, that's the

14   bulk of the first element of wire fraud, the second

15   portion is that it involved a material

16   misrepresentation, and we can talk about this for a

17   minute.

18        I suggest to you that the evidence of a material

19   misrepresentation in this case is fairly

20   straightforward.  Mr. Kohler and Mr. Brodfuehrer both

21   told you that ISPs rely on the MAC address of the modem

22   to verify that someone is a paying subscriber on their

23   network and they do that before providing internet

24   service to that person.  So when Harris and his users

25   changed their MAC address to one that they've swapped or

1    stolen, they were representing to the ISP that they were

2    the person to whom that MAC address really belonged.  So

3    -- excuse me.  So in doing that they were

4    misrepresenting their identity and the ISPs relied on

5    this misrepresentation and provided them service.  That

6    means that this mattered to the ISPs, which means it was

7    material.

8          Thank you.

9            (Takes drink.)

10           MR. BOOKBINDER:  Let's see if I can keep my

11   voice through the rest of this.

12         All right.  So that's the material

13   misrepresentation.

14         The next element is the willful participation,

15   Ryan Harris's willful participation in this scheme with

16   the intent to defraud.

17         So there's not much question here about whether

18   Mr. Harris participated in this scheme.  I mean, it was

19   his scheme.  He came up with it.  Exhibit 18, another

20   one of his chats, Page 1, he says:  "I created the

21   entire cable modem hacking scene."  You saw another chat

22   where he says:  "I am the creator."  This is his, this

23   is his thing.

24         He controlled TCNISO, its products, its website,

25   its bank account.  The evidence is clear that he

1    willfully participated in this scheme and the evidence

2    also proves that he did that with the intent to

3    defraud.  You heard that he designed these products to

4    steal service, that he modified them so the ISPs

5    couldn't prevent this theft of service, and that he used

6    them himself to steal service.

7         And the evidence also showed you that it was

8    really important to Ryan Harris that these products

9    worked because if they didn't work, he wouldn't sell any

10   more, he wouldn't make money, he wouldn't be able to

11   damage the cable companies.  So, for example, he was

12   willing to teach the person who was looking to buy those

13   10,000 copies how to steal service and he taught other

14   people how to use his products through the tutorials and

15   the videos that he put on his website.

16        All of this evidence proves that he willfully

17   participated in the scheme with the intent to defraud

18   the ISPs.  So let me move on to the final element and

19   that is the interstate wire communication.

20        Now, you may be thinking about a wire

21   communication as like a bank wire, you know, "I'm wiring

22   money from one bank to another," but I expect that the

23   judge will instruct you that internet communications can

24   also be wire communications, that the wire doesn't have

25   to be fraudulent in and of itself, there's not anything

1    fraudulent about the particular wire, that Ryan Harris

2    doesn't have to be the one actually making the wire, and

3    that he doesn't have to know the particulars about it,

4    who was going to do this wire communication, when were

5    they going to do it, it just has to be reasonably

6    foreseeable to him, this type of wire, and it has to be

7    in furtherance of the scheme.

8         I'm going to talk to you about each of the counts

9    individually and how the evidence fits this element, but

10   I want to first point out the stipulation that the judge

11   read to you before I started, which was that the TCNISO

12   website was hosted outside of Massachusetts.  That

13   means, I suggest to you, that if someone accessed that

14   website from within Massachusetts, that there was

15   necessarily an interstate wire communication of some

16   kind involved in that access.

17        I want to show you now -- to talk about the

18   specific counts, I want to show you a chart, and this is

19   -- the information on this chart comes from -- I'll move

20   it over here.  (Moves chart.)  Okay.  So the information

21   on this chart comes from the indictment, which you'll

22   have back with you in the jury room.  So if you miss

23   something or it's a little hard for you to see, you're

24   going to have this with you, um, when you make these --

25   you're going to have the indictment with you back in the

1      jury room.  But I want to talk about each of these wires
2      specifically and how they relate to the different
3      counts.
4           So Count 1 charges that in approximately 2005 it
5      starts talking about "NH" -- and you'll see that in this
6      -- in the indictment and on the chart it refers to these
7      users by their initials, but you heard from Nathan
8      Hanshaw, and Nathan Hanshaw is the "NH" referred to in
9      this count, and the count charges that the wire
10     transmission is:  "NH accessed the internet from
11     Massachusetts and downloaded Harris's Sigma cable modem
12     hacking product."
13          You heard from several different witnesses that,
14     um, Mr. Harris made Sigma 1.3 available for free on his
15     website and, um, Mr. Hanshaw told you this was the first
16     version that he downloaded.  So he's downloading this
17     from the TCNISO website and when you're thinking about,
18     um -- so that's the interstate wire portion, being
19     downloaded from that website, and when thinking about
20     whether this wire would be reasonably foreseeable to
21     Mr. Harris?  I ask you to use your common sense here.
22     If you make software available on a website, is it
23     foreseeable that someone would download it?  I would
24     suggest to you that it is.
25          So the next question is, is this wire, this

```
 1    download, in furtherance of Mr. Harris's scheme to
 2    defraud the ISPs?  The more people that he gets to use
 3    his products and to use them to steal internet access,
 4    the more he gets to punish the ISPs, and that was one of
 5    his goals.  So these downloads -- this download would be
 6    in furtherance of the scheme.  And I suggest to you that
 7    it doesn't matter, considering this count, whether at
 8    some point, as you've heard, Mr. Harris and Nathan
 9    Hanshaw had a feud or stopped getting along.  There's no
10    question that relationship was volatile.  But, um,
11    Mr. Harris was in a war with the cable companies, you
12    saw that excerpt from the book, and in this war, every
13    user, everybody who downloaded one of his products was
14    one of his soldiers, and I suggest to you that Nathan
15    Hanshaw, like him or not, and certainly by the end of
16    their relationship they didn't like each other, but that
17    Nathan Hanshaw was one of Mr. Harris's soldiers when he
18    used that software to steal internet access.
19         Count 2, again, is, this time it's 2007, and again
20    it's Nathan Hanshaw accessed the internet from
21    Massachusetts where he downloaded Harris's Sigma X cable
22    modem hacking product, a later generation.  Again,
23    you've got the download, Mr. Hanshaw told you that he
24    downloaded Sigma X from the website, again, but this
25    time it wasn't a free product, he didn't pay for it, he
```

1    was able to download it because he got a key, you know,

2    a combination essentially, from one of Harris's

3    programmers, someone named Chris Watts.

4         So you've got a download again from the website,

5    um, just like a paying customer would, and again that is

6    foreseeable that if you put products up on your website,

7    that people are going to download them.

8         Counts 3 and 4.  There are specific dates here,

9    January 15th, 2007 and December 5th of the same year,

10   and the first one charges that:  "Nathan Hanshaw

11   accessed the internet from Massachusetts using Harris's

12   products and a cloned MAC address and participated in an

13   on-line chat discussing his hacking activities."  And

14   the second one is the same description, but a different

15   date.

16        Now, you heard, first of all, from Nathan Hanshaw

17   that he used the products, he used cloned MAC addresses,

18   and he accessed the internet that way.  The specific

19   dates in these specific chats are based on two exhibits

20   that you saw, they were Exhibit 11 and Exhibit 12, and

21   those were just one page of logs that Nathan Hanshaw

22   said were logs of his chats with someone named Brad

23   Dennis.  And in using various user names, both he and

24   Mr. Dennis, but that's what Mr. Hanshaw said these

25   things were, and he told you that Mr. Dennis lived in

1    Washington state.  So again you've got them chatting

2    over the internet, it's an internet communication with

3    someone who lived outside of Massachusetts, that's the

4    interstate wire, and, um, as to the question of whether

5    this would be foreseeable?  Well, Mr. Harris, when he

6    made, distributed products that let people steal

7    internet access, I suggest to you that it's not only

8    foreseeable, it's almost a certainty that people are

9    going to use those products to access the internet, and

10   that's what Nathan Hanshaw did, that was the purpose of

11   those products.

12        Count 5, um, June of 2008, and this time we've got

13   "JL," Jose Larosa, "accessed Harris's TCNISO website

14   from Massachusetts and bought a modified cable modem and

15   ancillary products."  Again, you've got him accessing

16   the website out of Massachusetts, and there's your

17   interstate wire, and is it foreseeable?  Well, if you

18   put a website up and you sell things on it, the purpose

19   is for people to access it, and that's what Mr. Larosa

20   did.  That's Count 5.

21        Count 6.  Um, "Mr. Larosa accessed the internet

22   from Massachusetts using Harris's products and cloned a

23   MAC address and obtained free internet access."  So

24   again it's obviously foreseeable that if someone buys

25   one of these hacked modems, he's going to use it.  Once

again internet access.  Um, on the question of whether

that internet use was interstate, did Mr. Larosa do

anything with his modem that required interstate wires?

Well, you may remember he told you that -- well, a

couple of things.  First of all, that he bought -- after

he bought his first set of products, he went back to the

website, the TCNISO website, and he bought more

products, and that website's outside of Massachusetts.

So when he went back there to repeatedly order products,

those are interstate wires.  And he also told you that

he had some e-mail back and forth communication with

somebody at TCNISO because one of the batches of modems

he bought, um, he told you only five of them worked and

five didn't, and so he wanted to return them and then he

got an e-mail in response saying, "You don't have to

return them, but you can fix them," e-mails back and

forth with either Mr. Harris or someone else at TCNISO,

and you heard a stipulation yesterday that the company

was located in San Diego, California.  So again those

are interstate wires, and that is Count 6.

        Count 7, is "WM," William Madeira, "accessed the

website and bought a modified modem and ancillary

products."  It's just the same as Count 5 with

Mr. Larosa, you've got someone using or accessing an out

of state website, buying products, and that's what the

1  website was there for.

2       And then there's Count 8, which is "Mr. Madeira

3  accessed the internet from Massachusetts using these

4  products and obtained free internet access."

5       Now, Mr. Madeira testified that his situation was

6  a little different, he connected his modified TCNISO

7  modem and, um, he said, um, initially it didn't work, so

8  he had to go back to the TCNISO website and get

9  directions about, um, how to -- how to work it, um, and

10  then after he did that he was able to then get internet

11  service but he did not, um, register his MAC address

12  with the ISP, he, um, simply started using it and it

13  worked.  He started using the MAC address, for some

14  reason his ISP recognized him, or recognized the MAC

15  address and gave him service, um, and he got that faster

16  service that he paid for, and then, um, he -- you know,

17  by going back and forth with the website, those were

18  interstate wires in furtherance of the scheme.

19       So those are the counts that you're going to be

20  specifically asked to deliberate about.  And I'm going

21  to put this chart down.  And I want to talk for a minute

22  now -- since we're on the topic of Mr. Madeira, I want

23  to talk a little bit about some of these witnesses who

24  testified during the course of the trial.

25       As you know from their testimony, some of them did

1    some pretty bad things.  Mr. Madeira told you that he

2    stole identity information while he was working for John

3    Hancock as a temporary employee.  You heard from Craig

4    Phillips, he's got a felony conviction arising from his

5    work with Ryan Harris on TCNISO.  You heard from Nathan

6    Hanshaw, he was a pretty nasty hacker doing all kinds of

7    things, including swatting, some things that were pretty

8    dangerous.  Even Isabella Lindquist, um, was involved in

9    this scheme to help people steal service.  But the

10   reason that we called these people as witnesses in this

11   case is those are the people that Mr. Harris worked with

12   and those are the people who were his customers and

13   that's why they're the ones who had to come in here and

14   tell you how this thing worked and how these products

15   worked.  If you think about it, if you're going to run a

16   scheme to create a theft kit, it's not surprising that

17   the people you're going to work with and the people who

18   are going to buy it are thieves.

19        I expect that the judge is going to instruct you

20   that you should consider these people's testimony with

21   care, um, special care, and you certainly should, um,

22   particularly Mr. Phillips because, as you know, he is

23   hoping to get some benefit, when it comes to his

24   sentencing, in return for his cooperation.  But when you

25   think about Mr. Phillips's testimony, you'll see that

1    all of the significant things that he testified to are

2    corroborated by other evidence.  You don't have to just

3    rely on his words alone.  The testimony of other people,

4    like Isabella Lindquist, for example, about how the

5    company worked, about the conversations they each had

6    with Ryan Harris, and, um, Harris's own words in the

7    chats with Phillips -- and there were a lot of those in

8    Exhibit 5, um, his own words in those chats and in his

9    posts and in chats with other people.

10         Now, as to Ms. Lindquist and as to the

11   Massachusetts users, I ask you, when thinking about

12   their testimony, to consider the fact that they told you

13   they aren't hoping to get anything from the government

14   in return for their testimony, so think about whether

15   they have any incentive to make anything up to try to

16   curry favor.  Nathan Hanshaw already served his

17   sentence, so his cooperation can't help him.

18   Ms. Lindquist and Mr. Larosa and Mr. Madeira, um, they

19   have immunity, so their testimony can't be used against

20   them in any way unless they lie.  So what incentive do

21   they have to try to curry favor?  And why would these

22   people tell you that they stole internet service, why

23   would they come in here and say that, why would they

24   make that up if it wasn't true?

25         Before I wrap up, I want to, um, touch briefly on

1    some of the arguments that Mr. McGinty made in his

2    opening and some of the things that he raised through

3    his questioning of the witnesses and those essentially

4    boil down to two main points.  The first, ISPs are bad.

5    And the second one, Harris's products are good.  The

6    problem with these arguments is that the first one is

7    irrelevant and the second one is refuted by the evidence

8    you've heard during the course of this case.  Let me

9    start with the ISPs.

10        Mr. McGinty has presented you with a laundry list

11    of what he views as the ISP's sins.  Um, they limit the

12    potential of modems.  They don't let users have

13    control.  They impose filters on the modems.  Et

14    cetera.  Et cetera.  I suggest to you that all of that

15    is irrelevant here.  It doesn't give Mr. Harris or

16    anybody else an excuse to steal service.  You can't

17    defraud a victim you don't like, it's still fraud if you

18    do it.  All right?

19        As to the products, Mr. McGinty is suggesting to

20    you that there's no fraud scheme here because these

21    products had other uses, they were designed for things

22    not for theft of service.  Well, what you've heard from

23    him and what I suggest you're going to -- you may well

24    hear in his closing is a lot of speculation about what

25    these products could have been used for, what someone

1    might have used them for.  You could have used them to

2    open ports, you could have used them to be anonymous, to

3    get the service you are actually paying for from the ISP

4    and nothing more.  But there's no evidence in this case

5    that Mr. Harris intended the products for those purposes

6    and there's no evidence that anyone actually used them

7    for any of these purposes.  And it's not just that these

8    claims are not supported by the evidence, the evidence

9    actually refutes them.

10           Mr. McGinty suggested to you that it might be the

11   case that customers, for example, were paying for 1

12   megabit per second of speed, but only getting half the

13   megabit at some times, getting slower than what they

14   paid for, and that maybe they uncapped their modems so

15   that they could get that 1 megabit of service they were

16   paying for and nothing more.  Again, there's no evidence

17   of this, this is speculation, and the testimony is

18   actually the opposite.

19           You heard from Craig Phillips and you heard from

20   Nathan Hanshaw that their TCNISO modified modems got

21   service 10 times faster than what they had paid for.

22   They didn't go from half a megabit to 1 megabit, they

23   went from 3 megabits, Mr. Hanshaw testified, to 30, 10

24   times faster.  And Mr. Harris in his book talks about

25   what he wants to do as "removing the cap altogether."

He's not talking about uncapping just so you can get the service you paid for.

Mr. McGinty has also suggested that people may have bought Mr. Harris's products so that they can be anonymous.  Let me be clear here.  The evidence you heard proves that changing your MAC address doesn't make you anonymous, being anonymous is what Mr. Harris did, for example, when he used the name "DerEngel," he used a made-up name so nobody knows who you are.  Mr. Harris's products helped people steal the MAC addresses of real customers and impersonate those customers with the ISPs.  That's not being anonymous, that's taking someone else's on-line identity.

You also heard from Special Agent Russell that there are a lot of ways to be anonymous on the internet for free.  I mean, you could go to the library, you could go to Starbucks, you could go to a website like anonymizer.com.  There's no need to buy a $100 modified modem from TCNISO if all you want is to be anonymous.

Mr. McGinty's arguments boil down to speculation about possible noncriminal uses for Mr. Harris's products.  I ask you to think about it this way.  It's true that Mr. Harris's modems could have made great paperweights.  Right there.  (Points.)  They're kind of heavy.  You'll see one.  They have rubber feet on the

1    bottom.  They'll keep the papers from sliding around

2    your desk.  But use your common sense.  Do you think

3    anybody paid $100 for a $25 modem to use it as a

4    paperweight?

5        The evidence you've heard during the past week

6    proves that Ryan Harris designed TCNISO products for the

7    purpose of stealing service outright and stealing

8    premium service.  Mr. Phillips told you this.

9    Ms. Lindquist told you this.  Mr. Harris's own words in

10   his chats tell you this.  Mr. Kohler, Mr. Brodfuehrer,

11   they told you that for all practical purposes these

12   products had no other use other than theft of service.

13       So -- um, the evidence also proves to you that

14   Mr. Harris, Mr. Phillips, and their customers used these

15   software products and the modems in this way, in the

16   designed and intended way to steal service, and in the

17   end Mr. Harris was able to accomplish the goals that

18   motivated him to embark in this scheme in the first

19   place, he got free faster internet service for himself,

20   he made a lot of money selling these products to people,

21   and he was able to punish the cable companies.  And by

22   doing all of this he committed wire fraud, and we ask

23   you to return a verdict of guilty on all eight counts.

24   Thank you.

25            THE COURT:  Okay.

1          Ladies and gentlemen, that concludes the first

2     part of the government's closing argument.  As I've

3     said, I'll excuse you for lunch.  We'll resume about 20

4     after 1:00.

5          This instruction has to be getting harder to

6     follow, but it's increasingly important that you do

7     this.  Continue to keep an open mind.  Don't discuss the

8     case.  You still haven't heard all the arguments.  Of

9     course, you haven't heard my instructions that are going

10    to, as I said, define the questions that you need to

11    answer and the standards that you have to apply.

12         So you can talk about whether it was a good idea

13    to ban beer from the Red Sox clubhouse.  You can talk

14    about whether we're finally going to get snow, which

15    hopefully won't impede our progress this morning.  But

16    don't talk about the case.  Pretty soon it will be time,

17    I hope later this afternoon, but not yet.

18         The Court is in recess for the jury.

19              (Jury leaves, 12:40 p.m.)

20              THE COURT:  All right.  Is there anything

21    further before we recess until 1:20?

22              MR. McGINTY:  No, your Honor.

23              THE COURT:  All right.  Then the Court is in

24    recess.

25              (Lunch recess, 12:40 p.m.)

```
 1                    (Resumed, 1:20 p.m.)
 2              THE COURT:  All right.  A couple of things.
 3     One, have you given Mr. Hohler the redacted indictment?
 4     I think he gave me one earlier this morning.  I may have
 5     just stuck it --
 6              MR. BOOKBINDER:  Well, I have another copy
 7     here, your Honor.
 8              THE COURT:  Okay.  We'll do that.  And at the
 9     break we'll get about 20 --
10              MR. BOOKBINDER:  Oh, it actually has writing
11     on it.
12              THE COURT:  Well, here's a -- no, I've written
13     on mine as well.
14              MR. BOOKBINDER:  Well, I can run and get one
15     right now, your Honor, or I can get one during the
16     break.
17              THE COURT:  You don't need to do that.  But
18     we'll need to have it before we excuse the jury.
19         What's the next letter?
20              THE CLERK:  H, Judge.
21              THE COURT:  Okay.  Mr. Hohler will give you
22     the proposed verdict form, which I'll make Exhibit H.
23                    (Exhibit H, marked.)
24              THE COURT:  All right.  Is there anything
25     further before we proceed?
```

```
 1          Is that a chart you want there?
 2               MR. McGINTY:  Yes, it is.
 3               THE COURT:  What's it a chart of?
 4               MR. McGINTY:  It's the counts.
 5               THE COURT:  Okay, the same one the government
 6    used?
 7               MR. McGINTY:  Yes.
 8               THE COURT:  And it's just a duplicate of
 9    what's in indictment, is that correct?
10               MR. BOOKBINDER:  Yes.
11               THE COURT:  Is that correct?
12               MR. McGINTY:  Yes, that's correct, your Honor.
13               THE COURT:  All right.  We'll get the jury.
14               (Jury enters, 1:25 p.m.)
15               THE COURT:  Ladies and gentlemen, we're ready
16    to proceed to the defendant's closing argument.
17               MR. McGINTY:  Thank you, your Honor.
18
19    CLOSING ARGUMENT BY MR. McGINTY:
20          May it please the Court, men and women of the
21    jury.  The government doesn't like the products that
22    Mr. Harris made, but indignation is not the basis for a
23    criminal charge, and what I'd like to do right now is
24    just focus you momentarily on the charges that were
25    brought and let's just go through these quickly.
```

1          There are four counts here of what remains of the

2     indictment.  Of those four counts, all of them pertain

3     to a person named Nathan Hanshaw.  Remember him?  He's

4     the guy that Ryan Harris would have nothing to do with,

5     called an "idiot," didn't want Craig Phillips stealing

6     from him.  He's the guy that out of indignation at Ryan

7     Harris had hacked into his website.

8          The allegation here is that Nathan Hanshaw had

9     downloaded a Sigma 1.3, had -- we now know what he did

10    on Count 2, he induced Isabella Lindquist to give him

11    the raw code.  In other words, he didn't buy anything.

12    Actually, on Count 1 he didn't buy anything either.  He

13    didn't buy anything?  He didn't buy anything because he

14    duped Isabella Lindquist.  And on the next two he used

15    the internet and how do we know how he used the

16    internet?  Oh, that's right, he got hacked firmware from

17    MACs fraud, remember, and he was also war driving.  How

18    is Harris, Ryan Harris, complicit in anything Nathan

19    Hanshaw did?  That's the first four charges that

20    remain.

21          The next four relate to two people that Ryan

22    Harris didn't know.  How did Harris know how a

23    particular device was going to be used?  How did he

24    know?  Because the person communicated with him.  Well,

25    he didn't and he didn't.

1              (Points to people.)

2         MR. McGINTY:  And one more thing about this.

3    Notice down here it says:  "Mr. Madeira accessed the

4    internet from Massachusetts using Harris's products and

5    a cloned MAC."  Well, we now know that Mr. Madeira never

6    used a cloned MAC, Mr. Madeira took the device, plugged

7    it in, and it worked.  That was his testimony.  Not that

8    he did anything to alter it.

9         So if you look at what's here, wire fraud, and you

10   try to figure out, okay, let's take the indignation and

11   let fit it into the charge, let's make this intelligible

12   as a charge that brings him into criminal court, and you

13   know something?  You're not going to see it here, and

14   these are the charges you're deliberating on, and these

15   are the ones, the only ones that are part of your

16   deliberations in this case.

17        Now, the government's theory in this case is that

18   his business was illegitimate, it was a one-trick pony,

19   it did one thing, it stole service, and stealing service

20   was set up all through the opening of the government and

21   all through the closing of the government and stealing

22   service was the act of getting from a coaxial cable,

23   life, a coaxial cable that didn't have any life.  Now,

24   if you have -- and we went through this with

25   Mr. Kohler.  If you have a coaxial cable in your house

and it's not live, the magical products of TCNISO can't
make it live.  It can't do it.

So when the government talks about stealing
service, where's the evidence of the stealing service?
In Mr. Harris's book he talks about "uncapping," he is
not talking about stealing service.  His book will be in
evidence and you can look through it, but you're not
going to find it.

So what the government says to you is his business
is illegitimate, there's no basis to have it, and
everything he had was a theft device -- this stealing
service, this making a coaxial cable live, when you
haven't paid for any service and where it doesn't get
connected to the cable company.

Fiction.  It's a fiction.  You've heard no
evidence about that in this case.  It's fiction.  And
the case is founded on fiction.  And the one-trick pony
is a fiction.  How do we know that?

Yesterday, Agent Russell, on the stand, said there
were reasons that a person would seek to be anonymous on
the web.  I didn't make this up in my opening
statement.  He said it, and he acknowledged it, and he
said there are multiple ways you could do that, yes,
including the TCNISO product.  And he said it can be
legitimate to be anonymous on the web.  I think we all

 1    know that.  There are reasons why you want to have

 2    anonymity.  It's nobody's business, not the government's

 3    business, not anybody else's.  And if you're a political

 4    dissident, if you have a speech to make, but you'll pay

 5    a price for the consequences of that speech, then you

 6    want to have a way to get that speech and not have it

 7    get back to you in a way that could result in fatality

 8    or harm to you.

 9         So when we've talked about anonymity as one of the

10    things this does, I didn't say that in my opening --

11    yes, I said it, but that's not the evidence.  Agent

12    Russell said it.  And who else said it?  Mr. Kohler.

13    "Mr. Motorola" said the same thing.

14         Mr. Kohler also said, and agreed, that the cold

15    hand of the cable company could reach down to your

16    modem, in your house, and it can do things with your

17    modem.  It can change your filters.  It can close

18    ports.  It can change your content.  It changes your

19    experience.  It changes what you get.  If you have P2P

20    capability, then you want to be able to communicate,

21    upload, and the cable companies -- not all of them, not

22    all the time, but they overbook their service from time

23    to time and sometimes they get in the business of

24    throttling service because they don't want you to have

25    certain things or they want to create a disincentive for

1    you having that.  All of them?  No.  All of the time?

2    No.

3         Harris's business wasn't about a particular cable

4    company, it wasn't about constraining a particular cable

5    company, and no it wasn't a war with the ISPs, it gave

6    you, personally, you, the power to make the choice for

7    yourself.  And when Isabella Lindquist broke open the

8    cable box, the cable modem, what she did is release the

9    potential.  Oh, yes, you can abuse it.  You can abuse

10   it.  But she unleashed the potential of their products.

11   Ryan Harris's products gave you the ability to make a

12   choice.  The government says, "Oh, but there was really

13   only one choice, it was stealing service."  Fiction.

14        What else we know about this is some of the

15   people, Isabella Lindquist told you, were interested in

16   this because they were geeks, they were just interested

17   in finding out about how this stuff worked and they

18   wanted to know what it was.  They were among the

19   customer base of TCNISO.

20        And what do we know about TCNISO?  It ran a store,

21   it sold the book, "Hacking the Cable Modem, What Cable

22   Companies Don't Want You to know."  I would almost say

23   that the book could be written again and called,

24   "Hacking the Cable Modem, what the Government Doesn't

25   Want You to Know," because the government treats every

1    aspect of a cable modem as a closed system susceptible

2    to only the control that the cable company places on it,

3    and comes to you and accepts -- or asks you to accept

4    that as the capability of the product.  And it suggests

5    that anyone who would open it up to release that

6    potential is engaged in some kind of criminal endeavor.

7    That's the government's theory.

8         But TCNISO had a store.  It sold -- as it was

9    described by the agent, it had various computer parts

10   that it sold, it advertised itself as a personal

11   computer-repair-type shop.  On the website modems were

12   for sale and among the modems that were for sale was a

13   Motorola 5101, a stock Motorola modem.  Not modified.

14   Not hacked.  You could buy that modem from TCNISO.  You

15   could buy the 4101, which was the engineering

16   prototype.  You could buy the 5100.  You could buy each

17   of those modems, not changed, not altered, available

18   through TCNISO, and the price was better, more favorable

19   than it was if you bought it from a -- from a place

20   where you buy a cable modem, an electronics shop or

21   something like that.

22        The government says that Harris sought anonymity,

23   concealed who he was, and that the picture in the book,

24   you shouldn't even look at it, because it really isn't

25   clear it's him, and that when he put his name next to

1    the copyright on the book, um, he really wasn't

2    acknowledging that he was "DerEngel," the person that

3    wrote the book.

4         TCNISO had a bank account.  Its monies were

5    traceable.  It publicly filed for incorporation with his

6    name on it, Ryan Harris.  If you wanted to find out what

7    TCNISO was, there were articles of incorporation,

8    Exhibit 1, you'll see it, with his name on it.  Not much

9    of a way to hide.

10        Now, none of this makes a difference to the

11   government.  What the government wants you to do is to

12   infer from the nature of the object that anyone using it

13   must have been using it for an impermissible purpose,

14   and that's why they have say to you that all of the

15   other capabilities of the product, all of the choices

16   you could make with the product, just pretend they're

17   not there, just kind of ignore those, because all of

18   those introduce choice, all of those create the

19   potential, and the government wants to treat those as if

20   they're not here and want to suggest there was no

21   evidence that support it.  But I think you listened to

22   the evidence and you know better.

23        The government's narrowed this case, all of it --

24   well, actually not all of it, just 90 percent of it,

25   came from people who had plea deals or immunity.  Now,

1    imagine you're talking to a stranger about something

2    that happened outside the courtroom and imagine if you

3    were trying to figure out whether the person was telling

4    the truth or not, how would you do it?  Well, you'd try

5    to talk to the person and get a sense of, you know, who

6    they are and what it's all about.

7          Would it make any difference to you if you found

8    out the person was being paid money to tell you the

9    story they told you, would that be important to you?

10   Presumably.  Because if you thought the person was

11   telling the truth and you found out someone paid them to

12   tell you that, you'd go, "Come on."

13              (Indicates.)

14              MR. McGINTY:  What if you find out -- what if

15   you find out the person is threatened with jail?  What

16   if you find out the person -- that the government has

17   information about the person and gives them immunity?

18   How do you evaluate that?  I mean, if they give me

19   immunity, I know what song I'm singing, I know what it's

20   going to be, and in this case it's going to be, "Um, I

21   know, Ryan Harris."  Um, "Give me a second," "stealing

22   service."  I know how to say that and I didn't get

23   immunity.  But every one of us knows that if I give you

24   immunity, you may not do it, because you may have a

25   conscience, but if you get immunity, you're going to

1    thinking about it, "I know what I'm supposed to say."

2         So when the government gets up and says, "This is

3    the narrative of what happened," I want you to think

4    about the narrative because the narrative comes at a

5    price, at a cost, and it's a cost because you're

6    inducing somebody to say what you want them to say.  And

7    the cost isn't just that what the person says is

8    probably not going to be reliable, the cost is your

9    integrity, too, because if you bring in a witness and

10   you deliver their testimony, and you pay for it, you pay

11   for the immunity, it's not to be taken seriously.  How

12   could it be?  In your own lives, you wouldn't do that.

13        But here, if you go through the list of the people

14   that are in here, almost every single one of them,

15   Phillips, even gentle Isabella Lindquist, Madeira,

16   Larosa, every one of them steered -- how could they not

17   be? -- steered to the narrative, the one-trick pony,

18   "stealing service," "Ryan Harris."  The whole narrative

19   the government makes leans, it all leans in one

20   direction.  Why does it lean?  Because its pushed.  And

21   how are you pushing it?  You push it when you give an

22   immunity letter to a guy.

23        Mr. Larosa, Mr. Madeira, by the way, they got

24   immunity letters three weeks before they came in here.

25   Three weeks before they came in here.  Think about

1   that.  Are you kidding me?  What terrible secret did the

2   person have to have with confidence that if it came out

3   they'd be protected from revealing by giving them an

4   immunity letter three weeks before they came in to

5   testify?  What's that all about?  I don't know.  And you

6   don't either.  But we know, when we hear from people

7   like that, we know that what we're getting ain't the

8   truth.  We know there's something wrong.  And we know

9   that this entire case rests on a narrative that sits

10  atop the immunity letter, the cooperation agreement,

11  testimony that's bought, testimony that's paid for.

12       Now, the charges in this case that remain, as I've

13  mentioned before, are wire fraud -- are wire fraud

14  charges.  Now, of these Craig Phillips pled guilty, but

15  do you know something?  He's supposed to be the partner

16  of Ryan Harris.  He didn't plead guilty to wire fraud.

17  That's odd, isn't it, his partner, presumably?  It

18  wasn't wire fraud, it was computer fraud.  It was

19  something completely different.

20       Even Mr. Hanshaw, when he pled guilty, what he was

21  pleading to -- well, he was pleading to a laundry list

22  of very serious crimes, between his hacking and his

23  swatting, he pled guilty to wire fraud and do you know

24  what the wire fraud was?  It was calling up schools,

25  calling up the police department, it was calling in bomb

threats, and it was stealing people's credit

information.  Okay, wire fraud, I get it.  I

understand.  How is the manufacturer, how is the

preparer, how is the seller of a device that could be

used in different ways and by different people, at their

choice, at their election, based on what they wanted to

do, how is that person pulled into a charge called "wire

fraud"?

Well, Mr. Phillips, the government leaned on him

and they promised him no jail, so Mr. Phillips wasn't

about to fight the case.  When he was first arrested, he

said:  "He left the company because of his dislike for

Harris and that he needed a change of lifestyle."  A

short time later, once he realized what the script was,

he began to say something very different, he talked

about how he was afraid of getting caught.  When he was

first interviewed he never mentioned getting caught, he

never mentioned a fear of getting caught, he never said

he thought he did anything wrong.  But later on the fear

of getting caught became part of his theme and that's

when he came in here and said, "I was afraid of getting

caught because what we were doing we knew was wrong."

Now, why is he testifying that way and why isn't

that what he said the first time that he was arrested,

why isn't that what his narrative was from the start?

1    Because, you see, if you give a guy an incentive to tell

2    you a story, he'll tell a story, and that's what Craig

3    Phillips did.

4         Mr. Phillips told you he had chat logs.  You know,

5    he didn't tell the agents about that right away, he

6    didn't say, you know, "I've got chat logs involving Ryan

7    Harris."  His testimony was he turned over the chat logs

8    to his lawyers.  But what's interesting about

9    Mr. Phillips is he never turned over chat logs of

10   himself, and what we learned from Mr. Hanshaw was that

11   he and Mr. Phillips were in pretty steady

12   communication.  So what Phillips did is he took some

13   chats involving Mr. Harris and he kept them for three

14   and a half years.  Where he kept them?  What he did with

15   them?  Did he edit them?  No one knows anything about

16   it.  But he kept them somewhere.  And he produced them

17   at a later date and they've been offered up to you.  And

18   when they're offered up to you, you need to keep in mind

19   who had them, how long, and what were the circumstances

20   of keeping them in the first place, what was it that

21   Craig Phillips was trying to do?

22        Now, the government here has gone to great lengths

23   to try to make Mr. Harris look bad.  They culled out

24   from certain of these chats, these purported chats,

25   things that he said.  Among them it talks about his role

1   in, um, inventing uncapping.  But one of the chats they

2   talk about is a chat relating to a possible hacker

3   convention that was going to be held in Germany and the

4   question is whether there would be a lot of licenses

5   sold in connection with that hacking convention?  And

6   the government referred to this in their closing

7   statement and said:  "They were talking about teaching

8   people how to get free service."

9        In the jury room you will have that entire chat

10  and what you see as the chat develops is that when the

11  conversation started with Mr. Phillips, Mr. Phillips

12  said there was a group over in Germany, it was a hackers

13  convention, "They want us to come over, all expenses

14  paid," and Harris said -- he laughed and he said, "It's

15  not for real."  All of the conversation that happened

16  after that was in the context of a proposal that Harris

17  took not to be serious.

18       Now, the government plays that and all of it is

19  intended to show, you know, that Harris is knowing what

20  the product did and it shows him a little bit of a

21  megalomaniac, a guy who hated the ISPs, a guy who was

22  going to go to war with the ISPs, a guy that the ISPs

23  were afraid of and were concerned about, who was doing

24  damage to the ISPs, and the only problem with that is

25  that the ISPs didn't seem to notice this.  The cable

1    companies apparently didn't even know that Mr. Harris

2    existed.

3         Now, Mr. Brodfuehrer came in and if you remember

4    him, he was the person who didn't have outstanding tax

5    warrants in the State of Indiana, he said that he had

6    done testing on, um, a modem they got and testing to

7    determine, um, what the nature of the modifications were

8    that TCNISO had done, and he tried to remember when he

9    had done it, it was either 2006 or 2007.  Now, he didn't

10   say 2004, he didn't say 2005, it was 2006 or 2007,

11   almost up against the time that this investigation is

12   done.

13        So the government said to him, "What have you

14   got?"  You know, "Give us the reports."  And he said to

15   the government, "I don't have any."  And they said,

16   "Well, give us the e-mail."  I mean, "Give us the things

17   that are shown in the investigation."  "Show us the

18   things that indicate that you cared about his product,

19   looked at it, examined it to find out what it did

20   relative to your capability."  And instead,

21   Mr. Brodfuehrer told them that he didn't have it, there

22   was no test, no papers, no examination.

23        Motorola, apparently, if we understand this right,

24   made a modem with a single means of customer

25   authentication and that was the MAC address.  Now, the

1    MAC address, as we now know, was on the box that the

2    modem came in, it was on the bottom of the modem itself,

3    and apparently was all over the internet.  And, as we

4    now know, the MAC address is to modems what our license

5    plate is to our car or maybe our VIN number is to the

6    car, in other words, yeah, it's an identifier, but it's

7    an identifier that everybody knows about.  So the cable

8    company designed a modem which communicates with the

9    cable office using only something that everyone knows,

10   that's basically what we're told, and that was the

11   single means of verification of that.

12        Now, the government, in its opening statement,

13   suggested that getting a MAC is somehow illegitimate,

14   that, you know, getting a MAC is a bad thing, and what

15   they referred to it as was a "stolen account number."

16   So at the beginning of the case the government says to

17   you that what Harris did, the capability that he had in

18   his product, permitted access to a stolen account

19   number.  But it turns out it wasn't a stolen account

20   number.  Perhaps we should have someone look at Google

21   for its use of MACs in connection with its level of

22   service and with every other company that uses MACs for

23   internet service and for doing marketing.  MACs are

24   prevailing, they're available, they are in use.

25        In fact, Agent Russell talked about "sniffers"

1    that are commonly available, "Wire Shark" or "TCP Dunn,"

2    which were different ways that MACs could be obtained

3    using open source software, stuff that's out there, and

4    you could get a MAC from that.  It turns out that the

5    capability of sniffing a MAC is generally available,

6    it's open source, and as the agent said, "No, he's never

7    started an investigation to determine whether Wire Shark

8    had engaged in some kind of wire fraud."

9         When you consider all that we have learned, the

10   little we have learned from Motorola and from Charter,

11   there doesn't appear to be any response to anything that

12   Mr. Harris did, there doesn't seem to be a concern about

13   what he was doing or an identification of who it was who

14   was using the product and what the extent of the impact

15   was on Charter or even on Motorola in terms of its

16   development of the modems.

17        Now, when you consider the charges here, the ones

18   we pointed out earlier, all of them point to

19   Massachusetts, all of them indicate there's a link to

20   Massachusetts.  That's what's alleged.  And the reason

21   for that link is that the government has to show that

22   Mr. Harris's conduct was linked to Massachusetts, um, in

23   order to establish venue here, in other words, the right

24   to bring a charge in Massachusetts.  I mean, you can't

25   just haul him in here, you can't just bring a guy in

1     from California and pull him in here and have him answer

2     to a charge here unless there's some legitimate basis, a

3     count, a crime, something that makes it appropriate for

4     him to be charged here.

5          So the government now, in its charges, says the

6     connection between what Harris was doing in California

7     and what he was doing here was the conduct of

8     individuals in connection with the use of his product.

9     Right?  And the persons that we look to to get this

10    connection, because otherwise -- and the judge is going

11    to instruct you with respect to venue, but if you think

12    that the use of Massachusetts was a jury-rigged way of

13    pulling him into this court for charges in

14    Massachusetts, then you acquit him, as he ought to be

15    acquitted.

16         So in the charges here, we start with the first

17    four, and let's go through them now in a little bit more

18    detail.  These all rest on the accusations of Nathan

19    Hanshaw.

20         Nathan Hanshaw has a plea deal.  Forget the plea

21    deal, you can look at it and see him.  The measure of

22    Nathan Hanshaw is that he was a social engineer, he

23    lived by deception.  He penetrated into the inner

24    sanctum of important corporations, into their

25    confidential information, in order to steal.  And how

```
 1    did he do that?  He did it because he's good.  Nathan
 2    Hanshaw is a liar, he's a very good liar, and he's a
 3    skilled liar, and what he told you and admitted is he
 4    went to school on that, basically he would learn things
 5    so he could present himself in a way that would
 6    deceive.  And that's what he did, and that's how he got
 7    into Motorola, and that's how he got into Charter, and
 8    that's how he got into Roadrunner, and that's how he got
 9    into all of the sites that he got into, to get
10    information in order to steal, and that's quite apart
11    from the other stuff he was doing, the vicious, vicious
12    acts of calling in threats at schools, bomb threats.
13    But what you know about him is he's a social engineer
14    and social engineering is Counts 1, 2, 3 and 4.  Social
15    engineering.
16         He gets Sigma 1.3 and remember he couldn't
17    remember what the product was, and do you remember he
18    said, "I think so."  Do you remember when he was
19    testifying how some of the certainness of what you'd
20    expect from testimony kind of slipped away because
21    Hanshaw is a little bit on the elusive side of things.
22    So he said, "Well, I got 1.3 from the website," and then
23    later he said that he got every Sigma program from the
24    developers.  Well, which is it, did you get it from the
25    website or did you get it from the developers?
```

1             And then he said, in Count 2, the Isabella

2      Lindquist deceit, here he said that he had downloaded --

3      I'm sorry, he didn't download this, he had gotten this

4      from a different person, Christopher Watts, who had

5      given him a key.  Well, Christopher Watts is not TCNISO,

6      Christopher Watts didn't sell it to him, Christopher

7      Watts was doing something apart from anything TCNISO was

8      doing, and that's if you believe that this represents

9      the Christopher Watts activity, but if you believe it's

10     the Isabella Lindquist lie, then what he did was he

11     called Isabella Lindquist, convinced her that he had

12     some of the code, the raw code.

13             Now why do you need raw code?  I mean, if a

14     product has the capability, then you don't need to know

15     what its building blocks are, what its raw coding is.

16     If you're getting the raw code on a program, it's

17     because you've got something else in mind, and he did

18     have other things in mind, but he doesn't tell you what

19     they were.  But he wanted the code.  He didn't want the

20     product.

21             He didn't use the product.  How in the world are

22     Count 3 and Count 4 talking about its use?  He didn't

23     use the product.  He didn't want the product.  He wanted

24     the code.  And he got parts of the code from somebody

25     and then he went to Isabella Lindquist to try to

1    persuade her that because he had a substantial part of

2    it, she should give him the rest, and said:  "For a

3    $100, can you give me the rest?"  And Isabella Lindquist

4    did it, um, after she had left TCNISO, she did it while

5    talking to him on a private chat between her and him,

6    she agreed to pay -- or that she would give it to him in

7    exchange for the $100.  What on earth does that have to

8    do with Ryan Harris?  I mean, come on.

9         So she gives Hanshaw the code and when he gets the

10   code, what does he do with it?  He stiffs her.  He sends

11   her a payment, withholds the cash on it, and she ends up

12   getting nothing.  The social engineer.  The one who used

13   the confidence he had, the sure hand he had, in deceit

14   to get Isabella Lindquist to give up something that she

15   didn't want to give up.  What's that got to do with

16   Mr. Harris?

17        Nathan Hanshaw.  Nathan Hanshaw.  Nathan Hanshaw.

18   Nathan Hanshaw.  (Indicates.)  You don't need to give a

19   verdict, you've got to be saying, "You've got to be

20   kidding me?  You've got to be kidding me?"  And those

21   are the four charges of the eight, those are four to get

22   him here in Massachusetts.

23        Mr. Larosa.  Mr. Larosa came in and testified that

24   he never contacted Mr. Harris.  No communication.  What

25   is the thing that Mr. Larosa was going to do with the

1    capability of the product that he bought?  What was he

2    going to do and how was he going to do it and what was

3    he going to do it with?  We don't have answers to any of

4    that because there's no testimony about that.

5         So Mr. Larosa tries to get a product, the

6    government says, "Well, you see, it doesn't really

7    matter, you see, because it's the one-trick pony thing,

8    if it's only good for one thing, then it doesn't matter

9    how anybody would have used it."  Well, here how did

10   Mr. Larosa use it?  Who did he use it with?  We're told

11   that Mr. Larosa was using the internet, he was WIFIing

12   off his neighbor, but we don't know who the provider was

13   for Mr. Larosa.  And do you know what else?

14        Charter came in here and testified, do you

15   remember, and do you know what Charter never said?  It

16   never said, "Do you know something?  We looked at Nathan

17   Hanshaw to find out what his use was and we have proof

18   that he used our internet and this is how he did it."

19   Not only that, but they never said that his address was

20   served by Charter.  The Charter guy came in and as far

21   as he was concerned, you know, he had nothing to do with

22   Mr. Hanshaw.

23        Well, what about Mr. Larosa?  Who came in and

24   said, "This guy got a thimble full" -- and maybe that's

25   not the measure, "of broad band," "an iota," and maybe

1    that's not the one either, but anything of value that

2    constituted -- what's the word?  "Wire fraud."  Not

3    anything.  Did any cable company come in and say there's

4    any verification that Mr. Larosa got anything at any

5    time from anybody?  Nothing.  Nothing.

6         So we have Mr. Madeira and we know that

7    Mr. Madeira's testimony was that Mr. Madeira gets a

8    product and he plugs it in.  He doesn't change the MAC

9    address.  He doesn't try to get the configuration file.

10   We know that he's a customer of somebody, but the

11   somebody didn't come in to testify, so we don't know who

12   the somebody is.  He was paying for service and he

13   testified that he thought his service increased when he

14   plugged this thing in, but what he never told us is how

15   did he plug it in to make a difference?  Did he daisy-

16   chain these things?  Did he split them out?  How did he

17   get separate service?  Did he take one off and put the

18   other one on?  We have no idea what he did.  He said,

19   "Well, I think we got more service."  The government

20   says, "8 plus 8, my God, so bring the cable company in."

21        If I use my gas service, I have a meter that says

22   I used something, some thermal unit.  Something.  The

23   cable company didn't come in and say to you that it's

24   possible to measure that, it's not possible to measure

25   that, or "Oh, by the way, we had a dead line going into

1    this apartment, he must have gotten it from somewhere

2    else" or "We had a live wire that came in and this is

3    what the capability was."

4         We don't know anything about this guy or this guy

5    (Indicates.) What was their service?  What were they

6    getting?  Who gave it to them?  Did they use it?  He's

7    here because of this, "wire fraud."  This is the whole

8    thing.  This is the whole case.  So when you think about

9    it, you say, "I know they're mad.  They don't like us,"

10   you sit here and you say, "I find it distasteful,

11   dishonest, repugnant.  I'm disgusted that somebody could

12   create something that creates the capability that

13   permits people to steal."  Well, that's not what we're

14   here for, we're here because something either is or is

15   not a crime.  And he --

16        Is there a crime that says that he hacked the

17   modem?  No.  That he broke into the confidential

18   copyrighted materials of Motorola?  No.  Is there

19   anything that makes what he did a crime?  No.  We back-

20   doored it to drag him here, to Massachusetts, for this

21   or this (Indicates.)  How about that?  And we don't know

22   that a nickel was lost by any cable company because no

23   cable company came in and said, "I lost a nickel."

24        Isabella Lindquist came in and she got quiet and

25   she testified about what she had done to create Sigma

1    and it turns out she's a remarkable young woman.

2            THE COURT:  Mr. McGinty, you're going to have

3    to keep your voice up.

4            MR. McGINTY:  Sorry.

5        She's a remarkable young woman.  She has a

6    fascination with identity software.  Identity software,

7    as I understand it, is the firmware that controls

8    specific appliances for specific kinds of uses.  It's a

9    very idiosyncratic kind of expertise.  And she took

10   apart and created the capability, the MAC changer.  She

11   was here, Isabella Lindquist, she was on the stand.

12       If she was sitting there, would you convict

13   Isabella Lindquist?  Would you?

14           MR. BOOKBINDER:  Objection.

15           THE COURT:  Here, I can't hear what you're

16   saying, which is part of the problem.  So move the

17   lectern back a little bit and --

18           (Moves lectern back.)

19           MR. McGINTY:  Isabella Lindquist talked about

20   --

21           THE COURT:  I'm sorry, I want to rule on the

22   objection.  The objection was to:  "Isabella Lindquist

23   was on the stand.  If she was sitting there, would you

24   convict Isabella Lindquist?"

25       Well, I'll instruct the jury on that later, how to

 1    take into account the evidence regarding the other

 2    witnesses.  So the objection is overruled.  And I'll

 3    address it later.

 4           MR. McGINTY:  When you look at the back of

 5    Harris's book, and you'll see his name in the book, and

 6    you'll see a picture of him, you know something?  It

 7    really does look like him.  And it also has his wife,

 8    who was then his fiance, her picture is there as well.

 9    Both of them.

10           In the book it says:  "(1) the practice of

11    modifying a cable modem violates service agreements."

12    That makes sense, right?  Service agreements are your

13    beef with the cable company, whether it likes what you

14    did or didn't do.  And hackers risk being banned for

15    life by service providers.  This is all found in the

16    back of the book, right?  You're banned for life by the

17    service provider who says, "You know something?  You're

18    my customer, and I don't like what you do," and you cut

19    the guy off.

20           So messing with the cable companies, doing the

21    things that the government finds so repugnant here,

22    yeah, the cable companies can say, "I don't like that,"

23    and they can cut off your service and send you back to

24    the bad old days of dial-up.  What is that, 26 or 58, 56

25    or 20 -- or 28 and 56, waiting hours for your screen to

1    come on, that's where they can send you.  Instead he

2    faces inexplicable charges, unsupported by evidence,

3    with the Massachusetts link to drag him here and make

4    him answerable in this Commonwealth.

5         At the end of his book, Chapter 23, he had written

6    about -- a chapter called "Securing the Future," and

7    "Securing the Future" was the advice to cable companies

8    about what they could do to address their security

9    problems, because he was providing a function, including

10   telling them what they can do to change things.  In

11   writing that book, he had a well-known publisher and the

12   publisher has a little legend on there, it's called "The

13   Best of Geek Entertainment," and they view themselves as

14   providing expert analysis and information to the world

15   of geeks, you know, people who like to pull things

16   apart, people who may be different from you and me, but

17   people who wanted to find out what makes things tick.

18   And he wrote that book including telling the cable

19   companies what they could do.  What he didn't know was

20   that writing that book would make him a target, it would

21   elevate his profile, and would put him in the cross-

22   hairs of accusation.

23        Now, a jury.  A jury stands between an accusing

24   government and an individual.  You, as a jury, stand

25   between an accusing government and Mr. Harris.  Your

1    responsibility is to evaluate the evidence, your

2    responsibility is to do justice, and it's to size up

3    whether that government, in its effort to bring this

4    criminal charge, had created -- or strike that, had

5    overreached in a way that was intended to bring

6    Mr. Harris to Massachusetts to answer for a charge for

7    which there was no evidentiary support.  Your job is to

8    evaluate him, to listen to the evidence, yes, to

9    evaluate the evidence, and then to do justice to ensure

10   that your verdict does justice to Mr. Harris.

11        So I'm going to ask you to consider all that I've

12   said here and think about it and evaluate whether under

13   all those circumstances you ought not return a verdict

14   of not guilty against Ryan Harris on all of the charges

15   that the government has brought.

16        Thank you very much.

17             THE COURT:  May I see counsel briefly at

18   sidebar.

19

20             AT THE SIDEBAR

21             THE COURT:  All right.  Before we go to the

22   rebuttal, it may be prudent for me to give you this

23   cautionary note.

24        Mr. McGinty said, a number of times, you know,

25   what Mr. -- what Mr. Harris did was repugnant to the

```
 1    government and I hope he's not going to provoke you into
 2    saying things that are impermissible, like that you or
 3    he are personalizing this too much.  This is not a
 4    question of what Mr. Bookbinder or Ms. Sedky think about
 5    Mr. Harris, it's a question about whether he committed
 6    wire fraud.  So that's not what this is about.  So be
 7    sure to not be vouching for witnesses or saying what you
 8    do believe or don't believe.  That's not what this is
 9    about.

10

11             (In open court.)

12             THE COURT:  As I said earlier, because the
13    government has the burden of proof, it gets to argue
14    first and then, relatively briefly, last.

15        Would the government like to offer a rebuttal?

16             MS. SEDKY:  We would, your Honor.

17

18    REBUTTAL ARGUMENT BY MS. SEDKY:

19        Good afternoon, again.  Mr. McGinty said a lot of
20    things to you in the last 45 minutes and I'd like to
21    divide them into two.

22        First, he sort of attacked each of our
23    Massachusetts users and talked about what we haven't
24    proved about all of the nitty-gritty specifics about
25    which ISPs that he used, and where did they live, and
```

1    what were their names, and what were the direct

2    communications that they had with Mr. Harris.  Well, the

3    judge will instruct you about what you need to find

4    beyond a reasonable doubt in order to convict Mr. Harris

5    of wire fraud, and we expect that what the judge will

6    instruct you is that Mr. Harris does not have to have

7    any intent or any personalized --

8                MR. McGINTY:  Objection.

9                THE COURT:  Overruled.

10               MS. SEDKY:  -- any personalized knowledge

11   about the specific wires alleged in each count.  He

12   doesn't have to know.  He has to reasonably foresee that

13   the wires -- not a specific wire, that the wires, as an

14   instrumentality, will be used in furtherance of his

15   fraud scheme.  That is it.

16       So all of this -- all of -- you may remember in

17   Mr. McGinty's opening he talked about "dissipating the

18   mist," "getting rid of the noise," and really bearing

19   down to the basics here.  Well, let's do that, let's

20   dissipate the mist and get rid of the noise and talk

21   about what we actually will prove, have proven, and need

22   to prove in order to convict Mr. Harris of these eight

23   counts of wire fraud.  And you will see that we do not

24   have to prove that Mr. Harris committed the wires

25   himself, that he was at the computer pushing the

1    buttons.  That's not required.  Someone else can push

2    the buttons, cause the wire, and if it is reasonably

3    foreseeable that the use of the wires as an

4    instrumentality was part and parcel and in furtherance

5    of his wire scheme, then you may convict him of

6    committing wire fraud.

7         Now, Mr. McGinty talked a lot about the one-trick

8    pony, the one-trick pony fiction, that this device that

9    Mr. Harris devised actually has all of these benign

10   uses, and I'd like to -- earlier in my opening I talked

11   to you about what is this case not about, and I think I

12   used a screwdriver analogy.  And I said, "You know, this

13   case is not about a guy who made a harmless device like

14   a screwdriver and then found out later that some guy

15   bought the screwdriver and used it to rob a bank."  That

16   is not what this case is about.

17        Now, Mr. McGinty has argued that that's what this

18   case is about and this is all about -- about what does

19   he call it? "product potential," "product capability,"

20   and then those bad, bad users who are independently, on

21   their own, taking control and using these for bad

22   purposes.  That's not what this case is about.  This

23   case is about intentional product design and intended

24   use.  These individuals, Nathan Hanshaw, Jose Larosa,

25   William Madeira, they used these products exactly how

```
 1   Mr. Harris wanted them to use it and intended them to
 2   use it, to steal service.
 3        So let's talk about some of these phantom uses.  A
 4   diagnostic tool.  There's no evidence that a single
 5   purchaser of this theft kit used it as a diagnostic
 6   tool.  There's no evidence of it.  Not one user.  15,000
 7   product purchasers, 15,000 transactions, no evidence of
 8   a single one using it as a diagnostic tool.
 9             MR. McGINTY:  Objection.
10             MS. SEDKY:  And let's assume --
11             THE COURT:  No, excuse me.  I've got to rule
12   on the objection.
13             MS. SEDKY:  Sorry.
14             THE COURT:  Ladies and gentlemen, you can --
15   you have to understand two things I'm going to explain
16   to you in detail again in my instructions.  One, the
17   defendant has no obligation to present any evidence, but
18   you can consider, um, generally in the case all of the
19   evidence that there is.  But the defendant has no
20   obligation to produce any evidence himself.
21        Go ahead.
22             MS. SEDKY:  15,000 users.  Now, diagnostic
23   tools, as you've heard, those are for ISPs to diagnose
24   network problems.  15,000 IPSs?  That doesn't make
25   sense.  Mr. Phillips testified that not a single user
```

1   bought this as a diagnostic tool.  Not a single one.

2        What about a stock modems?  "Oh, yeah, we're just

3   selling stock modems."  Mr. Phillips testified that to

4   his knowledge not a single person purchased this as a

5   stock, vanilla, garden-variety modem.  It was a cover.

6   They had them on the website to throw people off, to try

7   to legitimize the public portion of their website.  That

8   is the evidence.

9        And what about CoaxThief, why do you need to sniff

10  MAC addresses for a diagnostic tool?  Why do you need to

11  swap MAC addresses for a diagnostic tool?  How does that

12  help you diagnose network problems?  How does that help

13  you get rid of filters?  How does that help you change

14  your packet size?  Let's look at this theft kit,

15  CoaxThief, a MAC sniffer, MAC swapping on the website, a

16  MAC changer, a config changer, you take them all

17  together, they were all packaged in one kit.  What's the

18  reason?  The experts told you, to steal service.

19       And even if there were some evidence that maybe

20  there were, out of the 15,000 users, somebody who did

21  use it to tinker with or diagnose their network

22  problems, it doesn't matter.  What matters is

23  Mr. Harris's intent.  Did that man participate in a

24  scheme to defraud the cable company?

25       And let's talk about Isabella Lindquist.  She's

1   the tinkerer.  And what did she tell you?  What did she
2   tell you?  Mr. Harris, back in 2002, when he first
3   approached her, he asked her to do one thing for him,
4   program a MAC changer.  He didn't ask her to make him a
5   diagnostic tool.  And then he asked her -- he was
6   breathing down her neck to create one work-around after
7   another work-around after another work-around, not to
8   add diagnostic functions so that all of these tinkerers
9   and diagnosticians can use the product better, but to
10  steal service, to defeat the ISPs' security measures.
11  That's what was going on in Mr. Harris's mind.
12       And you saw his e-mail -- you saw his e-mail:
13  "10,000 users, going to teach them how to steal
14  service."  That's what's going on in his mind.  He's
15  stealing service himself.  He's bragging to his other
16  people about having a 100 percent or almost 100 percent
17  success rate, about cracking these security measures,
18  that's what's going on in his mind.
19       And so this is not a diagnostic tool and it's not
20  a geek tinkerer play-thing.  That is not the evidence
21  here.  People were paying $100 for a $20 refurbished
22  modem that had already been tinkered with, extensively.
23  So if you're a tinkerer, why pay $100 for a $20 modem
24  just to pull it apart?  It makes no sense.  And why do
25  you need a MAC sniffer?  Why do you need a MAC changer?

1    Why do you need a config changer?  Why do you need a
2    website dedicated to -- that has portions in it about
3    changing or swapping people's MAC addresses?  What in
4    the world does that have to do with tinkering and play-
5    things?  Nothing.
6        Lindquist told you what this about.  He asked
7    her to program a MAC changer.  He directed her to create
8    constant work-arounds, staying up all night working
9    around the clock to work around the ISPs' security
10   measures, because he was sharpening the tools in his
11   tool kit, because he wanted them to work.
12       And this is not about freedom fighters.  This is
13   not about a privacy tool.  It's a little ironic for me
14   that someone who is now cloaking themselves in the veil
15   of "privacy protector" devised a program that he called
16   "CoaxThief" to let people eavesdrop on their neighbor's
17   internet connection.  That is an ironic use of the
18   privacy connection here.
19       And this is not about 15,000 Rwandan or Egyptian
20   freedom fighters who are out there trying to engage in
21   political speech.  As you heard from Mr. Russell, there
22   are lots of much cheaper and easier and more convenient
23   ways to get anonymous political speech.  And, by the
24   way, this wasn't anonymous, this was finger-pointing,
25   this was blaming your neighbor or whoever's MAC address

1    it was across the town and pretending that they were

2    you.

3         And Mr. McGinty has come up with a lot of -- a lot

4    of potential, a lot of conceivable uses, if you really

5    get creative and you really pick apart one little

6    feature and another little feature and say, "This is

7    benign," and "That's benign."  Well, what we need to

8    prove to you and what we believe the evidence has proven

9    to you is that Ryan Harris, beyond a reasonable doubt,

10   engaged in a scheme to defraud the cable companies and

11   that the use of the wires was a reasonably foreseeable

12   action in furtherance of that scheme.

13        Now, we don't have to prove that there was no

14   conceivable doubt, that no matter how you twist and turn

15   and look at the evidence there can be no possible doubt

16   that somebody might use these products in a benign way

17   or that Mr. Harris didn't have the intent to defraud the

18   cable company, we have to prove beyond a reasonable

19   doubt, that is the legal standard, and it is a high one,

20   we are well aware of that, that it is a very serious

21   burden, and we have met it.

22        In short, this case is not about screwdrivers and

23   it's not about books, it's not about Mr. Harris's book,

24   this is about a comprehensive soup-to-nut theft kit.

25   It's got a screwdriver, it's got a schematic to the bank

1    -- to the inside of the bank in it, it's got a mask that

2    you can wear, "Stealth Mode," to cloak yourself, it's

3    got a code to disable the bank's security cameras, it's

4    got a key to the front door, it's got a website that

5    posts the bank combinations on it -- and, by the way, if

6    the bank combinations change six months from now or a

7    year from now, they're going to go to the website and

8    update the bank combination to make sure that you go

9    right back there and you get the brand new combination

10   to walk right in that bank.  That's what this case is

11   about.

12        And I would submit to you that the government has

13   proven beyond a reasonable doubt that by concocting this

14   entire scheme to defraud the cable companies and using

15   the wires in furtherance of those schemes and causing

16   these eight wires to be transmitted in furtherance of

17   his scheme, the defendant has committed wire fraud and

18   is guilty of every one of those counts beyond a

19   reasonable doubt.

20        Thank you.

21        THE COURT:  Okay.  Ladies and gentlemen, that

22   concludes the closing arguments.

23        Based on what I've heard, I've got to do a little

24   fine-tuning on the instructions and I said I would give

25   you a break after the arguments, so we'll take about,

1   say, 15 minutes, to 1:45 -- oh, 2:45.

2           (Laughter.)

3           THE COURT:  It's been a long day and night.

4   Until 2:45.

5       So go back, continue to resist talking about the

6   case and when you come back the instructions will be in

7   three parts, one that relate to jurors in a criminal

8   case generally, one on the questions that you need to

9   focus on and the standards in answering them, and third,

10  on the process of your deliberations.

11      So look out the window, see if it's snowing, but

12  -- it is.  But we'll get you out of here, um, today.

13  But don't talk about the case yet.  Okay?

14      The Court is in recess for the jury.

15          (Jury leaves, 2:30 p.m.)

16          THE COURT:  Okay.  Three things, quickly, I

17  trust, about my instructions.

18      Mr. McGinty said I should instruct on venue.

19  Actually I don't intend to do that because the

20  conspiracy count is out.  If they prove -- um, there

21  would be venue for any of these counts if the wire came

22  from Massachusetts, which is what's charged, and facts

23  relating to venue only need to be proven by a

24  preponderance of the evidence.  We were talking about

25  this, I think, back in December, that it would

1    hopelessly confuse things.  But in order to find the

2    defendant guilty beyond a reasonable doubt of any of

3    these charges, they have find facts, as I understand it,

4    that establish venue in Massachusetts, in the District

5    of Massachusetts.

6        Second, I don't at present intend to give the

7    consciousness of guilt instruction.  You argued it, but,

8    um, I've got enough other things to instruct on.  And,

9    um, I have added the following line to my instructions

10   in response to the requests this morning by the

11   defendant for a supplemental instruction.  I propose to

12   say:

13       "It would not be enough to prove wire fraud for

14   the government to prove only that Harris sold one or

15   more products that he knew would be used to commit a

16   crime.  However, the nature of any product sold and any

17   knowledge Harris had as to how it would be used are

18   evidence that you can consider, along with all the other

19   evidence, in deciding whether the government has proven

20   any or all of the wire charges in this case."

21       Any comment on that?  That's essentially what I

22   told you I was inclined to say this morning.

23           MR. McGINTY:  May we have a minute, your

24   Honor?

25           (Pause.)

1            MR. McGINTY:  Fine, your Honor.  Thank you.

2            THE COURT:  Anything from the government?

3            MS. SEDKY:  Nothing further, your Honor.

4            THE COURT:  All right.  So you'll move the

5      easel and be back in 10 minutes.

6                 (Recess, 2:35 p.m.)

7                 (Resumed, 2:50 p.m.)

8            THE COURT:  We'll make the current version of

9      the superseding indictment an exhibit and we'll get the

10     jury.

11                (Jury enters, 2:50 p.m.)

12           THE COURT:  All right.  Ladies and gentlemen,

13     now I am going to give you your instructions.  As I

14     said, I'm going to give them to you in three parts.  The

15     first part would be instructions that would apply in any

16     criminal case like this one.  The second part will be

17     specific to the wire fraud charges that you'll need to

18     decide.  And the third part will relate to the process

19     of your deliberations.

20           With regard to the first part, the instructions

21     that would apply in any criminal case.  While the law

22     permits me to comment on the evidence, I choose not to

23     do that.  As I told you at the beginning of the case,

24     you should not interpret, or to be more precise,

25     misinterpret anything that I've said and done in the

course of the case or anything that I say to you now as
an indication of what I think your verdict should be.
That's entirely up to you.

You must decide whether the government has proven
the defendant guilty beyond a reasonable doubt on each
particular charge.  You'll make that decision based on
the evidence and the law as I instruct you.  You have to
know the law, and it's my duty to teach you the law.

I've discussed what I was going to instruct as my
thoughts have evolved with the lawyers in the course of
the case, but if anything they've said about the law
sounds different to you than what I'm saying now, you
have to follow the law as I'm describing it now.  And
similarly, if anything I've said to you in my brief
preliminary instructions at the beginning of the case
sounds different to you than what I'm telling you about
the law now, you must follow the law as I'm describing
it to you today.

I've worked to try to develop an accurate,
complete and balanced description of the law.  You
should not single out any one instruction or sentence,
but consider each of the things I say to you in the
context of the others.

You are required, by the oath that you've taken,
to follow the law whether you understand the reasons for

1    it or agree with it.  As I said, you took an oath.  If

2    the government doesn't prove every essential element

3    beyond a reasonable doubt, you must find the defendant

4    not guilty on a particular charge.  If you find the

5    government has proven every element of a charge beyond a

6    reasonable doubt, you must find the defendant guilty on

7    that charge.  And I'm going to explain the elements of

8    wire fraud to you.

9         You are required to decide whether the defendant

10   has been proven guilty beyond a reasonable doubt.  You

11   should understand, however, and remember that if the

12   defendant is convicted, if he's found guilty, the issue

13   of punishment is solely for the Court, for the judge.

14   It would be improper for you, the jury, to consider or

15   be influenced by what the possible punishment might be.

16        You've heard me say repeatedly that you must

17   decide the case based on the law and the evidence and

18   that means, among other things, that you must disregard

19   any possible bias or prejudice or sympathy that you may

20   have.  Both the defendant and the public expect that you

21   will carefully and impartially consider all the evidence

22   in this case, follow the law as I describe it, and reach

23   a just verdict regardless of consequences.

24        As I've told you before, there are certain

25   fundamental principles that apply in every criminal case

     1    like this one.  First among them is that the defendant,

     2    Mr. Harris, is presumed innocent.  You'll have the

     3    indictment in the jury room.  You must remember that

     4    that indictment is only an accusation, it's a way of

     5    informing the defendant of the charges against him and

     6    bringing him to court for this trial.  It is not itself

     7    evidence or any proof that he's guilty of any charge.

     8    In order for you to find the defendant guilty of a

     9    charge, the government must prove his guilt on that

    10    charge beyond a reasonable doubt.

    11        The defendant has no obligation to prove his

    12    innocence, he has no obligation to present testimony, he

    13    has no obligation to testify himself.  Where as here the

    14    defendant has chosen not to testify, you may not

    15    consider that as an indication that he is guilty.  You

    16    should not discuss or consider that at all.

    17        Now I've said repeatedly that the burden is on the

    18    government to prove beyond a reasonable doubt that the

    19    defendant is guilty of the charge raised against him.

    20    I'm now going to tell you what reasonable doubt means.

    21        The burden of proof has nothing to do with who

    22    called the witness or offered documents into evidence,

    23    It has to do with the quality of the evidence.  Proof

    24    beyond a reasonable doubt is a strict and heavy burden,

    25    but it does not mean that a defendant's guilt must be

1    proved beyond all possible doubt.  It does require that

2    the evidence exclude any reasonable doubt concerning the

3    defendant's guilt.

4         A reasonable doubt may arise not only from the

5    evidence produced, but also from the lack of evidence

6    produced by the government.  Reasonable doubt exists

7    when after weighing and considering all the evidence,

8    using reason and common sense, jurors cannot say that

9    they have a settled conviction of the truth of the

10   charge.

11        Of course a defendant is never to be convicted on

12   suspicion or guesswork.  If, for example, you view the

13   evidence in the case as reasonably permitting either of

14   two conclusions, one that the defendant is guilty as

15   charged and the other that the defendant is not guilty,

16   you will find the defendant not guilty.  It is not

17   sufficient for the government to establish a

18   probability, though a strong one, that an element of the

19   offense charged or a fact necessary to prove an offense

20   charged is more likely to be true than not true.  That

21   is not enough to meet the burden of proof beyond a

22   reasonable doubt.  On the other hand, there are very few

23   things in this world that we know with absolute

24   certainty and in criminal cases the law does not require

25   proof that overcomes every possible doubt.

1    So concluding my instructions on the burden then,

2    I instruct you that what the government must do to meet

3    its heavy burden is to establish the truth of each part

4    of each offense charged by proof that convinces you and

5    leaves you with no reasonable doubt and therefore

6    satisfies you that you can, consistent with your oath as

7    jurors, base your verdict upon it.  If you find a

8    particular charge against the defendant has been proven

9    beyond a reasonable doubt, you will return a verdict of

10   guilty on that charge.  If on the other hand you think

11   there is a reasonable doubt about whether a defendant is

12   guilty of a particular offense, you must give the

13   defendant the benefit of the doubt and find the

14   defendant not guilty of the offense.

15       Now I have said that you have to decide the facts

16   based on the evidence.  The evidence has come to you in

17   three forms.  As I predicted, in the form of testimony,

18   in the form of exhibits that have been admitted into

19   evidence and which you'll have in the jury room, and in

20   the form of stipulated facts, facts that the parties

21   agree are true and you may accept as true.  As the jury

22   you're the judges of the facts, you decide if the facts

23   are proven, you decide what inferences to draw from

24   those facts, you decide the credibility of the evidence

25   that's been presented.

1          With regard to all of the evidence, you can

2    accept -- with regard to each piece of evidence, you can

3    -- or each witness's testimony, you can accept all of

4    it, you can disbelieve it and reject all of it, or you

5    can believe part of it and disbelieve another part of

6    it.  And once you decide what's true, you decide what

7    weight to give to that evidence.

8          In considering the evidence, you may draw

9    reasonable inferences from the facts proven.  I told you

10   before that you need to put aside any possible bias,

11   sympathy or prejudice you may have, but you're not to

12   put aside your common sense.  You're expected to bring

13   together your common sense and serve somewhat as the

14   common sense of the community in this case.

15         Facts can be proven by both direct and

16   circumstantial evidence.  Direct evidence is the

17   testimony of someone who asserts actual knowledge of the

18   facts, someone who says "I was there, this is what I saw

19   and this is what I heard."  Circumstantial evidence is

20   proof of events or circumstances on the basis of which

21   you, based on your common experience, may infer the

22   existence or nonexistence of a fact.

23         And looking out the window I think it's timely to

24   remind you of the example I gave you at the beginning of

25   the case to explain what circumstantial evidence is, and

1    I'll elaborate it a bit.  Because remember I told you

2    that while circumstantial evidence may sound like some

3    complicated legal concept, it's really something you do,

4    reasoning by circumstantial evidence, every day.

5         So if you were to go to sleep tonight and the

6    ground were green in front of your home and you woke up

7    tomorrow morning and there was 6 inches of snow there,

8    you would infer that during the night while you were

9    sleeping it snowed, although you didn't see it and

10   nobody told you that.  And if you looked out into the

11   snow and saw there were footsteps leading to your front

12   door, you would infer that during the night, while you

13   were sleeping, after it snowed, somebody walked to your

14   front door.  And if the newspaper was at the end of the

15   footsteps, you would infer that during the night, while

16   you were sleeping, after it snowed, somebody delivered

17   the newspaper.  That's reasoning from circumstantial

18   evidence.

19        Direct and circumstantial evidence have equal

20   standing in the law, you decide what weight to give to

21   each.  No greater certainty is required of

22   circumstantial evidence than of direct evidence.  You

23   should consider all of the evidence and give each item

24   the weight you think it deserves.

25        Certain things are not evidence.  Anything you saw

1    or heard outside the railing there in this courtroom is

2    not evidence and you should disregard it.  If an answer

3    was given to a question and I later said that it was

4    inadmissible and directed you to disregard it, you

5    should disregard the answer.  If I allowed any evidence

6    in for only a limited purpose, you should use it only

7    for that limited purpose.

8         As I've told you several times, anything the

9    lawyers say is not evidence.  Their opening statements,

10   their questions, their closing arguments is not evidence

11   -- are not evidence.  And if in these closings that we

12   just heard the lawyer's memory of the evidence differs

13   from yours, individually and collectively, then you

14   should rely on your memory of the evidence rather than

15   what the lawyers said.

16        In the course of the case, as in every trial there

17   have been some objections, but actually not that many

18   while you've been sitting there, and it's proper, as I

19   told you, for a party to object.  It provides me an

20   opportunity to decide whether the information at issue

21   is sufficient, relevant -- sufficiently relevant and

22   reliable to come to your attention under the rules of

23   evidence.

24        You shouldn't draw any inferences or conclusions

25   from the objections or my rulings.  If I sustain the

1    objection, you should -- if I sustain the objection, you

2    should disregard any answer that might have been given.

3    If I overrule the objection, you should treat the answer

4    like any other answer.  And as I said, if I gave any

5    limiting instruction, you should use the testimony only

6    for that limited purpose.

7         I told you in my preliminary instructions that

8    when we got to this point, since you're going to have to

9    judge the credibility, the believability of some

10   evidence of the witnesses, I would give you sort of a

11   common-sense checklist of things that you might want to

12   think about in judging credibility or believability.

13        You should treat the testimony of a law

14   enforcement officer like the testimony of anybody else

15   and not assume that he's more likely or less likely to

16   be telling the truth because he's employed in law

17   enforcement.

18        With regard to all the witnesses, you may want to

19   ask yourself did he or she seem honest?  Is what the

20   witness said reasonable?  Did it make sense?  Did the

21   witness have a reason not to tell the truth?  Did the

22   witness have a personal interest in the outcome of the

23   case?  Did the witness have a relationship to either

24   side of the case?  Did the witness have a reason to be

25   prejudiced against or hostile to any party?  Will the

witness be affected by the verdict?  Did the witness

seem to have a good memory?  Did the witness have a good

opportunity to observe what he or she testified to?  Did

the witness answer the questions directly or not?  Did

the witness's testimony differ from the testimony of

other witnesses?  Was that testimony supported or

contradicted by other evidence in the case?

Inconsistencies between two witnesses, or several

witnesses, and inconsistencies in two statements by the

same witness may or may not bear on credibility.

Sometimes they're just innocent differences in

perception and memory.  It's also possible that

somebody's contriving or making up their testimony.  So

in judging any inconsistencies you may want to consider

whether the witness had a motive to lie, did the

inconsistency concern an important matter or an

unimportant detail, did it seem to be an innocent error

or an intentional lie?

You heard some testimony that witnesses made

statements before trial.  You can consider those

statements made before trial in deciding whether to

believe the trial testimony you heard from any witness.

You can decide if the prior statement was inconsistent

with the trial testimony, and if so, decide whether it

affects the believability of the testimony you heard at

1    trial.  If the prior statement was under oath, you may

2    consider it for the truth of the matter discussed

3    previously under oath and for the credibility of the

4    trial testimony and any evidence you heard or statements

5    that the defendant made before the trial you may

6    consider for the truth of what you find was said.

7         Now, you heard the testimony of some witnesses who

8    were given immunity by court order or by an agreement

9    with the government.  Those agreements in the court

10   order provide that no testimony given by the witness

11   will be used against him or her, directly or indirectly,

12   except in a prosecution for perjury or if he or she

13   testifies falsely.

14        You're instructed that the government's entitled

15   to present the testimony of an immunized witness.  Some

16   people who are given immunity are entirely truthful when

17   testifying.  However, the testimony of such a witness

18   should be examined by you with greater care than the

19   testimony of an ordinary witness.  You should scrutinize

20   it closely because such a witness may have a motive to

21   falsify by making up stories or exaggerating what others

22   did because he or she wants to avoid getting

23   prosecuted.  As with all the evidence, in deciding

24   whether some or all of the testimony of a witness with

25   immunity was truthful, you should consider, among other

 1    things, whether it was contradicted or corroborated,

 2    supported, by other evidence in the case.  As I said,

 3    you should scrutinize the testimony of an immunized

 4    witness with great care and rely on it with caution.  If

 5    after doing so you find some or all of his testimony to

 6    be true, you should give it such weight as you believe

 7    it deserves.

 8         You also heard some testimony that some of the

 9    witnesses met before or during the trial with the

10    government lawyers.  It's permissible for the

11    government, and indeed any lawyer, to discuss testimony

12    with a prospective witness.  However, you can consider

13    those meetings in evaluating the testimony you heard and

14    deciding whether the witness was biased or influenced by

15    discussions with the lawyers.

16         You also heard testimony from some witnesses who

17    were allowed to give opinions and explain things not

18    specific to this case, relevant, but not specific to

19    this case, but based on a particular experience or

20    expertise that they have.  And they were allowed to give

21    that evidence to help you, the jury, but not to replace

22    your judgment.  So with regard to the people who

23    testified as experts, you should consider their training

24    and experience, you should consider the reasons for the

25    opinions or explanations they gave you and the facts on

1    which the witness relied.  If any of the facts on which

2    the witness relied are not proven, you should disregard

3    any opinion to the extent it's based on unproven facts.

4    And with experts, like any witness, you can accept or

5    reject opinions in whole or in part.

6         So that completes the first part of my

7    instructions, those that apply in a criminal case.  Now

8    I'm going to give you the instructions that apply to the

9    particular charges in this case.

10        There are now eight charges of wire fraud for you

11   to decide.  You're not being asked to decide whether the

12   government has proven Count 1, the conspiracy charge

13   that was read to you at the beginning of the trial and

14   that charge has been removed from the indictment with a

15   superseding indictment that you'll have in the jury

16   room.  Now it's shorter.

17        As I've told you, the indictment is only an

18   accusation, it's not evidence or proof that a defendant

19   is guilty of any or all of the wire charges.  The

20   defendant has pled not guilty, therefore the government

21   must prove he's guilty beyond a reasonable doubt to

22   achieve his conviction on a particular charge.

23        Each count alleges a separate crime and you should

24   decide and consider each count separately and return a

25   separate verdict for each.  Unless I gave you a limiting

 1   instruction in the course of the trial, you may consider
 2   all of the evidence in deciding each count.  And if I
 3   did give you a limiting instruction, you have to follow
 4   it.  As to each separate charge you must determine
 5   whether the government has proven the defendant guilty
 6   beyond a reasonable doubt.
 7        Evidence provided by or concerning other people
 8   may be considered by you.  However, the fact that
 9   another person pled guilty to committing some other
10   crime himself is not evidence or proof that Mr. Harris
11   is guilty of any of the wire fraud charges in this
12   case.  Your verdict should be based solely on the
13   evidence or lack of evidence concerning Mr. Harris, and
14   in accordance with my instructions, and without regard
15   to the guilty pleas of others.  So that means you can
16   consider the testimony of others, but the fact, as I
17   said, that some of the witnesses pled guilty to
18   something, is not itself, the guilty pleas themselves
19   are not evidence that Mr. Harris is guilty of the
20   charges in this case.
21        Depending on your view of the evidence, you may
22   find Mr. Harris not guilty on all eight charges, you may
23   find him guilty on some of the charges and not on other
24   charges, or you may find him guilty on all of the
25   charges.  That depends on your view of the evidence.

1          You'll see the indictment charges that certain

2     alleged crimes were committed on or about certain

3     dates.  Although it's not necessary for the government

4     to prove beyond a reasonable doubt that the crimes were

5     committed on a particular day, it does have to prove

6     that the crime was committed at a time reasonably near

7     the dates alleged in the indictment.

8          Now, as I've said, each of the remaining counts

9     charges Mr. Harris with committing wire fraud.  And so

10    the charging language begins in Paragraph 2, which is on

11    the first page of the indictment you'll have in the jury

12    room, and it says:  "On or about the dates set forth

13    below, in the District of Massachusetts and elsewhere,

14    Ryan Harris, having knowingly devised a scheme to

15    defraud and to obtain money and property by means of

16    false" -- I'm sorry, "by means of material false and

17    fraudulent pretenses, representations and promises,

18    transmitted and caused to be transmitted in interstate

19    commerce wire communications, including writings,

20    signals and sounds, for the purpose of executing the

21    scheme to defraud and aided and abetted others in doing

22    so as set forth below."

23         So then Count 1 charges that in approximately

24    2005, Nathan Harris accessed the Internet from

25    Massachusetts and downloaded Harris's Sigma cable modem

```
 1    hacking product.  Essentially it's alleged that was in

 2    furtherance of the alleged scheme to defraud.

 3           Count 2 charges that in about 2007 Hanshaw --

 4    another wire fraud was committed for which Mr. Harris is

 5    allegedly responsible because Hanshaw, it's charged,

 6    accessed the Internet from Massachusetts and downloaded

 7    Harris's Sigma X cable modem hacking product.

 8           Count 3 charges that on or about January 15th,

 9    2007, in furtherance of the scheme Hanshaw accessed the

10    Internet from Massachusetts using Harris's products and

11    a cloned MAC address and participated in an on-line chat

12    discussing his hacking activities.

13           Count 4 charges that on December 5, 2007, or about

14    December 5th, 2007, Hanshaw accessed the Internet from

15    Massachusetts using Harris's products and cloned a MAC

16    address and participated in an on-line chat discussing

17    his hacking activities.

18           Count 5 charges that on or about June of 2008,

19    Mr. Larosa, Jose Larosa, accessed Harris's TCNISO

20    website from Massachusetts and bought a modified cable

21    modem and ancillary products in furtherance of the

22    scheme.

23           Count 6 charges that on or about July of 2008,

24    Larosa accessed the Internet from Massachusetts using

25    Harris's products and a cloned MAC address and obtained
```

1     free Internet access.

2          Count 7 charges that William Madeira accessed, on

3     about June of 2009, Harris's TCNISO website from

4     Massachusetts and bought a modified cable modem and

5     ancillary products.

6          And Count 8 charges that in furtherance of the

7     scheme, about July of 2009, Madeira accessed the

8     Internet from Massachusetts using Harris's products and

9     a cloned MAC address and obtained free Internet access.

10         For present purposes you don't have to try to

11    memorize all of that.  You're going to have it in the

12    jury room with you.

13         So all of the charges are charges of wire fraud.

14    Now I'm going to tell you what the government has to

15    prove, beyond a reasonable doubt, to prove a wire fraud

16    charge.

17         To prove -- and I'm going to read this to you and

18    part of the reason I'm going to read it to you is you

19    may come back and ask me to tell you again and it's

20    important that I be able to tell you the same thing, if

21    you do that, so.  It's not all that long.  But anyway.

22         To prove that the defendant committed a wire fraud

23    charge in this case the government must prove the

24    following things beyond a reasonable doubt.  First,

25    there was a scheme substantially as charged in the

indictment to defraud or obtain something of value from
internet service providers by means of false or
fraudulent pretenses.  Second, that the defendant
knowingly and willfully participated in the scheme with
an intent to defraud.  And third, on or about the dates
alleged, the defendant transmitted or caused to be
transmitted an interstate wire communication for the
purpose of furthering the scheme.

        If the government fails to prove any of these
elements beyond a reasonable doubt, you must find the
defendant not guilty on the count you are considering.
If the government proves all of these elements beyond a
reasonable doubt with regard to a particular count, you
must find the defendant guilty of that charge.

        As I said, the first thing that the government
must prove beyond a reasonable doubt is that the
defendant participated in a scheme to defraud that
involved material false or fraudulent pretenses.  A
scheme is a plan or a course of conduct.  The term
"defraud" means to deprive somebody of something of
value by means of deception or cheating.  A scheme to
defraud ordinarily includes a desire to bring about some
gain or benefit for oneself or some other person or a
desire to cause some loss to somebody else.  The term
"false or fraudulent pretenses" means any intentional

1   material false representation or omission, including

2   material direct false representations and the deliberate

3   concealment of material facts.  A fact is material if it

4   has a natural tendency to influence or is capable of

5   influencing whoever or whatever is making a particular

6   decision.

7        In essence, in this case the government must,

8   among other things, prove beyond a reasonable doubt the

9   existence of a scheme to deprive internet service

10  providers of payment for internet service based on

11  intentional material false representations or omissions

12  relating to a particular device concerning whether that

13  device was authorized to receive such service.  While

14  the government must prove that the scheme alleged in the

15  indictment existed, it does not have to prove that it

16  succeeded.

17       The next thing that the government must prove

18  beyond a reasonable doubt is that the defendant

19  participated in the alleged scheme knowingly and

20  willfully and with intent to defraud.  The government

21  does not have to prove that the defendant originated the

22  alleged scheme, it only has to prove that he

23  participated in it with the required knowledge and

24  intent to defraud.  To act knowingly means to act

25  intentionally and not by accident or mistake.  To act

1   willfully means to intentionally do something known to

2   be unlawful.  An intent to defraud means to act

3   knowingly and with specific intent to deceive and for

4   the purpose of causing some financial loss or to obtain

5   money for the defendant or someone else or for both of

6   these purposes.

7       It would not be enough to prove wire fraud for the

8   government to prove only that Harris sold one or more

9   products that he knew would be used to commit a crime.

10  However, the nature of any product sold and any

11  knowledge that Harris had as to how it would be used are

12  evidence that you can consider, along with all the other

13  evidence, in deciding whether the government has proven

14  any or all of the wire fraud charges in this case.

15      Now, it may be hard to get into somebody's head,

16  so intent or knowledge need not be proven by direct

17  evidence.  Rather circumstantial evidence, as well as

18  direct evidence, may be important in determining the

19  defendant's state of mind.  In determining what the

20  defendant knew or intended at a particular time you may

21  consider any statements made or anything done or not

22  done by the defendant and all the other facts and

23  circumstances proven by the evidence.

24      You may infer, but you certainly are not required

25  to infer, that a person intends the natural and probable

1    consequences of acts knowingly done or deliberately not

2    done.  It's entirely up to you, however, to decide what

3    facts were proven by the direct and circumstantial

4    evidence.

5         The last thing that the government must prove

6    beyond a reasonable doubt is that on or about the date

7    alleged in the indictment, for the count you are

8    considering, the defendant transmitted or caused to be

9    transmitted an interstate wire communication in

10   furtherance of the alleged scheme.  The use of the

11   internet to send a message, such as an e-mail or a

12   communication to a website, may be a wire

13   communication.

14        An interstate wire communication is a wire

15   communication from one state to another.  The wire

16   communication does not have to be essential to the

17   scheme or itself be fraudulent.  However, it must be

18   made as part of an attempt to execute the scheme or

19   accomplish one of its goals.  To prove that the

20   defendant caused a particular interstate wire

21   communication to occur, the government does not have to

22   prove that he sent the wire communication himself.  It

23   would be sufficient if the government proved beyond a

24   reasonable doubt that he knew that the use of interstate

25   wires would follow in the course of the scheme or that

1    it was reasonably foreseeable that the interstate wires

2    would be used as a result of his actions.  It is the use

3    of the interstate wires generally rather than the

4    specific wire transmission that is charged that must be

5    proved to have been reasonably foreseeable as a result

6    of the scheme.

7         Therefore, if it is proven that Harris

8    participated in the alleged scheme and did something

9    relating to it which he knew or should have reasonably

10   foreseen would result in interstate wire transmissions

11   being used in an effort to execute the scheme or

12   accomplish one of its goals, you may find the use of the

13   interstate wire communication element to be proved.

14        As I said earlier, if you find that the government

15   has proven beyond a reasonable doubt every essential

16   element of wire fraud concerning the particular count

17   you're considering, you shall find the defendant guilty

18   on that count.  If the government has failed to meet

19   that burden, you shall find the defendant not guilty on

20   that count.  As I also said earlier, depending on your

21   view of the evidence, you may find the defendant not

22   guilty on all counts, guilty on some but not all counts,

23   or guilty on all counts.

24        Now I'm going to move to the third part of these

25   instructions which relate to your deliberations.

1        When we finish -- when I finish these

2    instructions, relatively soon, you'll go back to the

3    jury room, and I hope they'll be enough time for this,

4    but the first thing you should do is choose a

5    foreperson, somebody to moderate your discussions and

6    communicate with me on your behalf.

7        Then, either today or tomorrow, we're going to be

8    guided by your preferences from now on, um, you should

9    engage in rational discussion by all jurors for the

10   purpose of reaching a unanimous verdict.  Every juror

11   should decide the case for himself or herself in the

12   context of the evidence and the law giving proper

13   consideration to the views of your fellow jurors.  You

14   should reconsider your initial views and change them if

15   you're persuaded that they're not right, but you

16   shouldn't abandon your views solely for the sake of

17   reaching a unanimous verdict.

18       You should discuss the case only when you're all

19   together so everybody gets the benefit of everybody

20   else's view.  And your verdict must be unanimous on each

21   count.  You're going to have a very simple verdict form

22   that says:  "We the jury find the defendant, Ryan

23   Harris, blank on Count 1, blank on Count 2."  And when

24   all twelve of you agree, the foreperson will write what

25   you agree, guilty or not guilty on Count 1, for each of

1     the eight counts.

2          If you need to communicate with me, the foreperson

3     should write a question or a communication and sign it,

4     but at no time, until you have a unanimous verdict,

5     should you send me any note that indicates what you've

6     already decided or how you're divided on anything.

7     We're not entitled to know that until you've reached

8     unanimous verdicts on all counts.

9          All right.  May I see counsel at sidebar, please.

10

11               AT THE SIDEBAR

12               THE COURT:  Are there any objections to the

13    instructions?

14               MR. BOOKBINDER:  Not from the government.

15               MR. McGINTY:  Your Honor, with respect to the

16    Court had given an instruction regarding cooperating

17    witnesses, but hadn't mentioned -- I'm sorry, immunized

18    witnesses, but hadn't mentioned cooperating witnesses

19    that are testifying subject to a plea agreement.

20               THE COURT:  But I think they were covered in

21    the sense that I said some had -- one had an order or

22    the other had -- I think I said plea agreements, but

23    agreements with the government.  I think it's covered.

24    It's the same people, if I didn't say it.

25               MR. BOOKBINDER:  The agreement gives them

1    immunity in any case.

2              THE COURT:  Yeah, I did refer to the

3    agreement.

4              MR. McGINTY:  Thank you, Judge.  I think

5    that's it.

6              THE COURT:  All right.  Thank you.

7

8              (In open court.)

9              THE COURT:  All right.

10         Ladies and gentlemen, that completes my

11   instructions.  It's 3:30.  Um, I want you to go back to

12   the jury room and I'm afraid I have to separate our

13   alternates.  At this time of year I usually lose

14   somebody in the course of a week-long trial, but only

15   twelve of you can deliberate and decide the case.  So I

16   want you to stay here and I expect come back tomorrow as

17   well because sometimes, even in the course of

18   deliberations, a juror -- that something happens to a

19   juror and occasionally the remedy for that is to start

20   again in the deliberations.  So I apologize, but that's

21   the way it has to work.

22         In any event, I'm going to excuse you.  Twelve of

23   you will be back there.  I hope you can pick a

24   foreperson and then let me know what you want to do.

25   It's snowing and you probably -- well, you can start

1    deliberating and, you know, you can tell me at about

2    4:15 that you want to go home and come back tomorrow

3    morning or that you want to keep deliberating.  We'll be

4    guided by your preference.

5        If you look out the window and say, "We don't even

6    want to wait until 4:15, we'd rather just get into this

7    tomorrow," then I'll let you go home early.  Let me know

8    what you want to do.  Write a note.  But if I haven't

9    heard from you beforehand, please send me something at

10   4:15, so I have a sense of direction for us.  In fact,

11   if you want to work into the night, we'll get you some

12   pizza or something.  But I'm not ordering you to do

13   that.

14       So when you get back there, first you're going to

15   get the exhibits in paper form and then -- you've seen

16   that big flat screen there.  There's a way for you to

17   look at the exhibits on a disk.  You're going to be the

18   first of my jurors to use that technology.  I assume it

19   works, but I haven't tried it out.  But we need to make

20   sure that you've got everything that you're supposed to

21   have on the disk and nothing else.  So maybe -- I'm not

22   sure where we are on that.  It may be that you have to

23   start the old fashioned way.  But we'll get you there,

24   too.  Um, and you'll get your notebooks back.  You'll

25   have those in the jury room.  And we'll get you whatever

1   else you need.

2       All right.  Is there anything before we excuse the

3   jury?

4           MR. BOOKBINDER:  Not from the government, your

5   Honor.

6           MR. McGINTY:  No, your Honor.  Thank you.

7           THE COURT:  All right.  The Court will be in

8   recess for the jury.

9           (Jury leaves to deliberate, 3:30 p.m.)

10          THE COURT:  All right.  What is the status of

11  the --

12          (Pause.)

13          THE COURT:  What is the status of the

14  exhibits?

15          MR. BOOKBINDER:  We're just consulting right

16  now, your Honor.

17          THE COURT:  All right.  Well, you want to work

18  with Mr. Hohler, I would say, first on the paper

19  exhibits and then on the disk, and don't go very far

20  away.  I won't be surprised if they pick a foreperson

21  and say they want to go home right now.

22          MR. McGINTY:  Although that pizza invitation

23  kind of caught their eye.

24          THE COURT:  You think?  I thought that was

25  reinforcing a desire to get out of here.

1          (Laughter.)

2          THE COURT:  Anyway.  The Court is in recess.

3          (Recess, 3:35 p.m.)

4          (Resumed, 3:45, juror note.)

5          THE COURT:  The pizza was not that enticing.

6    I'll have you know it says:  "It's been decided that

7    Juror Number 7 will be the foreperson for this case.

8    The jury would like to adjourn for the day and come back

9    on Thursday, March 1, at 9:00 a.m.  So I will have them

10   in and excuse them.

11        Did we lose Ms. Sedky?

12        MR. BOOKBINDER:  We did, your Honor.  She had

13   family responsibilities.  She had to get back to

14   Washington.

15        THE COURT:  Okay.  So we can mark this as

16   Juror Question 1.

17        All right.  We'll bring the jury in.

18        MR. McGINTY:  Your Honor, is that Seat 7 or

19   Number 7?

20        THE COURT:  Seat 7.

21        MR. McGINTY:  Seat 7.  And that would be in

22   the front row?

23        THE COURT:  Well, you'll see in a minute.  I

24   just thought I would, at this point, put the name on the

25   record.

```
1                    (Jury enters, 3:50 p.m.)
2                    THE COURT:  Just everybody move down one.
3                    (Move seats over.)
4                    THE COURT:  All right.
5            Mr. Foreperson, I have a note that says:  "It's
6      been decided that Juror Number 7 will be the foreperson
7      for this case.  The jury would like to adjourn for the
8      day and come back on Thursday, March 1, at 9:00 a.m."
9            Have I read that right?
10                   THE FOREPERSON:  Yes, your Honor.
11                   THE COURT:  And then, as I said, we'll honor
12     that request.
13           It's only snowing lightly here now.  Hopefully it
14     won't get much worse.  But if the Boston schools are
15     closed or delayed tomorrow morning, then you don't need
16     to come in.  If the Boston schools are open, um, you do
17     need to come in.  Although if the weather makes it
18     difficult or dangerous to get here by 9:00, just take
19     your time.  But hopefully now that we're at this
20     important stage, we'll be able to go ahead tomorrow.
21           You are now at a time when you can discuss the
22     case among yourself, of course, but wait until all
23     twelve of you are there to do that to make sure that
24     everybody gets the benefit of everybody else's
25     thoughts.
```

1          It's especially important that you not read,

2     listen or watch anything about the case that may be in

3     the media.  Everything that's relevant and everything

4     you're entitled to consider has been presented here in

5     court.  Of course, don't discuss the case with anybody

6     who is not on the jury.

7          You'll come back tomorrow.  When you get here at

8     9:00, I'll have you in the courtroom briefly just so I

9     can be sure you're all here, and you'll go back and

10    you'll deliberate.  I think they'll bring you some

11    snacks mid-morning and if you're still deliberating,

12    they'll give you lunch.

13         I have no idea how long your deliberations should

14    take, and these comments should not be interpreted as a

15    suggestion of how long I think they should take, but if

16    you're still deliberating tomorrow afternoon, I'll ask

17    you to, you know, let me know at 4:00 whether you want

18    to keep going or whether you want to go home and come

19    back on Friday.  All right?

20         So there have been times, particularly recently,

21    particularly today, that you've had to wait for us, now

22    we're going to wait for you.

23         Okay.  The Court is in recess for the jury.

24              (Jury leaves, 4:00 p.m.)

25              THE COURT:  All right.  I'll see you all at

1    9:00 tomorrow morning.

2          The Court is in recess.

3                (Adjourned, 4:00 p.m.)

4

5                  C E R T I F I C A T E

6

7          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

8    hereby certify that the forgoing transcript of the

9    record is a true and accurate transcription of my

10   stenographic notes, before Chief Judge Mark L. Wolf, on

11   Wednesday, February 29, 2012, to the best of my skill

12   and ability.

13

14

15   /s/ Richard H. Romanow 11-07-12

16   _____
     RICHARD H. ROMANOW   Date

17

18

19

20

21

22

23

24

25