1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                           No. 1:09-cr-10243-MLW

4

5

6   UNITED STATES OF AMERICA

7

8   vs.

9

10  RYAN HARRIS

11

12

13                      * * * * * * * * *

14

15              For Jury Trial Before:
                Chief Judge Mark L. Wolf

16

17              United States District Court
                District of Massachusetts (Boston.)
18              One Courthouse Way
                Boston, Massachusetts 02210
19              Thursday, March 1, 2012

20                      * * * * * * * *

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                Official Court Reporter
23              United States District Court
        One Courthouse Way, Room 5200, Boston, MA 02210
24              bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    ADAM J. BOOKBINDER, ESQ.
          United States Attorney's Office
 4        John Joseph Moakley Federal Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          (617) 748-3112
 6        E-mail: Adam.bookbinder@usdoj.gov
     and
 7    MONA SEDKY, ESQ.
          U.S. Department of Justice
 8        601 D. Street, N.W.
          Washington, D.C. 20530
 9        (202) 353-4304
          Email: Mona.sedky@usdoj.gov
10        For the United States of America

11

12    CHARLES P. McGINTY, ESQ.
          Federal Public Defender Office
13        District of Massachusetts
          51 Sleeper Street, 5th Floor
14        Boston, Massachusetts 02210
          (617) 223-8080
15        E-mail: Charles_mcginty@fd.org
          For the defendant
16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3        First Jury Question.....................   6

4        Second Jury Question...................   9

5        Recharge by Judge......................  10

6        Verdict................................  26

7        Detention/release order................  33

8

9                      E X H I B I T S

10                    (None entered.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2              (Begins, 9:00 a.m.)
3              THE CLERK:  Criminal Matter 09-10243, the
4    United States of America versus Ryan Harris.  The Court
5    is in session.  You may be seated.
6              THE COURT:  Would counsel please identify
7    themselves for the record.
8              MR. BOOKBINDER:  Good morning, your Honor.
9    Adam Bookbinder for the United States.
10             MR. McGINTY:  Your Honor, Charles McGinty and
11   Christine Demaso for Mr. Harris.  Good morning.
12             THE COURT:  All right.
13        We're missing one juror and the alternate.  Um, we
14   can start without the alternate, but we'll wait for the
15   last deliberating juror.
16        There are two matters that I wanted to raise with
17   you, however.  One is the exhibits.
18        Are the paper exhibits, have they been reviewed by
19   the parties and agreed to?
20             MR. BOOKBINDER:  Your Honor, we've reviewed
21   all the paper exhibits.  Those are agreed to.  We've
22   also reviewed the electronic juror's copy of the
23   exhibits and we've agreed to those as well.
24             THE COURT:  Is that correct, Mr. McGinty?
25             MR. McGINTY:  That's right, your Honor.
```

1          THE COURT:  All right.  Somebody needs to

2     explain to me, maybe Mr. Niecewicz, who is here, how

3     this works.  I understand there's no disk that the

4     jurors receive and can be -- that can be marked for the

5     record.

6          THE CLERK:  (Mr. Niecewicz.)  Chief, um, once

7     we release the exhibits back to the jury room, they'll

8     be instructed to watch a brief tutorial and then they'll

9     just basically hit the exhibit list button and it will

10    bring up all the exhibits for them to open and they can

11    go back to them.  Um, they can't look at them now until

12    everybody gets here and Dan releases them.

13         THE COURT:  Okay.  And, you know, it's

14    something to consider.

15       Is there any permanent record of what goes on the

16    system?

17         THE CLERK:  (Mr. Niecewicz.)  We'll burn a

18    disk of what has been saved to this particular case and

19    keep a record of it.

20         THE COURT:  Well, I want the disk and I want

21    the disk to be given a letter because theoretically

22    there could be a discrepancy between what was admitted

23    and what's on the disk.  So I think there has to be a

24    record of what's on the disk.  Okay?

25         THE CLERK:  (Mr. Niecewicz.)  Okay.

 1               THE COURT:  We'll get that DVD as soon as

 2      possible.

 3          And is there any objection to having somebody from

 4      the court IT staff just go in and show them where the

 5      tutorial button is?

 6               MR. BOOKBINDER:  No, your Honor.

 7               MR. McGINTY:  No, your Honor.

 8               THE COURT:  Okay, then we'll do that.

 9          Then what's the next letter?

10               THE CLERK:  J, Judge.

11               THE COURT:  Okay.  We'll mark as Exhibit J an

12      article from today's Boston Globe named "Hacker Trial,

13      Issues of Theft and Free Access," um, and give you

14      copies.

15          Have you read this article?

16               MR. McGINTY:  I have not.

17               MR. BOOKBINDER:  Yes.

18               THE COURT:  Okay.

19               (Hands out copies.)

20               THE COURT:  The question is going to be

21      whether -- I mean, I've admonished them not to read the

22      media and there's nothing in here that I saw about

23      excluded evidence or the discussion yesterday about the

24      sufficiency of the evidence that was addressed by the

25      stipulation.  I guess I'm not inclined to ask whether

```
1    anybody read it, but I thought I should discuss that
2    with you.
3           Let Mr. McGinty go through it.
4              (Reads.)
5           MR. McGINTY:  Thank you, your Honor.
6           THE COURT:  All right.  What are the parties's
7    thoughts on whether I ought to ask whether anybody's
8    read, seen or heard anything in the media?
9           MR. BOOKBINDER:  Your Honor, I think, like the
10   Court, I'm generally not inclined to suggest inquiring
11   into what goes one with the jurors.  I would defer to
12   the Court's experience on this, but I think it makes
13   sense probably to repeat the admonition but not to do a
14   specific inquiry.
15          MR. McGINTY:  I think that's sensible.
16          THE COURT:  Okay.  I think we're all in the
17   same place.  I mean, sometimes when the media's, you
18   know, reporting on matters that occurred in court
19   outside the presence of the jury, prominently,
20   repeatedly, um, I will ask, but as I read this, there
21   was no reference to excluded evidence or the sufficiency
22   of the evidence.  There are comments by, you know,
23   people about the prosecution, I think it can be stated
24   that way, and I have directed them.  But, you know,
25   they're to follow the instructions and return a verdict
```

```
 1    based on the evidence and the law regardless of whether

 2    they understand the law or agree with it.  So I just

 3    thought I should consult you.

 4         All right.  Well, we'll recess.  I'm scheduled on

 5    an international telephone call at 9:30, but if we get

 6    the 12th juror, I'll interrupt that and come back just

 7    to make sure they're all here, and then send them back

 8    to deliberate.

 9              (Pause.)

10              THE COURT:  So we'll get them their lunch at

11    12:30, if they haven't finished their deliberations by

12    then.

13         All right.  The Court is in recess.

14              (Recess, 9:30 a.m.)

15              (Resumed, 9:45 a.m.)

16              THE COURT:  All right.  All the jurors are

17    here except the alternate and we can start without him.

18    So we'll get the jury.

19              (Pause.)

20              THE COURT:  And, Mr. Niecewicz, were you able

21    to go back and show them the tutorial?

22              THE CLERK:  (Mr. Niecewicz.)  Yes, your Honor.

23              THE COURT:  Of course you can't discuss

24    anything with them.

25              THE CLERK:  (Mr. Niecewicz.)  Yes, your Honor.
```

```
 1              (Pause.)

 2              THE COURT:  Is it true they wanted a hot

 3    lunch?

 4              (Laughter.)

 5              MR. McGINTY:  I would, too.

 6              THE COURT:  I have another message from the

 7    jury.

 8         "The jury would like to know if we could have a

 9    hot lunch today from the cafeteria such as hamburgers,

10    fries or pizza, plus cookies, brownies, plus tossed

11    garden salad as well, plus all jurors are here and

12    accounted for."

13              (Laughter.)

14              THE COURT:  I don't know.  I don't think so.

15    We'll check.  We can ask.

16         All right.  I think salad and pizza, we can

17    probably do that.

18         You know, 27 years, I haven't gotten that one

19    yet.

20              (Laughter.)

21              THE COURT:  All right.  I'm going to tell them

22    that we'll inquire and maybe I could get pizza.  I don't

23    think I can order hamburgers.  But go ahead.

24              (Jury enters, 9:30 a.m.)

25              (Another note from jury.)
```

1          THE COURT:  "A juror would like to see and

2    hear instructions pertaining to the wire fraud in this

3    case, both definition and counts," as predicted.

4          (Pause.)

5          THE COURT:  All right.  So with regard to the

6    instruction, anticipating this possibility, I

7    essentially read them it verbatim, the wire fraud

8    instructions, and can tell them substantially the same

9    thing I told them yesterday.  When they say they want to

10   see them, um, only part of the instructions were written

11   out and I would not feel comfortable just giving them,

12   to take back with them, the case-specific part.  I can

13   ask the -- so I'm going to tell them there isn't a

14   transcript of the complete instruction and they'll just

15   have to listen and if they have any questions, just come

16   back to me, which is part of the reason I usually don't

17   send back a transcript, although I've considered it on

18   occasion.

19       Any comments on that response?

20          MR. McGINTY:  No, your Honor.

21          MR. BOOKBINDER:  No, your Honor.

22          THE COURT:  Okay.  Let's bring them in.

23          (Jurors enter, 9:30 a.m.)

24          THE COURT:  Ladies and gentlemen, you've

25   braved the elements and got back.  That's good.  I have

1    two questions.

2         The first, Mr. Foreman, if I read it right, says:

3    "A juror would like to know if we could have a hot lunch

4    today from the cafeteria such as hamburgers, fries or

5    pizza, plus cookies, brownies, plus tossed garden salad

6    as well, plus all the jurors are here and accounted

7    for."

8         Is that indeed the first question?

9              THE FOREPERSON:  Yes.

10             THE COURT:  The answer is maybe.  I'll look

11   into whether we can get you some pizza.  There's a

12   protocol in the courthouse, they typically bring up

13   sandwiches and salad, as I understand it, for the

14   jurors, but I'll see what I can do.  And you'll get

15   snacks around 10:30 if your deliberations -- and you'll

16   get lunch at 12:30.  If you finish your deliberations

17   before 12:30, let us know and you can eat the lunch

18   anyway.  A lot of verdicts I get right after lunch.  So

19   you can have lunch anyway.  But if you're still

20   deliberating, they'll bring the lunch about 12:30.

21   Okay?

22        Then am I correct that the second question for

23   this morning is that:

24        "The jury would like to see and hear instructions

25   pertaining to the wire fraud of this case both the

 1  definition and counts."

 2       Is that correct?

 3            THE FOREPERSON:  Yes.

 4            THE COURT:  All right.  They haven't gotten

 5  the indictments yet?

 6            THE CLERK:  No, judge.

 7            THE COURT:  All right.

 8       I can give you again, as I said yesterday,

 9  anticipating that you might ask this, the case-specific

10  instructions on wire fraud and I can read you again what

11  the indictment says, but when you go back, we're going

12  to give you that indictment.  In fact, let me give it to

13  you right now.  So, you know, you'll know what the

14  specific charges are.  But here, actually, I prefer you

15  sit down first.

16            THE CLERK:  Sorry, Judge.

17            THE COURT:  So you'll have the indictment.

18       There is no transcript of everything I said to you

19  yesterday about the instructions and it's very

20  important, although I'm going to repeat the wire fraud

21  instructions, that you consider them in the context of

22  everything I said, um, much of it from an outline, not

23  from a text, so there's nothing I feel I can properly

24  give you to read.

25       In addition, if you have questions about the law,

1    I don't want you to be back there trying to figure out

2    what the instructions mean, I want you to write me a

3    note.  So you can come in and if something needs

4    repetition or particularly a different explanation, a

5    fuller explanation, then I'll know and I'll talk to the

6    lawyers and see what I can tell you about it.  Okay?

7         All right.  So now Mr. Hohler will give you each a

8    copy of the indictment.

9              (Hands out.)

10             THE COURT:  But why don't you just put that

11   down for a minute because there are some things that I'm

12   going to tell you again before we focus on the

13   indictment.

14        As I told you yesterday, there are now eight

15   charges of wire fraud for you to decide.  You're not

16   being asked whether the government has proven the

17   original earlier Count 1, the conspiracy charge that was

18   read to you at the beginning of the trial, that charge

19   has been removed from the copy of the indictment you

20   have in the jury room and the charges have been

21   renumbered.  So all of the charges now are wire fraud.

22   Okay?  And don't read the indictment.  We'll get to it.

23   We'll read it together.

24        Do you remember I told you yesterday that the

25   indictment is merely an accusation, it's not evidence or

1    proof that the defendant is guilty of any or all of the

2    wire frauds charged.   Therefore, the government must

3    prove he's guilty beyond a reasonable doubt to achieve

4    his conviction on any charge.   Each count alleges a

5    separate crime.   You should consider each count

6    separately and return a separate verdict for each

7    count.

8         Unless I gave you a limiting instruction in the

9    course of the case, you may consider all of the evidence

10   in deciding each count, and if I gave you a limiting

11   instruction, you have to use the information only for

12   the limited purpose I directed.   As to each separate

13   count, you must determine whether the government has

14   proved the defendant guilty beyond a reasonable doubt.

15        Evidence provided by or concerning other people

16   may be considered by you.   However, the fact that

17   another person pled guilty to committing some other

18   crime is not itself evidence or proof that Harris is

19   guilty of any of the wire charges in this case.   Your

20   verdict should be based solely upon the evidence or lack

21   of evidence concerning Mr. Harris, in accordance with my

22   instructions, and without regard to the guilty pleas of

23   others.   Depending on your view of the evidence, you

24   could find Mr. Harris not guilty on all counts, guilty

25   on some counts and not guilty on other counts, or guilty

1    on all the counts.  That's up to you.

2         You'll see that the indictment charges that

3    certain crimes were committed on or about a particular

4    date.  It is not necessary for the government to prove

5    beyond a reasonable doubt that the crimes were committed

6    on a particular date.  The government does have to prove

7    that the crimes were committed on a date reasonably near

8    the dates alleged in the indictment.  But the government

9    doesn't have to prove the precise date.

10        Then, as I said, all of the remaining charges, all

11   of the remaining counts charge Mr. Harris with

12   committing wire fraud.  And the charging language -- now

13   you can look at it, is in Paragraph 1.  It says: "On or

14   about the dates set forth below, in the District of

15   Massachusetts and elsewhere, Ryan Harris, having

16   knowingly devised a scheme to defraud and to obtain

17   money and property by means of material false and

18   fraudulent pretenses, representations and promises,

19   transmitted and caused to be transmitted in interstate

20   commerce wire communications, including writings,

21   signals and sound, for the purpose of executing the

22   scheme to defraud and aided and abetted others in doing

23   so as set forth below."

24        And actually I'm not instructing you on aiding and

25   abetting.  You're going to have to decide whether

1    Mr. Harris alone -- well, whether Mr. Harris committed

2    all of the -- well, not alone, but Mr. Harris committed

3    all of the elements of wire fraud as I'm going to

4    describe them to you.

5         And then each count alleges that a particular wire

6    was sent or caused to be sent by Mr. Harris in

7    furtherance of the alleged scheme.  So Count 1 charges:

8    "In about 2005, NH," Nathan Hanshaw, "accessed the

9    internet from Massachusetts and downloaded Harris's

10   Sigma cable modem hacking product" in furtherance of the

11   alleged scheme in which it's charged Mr. Harris

12   participated in.

13        Count 2 charges that in or about 2007 Hanshaw

14   accessed the internet from Massachusetts and downloaded

15   Harris's Sigma X cable modem hacking product for the

16   purpose of executing a scheme to defraud.

17        And then it goes right down the line.  If you

18   want, I'll read them all now, or perhaps it's not

19   necessary.  But I can read them all to you.

20        Count 3 charges that on or about January 15, 2007,

21   in furtherance of the scheme, Hanshaw accessed the

22   internet from Massachusetts using Harris's products and

23   a cloned MAC address and participated in an on-line chat

24   discussing his hacking activities.

25        Count 4 charges that on or about December 5, 2007

1    Hanshaw accessed the internet from Massachusetts using

2    Harris's products and a cloned MAC address and

3    participated in an on-line chat discussing his hacking

4    activities.

5         Count 5 charges that on about June of 2008, in

6    furtherance of the scheme to defraud, Jose Larosa

7    accessed Harris's TCNISO website from Massachusetts and

8    bought a cable modem and ancillary products.

9         Count 6 charges that Larosa accessed the Internet

10   from Massachusetts using Harris's products and a cloned

11   MAC address and obtained free Internet access on about

12   July of 2008.

13        Count 7 charges that William Madeira, on about

14   June -- or in about June of 2009 accessed Harris's

15   TCNISO website for Massachusetts and bought a modified

16   cable modem and ancillary products.

17        And Count 8 charges that Madeira accessed the

18   internet from Massachusetts on about July of 2009, in

19   furtherance of the scheme, using Harris's products and a

20   cloned MAC address and obtained free internet service.

21        So those are the charges.  Now I'm going to tell

22   you again what the government has to prove beyond a

23   reasonable doubt to prove wire fraud, each charge of

24   wire fraud.

25        The government has to prove the following things

beyond a reasonable doubt.  First, that there was a
scheme substantially as charged in the indictment to
defraud or obtain something of value from an internet
service provider or internet service providers by means
of false or fraudulent pretext.  Second, that the
defendant knowingly and willfully participated in the
scheme with an intent to defraud.  Third, on or about
the dates alleged, the defendant transmitted or caused
to be transmitted an interstate wire communication for
the purpose of furthering the scheme.

If the government fails to prove any of these
elements beyond a reasonable doubt, you must find the
defendant not guilty on the counts you are considering.
If the government proves all of these elements beyond a
reasonable doubt, with regard to a particular count, you
must find him guilty of that charge.

The first thing that the government must prove
beyond a reasonable doubt is that the defendant
participated in a scheme to defraud that involved
material false or fraudulent pretenses.  A scheme is a
plan or a course of conduct.  The term "to defraud"
means to deceive someone of something of value by means
of deception or cheating.  A scheme to defraud
ordinarily includes a desire to bring about some gain or
benefit for oneself, or some other person, or desire to

cause loss to someone else.  The term "false or
fraudulent pretenses" means any intentional material
false representation or omission including material
direct false representations and the deliberate
concealment of material facts.  A fact is material if it
has a natural tendency to influence or is capable of
influencing whoever or whatever is making a particular
decision.

In essence, in this case the government must,
among other things, prove beyond a reasonable doubt the
existence of a scheme to deprive internet service
providers of payment for internet service based on
intentional material false representations or omissions
relating to a particular device concerning whether that
device was authorized to receive such internet service.
While the government must prove that the scheme alleged
in the indictment existed, it does not have to prove
that it succeeded.

The next thing the government must prove beyond a
reasonable doubt is that the defendant participated in
the alleged scheme knowingly and willfully and with the
intent to defraud.  The government does not have to
prove that the defendant originated the alleged scheme,
it only has to prove that he participated in it with the
required knowledge and intent to defraud.  To act

knowingly means to act intentionally, not by accident or

mistake.  To act willfully means to intentionally do

something known to be unlawful.  An intent to defraud

means to act knowingly and with specific intent to

deceive for the purpose of causing some financial loss

or to obtain money for the defendant or someone else or

for both of these purposes.

It would not be enough to prove wire fraud for the

government to prove only that Harris sold one or more

products that he knew would be used to commit a crime.

However, the nature of the products sold and any

knowledge Harris has as to how it would be used are

evidence that you could consider, along with all the

other evidence, in deciding whether the government has

proven any or all of the wire fraud charges in this

case.

Intent or knowledge need not be proven by direct

evidence, therefore circumstantial evidence as well as

direct evidence may be important to determining the

defendant's state of mind.  In determining what the

defendant knew or intended at a particular time you may

consider any statements made or anything done or not

done by the defendant and all other facts and

circumstances proven by the evidence.  You may infer,

but you are certainly not required to infer, that a

1    person intends the natural and probable consequences of

2    acts knowingly done or deliberately not done.  It's

3    entirely up to you, however, to decide what facts are

4    proven by the direct and circumstantial evidence.

5         The last thing that the government must prove

6    beyond a reasonable doubt is that on or about the date

7    alleged in the indictment, for the count that you are

8    considering, the defendant transmitted or caused to be

9    transmitted an interstate wire communication in

10   furtherance of the alleged scheme.  The use of the

11   internet to send a message, such as an e-mail or a

12   communication to a website, may be a wire

13   communication.  An interstate wire communication is a

14   wire communication from one state to another.  The wire

15   communication does not have to be essential to the

16   scheme or be itself fraudulent, however it must be made

17   as part of an attempt to execute the scheme or

18   accomplish one of its goals.

19        To prove that the defendant caused a particular

20   interstate wire communication to occur, the government

21   does not have to prove that he sent the wire

22   communication himself.  It would be sufficient if the

23   government proves beyond a reasonable doubt that he knew

24   that the use of interstate wires would follow in the

25   course of the scheme or that it was reasonably

foreseeable that the interstate wires would be used as a
result of his actions.  It is the use of interstate
wires generally rather than the specific wire
transmission that is charged that must be proved to have
been reasonably foreseeable as a result of the scheme.

Therefore, if it is proven that Harris
participated in the alleged scheme or did something
relating to it which he knew or should have reasonably
foreseen would result in interstate wire transmissions
being used in an effort to execute that scheme or to
accomplish its goals, you may find the use of interstate
wire communications element to be proven.

As I said earlier, if you find the government has
proven beyond a reasonable doubt every essential element
of wire fraud concerning a particular count, you shall
find the defendant guilty of that count.  If the
government has failed to meet that burden, you shall
find the defendant not guilty of that count.  As I also
explained, depending on your view of the evidence, you
may find the defendant not guilty on all counts, guilty
on some counts and not guilty on other counts, or guilty
on all counts.

So that's the case-specific portion of the
instructions I gave you yesterday.  Again, it's
important to consider this in the context of everything

1    I told you yesterday, but didn't repeat today, and

2    hopefully having told you that again, it will be helpful

3    in your deliberations.

4         All right.  You're going to go back, you're going

5    to be given a paper set of the exhibits.  In addition,

6    there's some technology back there that hasn't been used

7    before.  I'm told it's easy, but I haven't tried it.

8    And a member of the Court's staff, Mr. Niecewicz, is

9    going to come back, he's not going to talk to you at all

10   about the case, he's going to show you what button to

11   push to get the tutorial that will show you how to use

12   the technology, if you want to use it, and then he's

13   going to leave and after he leaves you'll engage in

14   rational discussion with a view to reaching a unanimous

15   verdict on each count.

16        When you reach a unanimous verdict on each count,

17   as I told you yesterday, indicate, you know, the foreman

18   will write that out and give it to the Court Security

19   Officer, and if you have any further questions, you

20   know, write it out, give it to the Court Security

21   Officer, um, and I'll discuss it with the lawyers.  But

22   be sure not to indicate, you know, what if anything

23   you've already decided or how you're divided.  Okay?

24        The Court will be in recess for the jury.

25             (Jury leaves, 10:50 a.m.)

```
 1            THE COURT:  All right.  Is there anything
 2   further?  Just make sure that Mr. Hohler knows where to
 3   find you, that you can get here quickly if they have
 4   more questions or a verdict.
 5            MR. McGINTY:  Um, your Honor, in the prior
 6   rendition, the Court had mentioned the intent -- that
 7   the person intends the "natural consequences."  This
 8   time the Court has said the person intends the "natural
 9   and probable consequences."
10            THE COURT:  First of all, one, I believe
11   that's what I said yesterday.  I was reading from the
12   same text.  Two, I don't think there's any material
13   difference.  But the record will reflect what I said
14   yesterday.
15            MR. McGINTY:  I mean, I had not seen the
16   Court's instruction before it was rendered and I tried
17   to take careful notes and listen carefully.  Um, I -- if
18   the Court had rendered it earlier as "natural and
19   probable consequences," then I would object to the use
20   of the word "probable" in that it would appear to
21   diminish the Court's instruction that the person has to
22   be aware of how the product would be used.
23            THE COURT:  Well, I think when we check, for
24   example, the First Circuit jury instructions, you will
25   find "natural and probable" in there and I may be able
```

1   to find what I told them yesterday.

2                (Pause.)

3                THE COURT:  Yeah, what I said yesterday:  "You

4   may infer, but you're certainly not required to infer

5   that a person intends the natural and probable

6   consequences."  It's here in the draft transcript.

7                MR. McGINTY:  Then at that point I did not

8   catch that when the instruction was given and I --

9                THE COURT:  Well --

10               MR. McGINTY:  I would ask that the record just

11  reflect my objection.

12               THE COURT:  All right.  I guess I'd say my

13  view is if I did indeed say it yesterday, it's too late

14  to object, and more fundamentally -- because if I made a

15  mistake, and we just caught it now, and I thought it was

16  a mistake and it was possibly material, then I would

17  correct it.  But I think this is a correct statement of

18  the law going to the First Circuit.

19               MR. McGINTY:  And I would note, your Honor,

20  that I think there's a difference between a person

21  intending the natural consequences of what they

22  ordinarily do, um, but here the Court's saying that the

23  person needs to have knowledge of how a device would be

24  used, and that would appear to diminish that

25  instruction.

```
1            THE COURT:  All right.  Let's see.

2            (Reads.)

3            THE COURT:  Now, if you look at the First

4    Circuit pattern jury instruction 4.18 dot 1343, it uses

5    the natural and probable language that I used.  So, one,

6    I don't think it's --

7            MR. McGINTY:  I'm sorry.  And that instruction

8    is in what context?

9            THE COURT:  Wire fraud.  It's in the context

10   that I used it in, I think.  (Reads.)  Yeah, it's in the

11   context in which I used it.

12       Okay.  The Court is in recess.

13            (Recess, 10:00 a.m.)

14            (Verdict, 3:45 p.m.)

15            THE COURT:  The parties are present.  I have a

16   note which says:  "We have reached a verdict.  Only one

17   copy has been signed.  If you need more than one signed

18   copy, please let us know."  One is sufficient.

19       So I will have the jurors in and if they confirm

20   they've reached a unanimous verdict on all counts, I

21   will take the verdict.  Okay?

22            (Jury enters, 3:45 p.m.)

23            THE COURT:  Mr. Foreperson, I understand from

24   your note that the jury has reached a unanimous verdict

25   on all eight counts, is that correct?
```

1           THE FOREPERSON:  Correct.

2           THE COURT:  All right.  Please hand the

3   verdict form to the Clerk.

4           (Hands to Clerk, then to judge.)

5           THE CLERK:  The United States of America

6   versus Ryan Harris, Criminal Matter Number 09-10243,

7   verdict:

8       "We, the jury, find the defendant, Ryan Harris,

9   guilty on Count 1, guilty on Count 2, guilty on Count 3,

10  guilty on Count 4, guilty on Count 5, guilty on Count 6,

11  guilty on Count 7, not guilty on Count 8," dated March

12  1st, 2012, Jury Number 7, Mr." --

13          THE COURT:  That's fine.

14          THE CLERK:  To say you -- so say you,

15  Mr. Foreman, and all members of the jury?

16          THE JURY:  (In unison.)  Yes.

17          THE COURT:  Is there anything further before

18  the jury is discharged?

19          MR. BOOKBINDER:  No, your Honor.

20          MR. McGINTY:  There is not.

21          THE COURT:  All right.

22      Ladies and gentlemen, that concludes your service

23  as jurors in this case.  Just as I didn't comment on the

24  evidence or suggest what I thought your verdict should

25  be, I'm not now commenting on the, um, decisions that

1    you've reached, but I do want you to know and fully

2    understand that you've rendered a great contribution to

3    the administration of justice and fulfilled one of the

4    highest obligations and also taken advantage of one of

5    the greatest opportunities provided to citizens in our

6    democracy.

7         The institution of trial by jury is very

8    important.  It -- as Thomas Jefferson once said, that if

9    he had to choose between his right to elect the people

10   who make the laws and his right to be tried by a jury of

11   his peers, he would give up his right essentially to

12   vote before he would give up his right to a trial by a

13   jury.

14        The vast majority of criminal cases and the vast

15   majority of civil cases don't go to trial and that

16   nationally they'd be about 5 percent of all criminal

17   cases that go to trial.  And it may seem odd -- and the

18   cases that go to trial tend to be the most difficult or

19   the most consequential.  And it may seem odd to provide

20   -- you know, to call on amateurs, like jurors, rather

21   than professionals, experienced judges, to make those

22   decisions, which I know are heavy decisions, um, but

23   it's not odd at all, it's an expression of our enduring

24   faith in this country and the common sense and fairness

25   and ability to follow the law of regular people, and you

1    have done that in this case.

2          I haven't yet said "thank you" and I'll tell you

3    why.  I think it's odd to thank people for doing

4    something that's in their own enlightened self

5    interest.  We've got our tradition of trial by jury from

6    the English, but they've given it up in almost all civil

7    cases and in criminal cases the judges in England at

8    least try, in many instances, to tell the jury what to

9    do, something I try -- I tried successfully not to do in

10   this case, and there's controversy in the United States

11   about whether we should continue to have trial by jury,

12   which I believe in very deeply.  It's a valuable thing.

13   And it may have occurred to you, as it always used to

14   occur to me, that you could be in the courtroom on

15   another day, but not as a juror, you, or somebody close

16   to you could be a victim, could be a witness, you could

17   be a defendant, and if that day comes I think you would

18   want what you've given in this case, which is a group of

19   your fellow citizens to take time from their busy and

20   demanding lives to come to court, to listen carefully to

21   the evidence, to understand the law -- and your

22   discriminating verdict indicates to me that you

23   understood the law, and, um, you know, to make an honest

24   judgment.  And you've done that.  And by coming here for

25   the past week and doing that, you've made it more likely

1    that if you ever have to come again, not as a juror, but

2    as a victim, a witness, or a defendant, that this great

3    institution of trial by jury will be here available to

4    you.  So I stop just short of saying "thank you."

5         I have some additional things I have to do --

6         And where's our alternate?

7              MR. MacALEAR:  Right here, your Honor.

8              THE COURT:  Okay.  I thank you very much,

9    too.  It's frustrating and difficult not to get to

10   deliberate and decide and, of course, you got the wrong

11   message this morning on the answering machine.  But, um,

12   particularly at this time of year when people get sick,

13   um, the weather's bad, it's hard to get through a whole

14   week and not lose a juror.  But this is a determined

15   group.

16        I have some matters that I have to discuss with

17   the lawyers, but if I haven't said it, I'm directing the

18   Clerk to enter the verdicts as they've been read.  I'm

19   discharging the jury.  I'm going to take a very short

20   break and just shake their hand as they go out and then

21   we'll come back to deal with the matters we need to deal

22   with.  Okay?

23        Anything before I excuse the jury?

24             MR. BOOKBINDER:  No, your Honor.

25             THE COURT:  The Court will be in recess for

1  the jury.

2              (Jury leaves, 4:00 p.m.)

3              THE COURT:  All right.  The case was extremely

4  well presented up to a point.  Um, the defendant was

5  certainly energetically and effectively represented.

6        I had taken under advisement the Rule 29 motion.

7  Viewing the evidence in the light most favorable to the

8  government, I had come to the determination that there

9  was sufficient evidence to prove the defendant guilty

10  beyond a reasonable doubt on Counts 1 to 7.  The

11  inclination I had was to talk to you about Count 8,

12  which alleged that Madeira accessed the internet from

13  Massachusetts using Harris's products and cloned MAC

14  address and obtained free internet access.  And based on

15  what I can recall from the evidence, I didn't think that

16  was proven beyond a reasonable doubt because -- but the

17  jury has found -- that might not have been sufficient to

18  prove it beyond a reasonable doubt as what he got didn't

19  work at first, but they found him not guilty on that

20  charge.

21        So I'm denying the Rule 29 motion with regard to

22  Counts 1 through 7.  The defendant may, within 14 days,

23  or by March 15th, file a motion -- well, renew the

24  motion, if he wishes.

25              MR. McGINTY:  I do intend to do that, your

1    Honor, to move again for Rule 29 and also for a new

2    trial, under both of those there's a 14-day period.  I

3    would ask the Court to consider whether I could file a

4    motion, identifying what the grounds would be, but have

5    a little bit more time to address the issues in greater

6    length.  Um, we do intend to vigorously contest the

7    verdict and we have been actively involved in that so

8    far and we do intend to do that, so I would like the

9    opportunity to address this sufficiently to the

10   seriousness of the charge.

11           THE COURT:  Well, I think, you know, you

12   should do this, and I haven't looked at this lately, but

13   I don't know that I have the authority to extend the 14

14   days.  Um, you need to file something within 14 days,

15   which is a motion and a memo.  If you request leave to

16   supplement it, I'll consider it, but I have an interest

17   in deciding this while I can remember it.  And I, of

18   course, haven't read the motion, but I looked at the

19   Rule 29 motion that you filed and I raised an issue and

20   I listened very carefully to the closing arguments.  But

21   at the moment it seems to me to be -- that the guilty

22   verdicts on Counts 1 to 7 seem to be an application of

23   the conventional law regarding wire fraud, basically

24   linking the objections to the way I instructed to

25   evidence which viewed in the light most favorable to the

1    government was ample to prove the defendant guilty

2    beyond a reasonable doubt.  But I'll continue to

3    consider it.  But you may not have forever.  I know

4    you've got another trial coming up, too, if I remember

5    right, so you should intensively focus on this.  And

6    I'll give the government 14 days more to respond,

7    although a faster response would be valuable.

8         But you shouldn't necessarily assume, Mr. McGinty,

9    you know, that you're going to get a second shot and

10   this is going to go out months and months.  Do the best

11   you can in 14 days.

12              MR. McGINTY:  No, we will take it very

13   seriously.

14              THE COURT:  You do.  And, you know, I was, um,

15   disturbed that you didn't make your filings in a timely

16   way because there were a lot of issues, but I'll say for

17   the defendant and for the record, and he understands

18   this, you know, that when you got to this, um, you,

19   Ms. Demaso, did a very, very good job.  I don't think

20   there's anything you could have done if you worked on my

21   schedule, um, that you didn't do, and the defendant

22   wasn't prejudiced by your missing a deadline.

23         All right.  So there's one more issue and that's

24   whether the defendant should be released pending

25   sentencing under Section 3143.  If I read this right,

1   we're under Section 3143(a) rather than (b).  I guess I

2   need to know what the guideline range may be.  And

3   unless it calls for or recommends no time in prison, the

4   defendant would have to be detained unless there's clear

5   and convincing evidence he's not likely to flee or pose

6   a danger to the safety of any person in the community.

7        But what's the government's position with regard

8   to whether Mr. Harris should be released?

9              MR. BOOKBINDER:  Your Honor, our position, and

10  I take no pleasure in saying this, is that he should be

11  detained, um, and I'm happy to articulate why that is.

12  First of all, the guideline range, I believe the last

13  time we calculated it, would fall under -- potential

14  enhancements included was, I think -- and I don't have

15  it right in front of me, but it was 71 to 87 months or

16  something along those lines.  Certainly all those

17  enhancements the Court may not end up applying, but

18  certainly it's a significant range, um, and for purposes

19  of this inquiry certainly well beyond no time in jail.

20       And the reason for the request is, um, first that

21  the defendant is looking at a significant prison

22  sentence, um, which creates an incentive to flee.  Um,

23  but in and of itself that wouldn't be enough, um, for us

24  to be asking for -- um, asking for detention at this

25  point.  But as you heard, you know, this is someone who

1    has spent time living, you know, a period of a month or

2    two in Hong Kong, he's married to someone who is a

3    Chinese citizen, although I understand she may have a

4    green card or some immigration status here, but is not a

5    U.S. citizen.  He has, um -- this evidence did not come

6    in at trial, but I know the Court heard about it, that

7    he, as Mr. McGinty said this, that he had a bank account

8    in Hong Kong, um, we have evidence that we would have

9    offered at trial that he made at least one $49,000 wire

10   transfer during the course of this scheme.  Um, if I

11   could just ask, I think I could get that answer right

12   now, but during the course of this scheme.

13        THE COURT:  But not after he was indicted?

14        MR. BOOKBINDER:  Oh, no, no, no, during the

15   scheme and, you know, maybe 2006, 2005 or 2006,

16   something like that, not after he was indicted.  Um, so

17   there is some money that's moved over there.  And, um,

18   that he has some kind of a property, I think, an

19   apartment or a condo that he owned and, as far as we

20   know, may still own in Hong Kong.

21        THE COURT:  You know, I haven't focused on it,

22   but let me ask Mr. Riley, the Pretrial Services officer

23   to come inside the rail.  I haven't looked at the

24   Pretrial Services report and I don't believe I have a

25   letter regarding compliance or noncompliance of

1   conditions.

2          MR. RILEY:  I apologize, your Honor.  Here's

3   the original report.  He was interviewed actually by

4   Pretrial Services in the District of Oregon.  Here's the

5   bail conditions that were set.

6          (Hands up.)

7          MR. McGINTY:  If I may get a copy as well,

8   your Honor?

9          MR. RILEY:  I'll see if I have an extra one.

10         THE COURT:  Yeah, you know what I'll do?  Um,

11  let me hear, you know, a little bit about this generally

12  and then I'll copy -- we'll, in fact, do this now.  It

13  does show or say he had a flat in Hong Kong.

14         (Pause.)

15         THE COURT:  I'm sorry.  Go ahead.

16         MR. BOOKBINDER:  So between that, um, you

17  know, having a residence of some kind there, money, um,

18  a bank account over there, you know, a family

19  connection, and to a place that it's worth noting, um,

20  from which it is almost impossible to get somebody back

21  if they're there, um, that raises a real concern of risk

22  of flight and given the presumption at this point and

23  the sentence, at least at the guideline range, um, I

24  would suggest that it, you know, makes sense for him to

25  be detained.

```
1              THE COURT:  Well, as I understand it, the

2    burden, at this point, is on the defendant.

3         Mr. McGinty, would you like to address this?

4              MR. McGINTY:  Well, I would like to start with

5    the last comment that Mr. Bookbinder made relative to it

6    almost being impossible to have someone return from Hong

7    Kong.  In fact, I have a copy of an agreement with Hong

8    Kong for the surrender of fugitive defendants.  This

9    agreement between the United States and Hong Kong was

10   entered into in 1997, um, and it has proven to be an

11   effective means of agreement and cooperation between

12   Hong Kong and the United States.  So there is, in fact,

13   a functioning and effective means of returning to the

14   United States people who -- against whom there's process

15   in the United States, just as there is the reciprocal

16   agreement with the United States to commit people to

17   Hong Kong, and that was signed by President Clinton, as

18   I say, back in 1997.  So there is a means of returning a

19   person to the United States.

20        Mr. Harris has done the thing that I think is most

21   demonstrative of the single consideration here, which is

22   whether there's a risk of flight, um, he's appeared.

23   And, um, I remember some years ago, um, hearing that

24   Paul Cooley, who was a renowned lawyer, had, um, a

25   client, Miles Connor, and Miles Connor had been charged
```

1   with homicide, murder 1, and Mr. Cooley had represented

2   him during trial and he was out on $50,000 cash bail

3   and, um, come verdict his client did not appear because

4   his client knew that that was the moment of judgment and

5   did not appear.

6        Now, in that particular case, um, Mr. Cooley's

7   client proved to be not guilty, but what he had done is

8   he had recognized that appearing as Mr. Harris has done

9   here is the most significant proof of whether he intends

10   to appear at every court appearance -- not just every

11   trial day, which he has done, but coming for the

12   verdict.  And he knew full well, I discussed it with him

13   beforehand, I looked through the details of his past to

14   make sure I had sufficient information to present to the

15   Court, but he knew coming in here and he certainly knew,

16   um, when the message from the clerk was that, um, we

17   were not going to find out why we were being called

18   here, um, he certainly knew he was coming here for the

19   verdict.  I knew it and he knew it.

20        And we discussed this, um, the issue of what his

21   prospects were for release, um, as I told him to prepare

22   himself should this moment occur, and he appeared, um,

23   and not with a moment's reservation about whether he was

24   going to appear or not because he has respect for this

25   Court, he has demonstrated that by participating in, um,

being present for or by phone, a conference with the
Court on each time motions were -- required his
presence, um, and he's appeared every day at trial, with
respect to the Court, demonstrated throughout, by his
behavior -- his respect for the Court.

So if there's an issue about nonappearance, I
think by his behavior -- well, not his behavior, but his
presence and the manner in which he's presented himself
to the Court each day, particularly his appearance now,
um, I would respectfully submit that there is no basis
to find, understanding that the burden shifts here, um,
to show by clear and convincing evidence that the person
is not likely to flee.  I think there's ample basis to
make that judgment here.

THE COURT:  And what -- you know, now I've
been given, by my secretary, the conditions.  I don't
know why we all walk in here without the documents,
although I've been working in other matters.  I
interrupted another hearing to take the verdict.

What conditions do you suggest?  For example, do
we have his passport?

MR. RILEY:  Yes, your Honor.

THE COURT:  Where is it?

MR. RILEY:  Pretrial Services in Boston has
his passport.

1           THE COURT:  You do have his passport?

2           MR. RILEY:  Yes, your Honor.  He was released

3      back in December of '09 in the District of Oregon on

4      personal recognizance.  Um, reporting instructions?

5      He's been reporting to the Eugene Oregon Pretrial

6      Services Office and we've had regular contact, up until

7      even today, with the pretrial officer providing

8      supervision and both the pretrial officer reports that

9      Mr. Harris was very compliant with his conditions of

10     release, not only coming into the office and meeting

11     with him, but also in the field the officer met with

12     Mr. Harris on a regular basis at his home and was able

13     to confirm that he continued to work.  Yes, his passport

14     has been -- it was surrendered to the Eugene office and

15     then forwarded to us just recently.

16          MR. McGINTY:  And, your Honor, he has been a

17     significant part of the defense effort here, he's been

18     committed to the case, and frankly, um, we intend to be

19     as vigorous as we can to continue to contest the verdict

20     and he's an integral part of that and I think he wants

21     to participate in that and frankly it matters that he be

22     given the opportunity to do that and not in custody.

23          THE COURT:  Well, he'd be able to participate

24     whether he was in custody or not in custody.

25          MR. McGINTY:  Yes, but we'd --

```
 1          THE COURT:  But -- yet this is not over and it
 2   would be monumentally stupid for him to flee, or go into
 3   exile, um, because that could dramatically increase the
 4   sentence he's facing when he's caught and returned.
 5          MR. McGINTY:  And there are very significant
 6   differences between the defense and the government with
 7   respect to the guideline range.  Um, Mr. Phillips' --
 8   Mr. Phillips' guideline range was 8.  The government's
 9   contention of the guideline range here is 27, um, with
10   significance differences in Mr. Phillips' case, the loss
11   figure was $5,000 or less.  Now, this isn't the time to
12   dispute, either for the government or for me, to dispute
13   whether the government can demonstrate the loss to drive
14   the sentence in the fashion the government suggests
15   here, um, that would be also litigated.
16          THE COURT:  No, actually I assume there's
17   going to be some challenging issues with regard to
18   calculating loss that, you know, could, in a meaningful
19   way, affect the guidelines range.
20          (Pause.)
21          THE COURT:  What's the guideline that applies
22   to mail and wire fraud?  I guess it's the general --
23          MR. McGINTY:  It's 7 --
24          MR. BOOKBINDER:  It's 2(b)(1.1), your Honor.
25          MR. McGINTY:  The base offense level is 7.
```

```
 1              (Reads.)
 2              THE COURT:  I'm going to have Mr. -- I'm
 3    sorry.
 4        Are there any conditions that you would suggest
 5    that might increase my -- that might help meet your
 6    standard?
 7              MR. McGINTY:  Well, your Honor, we could do
 8    the electronic monitoring would perhaps be sufficient
 9    for the Court.
10              THE COURT:  And is it his plan or hope to
11    return to Oregon?
12              MR. McGINTY:  Yes.
13              THE COURT:  And, Mr. Riley, how long would it
14    take to set up electronic monitoring?
15              MR. RILEY:  Well, without knowing what
16    Mr. Harris's return travel plans are, um, if he were to
17    arrive tomorrow, which might be difficult, it would be
18    tomorrow, otherwise it most likely would be Monday at
19    the earliest, and so his arrival would be over the
20    weekend.  And then the question would be what the
21    electronic monitoring would be, such as on a curfew
22    versus home detention and --
23              THE COURT:  All right.
24        What about some financial conditions?
25              (Pause.)
```

```
 1              THE COURT:  Did Mr. Harris travel to Hong Kong
 2    from November to January -- November 2009 to January
 3    2010?  That says it was planned.  No?  So he didn't go.
 4              (Reads.)
 5              THE COURT:  Well, I don't know what's happened
 6    in the last couple of years, but this actually shows
 7    Mr. Harris with a net worth of about $300,000.
 8              (Reads.)
 9              THE COURT:  Let Mr. Hohler give you these
10    documents.
11              (Hands out.)
12              THE COURT:  Has Mr. Harris made any tentative
13    plans to return to Oregon?
14              MR. McGINTY:  Since we didn't know when the
15    verdict was coming back and the trial would be over, no.
16              (Pause.)
17              MR. McGINTY:  Mr. Harris said he believes that
18    he would be able to get a flight back tonight, with his
19    wife.
20              (Pause.)
21              THE COURT:  You can consult on this.  I mean,
22    I've got take this seriously.  The burden is on the
23    defendant.  I do appreciate the argument that he hasn't
24    fled to date.  There is a change in circumstances and
25    it's recognized in the law that it would be very stupid
```

 1    of him to flee, but people have been known to do stupid

 2    things.

 3         Do you wish to testify or say anything that might

 4    provide me some information on what he intends to do if

 5    I release him?

 6         MR. McGINTY:  Well, your Honor, frankly I'm

 7    loathe to do that.  I would recommend to you, um -- I

 8    think what the Court ought to consider, um, is

 9    Mr. Harris is married to his wife, Carly Chan.  They got

10    married back in January of 2006.  They are deeply

11    committed to one another.  She's a legal permanent

12    resident in the United States.  They've been living

13    together.  Um, they have a place in Hong Kong purchased

14    by her father.  They had regularly visited Hong Kong in

15    order to visit with her parents.  Um, they have a bank

16    account there for purposes of living there to visit her

17    parents, um, but their residence, um, their -- the place

18    that they view as their home is in Redmond, Oregon.

19         The figures, the money that is set out in the

20    financial resources -- um, and this is one of the

21    hazards of filling this out the way these are done.  The

22    person's arrested, they come in, and they're basically

23    asked to fill out a financial record.  Each of these are

24    projections based on property values that have largely

25    evaporated.  So the Portland property is not worth that

1   256, in fact, it's got a negative asset value, um, and

2   the same is true of the place that her parents purchased

3   in Hong Kong, but that's her parent's property on the

4   deed, they pay a mortgage on that, they make a payment

5   on that, and they do anticipate that that's going to be

6   a gift.

7           THE COURT:  Well, I guess I don't have any

8   current financial information because I'm thinking of

9   requiring a bond if I release him.

10          MR. McGINTY:  Okay.  Um, would it be an

11  unsecured bond?

12          THE COURT:  No.

13          MR. McGINTY:  Because he would be unable to

14  post cash --

15          THE COURT:  Well, "unsecured"?  I don't know

16  if we're talking in the same language.  He'd have to

17  acquire a bond.

18          MR. McGINTY:  But he would sign a bond and as

19  long as there's no -- that he doesn't have to post

20  money, he would be prepared to do that, sir.

21          THE COURT:  What's the value of an unsecured

22  bond?  I mean, you just told me he has no assets.  How

23  would that discourage him from fleeing.

24          MR. McGINTY:  Because he's 26 years old and he

25  plans on, you know -- and his financial future matters

```
 1    to him and that's --
 2              THE COURT:  What's that?
 3              MR. McGINTY:  His financial future matters to
 4    him and that's a commitment from the Court.
 5              THE COURT:  Mr. Bookbinder, what do you say?
 6              MR. BOOKBINDER:  Your Honor, I certainly
 7    understand what defense counsel is saying and I
 8    understand why this is difficult, but, um, you know,
 9    this is someone -- and again the presumption is the
10    other way now, it's someone who is facing a significant
11    sentence and obviously they'll need litigation about the
12    guideline range here.  But, you know, the gain to him
13    alone is a significant amount of money and there are
14    enhancements that are very likely to apply.
15         And, you know, he's got an -- he's got an
16    apartment in Hong Kong, he's got family in Hong Kong,
17    he's got a bank account in Hong Kong, there may have
18    been -- I don't know -- I have no personal experience
19    with extradition matters from Hong Kong, but obviously a
20    lot has changed with China since -- well, a lot has
21    changed with Hong Kong since it became part of China.
22    So, um, you know, I think there's a real basis to be
23    concerned here.
24              THE COURT:  I know, but if the government
25    represents that it's hard to get somebody back from Hong
```

1    Kong, you ought to know whether we have an extradition

2    treaty in matters like that.

3          I'm going to do the following.  I'm not persuaded,

4    at the moment, that there are conditions that reasonably

5    assure Mr. Harris -- I'm not persuaded by clear and

6    convincing evidence that essentially releasing him

7    without conditions is prudent.  I'm going to require

8    that he be detained.  By that's without prejudice to

9    considering this further.  Once I know what his proposed

10   flight information is and once I know when the

11   electronic monitoring can be set up, once I have a

12   proposal on the bond and any other information, um, I'll

13   address this again.

14         But at the moment I don't find there's clear and

15   convincing evidence that persuades me that just

16   releasing Mr. Harris, who is convicted of fraud, of

17   course, like everything else in the case, I'm going to

18   carefully consider the Rule 29 motion or the motion --

19   the renewed motion for acquittal and for a new trial.

20   But at the moment I see this case as involving a

21   conventional application of the wire fraud statute to,

22   um, you know, to facts that fit well within them.

23              MR. McGINTY:  Can I?

24              THE COURT:  No, no, why don't you -- here,

25   stop.  I mean, I'll listen to you.  But, you know, if

1    you get me something, um, tomorrow, you know, we may

2    revisit this on Monday, but I want to know what the

3    proposed conditions are and whether they're feasible.

4              MR. McGINTY:  If I might, your Honor?  As I

5    mentioned before, I'm loathe to have a client who's been

6    on trial here --

7              THE COURT:  And I know.  And, you know, it was

8    very reasonable for you to take that position, and I

9    probably -- but you took a position, I now have all the

10   information I'm going to have today, and I'm not

11   persuaded by clear and convincing evidence that

12   releasing Mr. Harris -- you know, that if Mr. Harris is

13   released on no conditions, um, that he is not likely to

14   flee.

15             MR. McGINTY:  Well, your Honor --

16             THE COURT:  He's convicted of fraud.  So

17   that's it.  I ruled.  I ruled.

18             MR. McGINTY:  Might I say one thing?

19             THE COURT:  Yes.

20             MR. McGINTY:  Mr. Harris wanted to speak and I

21   prevented him from doing that and I did that, using my

22   judgment, he wished for that opportunity and I -- I -- I

23   would ask that the Court consider that.

24             THE COURT:  You mean now he wants to say

25   something?

 1              MR. McGINTY:  Well, he wanted to -- as the

 2      Court --

 3              THE COURT:  Well, let me ask you this.  Here.

 4      Go ahead.  You tell him what your concerns are and then

 5      he'd tell me if he would like to say something, and I

 6      may or may not listen to it if he wants to say something

 7      after you explained your concerns.

 8              MR. McGINTY:  Okay.

 9              (Pause.)

10              MR. McGINTY:  Mr. Harris does wish to address

11      the Court.

12              THE COURT:  It may be subject to cross-

13      examination.  Here, approach the witness stand.  Well,

14      look, let me make sure we understand this.

15          Does the government -- he can speak, but does the

16      government want to cross-examine him?

17              MR. BOOKBINDER:  Your Honor, it all depends.

18              THE COURT:  On what he says.

19              MR. BOOKBINDER:  If he's making factual

20      statements that I think are inappropriate, then I would

21      ask for that, but if not, then not necessarily.

22              MR. McGINTY:  Your Honor --

23              THE COURT:  What?  Go ahead.

24              MR. McGINTY:  I don't know what the boundaries

25      are that are being set here.

1          THE COURT:  If I'm conducting, in effect, a

2    detention hearing, when a defendant wants to submit

3    evidence in a detention hearing, he goes on the witness

4    stand, he takes an oath, and he's sworn.  He's answers

5    questions and he's subject to cross-examination.

6          MR. McGINTY:  May I have a moment?

7          THE COURT:  Yes.

8          (Pause.)

9          MR. McGINTY:  Your Honor, under the

10   circumstances I have to withdraw the request.  I -- my

11   concern is this.  On the suggestion or the approach the

12   Court had set out, um, Mr. Harris needs to, as I

13   understand this, he need to set or to report to the

14   Court what his flight plans would be, he's the person

15   that would make those flight plans.  I can't.  If I come

16   back tomorrow and say that he's prepared to make flight

17   plans, um, I'm not in a position to make them, nor would

18   he, from a place of custody.

19          THE COURT:  Well, presumably his wife could.

20   I need to know -- and this is -- I'm not punishing him

21   for not saying anything, but I'm trying to be fair to

22   both sides and, you know, we're in a detention

23   proceeding posture, not a sentencing, and when I get to

24   sentencing, you know, he'll get a chance to speak and,

25   like everything, I'll take it seriously and I've

1    observed him and he has been respectful and he's been on

2    the line when he was supposed to be here, to be on the

3    line, and he's been here when he's supposed to be here,

4    and I have that in mind.  But I also have in mind that

5    now he's convicted of fraud, um, which is, you know,

6    fundamentally a crime of dishonesty, and he doesn't live

7    in Massachusetts, he has no roots here, he's going to

8    get on an airplane and go somewhere, and there can't be

9    any immediate electronic monitoring and there doesn't

10   seem to be any security that can be hosted.  And so, you

11   know, at least until I know that arrangements are in

12   place to get him home, to get the electronic monitoring,

13   then I'll decide it, that I'm satisfied that he's going

14   to go home.

15              MR. McGINTY:  May I have a moment, your

16   Honor?

17              THE COURT:  Well --

18              MR. McGINTY:  The Court has been very patient.

19              THE COURT:  Yeah, I know.  I know it's

20   consequential, but, um, you know, every time you lose

21   you want to change, you know, your position, get another

22   bite at the apple, and I'm going to let you do it.

23         Because, Mr. Harris, you know, when Mr. McGinty's

24   cautioning you or telling you about the risks of

25   testifying, you know, he's basing it on experience, and,

```
 1    on the other hand, I don't have to decide whether he's
 2    going to -- is likely to flee, I have to decide whether
 3    you're likely to flee, and I just have limited
 4    information.  So you're under no obligation to testify.
 5    But I think if there's something I'm going to rely on
 6    and, of course, you know, you're seeing that my own
 7    thinking has evolved and that it's not sufficient to
 8    just let him say something, that if the government wants
 9    to cross-examine him on it, then I think fairness
10    requires that I let them cross-examine him.  So you can
11    talk to him.
12              (Pause.)
13              MR. McGINTY:  Your Honor, Mr. Harris's wife is
14    here and she is, um, without a driver's license.  They
15    have a rental car which they need to return, they're
16    unable to do that.  She is, um, because of her limited
17    English skills, um, she has relied upon Mr. Harris to
18    make the plane arrangements and do the sorts of things
19    that would make possible her return trip, and she has
20    relied on her husband to help her get here and is
21    relying on him to get her back.
22          They -- I would simply, given the gravity of a
23    commitment order and the fact that I will, in several
24    days, have likely no more information I can offer the
25    Court than now, um, the only thing I might suggest is
```

```
 1    that, um, Mr. Harris might be interviewed by Pretrial

 2    Services which might supplement and make more recent the

 3    information that's on the Pretrial Services report.  But

 4    I don't know that in two days I'm going to have the kind

 5    of arrangements that he would be able to make, which I

 6    can't, and the kind of assurances that the Court will

 7    look for that, um, I would have a means to provide him.

 8    So my concern is that, um, as much as I'm imposing upon

 9    the Court now by prolonging this, I won't have a second

10    chance to effectively communicate with him and I don't

11    want that to happen.

12              THE COURT:  Does Mr. Harris want to testify

13    and possibly be subject to cross-examination or not?

14              MR. McGINTY:  No, I'm sorry, I already

15    indicated that I was withdrawing that request.

16              THE COURT:  I thought that's what you were

17    going to talk to him about, but what I observed is you

18    were talking to the women behind you.

19              MR. McGINTY:  I was.  I was talking to the

20    investigator in my office to find out what the

21    circumstances involving his wife were and what the

22    hardship it would impose on her.

23         A moment, your Honor?

24              (Pause.)

25              MR. McGINTY:  I would -- I just ask the Court
```

1    to consider having a Pretrial Services interview to

2    supplement the information.

3                    THE COURT:  I'm not.  I've got to make an

4    assessment of Mr. Harris.

5          Here's the final chance.  This is the last

6    chance.  If he wants to say something to me, he can, and

7    if the government wants to cross-examine, I'll consider

8    whether fairness requires it and I may.  Um, but -- no,

9    that's it.  You can talk to him once more, otherwise I'm

10   going to make a decision based on the information I have

11   now.

12         Basically what I want to know is essentially why I

13   should believe or be convinced that he's not going to

14   flee now that he's been convicted, and you sound great

15   but I'm not making a prediction of how you're going to

16   behave, I have to make a prediction about how he's going

17   to behave.

18                    MR. McGINTY:  Well, he would like the

19   opportunity to convey to the Court his intention of

20   continuing to, um, honor the appearance requirements and

21   to show up here.

22                    THE COURT:  All right.  And he may have to

23   answer some questions about it and we'll listen to it.

24   But he's going to stand and do it under oath.

25         Administer the oath.

1              (THE DEFENDANT, sworn.)

2              THE COURT:  All right.  Well, actually, why

3     don't you stay standing.

4          All right.  Mr. Harris, the question essentially

5     is, you know, why should I believe that if I let you

6     walk out of here today, you know, you'll go back to

7     Oregon as promptly as possible, you'll stay in your

8     apartment or your home until the electronic monitoring

9     is set up and then stay there until your sentence,

10    except for medical emergencies or religious reasons,

11    things like that?

12             THE DEFENDANT:  Your Honor, um, I've had

13    against me a guideline of up to 25 years in prison and

14    even knowing that, um, I reported to a Mr. Gennari from

15    Pretrial Services in Eugene, Oregon, um, on a weekly

16    basis.  Um, I met with them -- firstly, he visited my

17    house, um, once or twice every single month.  Um, I'm

18    actually currently employed with a company in California

19    where I actually worked from home.  Um --

20             THE COURT:  What do you do?

21             THE DEFENDANT:  Um, I write software for them,

22    um, and over 40 hours every single week, um, to make my

23    mortgage payment that I am under water in.  Um, but, you

24    know, that's what I do.

25          And my wife, um, she -- she can't rely on -- I

1   have to do almost everything for her.  Her English

2   capabilities is very, very low.  Um, she -- it would be

3   really hard for her even to travel back now, um, you

4   know, to our home.

5         And, like I said, I mean, and you can ask Pretrial

6   Services, I have been, you know, over three years in

7   constant contact with them on everything.  And I have no

8   issues about tonight.  I will see Nick Gennari

9   tomorrow.  I will drive to Eugene.  I will be at his

10  office as soon as I can.

11             THE COURT:  Here, let me ask you this.  What's

12  the name of the company you work for?

13             THE DEFENDANT:  It's called Cable Site.  It's

14  located in Alta Vista, California.

15             THE COURT:  And what kind of software products

16  do you develop?

17             THE DEFENDANT:  Um, it's mostly for server

18  infrastructures.

19             THE COURT:  Is this a real legitimate company

20  that --

21             THE DEFENDANT:  I've actually been providing

22  my pay records to Nick Gennari every month, um, with

23  every single pay stub that they pay me, and they pay me

24  on a weekly basis.

25             THE COURT:  And this is not a company that

1    makes modified modems or anything like that?

2         THE DEFENDANT:  No.  No.  No, your Honor.

3    No.  I mean, they have -- I'm sorry.  Um, no, your

4    Honor, they don't -- they actually only do the server

5    end of it.

6         THE COURT:  And do you understand that I'm

7    considering releasing you requiring you to post at least

8    an unsecured bond, say, you know, if you fled or failed

9    to appear, you know, $250,000, and putting you on

10   electronic monitoring so that while you could stay home

11   with your wife, you couldn't go out and play.

12        THE DEFENDANT:  Your Honor, you can make it

13   half a million dollars, I will show up to court every

14   single time I'm required.  I mean, the first time I had

15   a court appearance it was one or two weeks after my

16   initial appearance in Eugene and, you know, I raised my

17   own travel over here, um, you know, I was here promptly,

18   and every single time I've been asked, I have, you know,

19   gone out of my way to make sure that I'm here on time,

20   that I'd show up, and not evade the Court order.

21        THE COURT:  Does the government think there's

22   anything else I should ask the defendant?

23        MR. BOOKBINDER:  Your Honor, I suppose, um,

24   you know, to the extent that there's information in the

25   presentence report that's several years old and it's

```
 1   worth knowing --
 2               THE COURT:  You mean the Pretrial Services
 3   report.
 4               MR. BOOKBINDER:  I'm sorry, the Pretrial
 5   Services report -- whether he -- I mean, it sounds like
 6   he still has the apartment in Hong Kong and a bank
 7   account there, but I suppose we could --
 8               THE COURT:  Is there still an apartment in
 9   Hong Kong?
10               THE DEFENDANT:  There is, your Honor.
11               THE COURT:  And who owns that?
12               THE DEFENDANT:  It's actually in her father's
13   name, and I'm not sure how the laws work there, but it
14   has her on it, I believe, as well as me, and he -- and,
15   of course, it's owed to the bank or to the financial
16   agencies, just like my house here in Oregon.
17               THE COURT:  And why should I think you're not
18   going to go to Hong Kong?
19               THE DEFENDANT:  Well, first off, I don't think
20   there's an airline in the world that lets you board
21   without a passport.  Um, I think there would actually be
22   no physical way for me to get there except to swim, and
23   I'm not a very good swimmer.
24               THE COURT:  Does your wife still have her
25   passport?
```

1          THE DEFENDANT:  She does, your Honor.

2          THE COURT:  Mr. McGinty, do you want to see if

3    she's willing to surrender her passport?

4          THE DEFENDANT:  She does, your Honor.

5          THE COURT:  You can ask her or tell her.

6          (Pause.)

7          MR. McGINTY:  Yes, your Honor.

8          THE COURT:  All right.

9          MR. McGINTY:  It's in the car, um, near here,

10   so she could produce it very quickly.

11         THE COURT:  Yeah, I think that would give me

12   some -- yeah, provide the passport to Pretrial

13   Services.

14      Does she have other identification other than the

15   passport that would permit her to get on the plane?

16         THE DEFENDANT:  Just her green card, your

17   Honor.

18         (Pause.)

19         THE DEFENDANT:  And her permanent resident

20   card that she got from Homeland Security has a card.

21         THE COURT:  But does it have her picture on

22   it?

23         THE DEFENDANT:  Yes, it does.  I believe she

24   can use that card to fly.

25         MR. McGINTY:  She does have it.  She has a

1    permanent resident card that I can show to the Court.

2              THE COURT:  Okay.  I mean, I want to make sure

3    she can get on the plane.

4              (Shows to judge.)

5              THE COURT:  Here, I mean, the relevance of

6    this to me is theoretically or conceivably Mr. Harris,

7    who is now convicted of fraud, could have gotten another

8    passport in the last couple of years, but I don't know

9    that he would have had an incentive to get one for his

10   wife, and I've watched her weeping here today and I do

11   have the sense that he's not going to leave her and that

12   she can't go anywhere, so she's going to stay in the

13   United States.

14       All right.  Here's what I'm doing.  Mr. Harris is

15   to remain in the custody of the marshals until

16   Mrs. Harris's passport is surrendered to Pretrial

17   Services.  Mr. and Mrs. Harris are to arrange to get

18   back to go -- I'm ordering that Mr. Harris is to go, as

19   soon as he can, from Massachusetts to Oregon, to go

20   home, with no unnecessary stops in between.  Mr. Harris

21   is to stay home until electronic monitoring can be set

22   up.  He's to be on electronic monitoring initially at

23   least 24 hours, but he can go out for religious

24   services, he can go out if he has a medical appointment

25   or with the approval of the probation officer, or he can

1   go out if there's a medical emergency.  But, you know,

2   once that's up and -- and I'm ordering that if you use a

3   computer, you use it only for lawful purposes.

4        You know, you're a young man and you've got

5   yourself in a lot of trouble.  I don't know what's going

6   to happen in your sentence.  I always keep an open

7   mind.  But it's going to be a lot worse for you if you

8   flee or try to flee.

9        Do you understand that?

10            THE DEFENDANT:  Yes, I do, your Honor.

11            THE COURT:  All right.  So I -- you know, I

12   have to make a judgment.  So I'm ordering a $250,000

13   unsecured bond, initially at least 24 hour electronic

14   monitoring, and use of the computer only for legitimate

15   purposes.  That the government -- that Pretrial Services

16   will hold Mrs. Harris's passport until he's sentenced

17   and if he's sentenced to prison and allowed to self

18   report, until he self reports.  And there'll be other

19   standard conditions that I'll impose once I get a form.

20        All right.  Mr. Harris, it's -- it's possible to

21   be intelligent and not wise.  I think the scheme at

22   which you've been convicted required intelligence and

23   skill and hard work, but it reflects a lack of wisdom,

24   and this is a close question, and I haven't relaxed of

25   the standard, but I'm basically depending on what you've

```
 1    told me.  But one way or the other you're going to see

 2    me again.  So it would be unwise for you to disappoint

 3    me.

 4          Do you understand?

 5               THE DEFENDANT:  Yes, your Honor, I won't

 6    disappoint you.

 7               THE COURT:  Thank you.

 8          All right.

 9               MR. McGINTY:  Just so the marshal knows, the

10    -- once the passport is given over, as I understand it,

11    the marshals would then --

12               THE COURT:  No, I'll have Mr. Hohler --

13    Mr. Riley will tell me when he's got the passport, we'll

14    prepare some --

15          And he's going to have to sign some paperwork?

16               PRETRIAL OFFICER:  Yes, your Honor.  He'll be

17    signing an order acknowledging the conditions.

18               THE COURT:  Yeah, when the paperwork's done,

19    he'll be able to leave.

20          You know, you saved him at least a weekend in

21    jail, but he's going downstairs while I finish the

22    hearing I interrupted about an hour and a half ago, and

23    we button this up.  All right?

24               MR. BOOKBINDER:  Will the Court want the

25    parties back here for --
```

1          THE COURT:  No, actually here, let me tell you

2     the -- here, Mr. McGinty, listen to this.  I have to

3     schedule the sentencing.

4          My intention is to schedule the sentencing for May

5     23 at 3:00 p.m.  If there's anything other than the

6     information in the presentence report, it shall be filed

7     no later than May 9th, um, so that's sentencing memos,

8     letters, motions, and any reply shall be filed by May

9     16.  But, you know, actually -- actually --

10               (Pause.)

11          THE COURT:  All right.  It's possible that

12     that may slip a few days further back.  But at the

13     moment --

14               (Pause.)

15          THE COURT:  All right.  I think the 23rd

16     should be all right.  All right?

17          So, Mr. Harris, you'll go with the marshals and I

18     hope in about an hour we'll be able to get you out of

19     here.

20          All right.  Anything else -- excuse me.  He's not

21     going to go right this second.  The marshals will wait

22     just a minute.

23          Is there anything else before we recess?

24          MR. McGINTY:  There is not, your Honor.

25          THE COURT:  All right.  The Court is in

1    recess.

2              (Ends, 5:00 p.m.)

3

4                 C E R T I F I C A T E

5

6        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

7    hereby certify that the forgoing transcript of the

8    record is a true and accurate transcription of my

9    stenographic notes, before Chief Judge Mark L. Wolf, on

10   Thursday, March 1, 2012, to the best of my skill and

11   ability.

12

13

14   /s/ Richard H. Romanow 11-07-12
     _____
15   RICHARD H. ROMANOW  Date

16

17

18

19

20

21

22

23

24

25