1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                              No. 1:09-cr-10243-MLW

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   RYAN HARRIS

11

12

13                          *********

14

15                    For Hearing Before:
                      Chief Judge Mark L. Wolf

16
                            Sentencing
17

18                    United States District Court
                      District of Massachusetts (Boston.)
19                    One Courthouse Way
                      Boston, Massachusetts 02210
20                    Wednesday, June 27, 2012

21                          ********

22
                   REPORTER: RICHARD H. ROMANOW, RPR
23                      Official Court Reporter
                     United States District Court
24       One Courthouse Way, Room 5200, Boston, MA 02210
                      bulldog@richromanow.com
25

```
 1                    A P P E A R A N C E S

 2

 3    ADAM J. BOOKBINDER, ESQ.
          United States Attorney's Office
 4        John Joseph Moakley Federal Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          (617) 748-3112
 6        E-mail: Adam.bookbinder@usdoj.gov
     and
 7    MONA SEDKY, ESQ.
          U.S. Department of Justice
 8        601 D. Street, N.W.
          Washington, D.C. 20530
 9        (202) 353-4304
          Email: Mona.sedky@usdoj.gov
10        For the United States of America

11

12    CHARLES P. McGINTY, ESQ.
          Federal Public Defender Office
13        District of Massachusetts
          51 Sleeper Street, 5th Floor
14        Boston, Massachusetts 02210
          (617) 223-8080
15        E-mail: Charles_mcginty@fd.org
          For the defendant

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (Begins, 2:00 p.m.)
3              THE CLERK:  Criminal Matter 09-10243, the
4    United States of America versus Ryan Harris.  The Court
5    is in session.  You may be seated.
6              THE COURT:  Good afternoon.  Would counsel
7    please identify themselves for the Court and for the
8    record.
9              MS. SEDKY:  Good afternoon, your Honor.  Mona
10   Sedky and Adam Bookbinder for the United States.  I also
11   wanted to alert the Court that we have a representative
12   from Charter Communications.
13             THE COURT:  I'm sorry.  I can't hear you.
14             MS. SEDKY:  I'm sorry.  We have a
15   representative from one of the victims, Charter
16   Communications, and he would like to address the Court
17   whenever the Court would like to address him.
18             THE COURT:  Yes, and, in fact, I was going to
19   ask you whether the notices were given and whether
20   anybody wanted that opportunity.
21        Okay.  And for the defendant?
22             MR. McGINTY:  And, your Honor, for Mr. Harris,
23   Charles McGinty and Christine Demaso from the Federal
24   Defender Office.  Good afternoon, your Honor.
25             THE COURT:  Good afternoon.  And Mr. Harris is
```

1  present.

2      Yesterday I issued two memoranda and orders

3  addressing the defendant's motions to acquit.  I assume

4  the defendant and the government received those,

5  correct?

6           MR. McGINTY:  We did, your Honor.

7           MS. SEDKY:  Yes.

8           THE COURT:  And then you've implicitly

9  answered this, Ms. Sedky, but were the victims notified

10  of this proceeding?

11           MS. SEDKY:  They were, your Honor.  Two of

12  them submitted written submissions and one of those two

13  has come to appear in court, your Honor.

14           THE COURT:  And the representative from

15  Charter would like to be heard at the appropriate time.

16  Essentially after I calculate the guidelines I will give

17  him an opportunity to be heard.

18      In connection with this I have a presentence

19  report as to which the defendant has made several

20  objections, the government's sentencing memo with some

21  attachments, the defendant's sentencing memo, the

22  government's response to the defendant's sentencing

23  memo, which includes letters from Charter, Motorola.

24      Is there anything else I should have received and

25  read?

1          MS. SEDKY:  No, your Honor.

2          MR. McGINTY:  I think the only other matter,

3     your Honor, is there's a Pretrial Services release

4     status letter that is also part of the record.

5          THE COURT:  Thank you.  I have received that

6     letter, it's dated June 25, and it tells me that

7     Mr. Harris has been in compliance with the requirements

8     of his pretrial release.

9          MS. SEDKY:  Your Honor, we do have one item

10    that we brought to court with us this morning, and I'm

11    showing it to defense counsel, and if I could approach

12    the Courtroom Deputy and hand him a copy, it's a

13    document that I'd like to reference in my oral

14    statements to the Court.  It's a printout from

15    Mr. Harris's web page as of two days ago.

16         THE COURT:  Um -- okay.  You may give a copy

17    to the Clerk.

18         (Hands up.)

19         THE COURT:  I'll make this Exhibit 1 with

20    today's date.

21         (Pause.)

22         THE COURT:  All right.  As always I'd like to

23    assure that we have a common sense of the operative

24    legal framework, it's succinctly stated by the Supreme

25    Court in *Gall*.  I'm required to begin this sentencing

1    hearing by correctly calculating the applicable

2    guideline range.  The guidelines must be the starting

3    point as an initial benchmark.  However, I must consider

4    all of the Section 3553(a) sentencing factors to

5    determine what sentence is sufficient and no more than

6    necessary to serve the intended purpose of sentencing.

7    I may not presume that the guideline range is

8    reasonable.  I have to determine the sentence based on

9    the unique facts of the case.  If there's a departure or

10   a variance, a major departure or a variance requires a

11   more substantial justification than a minor one.  And I

12   need to explain my decision.

13        Do the parties agree that's the applicable

14   framework?

15             MS. SEDKY:  We do, your Honor.

16             MR. McGINTY:  We do, your Honor.

17             THE COURT:  And we're operating under the

18   guidelines in the most current manual with the

19   amendments effective November 1, 2011.

20        Mr. McGinty, have you and Mr. Harris each read the

21   presentence report?

22             MR. McGINTY:  We have, your Honor.

23             THE COURT:  And other than the matters raised

24   in your objections, is there anything that you or he

25   think is inaccurate?

1          MR. McGINTY:  No, your Honor.

2          THE COURT:  All right.

3      And, Mr. Harris, did you read the presentence

4  report?

5          THE DEFENDANT:  Yes, I have, your Honor.

6          THE COURT:  And other than the objections

7  raised on your behalf by Mr. McGinty, is there anything

8  in there that you feel is inaccurate?

9          THE DEFENDANT:  No, your Honor.

10          THE COURT:  Okay.  Then let's turn to those

11  objections.

12      All right.  The first objection resulted in the

13  updating of the presentence report to reflect that Craig

14  Phillips has been sentenced to one year of probation.

15      The second objection is to Paragraphs 8 through 19

16  concerning the government's statement of the facts of

17  the case.  Now, the statement seemed to me to be a

18  reliable summary of the evidence that the jury would

19  have found credible in convicting the defendant, so I'm

20  inclined to deny that objection.

21      But do you wish to be heard, Mr. McGinty?

22          MR. McGINTY:  No, your Honor.  I just wanted

23  to have a formal objection.

24          THE COURT:  Okay.

25      Objection 3 relates to the loss calculation.

1   Essentially, as I understand it, the Probation

2   Department, based on the information provided by the

3   government, calculated the guidelines based on a loss

4   figure of over 1 million and less than 2,500,000.  That

5   was based on all of the revenue to TCNISO in certain

6   years.  But if I read the sentencing memos right, um,

7   the parties recognize that some of that revenue might

8   not have been unlawful and there may have been some

9   associated expenses, too, and the parties agree that

10  it's too difficult, in this case, to reliably,

11  reasonably calculate the loss.  So the gain, as

12  Probation did, ought to be used.

13       But the parties are of the view that the gain is

14  more accurately or appropriately deemed to be in the

15  400,000 to a million dollar range -- do I understand the

16  posture of this, for calculating the guideline range as

17  opposed to restitution?

18            MS. SEDKY:  That's correct, your Honor.

19            MR. McGINTY:  And that is by agreement, your

20  Honor.

21            THE COURT:  All right.  Well, that does seem

22  to me to be most reasonable.  The Probation Department

23  was acting on the information it had at the time, but,

24  um, you know, recognizing that some of the products sold

25  could be lawfully -- well, weren't part of the scheme

1   and that there would have been some expenses, um, I

2   agree both that for the reasons the parties stated in

3   their submissions, the loss cannot be reasonably

4   determined, and so under Section 2(b)(1.1) Application

5   Note 3(b), it's appropriate to use the gain, and

6   $400,000 to a million is the most appropriate figure.

7        Okay.  Is the restitution issue raised in a

8   separate objection or is it embedded in this one?  I

9   think it may be embedded in this one.

10            MR. McGINTY:  It is embedded in that, your

11  Honor.  We reached agreement -- and I don't recall

12  whether we reached agreement, um, after I filed the

13  objections, but we did reach an agreement as to --

14            THE COURT:  Well, that's $152,320?

15            MR. McGINTY:  Correct.

16            THE COURT:  And what's the theory on that?

17            MS. SEDKY:  Your Honor, the parties conferred

18  after the various submissions and, um, in light of the

19  analysis that Charter performed, coming up with a range

20  of approximately 304,000, I believe, to a high of

21  350,000-plus thousand based on -- depending on different

22  assumptions that were made, um, the parties got together

23  and decided that there were some assumptions in

24  Charter's number that we thought were arguably

25  aggressive and in the end there were some genuine

1    litigable issues about whether, for example, um, it was

2    fair to assume that every single purchaser of the TCNISO

3    product successfully used that product every day from

4    the date of purchase through October of 2010 when

5    Charter was able to find a technical fix.  And we

6    thought that in light of those assumptions, that might

7    have been too aggressive, um, we thought -- the parties

8    got together and decided that a 50 percent number would

9    be a fair recommendation to the Court.

10              THE COURT:  And, um, I don't know if Charter

11   wants to be heard on that.  Do you know whether Charter

12   is content with that amount?

13              MS. SEDKY:  Well, we did tell Charter in

14   advance of appearing here today and I'm happy to have,

15   um, her address that either now or later.  I didn't hear

16   any push-back from her then, but we're open to it.

17              THE COURT:  Who is the Charter

18   representative?

19              MS. SEDKY:  Her name is Laurie Jill Wood and

20   she's in the second row.

21              THE COURT:  And, Ms. Wood, I'm going to give

22   you a chance to speak more generally later, but is

23   Charter, which will be the recipient of any restitution

24   that's paid, wish to argue against or tell me something

25   that should cause me to find an amount of restitution

1    owed of more than that 152,000?

2              MS. WOOD:  No, your Honor, we understand the

3    government's position.

4              THE COURT:  All right.  Thank you.

5         All right.  So I've allowed Objection Number 3 and

6    said the gain is 400,000 to 1 million dollars and the

7    amount of restitution is $152,320.

8         The fourth objection.  The IRS summary included

9    "all revenues not simply monies for the sale of TCNISO

10   products."

11        Is that essentially moot at this point?

12             MR. McGINTY:  It is, your Honor.

13             THE COURT:  Okay.  I'm going to treat that

14   one, at this point, as withdrawn, but I will keep it in

15   mind.

16        Objection 5.  It says:  "Harris denies he retained

17   $526,685."  I think the government has the burden of

18   proving this.  It doesn't affect the guideline range and

19   the amount of the gain is in the 400,000 to 1 million

20   dollar range, but, Ms. Sedky, do you want to speak to

21   this?

22             MS. SEDKY:  My understanding is that because

23   it doesn't affect the guidelines range, I assume that

24   Mr. Harris is putting this in here in part out of a

25   concern for a potential IRS prosecution down the line.

1    Um, we stand by the number.  We had an IRS agent do a

2    very comprehensive analysis of Mr. Harris's business

3    expenses versus revenues and if -- and when there is a

4    tax case, we can certainly discuss the merits there.  I

5    don't think it bears taking up any of the Court's time

6    here because it's not relevant to the guidelines

7    calculation.

8                THE COURT:  Well, I'd also have to determine

9    that it's not relevant to the sentence, including the

10   amount of restitution.  But I'm prepared to assume that

11   the amount of the gain or the gain to Mr. Harris was

12   400,000 to a million, but whether it's precisely

13   $526,685 is not going to influence the guideline range

14   or the sentence.

15        But do you want to be heard?

16                MR. McGINTY:  I do not, your Honor.

17                (Pause.)

18                THE COURT:  All right.  So with regard to

19   objection 5, I've written on the presentence report:

20   "The amount of the gain is 400,000 to 1 million dollars

21   to Harris and the precise amount does not affect the

22   guideline or the sentence."  Objection 5, I've allowed.

23        So, in the circumstances, while I'll say that my

24   present intention is to give the same sentence

25   regardless of whether the guideline range is 87 to 108

months, as probation calculated, or 70 to 87 months, as

my rulings, I think, provide, um, the present guideline

range is a total offense level of 27, a criminal history

category of 1, 70 to 87 months in prison, therefore, 12

to 36 months supervised release.  The fine range is

reduced to $12,500 to 125,000.  The amount of

restitution is $152,370 -- actually, 320, I think,

dollars.  And there's a $700 special assessment.

Do the parties agree that those are the guideline

ranges?

MR. McGINTY:  We do, your Honor.

MS. SEDKY:  Yes, we do.

THE COURT:  All right.  I think before I hear

from counsel and Mr. Harris, if he wishes to be heard,

that this would be the appropriate time to hear from the

representative of Charter.  So if you would come up to

that podium, say your name for the record and for the

Court, and let me -- let us hear, but direct it to me,

what you would like to say.

MS. WOOD:  Okay.  Great.  My name is Laurie

Jill Wood and, um, I am the Director of Security at

Charter Communications.

Okay.  Um, well, um, there's a few things that I

wanted to touch on or reasons that I wanted to come here

today.  Um, you know, I think that sometimes people

1  think of cable theft as just a small crime and

2  victimless crime that, you know, whether it's

3  downloading a song or plugging into an apartment

4  building, but in this particular case, while though we

5  can't determine exactly how much money was lost, it was

6  significant, and it was, um, across the industry.  We

7  believe somewhere around 3 to 4 million dollars.

8       Another effect of this was that it affected our

9  paying and legitimate customers.  We, as I mentioned in

10  my letter, we structure our network and site it based on

11  how many customers we have and if we have a certain

12  number of unexpected customers, then, um, our using up

13  the service, that degrades the service for our paying

14  customers as well.

15       I wanted to be here today also because this has

16  been an important part of my professional life.  Um, I

17  started the Internet Security Department at Charter in

18  2001 as a 1-person department and, um, over the years,

19  as computer crimes have grown, we've expanded as well.

20  I know that as early as 2004 I was monitoring the TCNISO

21  site as were, um, some of the engineers in the field,

22  and I would regularly receive calls from them saying,

23  "Have you seen this site?  TCU can buy a modem -- did

24  you see if he can say you want the Charter modem?"  And

25  so this is something we've been fighting for quite a

1    while.

2         And I remember also that it was what -- I'm sure

3    that may have been other people -- or there may or may

4    not have been other people who developed and sold cloned

5    modems, but specifically I remember TCNISO as the

6    primary source because, um, I could never remember the

7    initials, so I regularly would Google "hacked modem" or

8    a "cloned modem" and there would pop up TCNISO.

9         We did finally, as I believe Benjamin testified,

10   um, during the trial, that our engineers kept working at

11   how could we get these modems distinguished and kicked

12   off the network?  And they did come up with a way of

13   doing it that would identify all the duplicate modem

14   MACs across our network, but as I indicated earlier,

15   that the problem was that it didn't distinguish between

16   legitimate customers and illegitimate customers and, um,

17   rather than kick off a legitimate customer on the

18   network, we were limited in our resources and so we

19   decided to just let those folks be on the network until

20   we could figure out a better solution.  And the

21   engineers kept working and kept working and, um,

22   eventually they did find a way of distinguishing between

23   the paying customer and the illegitimate customer, but

24   it took a while -- it took several years and a lot of

25   research.

1    The main reason I wanted to come today is that,

2    um, my role, since 2001, has been, um, to respond to law

3    enforcement.  Charter has a law enforcement response

4    team that reports to me.

5    I'm sorry?

6    THE COURT:  If you would step back just a

7    little bit, I'll hear you and you won't get that back --

8    MS. WOOD:  Okay.  Thank you.  That's great.

9    (Steps back from microphone.)

10    MS. WOOD:  So we have a department, the LERT,

11    we call it the "Law Enforcement Response Team" that

12    reports to me and every day we get subpoenas and court

13    orders from local law enforcement, federal law

14    enforcement, Homeland Security, DEA, FBI, the Secret

15    Service, and we're asked to investigate the source of

16    the activity that's being investigated by law

17    enforcement.  And during the period of time that we had

18    cloned modems on our network, that was very difficult to

19    do sometimes.  If I have four modems on the network, all

20    that look identical, and I basically wanted to know

21    which one is the right one, the person they're looking

22    for, um, I have no way of knowing, because they all look

23    alike.  And so we would have to respond, "unable to

24    identify."  I just don't have a way of distinguishing

25    it.  And this happened many, many times and it made me

1    sick so often that I had to go back to law enforcement

2    and say, "Can't tell you."

3         Now, you know, how many of those folks committed

4    those crimes?  You know, I don't have a way of proving

5    that every single one of those times the perpetrator was

6    using a modem built by and sold by Mr. Harris, but it's

7    been an ongoing problem for many years that was very

8    disturbing to me.  And that's why when we had the

9    opportunity to come today, I asked if I could come and

10   Charter understood what an important issue it was and

11   agreed to send me here to speak.

12              (Is seated.)

13              THE COURT:  All right.  Thank you very much.

14              MS. WOOD:  Thank you, your Honor.

15              THE COURT:  All right.

16        Ms. Sedky, what, please, is the government's

17   recommendation and what are the reasons for it?

18              MS. SEDKY:  Thank you, your Honor.

19        We are asking for a low-end guideline sentence of

20   70 months to be followed by 3 years of supervised

21   release, no fine, and the restitution that we discussed

22   earlier.  And the reasons to support the 70 month

23   sentence is, we acknowledge that 70 months is a strong

24   sentence here, but Mr. Harris's conduct, if you look at

25   the nature and the circumstances of his offense, it was

1    a six-year prolonged crime spree that wreaked havoc on
2    ISPs like Charter who spent hundreds of hours, as you
3    can see from the letters from Motorola and Charter and
4    you might recall from the testimony of Benjamin
5    Brodfuehrer and Chris Kohler at trial, playing this
6    cat-and-mouse game, and TCNISO was a scourge to the
7    ISPs.  And as easy as it is to demonize the ISPs, nobody
8    likes paying high cable bills, the bottom line is that
9    they lost millions of dollars in subscriber revenues and
10   spent hundreds of man hours, person hours, which equates
11   to money, on Ryan Harris alone.
12        This was a very prolonged six-year program.
13   Mr. Harris acted with absolute knowing malice.  He had a
14   desire to punish the cable companies.  He expressed that
15   desire repeatedly in his literature, in his chat logs,
16   in his book.  He was the "angel" he called himself.  He
17   was the father of this cottage industry of cable modem
18   hacking.  He created it himself.  He was the only person
19   in this state to mass market a turnkey plug-and-play
20   device that allowed people very easily to steal internet
21   service for months and years at a time.  And he did so
22   with knowing malice and he was motivated by greed.
23        This was not someone who was sitting back as a
24   freedom fighter or for the internet and free speech or
25   whatever, he was in this to become a millionaire.  He

1    wanted a house.  He wanted a pool.  He wanted money,

2    millions and millions of dollars.  And he was successful

3    in wreaking havoc and in punishing these ISPs, as you

4    heard from Ms. Wood.

5         And I would submit to the Court that a 70-month

6    sentence, being at the low end of the guidelines,

7    actually gives Mr. Harris a huge discount on what his

8    guidelines calculation would be if we were lucky enough

9    to be able to calculate the loss, because I don't think

10   it is disputed that it is orders of magnitude higher

11   than his personal gain.  And he is fortunate that we are

12   not able to measure because his guidelines would be

13   exponentially higher.

14        And he's getting a major discount by virtue of the

15   fact that we have agreed to view the gain as a proxy for

16   the loss, um, the loss in terms of lost subscriber

17   revenues, the loss in terms of degraded performance to

18   the other legitimate paying subscribers, and, as you

19   heard during the trial, and in the letters and

20   Ms. Wood's testimony today, legitimate paying

21   subscribers were knocked off the network.  The ISPs

22   would have to invest money to keep their speeds the same

23   and many times they would have to pass these costs off

24   to their consumers to some degree.  So this is not some

25   nameless, faceless victim, these were innocent,

1   legitimate paying subscribers who were ending up having

2   to essentially pay for Mr. Harris's six-year crime

3   spree.

4          And, um, in addition to this exponentially larger

5   harm to the ISPs that was shared by legitimate paying

6   subscribers, you also have to look at what exactly was

7   Mr. Harris's role in this scheme and the evidence is

8   unrefuted and Mr. Harris essentially concedes it in his

9   own guidelines calculation, he accepted a

10  leader/organizer enhancement for four points

11  acknowledging that he was the guy.  He sold, admitted --

12  he, by his own estimation, has sold 15,000 of these

13  units or he had 15,000 purchasers.  We had trial

14  testimony that he was trying to cut a deal for unlimited

15  licenses up to 10,000.  So he was acting with not just

16  reckless abandon, but malice and greed.  He declared war

17  on the cable companies repeatedly and he essentially

18  used his purchasers as his soldiers in his own war.

19         And he has shown no remorse throughout this

20  proceeding.  I would like to draw the Court's attention

21  to what has been marked as Exhibit 1.  A few days

22  before, I guess it was Monday, as I was preparing my

23  remarks for today, I wanted to just take a look at what

24  was going on in his website and you'll see that he has

25  turned his website into a donation tool.  It says:

1    "TCNISO donate," with some Visa, PayPal, Mastercard

2    buttons, "If you have any questions, contact us.  Thank

3    you for being patient."

4         Now, this strikes me as someone who is not

5    remorseful, is laying in wait, waiting to rise up again

6    and start his business as soon as he gets the go-ahead.

7    I don't know what to make of this, but it is not the

8    activity of someone who feels remorseful and that leads

9    into the deterrence argument here.

10             THE COURT:  Well, this document says:  "TCNISO

11   donate," it shows some credit cards, and it says, "If

12   you have any questions, contact us.  Thank you for being

13   patient."

14        And what do you argue that indicates?

15             MS. SEDKY:  I think this is -- this is not

16   emblematic of someone who has realized he's been

17   convicted of a crime and is remorseful and is feeling

18   like what he did was illegal and wrong.  And, um, and I

19   think that that goes to -- when we're thinking about

20   deterrence, both specific deterrence and general

21   deterrence, this is a man who really has had every

22   advantage in his personal life.  He came from -- unlike

23   many of the defendants we come across in our jobs as

24   prosecutors, he did not come from a gang background or a

25   drug addict background where he had many externalities

1    that were pressuring him to turn to crime, he came from

2    a stable, intact, upper middle-class home.  He had

3    unbelievably marketable skills in his computer

4    background as evidenced by the fact that he's had no

5    problems finding a job in the computer industry to

6    support himself during the pendency of this criminal

7    action.  And, um, given -- we see no circumstances of

8    his personal life to justify leniency beyond what has

9    already been shown by his guideline calculations

10   specifically by substituting gain as a proxy for loss

11   here.

12        And in terms of deterrence, and also in protecting

13   the public, there are -- Mr. Harris -- we have very

14   serious concerns over whether a year-and-a-day sentence

15   would have any effect on Mr. Harris's decision-making

16   going forward, but, more importantly, the industry of

17   cable-modem-hacking people are watching with bated

18   breath, they were watching the trial to see if he got

19   convicted, and they will be watching this sentence.  And

20   if he has a -- what they consider to be a slap on the

21   wrist, they will think of the cost of doing business,

22   they'll do their cost-benefit analysis in their head and

23   they'll think, "What's the percentile likelihood that

24   I'm going to get caught and prosecuted successfully and

25   then what's my likely outcome if I do get prosecuted

1    successfully?"  And I would submit to the Court that if

2    Mr. Harris gets a lenient sentence here, it will send a

3    terrible message to current and would-be cable-modem

4    hackers and it will expose ISPs and their legitimate

5    paying subscribers and cable modem manufacturers all

6    around the world to continued significant risk.

7         And for those reasons we believe that a 70-month

8    sentence is fair, we believe it accomplishes the 3553

9    factors, it takes into account his personal background,

10   the nature and circumstances of the offense, and it

11   would adequately deter him from his own future of

12   criminal conduct and others in his own position.

13              THE COURT:  Thank you.  Mr. McGinty.

14              MR. McGINTY:  Can I start with something that

15   the government just spoke about moments ago and that is

16   the prospective risk of cloned modems being used.

17   Looking at the chart or letter that was submitted to the

18   Court, I'm looking now at the --

19              THE COURT:  Hold on a second.  I'll get that.

20              (Pause.)

21              MR. McGINTY:  This is Page 2 of the Exhibit 2,

22   Docket 160.

23              THE COURT:  Okay.

24              MR. McGINTY:  You know, on the -- in the

25   fourth paragraph it addresses "corrective capability to

1    identify cloned modems" and what it says in the third

2    line, it begins:  "We were able to develop automation

3    that would successfully integrate into our billing and

4    provisioning systems so that the anticloning system

5    would automatically disable connectivity for the cloned

6    modems.  The development time for this process took

7    several years.  I'm proud of Charter's engineers because

8    Charter was one of the first major cable companies to

9    develop this capability.  Later other companies asked if

10   we could share our code."

11        The cloned modem access to unprotected cable

12   networks is over.  The technology capable of doing that

13   is -- has been defeated by detection capabilities within

14   the cable companies.  So when the government talks about

15   this concern about specific deterrence to Mr. Harris,

16   whether prospectively he may want to go into this again

17   because it remains as a possibility, I respectfully

18   suggest, um, that door is closed.

19             THE COURT:  The evidence at trial did indicate

20   what the government characterizes as a "cat-and-mouse

21   game" with the companies taking steps to frustrate the

22   cloning and then efforts with Ms. Lindquist and others,

23   you know, to get around that.  Why wouldn't I be

24   concerned, why wouldn't one be concerned about sort of a

25   continued effort on the behalf of somebody to, you know,

1   frustrate the efforts of the cable company?

2           MR. McGINTY:  Well, the person who was, um,

3   the -- who had the capability of imagining the

4   penetration into a cloned system or into an embedded,

5   um, CPU, was Isabella Lindquist whom, um, the Court saw

6   testify here, and there's, I would think, the Court

7   would agree, that there's very little likelihood that

8   she would engage in anything like this in the future.  I

9   think it's pretty clear from what we've read or from

10  what I've been able to read, um, that the capability of

11  doing this has ended because the systems are no longer

12  unguarded and what existed before and in the period of

13  2002, 2003, 2004, was frankly -- and I say this not

14  intending to spark an argument with the government, but

15  to try to put this into a larger context, but was a

16  largely unguarded access to the cable modem network.

17  Um, Motorola had a device, it relied upon a publicly-

18  available conspicuous identifier as a means of gaining

19  access.  That vulnerability doesn't exist anymore.

20       Um, what, um -- what --

21           THE COURT:  And you say that because -- for

22  example, the boxes of the modem had the MAC addresses on

23  them?

24           MR. McGINTY:  Correct, and that was the

25  only -- I mean, I think to use the word "security" is to

1   overstate it.  If you use a publicly-available

2   identifier as your security means, you either are

3   indifferent to security, um, or you, um, don't think

4   that it's a significant problem to your system.  And --

5              THE COURT:  I think that they have other

6   measures, that it was necessary to get MACs from other

7   parts of the country because you couldn't have two MACs

8   in the same neighborhood, um, with the same address?

9              MR. McGINTY:  Right, but as security measures

10  go, that's a fairly modest measure.  And I want to be

11  clear about what I'm going to argue here with respect to

12  this.

13      I'm not suggesting that Motorola and Charter

14  didn't notice that Mr. Harris is existing.  What I do

15  want to say is that based on discovery during the course

16  of the trial what we learned is the degree to which they

17  knew he existed is reflected in e-mails or

18  correspondence and it was modest indeed.  Um, there was

19  an inquiry, as part of a grand jury investigation, to

20  Ms. Wood at Charter and it was looking for information

21  with respect to, you know, what was it that you have

22  with respect to TCNISO.  The response to the agent went,

23  quote:  "My department had asked if it would be possible

24  for us to get information regarding how many Charter

25  modems were sold by his site or a group of people so

Case 1:09-cr-10243-MLW   Document 181   Filed 11/09/12   Page 27 of 75

1    that we could calculate damages.  I think he is

2    interested in claiming damages in a criminal action and

3    also possibly initiating a civil action.  Is this

4    information available or should I check in later when

5    the process of negotiation with the defendant is further

6    along?  Thank you very much."

7              THE COURT:  That's Charter asking the

8    government?

9              MR. McGINTY:  Correct, asking the government.

10         Now, um, correspondingly, um, there was an inquiry

11   by Mr. Bookbinder, this was to Motorola, and this was

12   the one I quoted in my brief, which indicated that, um,

13   that the government had asked, you know, "What documents

14   do you have to document what it was that TCNISO was

15   doing?"  And what it said is, quote, "Let's discuss next

16   week as the search for responsive documents, while not

17   being complete, does not appear to be fruitful."

18         Now, in arguing this, I'm not suggesting that they

19   weren't aware that there was a hacked modem capability

20   out there, what I am suggesting is that in terms of the

21   significance of this as a -- as a, um -- as a, um, sort

22   of threat to the cable companies or as a significant

23   looming presence that created significant security

24   concerns for the ISPs, um, these documents don't bear

25   that out.  And I would note that with respect to the

 1    Motorola submission, they do present e-mails and the

 2    e-mails are for a period in 2004.  The 2004 e-mail --

 3              THE COURT:  Hold on just a second.  The

 4    Motorola letter?

 5              MR. McGINTY:  No, this is separate, this is

 6    the, um -- this is not submitted as part of the

 7    sentencing documents.

 8              THE COURT:  Is it something that I have?

 9              MR. McGINTY:  Um, this is not something that

10    you have.  But this was an e-mail exchange between

11    Mr. Bookbinder and a Carol Tate, um, of Motorola back in

12    2008 while the grand jury investigation is ongoing.

13         Now, if the Court recalls, um, there was some

14    issue about whether or not, um, I would seek to have

15    this admitted and also whether I would seek to have

16    admitted Charter e-mail and we didn't ultimately seek to

17    admit them because the government's position was that if

18    we put in the Charter e-mail, they would seek to put in

19    the subsequently-created claims of Charter with respect

20    to overall loss, um, and with respect to the e-mails

21    here, um, in the midst of the e-mail was a profile about

22    Mr. Harris in 2004 that described, you know, what it was

23    that TCNISO did and what the views were of the author

24    about what it was that he did, which also we didn't want

25    to have admitted.

1      The point of the e-mails, though, was that save

2   for an e-mail in 2004, which was a "Has anyone seen this

3   communication about this hacker named Harris and his

4   company called TCNISO?" um, there was no more

5   communication in e-mails in Motorola until 2006 and that

6   was in connection with the purchase of a modified modem

7   in 2006 and then a further inquiry by e-mail in 2007.

8   So in terms of the impact this had on the cable

9   companies, in terms of their perception that they were

10  expending money to increase their -- their service in

11  certain service areas, that this constituted a

12  significant impact on the cable companies, such as is

13  described here by the government, in urging a higher

14  sentence for Mr. Harris, I would respectfully submit

15  that this documentary record doesn't support that and

16  more for that matter does the testimony during the

17  course of the trial.

18      The Court heard from Mr. Brodfuehrer, for example,

19  um, during trial, he of Charter.  He testified with

20  respect to, um, what steps he took to identify cloned

21  modems and what their capability was.  And if your Honor

22  recalls, he said that either in 2006 or 2007, um, he had

23  tested one of the modified modems to find out what its

24  capability was, but it turned out there were no

25  documents reflecting the test, there was no

1    communication with other people with respect to what the

2    test meant, and there was no discussion about what steps

3    would be taken to try to address this issue.

4              THE COURT:  This -- the gains Mr. Harris has,

5    and I agree, conservatively have been estimated to be

6    between 400,000 and a million dollars, and your argument

7    sounds something like saying, um, if somebody had a half

8    a million dollars in their house and left their door

9    open and somebody walked in and took it, or didn't put a

10   good lock on the door and somebody went in and took it,

11   um, that's not such a big deal.

12             MR. McGINTY:  Well, that's exactly the

13   argument I'm not trying to make.  What I am trying to

14   make is that when the government says that the losses

15   were exponentially higher, in other words, the guideline

16   range that we've talked about here, I think they could

17   be actually calculated to be significantly higher.

18   That's simply not the case.

19             THE COURT:  No.

20             MR. McGINTY:  And also in terms of the harm

21   done, in terms of the daily harm and the commitment to

22   try to rectify the problems raised by Harris's work

23   here, um, I would respectfully submit, um, don't fairly

24   capture the degree to which the cable companies were

25   largely indifferent to what was happening in this

1    sphere.

2        So in terms of the sort of the larger threat of

3    the cable companies quaking in their boots because it

4    was concerned about what Mr. Harris was capable of

5    doing, um, they knew he existed, but they didn't notice

6    that he existed, and there's a difference.

7            THE COURT:  The -- I mean, I think this is a

8    meaningful point to discuss because I think the

9    government's argument is that there's a larger context

10   to this, um, and it's something almost of a generational

11   war that emerges as the picture from the trial, because

12   you've got these relatively young people, um, with

13   computer skills, who got into this because they wanted

14   faster service when they played their video games and,

15   you know, they're antagonistic to these big corporations

16   that are making money and making it either too expensive

17   or not giving them the fast service they want even if

18   they, you know, are going to pay for it.  And I think,

19   you know, it's something I think about and I say it so

20   you can address it, um, with regard to the need for

21   general deterrence is, you know, is it not just this

22   specific scheme, you know, cloning modems, but, you

23   know, the whole idea that if you steal something from

24   somebody you don't see on the internet, um, that that's

25   not really a crime?  Um, and perhaps there are, you

1    know, people who would never break into somebody's house

2    themselves or rob a bank, but would take just as much

3    money on the internet.  And, in fact, as you cited the

4    *Watt* case or quoted it, or somebody did -- I guess the

5    government did, you know, quoted Judge Gertner, you

6    know, talking about, you know, quoting some treatise on

7    the threats -- you know, the unique threat from cyber

8    crime.  And we had the testimony of Hanshaw -- and

9    Mr. Harris is certainly not going to be punished by me

10    for anything Mr. Hanshaw did, but he had those phony 911

11    hostage calls and thought it was amusing that the police

12    in Seattle would show up with a SWAT team at somebody's

13    house.

14           MR. McGINTY:  It's no small part ironic,

15    however, um, that one of the contentions the defense

16    made at trial was that this was a multicapability device

17    and one of the significant ones, that is, is that it, in

18    fact, ensured anonymity on the web.  In fact, as part of

19    the evidence at trial, um, we put in that there's a

20    government-sponsored, government-created anonymity

21    capability that the government has sponsored and made

22    available to everybody, and part of the government's

23    response on the anonymity side is that there are other

24    ways to get that and you don't have to resort to using

25    Harris's product to get it, because it's generally

1    available.  Now we hear that anonymity is an aggravator

2    rather than something that shows that this is a

3    multifaceted device.

4            THE COURT:  It's not so much that anonymity

5    itself is an aggravator, um, if you're in China or Iran,

6    you know, anonymity can serve the cause of human

7    rights.  But the idea that, you know, Mr. Harris is

8    representative of a group, I don't know how big a group,

9    of people who think that if you steal on the internet,

10   it's not unlawful or it's not comparable, you know, to

11   walking into somebody's business and stealing money out

12   of their safe.

13           MR. McGINTY:  Well, in *Watt*, um, Judge Gertner

14   confronted the contrast between a loss figure that was

15   in the billions, as in billions of dollars, and an

16   offender, um, who was a first offender, whose sense of

17   the scope and consequence from the conduct was entirely

18   disproportionate to the effect that he had, and trying

19   to reconcile those two was enormously difficult, and it

20   showed in the disposition when Judge Gertner said the

21   sentence ought to be two years, showed the difficulty of

22   trying to reconcile those two ends of the -- and I think

23   that's the same issue here.  And if --

24           THE COURT:  But in -- I'm sorry.  Go ahead.

25           MR. McGINTY:  And if I might?  A lot of the

1   fight here comes over a guideline that elevates the

2   exposure here to almost six years.  Now that's an

3   extraordinary exposure.

4       I recall something that Arthur Lyman of some

5   distinction some years ago had said, that for a first

6   offender, he said, um, "It's not length of jail, it's

7   the fact of jail," and it is the social opprobrium that

8   comes with that, it's the fear of going in the door.  I

9   have dealt many times with people where it wasn't the

10  length of the sentence that so frightened them -- oh,

11  sure, that was a component of it, but it was the fact

12  that they were going to be going into confinement with

13  fears that they couldn't even begin to imagine.

14      Now, in a large way we've lost sight of that

15  because we've elevated sentences now and we ask the

16  question, "Gee, is 6 years enough for a first

17  offender?"  And this is a first offender here, convicted

18  by a jury, who is 28 years of age, who has not quite

19  completed his college education, shows considerable

20  intelligence, considerable capability.  We'll warehouse

21  him for six years, if the government has its way, for

22  six years.  We have a degradation of skills, we have a

23  job market that will spit him out, and we have a felony

24  wrapped around his neck that's going to keep him from

25  being a productive member of the community.  I remember

1       some years ago, and I remember them well, that the

2       conversation was about, um, putting a person who has not

3       been convicted before in jail at all to pay the price

4       for the offense, but now the numbers have gotten so

5       extraordinary.

6              Now, what motivated Mr. Harris here --

7              THE COURT:  Wait, let me stop you because,

8       one, one of the purposes of the guidelines was to treat

9       white collar robbers comparably to blue collar robbers,

10      that's a stated purpose, and they did raise the offense

11      level for white -- or the guidelines over prior

12      experience.  That was deliberate and in my view, which I

13      may have expressed back in 1986, well founded.

14             Two, every case is unique.  Watts didn't develop

15      the scheme that he assisted in and he wasn't paid

16      anything according to the decision, he just did it as

17      sport because of his animosity -- well, to show he could

18      do it, um, and he helped Gonzalez make a fortune.  But

19      if you look at one of those early footnotes in the **Watts**

20      decision, it reminded me that I sentenced somebody else

21      in that scheme, Zane, to 46 months, because he provided

22      inside information on a bank.  Every case is unique.

23      But --

24             MR. McGINTY:  Well, I'm in favor of trying to

25      provide some sort of fair parity between, um, white

```
 1    collar offenses and non-white collar offenses.  I would
 2    note that if Mr. Harris robbed a bank, um, his guideline
 3    would be Offense Level 20, plus 2 for it being a
 4    federally-insured institution, and his guideline would
 5    be lower.  Um, and without a criminal record, there are
 6    any number of offenses, one of which includes arson --
 7              THE COURT:  How would his guideline be lower?
 8              MR. McGINTY:  His guideline would be lower
 9    because the --
10              THE COURT:  It would be 24 minus 3 --
11              MR. McGINTY:  It would be 22, plus 3, it would
12    be 19.
13              THE COURT:  I thought you said the offense
14    level would be 20 plus 4 for a federally-insured --
15              MR. McGINTY:  No, it would be plus 2.  It
16    would be plus 2.  So it would be 22, less 3 on a plea,
17    it would be 19.  The same would be true with arson.
18              THE COURT:  For the same amount of money?
19              MR. McGINTY:  Um, the same amount of money?
20              THE COURT:  Yeah, well, if one could see
21    whether he was the organizer of the bank robbery,
22    whether he got half a million dollars?  But anyway.  Go
23    ahead.  All I'm saying is I haven't done the alternative
24    calculation.  I'm not confident it's correct.
25              MR. McGINTY:  But while the Court is correct
```

1    that certainly in 1986 there was the intent to raise the

2    guideline, um, that guideline became raised over and

3    over again after that, not simply for purposes of

4    adjusting for inflationary changes, um, but sort of

5    increased willy-nilly, and so that now we have the

6    extraordinary spectacle of first offenders in white

7    collar cases looking at double-digit sentences.

8              THE COURT:  I think the theory -- I'm not sure

9    it's willy-nilly, um, we've gone through, you know, um,

10   several financial crises since 1986 that have probably

11   heightened people's appreciation of the cost of white

12   collar crime and helped recognize that white-collar

13   crime almost uniquely is a crime of calculation, usually

14   generated primarily by greed, and so the sentences are

15   intended to alter the calculations.

16             MR. McGINTY:  Well, here, um, the offense

17   conduct is not originally motivated by greed.  Um,

18   Mr. Harris had perceived a wrong, in his view, um, this

19   capability of ISPs to affect your speed and to affect

20   your service performance.  Now, that would not be a

21   grievance that most of us would find worthy.  Um,

22   certainly unlimited web speed is -- to call it a false

23   guide gives it the respect that it doesn't deserve, but

24   his motivation in doing this -- um, the government

25   refers to him as "leading a life of crime," his

1   motivation was not that.  His motivation was his

2   grievance and his feeling that there had to be sort of a

3   rectification of power.  And when he did that, um, he

4   didn't seek anonymity, he didn't prepare a black box and

5   sell it surreptitiously, um, he published a book,

6   identified exactly what his exploits were, and in effect

7   notifying the cable companies or the ISPs exactly what

8   their vulnerability was, um, and he sold a product,

9   which the government says was "out of the box, plug in,"

10  but, it wasn't "out of the box, plug in," as we know

11  from Mr. Medeira, who testified, um, that when he

12  plugged it in it lasted for thirty days and then there

13  would be something required for him to do and that he

14  didn't follow up and do that, and other persons have

15  tried to use it and have found it to be burdensome, um,

16  and so the result was that rather than this being an

17  easy application, it turned out to be considerably

18  different from that.

19        Now, I think that looking to see whether

20  Mr. Harris fits the marque of a person who is leading a

21  life of crime, I think the Court captured the nub of the

22  issue, um, at the time the Court had the colloquy with

23  Mr. Harris after the guilty verdict, and what the Court

24  said was that "You could be smart, but not wise," and I

25  think that captured exactly what the issue is here, um,

1    a challenge to ISPs, based on a grievance about speed,

2    elevating that to the sale of a product, was misguided,

3    it was deeply immature, it was one that now puts him in

4    a very, um, in a very, um, frightening position as he

5    contemplates what the consequence for that might be.

6    Um, I think the government can argue, but its point

7    misses, when they talk about him, his life of crime as

8    if he was motivated here initially to steal.  Um, in

9    fact, he acted on a grievance as a lot of young people

10   do.

11            THE COURT:  The grievance that he couldn't get

12   service as fast as he wanted it?

13            MR. McGINTY:  Right, and this proceeding, what

14   the consequences would be.

15            THE COURT:  How did he misperceive the

16   consequences?  The jury found that he engaged in wire

17   fraud, intentionally knowing that it was illegal, and

18   with intent to defraud, to cheat the ISPs, and he wasn't

19   just out trying to get faster service for himself, um,

20   he was creating an industry.

21            MR. McGINTY:  But in terms of evaluating --

22   accepting the jury's verdict, in terms of evaluating the

23   gravity of the offense, looking to what motivated him to

24   participate in the offense and looking to see what

25   exactly he had done to advance this offense, um, I would

1  respectfully submit to the Court that there is a -- um,

2  this is an area where, um, the lines between permissible

3  and impermissible conduct are not as clear as they are

4  in other areas.  This is not an area of the law where

5  there are simple prohibitions against robbing a bank or

6  against setting a fire in a public building.  Um, there

7  are many applications on the net -- and I know the

8  Court's impatient with this, but it's --

9          THE COURT:  No, I'm not impatient.

10         MR. McGINTY:  -- but it's a significant point,

11 I think.  What Mr. Harris did is done in other ways by

12 legitimate, um, companies on the net who have

13 distributed hacking devices, who have distributed things

14 like "stroke counters," and have done it in a way that

15 --

16         THE COURT:  I'm sorry.  Things like what?

17         MR. McGINTY:  "Stroke counters" that identify

18 what the key strokes are of persons who are submitting

19 information over the net.  They're able to intercept

20 data that's going over the net.  And these applications

21 are ones that are generally available.  Um, in some

22 instances they are government sanctioned.  Um, for

23 Mr. Harris to glean the line that separates his conduct

24 from those kinds of conduct -- not in terms of whether

25 the jury convicted him of the crime or not, but in terms

1    of looking at the gravity of the offense and what

2    motivated him to participate, his misperception of the

3    consequence of doing that is what got him in harm's way.

4            THE COURT:  Well, it seems to me you just

5    conflated two points, and I'm not impatient with the

6    argument, although it's one I wrote about a dozen pages

7    about and issued yesterday.  I regard this case as a

8    straightforward application of the wire fraud statute

9    and, you know, it's -- the law gets applied to emerging

10   technologies, but as the cases I cited yesterday, um,

11   indicate, at times people were stealing telephone

12   service and developing technology to do that and then

13   cable television service and, you know, now you have the

14   internet, so now it's internet service.  But the jury

15   had to be convinced beyond a reasonable doubt that

16   Mr. Harris knew what he was doing was illegal and

17   engaged in the activity with intent to defraud, to get

18   money, to cheat the providers out of money.  So -- and

19   in viewing the evidence, I feel very comfortable with

20   that conclusion.  I recall, you know, various efforts

21   to, you know, make it difficult to find them.  Although

22   he did write the book.

23           MR. McGINTY:  And in writing the book, it's

24   something that's unusual in terms of what his -- in

25   terms of what his culpability is.  Um, it is the unusual

1    defendant who, mindful that they're committing some kind

2    of offense, does it in a way that involves sort of

3    publishing what the --

4              THE COURT:  It could be a manifestation of an

5    arrogant sense of invulnerability, um, "Nobody can nail

6    the angel."

7              MR. McGINTY:  Well, I respectfully submit that

8    it's suggesting something quite different and what it

9    suggests is that when he embarked on this, um, he

10   thought there was legitimacy about his contest, and it

11   was in the challenge, it was in the contest -- not in

12   the criminality, not in the theft, that motivated him.

13   And in terms of putting in perspective what the penalty

14   would be, it is important to assess the degree to which

15   that contributed to his behavior and sentence him

16   accordingly.

17             This nuance, and it's an important one, I think,

18   separates that -- that Mr. Harris, who's a real human

19   being, in terms of facing a consequence, and the

20   government's version of him, which is a person leading a

21   life of crime in different and in basically without --

22   without any compulsion about just, you know, constant

23   stealing.

24             So, um, it is significant to look at what he did,

25   it is significant to look at what he was doing publicly

1    as an expression of what he thought he was doing, and

2    it's also significant to look at who is the victim

3    here.  Um, no one is privileged to victimize a

4    corporation, but it is aggravating conduct if the fraud

5    focuses on the vulnerable, on the widows, on people who

6    don't have the means.  Harris went toe to toe --

7    actually not even toe to toe, he looked up at Goliath

8    and challenged Goliath.  He didn't trick the vulnerable

9    into giving him something not his.

10          The fraud guideline measures loss, it does that as

11   a -- sort of on a retribution model which says that you

12   answer for the gravity of your offense and it adds up

13   the money.  That money ordinarily is a factor of

14   somebody who takes something from someone that is done

15   by deception or deceit or by cunning.  Here Mr. Harris

16   announced his presence, the cable companies hardly

17   noticed that he existed, and he presented himself,

18   telling them what he was doing.

19          So the challenge here in sentencing him is the

20   same challenge that existed in *Watt*, but it's slightly

21   different.  What do you do about a person whose

22   motivation toward the offense, toward the conduct, was

23   not of a sort that ordinarily characterized the offense,

24   because he didn't go after the vulnerable, he didn't go

25   after the persons who would be harmed here.  And I think

1    that --

2           THE COURT:  By the way you just described the

3    ISPs, they're vulnerable to being robbed because what

4    you take from them is not that important, it's not that

5    large a part of their revenues.

6           MR. McGINTY:  No, but in terms of his aside

7    with you of the conduct.  Um, in jury selection, there

8    were a number of jurors who came in and said, "I've done

9    this."  Um, now, that doesn't mean it's good, they

10   weren't proud of themselves, but we do recognize that

11   the gravity of the offense depends upon, um, how it's

12   viewed in a larger societal scale.  Um, taking cable

13   service is not the same thing as doing harm to a person,

14   stealing their retirement.  Um, there are innumerable

15   examples, and the Court's seen them, of the terrible

16   harm that's done by people who engage in deceitful

17   conduct, but this is a very different kind of case with

18   very, very different kind of victims.  Yet, the

19   guideline we apply is a guideline that's based on this

20   retribution model, just desserts, if the loss is a

21   certain figure, that's where the consequence is, and

22   what it doesn't take into consideration are the things

23   that I think separate Mr. Harris from other people who

24   do this and put him into a -- sort of a very different

25   kind of evaluative process.

1          And I think -- and I'm going back to what the

2    Court has said.  Um, when Mr. Harris was addressing your

3    Honor and you characterized him as "smart, but not

4    wise," his response to that was -- um, he told you he

5    was working, that he went back to Oregon and he has kept

6    that job, that he's worked as many as 80 hours a week,

7    um, and he's appeared in court here in order to show

8    that he respects and honors the trust that the Court

9    extended to him, um, that, in a sense, that it's

10   important for the Court to appreciate that in a very

11   real way he gets it and that what you said to him

12   resonated in a way that was extraordinarily meaningful.

13          THE COURT:  Well, he -- I wouldn't have

14   released him pending sentencing if he hadn't obeyed the

15   conditions of his release before his conviction, that he

16   has -- and we may end up having a discussion about bail

17   before we go home today.  Um, but again I say this to be

18   as transparent as possible.  I'm not confident that

19   Mr. Harris gets it.  And I -- right after I told him he

20   might be smart, but he wasn't wise, he told me he wasn't

21   a good swimmer, that he couldn't swim to Hong Kong.  Um,

22   that didn't sound terribly contrite.

23          MR. McGINTY:  A weak attempt at humor under

24   difficult circumstances.

25          But what he's done is he's gone back to his home.

1    He has largely lived there.  He works from his home.

2    Um, what I have learned about Mr. Harris is he doesn't

3    leave his home and that what he does is he largely

4    functions around his work and about and around sort of

5    contemplating what's going to come up and what steps he

6    has to take to significantly change his life.

7         So my point in its entirety is this.  I think that

8    70 months is a sentence that holds no, um, for general

9    deterrence purposes, um, it has the effect of imposing a

10   sentence out of proportion to what's necessary for this

11   court to create a consequence for engaging in criminal

12   conduct.  For specific deterrence, there's not a hint

13   here that Mr. Harris, while he's been on supervision,

14   um, is contemplating engaging in this type of conduct

15   again.  He has renounced any business ownership or any

16   attempt to be involved in a business.  Um, he's employed

17   as a wage worker now.

18        So under all these circumstances I ask the Court

19   to consider the sentence that I recommended, the year

20   and a day.  Um, I think it fairly responds to the

21   gravity of the offense, it valuates who he is as an

22   offender with characteristics different from other

23   offenders in similar circumstances.

24             THE COURT:  So if I were to sentence him to a

25   year and a day, that would make him eligible for good-

1    time credits and if, as I expect, he performed well in

2    prison, he would serve about 10 1/2 months?

3              MR. McGINTY:  That's right, and he would then

4    be under house arrest for an extended period, um,

5    earning money and paying back --

6              THE COURT:  I'm sorry.  Are you recommending

7    that home detention is a feature of supervised release?

8              MR. McGINTY:  Oh, yes.

9              THE COURT:  How long?

10             MR. McGINTY:  We recommended, I think, two

11   years.  And the point of that was to have a meaningful

12   period of house arrest with him employed and being able

13   to pay back the restitution.

14             THE COURT:  And the government shows me this

15   printout from the TCNISO page, they say of Monday.  It

16   says:  "If you have any questions, contact us.  Thank

17   you for being patient."  And I think the government's

18   argument is this is Mr. Harris saying, "Be patient, I'll

19   be back in business sooner or later."  How do you think

20   this should be interpreted and what weight if any should

21   be given to it?

22             MR. McGINTY:  I don't think any weight should

23   be given to it.  The website has been -- the TCNISO

24   website has been removed.  Um, you know, for TCNISO to

25   breathe again, it would be immediately recognized by the

1   government.

2        The hacked cable modem, um, opportunity has passed

3   and there's nothing TCNISO can do about that, nothing

4   they can even try to do about that.  So, I mean, you

5   know, if the government suggests that there's a future

6   prospect of hacked modem work and that TCNISO is going

7   to again take the forefront in that, I frankly think

8   that's fiction.

9             THE COURT:  Thank you, very much.

10            (Pause.)

11            THE COURT:  All right.  Mr. Harris, you now

12  have an opportunity but not an obligation to speak

13  before I decide what sentence to impose.  That means you

14  do not have to say anything.  But if there's something

15  you'd like to say for me to consider, now is the time.

16            THE DEFENDANT:  Um, first, your Honor, I would

17  like to thank you for the last time we spoke.  Um,

18  you've given to me a lot of trust and, um, I do

19  understand my responsibility.  I was scared then.  I'm

20  still scared now.

21       Um, when I was first indicted, three or some years

22  ago, the original indictment, they didn't tell me much.

23  I read the indictment and they released me with no

24  conditions other than to perform pretrial and, um --

25  follow the standard pretrial conditions, of course.  Um,

1    they didn't mention anything about the alleged

2    business.  They didn't mention anything, um, at all.

3         Um, I went home and the very first thing I did,

4    you know, this is the day, um, is I took down my domain

5    and the screen shot you have, that's exactly the way it

6    looked on that very day.  It was my entire website, not

7    just what they alleged, but other links, I had other

8    projects, other things that were also on there, every

9    one of them went to that page you see, your Honor.  So I

10   know you asked about it, um, that I would clarify it.

11   And I'm sure the government knows that as well.  It's

12   been the same ever since.  Um, the computer was on, it

13   was paid in full, um, several years running, um, I have

14   canceled it, the whole domain, so eventually it will

15   disappear.

16        Um, the last time we spoke, I, um -- I got and

17   went to the airport as soon as I could, booked the first

18   flight to Portland, Oregon with my wife and we went to

19   see Nick Gennari at Pretrial Services, um, and talked to

20   him about the new release conditions and, um, picked up

21   the monitor and went directly to home.  And every day

22   since then I have been just working, um, at my job and

23   in my spare time, um, I work on my garden, a vegetable

24   garden that I do.  I also do yard work, you know,

25   flowers, planting.

1         Um, several years ago, um, I was given an

2    opportunity to be employed by a reputable company

3    utilizing my skills and even though I've been told it's

4    a very hard job market and my employer does know about

5    my illegal situations, they have been following me up on

6    their own, um, but they still want me -- to have me on

7    their payroll and to be productive for them, and I have

8    been trying over and beyond -- above and beyond what I

9    think they originally expected of me.  Um, and if --

10   they didn't just give me an opportunity or a job, they

11   also gave me a career, and I'd like to continue that

12   career.

13        Um, there was something, um, I read a while back

14   from a Nobel Lauriat when he said:  "For I, being poor,

15   have only my dreams.  I spread my dreams under your

16   feet.  Tread softly because you tread on my dreams."  So

17   I would like to summarize that as what I'm saying to

18   you.  Thank you.

19        Also I would like to add, um, that if you have any

20   questions of me, that I'd be happy to answer them for

21   you.

22             THE COURT:  I don't think so.  Thank you.

23             (Pause.)

24             THE COURT:  Mr. Harris, please stand.

25             (Defendant stands.)

1          THE COURT:  In connection with the seven

2     counts to which you've pled guilty, I hereby sentence

3     you to serve 3 years, 36 months, in the custody of the

4     Attorney General of the United States, to be followed by

5     36 months of supervised release on the standard

6     conditions and the additional conditions that you not

7     possess a firearm or other dangerous weapon, that you

8     pay restitution in the amount of $152,370 on a schedule

9     to be dictated or recommended to me by Probation, that

10    you pay a $50,000 fine, and a $700 special assessment.

11    The restitution will go to Charter.  You may not incur

12    any new credit charges or open any additional lines of

13    credit without the approval of the Probation Office and

14    you must provide the Probation Office access to any

15    requested financial information.

16         You have a right to appeal this sentence within 10

17    days of the entry of judgment.  If you cannot afford a

18    lawyer and would like to appeal, one will continue to be

19    appointed to represent you at public expense.

20         I feel I have tread very softly on your dreams.

21    While Mr. McGinty was ardent today, as he often is, um,

22    I'm sentencing you, and I have given you a sentence

23    that's several years less than the sentence I was

24    inclined to give you when we started.  But for the

25    reasons I'll explain, I believe this sentence is the

sentence that's sufficient and no more than necessary to
serve the purpose of sentencing.  If that proves to be a
miscalculation on my part and you commit any crimes
while you're out on supervised release, you'll be back
in front of me, I can lock you up for another three
years, and then you'll be prosecuted for those crimes.
But I am obligated to consider the nature and
circumstances of the offense and the history and
characteristics of you, the defendant.

I agree with the government, I think you committed
a very serious crime.  Most people of any age would
understand that if you went into somebody's home or
business and stole a half a million dollars or $900,000,
that's a serious crime, and you are certainly smart
enough to know -- more than smart enough to know that
that's what you were doing with regard to the ISPs.

And it's serious with regard to what you did and
it's serious to what it can lead to.  I'm not punishing
you for anything that Mr. Hanshaw did, but I did get the
impression -- I'm sort of an old man listening to this
case, that there may be a generation of people who don't
know the difference between real life and a video game,
they consider it some kind of entertaining sport to
steal on the internet or to victimize people on the
internet in a way that they would never do face to face

1    and that's something that goes into this sentence.

2         You know, you -- you know, you're an intelligent

3    person, you don't drink, you don't use drugs, um, you

4    could make rational decisions and you were capable of

5    making rational decisions when you engaged in the

6    conduct that you knew was criminal.  The jury found that

7    beyond a reasonable doubt.  I would certainly find the

8    same thing beyond a reasonable doubt.  You knew what you

9    were doing is criminal and you did it and you enjoyed

10   the sport with outsmarting the internet service

11   providers and it didn't just victimize them, but people

12   whose MAC addresses were cloned, they probably had to be

13   replaced, and people who weren't getting the service

14   they paid for because of what you had uncapped, I mean,

15   there are real human victims as well as the service

16   providers.

17        I originally thought I would give you a longer

18   sentence because I did not think -- I hadn't seen

19   anything that indicated to me that you got the message

20   and that you weren't going to do this again as soon as

21   you got out or soon after, but I find now that you have

22   thought about this, you have taken this seriously.  It's

23   just hard for a judge to know when a well-advised

24   defendant doesn't testify, you know, you get a feeling

25   in the trial for the person, but it doesn't mean it was

1  the wrong thing to do, but that's for sentencing.  But I

2  also have to send a message to other people and the

3  message that I hope that three years will be sufficient

4  to send is that it's not just wrong, it's dumb to steal

5  on the internet, that it's not -- that this is life,

6  it's not a video game, it has consequences.

7      I'm actually -- while I think there's no doubt

8  that you knew what you were doing was unlawful, I've

9  also been somewhat influenced by the fact that this is

10  one of the first, if not the first, case of this kind

11  and you didn't have the opportunity to hear internet

12  chatter that some video gamer got sentenced to three

13  years in federal court in Boston.  So whoever's next,

14  um, won't have the kind of argument that Mr. McGinty

15  made on your behalf.  But I do have a duty to diminish

16  unwarranted disparity.  Every defendant is unique.

17  Every case is unique.  There's a material difference

18  between you and Mr. Phillips.  Mr. Phillips, you know,

19  pled guilty, cooperated with the government, um,

20  testified based on that letter immunity.  It's customary

21  that people who do that get much lower sentences.  But

22  you do get, from me, some benefit for being the first or

23  one of the first.

24      But three years is a long time and you're going to

25  be separated from your wife, and unless she's got a

1  driver's license since the last time I saw you, um,

2  she's not only going to miss you, it's going to be a

3  hardship for her, and in those three years I expect

4  you're going to think about how you feel today and make

5  a decision about how you're going to behave when you get

6  out, and it's going to be up to you.  Either you're

7  going to remember how scared you were today and I expect

8  how much you don't enjoy being in prison, um, or you'll

9  get out and resume what you did before.  But one of the

10  things this case should teach you is -- and you may be

11  smart, I think you're smart, but that it's possible to

12  be smart and not wise.  And what you should understand

13  and everybody you communicate with should be told is

14  that it's really dumb to think that you're not going to

15  get caught, you're not going to get prosecuted, you're

16  not going to get seriously punished.  I think that the

17  sentence I've given you is minimally sufficient to

18  deliver that message to you and I hope to others.

19       I've imposed a $50,000 fine.  That's actually

20  something of an expression of confidence in you because

21  I think that you've got the potential to make some money

22  honestly.  If you make that money, you're going to have

23  to not just pay Charter, um, but pay that fine, because

24  I think you acted from a mixture of motives and one was

25  clearly against the internet service providers and the

1  other was the desire to make money, although, as I

2  recall, you thought a $170,000 house was an expensive

3  house.  You'll find, when you get out, $170,000 doesn't

4  buy as much as you think it does, at least around here.

5  But your crime was in part a crime of calculation, that

6  this was a good way to make money, and I think a

7  monetary penalty is an appropriate part of it.

8        So those are the reasons for the sentence.  I

9  don't regard the government's recommendation of 70

10  months as at all unreasonable.  I seriously considered

11  it.  I certainly think 5 years would have been well

12  within the range of reason.  But my obligation is to

13  give the sentence that I find is sufficient and no more

14  than necessary and because this is apparently about the

15  first case of its kind, I think, for you, the 3 years is

16  the most appropriate sentence.

17        But for your sake, um, I hope that you don't have

18  to see me again because Probation's moved to revoke your

19  supervised release.  If that occurs, I'll vividly

20  remember that I gave you a sentence below the guideline

21  range, the sentencing manual tells me I should take that

22  into account in deciding what the sentence is the next

23  time, and you and Mr. McGinty may not be as successful

24  next time.

25        So I'm sure, as you stand here today, you're

1    determined not to get into legal trouble again.  I hope

2    for your sake you sustain that commitment.

3         You may be seated.

4              (Defendant is seated.)

5              THE COURT:  Now the defendant has been

6    sentenced and ordinarily, absent certain prudent

7    circumstances, the defendant is detained pending

8    possible appeal.

9         What's the government's position with regard to

10   bail?

11             MS. SEDKY:  Your Honor, the government asks

12   that Mr. Harris be remanded to custody at this point.

13   We raised the same arguments after his conviction

14   pending his sentence and we think that the risk of

15   flight is even higher now that he has had his post-trial

16   motions denied and the sentence imposed.

17        I think he has his -- the PSR indicates that he

18   has property that he owns free and clear in Hong Kong,

19   real property.  Our own investigation showed -- we

20   didn't get that evidence in the trial, but he made

21   significant cash transfers to Hong Kong during the

22   pendency of his criminal conduct.  So he clearly has

23   means and assets.  In Hong Kong his wife is a Hong Kong

24   resident.

25        We think that this is a very different

1    cost/benefit analysis than it was three months ago when

2    he wasn't sure whether he was going to get sentenced at

3    all.

4              THE COURT:  All right.  Well, this is an issue

5    that arises under Section 3143(b).  I discussed the

6    standards in yet another *DiMasi* decision last year, 817

7    F. Supp. 2d 2 at 9:  "To be released the defendant must

8    show by clear and convincing evidence he'll not flee or

9    be dangerous and the defendant must prove that an appeal

10   will involve a substantial question of law or fact

11   likely to result in reversal or a new trial and a lower

12   sentence.  And a substantial question is a close

13   question.  I don't have to be persuaded I'm wrong, just

14   that there's some important material issue that

15   reasonable judges could decide differently.  I could go

16   either way and it would not be a harmless error.  If

17   it's a legal issue, um, preserved errors in jury

18   instructions are analyzed one way and those not

19   preserved are analyzed under the plain error doctrine."

20        Mr. McGinty, what is your position with regard to

21   detention pending appeal?

22              MR. McGINTY:  Well, your Honor, there's two

23   components, there's the ordinary request that he be

24   permitted to self report and then there's the second one

25   which was whether he would remain out pending the

1     appeal.

2          Um, with respect to the latter --

3              THE COURT:  And, actually, let me jump ahead.

4     What I might do in this case, subject to hearing from

5     the government, is if I order him detained pending

6     appeal, I would give him a date to self report, and I

7     would probably stay the decision, so if you wanted to,

8     you could go to the Court of Appeals.  That's one of the

9     -- I did that with Mr. DiMasi and I might do the same

10    thing here.  So it's one of the options which preserves

11    the self-reporting option.  But go ahead.

12             MR. McGINTY:  When Mr. Harris came here today,

13    um, he was fully mindful, I had spoken to him about

14    this, that he faces sentencing and that his freedom

15    could be revoked at the conclusion of the hearing.  I

16    told him that the government would likely move for

17    that.  I didn't want him to be surprised.  So under the

18    circumstances, he was aware that coming here today was,

19    in effect, potentially surrendering himself.  The best

20    measure of whether or not he is a flight risk is not

21    only the period that the Court entrusted him, which was

22    the period up until today, but also that today he came

23    and faced those consequences.

24         Um, here we have, over the course of this case,

25    tried to raise a number of issues which, um, the Court

```
1   differed with, ruled against us on a significant number
2   of those, but on occasion the Court did rule in our
3   favor, for example, with respect to the conspiracy
4   charge.  Um, we view the case as being, as the Court
5   said just a short time ago, as being a novel case
6   raising issues that were consequential and --
7              THE COURT:  And I actually -- I want to be
8   clear about that.  I don't think the legal issues that
9   this case went to the jury on were novel, that most of
10  the legal issues relating to the conspiracy charge -- I
11  granted the motion for acquittal, and as I said in the
12  order I issued yesterday, I believe this case involves a
13  straightforward application of well-established
14  jurisprudence concerning wire fraud.  And when I gave
15  the instructions, the only -- and I reviewed the draft
16  of the transcript to refresh my memory.  When I
17  instructed on the 29th, you thought I had failed to
18  mention cooperating witnesses in my immunized witness
19  instruction, I think I did, but I repeated it, and then
20  when the jury asked me to instruct them again on wire
21  fraud the next day, you said that you thought I hadn't,
22  on the 29th, said to the jury that a person "may be
23  found" -- something to this effect, you know, "may be
24  found to intend the natural and probable consequences of
25  his deliberate conduct."  I had told them that the day
```

1    before.  Those are the only two objections that we --

2    that, as I understand it, the First Circuit would regard

3    as preserved and not subject to plain error analysis.

4            MR. McGINTY:  But there's also the separate

5    issue of the -- what we call the *Sabinski* issue.  In

6    *Sabinski* the First Circuit had expressed quite clearly,

7    um, that wire fraud, mail fraud is an elastic charge

8    that does have boundaries, that prosecutors use it as

9    sort of a plenary charge.  But there are due process

10   boundaries on the limits of what, um -- of what --

11           THE COURT:  Is *Sabinski* a case you've cited

12   before?

13           MR. McGINTY:  We've cited it a number of

14   times.  In fact, I put it on a headnote of a motion to

15   dismiss, I captioned it above the motion to dismiss.

16   And *Sabinski* related to an IRS worker --

17           THE COURT:  I'm sorry.  What?

18           MR. McGINTY:  He was an Internal Revenue

19   Service --

20           THE COURT:  Here, hold on just a second.  Let

21   me get it.

22           (Pause.)

23           THE COURT:  Go ahead.

24           MR. McGINTY:  *Sabinski* was an IRS worker who

25   had accessed without authorization, um, numerous files

1   relating to persons who had filed their returns.  Um, he

2   was charged with both computer fraud and also with wire

3   fraud.  His conviction was reversed by the First Circuit

4   expressing a concern about how wire fraud is used in --

5   by the prosecutors to embrace conduct that ought not be

6   within its boundaries.

7        Now, **Sabinski**, is, I think, a sort of a Clarion

8   call that there are boundaries and that wire fraud does

9   exist within constraints and our whole argument here has

10  been from the start that if a person generates an

11  application, um, the manner of use by another person of

12  that application is not the stuff of a wire fraud

13  conviction.  We've raised a notice issue, we've raised

14  it by, in a motion to dismiss, we've raised it again in

15  the motion for a new trial after trial, raising this

16  notice issue that Mr. Harris would be fairly apprised of

17  this conduct given what amounted to a long list of civil

18  cases where even there applications by third parties

19  don't raise issues of civil liability, let alone

20  criminal liability.

21        That issue, in our view -- and the Court doesn't

22  view this as a consequential issue, but in our humble

23  view, it's --

24            THE COURT:  Oh, I know it's consequential, the

25  question is whether it's a close question.  I know

1    you're not trying to get me to confess that I made

2    errors as recently as yesterday, but just to cause me to

3    believe that reasonable judges might disagree.

4         Go ahead.

5              MR. McGINTY:  And just as this is a new type

6    of prosecution, the Court's view is that this is sort of

7    garden-variety wire fraud, um, under different facts,

8    um, our view is the facts matter and a notice to

9    Mr. Harris about whether or not his conduct was unlawful

10   is a matter of constitutional notice significance.

11        So that is among the issues that we've raised.

12   The Court rather clearly, um, disagrees.  It is a

13   daunting prospect to go before a judge and say that "I

14   would like you to make a finding and you're likely to be

15   the first," um, and I understand that maybe that's

16   rather a tough proposition to put to a trial judge, but,

17   um, this is a case that, um, I would respectfully

18   submit, merits, before he pays the penal consequence,

19   merits consideration by the Court of Appeals first.

20   And, you know, under those circumstances where he has so

21   earnestly attempted to convey to the Court his intent to

22   abide by the conditions set by this court, um, I would

23   respectfully request that the Court consider, um, that

24   stay so it can be --

25              THE COURT:  Well, I'm inclined to find that

1    there's clear and convincing evidence he's not going to

2    flee or be a danger.  And as I said, as I wrote in

3    *DiMasi*, relying primarily on the First Circuit decision

4    in *Bako*, that you don't have to persuade me that I think

5    I'm going to be reversed, you have to persuade me that

6    reasonable people might differ.  But as I wrote in the

7    order I issued yesterday, there were many cases

8    involving other technologies where people were convicted

9    under the wire fraud statute going back, I think, to the

10   1960s with telephones and then with cable scramblers.

11   And the other thing that's important, in my conception,

12   is the jury instructions.  The jury was instructed that

13   it had to find beyond reasonable doubt that, among other

14   things, Mr. Harris knew that his conduct was unlawful,

15   and I'm very comfortable with the -- you know, both the

16   quantity and the credibility of the evidence from which

17   the jury could have made that finding.

18        So that's what makes the vagueness argument

19   challenging for you at this point.

20        Does the government want to be heard?

21        I'm sorry.  Do you want to say some more?

22        MR. McGINTY:  I -- what I was going to say is

23   that unlawful -- um, something can be unlawful civilly,

24   it can be unlawful criminally.  Um, the Court's finding

25   with respect to whether something -- whether he knew

1    something could engender some kind of civil response

2    from the aggrieved party filing the complaint is

3    different from whether he knew it to be criminal.  And

4    here, um, I would respectfully submit that all of the

5    plugs -- all of the single application devices, um, that

6    were the predicates for convictions in the cases the

7    Court refers to are not relevant to this, which is a

8    multiple use application where the person using the item

9    makes a choice, an election about how it's going to be

10   used, and I respectfully submit that that's a

11   significant difference that differentiates this case

12   from each of those.

13            THE COURT:  Does the government want to be

14   heard on this?

15            MR. BOOKBINDER:  Very briefly, your Honor.

16   I'll address this since I've dealt with this issue I

17   think more than Ms. Sedky in the past, and we have an

18   easier job here, um, trying to persuade you that you

19   were right yesterday.  But I think it is exactly as you

20   described, which is that to the extent there were tricky

21   legal issues in this case, they were surrounded in a

22   conspiracy charge and while we didn't agree with the

23   decision at the time, um, it certainly simplified

24   matters here, that you were denying that charge, and

25   therefore all we have to deal with is wire fraud, which

is a fairly straightforward application of the statute.

And, you know, Mr. McGinty can suggest that this was a multi-use product and that makes it different from many other cases the Court cited or the government mentioned earlier involving other technologies.  Um, he can argue that, but I'd suggest the evidence simply didn't support it.  The evidence was that this product -- the products Mr. Harris sold had one purpose, it was to help someone steal cable internet access.  And in light of what the evidence was and the simpler law that applies to wire fraud, well, obviously they're entitled to pursue any issue they'd like on appeal, um, but I would suggest it certainly doesn't rise to the level of an issue that requires release pending appeal.

Finally, since this case was not extremely long, it is certainly long enough, and this is not a situation where the sentence is going to be served even before the appeal is decided in this case.  So I'd ask the Court to deny the request for release pending appeal.

THE COURT:  Well, I'm going to take a break. I want to think about this a little further.

Mr. Harris, you're not to leave that seat.  Okay?

THE DEFENDANT:  Okay.

THE COURT:  The Court is in recess.

(Recess, 3:45 p.m.)

1          (Resumed, 4:00 p.m.)

2          THE COURT:  For the reasons I'll describe, the

3    defendant's request to be released pending appeal under

4    Section 3143(b) is denied, however I am going to stay

5    the decision until the day after Labor Day, which I

6    believe is September 4, to permit the defendant to seek

7    a stay from the First Circuit, if he wants, or to report

8    to the institution designated by the Attorney General of

9    the United States if he decides on reflection that he'd

10   like to get this over with.

11          The standards, as I said, I had occasion to write

12   about last year in **United States vs. DiMasi**, 817 F.

13   Supp. 2d 9.  "First, the defendant must show by clear

14   and convincing evidence that he will not flee or pose a

15   danger to the community if he's released pending

16   appeal.  If he does that, he must also prove that the

17   appeal raises a substantial question of law or fact

18   likely to result in a reversal, a new trial, or a lower

19   sentence.  And a substantial question is a close

20   question, a question that could go either way, a

21   question that reasonable judges might differ on.  If

22   there is that required close question, it has to be

23   about a matter that wouldn't, in effect, constitute

24   harmless error, it has to be an error of the sort that

25   would entitle the defendant to some relief."

1           Perhaps, although I don't think this is decisive,

2      but with regard to alleged errors of law in the jury

3      instructions, the First Circuit has held that preserved

4      claims of instructional error are reviewed under a

5      two-tiered standard.  It considers de novo whether an

6      instruction embodied an error of law, but it reviews for

7      abuse of discretion whether the instructions adequately

8      explained the law or whether they tended to confuse or

9      mislead the jury on the controlling issue.  If an error

10     was made in a jury instruction, it is generally subject

11     to harmless error review.

12          With regard to this idea of plain error, the First

13     Circuit, in cases like *Meadows*, 571 F.3d 131 at 136, has

14     said that:  "To preserve an objection to a jury

15     instruction under Rule 30(d) a litigant must lodge a

16     specific objection and state the grounds for the

17     objection after the Court has charged the jury and

18     before the jury begins deliberations.  Objections

19     registered during precharge hearings are insufficient to

20     preserve the issue.  We review such unpreserved jury

21     instruction claims for plain error review."

22          After the jury instructions were given for the

23     first time, on February 29, the defendant only objected

24     to the government's instruction regarding cooperating

25     witnesses being under, I think, the misimpression that I

1   hadn't embraced them in my instruction on immunized
2   witnesses and I believe I repeated what the defendant
3   wanted.  But in any event, that was one objection.
4        I instructed the jury on wire fraud again on March
5   1st.  I repeated virtually verbatim what I had said the
6   day before.  The defendant had one objection on March 1
7   to the instruction that said, in effect, that a person
8   may be found to intend the natural and probable
9   consequences of something he did deliberately.  That was
10  the same language I used on February 29th.
11       I'm satisfied, by clear and convincing evidence,
12  that Mr. Harris will not -- is not likely to flee or be
13  a danger to the community if he's released.  I -- it was
14  a close question as to whether to release him after his
15  conviction.  I was promised that he would immediately
16  return to Oregon, that he would obey the conditions of
17  his electronic monitoring, that he wouldn't engage in
18  any more crimes, and he's done all that and he did come
19  here today and, I find, recognizing the substantial
20  likelihood he would be sentenced to prison and the real
21  risk that he'd be locked up today, and he came.  So I'm
22  satisfied with regard to the first prong.
23       The defendant has not satisfied the requirement
24  that any appeal will present a close question.  There
25  was a lot of discussion about legal issues before and

1    during the case, but most of them related to the

2    conspiracy count which I dismissed on the defendant's

3    motion for a judgment of acquittal.  All that remained

4    were the wire fraud counts.  The defendant was convicted

5    on seven of the eight.

6         The issue that the defendant characterized as a

7    "close question" here today is the question of whether

8    the wire fraud statute was unconstitutionally vague and

9    deprived him of the fair notice as applied to the

10   particular facts of this case.  I addressed this

11   contention in one of the two orders I issued yesterday,

12   June 26th, 2012, and it's docket number 161.  As I wrote

13   in that order:  "The wire fraud claims in this case

14   involve a straightforward application of the wire fraud

15   statute to relatively new technology.  However, going

16   back at least to 1967, the wire fraud and mail fraud

17   statutes have been applied to schemes that employed

18   technology to steal telephone service and cable

19   service."

20        Applying those statutes -- in this case the wire

21   fraud statute, to schemes to deprive Internet service

22   providers of revenue is an obvious logical next step.

23   Significantly I instructed the jury that it had to find

24   beyond a reasonable doubt that the defendant acted

25   knowingly, meaning intentionally, willfully, meaning

1    that he knew his conduct was unlawful, and with intent

2    to defraud, in order to convict and the jury did convict

3    on seven counts and returned a discerning verdict

4    acquitting him on the eighth, which I have expressed

5    some reservations about.  The evidence was far more than

6    is sufficient to prove knowing, willful, and intent to

7    defraud.  I not only defer to the jury's verdict, I

8    fully agree with it both in the assessment of

9    credibility and with regard to the sufficiency of the

10   evidence.

11        I did, during the break, read *Sabinski* again, 106

12   F.3d 1069.  I recognize that there are some limits to

13   the wire fraud statute.  There are limits that are

14   rooted in the terms of the statute.  In *Sabinski*, the

15   First Circuit held that merely accessing confidential

16   information did not deprive the Internal Revenue Service

17   of property as required to prove wire fraud.  The First

18   Circuit, at Page 1074, said that:  "Binding precedents

19   and good sense support the conclusion that to deprive a

20   person of their intangible property interest" -- here

21   about confidential information, "either some articulable

22   harm must befall the holder of the information as a

23   result of the defendant's activities or some gainful use

24   must be intended by the person accessing the

25   information, whether or not this use is profitable in

the economic sense."

The defects in *Sabinski* don't exist in this case. The government proved both articulable harm to the internet service providers -- they lost revenue, people stole service that they otherwise would have been required to pay for, and the government also proved a benefit to the defendant, an economic benefit, he made money, hundreds of thousands of dollars.

So *Sabinski*, in my mind, is distinguishable on its facts and in applying established jurisprudence I don't perceive a competitive void-for-vagueness argument. However, since I find, by clear and convincing evidence, that the defendant is not likely to flee or commit other crimes if he's released, I think it's prudent and appropriate to stay the order that he be detained pending appeal to give Mr. Harris and his counsel an opportunity to reflect on all of this and decide whether they would like to promptly appeal this decision denying bail pending appeal, and to give the First Circuit time to decide it.

I am ordering that Mr. Harris return to Oregon no later than tomorrow and that Pretrial Services be informed and inform me no later than Friday that he's back at his home on electronic monitoring.  I'm continuing the release on the same conditions.

 1    Basically I want to know no later than say 11:00, 12:00

 2    on Friday, the 29th, that he's back on electronic

 3    monitoring.

 4              PRETRIAL SERVICES OFFICER:  Yes, your Honor.

 5              THE COURT:  I'm ordering that Mr. Harris

 6    report to the institution designated by the Attorney

 7    General of the United States by 12:00 on September 4,

 8    2012, the day after Labor Day, unless the First Circuit

 9    has decided that he's entitled to a stay pending

10    appeal.  If for some reason the First Circuit hasn't

11    decided the matter, Mr. Harris can come back to me and I

12    may grant an extension.  In other words, I have

13    sufficient confidence that my ruling is correct, but I

14    don't want to preempt an opportunity for it to be

15    reviewed in the circumstances.

16         All right.  Mr. Harris, are you going to go home

17    and report to the institution designated by the Attorney

18    General on September 4 if the First Circuit or I don't

19    give you more time?  Are you going to do that?

20              THE DEFENDANT:  Yes, your Honor, I will.  I

21    promise.

22              THE COURT:  All right.  Once again I'm relying

23    on you being wise this time because if there's any

24    problem whatsoever, I'm going to issue a warrant for

25    your arrest, they'll find you --

1            THE DEFENDANT:  Your trust is well placed,

2    your Honor.

3            THE COURT:  All right.  Anything further for

4    today?

5            MR. BOOKBINDER:  Your Honor, just a matter of

6    housekeeping.  In the indictment there is a forfeiture

7    allegation in this case.  Obviously we're not pursuing

8    that at this point.  We did some investigation and there

9    wasn't any asset worth forfeiting.  So that isn't

10   something we're pursuing.

11           THE COURT:  All right.  So should I dismiss

12   the request for forfeiture?

13           MR. BOOKBINDER:  Yes, your Honor.

14           THE COURT:  It is dismissed.

15       Mr. McGinty, anything further?

16           MR. McGINTY:  No, your Honor.  Thank you.

17           THE COURT:  All right.  The Court is in

18   recess.

19           (Ends, 4:15 p.m.)

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5   hereby certify that the forgoing transcript of the

6   record is a true and accurate transcription of my

7   stenographic notes, before Chief Judge Mark L. Wolf, on

8   Wednesday, June 27, 2012, to the best of my skill and

9   ability.

10

11

12
    /s/ Richard H. Romanow 11-07-12
13  _____
    RICHARD H. ROMANOW  Date
14

15

16

17

18

19

20

21

22

23

24

25